**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JESSICA RAMSAY,      :
    Plaintiff     :
           :
    v.       :  CIVIL ACTION NO. 19-2002
           :
NATIONAL BOARD OF MEDICAL  :
EXAMINERS,      :
    Defendant   :

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## Introduction

Plaintiff Jessica Ramsay, a medical student who has successfully completed three years of medical school, is being blocked by defendant, National Board of Medical Examiners ("NBME"), from completing her medical school education, and becoming a physician. Ms. Ramsay needs extended testing time on tests administered by NBME because she has dyslexia and Attention-Deficit Hyperactivity Disorder.[1]  She must pass the first NBME test – "Step 1" – in order to move on to her fourth year of medical school and to apply for residency programs; and she must take and pass other NBME "Step" examinations in order to graduate and be licensed.   NBME is required under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act[2] to provide her with the extended testing time that she needs, but NBME has

---

[1] Dyslexia and ADHD, and the diagnostic criteria for each, are discussed in more detail in the Declaration of Robert D. Smith, Ph.D. ("Smith Declaration") filed together herewith, and below at pages 12-15.

[2] At p. 12 n. 7 of its Answer to the Complaint, NBME "denies that the Rehabilitation Act applies."  Ramsay's claims arise under both the Rehabilitation Act and Title III of the ADA. Both Title III of the ADA, and the Rehabilitation Act, provide for injunctive relief, and are governed by the same substantive standards. *See, e.g., Bragdon v. Abbott,* 524 U.S. 624, 631-32 (1998).  Only the Rehabilitation Act provides for damages, but that question need not be resolved at the preliminary injunction stage.

refused to do so.  Now with her medical career in the balance and a deadline of December 2, 2019 for her to schedule the test, and March 2, 2020 to take the test, or be dismissed from medical school, an injunction requiring NBME to provide the needed accommodations is the only remedy for this wrong.

* * *

Ms. Ramsay has dreamed of being a physician for many years, and is well qualified.  As a third year student, she was chosen by her classmates for membership in an honor society made up of medical students who have been identified as possessing outstanding clinical and interpersonal skills.[3]  Like all students in M.D. programs in the United States, she must pass a series of tests administered by NBME which are collectively known as the "United States Medical Licensing Examination" or "USMLE."  Dyslexia and ADHD affect her performance on reading-intensive timed examinations like the USMLE examinations.  In order to advance to the fourth year of medical school, she must take and pass Step 1 of the USMLE.  In order to graduate from medical school, she must take and pass two more parts of USMLE – Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills).  In order to become licensed as a physician after graduation, she must take and pass Step 3 of USMLE.  Ms. Ramsay will need accommodations for all of the USMLE Step examinations including Step 1, for which she needs a three month scheduling window prior to the March 2, 2020 deadline set by her school.

Ms. Ramsay's medical school has provided 100% extended testing time (double time) on examinations that the school itself administers, a standard testing accommodation for medical students with disabilities like Ms. Ramsay, but NBME has repeatedly refused Ms. Ramsay's request for extended testing time on Step 1.  After NBME's first refusal, Ms. Ramsay's medical

---

[3] Declaration of Jessica Ramsay ("Ramsay Declaration"), filed together herewith, at ¶3.

school advised her to attempt Step 1 without extended time, because of the negative impact that delay in testing would have on her ability to continue towards graduation.  She followed that advice, but she was unable to read a significant number (about 30 to 35 percent) of the questions within the allowed time,[4] and failed Step 1.[5]  Ms. Ramsay then submitted additional information and requested accommodations from NBME a second time; NBME refused again.  Ms. Ramsay then used NBME's internal "appeal" process, and was turned down a third time.  Even if Ms. Ramsay were to attempt Step 1 again now, without extended time, and were now to pass that test, she would be faced with the same barrier when she moved on to the subsequent Step examinations, which are more reading-intensive than Step 1.

Because of NBME, Ms. Ramsay's graduation from medical school has been delayed three years and now she is out of time.  She must take Step 1 before March 2, 2020, and medical students require three months lead time to schedule and prepare for exam administration, meaning that NBME must cease withholding of necessary accommodations no later than December 2, 2019 or her medical career is over.  She cannot advance without a passing score on Step 1.  She cannot graduate and become licensed without passing scores on Step 2 CK and CS, and Step 3, as well.  She cannot match to an appropriate residency training program, without

---

[4] Ramsay Declaration, ¶28.  On practice examinations for a subsequent USMLE Step, Step 2 CK, the number of questions that Ms. Ramsay is unable to read was even larger – more than half of all the questions – because Step 2 CK has longer and denser reading requirements. Ramsay Declaration, ¶29.

