**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JESSICA RAMSAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:19-cv-02002-JCJ** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT NBME'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, defendant National Board of Medical Examiners ("NBME") hereby opposes the motion for preliminary injunction filed by plaintiff Jessica Ramsay ("Ms. Ramsay") (Dkt. 7).

Ms. Ramsay's Complaint alleges that NBME violated Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehabilitation Act") in denying her request for extra time testing accommodations on the United States Medical Licensing Examination ("USMLE"). She is now seeking a *mandatory* preliminary injunction that would provide her with extra time accommodations on all three Steps of the USMLE (four examinations total), including Step 3 of the USMLE, an examination she would not take until two years from now, at the earliest. She is requesting, in other words, to be given by way of a preliminary injunction all the injunctive relief she could otherwise obtain in this case only if she prevailed on the merits, including relief with respect to far-off events.

Ms. Ramsay believes she is entitled to testing accommodations because she has been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and a specific learning

disorder.   ADHD and LD are neurodevelopmental disorders that begin in childhood, and individuals with these disorders should be able to provide records of early impairment in academic functioning, such as report cards, teacher reports, or records of evaluations or school interventions.   Ms. Ramsay, however, has offered *no* such records demonstrating difficulties in academic functioning.   The records that she has provided reflect a very successful student who earned high grades in demanding classes with no accommodations.   Specific to her request for testing accommodations, the records also show that Ms. Ramsay performed very well on timed, high-stakes tests—including the challenging Medical College Admission Test (MCAT)— without any accommodations.

Ms. Ramsay asks the Court to simply look to her diagnoses and order NBME to give her extra testing time.   *See, e.g.,* Pls.' Mem. of Law in Supp. of Mot. for Preliminary Injunction (Dkt. 7-2) ("Pl. Br.") at 1 ("Ms. Ramsay needs extended time on tests administered by NBME because she has dyslexia and Attention-Deficit Hyperactivity Disorder.").   Neither the ADA nor the Rehabilitation Act, however, support that outcome.

Ms. Ramsay has been diagnosed with ADHD and dyslexia.   As set forth below and in the declarations of Benjamin Lovett, Ph.D. and Steven Zecker, Ph.D., those diagnoses are not reasonably supported.   But even if Ms. Ramsay's diagnoses were accepted at face value, that would not be enough to establish that Ms. Ramsay is disabled within the meaning of the ADA.[1] To be disabled under the ADA and potentially entitled to testing accommodations, Ms. Ramsay must demonstrate that she is substantially limited in a major life activity relevant to taking the

---

[1] NBME denies that the Rehabilitation Act applies here but, in any event, the standard for determining disability is the same under the ADA and the Rehabilitation Act.   *See, e.g., Weidow v. Scranton Sch. Dist.*, 460 Fed. App'x 181, 185 (3d Cir. 2012) (citing 42 U.S.C. § 12102(1)(A) and 29 U.S.C. § 705(20)(B)).

USMLE, compared to most people in the general population.  Remarkably—and tellingly—Ms. Ramsay never once argues in her preliminary injunction motion or supporting brief that she is substantially limited in any major life activity.  She argues that dyslexia and ADHD "affect" her ability to read in general and to read questions on the USMLE Step 1 examination, *see* Pl. Mot. for Prel. Inj. (Dkt. 7) ¶ 4, and that she "needs" extended testing time, *see id.*, but that is not the legal standard.  Ms. Ramsay must demonstrate that she is ***substantially limited*** in her ability to read ***compared to most people in the general population***.  She cannot make that showing.  Ms. Ramsay's strong performance in school and on standardized tests without accommodations show that she is ***not*** substantially limited in reading compared to most people in the general population.

Ms. Ramsay has not shown that she is likely to succeed on the merits, and her claim that she will suffer irreparable injury absent a preliminary injunction also fails because the alleged irreparable harm is both speculative and insufficient.  The other preliminary injunction factors likewise do not weigh in her favor, particularly in light of the heavy burden for obtaining mandatory preliminary injunctive relief.  Her motion should be denied.

## BACKGROUND

### I.    NBME and the USMLE

NBME is a not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality examinations.  Decl. of Catherine Farmer, Psy.D. ¶ 3 ("Farmer Decl.").  In conjunction with the Federation of State Medical Boards, NBME sponsors the USMLE program.  *Id.* ¶ 4.

The USMLE is a standardized examination[2] used to evaluate applicants' competence for medical licensure. *Id.* It is designed to assess an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. *Id.* Licensing authorities across the United States rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine. *Id.* ¶ 5.

Three "Step" exams make up the USMLE, taken at different times in an individual's medical education process: Step 1, Step 2 (consisting of the Step 2 Clinical Knowledge exam (Step 2 CK) and the Step 2 Clinical Skills exam (Step 2 CS)), and Step 3. *Id.* ¶ 6.

Step 1 assesses whether candidates understand and can apply important science concepts that are basic to the practice of medicine. *Id.* Under standard conditions, Step 1 is a one-day multiple-choice examination. *Id.* ¶ 6. Step 2 assesses whether candidates can apply medical knowledge, skills, and understanding of clinical science essential for the provision of care under supervision. Step 2 CS uses standardized patients to test examinees on their ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues. *Id.* Step 2 CK is a one-day, computer-based, multiple-choice examination that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. *Id.* Step 3 is the final examination in the USMLE sequence leading to a license to practice medicine without

---

[2] "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies." *Standards for Educational & Psychological Testing* at 111 (2014).

supervision.  It assesses whether candidates can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.  *Id.*  Step 3 is taken after the candidate has graduated from medical school and obtained the MD degree, and candidates are advised to have completed or be near completion of at least one postgraduate training year in an accredited US graduate medical education program that meets state board licensing requirements before taking the Step 3 examination.[3]

Examinees take the USMLE under standard conditions, including standard timing.  *Id.* ¶¶ 7-8.  NBME provides accommodations that may include extra time and other alterations in standard conditions to individuals who document that they have a disability within the meaning of the ADA and that such accommodations are necessary to afford them access to the exam.  *Id.* ¶¶ 8-10.  In all instances, NBME's objective is to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage….  As administrator of the national exam used by ... states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004) (rejecting ADA claims brought by an examinee against NBME and her medical school).  NBME also has a duty to protect the integrity of USMLE scores, given the USMLE's role in helping jurisdictions ensure the minimum competency of licensed physicians.

Licensing exams are challenging for a reason.  They help protect the public welfare.  The ADA should not be applied in a manner that assists non-disabled individuals in passing an exam because they receive more testing time than other examinees.

---

[3] *See* "Eligibility for the USMLE Steps," available at www.usmle.org/bulletin/eligibility/.

