**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA RAMSAY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-2002 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| Defendant | : | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**A.      Preliminary Statement.**

No one denies that extended testing time is an appropriate accommodation for students with impaired reading speeds.  Everyone admits that the applicable laws – the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act[1] – require that testing providers like defendant, the National Board of Medical Examiners ("NBME"), provide this accommodation to students who, because of a disability, need extended testing time in order to have a fair opportunity to take time-limited tests.  It might be different if reading speed – not knowledge – was what a test was designed to measure, but no one contends that NBME's "United States Medical Licensing Examination" or "USMLE" is intended to measure reading speed.

For three years, Jessica Ramsay, an accomplished medical student who also has a disability that affects her reading speed, has fought for the right to have this basic accommodation – which she has received throughout most of college, and all of medical school – so that she can take the USMLE Step examinations.  She consulted physicians and psychologists

_____

[1] 29 U.S.C. §794.

who evaluated her in person and concluded that she needed to have extended testing time in order to have a fair opportunity to demonstrate what she knows.  Her college and medical school both provided extended testing time.  However, NBME refused, and continues to refuse.

When NBME refused the first time, and Ms. Ramsay tried to take the USMLE Step 1 examination in "standard" time, she failed because she could only read about 65 to 70 percent of the questions in the time allowed.[2]  She then obtained an additional thorough evaluation by a qualified clinical psychologist with over 25 years' experience, Dr. Robert Smith.  Dr. Smith confirmed the diagnosis of significant dyslexia (a learning disorder that affects reading speed) and attention deficit/ hyperactivity disorder ("ADHD"), and the need for extended testing time, but NBME rejected Ms. Ramsay's request for extended time, again.

Now – because Ms. Ramsay filed this lawsuit – NBME has disclosed for the first time the basis for its multiple rejections, namely, reports by paid academic reviewers who regularly work for NBME, who are not practicing clinical psychologists, and who have never met with Ms. Ramsay.[3]  NBME's academic reviewers have pronounced that – in the "real world" as they define it – Ms. Ramsay doesn't need extra time, and therefore, NBME is refusing to provide extra time.

---

[2] *See* Ramsay Declaration (ECF No. 7-3), ¶¶28-29, 32.

[3] The Declarations of both of NBME's reviewers, Professors Zecker and Lovett, contain the same boilerplate sentence which reads "As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems to assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning."  *Compare* Zecker Declaration (ECF No. 17-3), ¶3, and Lovett Declaration (ECF No. 17-2), ¶3.  But this is not clinical experience, and neither Professor Zecker nor Professor Lovett ever met with Ms. Ramsay.  Neither Professor Zecker nor Professor Lovett lists current or recent clinical experience in his *curriculum vitae*.  *See also* p. 7 and p. 7 n. 21, *infra*, concerning another court's finding (in a recent case involving NBME and the USMLE) about Professor Lovett's lack of clinical experience.

## B.      The Real World.

NBME's "real world" is not real.

In the real world, Ms. Ramsay – who has already suffered nearly three years of delay because of NBME – will be dismissed from medical school on March 2, 2020,[4] unless she can take and pass USMLE Step 1 before that date.[5]  Therefore, she is asking this Court to require that NBME provide extended testing time, an established type of accommodation which the NBME has provided in other cases, and which the ADA requires.  Otherwise, her good grades, her nomination for a medical honor society, and all of the many ways in which she has worked to overcome a significant learning disability, will come to nothing.  She will not only be unable to continue in her current medical school, but she will almost certainly never become a physician, because the USMLE Step 1 and Step 2 examinations are requirements for graduation for every M.D. degree program in the United States.[6]  The harm to Ms. Ramsay is not speculative, as NBME would have it, but certain, present, and devastating.

NBME also asks the Court to disregard an in-person evaluation by Dr. Smith, a clinical psychologist with more than 25 years of experience in conducting neuropsychological assessments of people with learning disorders and ADHD,[7] based on NBME-paid reviews by two academics who have no clinical practice, and who have never met Ms. Ramsay.  Both of

---

[4] *See* Exhibit A, letter dated 6/24/2019 from Peter Ziemkowski, M.D., Associate Dean for Student Affairs; and Exhibit B, letter dated 8/6/2019 from Dr. Ziemkowski.

[5] *See* p. 17, *infra,* for further discussion of the medical school's requirements for Ms. Ramsay to return from leave-of-absence.

[6] Moreover, it is unlikely that Ms. Ramsay would be accepted to another medical school after being dismissed by her current school.

[7] *See* Declaration of Robert D. Smith, Ph.D. (ECF No. 7-2) at ¶2, and Dr. Smith's *curriculum vitae* which is Exhibit A to his Declaration.

NBME's academic reviewers discredit her claim of dyslexia and ADHD because she was not diagnosed as a child (which is not a requirement for the diagnosis).[8]  Yet, Professor Zecker, one of NBME's academic reviewers, has stated in a published article that bright children with learning disabilities and ADHD, like Ms. Ramsay, "often are not identified as LD [learning disabled] or ADHD as accurately or as early in their lives as their non-gifted peers."  Zecker (2000), "Underachievement and learning disabilities in children who are gifted," *Talent Development*, Spring, 18-23.[9]

In any event, the question before this Court is not whether Jessica Ramsay might have benefited from formal accommodations in earlier schooling, or on the Medical College Admission Test ("MCAT").  Many gifted but disabled students are initially able to compensate for their impairments (like dyslexia) by drawing upon their other strengths, as Professor Zecker wrote.  However:  "A student who is not identified disabled or gifted may . . . [s]how areas of difficulty as curriculum becomes more challenging."  National Education Association, *The Twice-Exceptional Dilemma* (2006).[10]  Jessica Ramsay's case is just such a case.  The question

