**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA RAMSAY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-2002 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| Defendant | : | |

**Exhibits to Plaintiff's Reply Memorandum of Law**
**In Support of Motion for Preliminary Injunction**

**Exhibit**

A        Letter dated June 24, 2019 to Ms. Ramsay from Peter Ziemkowski, M.D., Associate Dean for Student Affairs, Homer Stryker M.D. School of Medicine of Western Michigan University

B        Letter dated August 6, 2019 to Ms. Ramsay from Dr. Ziemkowski

C        Excerpt from Medical Student Policy Manual

D        Declaration of Benjamin J. Lovett, Ph.D. (ECF No. 27-4) in *Berger v. National Board of Medical Examiners,* No. 1:19cv00099 (S.D.Ohio)

E        Settlement Agreement Between United States of America and National Board of Medical Examiners, DJ # 202-16-181

Lawrence D. Berger (ID No. 16028)
Larry@rcglawoffices.com
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ  08033
(856) 354-0021

Mary C. Vargas (ID No. 324005)
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
(202) 248-5092

Attorneys for Plaintiff Jessica Ramsay

Dated:  September 19, 2019

# Exhibit A



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

June 24, 2019

By email to Jessica.ramsay@med.wmich.edu and by USPS first class mail

Jessica Ramsay
jessica.ramsay@med.wmich.edu
6862 Tall Oaks Dr, Apt 3B
Kalamazoo, MI 49009

Lawrence D. Berger
19 Chestnut St
Haddonfield, NJ 08033

Dear Jessie,

I am in receipt of your request to again extend your leave of absence in order to pursue further accommodations from the NBME.  Your original leave of one year duration, August 28, 2017 to August 29, 2018, was offered to allow you to retake USMLE Step 1.  It was subsequently extended for up to a year, ending August 29, 2019, with the expectation that you would resolve your issues with the NBME and retake Step 1.  Without an end date stated your current request represents an indefinite leave of absence, which is neither allowable under WMed policies, nor reasonable.  I cannot extend your leave of absence indefinitely.

I am not able to further extend your Leave of Absence under the current expectations beyond August 29, 2019.  As an alternative and in order to support your preparation, I can offer to extend your leave for six months, until March 2, 2020, with the expectation that you will sit for the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by that date.

If you are unable to return to the WMed curriculum by March 2, 2020, under the policies you would be dismissed from medical school.  Up until that date, you may voluntarily withdraw from WMed.  In either case you would be eligible to apply for readmission at the time you are prepared to take USMLE Step 1.  (You must be admitted to medical school to be eligible to schedule and sit for USMLE Step 1.)

As I have stated before, I recognize your hard work through all parts of the WMed curriculum.  I especially recognize the clinical excellence leading to your peers identifying you as a member of

the WMed chapter of our Humanism Honor Society.  I anticipate that upon achieving a passing score on USMLE Step 1, you will demonstrate the same clinical work ethic to complete your education.  I appreciate your willingness to work with WMed faculty and staff through this process, and I look forward to supporting your career goals upon your return as a WMed student.

If you have further questions or concerns, please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file

# Exhibit B



August 6, 2019

Jessica Ramsay
jessica.ramsay@med.wmich.edu

Jessie,

We are pleased that you have accepted our offer to further extend your leave of absence with the expectation that you would take USMLE Step 1 and return to the WMed curriculum by March 2, 2020. I would like to address each of your questions in turn. These answers are based on the Medical Student Policy Manual dated January 2019, which is available at https://med.wmich.edu/policies-manuals-statements

*Question 1: In your letter, you state, "As an alternative and in order to support your preparation, I can offer to extend your leave for six months, until March 2, 2020, with the expectation that you will sit for the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by that date."*

*I would like to confirm that, if I take Step 1 by March 2, 2020, I would be able to return to the curriculum immediately and begin taking rotations starting with the next block following the completion of my exam.*

Answer 1: You may return to the curriculum upon taking Step 1, at the start of the next available rotation block. As stated on pg. 114 of the Medical Student Policy Manual "Following the second USMLE Step 1 attempt, the student may enroll in an advanced required or elective clerkship prior to receiving a score on the second attempt." I cannot, however, guarantee that you are able to take specific elective rotations at specific times. Not all rotations are available in all blocks, and rotations must have sufficient capacity for you to be added as an additional student. You may also need to recertify for specific skills, such as Adavanced Cardiac Life Support (ACLS), before you are eligible for certain rotations. The policies and requirements regarding return from leave of absence, including advance notice, are found starting on pg. 183 of the Medical Student Policy Manual.

*Question 2: I would also like to confirm that if I take Step 1 prior to March 2, 2020, I will re-enter the curriculum in my 4th year where I left off, with 11 weeks of credit for 4th-year electives.*

Answer 2: As noted on page 80 of the Medical Student Policy Manual, the Medical Student Peformance Committee (MSPC) is charged with "the responsibility to monitor learning and performance – academic progress as well as student behavior, and professional and personal conduct

– of all medical students, and make faculty recommendations for medical student advancement and graduation."

On your return from leave of absence, the MSPC will review your transcript and determine whether any curricular content must be repeated.  Given the gap in clinical care, it is likely that you would benefit from participation in a course such as Transition to Clinical Applications or more appropriately Transition to Advanced Clinical Care (TRAN 9100) prior to restarting clinical rotations, and from a robust set of M4 electives to prepare for residency.  However, any specific requirements will be determined by the MSPC upon your return.

*Question 3: I understand that graduation requirements, particularly those pertaining to 4th-year rotations, have changed for each graduating class. If I am able to take Step 1 prior to March 2, 2020 and return to the curriculum, what are the remaining requirements I need to complete in order to graduate?*

Answer 3: Graduation Requirements are detailed starting on page 123 of the Medical Student Policy Manual.  Your specific requirements will be determined upon your request to return from Leave of Absence, but at this time a review of your transcript suggests that you will need to complete the following:
TRAN 9100 – Transition to Advanced Clinical Management (2 credits) – You took Tran 9100 when it was 1 credit and titled Clinical Skills. You may need to remediate at least a portion of this course as a part of re-introduction to Clinical Activities.
MEDU 6804 – Advances and Perspectives in Medicine (1 credit)
PROF 9340 – Profession of Medicine 7 (1 credit)
TRAN 9900 – Transition to Residency (2 credits)
EMER 9710 – Advanced Emergency Medicine (4 credits)
98_ _  - Advanced Critical Care (4 credits)
97 _ _ - Advanced Hospital Centered (4 credits)
M4 Electives – you have completed 10 out of the 20 elective credits. (10 credits)