[5] The fact that Ms. Ramsay failed the Step 1 examination by a single point does not mean that she does not need accommodations.  As already noted, she was unable to read about 30 to 35 percent of the questions, which means that her score for Step 1 did not reflect her true level of competency, even apart from the question of the pass/fail cutoff.  (NBME subsequently raised the pass/fail cutoff.)  NBME admits in paragraph 16 of its Answer to the Complaint "on information and belief that scores on USMLE Step 1 are considered by medical residency training programs during the residency selection process."  Therefore, even a passing score is harmful if it is so low that it does not fairly reflect the student's true level of knowledge.

scores that adequately reflect her true level of knowledge.  Ms. Ramsay is in danger of losing her chance to ever become a physician.  An injunction is the only possible remedy.  Without an injunction, the damage caused by NBME's refusal – damage that is also against the public interest – will become incalculable and incurable.

### Summary of Facts

Ms. Ramsay is a medical student at the Homer Stryker M.D. School of Medicine of Western Michigan University ("WMed").  She began the four-year program leading to the M.D. degree in 2014, and would have graduated more than a year ago, except for the refusal of NBME to provide her with the needed testing accommodations for the examinations.

Students at "allopathic" medical schools, *i.e.,* schools that confer the M.D. degree, are required to pass four examinations which are collectively referred to as the United States Medical Licensing Examination or "USMLE."  These examinations are referred to as "Steps": Step 1, Step 2 CK (Clinical Knowledge), and Step 2 CS (Clinical Skills) must be passed before graduation, and an additional examination, Step 3, must be passed after graduation and before licensing.  *See generally* "Eligibility for the USMLE Steps."[6]  Ms. Ramsay has not yet been able to pass the Step 1 examination, but if she does pass, she will also need accommodations for the subsequent Step examinations.  Subsequent Step examinations are more reading-intensive than Step 1.[7]

---

[6] Found on the Internet at https://www.usmle.org/pdfs/bulletin/QF_Eligibility.pdf.  The timing and sequence for taking and passing each Step examination is spelled out by the medical school.  At WMed, Step 1 is required before the student begins "advanced clerkships" which are 4th year specialty rotations.  *See* WMed Medical Student Policy Manual (found on the Internet at https://wmed.policytech.com/dotNet/documents/?docid=1589&public=true) at 113.  Step 2 CK and Step 2 CS are required by February 1 of the year of graduation.  *Id.* at 114.

[7] Ramsay Declaration, ¶29.

Ms. Ramsay has dyslexia[8] and Attention-Deficit/ Hyperactivity Disorder.[9]  Both of these conditions affect her ability to take reading-intensive standardized and time-limited written examinations like those administered by NBME.[10]  WMed has provided her with testing accommodations for tests administered by the school,[11] including 100% extended testing time ("double time"), but NBME has refused to provide the needed accommodations.  As a result, Ms. Ramsay has been forced to take a leave of absence from WMed.  This leave of absence has now continued for two years, and has delayed her graduation date by three years while she has repeatedly sought and been denied necessary accommodations by NBME.[12]  Now, Ms. Ramsay is out of time. WMed has refused to extend her leave of absence beyond March 2, 2020.[13]  This means that Ms. Ramsay must be cleared to take the exam with accommodations three months in advance of that date, or December 2, 2019.

---

[8] More formally, Specific Learning Disorder with impairment in reading (developmental dyslexia):  reading comprehension, severely impaired reading rate and fluent word recognition, which has the diagnostic code 315.00 in the 5th edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5).  Developmental dyslexia also has the diagnostic code F81.0 in the 10th edition of the International Classification of Diseases, Clinical Modification (ICD-10-CM) published by the World Health Organization and the National Center for Health Statistics.  DSM-5 and ICD-10 are widely used standard references, and are accepted as such by the defendant in this action.  *See* Smith Declaration, ¶¶6, 23.

[9] More formally Attention-Deficit Hyperactivity Disorder, Combined Presentation, DSM-5 314.01 and ICD-10 F90.2.  *See* Smith Declaration, ¶27.  (In the past, ADHD was sometimes referred to as Attention Deficit Disorder, as in one of Ms. Ramsay's earlier evaluations.)

[10] Further details are provided in the Smith Declaration, and below at pages 12-15.

[11] This includes "shelf examinations" which are subject-matter examinations created by NBME and given in the third year, but administered by the school.  WMed is able to provide Ms. Ramsay with extended testing time for shelf examinations, but not for USMLE Step examinations.

[12] Ramsay Declaration at ¶¶34-36.

[13] *See* WMed's decision on the leave of absence, Ramsay Declaration, Exhibit B.

Ms. Ramsay has exhausted every possibility for convincing NBME, through NBME's own review process, to grant the testing accommodations that she needs and that NBME has provided to other students.  She first applied for accommodations more than two years ago, in December 2016.  NBME refused in March 2017.  WMed advised Ms. Ramsay to attempt the first of the required "step" examinations, without extended time, in July 2017 and she received a failing score.  Ms. Ramsay applied to NBME again in June 2018; NBME said no in September 2018;[14] Ms. Ramsay "appealed"[15] the ruling in December 2018; NBME rejected Ms. Ramsay's appeal in February 2019, and again in March 2019.[16]  An injunction from this Court is now the only path open for Jessica Ramsay to obtain the testing accommodations that she needs.