## II.  Ms. Ramsay's Requests for Accommodations on the USMLE

### A.  December 2016 Request

In December 2016, Ms. Ramsay requested accommodations on Step 1 and Step 2 CK of the USMLE.  *See* Farmer Decl. ¶ 12.  She sought 100% additional test time (double time) over two days on both tests, a separate, distraction-free exam space, extra laminated paper, colored dry-erase markers in addition to black, and the ability to drink water and eat a snack with medications during the test.  *See id.* Ex. A at 3.  She requested these accommodations based on diagnoses of ADHD and dyslexia.  *See id.*

Ms. Ramsay provided various documentation to NBME in support of her accommodation request.  *See id.* ¶¶ 12-20 and Exs. A-H; Decl. of Steven G. Zecker, Ph.D. ("Zecker Decl.") Ex. B at 1-2 (listing documentation reviewed).  NBME thoroughly reviewed all the documentation. *See* Farmer Decl. ¶ 21 and Ex. I.  It also sought the recommendation of an outside expert, Steven Zecker, Ph.D.  *See id.* ¶ 21; Zecker Decl. Ex. B.  NBME concluded that Ms. Ramsay's documentation "does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of [her] USMLE Step 1 or Step 2 CK test administration."  Farmer Decl. Ex. I.  NBME therefore denied her accommodation request.  Ms. Ramsay took the Step 1 examination in July 2017 without accommodations and missed passing by one point.  *See* Farmer Decl. ¶ 23.

### B.  June 2018 Request

Instead of taking the exam again, Ms. Ramsay submitted a new request for accommodations approximately ten months later, in June 2018.  *See id.* ¶ 24 and Ex. J.  This time, Ms. Ramsay sought 100% additional testing time (double time) over two days, a private testing room, and additional break time.  *See id.* Ex. J at 3.  Her requests were based on

- 6 -

diagnoses of learning disabilities of reading and writing (with abnormal scanning and processing speed), ADHD (combined type), migraines with aura, and a clotting disorder with recent deep vein thrombosis (DVT) and post-thrombotic syndrome.  *See id.* ¶ 24 and Ex. J at 4.

Ms. Ramsay again submitted documentation in support of her request, including a revised personal statement, a letter from her lawyer, and a new diagnostic evaluation from Dr. Alan Lewandowski.  *See* Farmer Decl. ¶¶ 26-27; Ex. J at 6 (listing documents).  NBME thoroughly reviewed the documentation and again sought the recommendation of Dr. Zecker.  *See* Farmer Decl. ¶ 28; Zecker Decl. Ex. C. NBME concluded that the documentation did not demonstrate that 100% additional testing time was an appropriate modification of Ms. Ramsay's USMLE Step 1 examination.  *See* Farmer Decl. ¶ 29 and Ex. I.  NBME agreed, however, to provide Ms. Ramsay with additional break time, testing over two days, and a separate room in which she may stand, walk or stretch during the exam in order to address her issues related to migraine headaches and DVT, and, since she would already be testing in a separate room and reported that she usually reads text aloud, permission to read aloud as a courtesy.  *See id.*

Ms. Ramsay did not re-take the exam with these accommodations.  Instead, she obtained another diagnostic evaluation and, through her lawyer, submitted this new evaluation and additional material to NBME in December 2018 with a request for reconsideration of the denial of 100% extended testing time.  *See* Farmer Decl. ¶ 30.  NBME once again thoroughly reviewed Ms. Ramsay's request and supporting documentation, and sought the recommendation of another external consultant, Benjamin Lovett, Ph.D.  *See* Farmer Decl. ¶ 31; Decl. of Benjamin J. Lovett, Ph.D. ("Lovett Decl.") Ex. B.  NBME concluded that Ms. Ramsay's "documentation with regard to learning disabilities and ADHD offers no objective evidence of impaired reading or pervasive ADHD symptoms that limited any major life activity compared to most people in the general

population[,]" and it did not change its decision to deny her request for additional testing time. Farmer Decl. Ex. N.  Ms. Ramsay's lawyer thereafter made another reconsideration request, but NBME did not change its position.  *See* Farmer Decl. ¶ 33 and Ex. O.

## III.    Ms. Ramsay's Academic and Standardized Testing History

Learning disabilities and ADHD are neurodevelopmental disorders that begin in childhood.  *See* Lovett Decl. ¶¶ 9, 16, 25; Zecker Decl. ¶ 7.  Therefore, individuals with these disorders typically can point to school records such as report cards and teacher comments for objective evidence of symptoms of these disorders and resulting functional impairment.  *See generally* Lovett Decl. ¶¶ 7, 9, 25; Zecker Decl. ¶ 7.  Ms. Ramsay, however, did not submit any school records from prior to high school to NBME in support of her accommodations request.[4] Nor has she has offered any school records in support of her motion for preliminary injunction.

The records that Ms. Ramsay did submit to NBME show that she performed very well in high school, in her first five terms in college, and on standardized tests, without any accommodations.

In high school, Ms. Ramsay earned A's and B's while taking numerous honors and AP classes (Honors English, AP US History, Honors Biology, Honors Chemistry, Honors Algebra, Honors Trigonometry/Pre-Calculus, AP Calculus).  *See* Farmer Decl. Ex. C.  The high school transcript she provided to NBME reflects a 3.746 GPA and a ranking of 27 out of a high school

---

[4] It is not because Ms. Ramsay does not have early school records.  Ms. Ramsay's most recent evaluator, Dr. Smith, reported that he reviewed Ms. Ramsay's records from kindergarten, second through sixth grade, as well as from high school, and acknowledged that they "do not clearly reflect academic struggles in elementary, middle or high school[.]" Smith Decl. Ex. B at 29.

class of 237 (top 12% of the class).  *See* Farmer Decl. Ex. C.[5]  Ms. Ramsay did not receive

accommodations in high school.  *See* Farmer Decl. Ex. A at 6, Ex. B at 2, Ex. J at 5.

Ms. Ramsay also reported taking the ACT examination, a college admission examination,

two times.  *See* Farmer Decl. Ex. J at 4.  She did not submit her ACT score reports to NBME and

she has not offered them in support of her motion for preliminary injunction, but she apparently

has two ACT score reports which she shared with her evaluator, Dr. Smith.  *See* Smith Decl. Ex.

B at 2, 6.  Ms. Ramsay informed another one of her evaluators that she scored in the 27-30 range

on the ACT, which is a very high score.  *See* Farmer Decl. Ex. L at 2; Lovett Decl. ¶ 13 and Ex.

B at 1; Zecker Decl. Ex. C at 8.  Ms. Ramsay did not receive accommodations on the ACT.  *See*

Farmer Decl. Ex. A at 5; Ex. J at 4.