---

[8] The current edition of DSM-5, the authoritative *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, states at p. 69 that "the learning difficulties may not manifest fully until later in school years, by which time learning demands have increased and exceed the individual's limited capacities."  DSM-5 also states "Specific learning disorder may also occur in individuals identified as 'gifted'.  These individuals may be able to sustain apparently adequate academic functioning by using compensatory strategies, extraordinary high effort, or support, until learning demands or assessment procedures (*e.g.,* timed tests) pose barriers to their demonstrating their learning or accomplishing required tasks."  *Id.*

[9] Found on the Internet at http://www.nldline.com/gifted_and_ld.htm, and listed in Professor Zecker's c.v., *see* Zecker Declaration (ECF No. 17-3), Exhibit A at p. 3.

[10] Available on the Internet at http://www.nea.org/assets/docs/twiceexceptional.pdf, at 6.

before the Court is whether the ADA requires NBME to provide her with extended testing time **now**, on the USMLE Step examinations.

### C.    In the Real World, Jessica Ramsay Needs Extended Testing Time In Order To Be Able To Demonstrate Her Knowledge On Time-Limited Reading-Intensive Standardized Tests Like The USMLE.

For two years and now continuing into a third year, Jessica Ramsay has been blocked from moving further in medical school because NBME refuses to grant her the same extended testing time accommodation that was approved by her school.  NBME itself caused much of this delay.[11]

Ms. Ramsay first requested extended testing time for the USMLE "Step" examinations in 2016, and NBME refused in 2017.  Ms. Ramsay attempted the Step 1 examination without extended testing time in 2017.  Because of her slow reading speed, she was only able to read about 65 to 70 percent of the questions,[12] and she received a score of 191 which is a failing score.  Her school placed her on leave-of-absence in 2017 after she failed Step 1.  Ms. Ramsay re-applied for extended testing time in 2018, and NBME refused again.  Up to this point, the physicians and psychologists who Ms. Ramsay consulted about her slow reading speed had diagnosed ADHD.  According to Professor Zecker, in the same article quoted above at page 4, ADHD, "while not a learning disability, often co-occurs with learning disabilities and also

---

[11] NBME sent Ms. Ramsay's request to external reviewers three times, and each time waited for about two additional months before denying Ms. Ramsay's requests, often in the same words as the reviewer's words,  *See* Zecker Declaration (ECF No. 17-3), Exhibit B dated 1/13/2017 and Farmer Declaration (ECF No. 17-1), Exhibit I 3/10/2017; Zecker Declaration, Exhibit C dated 7/19/2018 and Farmer Declaration, Exhibit M dated 9/11/2018; and Lovett Declaration (ECF No. 17-2), Tab B dated 12/25/2018 and Farmer Declaration, Exhibit N dated 2/14/2019. NBME offers no explanation for waiting this additional time, nearly six months in total.

[12] *See* p. 2 n. 2, *supra*.

frequently manifests itself in ways that are quite similar to learning disabilities." Zecker (2000), *supra*.

Ms. Ramsay had long believed that, much as Professor Zecker writes, she also had a learning disability, dyslexia.[13] She therefore responded to NBME's decision by seeking additional information concerning her slow reading speed. Dr. Robert Smith, the independent evaluator who she consulted and who, unlike Professors Zecker and Lovett, is a practicing clinical psychologist and is not paid by NBME, reviewed the prior evaluations and told Ms. Ramsay before proceeding that he "did not know, until I carried out the assessment procedures, whether she actually had a learning disorder such as developmental dyslexia and/or ADHD or that I would find additional evidence of dyslexia and ADHD beyond what [prior evaluators] had found."[14]

In short, Dr. Smith had no pre-conceptions. The only thing that he promised Ms. Ramsay was that he would meet with her, and test her, and report his results. His report, finding that Ms. Ramsay's slow reading speed is because of dyslexia and ADHD, was submitted to NBME and now to this Court.[15]

As Dr. Smith wrote in his report, dyslexia is a "neurologically-based condition that results in unexpected difficulty in acquiring an understanding of letter-phoneme relationships, acquiring a capacity for efficiently processing phonological information, or developing rapid, automatic reading fluency (either oral or silent)."[16] Characteristically, dyslexic readers like Ms.

---

[13] In DSM-5, dyslexia is called "Specific Learning Disorder with impairment in reading."

[14] *See* Smith Declaration, ECF No. 7-4 at ¶12.

[15] Smith Declaration, *supra,* Exhibit B.

[16] Smith Declaration, Exhibit B, at p. 24.

Ramsay lack automatic reading fluency and therefore must concentrate on the mechanics of reading with the result that comprehension is compromised and speed is significantly impaired.[17] Letters are merged, switched, and tangled.[18]  Dyslexia cannot be diagnosed based on any single test.[19]  Instead, diagnosis of dyslexia requires expert, comprehensive evaluation including the administration of a battery of tests, each measuring different components of reading.[20]  Ms. Ramsay had exactly such a comprehensive evaluation by an expert who specializes in dyslexia and who administered a battery of tests designed to identify learning disorders such as dyslexia. That testing confirmed a diagnosis of dyslexia.