*Question 4: You also state in your letter, "If you are unable to return to the WMed curriculum by March 2, 2020, under the policies you would be dismissed from medical school. Up until that date, you may voluntarily withdraw from WMed. In either case you would be eligible to apply for readmission at the time you are prepared to take USMLE Step 1."*

*Am I correct in assuming that, if circumstances become such that it becomes necessary, voluntarily withdrawing from the program would ultimately be more favorable than being dismissed? How would each of these be noted in my record?*

Answer 4: Official withdrawal and subsequent readmission, which is not assured, are described on page 132 of the Medical Student Policy Manual.  In general, students dismissed from WMed are not eligible for readmission, while those who officially withdraw may be so eligible.  In either case they may apply for admission to other schools.  As currently configured, these actions do not appear on

your transcript, but it would show a gap in coursework for the elapsed time.  All gaps in medical education are identified on the Medical Student Performance Evaluation (MSPE or "Dean's Letter").  I cannot state how these actions may be interpreted by other medical schools or residency programs.

*Question 5: Additionally, in the case that I have to withdraw or am dismissed from the program and subsequently must apply for readmission to the program, how would this process differ from first-time application to the program? Would I have to retake the MCAT? Would I have to start the program over completely and enter as an M1, or would I maintain credit for the courses and clinical rotations that I have already passed and re-enter where I left off?*

Question 5: Recommendation for readmission, which would be with advanced standing, would be at the discretion of the Medical Student Performance Committee (MSPC), and the same stipulation on the need to potentially repeat content as noted in the answer to question 2 would apply.  This would depend on the amount of time that passed since active participation in medical education at WMed. If a significant amount of time were to elapse prior to return, the curriculum may have changed enough to require that remediation of some content be necessary, and may lead to the need to repeat a course, clerkship or elective.

I doubt that your situation would require retaking the MCAT, and may not require retaking any early coursework, but I cannot say that for certain at this time.  If a student were seeking readmission after a prolonged period of time, it is possible that the MCAT may have changed significantly, as it did in 2015, or that the application pool my have changed.  In this case a student may need to retake the MCAT prior to readmission.

I am glad to hear that you are working toward a successful return to WMed to complete your medical education.  As I have stated previously, and as I believe I speak for the WMed faculty, we look forward to your return and helping you to reach a successful career as a physician.

If you have further questions or concerns please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file

**Exhibit C**



# Medical Student Policy Manual

## January 2019

*"Education is not the filling of a pail,*

*but the lighting of a fire."*

– William Butler Yeats

## Travel Awards for Presentations at Professional Academic Meetings

The medical school provides medical students with travel awards for presenting a poster or oral presentation at approved professional academic meetings of an abstract or manuscript for which they are listed as an author affiliated with the medical school and are making the poster or oral presentation at the meeting. Reimbursement for allowable travel and meeting expenses is up to $250 for a meeting held in Michigan and contiguous states, and up to $500 for a meeting that is held outside of the region. Travel awards are provided for only one meeting for each eligible abstract or manuscript, and only for the medical student(s) making the poster or oral presentation. For abstracts or manuscripts with multiple medical students making the poster or oral presentation, the travel award is divided equitably among eligible students based on participation, as determined at the discretion of the medical school. A medical student may receive multiple travel awards for multiple poster and oral presentations of different abstracts and manuscripts.

Applications for travel awards for presentations at approved professional academic meetings must be submitted along with the complete abstract to the office of Student Affairs at least four weeks prior to the meeting.

## Leaves of Absence

A leave of absence may be approved for a medical student when a temporary interruption of the student's academic schedule is in the best interest of the student or the medical school. A leave of absence may postpone participation in residency match and graduation. All leaves of absence are part of the permanent student record, and are described in the MSPE. The medical school does not recognize an unapproved leave of absence. Any leave of absence that does not meet all of the conditions of an approved leave of absence is considered to be unapproved and is treated as an unofficial withdrawal from medical school.

Individuals who are on leave of absence: are not enrolled in any courses/clerkships; are not reported by the medical school as enrolled students; may not participate as a student in curricular or other medical school activities including research; may not hold a position in student organizations or on medical school committees; may not represent the medical school in any manner including at conferences; and are not eligible for medical school travel awards and other student funding awards. Individuals on leave of absence may confer with medical school faculty to facilitate independent learning; have continued electronic access to library resources, and course/clerkship materials for those courses/clerkships for which they had been enrolled, to facilitate independent learning; have access to medical school facilities as normally provided for a visitor, which does not include printing and photocopying privileges, or access to the fitness center; and have use of medical school email systems for communication from and to other medical school email addresses. Individuals on leaves of absence continue at all times to be subject to all medical school policies, including the Code of Professional Conduct and the requirement to provide notice of adverse actions within five working

**Exhibit C**

days of the action. Individuals on leaves of absence are strongly encouraged to maintain, throughout the entire leave, health insurance that provides coverage for preventive, diagnostic, therapeutic, and mental health services.

All requests for leaves of absence are made in writing directly to and granted at the discretion of the associate dean for Student Affairs. A leave of absence constitutes a mutual agreement between the medical school and individual with regard to the use of time during the leave, as well as the requirements that must be met prior to re-entering the curriculum. Stipulations of a learning contract are deemed to be part of the mutual agreement between the medical school and the individual for the leave of absence. The Medical Student Performance Committee may modify an existing learning contract upon approval of a leave of absence, and upon return from leave of absence, to revise the requirements and deadlines stipulated by the learning contract. A leave of absence may be required as part of a learning contract.

The medical school recognizes three types of leaves of absence, each of which requires the approval of the associate dean for Student Affairs:

- Academic leave of absence: an approved leave of absence generally for up to one year, granted to pursue a specified course of study or academic experience. An academic leave of absence is not granted for remediation purposes.
- Medical leave of absence: an approved leave of absence generally for up to one year, granted because of a personal medical condition.
- Personal leave of absence: an approved leave of absence generally for up to one year, granted because of temporary, extenuating personal and family circumstances, including to provide time for course/clerkship remediation or additional preparation for USMLE.

Conditions and circumstances that necessitate an interruption of studies for longer than one year should be managed generally by request for official withdrawal from the medical school.