## Argument

A.    **This Case Is Governed By Both the Americans With Disabilities Act and the Rehabilitation Act, Both of Which Require That Testing Providers Like NBME Provide Accommodations To People With Disabilities.**

Both Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12181-12189, and Section 504 of the Rehabilitation Act, 29 U.S.C. §794, prohibit discrimination on the basis of disability.  *See, e.g*., *Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998).  The two federal

---

[14] Ms. Ramsay also suffers from a medical condition known as "deep vein thrombosis" and from migraine headaches.  On Ms. Ramsay's second application, NBME granted extended break time, and testing in a private room, as accommodations for these two conditions, but refused Ms. Ramsay's request for extended testing time for her dyslexia and ADHD.  *See* Test Accommodations letter dated September 11, 2018 from Constance Farmer, Psy.D. ("Farmer"), NBME's Director of Disability Services, Smith Declaration, Exhibit C.

[15] The "appeal" is an internal  process in which NBME reconsiders its own decision.  *See* https://www.usmle.org/test-accommodations/guidelines.html, "Reconsideration."  Appeals or reconsideration request require "new substantive supporting documentation, and therefore Ms. Ramsay obtained and submitted a new evaluation by Dr. Smith which is discussed in the text.

[16] Ramsay Declaration, ¶¶32-33; Smith Declaration, Exhibit E.

statutes are generally analogous,[17] and therefore the remainder of this discussion will focus on the ADA.

An individual has a disability if he or she is substantially limited in a major life activity. 42 U.S.C. §12102.  The Department of Justice has explained that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  28 C.F.R. §36.105(a)(2)(i).  Courts regularly construe dyslexia and ADHD as disabilities that substantially limit the major life activities of reading, writing, learning, and concentrating.  *See, e.g.*, *Vinson v. Thomas*, 288 F.3d 1145, 1153-54 (9th Cir. 2002); *Karlik v. Colvin,* 15 F. Supp. 3d 700, 707 (E.D. Mich. 2014).

Title III of the ADA requires that testing providers, like NBME, "offer such examinations . . . in a place and *manner* accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. §12189 (emphasis added).  The U.S. Department of Justice regulations interpret this provision of the ADA to require that

> The examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. §36.309(b)(1)(i) (emphasis added).

When considering what accommodations are necessary for the test to "best ensure" that the test measures the applicant's ability rather than his or her disability, the testing entity must

---

[17] The main difference is that the Rehabilitation Act provides for damages, while Title III of the ADA does not.  NBME claims that it is not subject to the Rehabilitation Act, *see* p. 1 n. 2, *supra*, but that is not an issue that needs to be resolved at this preliminary injunction stage.

give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations. . . ."  28 C.F.R. §36.309(b)(1)(v).  Here, Ramsay is asking for the same accommodation – extended testing time – that she has received from her own medical school for similar examinations.

The regulations further state that the testing entity "must assure that * * * * [a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested." *Id.* §36.309(b)(1)(iv). Here, Ramsay has documented the accommodations that she already received from her school, and has also provided ample documentation of her dyslexia and ADHD.  The regulations state explicitly that "[r]equired modifications to an examination may include changes *in the length of time permitted for completion of the examination* and adaptation of the manner in which the examination is given."  *Id.* §36.309(b)(2) (emphasis added).

Courts analyzing the regulation have made clear that testing entities must provide the testing accommodations "so as to best ensure" that the results reflect whatever skill or aptitude the exam purports to measure.  *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011) (quoting 28 C.F.R. §36.309).  This "best ensures" standard is distinct from the "reasonable accommodation" standard used in the employment discrimination context. *Id*.

Courts give considerable weight to expert evaluations of the person with a disability and his or her prior history of accommodations.  For instance, in *D'Amico v. New York State Board of Law Examiners*, 813 F. Supp. 217 (W.D.N.Y. 1993), the Court granted a preliminary injunction, taking the view that the opinion of the plaintiff's physician must be given great weight and that the absence of a medical expert reviewing on behalf of the testing agency left it

in "no position to countermand . . . as to what is the appropriate accommodation." *Id.* at 222-23.

*See also Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp.2d 86, 87 (D. Mass. 1999).

## B.    Plaintiff Meets the Standards for a Preliminary Injunction.

The standards for granting a motion for preliminary judgment have been summarized by

this Court in several prior cases including *Hall v. Wetzel,* 2018 U.S. Dist. Lexis 28991 (E.D.Pa.