Ms. Ramsay graduated from The Ohio State University (OSU) with a Bachelor of

Science degree and 3.57 GPA.  *See* Farmer Decl. Ex. D; *see also* Ex. L at 2 (evaluator reporting

a 3.65 college GPA).  She majored in genetics with minors in business and science.  *See* Farmer

Ex. L at 2.  Ms. Ramsay began receiving accommodations during the Spring of her sophomore

year.  *See* Ramsay Decl. ¶ 17; Farmer Ex. B at 5-6 (explaining that she applied for and obtained

accommodations after not completing the midterm exam for her Honors Organic Chemistry

class, which she took in Spring 2010).  Prior to that time (and through 5 college terms), Ms.

Ramsay earned all A's and B's in her classes, without accommodations.  *See* Farmer Decl. Ex.

D.  Once she began receiving accommodations in college, Ms. Ramsay continued to earn A's

and B's, as well as one C+.  *See id.*

---

[5] The high school transcript that Ms. Ramsay submitted to NBME does not appear to include her senior year grades.  *See* Farmer Decl. Ex. C.

Ms. Ramsay took the Medical College Admission Test in April 2011.  Her total score on that test, 30M, fell at the 79th percentile—better than 79% of the other college-educated examinees who plan to attend medical school.  *See* Farmer Decl. Ex. E; Zecker Decl. ¶ 10.  Her score on the Verbal Reasoning section of the test fell at the 67th percentile—again, better than most of the examinees in this select group.  *See id.*; *see also* Lovett Decl. ¶ 12 and Ex. A at 1.  Ms. Ramsay did not receive accommodations on the MCAT.  *See* Farmer Decl. Ex. A at 5; Ex. J at 4.

Ms. Ramsay has provided various narratives of her academic performance and perceived struggles, both in personal statements to NBME and in reports to her evaluators.  In a nine-page, single-spaced written statement to NBME in support of her 2016 accommodation request, Ms. Ramsay provided several anecdotes to describe her academic experiences.  In one example, she described her difficulties in completing a screening test for an accelerated academic program for middle school and high school.  *See id.* at 2.  Ms. Ramsay had to answer at least 30 of 60 test questions correctly to be accepted into the program.  *See id.*  She claimed that she could not answer more than 29 questions before time ran out, while everyone else taking the test finished early.  *See id.*  She answered all questions correctly, however, and felt that she was going to get the correct answer on the 30th question.  *See id.* at 3.  After her mother advocated for her, Ms. Ramsay participated in the accelerated academic program during a trial period and subsequently was allowed to stay in the accelerated program because, in her words, she "did very well, understood everything and was able to do the homework[.]" *Id.*[6]

---

[6] Ms. Ramsay discusses this same experience in her declaration submitted to the Court.  *See* Ramsay Decl. ¶ 13.  Unlike in her 2016 statement, however, she omits mentioning that this test was a qualifying test for inclusion in an accelerated academic program and instead describes this as a test where she needed to answer 30 questions correctly to "pass."  *Id.*

In another example, Ms. Ramsay explained that she received a C- on an exam in an accelerated track Algebra class in seventh grade because she forgot to bring her calculator for the exam. *See id.* at 3. After Ms. Ramsay and her mother met with the teacher, Ms. Ramsay was allowed to retake the exam with a calculator but ran out of time and received a B+ on the test. *See id.* In high school, Ms. Ramsay purportedly ran out of time on the final exam in her Pre-Calculus class in 10th grade, receiving a D on the test. *See id.* Although Ms. Ramsay had an A- in the class going into the final, she stated that she ended up with a "significantly lower grade in the class than [she] was originally on track for." *See id.* According to the high school transcript that Ms. Ramsay submitted to NBME with her accommodation application, she received an A in the first semester of her Honors Trigonometry/Pre-Calculus class, and a B+ in the second semester of the class. *See* Farmer Decl. Ex. C. Presumably, then, the B+ was the "significantly lower grade."

Ms. Ramsay also explained to NBME that she was "tipped off" that she might have a "problem" in college when she "could not get above an A- on [her] written [Spanish] tests, even though all of her answers were 'technically correct.'" *Id.* at 5-6. After speaking with her professor, Ms. Ramsay was informed that the professor could not help her "unless she had an official diagnosis and was registered with the Office of Disability Services (ODS)." *Id.* at 6. Ms. Ramsay's second "tip-off" occurred in connection with her work in the Honors section of an Organic Chemistry class during her second year in college. *See id.*; *see also* Farmer Decl. Ex. D. Ms. Ramsay stated that she was "alarmed and embarrassed" when she had to turn in her mid-term examination with four pages of unanswered questions because she ran out of time on the test. *See* Farmer Decl. Ex. B at 6. She spoke with her teacher, and because almost everything she had answered was correct, he "recommended talking to ODS to get more time on her

exams." *Id.*  Ms. Ramsay explained that she applied for and received accommodations from ODS after that time. *See id.*[7]

## IV.    Ms. Ramsay's Diagnoses

Ms. Ramsay underwent diagnostic evaluations in 2014 (by Mr. Livingston), 2017 (by Dr. Lewandowski), and 2018 (by Dr. Smith).[8]  Ms. Ramsay sought out these evaluations for the specific purpose of requesting accommodations in school or on the USMLE.  *See* Ramsay Decl. ¶¶ 23, 33.  Ms. Ramsay only includes reports by Dr. Smith and Dr. Lewandowski with her preliminary injunction papers.

Ms. Ramsay claims that she was diagnosed with Attention Deficit Disorder in 2009, when she was eighteen years old, by her primary care physician, Dr. Alan Smiy.  *See* Ramsay Decl. ¶ 15.  Ms. Ramsay visited Dr. Smiy in March 2009 because she wanted accommodations in college.  *See* Ramsay Decl. ¶ 15; Farmer Decl. Ex. B at 6-7.  In an "office visit" summary, Dr. Smiy indicated that he met with Ms. Ramsay for thirty minutes.  *See* Farmer Decl. Ex. F at 4. Dr. Smiy did not administer any diagnostic tests, interview any other individuals, or review any objective records relating to Ms. Ramsay.  *See* Farmer Ex. G at 2; Zecker Decl. Ex. B at 4; Ex. C at 3-4.  His assessment from this "office visit" does *not* indicate a formal diagnosis of ADHD,

---

[7] According to her college transcript, Ms. Ramsay took Honors Organic Chemistry in the Spring 2010 term and earned an A.  *See* Farmer Decl. Ex. D.  Ms. Ramsay attributes this high final grade to receiving extra time accommodations on the final examination.  *See* Farmer Decl. Ex. B at 7.