NBME responded by hiring Professor Lovett, who "has been a consultant for NBME for ten years," who "does not have a clinical practice and [who] does not personally perform clinical evaluations."[21]  Professor Lovett does have pre-conceptions, with which NBME apparently agrees, and so, as discussed in the following paragraphs, he wrote to NBME that Ms. Ramsay's score on a different test, the MCAT, proved that in the "real world," Ms. Ramsay did not have a disability.

Professor Lovett stated that "there is no objective evidence of poor academic skills or significant ADHD symptoms and impairment in *real-world* settings."[22]  Professor Lovett based

---

[17] *See* Complaint (ECF No. 1), ¶23:  "The skills that are required in order to completely read the questions on the USMLE step examinations under standard timing conditions include the ability to read fluently and with automaticity, *i.e.,* the ability to recognize words quickly and accurately, and without conscious thought or hesitation."

[18] *See* Ramsay Declaration (ECF No. 7-3), ¶8.

[19] Smith Declaration, *supra,* ¶13.

[20] Smith Declaration, *id.*

[21] *See Berger v. National Board of Medical Examiners,* 2019 U.S. Dist. Lexis 145666 at *38 (S.D. Ohio 2019).

[22] *See* Lovett Declaration (ECF No. 17-2, Tab B at 3) (italics added).

this opinion on absence of formal accommodations in school prior to college (while ignoring that such accommodations were provided both in college and medical school, and refusing to credit that informal accommodations were granted earlier), and on the fact that Ms. Ramsay achieved scores within the "average range" on standardized tests (the ACT college admissions test, and the MCAT) prior to medical school.  Professor Lovett also suggested that Ms. Ramsay's evaluator, Dr. Smith, skewed his assessment because "many evaluators view their role as helping a client to secure accommodations."[23]  Surely it is fair to assume that Professor Lovett, who NBME has been paying to review accommodations requests for ten years, views his role as helping NBME.

NBME's Director of Disability Services, Dr. Farmer, echoed Professor Lovett in her Declaration,[24] and NBME's other paid reviewer, Professor Zecker (who did not review Dr. Smith's evaluation) placed similar stress on the lack of formal accommodations prior to college, and on the ACT and MCAT examinations.[25]

---

[23] Lovett Declaration, *id.,* ¶35.  This superficially polite slur against professionals who are hired by students is apparently a regular feature of Professor Lovett's Declarations.  *See* Professor Lovett's Declaration in *Berger v. National Board of Medical Examiners* (S.D.Ohio No. 1:19-cv-99) attached hereto as Exhibit D, at ¶48, which reads almost word-for-word the same.  (Exhibits to the Declaration in the *Berger* case are omitted.)  How does Professor Lovett, who regularly acts as a paid reviewer for testing organizations like NBME (Lovett Declaration, *id.,* ¶5), view his role?  In the *Berger* case, where Professor Lovett also acted as a paid reviewer, the Court stated in its decision to grant a preliminary injunction, which is reported at 2019 U.S. Dist. Lexis 145666 at *38 (S.D. Ohio 2019) that "Dr. Lovett . . . has been a consultant for NBME for ten years. (Doc. 33, Tr. 140:12-14). Dr. Lovett does not have a clinical practice and does not personally perform clinical evaluations."

[24] *See* Farmer Declaration (ECF No. 17-1), ¶31.

[25] *See* Zecker Declaration (ECF No. 17-3), Exhibit B at p. 6 ("She was apparently a strong student from kindergarten through high school in the absence of accommodations"); *id.* ("she obtained an above average unaccommodated MCAT score").

However, almost 20 years ago, in the previously cited article for which he presumably was *not* paid by NBME, Professor Zecker wrote that:

> [C]hildren who are gifted are as likely to have learning disabilities or attention-deficit hyperactivity disorder as any other children. Due to some of the characteristics of gifted children (most notably their high levels of intelligence), however, *gifted children often are not identified as LD or ADHD as accurately or as early in their lives as their non-gifted peers.*

Zecker (2000), *supra* (italics added.)  Professor Zecker's article is consistent with DSM-5 which states that gifted individuals with disabilities "may be able to sustain apparently adequate academic functioning by using compensatory strategies, extraordinary high effort, or support, until learning demands or assessment procedures (*e.g.,* timed tests) pose barriers to their demonstrating their learning or accomplishing required tasks."[26]

Therefore, both Professor Zecker and Professor Lovett should understand that a student with a learning disability or ADHD may not be identified as such during childhood, because of high intelligence, and may nevertheless be a person with a disability.  Professor Zecker also recognizes in his report to NBME that some of Ms. Ramsay's testing shows evidence of superior intelligence even though she is a slow reader,[27] and refers to the Personal Statement that Ms. Ramsay submitted to NBME as both "lengthy" and "well-written,"[28] as though this was a bad thing, or was somehow inconsistent with requesting accommodations.

What Professor Zecker wrote in 2000 was right:  students – both those in lower grades and those who are able to make it into college and professional school by self-mitigating, up to a point, for their disabilities – are still people with disabilities.  In fact, Congress expressly

---

[26] DSM-5, *supra,* at p. 4 n. 8.

[27] Zecker Declaration, *id.,* Exhibit B at p. 3.

[28] Zecker Declaration, *id.,* Exhibit B at p. 2.

amended the Americans with Disabilities Act in 2008 in order to overrule prior court decisions to the contrary, and to expressly provide that people who self-mitigate may still require legal protection.[29]  And – as Professors Zecker and Lovett should also have recognized – students with disabilities may even find it possible to write lengthy and well-written statements, when they are not constrained by artificial time limits.[30]  The issue in this case is not whether Ms. Ramsay needed accommodations in grade school or high school.  (As the record shows, she was able to achieve a degree of success without formal accommodations, just like the students that Professor Zecker wrote about.)  The issue in this case is not whether Ms. Ramsay needed accommodations for the ACT or the MCAT, which are both very different tests than the USMLE Step examinations.  The issue in this case is not whether Ms. Ramsay can write well, when she has sufficient time.  The issue in this case is whether Ms. Ramsay needs extended testing time **now** for the time-limited USMLE examinations, and in the "real world," the answer is yes.