The Leave of Absence Request includes the reason for the leave of absence, start date, proposed end date, and must be signed, dated, and submitted by the student. Students requesting a leave of absence must meet with the director of Financial Aid, which is also required to meet Federal Title IV financial aid loan counseling requirements. If the leave is approved, the student receives written confirmation of approval from the associate dean for Student Affairs. This approval summarizes any conditions pertinent to the individual student's leave and establishes the date by which time the student must notify the registrar of intent to return to the medical school, and the date by which the student must return to enrollment and full participation in courses/clerkships.

Grades of incomplete and in progress at the start of a leave of absence are changed to a grade of either fail or withdrawal.

Individuals must submit a completed Request to Return from Leave of Absence to the associate dean for Student Affairs at least four weeks prior to the requested date to

**Exhibit C**

return if no accommodations are requested, and at least eight weeks prior to the requested date to return if accommodations are requested. Approval for return from a leave of absence requires satisfactory results from a background review and drug testing, and also a fitness-for-duty evaluation for students after a medical or personal leave of absence. Individuals who do not request a return by the required time, or whose return is not approved, are dismissed from medical school on the first working day following the approved end date of the leave of absence and with an effective dismissal date of the start date of the leave of absence. Individuals remain on leave of absence until approved to return and have restarted courses/clerkships. Individuals resume the curriculum generally at the same point in the curriculum that the leave of absence started.

Tuition may be refunded for a leave of absence, following approval and according the tuition refund schedule as described in the Financial Aid Policy Manual. Time on an approved leave of absence does not count toward the federal financial aid eligibility time limits for progress toward degree completion.

### Satisfactory Academic Progress and Leaves of Absence

A student on a leave of absence remains subject to policies regarding satisfactory academic progress.

### Time Limitations of Leaves of Absence

In general, leaves of absence for medical students are not granted for a period longer than 12 months. A return from leave of absence to the academic program leading to the Doctor of Medicine degree is subject to the availability of space in the appropriate medical student class. The time period of approved leaves of absence is not included in the maximum time limitations for completion of degree programs.

### Appeal of Refusal to Permit Return from Leave of Absence

An individual who requests to return from an approved leave of absence may appeal a refusal by the associate dean for Student Affairs by submitting an appeal in writing to the associate dean for Student Affairs within five working days after receipt of the refusal. The appeal must state the grounds for the appeal.

The associate dean for Student Affairs submits the appeal to the Student Appeals Committee, which is responsible for the appeal process. The Student Appeals Committee shall meet separately with the student and the associate dean for Student Affairs, and others as the committee deems appropriate, as soon as possible but not more than 30 working days from the date of the receipt of the appeal. Within 30 working days of concluding all meetings, the committee shall report its findings and decision to the dean for disposition. The decision of the Student Appeals Committee is final.

**Exhibit C**

**Exhibit D**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **BRENDAN BERGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:19cv00099** |
| | ) | |
| **v.** | ) | **Judge: Hon. Susan J. Dlott** |
| | ) | **Magistrate Judge: Hon. Karen L.** |
| **NATIONAL BOARD OF MEDICAL** | ) | **Litkovitz** |
| **EXAMINERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF BENJAMIN J. LOVETT, PH.D.

1.      My name is Benjamin J. Lovett.  I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2.      I am currently an Associate Professor of Psychology at the State University of New York (SUNY) at Cortland and an Adjunct Professor of Psychology at Syracuse University. As of September 1, 2019, I will be Associate Professor of Psychology and Education at Teachers College, Columbia University.  I am a licensed psychologist.  A true and correct copy of my curriculum vitae is attached at Exhibit 1.

3.      My professional expertise includes the diagnosis and management of neurodevelopmental conditions, particularly learning disabilities (LD) and Attention Deficit-Hyperactivity Disorder (ADHD).  I have published numerous articles and book chapters on these topics.

4.      Much of my research involves testing accommodations for students with disabilities, and I have published a book on that topic.  As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems, and I assess both their

144910742.1

**Exhibit D**

self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

5.      In addition to my faculty and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the National Board of Medical Examiners (NBME), the National Board of Osteopathic Medical Examiners (NBOME), and the New York State Board of Law Examiners.  For each of these organizations, among others, I have reviewed documentation submitted by examinees seeking testing accommodations based, at least in part, on ADHD and/or LD diagnoses.

6.      It is a common practice for testing entities to seek input from external experts regarding disability-based requests for testing accommodations.  The external professionals have expertise in the areas of impairment that provide the basis for an accommodation request.  The external professionals are asked to review documentation submitted in support of an accommodation request and to advise on matters of disability assessment and diagnosis, the level of functional impairment experienced by an applicant, and the appropriateness of specific test accommodations in a given case.  The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well established and professionally sound.

7.      For cognitive impairments, certain documentation is routinely expected (*e.g.*, school records of a learning disability, or medical records on ADHD or a brain injury), and reviewers will generally ask to have such materials submitted.  By reviewing a complete historical record, an evaluator can determine whether an individual has evidence to support the disability diagnosis and to demonstrate that the individual is substantially limited in one or more major life activities.

- 2 -

**Exhibit D**

8.     I was asked by NBME to review Mr. Berger's request for accommodations on the Step 1 USMLE exam in 2013.  At that time, in addition to an application form and personal statement, I reviewed the following documentation:  (a) standardized, group-administered test results from grades 2, 3, 4, and 6; (b) transcripts from college and medical school; (c) score reports from the SAT and MCAT; (d) the report from a 1992 speech and language evaluation; (e) the reports from psychological evaluations conducted in 1994, 2003, 2008 (with a 2010 addendum), 2010, and 2013; (f) documentation of eligibility for accommodations in prior settings, generally consistent with what Mr. Berger reported in his application; (g) a supportive letter from Mr. Berger's mother; and (h) a letter from AAMC describing why accommodations on the MCAT were denied.

9.     At that time, I concluded that there was insufficient evidence to show the presence of any disability conditions that would keep Mr. Berger from accessing the Step 1 exam under standard administration conditions, and I prepared a report for NBME based on my review of this information.  A true and correct copy of my October 22, 2013 report from that evaluation is attached hereto as Exhibit 2.

10.     It is my understanding that NBME denied Mr. Berger's request for accommodations, and he took the Step 1 exam under standard conditions and passed it.