2018), *quoting ACLU v. Black Horse Pike Regional Board of Education*, 84 F.3d 1471, 1477, n.2

(3d Cir. 1996), *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994) and *SI Handling Systems,*

*Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985):

> Four factors govern a district court's decision whether to issue a
> preliminary injunction: (1) whether the movant has shown a reasonable
> probability of success on the merits; (2) whether the movant will be
> irreparably injured by denial of the relief; (3) whether granting preliminary
> relief will result in even greater harm to the nonmoving party; and
> (4) whether granting the preliminary relief will be in the public interest.

*Hall v. Wetzel, id.,* at *14.

In this case, as discussed in more detail below:

- The reasonable probability of success on the merits in this case is amply

  demonstrated by several factors including the report of Dr. Robert Smith, which

  was submitted to NBME in December 2018.  Dr. Smith has also submitted a

  Declaration in support of the motion for preliminary injunction.  NBME itself has

  conceded that Dr. Smith's evaluation demonstrates "exceptionally low scores on

  timed reading tests."[18]  The United States Department of Justice has declared that

  "Reports from qualified professionals" – like Dr. Smith – "who have evaluated

---

[18] NBME letter from Dr. Farmer (2/14/2019) at p. 2, attached to the Smith Declaration as
Exhibit E,

the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate."[19]   No one from NBME  has evaluated Ms. Ramsay face-to-face as Dr. Smith did.   NBME's purported justification for disregarding Dr. Smith's report, and Ms. Ramsay's "exceptionally low scores," is without any factual basis, and is contrary to the ADA itself.

- The irreparable injury in this case is demonstrated by the fact that Ms. Ramsay has already failed the Step 1 examination because of NBME's refusal. Ms. Ramsay's medical education and graduation has been delayed three years, and now her entire future hangs in the balance of this motion. She cannot move forward without the accommodations that she needs for the USMLE examinations and she will be dismissed from medical school if she does not take Step 1 before March 2, 2020.

- NBME will not be harmed.  Extended testing time is an accommodation that NBME has granted in other cases.  It is not logistically difficult to provide, in general, and even less so in this specific case.  In Ms. Ramsay's case, NBME has granted Ms. Ramsay extended break time[20] and testing in a private room because of other medical conditions.  Because of the extended break time, Ms. Ramsay

---

[19] United States Department of Justice, "Testing Accommodations," found on the Internet at http://www.ada.gov/regs2014/testing accommodations.pdf, at p. 7.

[20] Extended break time does not affect the amount of time that a student has to read and answer questions.  It is a different accommodation, and one that is commonly granted – as in this case – to students who require longer and more frequent breaks, from the time spent answering questions.  NBME granted Ms. Ramsay extended break time because of two medical conditions, deep venous thrombosis and migraine headaches.  However, NBME refused to grant extended testing time, which Ms. Ramsay needs because of dyslexia and ADHD.

will take the Step 1 examination over 2 days instead of the customary 1 day, and in a private testing room. Increasing the amount of time allotted for answering questions by 100 percent (double time) still allows for the examination to be taken over 2 days, and does not require additional days of testing. All that is required is for NBME to direct the test center to increase the amount of time allotted for answering questions.

- There is a clear public interest both in enforcement of the ADA, and in enabling qualified people like Ms. Ramsay to pursue her medical career.

No extended pretrial discovery is needed in this case. Ms. Ramsay has requested accommodations through NBME's internal processes four times. Ms. Ramsay will rely, in this litigation, on the same information that she has already submitted to NBME. A prompt hearing is needed because Ms. Ramsay is in danger of losing her entire career unless the NBME approves the necessary accommodations by **December 2, 2019** so that she is able to take the Step 1 examination with accommodations by March 2, 2020.

### 1. Ramsay Has Shown A Reasonable Probability of Success on the Merits.

The facts that demonstrate Ms. Ramsay's reasonable probability of success on the merits are contained in the report and Declaration of Dr. Robert Smith who is an expert in dyslexia.

Dr. Smith's thorough report is 31 pages in length, and is summarized in his Declaration and attached to the Declaration as Exhibit B. The full report was submitted to NBME as part of Ms. Ramsay's "appeal" of NBME's refusal to grant extended testing time.[21] Dr. Smith is an

---

[21] After NBME denied Ramsay's first application for accommodations, Ramsay took the Step 1 examination without accommodations, and failed. She applied again, and NBME denied her application again. NBME allows applicants to "appeal" or request reconsideration of decisions to refuse accommodations, and requires such applicants to submit "new substantive

experienced and licensed psychologist who holds a Ph.D. degree in Counseling Psychology from

Michigan State University and who specializes in dyslexia.  Dr. Smith interviewed Ms. Ramsay

(and also Ms. Ramsay's mother), to obtain information about Ms. Ramsay's life-long struggles

with reading speed and attention.  He tested Ms. Ramsay, using generally accepted standard

testing instruments, and applied generally accepted diagnostic standards to diagnose

Ms. Ramsay's reading and attention disabilities.  NBME did none of that, and simply ignored

Dr. Smith's findings, except to comment that her reading scores were "exceptionally low."