[8] Ms. Ramsay was also evaluated by an optometrist, Dr. Tanguay, in 1997 because of concerns about letter reversals.  *See* Zecker Decl. ¶ 12 and Ex. B at 3; Ex. C at 3.  Dr. Tanguay administered a single test (which she administered incorrectly and scored incompletely).  *See id.* After Ms. Ramsay underwent four months of perceptual skills training, she "scored above age level in all categories" and her comprehension and perceptual skills were reported as "excellent." *Id.*  Ms. Ramsay is not relying on Dr. Tanguay's evaluation for her preliminary injunction motion.

and an ADHD diagnosis would not have been supported.  Farmer Decl. Ex. F at 4; Zecker Decl. ¶ 13 and Ex. B at 4; Ex. C at 3-4.[9]

Later, in an August 2010 form submitted to OSU in support of Ms. Ramsay's request for testing accommodations, Dr. Smiy reported that he had diagnosed Ms. Ramsay with ADHD-Inattentive type on March 24, 2009 (although no such diagnosis is supported by the record of this office visit).  *See* Farmer Decl. Ex. G at 2.  He identified on the form five symptoms of ADHD-inattentive type that Ms. Ramsay was currently exhibiting, *see id.* at 4, but this did not meet the diagnostic criteria at that time, which required that a minimum of six symptoms be present to support an ADHD diagnosis, *see* Zecker Decl. ¶ 14 and Ex. B at 4-5.  Nevertheless, OSU apparently extended testing accommodations to Ms. Ramsay based on this form from Dr. Smiy. *See* Ramsay Decl. ¶¶ 16-17.

Charles Livingston, M.A. (Licensed Masters Social Worker, Limited License Psychologist), evaluated Ms. Ramsay in 2014.  Ms. Ramsay visited Dr. Livingston because she wanted to receive accommodations in medical school.  *See* Ramsay Decl. ¶ 23.  In a one-page evaluation report, Mr. Livingston noted a "broad range" of results on measures of intellectual ability and "above average" reading comprehension on measures of academic achievement for Ms. Ramsay.  *See* Farmer Decl. Ex. H.  Based on "biographical information" provided by Ms. Ramsay and the then-unspecified tests that he administered, Mr. Livingston diagnosed Ms. Ramsay with ADHD, inattentive type, severe.  *See id.*  Mr. Livingston did not perform a comprehensive assessment of Ms. Ramsay's academic skills, and his report does not reflect adequate testing or evidence to support a diagnosis of ADHD or the provision of accommodations.  *See* Lovett Decl. ¶ 18 and Ex. B at 2; Zecker Decl. ¶ 15 and Ex. B at 2-3, Ex.

---

[9] Ms. Ramsay does not rely on this documentation in her motion for preliminary injunction.

C at 4.  Nevertheless, Ms. Ramsay's medical school extended her accommodations based on this evaluation.  *See* Ramsay Decl. ¶ 23.[10]

Apparently in anticipation of requesting accommodations on the Step 1 exam, Ms. Ramsay obtained an "Addendum" from Mr. Livingston in September 2016 to his 2014 evaluation report.  In the addendum, Mr. Livingston attempted to bolster his 2014 diagnosis (apparently after the diagnosis was made) by referencing unspecified medical records indicating "difficulties with focus and headaches as early as age five," an optometrist's report, the "office visit" summary from Dr. Smiy discussed above, and records showing that Ms. Ramsay was approved for accommodations by OSU and her medical school.  *See* Farmer Decl. Ex. H at 2-3.

Alan Lewandowski, Ph.D., evaluated Ms. Ramsay in 2017.  Ms. Ramsay sought this evaluation to support her request for testing accommodations on the USMLE.  *See* Farmer Decl. Ex. L at 1.  Dr. Lewandowski apparently took an oral history from Ms. Ramsay and her mother, *see id.* at 1-5, and then prepared a "neurocognitive examination" report after administering certain tests, *see id.* at 6-11.  As part of this oral history, Ms. Ramsay reported that she began receiving accommodations in college.  *Id.* at 1.

Dr. Lewandowski's initial report did not specify the assessments that he administered, which is unusual.  *See id.*; *see also* Zecker Decl. ¶ 7 and Ex. C at 5.  Despite "attention" testing that resulted in largely normal scores and "academic" testing that resulted in "high average" reading scores, *see* Farmer Decl. Ex. L at 7; Zecker Decl. Ex. B at 5,[11] Dr. Lewandowski

---

[10] Ms. Ramsay does not rely on Mr. Livingston's report in support of her preliminary injunction motion.

[11] Like Mr. Livingston, he failed to perform a comprehensive assessment of Ms. Ramsay's academic skills.  *See* Lovett Decl. ¶ 18 and Ex. B at 2.

diagnosed Ms. Ramsay with ADHD, hyperactive type, moderate, and a learning disability, nonverbal (abnormal scanning and processing speed).  *See* Farmer Decl. Ex. L at 9.

After her 2018 request for extra time accommodations was not granted by NBME, Ms. Ramsay obtained another diagnostic evaluation, this time from Robert Smith, Ph.D.  *See* Smith Decl. Ex. B at 2.  In his evaluation report, Dr. Smith recounted a "school history" that appears to have be based largely on an oral report by Ms. Ramsay and her mother, *see id.* at 4-7, and stated—incorrectly—that "Ms. Ramsay has a ***history of academic struggle that began from her first days in school and has consistently required accommodations*** such as extended time on tests and assignments, altered grading schemes, frequent breaks, and a private space for testing and completing classwork in order to compensate for distractibility, impaired attention and concentration, impaired reading comprehension, impaired reading speed, and hyperactivity," Smith Decl. Ex. B at 4 (emphasis added).  He made this conclusion notwithstanding Ms. Ramsay's report to Dr. Smiy in 2009 that she had "no problems" in high school, *see* Farmer Decl. Ex. F at 2, her representation to Dr. Lewandowski that she did not begin receiving accommodations until college, *see id.* Ex. L at 2, and the fact that she earned excellent grades in honors and AP-level courses in high school, *see id.* Ex. C.[12]   Dr. Smith apparently was provided Ms. Ramsay's score reports from the ACT, *see* Smith Decl. Ex. B at 2, but he did not address her performance on this test (or divulge her scores) in his report, *see id.* at 6.  He also received copies of Ms. Ramsay's report cards for grades K, 2, 3, 4, 5, and 6, but he did not discuss her grades other than to note that Ms. Ramsay "managed to get good grades during her elementary, middle

---

[12] This information was reflected in documentation reviewed by Dr. Smith.  *See* Smith Decl. Ex. B at 1-2.

and high school years" (purportedly with the aid of informal accommodations). *See id.* at 5, 29.[13]

Dr. Smith administered additional diagnostic tests to Ms. Ramsay, and her scores on several time-pressured measures of academic skills reflected aberrationally low performance. *See* Lovett Decl. ¶ 19.  Dr. Smith points in his declaration to three tests where Ms. Ramsay's performance was at the 1st or 2nd percentile.  *See* Smith Decl. ¶ 18.  These scores suggest that Ms. Ramsay's reading skills are worse than those of almost anyone else (except for 1 or 2% of the population).  *See* Lovett Decl. ¶¶ 20-21.  As Dr. Lovett explains, these scores are not credible.  *See id.* ¶¶ 20-22.  Ms. Ramsay earned excellent grades in school—including in challenging classes in high school and college—before receiving accommodations.  Without accommodations on the Verbal Reasoning section of the time-pressured MCAT examination, she scored better than 67% of other college-educated students interested in applying to medical school.  She also performed very well on the timed ACT examination without accommodations. These scores could not have been obtained by someone with reading comprehension skills