**D.     NBME's Academic Attempt To Define Away Ms. Ramsay's Real Disability Is Contrary To The Broad And Remedial Purpose Of The ADA And The Rehabilitation Act.[31]**

NBME has chosen to rest its opposition largely on its theory, or Professor Lovett's theory, that Ms. Ramsay is not "really" disabled.  If this Court were to accept NBME's theory, it would be disregarding what Congress intended when it enacted the "ADA Amendments Act," P.L. 110-325, 122 Stat. 3553, in 2008.

---

[29] NBME is required to disregard "learned behavioral . . . modifications," like the strategy that Ms. Ramsay used on the MCAT of answering questions without reading the passage in order to mitigate a reading disability.  42 U.S.C. §12102(4)(E)(i)(IV).

[30] NBME has submitted no evidence that the "standard" time limits for the USMLE Step examinations are relevant to evaluation of the skills of medical students.

[31] In this Reply Brief, we will generally ignore irrelevant non-ADA cases cited by NBME such as *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceutical, Inc.,* 765 F.3d 205 (3d Cir. 2014) (Lanham Act).

The ADA Amendments Act begins with this legislative finding:

> [I]n enacting the Americans with Disabilities Act of 1990 (ADA),
> Congress intended that the Act "provide a clear and comprehensive
> national mandate for the elimination of discrimination against individuals
> with disabilities" and provide broad coverage. . . .

ADA Amendments Act, §2(a)(1).  To that end, Congress:

- Found that *Sutton v. United Air Lines,* 527 U.S. 471 (1999) and other court decisions had wrongly "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect."  ADA Amendments Act, §2(a)(4).

- "*reject[ed]* the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  ADA Amendments Act, §2(b)(4).

- stated that "the standard created by the Supreme Court" in the *Toyota* case for "substantially limits . . . has created an inappropriately high level of limitation necessary to obtain coverage under the ADA."  ADA Amendments Act, §2(b)(5).

- stated "that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  *Id.*

- added new language to the ADA requiring courts to disregard "learned behavioral modifications" in determining whether someone has a disability.  42 U.S.C. §12102(4)(E)(i)(IV).

Yet, more than 10 years later, NBME is still clinging to the defenses that Congress expressly rejected.  According to NBME, "exceptionally low scores on timed reading tests" are not enough to show that Jessica Ramsay has a reading disability,[32] and yet nothing could be more relevant to determine her need for an accommodation on the very reading intensive USMLE examinations.[33]  In NBME's own words, the low reading scores are not "credible" because Jessica Ramsay passed a different test using "strategies such as answering questions before reading the passages."  (That strategy for the MCAT, which worked for Ms. Ramsay and another NBME plaintiff whose case is discussed in the next section, is ineffective for the reading-intensive USMLE examinations.)  But such strategies are exactly what Congress told the Courts to disregard, in deciding whether someone has a disability:

---

[32] Farmer Declaration, Exhibit N, p. 2.

[33] Here is a sample question for the Step 1 examination from the USMLE web-site, https://www.usmle.org/pdfs/step-1/samples_step1.pdf (Sample Question No. 89 at p. 34, image omitted):  "A 72-year-old woman is brought to the emergency department by her husband because of a 1-hour history of difficulty walking and speaking. The husband says that she was well last night but when she awoke this morning, she had difficulty getting out of bed and her speech was slurred. She has a 20-year history of type 2 diabetes mellitus well controlled with medication and diet. She is alert and oriented and is able to follow commands and respond verbally, but she has impaired speech. Her pulse is 80/min, respirations are 16/min, and blood pressure is 142/88 mm Hg. Physical examination shows left-sided hemiparesis. The tongue deviates to the right when protruded. Sensation to pinprick and temperature is normal, and proprioception and sensation to light touch are absent over the left upper and lower extremities. Which of the following labeled sites in the photograph of a cross section of a normal brain stem is most likely damaged in this patient?"  **Real USMLE questions are even longer and more densely written**.  When taken under standard time conditions, a student must read and answer about 280 such questions in an 8-hour session.  Ms. Ramsay can only read about 180 to 200 questions (65 to 70 percent of the total) in an 8-hour session, and therefore is **unable to read about 80 to 100 questions** (30 to 35 percent of the total).

(A) The definition of disability in this chapter shall be construed in favor of *broad* coverage of individuals under this chapter, to the *maximum* extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

* * *

(E) (i)The determination of whether an impairment substantially limits a major life activity shall be made *without regard to the ameliorative effects of mitigating measures* such as —

* * * *

(IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. §12102(4), as added by the ADA Amendments Act (italics added).

**E.     In A Recent Case Similar To This Case, NBME Has Been Ordered To Provide Extended Testing Time for A USMLE Step Examination.**

Last month, in *Berger v. National Board of Medical Examiners,* 2019 U.S. Dist. Lexis 145666 (S.D. Ohio 2019), the District Court issued a preliminary injunction, requiring that NBME provide double testing time – the same accommodation that Ms. Ramsay is requesting – for a USMLE Step examination (Step 2 CK).  No two cases are identical, but Mr. Berger[34] – like Ms. Ramsay – took the MCAT without accommodations, and like Ms. Ramsay, was able to achieve an MCAT score in the "average" range.[35]

Just like Ms. Ramsay when NBME refused her, Mr. Berger attempted to take the USMLE Step exam without accommodations, and failed.  Just like Ms. Ramsay, NBME sent

---

[34] Mr. Berger is not related to plaintiff Ramsay's counsel.