11.     In 2018, NBME asked me to review Mr. Berger's request for accommodations on the Step 2 CK USMLE exam.  At that time, I reviewed his application forms and personal statements, the documents listed in paragraph 8 above, and the following additional documents: (a) a transcript from medical school with additional information about performance there; (b) a score report from the PSAT exam; (c) the report from a 2017 diagnostic evaluation conducted by Dr. Cheryl Beach; (d) NBME's letters to Mr. Berger dated December 23, 2013 and July 24,

- 3 -

**Exhibit D**

2015, denying his prior requests for testing accommodations; (e) letters from Dr. Cheryl Beach; (f) additional evidence of accommodations having been provided in medical school; (g) a letter from an attorney representing Mr. Berger; and (h) miscellaneous correspondence.

12.     I prepared a report for NBME based on my review of this information.  A true and correct copy of my March 14, 2018 report is attached at Exhibit 3.  I have reviewed this report and reaffirm my belief in the opinions expressed the report.

**Mr. Berger's Learning Disabilities Diagnoses**

13.     The current official diagnostic criteria for learning disabilities (LD) require that someone have academic skills that are clearly below the average range for age expectations and that cause problems performing in real-world settings.  These academic skill weaknesses would have been present in the person's childhood and are not better accounted for by other factors (e.g., general low intelligence).  Typically, young adults with valid LD diagnoses can point to evidence of their disorder that includes report cards from their K-12 schooling showing low grades or other indicia of poor performance in the area of their LD (e.g., reading), special education records showing the specialized instruction and related services they were provided, and reports from professional evaluations showing below-average scores on diagnostic achievement tests in the area of their LD.

14.     When applicants request testing accommodations, it is often helpful to examine their history of taking other timed standardized tests, whether they did so with or without accommodations.  An examinee's consistent history of taking standardized tests with accommodations is of course generally supportive of a need for accommodations.  Conversely, performance on similar tests in the past where they did *not* receive accommodations provides

**Exhibit D**

evidence regarding the individual's ability to read and think in the specific context of taking a standardized test and may support the conclusion that accommodations are not needed.

15.     In Mr. Berger's case, two of the most important pieces of information in his record are his score reports from the Medical College Admission Test (MCAT). The MCAT is a rigorous admission test taken by those applying for entry into medical school. The test has a strict time limit, and Mr. Berger took the test without any accommodations (it is my understanding that his accommodation requests were denied). One of the MCAT sections, "Verbal Reasoning," involves reading passages and answering questions about the passages under the applicable strict time limit. Both times that Mr. Berger took the MCAT, his Verbal Reasoning scores were in the average or above average range, compared to all medical school applicants taking that test (a group that is already well above-average compared to the general population). True and correct copies of the MCAT score reports that I reviewed for Mr. Berger are attached as Exhibit 4.

16.     Mr. Berger also took the PSAT exam in 2002, when he was in the 11th grade. He apparently took that exam under standard time limits. All of his scores on this test--in reading, writing, and mathematics--were in the average range or above. The PSAT is taken by essentially a general population group (referred to on his score report as "college bound juniors"). Mr. Berger's scores on the PSAT thus suggest that his academic skills were in the average range or above compared to the population of Grade 11 students (his grade level at that time). A true and correct copy of the PSAT score report that I reviewed for Mr. Berger is attached as Exhibit 5.

17.     While in elementary school, in grades 2, 3, and 4, Mr. Berger took the Stanford Achievement Test, a common group-administered battery of academic skills. Each year, his reading comprehension scores were consistently in the average range or above. It is my

- 5 -

**Exhibit D**

understanding that the Stanford Achievement Test has a strict time limit, and it appears that Mr. Berger did not receive any accommodations.[1]  True and correct copies of the Stanford Achievement Test score reports that I reviewed for Mr. Berger are attached as Exhibit 6.

18.     Mr. Berger took the Iowa Tests of Basic Skills and Cognitive Abilities Test in the 6th grade.  The report states that "Brendan's national percentile rank of 94 on verbal ability means that, compared with other sixth grade students nationally, Brendan scored higher than 94 percent."  I do not know, however, whether he took this test with or without testing accommodations.  A true and correct copy of the Iowa Tests score report that I reviewed for Mr. Berger is attached as Exhibit 7.

19.     Mr. Berger took the SAT in 2004, with 50% extra testing time.  He scored in the 91st percentile nationally on the Reading section of this test.  A true and correct copy of the SAT score report that I reviewed for Mr. Berger is attached as Exhibit 8.  I carefully considered this information, as well as information regarding the other standardized tests that he has taken and information regarding accommodations that he was approved to receive in high school, college and medical school, in forming my opinion about whether Mr. Berger has a disability that warrants testing accommodations on the USMLE.

20.     Mr. Berger also has undergone at least six diagnostic evaluations.

21.     A key indicator of learning disabilities is academic skills that are significantly below average.  In his earlier evaluations (conducted in 1994, 2003, and 2008, when Mr. Berger was 8, 17, and 23 years old, respectively), all of Mr. Berger's reading and writing scores on

_____

[1] Mr. Berger does not report receiving any accommodations on these tests, and given that he was being home schooled at the time and there are no records of accommodations (even informal ones) prior to fifth grade, I am not aware of any way that the school could have properly provided them when he came in to take the Stanford Achievement Test. Dr. Beach stated in a report that the Stanford Achievement Test was taken with accommodations, but she provided no basis for that statement and I would be surprised if it were correct.

Exhibit D

diagnostic achievement tests were in the average range or above.  These scores are not consistent with what I would expect for someone who has a learning disability.

22.     In Mr. Berger's 2010, 2013, and 2017 diagnostic evaluations conducted by Dr. Beach (and a 2010 addendum to a prior evaluation by Dr. Alexander Smith, Jr.), his scores on timed measures of reading and writing became increasingly worse.

23.     In 2010, Mr. Berger's score on the Woodcock-Johnson (WJ) reading fluency test was 85, in the low average range (at the 17th percentile).  In his 2013 evaluation, it dropped to 75 (at the 5th percentile), and in 2017, it dropped even further, to 46 (in the bottom 0.1st percentile—that is, skills worse than those of 999 people out of 1000 people in the general population at Mr. Berger's age).

24.     Similar patterns are seen in Mr. Berger's WJ writing fluency scores. In 2010, his writing fluency score was 90, at the 32nd percentile. In 2013, his score on the same task was 79, at the 8th percentile. In 2017, his score was 69, at the 2nd percentile.[2]

25.     Moreover, on some other diagnostic tests of academic skills completed in 2010 with Dr. Beach, Mr. Berger's scores were at the estimated level of a typical elementary school child. On the Nelson-Denny Reading Test (NDRT) timed reading comprehension task, his score was at the estimated level of a child in fourth grade. On the Gray Oral Reading Test, his reading fluency score was at the estimated level of a child just starting third grade.