Dr. Smith's report stated the following with respect to Ms. Ramsay's reading disability:

> Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment. Jessica's overall basic reading skills are in the average range as measured by the WIAT-III [Wechsler Individual Achievement Test-Third Edition] Basic Reading Composite score of 96, which reflects word decoding skills under untimed conditions. She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits *persistently impaired reading rate and reading fluency compared to other adults her age*, as reflected in WJ-4 [Woodcock-Johnson IV Tests of Achievement], Reading Rate Cluster, the GORT-5 [Gray Oral Reading Tests – Fifth Edition], Fluency and the Nelson-Denny [Reading Test] Rate and Comprehension scores.

> . . . . Jessica's history and pattern of reading scores indicate and warrant a diagnosis of Specific Learning Disorder with impairment in reading that involves reading rate, reading fluency and reading comprehension. Her impairment in reading is exacerbated by the effects of ADHD. *The severity of her impairment in reading is severe.*

---

supporting documentation."  *See* Test Accommodations, Guidelines, Reconsideration, found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html.  Dr. Smith's report provided the additional documentation that NBME required, but NBME denied Ms. Ramsay's request again.

> *Double the usual time for any timed test is recommended because of Jessica's very slow reading speed and difficulty comprehending the content of passages. . . .*

Smith Report at 26-27 (emphasis added).

Dr. Smith stated the following with respect to Ms. Ramsay's attention disability:

> . . . .  Jessica's academic and behavioral history reflect DSM-5 diagnostic criteria indicating ADHD, Combined Presentation.
>
> Jessica reported often experiencing 17 of the 18 DSM-5 criteria symptoms associated with ADHD that have persisted for at least the past six months with most having been present since her earliest years in school. The persistently frequent manifestation of these symptoms was corroborated by her mother and her fiancé. On a systematic rating score of the frequency of occurrence of the DSM-5 ADHD symptoms, Jessica endorsed 17 (her mother, 14 and fiancé, 11) of the 18 criteria that are associated with a diagnosis of ADHD. Only 5 inattention or 5 hyperactive-impulsive symptoms are required to be frequently and persistently present over the previous six months. The ADHD symptoms described or endorsed by Jessica, her mother and fiancé are prominently exhibited at school, at her home and with her interpersonal relationships. These symptoms were reported by Jessica and corroborated by her mother to have interfered with and reduced the quality of her academic functioning and her daily adaptive functioning since her earliest school years.
>
> The available school records do not clearly reflect academic struggles in elementary, middle or high school, *but this is a result of the family obtaining help on an informal basis*, which was very successful in preventing poor academic grades, and therefore *masked the degree of struggle Jessica experienced during these years*. In addition, the specificity of Jessica's descriptions, which are corroborated by her mother, attest to the presence of such struggle. Although Jessica has worked hard at compensating for her deficits, her symptoms have continued to significantly interfere with her life. *Results of the IVA+Plus, a computerized test of sustained attention and distractibility, reflect a severe impairment compared to other adults her age.*[22] In addition, her WAIS-IV Processing Speed Index score at only the 8th percentile for her age reflects a weak cognitive efficiency highly associated with ADHD. *Jessica's symptoms are not better explained by any other psychiatric or medical condition. . . .*  Consequently, a diagnosis of ADHD, Combined

---

[22] Ms. Ramsay recorded scores with a percentile rank of 1 on the IVA+Plus test, *i.e.,* 99% of individuals in her age group had better scores.  *See* Smith Report at 12-13.

>       Presentation is warranted in addition to a Specific Learning Disorder with
>       impairment in reading.

Smith Report at 28-29 (emphasis and footnote added).

NBME will often deny test accommodations to students by claiming that their scores are "average" and therefore do not satisfy the requirements of the ADA. However, in Ms. Ramsay's case, NBME has conceded that her reading scores are "exceptionally low." *See* NBME letter rejecting appeal (February 14, 2019) at 2.[23]

The following are some examples of what Dr. Smith found, and what NBME simply ignored:

a.      Ramsay's WIAT-III[24] Oral Reading Fluency was at the 1st percentile. Smith Report at 16 and 18.

b.      Ramsay's WJ4 Reading Rate Cluster score of 66 was in the Far Below Average range, which is higher than only 1% of other individuals her age. Smith Report at 21.

c.      Ramsay's GORT-5[25] Fluency was at the 2nd percentile. Smith Report at 22.

d.      Ramsay "was only able to attempt 47% of the Nelson-Denny[26] Comprehension items during the standard time limit." Smith Report at 30.

---

[23] Smith Declaration, Exhibit E.

[24] Wechsler Individual Achievement Test – 3d Edition.

[25] Gray Oral Reading Tests – 5th Edition.