---

[13] Dr. Smith attributed Ms. Ramsay's success "in preventing poor academic grades" to "the family obtaining help on in informal basis." Smith Decl. Ex. B at 5. Ms. Ramsay, however, has reported at other times that she did not receive any accommodations or aids in school prior to college (other than informal accommodations purportedly provided by a teacher in second grade), and that her parents and teachers "never considered the possibility that [she] might have a learning disability[.]" *See* Farmer Decl. Ex.  A at 6, Ex. B at 1-2. Ms. Ramsay also informed Dr. Lewandowski that she began receiving accommodations as an undergraduate in college, Farmer Decl. Ex. L at 1, and her mother informed Dr. Lewandowski that "her daughter's intellectual abilities allowed her to self-accommodate and thus additional services/specialized services were not necessarily required," *id.* at 2.  Dr. Smith reviewed Dr. Lewandowski's report as part of his analysis.  *See* Smith Decl. Ex. B at 1.

The only specific examples of "informal accommodations" that Ms. Ramsay alluded to in her 2018 personal statement to support her request for accommodations on the USMLE, which Dr. Smith also reviewed, *see id.* at 2, were her second-grade accommodations and special grading on the qualifying test she took for an accelerated academic program.  *See id.* Ex. K at 7.

typical of a student in elementary or middle school.  *See* Lovett Decl. ¶ 22.  Dr. Smith argues that the MCAT and ACT are not diagnostic measures, *see* Smith Decl. ¶ 19, but that is not the point. Ms. Ramsay's performance on the MCAT and ACT demonstrates that her reading skills are not substantially limited compared to most people in the general population, and that her extremely low scores on the tests that Dr. Smith administered are not credible.  *See* Lovett Decl. ¶¶ 20-22; Farmer Decl. Ex. N.

Dr. Smith also diagnosed Ms. Ramsay with ADHD, combined type (meaning that she has symptoms of both hyperactivity and inattention).  Ms. Ramsay self-reported exhibiting 9 out of 9 symptom criteria associated with "predominantly inattentive" presentation of ADHD and 8 out of 9 criteria associated with "predominantly hyperactive-impulsive presentation of ADHD." Smith Decl. ¶ 25.  ADHD symptoms must be present in childhood and must interfere with an individual's functioning in multiple settings such as school, home, and work.  *See* Lovett Decl. ¶ 28.  Dr. Smith relied solely on Ms. Ramsay's self-report and that of her mother to find that the symptoms of ADHD were present in Ms. Ramsay's childhood and "interfered with and reduced the quality of her academic functioning and her daily adaptive functioning since her earliest school years."  Smith Decl. Ex. B at 29; *see* Lovett Decl. ¶¶ 26-27.  Dr. Smith administered a computerized test that evaluates ADHD symptoms, and Ms. Ramsay again performed extremely poorly.  *See* Lovett Decl. ¶ 30.  Once again, Dr. Smith accepted that this performance reflected "extreme impairment," despite the objective evidence of Ms. Ramsay's strong academic performance and absence of documented attentional issues in any settings (much less multiple settings), and despite Ms. Ramsay's non-impaired performance on a similar test just one year prior, administered by Dr. Lewandowski.  *See* Lovett Decl. ¶ 30.

## V.     Ms. Ramsay's Current Status in Medical School

Ms. Ramsay states that her medical school requires her to take the Step 1 examination before beginning her final year of medical school.  Ramsay Decl. ¶ 32.  She attempted the test once without accommodations in July 2017 and failed to achieve a passing score by one point.  *See* Farmer Decl. ¶ 23.  Rather than taking the test again under standard conditions, which she could have done,[14] Ms. Ramsay submitted a new request for testing accommodations to NBME in June 2018, approximately ten months after receiving her score report.  *See* Farmer Decl. ¶¶ 23-24.  She apparently has been on leave from medical school since the time she failed to pass the Step 1 test on her first attempt.  *See* Ramsay Decl. Ex. B.  According to Ms. Ramsay, her school has informed her that can extend her current leave of absence to March 2, 2020, if she takes and passes the Step 1 examination by that date.  *See* Ramsay Decl. Ex. B at 1.  If she does not pass by that date or voluntarily withdraws, she "would be eligible to apply for readmission at the time [she is] prepared to take USMLE Step 1."  *Id.*

## ARGUMENT

## I.     PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an "extraordinary" remedy that should not be granted unless a plaintiff shows that all four prerequisite factors support the requested relief.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).  A plaintiff must make a "clear showing" that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20, 22; *see also Reilly v. City of Harrisburg*, 858 F.3d 173,

---

[14] *See* Western Michigan University Homer Stryker M.D. School of Medicine, Medical Student Policy Manual (Jan. 2019), at 113-114, available at https://wmed.policytech.com/dotNet/ documents/?docid=1589&public=true.

176 (3d Cir. 2017) ("[A] district court—in its sound discretion—should balance [the four preliminary injunction] factors so long as the party seeking the injunction meets the threshold on the first two.") (citations omitted).  The Third Circuit has "insisted that the risk of irreparable harm must not be speculative."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000).

The burden on Ms. Ramsay is even higher here, because she seeks a mandatory preliminary injunction that would alter the status quo and award her all the substantive relief to which she would be entitled only if she were to prevail in this lawsuit.[15]  "[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."  *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citation omitted); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.") (citation omitted).  Ms. Ramsay has not come close to meeting this heavy burden.

## II.    MS. RAMSAY HAS NOT SHOWN THAT SHE IS LIKELY TO SUCCEED ON THE MERITS

Ms. Ramsay is not entitled to preliminary injunctive relief because she has not shown a likelihood or "reasonable probability" of success on the merits.  She is not disabled within the meaning of the ADA.

---

[15] The only relief available to Ms. Ramsay if she were to prevail on the merits of her ADA claim is injunctive relief.  She also asserts a Rehabilitation Act claim, for which damages can be awarded.  However, NBME is not covered by the Rehabilitation Act because it is not a recipient of federal financial assistance.

Ms. Ramsay has been diagnosed with a learning disability and ADHD. As set forth above, both diagnoses are subject to question. *See supra* at 12-17. More importantly, the documentation does not establish that she is substantially limited in any relevant major life activity when compared to the general population, as she must do to show that she is disabled within the meaning of the ADA. Indeed, she does not even argue in her preliminary injunction papers that she is substantially limited in any major life activity. Instead, she points to the diagnoses of her most recent evaluator, Dr. Smith, and argues that is reason enough to provide her with testing accommodations. *See* Pl. Br. at 11-19. That is not correct.