[35] Mr. Berger did request accommodations for the MCAT but was turned down.  *Berger v. NBME, supra,* at *10 and *11.

Mr. Berger's accommodations request to Professor Lovett for review.  Just like Ms. Ramsay's

case, Professor Lovett told NBME that Mr. Berger's low scores on assessments of his reading

ability were "not credible" because he obtained scores in the "average range" on the MCAT, and

because of other so-called "real-world" discrepancies. [36]  Just like this case, Professor Lovett

criticized Mr. Berger's evaluator as being one of those people who tries to help students, and

hinted, in his *Berger* Declaration at clinical experience that he (Professor Lovett) does not

actually have. [37]

       The *Berger* Court rejected Professor Lovett's "real world" theory, stressing instead the

clinical experience of Mr. Berger's evaluator, and Professor Lovett's lack of such experience.

*Berger, supra,* at *72-74.  Mr. Berger was different from Ms. Ramsay in having received formal

school accommodations before college,[38] but Mr. Berger and Ms. Ramsay were alike in other

ways.  Both were diagnosed by clinical psychologists – who actually met with them – as having

dyslexia and ADHD.  Both are slow readers who are unable to read all of the questions on

USMLE examinations in standard time.  Both took the MCAT without extended time, and

---

[36] *See, e.g.,* Professor Lovett's Declaration in *Berger v. NBME,* attached hereto as Exhibit D, at ¶¶26 and 28 (MCAT and other scores), and ¶¶35, 37 and 42 ("real-world" school and work records).  Professor Lovett also included in his *Berger* Declaration the same broadside against evaluators who work for students and not for NBME.  *See* Lovett Declaration in *Berger* at ¶48.

[37] In *Berger,* the Court found that Professor Lovett "does not have a clinical practice and does not personally perform clinical evaluations." *See* p. 7 n. 21, *supra*.  In the case at bar, Professor Lovett states that "As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems, and I assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning." Lovett Declaration (ECF No. 17-2) at ¶3.  The identical sentence appears in Professor Lovett's *Berger* Declaration (Exhibit D) at ¶4; and in Professor Zecker's Declaration in the case at bar (ECF No. 17-3) at ¶3.  Despite this boilerplate declaration, neither Professor Lovett nor Professor Zecker have a clinical practice.

[38] As discussed above at pages 4 and 9, it is not uncommon for students who are "gifted but disabled" to be able to get through lower grades without accommodations.

avoided the reading passages on the MCAT.  *See* Ramsay Declaration at ¶¶19 and 22, and *Berger, supra,* at *12.[39]

In his testimony in the *Berger* case, Professor Lovett acknowledged that, when considering a student's performance on a standardized test, it is important to also consider "the condition, manner, and duration under which the individual performed the standardized test." *Berger, supra,* at *70-*71.  As the *Berger* Court also observed:

> This would include the amount of study effort one put forth in comparison to most people in the general population; *the strategies the individual employed to maximize his or her time on the exam; the amount of the test the person was able to complete; and any other mitigating measures the individual employed in taking the test.* (*id.*, Tr. 241-42).  [Professor Lovett] also agreed that these would be valid considerations in assessing an individual's performance on the Step 2 CK exam. (*id.*, Tr. 243-44).

*Berger, supra,* at *71 (italics added).  Here too, it is important to consider the strategies that Jessica Ramsay used in taking the MCAT, a consideration that NBME and Professors Lovett and Zecker dismissed, and "the amount of the test [Ms. Ramsay] was able to complete," which was only 65 to 70 percent for the Step 1 examination.[40]

Like Mr. Berger's evaluator, Ms. Ramsay's evaluator has more than 25 years' experience in conducting assessments of people with dyslexia and ADHD.[41]  In this case, Dr. Smith went one step further, and performed a separate "vigilance" test of Ms. Ramsay's performance.[42]  In

---

[39] For another example of a student who obtained double-time, *see* Settlement Agreement between the United States and NBME, found on the Internet at www.ada.gov/nbme.htm, a copy of which is attached hereto as Exhibit E.

[40] *See* Ramsay Declaration (ECF No. 7-3), ¶¶28-29, 32.

[41] *Compare Berger, supra,* at *72-*73, and Dr. Smith's Declaration, *supra,* ¶2.

[42] Smith Declaration, ¶22.  Professor Lovett criticized Berger's evaluator, because she failed to perform a "vigilance" or "symptom validity" test, *i.e.* a test to determine whether the student if making a good faith effort.  The *Berger* Court rejected this argument, and accepted the clinical judgment of Berger's evaluator as more persuasive than the theoretical pronouncements of

the end, the *Berger* Court found that the clinical psychologist who evaluated the student face-to-

face was more persuasive than the academic psychologist who did not:

> *Dr. Lovett, in contrast, is not a clinical psychologist.*  He has
> acknowledged the importance of a clinical evaluation in diagnosing a
> learning disability, which is something *he did not perform* in reviewing
> Mr. Berger's request for accommodations on the Step 2 CK. . . .
>
> Consistent with DOJ guidance that an individualized evaluation is
> "particularly important in the learning disabilities context, where proper
> diagnosis requires face-to-face evaluation," and that *"[r]eports from
> experts who have personal familiarity with the candidate should take
> precedence over those from, for example, reviewers for testing agencies,
> who have never personally met the candidate," Bibber [v. National Board
> of Osteopathic Medical Examiners],* 2016 U.S. Dist. LEXIS 48181, 2016
> WL 1404157, at *6,[43] the Court finds the strong weight of the evidence
> supports the findings and conclusions of Dr. Beach [Mr. Berger's
> evaluator], who *personally administered multiple assessments to Mr.
> Berger and clinically observed his performance and efforts on those
> assessments.*

*Berger, supra,* at *73-74 (italics and footnote added).