26.     These scores, in my opinion, are not credible.  There are two distinct patterns in the data that suggest that the diagnostic test scores are not credible.  First, there are significant discrepancies between Mr. Berger's performance on timed, unaccommodated real-world reading

_____
[2] I should note that by 2017, a new edition of the WJ was available, and Dr. Beach administered that updated edition. What had been called "reading fluency" and "writing fluency" in earlier editions were then called *sentence reading fluency* and *sentence writing fluency.*

- 7 -

comprehension tests and his performance in these diagnostic evaluations. On the MCAT timed reading comprehension section (called "Verbal Reasoning"), Mr. Berger's scores were consistently in the average range or above, when compared to other medical school applicants. On the PSAT, under timed conditions, his academic skills were all in the average range or above. And he apparently passed the Step 1 exam on his first attempt, which is a demanding examination. These scores on real-world tests could not be validly obtained by someone with timed reading comprehension skills typical of an elementary school child. The second data pattern involves the decline of the WJ scores over time. I might expect to see such a decline in a patient with a head injury or degenerative neurologic disorder, but not in the case of a learning disability.

27.    The two data patterns just described *are* consistent with an examinee who is motivated to demonstrate impairment to obtain testing accommodations, and in Mr. Berger's case there is evidence consistent with such a motivation. The 2010 testing (i.e., when the low scores began to appear) occurred after Mr. Berger had taken the MCAT without accommodations, and had received a score that Dr. Smith noted was "apparently considered mediocre by many medical school admissions committees. Mr. Berger felt he could have achieved a higher score and optimized a greater opportunity for admission"[3] to medical school if he had had additional testing time.

28.    Dr. Beach has offered a number of explanations for Mr. Berger's score discrepancies.  She points out that the testing conducted in 1994, 2003, and 2008 did not involve severely time-pressured reading and writing tasks, in contrast to the 2010, 2013, and 2017

---

[3] See page 2 of Dr. Smith's 2010 addendum.

- 8 -

**Exhibit D**

testing.  However, this does not explain either of the two data patterns that I have noted—the continuous score declines between 2010 and 2017, or the difference between the real-world test (PSAT, MCAT, Step 1) scores and the diagnostic test scores. With regard to the first of these patterns, Dr. Beach notes that the norms of the WJ tests changed over time, but I cannot see how this would account for such tremendous changes in scores—indeed, the score changes are so large as to suggest that Mr. Berger actually got significantly fewer items correct each time that he took the test, a bizarre pattern for someone of his age without a degenerative neurologic condition. As for the obvious discrepancies between his average to above-average performance on timed reading tests on the PSAT and MCAT and his very poor performance on the later diagnostic tests, Dr. Beach claims that Mr. Berger made lucky guesses on the MCAT. This is not a persuasive explanation; each item on the MCAT is a distinct, independent variable, and so the chance that he would be able to guess correctly on item after item, enough to get a score much higher than his true ability level, *and* do the same thing a second time on a second MCAT, is so low as to not be credible.

29.     Dr. Beach could have administered a standalone performance validity test (PVT) to Mr. Berger to provide a more objective measure of Mr. Berger's motivation in taking the later diagnostic tests.  Such PVTs are assessment tools that are designed specifically for the purpose of ensuring that a client (here, Mr. Berger) is putting forth sufficient effort and appropriate motivation during an evaluation.  Some PVTs are time-pressured, which would specifically address the issue of someone seeking extended time accommodations. However, Dr. Beach did not administer any standalone PVTs as part of any of her evaluations, even though Mr. Berger had a clear incentive to demonstrate impairment, and even though research has often shown that

a significant minority of young adults being evaluated for learning and attention problems will exaggerate their impairment.[4]

30.     Interestingly, one of the tests that Dr. Beach *did* administer in 2017—the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)—contains a time-pressured section that research has found to be an effective embedded indicator of effort and motivation. A recent research study found that the Processing Speed Index from the WAIS-IV relates strongly to PVT performance. In 2017, Mr. Berger's WAIS-IV Processing Speed Index score was 68 (where 100 is exactly average). The research study found that 99 to 100% of individuals scoring at least as poorly as Mr. Berger would be classified by established PVTs as exaggerating impairment or having noncredible data.[5] I would note further that in 2003 and 2008, when Mr. Berger took the WAIS (it was then the WAIS-III), his Processing Speed Index scores were much higher, in the average range (93 and 96, respectively). At those points in time, he had not yet been denied MCAT accommodations.

31.     In 2003, Dr. Smith had entertained the possibility of a learning disability in *writing* (not reading), and in 2008 he did diagnose a learning disability in writing. He used an approach to diagnosis based on discrepancies between different diagnostic test scores that Mr. Berger had obtained. Such a diagnostic approach, while common in some school districts

---

[4] See, for instance, Sullivan, B. K., May, K., & Galbally, L. (2007). Symptom exaggeration by college adults in attention-deficit hyperactivity disorder and learning disorder assessments. *Applied Neuropsychology, 14*(3), 189-207.

[5] Erdodi, L. A., Abeare, C. A., Lichtenstein, J. D., Tyson, B. T., Kucharski, B., Zuccato, B. G., & Roth, R. M. (2017). Wechsler Adult Intelligence Scale-(WAIS-IV) processing speed scores as measures of noncredible responding: The third generation of embedded performance validity indicators. *Psychological Assessment, 29*(2), 148-157.

- 10 -

**Exhibit D**

especially at that time, lacks reliability and validity,[6] and the current official clinical criteria for learning disabilities were revised to eliminate such an approach. In both the 2003 and 2008 evaluations, all of Mr. Berger's writing scores were in the average range, in any case, meaning that those scores did not show substantial limitations in his ability to write. Finally, his writing skills are not relevant to his ability to access the Step 2 CK exam, as it does not require any writing.

32.     In 1994, Dr. Jeanne Artner did not make any formal diagnoses of learning disabilities but noted that Mr. Berger presented with "some severe discrepancies" between his academic skills and IQ, "which could lead to him being classified as a student with learning disabilities."[7] Again, all of his academic skills were in the average range or above, but in 1994 (when Mr. Berger was in second grade), the now-discredited discrepancy approach to learning disability diagnosis was quite popular.