[26] Nelson Denny Reading Test.

    e.     Ramsay's WAIS-IV[27]-Processing Speed Index was at the 8th percentile, *i.e.,* greater than only 8 percent of same-aged individuals, a score which was 53 points (3.5 standard deviations) below her GAI[28] score of 132.  Smith Report at 10.

Simply stated, while Ms. Ramsay is a gifted medical student, almost everyone reads faster than Ms. Ramsay.  That is what the percentile scores mean.  Dr. Smith administered testing to Ms. Ramsay, and also met with her face-to-face, obtained a history, and applied his experience and training to conclude that Ms. Ramsay's reading disorder is severe.  Specifically, Dr. Smith concluded that Ms. Ramsay has a "Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition."  (DSM-5 315.00) (ICD-10 F81.0).  Smith Declaration, ¶23, and Smith Report at 29.

As described in his report, Dr. Smith also administered a test called the Test of Memory Malingering, for corroboration that Ms. Ramsay was making maximum effort.  As described in his report:

**Symptom Validity**

*Test of Memory Malingering (TOMM)*

The TOMM was administered midway through the exam. Jessica was told that the TOMM measured important memory skills needed for efficient reading. Jessica's performance on the TOMM resulted in 50 of 50 items correct on Trial 2 and after a delay of 15 minutes she correctly answered 50 of the 50 items on the Retention Trial. This pattern of TOMM scores does not reflect suboptimal effort. Her overall pattern of test scores and behavioral performance reflected strong effort on all tests administered to her.

---

[27] Wechsler Adult Intelligence Scale – 4th Edition.

[28] General Ability Index, which is calculated from the Verbal Comprehension Index and the Perceptual Reading Index.

* * * *

       The Test of Memory Malingering (TOMM) measure is a symptom validity measure and was administered to detect whether Jessica was making suboptimal effort, either consciously or unconsciously. The examinee is not informed as to the purpose of this measure and in fact was told that it measured an important memory component underlying reading skill. The absence of indication of suboptimal effort on the TOMM is an indication that Jessica's effort was not suboptimal. Her performances on reading and writing tests was also highly variable, ranging from average to below average. In the context of her request for accommodations due to a reading impairment, the reading and writing scores that are within the average range are inconsistent with poor effort from either conscious or unconscious intent. Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning.

Smith Report (Exhibit B to Smith Declaration) at 8, 23.

       NBME did not dispute anything about the testing results obtained by Dr. Smith, including Dr. Smith's use of the Test of Memory Malingering to confirm that Ms. Ramsay's "exceptionally low" reading scores were valid.  As explained in his report and Declaration, this test found no evidence that Ms. Ramsay was "faking" the slow reading speed – to the contrary the test for malingering caused Dr. Smith to conclude that Ms. Ramsay was putting forth maximum effort. Ms. Ramsay's "exceptionally low" reading scores reflect a genuine and significant impairment of her reading ability, for which NBME should be required to provide accommodations.

       Nevertheless, NBME ignored the testing results, and Dr. Smith's diagnosis, for the sole stated reason that "[Ms. Ramsay's] average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college [the ACT] and medical school [the MCAT] demonstrate that your skills are better than most people in the general population."  NBME letter from Dr. Farmer, denying appeal (Feb. 14, 2019)[29] at 2.

---

[29] Smith Declaration, Exhibit E.

Here too, NBME did not deny Dr. Smith's conclusions.  As Dr. Smith stated in his report:

> When she took the exam, she relied on strategies suggested by her Princeton Review instructors[30] in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested that Jessica not read the passages until she had first answered all the questions she could without reading the passage.  Only then with any remaining time, she could go back and try to answer the passage-dependent questions starting with the shortest passages.  Finally, with the last minute, it was recommended that she randomly fill in answers to any questions she wasn't able to get to.

Smith Report at 7 (footnote added).  **NBME conceded that Dr. Smith was correct**, stating "Dr. Smith reports that you relied on strategies such as answering questions before reading the passages, a common strategy recommended by prep courses and utilized by savvy students." NBME letter denying appeal (Feb. 14, 2019), *id.*  However, NBME simply ignores the fact that Ms. Ramsay was following this "strategy" in order to self-accommodate for her disability.  As discussed in the following paragraph, the ADA expressly provides that the determination of whether a person has a disability must be made without consideration of such strategies. Moreover, this is notably also a strategy that may work on the ACT and MCAT but that does not work on the USMLE.  *See* Ramsay Declaration. ¶27.

NBME wrongly refused accommodations to Ms. Ramsay on the basis of the very self-accommodations that NBME is required by the ADA to ignore.  Thus, the ADA, as amended by the ADA Amendments Act of 2008,[31] states:

> (i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as —

---

[30] Princeton Review is in the business of helping students prepare for standardized examinations like the MCAT.  *See, e.g.,* www.princetonreview.com/medical/mcat-test-prep.

[31] P.L. 110-325.

* * * *

  (IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. §12102(4)(E)(i)(IV).