### A.   Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.

Section 12189 of the ADA provides as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189. Pursuant to Section 12189, persons who qualify as disabled under the ADA are entitled to reasonable accommodations, if needed, during test-taking.

Ms. Ramsay argues that "[c]ourts regularly construe dyslexia and ADHD as disabilities that substantially limit the major life activities of reading, writing, learning, and concentrating." Pl. Br. at 7. But ADA claims must be evaluated on a case-by-case basis, and having a diagnosed physical or mental impairment is not sufficient to establish a disability under the ADA. *See Matthews v. Pennsylvania Dept. of Corrections*, 613 Fed. Appx. 163, 167 (3d Cir. 2015); *Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) ("An impairment and a disability are two different things."). While learning disabilities and ADHD can be disabilities

under the ADA, each is a disability only if it substantially limits a person's ability to perform major life activities as compared to most people. *See, e.g., Black v. Nat'l Bd. of Med. Examiners*, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (finding that medical school student with ADHD was not disabled under the ADA); *Bibber v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 2016 WL 1404157, at *7 (E.D. Pa. 2016) ("[W]e find that Ms. Bibber's dyslexia does not substantially limit her ability to read or process information as compared to the general population, and thus we hold that she is not a disabled person under the ADA."); *see also Mann v. Louisiana High Sch. Athletic Ass'n.*, 535 Fed. App'x 405, 410 (5th Cir. 2013) ("[A] plaintiff must still show substantial limitation....") (setting aside preliminary injunction in case involving a diagnosed anxiety disorder).

To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), "as compared to most people in the general population."   28 C.F.R. § 36.105(d)(1)(v).   Thus, in evaluating whether Ms. Ramsay is substantially limited, her claimed limitations must be measured against the general population, not against college graduates, other medical students, or her own expectations.  *See, e.g., Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d at 1249-50 ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *6 ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within

the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[16]

Ms. Ramsay references the "best ensure" language found in 28 C.F.R. § 36.309 and discussed in the *Enyart v. Nat'l Conf. of Bar Examiners* case. *See* Pl. Br. at 7-8. This regulatory language, however, addresses the type of accommodation that is appropriate **if** an individual is found to be disabled within the meaning of the ADA. The plaintiff in *Enyart* was legally blind and there was no dispute that she was disabled; the only issue was whether the accommodations she sought were warranted. Ms. Ramsay, however, has not shown that she is disabled with respect to her LD and ADHD diagnoses, so the issue of appropriate accommodation is not relevant here. She also points to the regulation requiring that "considerable weight" be given to documentation of past modifications or accommodations in received in similar testing situations. Pl. Br. at 7-8 (quoting 28 C.F.R. § 36,309(b)(1)(v)). NBME did so here, however, considering not only the instances in which she received accommodations, but also the instances in which took standardized, timed examinations with no accommodations and performed exceedingly well.

### B.      Ms. Ramsay Is Not Disabled Within the Meaning of the ADA

If a diagnosis is unwarranted, or if an impairment does not result in substantial limitations, the individual is not disabled under the ADA and is not entitled to accommodations.

---

[16] *See also Bach v. Law Sch. Admission Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant).

There is significant reason to question whether Ms. Ramsay meets the diagnostic criteria for either a learning disability or ADHD. *See supra* at 12-17. In all events, the available documentation demonstrates that Ms. Ramsay is not substantially limited in her ability to read, learn, concentrate, or perform any other major life activity relevant to taking the USMLE as compared to most people in the general population. She participated in gifted and accelerated academic programs in elementary, middle, and high school and earned excellent grades without accommodations. As her own expert witness concedes, her school reports do not reflect any "struggle." *See* Farmer Decl. Ex. C; Smith Decl. Ex. B at 2, 29. Ms. Ramsay earned A's and B's in five terms of college classes without accommodations. *See* Farmer Decl. Ex. B at 5-6; Ex. D. She took the ACT test—a high stakes college admission test—without accommodations and performed very well. *See* Farmer Decl. Ex. L at 2; Lovett Decl. ¶ 13; Zecker Decl. Ex. C at 8. She also took the Medical College Admission Test (MCAT) without accommodations and scored better than most of the other college-educated, medical school aspirants who took the test, *see* Farmer Decl. Ex. E, a "high functioning population," *Bibber*, 2016 WL 1404157, at *8.

Individuals who perform at the level that Ms. Ramsay has performed in school and on timed standardized tests that require thinking, concentration and extensive reading—with no extra testing time or other accommodations—are not substantially limited in their ability to read, think and concentrate as compared to most people in the general population and thus are not disabled under the ADA. *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs,* 281 F. Supp. 3d at 1250-51 (relying, among other evidence, on plaintiff's performance in high school and college and average or above-average performance on the MCAT and other standardized examinations, all without accommodations, in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average

(or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *8 ("She took the MCAT twice, and both times scored in the average range on the most reading intensive section of the test, the verbal reasoning section, when compared to [a] high functioning population:  college seniors or graduates wishing to attend medical school.") (holding that a  deaf plaintiff diagnosed with dyslexia was not substantially limited in her ability to read when compared to most people in the general population and granting judgment in favor of the NBOME); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d at 95 (noting plaintiff's prior "test-taking without accommodations," in holding that he was "not substantially limited in the major life activities of seeing, learning, and reading"); *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d at 214  (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and denying accommodations on the LSAT, where, among other evidence, plaintiff was an "excellent student" with or without "informal" accommodations and had ACT and SAT scores "within the average range" with no accommodations); *cf. Marshall v. Sisters of Holy Family of Nazareth*, 399 F. Supp. 2d 597, 603-04, 607 (E.D. Pa. 2005) (holding that elementary school student diagnosed with ADHD was not substantially limited in the major life activities of learning or concentrating, and thus was not disabled within the meaning of the ADA or Rehabilitations Act, as evidenced by the fact that "he earned grades consistently at or near the top of his class").

Ms. Ramsay argues that the Court should defer to the report of Dr. Smith.  *See* Pl. Br. at

8-9, 9-10.  Nothing in the ADA or its implementing regulations requires NBME to defer to the

findings or recommendations of an examinee's supporting professional, however, which is why

Ms. Ramsay provides no statutory or regulatory support for her argument.  She instead cites

informal guidance from the U.S. Department of Justice.  Such guidance does not have the force

of law, *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2012), and, as DOJ itself has

noted, "cannot create binding requirements that do not already exist by statute or regulation,"

U.S. DOJ, Office of the Att'y Gen'l, Mem. for Heads of Civil Litig. Components at 2 (Jan. 25,

2018) (available at www.justice.gov/file/1028756/download).  She also cites two decades-old

cases, neither of which support her broad legal proposition.  In *D'Amico v. N.Y. State Bd. of Law*

*Exam'rs*, the Board did not challenge that the plaintiff was disabled and offered no contrary

medical opinion to support its conclusion.  813 F. Supp. at 223.  Here, in contrast, NBME does

not agree that Ms. Ramsay or her evaluators have documented a disability and has offered the

opinions of experts to challenge their conclusions.  The court in *Agranoff v. LSAC* conducted a

cursory analysis and relied solely on *D'Amico* in deciding to afford "great weight" to the

plaintiff's treating physician.  97 F. Supp. 2d at 87.[17]

Ms. Ramsay also argues that NBME either "ignored" or "conceded" that her reading

scores are "exceptionally low," Pl. Br. at 14, but that is not correct.  As NBME informed Ms.