Here too, as in Berger, the evidence supports the findings of Ms. Ramsay's evaluator –

Dr. Smith – the clinical psychologist with 25 years of real-world experience, and not the

secondary review comments of Professor Lovett, the academic reviewer who has worked for

NBME for 10 years.

---

Professor Lovett.  *Berger, supra,* at *73.  In the case at bar, Professor Lovett asserts that
Dr. Smith should have performed a different type of vigilance testing, but does not identify any
specific test.  Lovett Declaration, ¶24.  Dr. Smith will discuss the subject of vigilance testing
further at the hearing.

[43] In *Bibber,* the District Court (Judge Dalzell) ruled against the student, but only because he
concluded that the student's own experts had shown that "she reads at an average level."  2016
U.S. Dist. Lexis 48181 at *21.  For example, "she scored in the 68th percentile in word reading,
the 53rd percentile in Pseudoword Decoding, and the 82nd percentile in spelling."  *Id.* at *23.
By contrast, Ms. Ramsay had an oral reading fluency score at the 1st percentile, a reading rate
cluster score at the 1st percentile, and a fluency score at the 2d percentile.  *See* Smith
Declaration, Exhibit B, at pp. 16, 18, 21, 22.

**F.    The Harm To Jessica Ramsay Is Immediate And Irreparable, And Will Continue Unless And Until NBME Is Required To Stop Interfering With Her Medical Education.**

Jessica Ramsay faces an imminent danger.  If she cannot obtain extended testing time, schedule and take USMLE Step 1, and return from leave-of-absence before March 2, 2020,[44] she will be dismissed from or forced to withdraw from medical school, and will never be able to become a physician.  The normal scheduling window for the Step 1 examination is three months.[45]  Ms. Ramsay's medical school also requires that additional steps be taken **before** returning from leave of absence, *e.g.,* a "fitness-for-duty evaluation."  Ms. Ramsay is in imminent danger of being dismissed from medical school unless she can complete all these steps, and actually take the Step 1 examination, before the leave-of-absence expires on March 2, 2020.

NBME asserts that this harm is "speculative and insufficient" (NBME Opposition at 3), and that "delays" in education "do not amount to irreparable harm," *citing B.P.C. v. Temple University,* 2014 U.S. Dist. Lexis 130410 (E.D.Pa. 2014) (Sitarski, M.J.), *adopted by* 2014 U.S. Dist. Lexis 129181 (E.D.Pa. 2014) (Jones, J.) and *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 WL 5364689, 2012 U.S. Dist. Lexis 86837 (E.D. Pa. 2012).  (NBME Opposition at 28.)  Neither case is remotely similar to this case.

In this case, Ms. Ramsay was forced to suspend her medical studies, and go on leave-of-absence, in August 2017 – more than two years ago – when she received her failing score on the Step 1 exam, and has been forced to remain on leave-of-absence since that time.  In this case, Ms. Ramsay asked her school to extend the leave-of-absence until this case was decided, and her

---

[44] *See, e.g.,* Exhibit C hereto which is an excerpt from the Medical Student Policy Manual for Ms. Ramsay's medical school, the Homer Stryker M.D. School of Medicine at Western Michigan University.

[45] *See* Ramsay Declaration (ECF No. 7-3), ¶36.

school refused to do so, offering instead an extension to only March 2, 2020.[46]  In this case, unless Ms. Ramsay retakes the Step 1 exam by March 2, 2020, **and passes**, she will be dismissed from medical school or required to withdraw.  In case of dismissal, she would not be eligible for readmission, and in case of withdrawal, readmission would not be assured.  Moreover, her transcript "would show a gap in coursework for the elapsed time," and this would be part of her application for the National Residency Match Program (the "Match").[47]

Even if Ms. Ramsay is able to retake Step 1 and return to the curriculum by March 2, 2020, Ms. Ramsay's graduation will be delayed until 2021 – three years after the normal graduation date for her medical school class which entered in 2014 – and Ms. Ramsay will not be able to enter the Match until 2021.  Any delay beyond March 2, 2020 will result in Ms. Ramsay's dismissal or forced withdrawal from medical school.

In short, Ms. Ramsay's medical education and career have already been significantly delayed, and the delay and damage will only become greater, and irreparable, if she is not able to obtain the extended testing time that she needs, and retake the Step 1 exam with that accommodation by March 2, 2020.  The normal scheduling window for the exam is 3 months, and for this reason, Ms. Ramsay is requesting a decision from this Court as close as possible to 3 months prior to March 2, 2020.  This date is neither remote nor speculative.

NBME also argues that Ms. Ramsay herself is responsible for the delay because:  (a) she could have taken the test again without accommodations; (b) she took 10 months to reapply for

---

[46] *See* Exhibit A hereto, letter dated June 24, 2019 from Dr. Ziemkowski.