33.     Finally, according to the evaluation reports from Dr. Smith and Dr. Beach, it appears that Mr. Berger's (private) high school staff met with a psychologist from the local public-school district and determined that Mr. Berger did not qualify for special education assistance. Dr. Beach reports that this determination was made because Mr. Berger did not meet the public school's LD criteria. This suggests that his academic skills were felt by the school district to be satisfactory.[8]

---

[6] See, for instance, Sternberg, R. J., & Grigorenko, E. L. (2002). Difference scores in the identification of children with learning disabilities: It's time to use a different method. *Journal of School Psychology*, *40*(1), 65-83.

[7] See page 5 of Dr. Artner's report.

[8] Dr. Beach states that Mr. Berger did not meet the district's aptitude (IQ) vs. achievement discrepancy criteria for LD identification. Given Mr. Berger's average and above-average IQ scores, if he did not meet the discrepancy criteria, his academic skills would seem to have been relatively close to his IQ—that is, at least average.

**Mr. Berger's ADHD Diagnosis**

34.     The current official diagnostic criteria for ADHD found in DSM-5 require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/ impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with real-world functioning.  In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety disorder).  Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with everyday life responsibilities that most people in the general population can successfully perform.

35.     As discussed below, there is not clear, consistent evidence of ADHD from Mr. Berger's historical clinical evaluations.  Mr. Berger also has not provided real-world records (e.g., school reports, teacher comments, work evaluations) showing significant ADHD symptoms or related functional impairment in school or work settings.

36.     Mr. Berger was first diagnosed with ADHD by Dr. Beach in 2013, when he was 27 years old.  The possibility of ADHD was discussed in some of the clinical evaluations that Mr. Berger received before that time, but Dr. Beach was the first clinician to actually diagnose him with this impairment.

37.     In a 1994 evaluation, Dr. Jeanne Artner had noted that Mr. Berger (then eight years old) was highly distractible during the evaluation, and it also appears that Mr. Berger's mother reported some symptoms of inattention at that time.  Dr. Artner did not report administering any norm-referenced rating scales to Mr. Berger or his parents or others who knew

- 12 -

**Exhibit D**

him and did not provide any detailed description of any impairment that Mr. Berger was experiencing in real-world settings (for example, in home, church, or school).  Dr. Artner suggested that Mr. Berger's behaviors "raised the possibility" of ADHD, but only recommended that his parents consult with a physician *if* the parents noticed attention problems that "interfered with learning."  I have not seen a record of any such consultation.

38.     In a 2003 evaluation, Dr. Alexander Smith reported administering two continuous performance tests[9] and the Brown ADD symptom rating scales[10] to Mr. Berger, who was then seventeen years old.  Dr. Smith stated that there did not appear to be "any clinically significant results" suggesting inattention on either of the two continuous performance tests (that is, Mr. Berger did well on those objective tests) and Dr. Smith did not provide any scores from the Brown ADD symptom rating scales. He did not diagnose ADHD, and instead concluded that the diagnostic test data "help rule out specific attention deficits".[11]

39.     Mr. Berger was evaluated by Dr. Smith again in 2008, when he was 23 years old. Dr. Smith concluded that an ADHD-like condition (ADHD NOS - Not Otherwise Specified), which does not reach the full criteria for ADHD, should be further evaluated to be ruled out. Dr. Smith conducted a supplemental evaluation in 2010 and administered diagnostic rating scales to Mr. Berger and his parents.  He described the results of the rating scales as "equivocal," and

---

[9] Continuous performance tests (CPTs) administer a series of game-like tasks that are designed to measure an individual's ability to maintain attention over time and carefully choose when to respond and when not to respond to visual or auditory stimuli.  For example, one CPT task flashes a series of digits, one at a time, on an electronic display, and the examinee is instructed to press a button every time a "1" is followed by a "9."  The test machine records the number of correct responses, incorrect responses, and failures to respond.

[10] The Brown ADD rating scales are normed scales that help assess symptoms of executive function impairments associated with ADHD (known earlier as ADD).  Individuals filling out the scales identify the degree to which a client shows particular symptoms of these executive function problems.

[11] His report also states: "the broader 'executive function' issues of self-activation, prioritizing work, and self-monitoring for organization are problematic." However, even here, Dr. Smith noted that Mr. Berger "does actually function quite well despite them," even though deficits "may interfere with his performing in a very superior way.".

**Exhibit D**

stated that "[t]hey did not indicate a clear and significant pattern of difficulties that impaired academic performance, classroom behavioral performance and associated deficits in self-regulation and executive function."

40.     Mr. Berger was also evaluated by Dr. Beach later in 2010, when he was 24 years old. She administered the Behavior Assessment System for Children - Second Edition (BASC-2), a broadband, standardized, norm-referenced self-report behavior rating scale, which has scores for attention problems and hyperactivity.  Dr. Beach concluded that Mr. Berger's self-reports yielded "no significant elevations on clinical problem scales."  She made no mention of ADHD as a diagnosis.

41.     A diagnosis of ADHD would generally be supported with evidence of significant impairment with a childhood onset.  Documentary evidence would generally reflect symptoms that consistently and substantially disrupt the individual's functioning across different settings (for example, school, work, and home).

42.     Although there has been mention of some ADHD symptoms in Mr. Berger's clinical evaluation reports since 1994, this is not clear, consistent evidence of ADHD.  Instead, until relatively recently, it appears that his evaluators had the opportunity to diagnose the condition and instead chose not to do so. And Mr. Berger has not offered any real-world records showing significant ADHD symptoms or related functional impairment at home, in school, or at work.

43.     Even if ADHD were present, this would not necessarily lead to a need for any testing accommodations. Indeed, research has found that postsecondary students with ADHD diagnoses do not, on average, demonstrate deficits in skills needed to access typical reading-

- 14 -

based tests (some do but many do not).[12] In Mr. Berger's case, his unaccommodated PSAT and MCAT scores are again quite relevant; if he had been unable to access reading-based tests without accommodations (whether due to learning disabilities or ADHD), the PSAT scores and especially the MCAT verbal reasoning scores would have been below the average range.

**Disability Status and Testing Accommodation Needs**

44.     As discussed above, there is insufficient credible evidence that Mr. Berger has a learning disability or ADHD.  For similar reasons, there is insufficient evidence that Mr. Berger is disabled within the meaning of the Americans with Disabilities Act.