  The only reason stated by NBME for ignoring the "exceptionally low" scores, and

Dr. Smith's diagnosis, is that on the ACT and MCAT, Ms. Ramsay received scores within the

average range,[32] by "rel[ying] on strategies such as answering questions before reading the

passages, a common strategy recommended by prep courses and utilized by savvy students."  In

other words, Ms. Ramsay was able to use "learned behavioral . . . modifications" on other exams,

to "ameliorat[e]" the effects of her disability.  These learned behavioral modifications are

precisely what the ADA, as amended, says that NBME must **not** consider.  *See Girard v. Lincoln

College of New England,* 27 F.Supp.3d 289, 295 (D.Conn. 2014) (plaintiff's status as a person

with a disability was not refuted by evidence that she used adaptive strategies, or by evidence

that she succeeded in some courses without accommodations).  *See also Harty v. City of Sanford,*

(M.D.Fla. 2012), No. 6:11-cv-1041 ("While he is able to ameliorate the effects of his disability

by doing these things 'in a different way,' the [ADA Amendments Act] does not permit such

measures to be considered").[33]

  As the Court explained in *Girard*, in making the threshold determination of whether a

person requesting accommodations is a person with a disability, a provider like NBME cannot

consider the effects of learned behavioral modifications:

---

[32] February 14, 2019  letter at 2.  The claim that Ms. Ramsay received "above average" scores is erroneous.  On the MCAT, by following the strategy of not reading the question prompts – a strategy that is not available for the USMLE Step examinations – Ms. Ramsay's score fell at the 79th percentile which is within the average range.

[33] Available on the Internet at https://scholar.google.com/scholar_case?case=7207825119511790798&q=harty+v.+city+of+sanford&hl=en&as_sdt=6,31

[Defendant's argument that plaintiff was not disabled] is without merit because under the ADA's new definition of disability, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . learned behavioral or adaptive neurological modifications."  42 U.S.C. §12102(4)(E)(i).  Indeed, one of the stated purposes of the ADAA [the ADA Amendments Act] was "to reject the requirement enunciated by the Supreme Court in [*Sutton v. United Air Lines*, 527 U.S. 471(1999)] . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures."  122 Stat. 3553, Sec. 2(b); see 42 U.S.C. §12102(4)(B) (requiring courts to interpret term "substantially limits" in accordance with findings and purposes of ADAA).  Because Plaintiff's study strategies are "learned behavior" modifications, I cannot consider them in determining whether Plaintiff's ADP [auditory processing disorder] substantially limits a major life activity.

. . . .  The fact that Plaintiff's impairment prompted a request for accommodation in a minority of classes, and proved to be an insurmountable obstacle in only one class in which an adequate accommodation was not provided does not, as a matter of law, mandate a finding that the impairment did not substantially limit Plaintiff. . . .  Most importantly, resolution of this question must be guided by the clear congressional intent expressed in the ADAA.  In light of the ADAA's findings and purposes, which are set forth in part above and must be considered in determining whether a person is "substantially limited," I find that the evidence in the record raises a genuine issue of material fact as to whether Plaintiff's ADP substantially limits her in any major life activity, *her partial success in overcoming her disability without accommodation notwithstanding*.

27 F.Supp.3d at 295-96 (emphasis added).

## 2.    The Harm To Ramsay Is Irreparable.

Courts have presumed irreparable harm when there was a violation of the ADA, since the statute's goals "include assuring that individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.'"  *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp.2d 1078, 1084 (N.D. Cal. 1997) (quoting 42 U.S.C. §12101).  Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute irreparable injury."  *Id*.; *see also*, *Burriola v. Greater Toledo YMCA*, 133 F. Supp.2d 1034, 1040

(N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated against on the basis of disability).

Courts also view as irreparable injury a person's psychological harm in not being able to pursue his chosen profession.  In *Enyart v. Nat'l Conference of Bar Examiners*, *supra,* the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that she had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession."  630 F.3d at 1165. *See also Featherstone v. Pacific Northwest U. of Health Sciences,* 2014 U.S. Dist. Lexis 102713, 2014 WL 3640803 (E.D. Wash. 2014).  As the Court stated in *Featherstone,* delay in following a chosen profession – just delay – is enough to satisfy the requirement for "irreparable harm":

> It is uncontested that Plaintiff has been waiting to pursue his medical career for over a year already, and would continue to be delayed in pursuing his chosen profession if not admitted to [Pacific Northwest University].  The Ninth Circuit has concluded that irreparable harm can be shown "in the form of the loss of opportunity to pursue [one's] chosen profession." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011).