Ramsay, although Dr. Smith found her "exceptionally low scores" on timed reading tests to be

---

[17] The *D'Amico* and *Agranoff* cases were both decided prior to the Supreme Court's decision in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003), where the Court held that ERISA plan administrators are not required to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan, in determining whether the claimant has a qualifying disability.  While the present case involves the question whether someone is disabled for purposes of the ADA, the same conclusion is warranted in this context.

valid and credible, NBME found that her average and above average performance on timed standardized tests taken for purposes of gaining admission to college and medical school demonstrate that she is not substantially limited compared to most people in the general population.  *See* Farmer Decl. Ex. N.  NBME, in other words, did not find the "exceptionally low scores" that Ms. Ramsay obtained in her testing with Dr. Smith to be valid and credible in light of Ms. Ramsay's record of performance on the ACT and MCAT.  *See id.*; *see also id.* Ex. O.  Ms. Ramsay cannot seriously argue that NBME "did not dispute anything about the testing results obtained by Dr. Smith."  Pl. Br. at 16.

Ms. Ramsay asserts that her diagnostic test results are credible because she performed well on the "Test of Memory Malingering" (TOMM).  *See* Pl. Br. at 15-16; Smith Decl. ¶ 22. She suggests, incorrectly, that NBME did not "dispute" Dr. Smith's use of the TOMM to confirm the validity of Ms. Ramsay's exceptionally low reading scores.  *See* Pl. Br. at 16. Again, NBME made clear in its letter to Ms. Ramsay that it did not accept the conclusions drawn by Dr. Smith.  *See* Farmer Decl. Ex. N.  And NBME does not accept the results of the TOMM test as evidencing the validity of Ms. Ramsay's scores.  The Test of Memory Malingering, as its name suggests, was developed to identify people feigning or exaggerating *memory* problems, not to identify people working slowly on academic tests or reporting more ADHD symptoms than they actually experience.  *See* Lovett Decl. ¶ 23.

Ms. Ramsay also argues that NBME "conceded" that Ms. Ramsay used test-taking strategies to perform well on the ACT and MCAT, and improperly considered these purported "learned behavioral modifications" in determining that she is not disabled.  Pl. Br. at 17-19. Once again, however, Ms. Ramsay misreads NBME's letter.  NBME did not "concede" that Ms. Ramsay was utilizing compensatory skills to overcome a disability, it simply noted that her

report to her evaluator credited test-taking strategies that are commonly recommended by test preparation companies as the reason for her strong, unaccommodated scores on the ACT and MCAT. *See* Farmer Decl. Ex. N at 2. The test-taking strategies that Ms. Ramsay purportedly utilized on the ACT and MCAT are just that—test-taking strategies available for use by all examinees—not "learned behavioral modifications" that are relevant to an ADA disability determination. *See* Pl. Br. at 17-19. The test-taking strategies purportedly used by Ms. Ramsay are not like the strategies used by the plaintiff in *Girard*, who was an individual with auditory processing disorder, to overcome her auditory impairment, *see* 27 F. Supp. 3d 289, 295 (D. Conn. 2014), or the plaintiff in *Harty*, who had knee injuries leading to a 40% disability rating and learned how to bend or sit differently, *see* 2012 WL 3243282, at *1 (M.D. Fla. 2012).

In all events, it is extremely unlikely that Ms. Ramsay used the "strategies" that she described given how well she performed on the tests. Ms. Ramsay claims that she was able to answer many questions without reading the whole question or without reading the passages that were part of the questions. *See* Farmer Decl. Ex. K at 3. But without reading at least a substantial portion of the passages, it is highly unlikely that she could answer many questions correctly. *See* Lovett Decl. ¶ 15. This is particularly the case on the Verbal Reasoning section of the MCAT, where examinees are generally asked to identify or interpret themes, perspectives, and arguments from a length passage. *See id*.

Ms. Ramsay's "learned behavioral modification" argument based on her purported test-taking strategies has no basis in law or fact.

Ms. Ramsay has failed to show a likelihood of success on the merits, and her motion should be denied on that basis.

### III.    MS. RAMSAY WILL NOT BE IRREPARABLY HARMED IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF

Ms. Ramsay invites the Court to "presume" irreparable harm in the absence of an injunction "when there is a violation of the ADA," Pl. Br. at 19, but this would be improper.  In the first place, her argument improperly assumes that there has been such a violation.  There has not.  And, as shown by dozens of ADA cases in which the irreparable harm factor is appropriately included in the court's analysis (many of which are cited elsewhere in this brief), irreparable harm is not presumed in ADA cases.  *Cf. Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 212-217 (3d Cir. 2014) (explaining why presumption of irreparable harm in Lanham Act cases is contrary to the Supreme Court's decision in *Winter* requiring a plaintiff to make a "clear showing" that she is entitled to relief); *EEOC v. Anchor Hocking Corp*, 666 F.2d 1037, 1040-42 (6th Cir. 1981) (rejecting argument that irreparable harm should be presumed when the EEOC seeks a preliminary injunction under Title VII of the Civil Rights Act).  Instead, Ms. Ramsay must show —with record evidence—that she is likely to suffer irreparable harm absent a preliminary injunction.  She cannot make this showing.

Ms. Ramsay also argues that there is irreparable harm because she will be delayed in pursuing her chosen profession.  *See* Pl. Br. at 20.  However, "courts in this Circuit have held that delays in testing or education do not amount to irreparable harm."  *B.P.C. v. Temple Univ.*, No. 13-7595, 2014 WL 4632462, *5 (E.D. Pa. Sept. 16, 2014) (citing, *inter alia*, *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 WL 5364689 (E.D. Pa. 2012)).[18]

---

[18] *Cf. Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 WL 4040576, *28 (S.D. Ohio Aug. 27, 2019) (holding that a plaintiff who had completed medical school and all clinical rotations, passed the Step 1 exam, passed the Step 2 CS exam, and faced dismissal by his medical school if he did not pass Step 2 CK on his next attempt had shown irreparable harm because, absent accommodations, he was likely to fail the Step 2 CK exam and would be foreclosed from taking

Moreover, Ms. Ramsay took approximately ten months to re-apply for accommodations on the Step 1 exam after she failed on her first attempt, and she made no attempt to take the test again without accommodations in the meantime, even though she missed achieving a passing score by only one point and her school allows students three attempts to pass the test.  *See* Medical Student Policy Manual at 113-114, *supra* note 14.  To the extent Ms. Ramsay's medical school is now requiring her to take the Step 1 examination by March 2, 2020 or withdraw from medical school, she is responsible for much of the delay that she now characterizes as irreparable harm.