[47] *See* Exhibit B hereto, letter dated August 6, 2019 from Dr. Ziemkowski.  The "Medical Student Performance Evaluation" or Dean's Letter, to which Dr. Ziemkowski refers, is part of the Match process.  "Medical Student Performance Evaluation (MSPE) was the 3rd highest ranked factor (equivalent to USMLE Step 2 CK and COMLEX Level 2 Score) cited by 1,233 medical residency program directors when selecting applicants to interview."  Found on the Internet at https://www.acmedical.org/services/medical-student-performance-evaluation/.

accommodations; and (c) she might now pass because NBME has given her different accommodations (based on physical impairments).  (NBME Opposition at 29).  NBME is wrong about this too:

- The Step 1 examination is more than a simple pass/fail test:  NBME admits that "scores on USMLE Step 1 are considered by medical residency training programs during the residency selection process."  NBME's Answer (ECF No. 3), ¶16.  If Ms. Ramsay were to take the test again with standard time, she still would only be able to read at most 65 to 70 percent of the questions, and in order to have a fair chance to be placed into a residency training program, she needs a score that fully reflects her abilities.  A score, taken under conditions where she can only read 65 to 70 percent of the questions, is not such a score.

- Ms. Ramsay needed 10 months to reapply for accommodations, because NBME rejected Ms. Ramsay's first application, and Ms. Ramsay needed to gather additional information for her second application.  It also took NBME about 9 months to review Ms. Ramsay's applications and requests for reconsideration, and about 6 of those months came between the time that NBME's external reviewers (Professors Zecker and Lovett) delivered their reports, and the time that NBME sent denial letters to Ms. Ramsay.[48]

- While the other accommodations (extended break time and a private room) may be helpful, extended break time and a private room do not give Ms. Ramsay any more time to read questions, and in standard time, she still can only read 65 to 70 percent of the questions.  (Ms. Ramsay suffers from migraine headaches, and had

---

[48] *See* p. 5 and n. 11, *supra*.

such a headache during her first attempt at the Step 1 examination.  Extended
break time and a private room may help Ms. Ramsay cope with her susceptibility
to migraines, and her other physical impairment, deep vein thrombosis or DVT,
but will not change her slow reading speed.)

This is a case in which Ms. Ramsay has exhausted every form of internal review within
NBME, and now faces a real and immovable deadline which threatens her ability to progress
further in medical school, to graduate, to be placed in a residency program, and to be licensed.
None of the cases cited by NBME are remotely similar.  In *B.P.C.,* the plaintiff was an
undergraduate student who was suspended after he was charged with stalking a faculty member,
and faced potential expulsion.  While the university's internal discipline process was still
proceeding, he sought to enjoin a final university hearing, alleging stigma, speculative harm to
his reputation and future education as irreparable harm.  Judge Sitarski noted that the internal
hearing process was still in progress, and that even if there was an adverse decision,
reinstatement was a potential remedy in the plaintiff's court litigation.  Here, by contrast, NBME
has already denied plaintiffs' requests for accommodations twice, and denied plaintiff's requests
for reconsideration twice.  Ms. Ramsay has no further recourse with NBME.  Moreover, in
Ms. Ramsay's case, what is at stake is whether she can **ever** finish her medical education, which
has already been delayed for more than two years, and whether she can **ever** become a doctor.
Passing the USMLE Step examinations is required for licensing, throughout the United States,
and also plays a material part in the National Residency Matching Program.  **All of this is
undisputed**.

*Mahmood* is even further from the mark.  There was no evidentiary hearing in *Mahmood*.
The case involved a student who was scheduled to take one of the USMLE step examinations

(Step 2 CK).  There was a delay or malfunction with a custom monitor that was required because of her disability.  The student became frustrated and started a fire, and subsequently pled guilty to a charge of malicious destruction of property.  Because of this behavior, NBME suspended her from taking the exam for a three year period.  However, the court believed that she had other avenues for relief from NBME's action.[49]  Ms. Ramsay has none.

Ms. Ramsay did not start a fire.  All she did was to request that NBME provide her with the same testing accommodations that she had received throughout medical school.  If the accommodations had been provided, Ms. Ramsay could have graduated from medical school and begun her residency training more than a year ago.  NBME made that impossible.  Ms. Ramsay has already been forced to take a leave of absence from her medical school for more than two years.  Because of this extensive delay, Ms. Ramsay will likely face additional academic requirements if and when she can return to medical school.[50]  While a "mere" delay in education, such as the *B.P.C.* case, may not constitute irreparable harm, delay which threatens a student's ability to pursue a profession, does constitute irreparable harm.  *See, e.g., Berger v. National Board of Medical Examiners,* 2019 U.S. Dist. Lexis 145666 at *83-*84 (S.D.Ohio 2019) ("Obtaining a passing score on the Step 2 CK has prevented Mr. Berger from pursuing his chosen career path as a physician, and it is highly likely that without accommodations to address Mr. Berger's impairments in reading fluency, processing speed, and ADHD he will not pass the Step 2 CK a third time"); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153,

---

[49] *E.g.,* "Mahmood does not discuss the ways in which adverse decisions by her university or NBME might be appealed to higher adjudicatory bodies."  *Mahmood, supra,* 2012 U.S. Dist. Lexis 86837 at *15.

[50] *See* Exhibit B, letter dated 8/6/2019 from Peter Ziemkowski, M.D., Associate Dean for Student Affairs.  For example, Ms. Ramsay may be required to repeat courses.