45.     Individuals who are substantially limited in a major life activity due to an LD or ADHD generally have extensive documentation in their academic and/or employment histories, and in their medical records, reflecting clearly poor performance in diagnostic and real-world settings, because both categories of impairment have childhood onsets.

46.     Here, there is insufficient evidence that Mr. Berger is substantially limited in his ability to read, think, concentrate, or engage in any other activity that is relevant to taking the USMLE Step 2 CK exam, when he is compared to most people in the general population. Although at times Mr. Berger has obtained scores during diagnostic evaluations that would superficially suggest substantial limitations, those scores are not supported by--and are sometimes inconsistent with--other important evidence, including his performance on real-world timed tests that required significant amounts of reading.

---

[12] See Lewandowski, L., Gathje, R. A., Lovett, B. J., & Gordon, M. (2013). Test-taking skills in college students with and without ADHD. *Journal of Psychoeducational Assessment*, *31*(1), 41-52.; Miller, L. A., Lewandowski, L. J., & Antshel, K. M. (2015). Effects of extended time for college students with and without ADHD. *Journal of Attention Disorders*, *19*(8), 678-686.

47.    There is also insufficient evidence that Mr. Berger requires any accommodations to access Step 2 CK of the USMLE.  Given his performance on other, similar high-stakes standardized tests, including the MCAT verbal reasoning sections, there is insufficient credible evidence of deficits in Mr. Berger's access skills (e.g., timed reading comprehension, concentration), relative to most people in the general population, that would make accommodations appropriate.

48.    Although it may seem puzzling for evaluators to ignore real-world evidence that shows diagnostic test scores to be untrustworthy, research has shown that many evaluators view their role as helping a client to secure accommodations.[13] Mr. Berger began to obtain low diagnostic test scores after being denied accommodations on the MCAT, giving him reason to try to demonstrate impairment to seek reconsideration of the denial. Many evaluators would likely have viewed their role here as helping Mr. Berger to do so.

49.    Finally, I understand that counsel for Mr. Berger is relying on a statement in a book that I co-authored to support Mr. Berger's case, as follows:

> Mr. Berger's experience in taking the USMLE Step 2 CK reflects that due to impairments, he was unable to answer nearly half the questions on the exams, resulting in two failures.  The inability to complete substantial portions of the USMLE Step 2 CK is tantamount to a denial of access to the exam.  Moreover, if Mr. Berger is unable to complete the reading vignettes on the USMLE Step 2 CK due to his impairments, AUC and state-licensing boards would not be in a position to make a proper conclusion about his licensure.  As noted by two consultants frequently hired by several testing entities, "[w]ithout accommodations, then, we are left with inaccurate inferences about a student's skill levels, threatening the appropriateness of any decisions that we make regarding that student."  Lovett, B.J., Lewandowski, L.J., *Testing Accommodations For Students With Disabilities: Research Based Practice*, American Psychological Association, 2015 p.18.

---

[13] See Gordon, M., Lewandowski, L., Murphy, K., & Dempsey, K. (2002). ADA-based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards. *Journal of Learning Disabilities, 35*(4), 357-363. For a more recent study with similar findings, see Harrison, A. G., Lovett, B. J., & Gordon, M. (2013). Documenting disabilities in postsecondary settings: Diagnosticians' understanding of legal regulations and diagnostic standards. *Canadian Journal of School Psychology, 28*(4), 303-322.

Exhibit D

> Accordingly, to avoid improper conclusions about Mr. Berger's competency and
> licensure, the NBME must approve his request for extended time.

I certainly stand by the quoted sentence.[14] Indeed, it shows quite well that I strongly support

accommodations when appropriate. However, the sentence refers to students for whom a

disability warranting accommodations has been properly documented -- not to students whose

documentation does not support a finding that they are disabled and need reasonable

accommodations to access an examination.  Mr. Berger is in the latter category.  For students

like him, it is the provision of unwarranted accommodations that creates a risk of inaccurate

inferences regarding his knowledge and skill levels, as my book also discusses (see e.g., page

47). Taken out of context (as it was), the quote would seem to imply that *all* students require

accommodations; obviously, this is not the case. Moreover, even if Mr. Berger feels time

pressure on the Step 2 CK exam and is not able to complete the reading at the pace that he

wishes to, this is *not* evidence of a disability relative to the average person in the general

population, as the vast majority of people in the general population are never expected to take a

medical licensure exam.

> I declare under penalty of perjury that the foregoing is true and correct.  Executed on July

23, 2019.

Benjamin J. Lovett, Ph.D.

---

[14] The citation by Mr. Berger's counsel is incorrect, incidentally; the passage comes from page 5 of my book, not
page 18.

- 17 -

**Exhibit D**

[Exhibits Omitted]

**Exhibit D**

**Exhibit E**

# SETTLEMENT AGREEMENT

# BETWEEN

# UNITED STATES OF AMERICA

# AND

# NATIONAL BOARD OF MEDICAL EXAMINERS

### DJ# 202-16-181

This Agreement is entered into by and between the United States of America, acting through the United States Department of Justice, Civil Rights Division, Disability Rights Section (the "United States"), and the National Board of Medical Examiners ("NBME").

## <u>BACKGROUND AND APPLICABLE LAW</u>

1. NBME is a private, non-profit organization. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

2. Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE"), an examination related to licensing for professional purposes. NBME administers the USMLE. Thus, NBME is subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309.

3. The USMLE is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the U.S. and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians.

4. The United States Department of Justice (the "Department") is the federal agency responsible for administering and enforcing Title III of the ADA, 42 U.S.C. §§ 12181-12189.

5. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189 and 28 C.F.R. § 36.309.

6. Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2).

7. The auxiliary aid requirement is a flexible one. A testing entity can choose among various alternatives as long as the result is effective communication. Use of the most advanced technology is not required so long as effective communication is ensured. *See* 28 C.F.R. Part 36, App. B, at 727-728 (2010).

8. Pursuant to the Attorney General's authority under 42 U.S.C. § 12188(b)(1)(A)(i) to conduct investigations of alleged violations of Title III of the ADA, the Department investigated a complaint from [redacted], alleging that the NBME had failed to grant him reasonable testing accommodations on the basis of a disability (dyslexia) for administrations of the USMLE Step 1 examination in 2008 and 2010. Among other things, the NBME had found that the supporting documentation submitted to NBME by [redacted] did not demonstrate that he is currently substantially limited in a major life activity as compared to most people , so as to be disabled within the meaning of the ADA, as amended.