2014 U.S. Dist. Lexis at *17 (footnote omitted0.

Like Featherstone (now Dr. Featherstone), Ms. Ramsay wants to become a physician. Each day that Ms. Ramsay has to defer her dream is a day that she suffers the sort of emotional and dignitary harm that the ADA was enacted to prevent.  By the time that Ms. Ramsay is able to take the Step 1 examination, she will already have already lost three years as a result of NBME's refusal to provide testing accommodations, and with the passing of each year, she becomes increasingly less likely to obtain the residency position that is necessary to becoming a physician.  Since this is precisely the sort of injury that courts have held to be irreparable harm, Ms. Ramsay satisfies the requirement for irreparable harm.

### 3.      NBME Will Not Be Harmed By Granting of a Preliminary Injunction.

NBME grants double-time on examinations.  NBME will suffer no harm if it grants

Ms. Ramsay double time on this examination, in accordance with its policy of providing extra

time for students with disabilities and the settlement agreement it entered into with the

Department of Justice committing to providing such accommodations.[34]

While NBME will suffer no harm if it grants her double time, Ms. Ramsay has had to put

her career on hold, and now is out of time.  She is in danger of losing her career entirely.

Ms. Ramsay's medical school, WMed, has already extended her leave of absence several times,

for over two years, now to March 2, 2020, and there is no assurance that it can be extended any

further.  NBME's standard window for scheduling the Step 1 examination is three months.[35]

Medical students regularly take three months to prepare for Step exams meaning that Ms.

Ramsay must be able to schedule the examination and begin preparing by December 2, 2019,

and must take the exam by March 2, 2020.

An M.D. graduate must receive further training in a medical residency program before

she can be licensed as a physician.  Almost all M.D. graduates are placed in residency programs

through the National Residency Matching Program ("NRMP" or the "Match").  Even if

Ms. Ramsay is able to take the Step 1 examination by March 2, 2020, that will already be too late

for Ms. Ramsay to enter the NRMP Match Program for 2020,[36] and therefore, she will suffer

another year of delay for this reason as well.  Any further delay in NBME granting

---

[34] *See* https://www.usmle.org/test-accommodations/dop-settlement.html

[35] *See* Ramsay Declaration, ¶36.

[36] *See* http://www.nrmp.org/match-calendars/.  The standard registration deadline for the 2020 match is 11/30/2019, and the late registration deadline is 2/26/2020.  Applicants must have successfully completed not only Step 1 but also Step 2 CK and Step 2 CS prior to these deadlines.

accommodations will cause further delay – beyond even the three years that Ms. Ramsay has already suffered.

      **4.**    **The Granting Of A Preliminary Injunction Is In The Public Interest, Which Favors Enforcement of the ADA and Making it Possible for Qualified Persons With Disabilities to Pursue Careers In Medicine.**

Obviously the enforcement of the ADA is in the public interest.  Many areas of the United States are under-served by physicians, and so increasing the number of physicians is in the public interest.  Finally, it is in the interest of people with disabilities – estimated to number almost 13 percent of the total population of the United States[37] – to have the opportunity to be treated by people with life experiences that are more similar to their own experiences, *i.e.,* by people with disabilities.  *See generally* L. Meeks and N. Jain, *Accessibility, Inclusion and Action in Medical Education* (Association of American Medical Colleges 2018) ("Meeks and Jain 2018") at 8.[38]

Ms. Ramsay's career now hinges not on the extraordinary hard work and commitment she has demonstrated in the course of medical school or the heart and compassion that caused her medical school peers to nominate her for her outstanding clinical skills, but on the outcome of this motion seeking accommodations that NBME is able to provide and does provide to other students.  For this reason, she seeks an order requiring the NBME to immediately cease its denial of necessary accommodations to allow her to proceed to demonstrate her knowledge and skill under fair testing conditions.

---

[37] *See* 2017 Disability Statistics Annual Report (Institute on Disability, University of New Hampshire, 2018), at 2, available on the Internet at https://disabilitycompendium.org/sites/default/files/user-uploads/2017_AnnualReport_2017_FINAL.pdf

[38] Available for free download from the Association of American Medical Colleges website, https://store.aamc.org/accessibility-inclusion-and-action-in-medical-education-lived-experiences-of-learners-and-physicians-with-disabilities.html.

## Conclusion

Ms. Ramsay needs and is entitled to injunctive relief, and she needs to have such relief in place prior to December 2, 2019, so that she can take USMLE Step 1 with accommodations before March 2, 2020. For the reasons set forth in plaintiff's Motion, this Memorandum and the Declarations of Dr. Smith and Ms. Ramsay, plaintiff respectfully requests that this Honorable Court schedule a preliminary injunction hearing, and issue a preliminary injunction against NBME to require that it provide Ms. Ramsay with the testing accommodations that she needs.

Respectfully submitted,

/s/     Lawrence D. Berger
Lawrence D. Berger (ID No. 16028)
Larry@rcglawoffices.com
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ  08033
(856) 354-0021

Attorney for Plaintiff

Of Counsel:

Mary C. Vargas (ID No. 324005)
Michael S. Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
(202) 248-5092

Dated:  July 25, 2019