It is also speculative whether Ms. Ramsay needs extra time accommodations to pass Step 1.  Based upon her recently documented physical impairments, Ms. Ramsay has been approved for a number of accommodations that she did not have the first time she tested, *see* Farmer Decl. Ex. M, and if she adequately prepares and knows the subject matter, there is no evidentiary basis for concluding that she will not achieve a passing score under standard time testing conditions. *See Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, *5-6  (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Kelly v. W. Va. Bd. of Law Exam'rs*, 2008 WL 2891036, at *2 (S.D. W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Exam's*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.")

---

the exam again and be unable to practice his chosen profession) (entering a preliminary injunction in plaintiff's favor).  NBME respectfully submits that the Ohio court erred in awarding the plaintiff a preliminary injunction in *Berger* and is considering an appeal from that ruling.

(denying preliminary injunction); *cf. Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 WL 2368462, at *5 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives.  For example, she does not discuss whether her school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools.") (denying preliminary injunction).[19]  Ms. Ramsay is not like the plaintiffs in *Enyart* and *Featherstone*, the cases she cites.  Both of those cases involved individuals with undisputed disabilities whom the courts determined would not be able to pursue their chosen profession in the absence of their requested testing accommodations.  *See* 630 F.3d at 1165; 2014 WL 3640803, at *6.

Ms. Ramsay has thus failed to establish that she is likely to suffer imminent and non-speculative irreparable harm in the absence of preliminary injunctive relief.[20]

## IV.   A PRELIMINARY INJUNCTION WOULD HARM NBME

Ms. Ramsay argues that NBME would not be harmed if it grants her double time testing accommodation because it provides such accommodations to other students and has committed

---

[19] The letter from Ms. Ramsay's school also indicates that she would be eligible to apply for readmission in the future even if she has not taken and passed the Step 1 exam by March 2, 2020. *See* Ramsay Decl. Ex. B.

[20] Ms. Ramsay's requested preliminary injunction seeks extra time accommodations not only on Step 1, but also on Step 2 CK, Step 2 CS, and Step 3 of the USMLE.  There is clearly no risk of imminent (much less irreparable) harm with respect to those exams.  According to Ms. Ramsay, her school is requiring her to take the Step 1 exam by March 2, 2020.  She will need to complete Step 2 CK and Step 2 CS to participate in the residency Match, but she has acknowledged that she cannot participate in the 2020 Match in all events, *see* Pl. Br. at 21, so there is no possible urgency relating to taking the other Step exams.  Ms. Ramsay is not even eligible to take the Step 3 examination, which is taken after the candidate has passed the other Steps, graduated from medical school and obtained the MD degree. The USMLE program recommends that, for Step 3 eligibility, candidates should have completed or be near completion of at least one year of postgraduate training in an accredited US graduate medical education residency program.  *See supra* at 5.

to providing such examinations in a settlement agreement that amicably resolved a dispute with the DOJ involving another examinee. *See* Pl. Br. at 21.

Ms. Ramsay misses the important point. NBME has a strong and legitimate interest in ensuring that the USMLE program is fair to all examinees. *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d at 88-89. NBME is therefore harmed if an examinee tests with unwarranted accommodations. Once scores are reported, the harm cannot be undone. The potential harm to NBME if it is ordered to provide unwarranted accommodations outweighs any speculative harm to Ms. Ramsay from not being able to test with accommodations. *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) (overturning preliminary injunction).

Residency programs and applicants to those programs might also be harmed if Ms. Ramsay is provided unwarranted accommodations. Residency programs rely on Step scores in evaluating applicants to their programs. A program that relies upon a Step score that was obtained with the benefit of unwarranted testing accommodations will have allocated a residency position based, in part, on unreliable information. And, because the number of residency slots in any given residency program is limited, a position given to Ms. Ramsay would necessarily come at the expense of another applicant for that position.

## V.   AN INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST

Ms. Ramsay argues that "obviously" enforcement of the ADA is in the public interest and that disabled individuals would benefit from being treated by disabled doctors. Pl. Br. at 22. This argument, however, is based on the incorrect premise that Ms. Ramsay is disabled under the ADA and likely to succeed on the merits of her claim.

Moreover, "[a]lthough the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach v. LSAC*,

2014 U.S. Dist. LEXIS 124632 at *7-8. Other candidates—including not only standard test takers but also disabled test takers who test with accommodations based on documented disabilities—do not want extra testing time to be granted to individuals who are not disabled, as that could provide an undue advantage. Nor do score users want unwarranted accommodations to affect the resulting scores. This is particularly true in the context of licensing examinations that help protect the public welfare—in this instance, by helping to ensure that licensed physicians have the minimum competencies to deliver safe and effective healthcare services. Especially in the context of a mandatory preliminary injunction, any doubts regarding her entitlement to accommodations should be resolved against an award of such accommodations.

## **CONCLUSION**

Ms. Ramsay's motion for a preliminary injunction order should be denied.

Dated:  August 30, 2019                              Respectfully submitted,


                                         /s/   Robert A. Burgoyne
                                         Nancy L. Goldstein (Pa. Bar No. 40019)
                                         Hamburg & Golden, P.C.
                                         1601 Market Street, Suite 3310
                                         Philadelphia, PA 19103-1443
                                         Phone: 215-255-8590
                                         Facsimile:  215-255-8583
                                         goldsteinnl@hamburg-golden.com

                                         Robert A. Burgoyne - *Pro hac vice*
                                         Perkins Coie LLP
                                         700 Thirteenth Street, N.W. Suite 600
                                         Washington, D.C.  20005-3960
                                         Phone:  202-654-1744
                                         Facsimile:  202-654-6211
                                         RBurgoyne@perkinscoie.com

                                         Counsel for Defendant NBME

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document and supporting declaration and proposed order were electronically filed on August 30, 2019, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Plaintiff.  I have also sent a copy by email to the following individuals:

> Lawrence D. Berger, Esquire
> Reisman Carolla Gran & Zuba, LLP
> 19 Chestnut Street
> Haddonfield, N.J. 08033
>
> Counsel for Plaintiff
>
> Mary C. Vargas
> Michael D. Stein
> Stein &Vargas LLP
> 10 G Street NE, Suite 600
> Washington D.C. 20002
>
> Counsel for Plaintiff

s/  Robert A. Burgoyne
Robert A. Burgoyne

Counsel for Defendant NBME

August 30, 2019