1166 (9th Cir. 2011) (affirming finding of irreparable harm based on the plaintiffs inability to practice law without successfully passing bar examination).[51]

In fact – contrary to what NBME says at page 30 of its Opposition – Ms. Ramsay is just "like the plaintiffs in *Enyart* and *Featherstone*."[52]  If this Court accepts Ms. Ramsay's evidence of her reading disability, as it should, then Ms. Ramsay, like Enyart and Featherstone, will not be able to pursue her chosen profession, without the requested accommodations.

NBME also made the same argument in *Berger v. NBME,* as here, that the plaintiff did not need a preliminary injunction, and could wait for a final hearing because his school would further extend his time.  The court rejected this argument in the *Berger* case, and the argument cannot even be made in Ms. Ramsay's case because Ms. Ramsay's medical school has already told her in writing that if she does not take the Step 1 examination by March 2, 2020, she will either be dismissed from the school, or will be required to withdraw, in which case readmission "is not assured."  In addition:

---

[51] Other factually inapposite cases cited by NBME include:  *Bach v. Law School Admissions Council,* 2014 U.S. Dist. Lexis 124632 (M.D.N.C. 2014) at *7 (harm not irreparable because plaintiff could "take the LSAT with accommodations at a later date if he is successful on the merits"); *Kelly v. West Virginia Board of Law Examiners,* 2008 U.S. Dist. Lexis 56840 (S.D.W.Va. 2008) at *6 (Board was already providing accommodations that had been sufficient for plaintiff on prior examinations); *Baer v. NBME,* 392 F.Supp. 2d 42 (D.Mass. 2005) (citing cases such as *Toyota* which have been overruled by the ADA Amendments Act); *Powell v. NBME,* 364 F.3d 79 (2d Cir. 2004) (pre-ADA Amendments Act, and Court found that plaintiff was academically unqualified); *Rothberg v. Law School Admissions Council,* 102 Fed. Appx. 122 (10th Cir. 2004) (non-precedential) (pre-ADA Amendments Act, plaintiff had already taken test with accommodations ordered by District Court, and Court of Appeals reversed only a subsequent Order requiring that the results be immediately reported, because further record was required).

[52] *Featherstone v. Pacific Northwest U. of Health Sciences*, 2014 U.S. Dist. Lexis 102713, 2014 WL 3640803 (E.D. Wash. 2014).

> [Y]our transcript . . . would show a gap in coursework for the elapsed time.  All gaps in medical education are identified on the Medical Student Performance Evaluation (MSPE or "Dean's Letter").

Letter dated 8/6/2019 from Peter Ziemkowski, M.D., Associate Dean of Student Affairs, to Ms. Ramsay, at p. 3.[53]  The MSPE or "Dean's Letter" to which Dr. Ziemkowski refers is part of the application for a student participating in the National Residency Matching Program (the "Match"), and therefore, affects a student's ability to receive her required residency training and be successful in practicing as a physician.[54]

### Conclusion

In the real world, Jessica Ramsay needs NBME to provide her with the reasonable testing accommodation that it has provided to other students, that Dr. Smith found to be necessary, and that her medical school has provided.  Without that accommodation, Ms. Ramsay cannot move forward and complete her medical education, because she cannot read all the questions that she needs to answer on defendant's examinations.  The academic reviews which NBME offers from its paid reviewers have nothing to do with the "real world," in which Ms. Ramsay has already failed the first USMLE Step examination because she could only read 65 to 70 percent of the questions.

Congress has directed the Courts to interpret the ADA broadly, and to reject prior restrictive interpretations.  In particular, Congress has directed the Courts that a person with a disability should not be denied the accommodations that she needs because of prior coping, but

---

[53] A copy of Dr. Ziemkowski's letter is attached hereto as Exhibit B.  Ms. Ramsay's school supports her request for testing accommodations from NBME, and has submitted a letter of support to NBME.  However, the school is unwilling to further extend the leave of absence.

[54] *See, e.g,* "Medical Student Performance Evaluation (MSPE), found on the Internet at https://www.aamc.org/members/gsa/54686/gsa_mspeguide.html ("The MSPE is a summary letter of evaluation intended to provide residency program directors an honest and objective summary of a student's salient experiences, attributes, and academic performance.")

rather should be provided with the accommodations that she needs **now**. Ms. Ramsay's proof, including her own personal account of her disability and Dr. Smith's report, demonstrate that she needs this specific accommodation in order to have a fair opportunity to simply read all of the questions on defendant's examinations. Therefore, she respectfully asks this Court to insure that she has that opportunity, as the ADA requires.

Respectfully submitted,

/s/      Lawrence D. Berger
Lawrence D. Berger (ID No. 16028)
Larry@rcglawoffices.com
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ 08033
(856) 354-0021

Mary C. Vargas (ID No. 324005)
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC 20002
(202) 248-5092

Attorneys for Plaintiff Jessica Ramsay

Dated: September 19, 2019

## Certificate of Service

I hereby certify that a copy of Plaintiff's Reply Brief In Support Of Motion For

Preliminary Injunction, and Exhibits thereto, were electronically filed on September 19, 2019,

via the Court's CM/ECF System, which will send notification of such filing to counsel of record

for defendant and I have also sent a copy by e-mail to the following on the date below:

Nancy L. Goldstein, Esquire
Hamburg & Golden, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA 19103-1443

goldsteinnl@hamburg-golden.com

Robert A. Burgoyne, Esquire
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 600
Washington, D.C. 20005-3960

RBurgoyne@perkinscoie.com

Attorneys for Defendant

/s/    Lawrence D. Berger
Lawrence D. Berger

Attorney for Plaintiff Jessica Ramsay

September 19, 2019