9. The Department concluded that [redacted] had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take the USMLE. NBME disputes the Department's

2

conclusions and denies that it has violated the ADA in any way in its handling of Mr. [redacted]'s request for accommodations.

10. [redacted] has recently provided additional documentation to the NBME in support of his request for accommodations on the USMLE Step 1 examination relating to accommodations he received in undergraduate school, graduate school, and medical school.

11. NBME and the Department have reached agreement that it is in the parties' best interests, and the Department believes it is in the public interest, to resolve this matter on mutually agreeable terms and have, therefore, agreed to enter into this Agreement.

WHEREFORE, the Department and NBME hereby agree and stipulate as follows:

## AGREEMENT TERMS

### A.   General Obligations

12. NBME shall provide reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of 42 U.S.C. § 12189 and the implementing regulations, 28 C.F.R. § 36.309.

13. NBME's requests for documentation shall be reasonable and limited to documentation that establishes (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions. *See* 28 C.F.R. Part 36, App. B, at 737 (2010).

14. NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined -- in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation -- that the individual is substantially limited in one or more major life activities within the meaning of the ADA and needs the requested test accommodations in order to demonstrate his or her ability and achievement level.

15. NBME will carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA, including the extent to which it is restricted as to the conditions, manner, or duration as compared to the reading ability of most people.

3

16. In determining whether to grant a request for testing modifications or accommodations for an individual who did not receive a diagnosis of a reading disability until later in his or her life, NBME shall consider bona fide, reasonably supported reasons for the late diagnosis as well as academic records and other objective evidence relating to the individual's reading ability.

17. NBME has a right to make a timely request for supplemental information if the information submitted by an applicant does not clearly establish the nature of the disability or the need for reasonable testing accommodations, and the request is consistent with the requirements of Paragraph 13. NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations.

18. NBME is not required to provide testing accommodations that would fundamentally alter what the USMLE is intended to test, jeopardize exam security, or in the case of auxiliary aids and services, result in an undue burden.

19. If it is not doing so already, NBME will comply with the following requirements of the implementing regulations set forth at 28 C.F.R. § 36.309(b)(1) once they become effective on March 15, 2011:

> (iv)   Any request for documentation, if such documentation is required, [will be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

> (v)   When considering requests for modifications, accommodations, or auxiliary aids or services, the entity [will] give[] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred as a Section 504 Plan).

4

**Exhibit E**

    (vi)  The entity [will] respond[] in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

**B.**  <u>Testing Accommodations for [redacted]</u>

20.NBME will grant [redacted] the accommodation of double the standard testing time and a separate testing area when he takes the Step 1 and Step 2 CK examinations. The testing for Step 1 and Step 2 CK shall be accomplished in accordance with a reasonable schedule. Actual testing time shall not exceed eight (8) hours per day.

21.[redacted] will be subject to all standard requirements for registering to take the Step 1 and Step 2 CK examinations and scheduling his examinations.

22.Except for the accommodations provided herein, the USMLE Step 1 and Step 2 CK examinations will be administered to [redacted] under the same conditions as those afforded examinees who do not receive accommodations. [redacted]'s scores on the Step 1 and Step 2 CK examinations will be reported in the same manner as are scores of other examinees who receive accommodations on the USMLE.

**C.**  <u>Miscellaneous</u>

23.<u>Compliance Review and Enforcement</u>. Throughout the term of this Agreement the Department may, at any time, review compliance with Paragraphs 20-22 of this Agreement by, among other things, arranging for meetings and discussions with NBME personnel, requesting copies of any documents related to compliance with this Agreement, or both. The United States may enforce this Agreement. If the Department believes that this Agreement or any portion of it has been violated, it will raise its concern(s) with the NBME and will attempt to resolve the concerns(s) in good faith. The Department will give the NBME thirty calendar days from the date it notifies the NBME of any breach of this Agreement to cure that breach, prior to instituting any court action.

24.<u>Disputes</u>. If the Department and NBME are unable to reach a resolution of any issues covered by this Agreement, the Department may seek appropriate relief. Failure by the Department to enforce any provision or deadline of this Agreement shall not be construed as a waiver of its right to enforce other provisions or deadlines of this Agreement.

25.<u>Entire Agreement</u>. This Agreement constitutes the entire Agreement between the Department and NBME on the matters raised herein, and no other

statement, promise, or agreement, either written or oral, made by the Department or NBME or their agents, that is not contained in this written Agreement shall be enforceable regarding the matters raised herein.

26. Agreement Binding on NBME. This Agreement shall be binding on the NBME, as well as the NBME's officers, agents, and employees, and their successors in interest. The NBME shall have a duty to so notify all such successors in interest of the existence and terms of this Agreement.

27. No Admission. This Agreement is not an admission by NBME of any violation of the ADA or its implementing regulations.

28. Term of the Agreement. This Agreement shall remain in effect for three years from the effective date.

29. Severability. If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

30. Public Document. This Agreement is a public document. A copy of this document, or any information contained herein, may be made available to any person. The Department and NBME shall provide a copy of this Agreement to any person or entity upon request.

31. Release. The Department will obtain a Release from [redacted] in the form attached as Exhibit A to this Agreement.

32. No Retaliation. The NBME agrees that it will not discriminate or retaliate against any person within the meaning of the requirements of 28 C.F.R. § 36.206.

33. Authorization of Signatories. The individuals signing this Agreement represent that they are authorized to bind the Department and NBME to this Agreement.

6

34. <u>Effective Date</u>. This Agreement shall be effective on the date it is signed by the last signatory.

FOR NBME:                              FOR THE UNITED STATES OF AMERICA:


By:                                    By:


_____      _____

Dated:                                 THOMAS E. PEREZ
                                       Assistant Attorney General
                                       SAMUEL R. BAGENSTOS
                                       Principal Deputy Assistant Attorney General
                                       JOHN L. WODATCH
                                       Deputy Assistant Attorney General



                                       _____
                                       RENEE M. WOHLENHAUS, Acting Chief
                                       KATHLEEN P. WOLFE, Acting Special Legal
                                       Counsel
                                       SHEILA K. DELANEY, Trial Attorney
                                       Disability Rights Section – NYAV
                                       Civil Rights Division
                                       U.S. Department of Justice
                                       950 Pennsylvania Avenue, NW
                                       Washington, D.C. 20530
                                       Telephone:   (202) 307-6309
                                       Facsimile:   (202) 305-9775

                                       Dated: 02/23/2011

7

**Exhibit E**