**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


JESSICA RAMSAY,                 :
                         :  CIVIL ACTION
        Plaintiff       :
                         :
   vs.                  :  NO. 19-CV-2002
                         :
NATIONAL BOARD OF MEDICAL   :
EXAMINERS              :
                         :
        Defendant       :


## MEMORANDUM AND ORDER


**JOYNER, J.**                                 **December 30, 2019**


This case has been brought before this Court on Motion of the Plaintiff, Jessica Ramsay, for Preliminary Injunction (Doc. No. 7). Following three full-day evidentiary hearings on December 3, 4, and 5, 2019, the matter is now ripe for disposition and we therefore hereby make the following:

### FINDINGS OF FACT

1. Plaintiff Jessica Ramsay is a citizen of the State of Michigan residing at 6862 Tall Oaks Drive, Apt. 3B, Kalamazoo, Michigan.

2. Defendant National Board of Medical Examiners ("NBME") is a non-profit corporation organized and existing under the

laws of the District of Columbia, with its principal place of business at 3750 Market Street, Philadelphia, Pennsylvania.

3.    Plaintiff is a medical student in the M.D. program at the Homer Stryker M.D. School of Medicine of Western Michigan University ("WMed").

4.    NBME develops a series of standardized timed examinations that are known collectively as the United States Medical Licensing Examination ("USMLE") and which are largely in written format.  NBME administers these examinations through a third-party-vendor throughout the United States and these examinations are relied upon by states throughout the country in making decisions regarding medical licensure.  In order to receive the degree of Doctor of Medicine (*i.e.* M.D.), to apply and/or be considered for medical residency training programs, and to become licensed as a physician, medical students must first take and pass all of the USMLE "Step" examinations.

5.    Plaintiff was required by Western Michigan Medical School to take and pass the USMLE Step 1 examination at or near the end of her third year of medical school.  In addition to being pre-requisite to continuation of their medical school educations, scores on the Step 1 examination are also significant in that they are used by medical residency training programs throughout the United States to rank student candidates in the very-competitive residency match process.  Consequently,

even if a student passes the Step 1 examination but with a low score, they may be unable to compete or may be significantly hindered in competing for a residency match with the possible result that they are not selected at all for admission to any residency program upon graduation from medical school.

6.   Step 2 of the USMLE consists of two parts:  Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills).  These examinations must also be taken and passed by M.D. medical students prior to graduation from medical school.

7.   Step 3 of the USMLE must generally be taken and passed by graduates of M.D. degree programs, prior to licensing as physicians.[1]

8.   Only students of accredited medical schools are eligible to take the USMLE Step examinations.

9.   Plaintiff entered Western Michigan University Medical School in 2014 and had a projected graduation date of May, 2018.

10.   In March 2009, during her sophomore year at Ohio State University, Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder, Migraine Headaches and probable dyslexia by her family physician, Dr. Alan Smiy. She was prescribed Ritalin to treat the ADHD and granted educational/testing

---

[1]  As noted by NBME in its Answer to paragraph 18 of Plaintiff's Complaint, this process generally applies to medical students seeking to be licensed as allopathic (M.D.) physicians.  Although similar, the process for testing and/or the examinations necessary for licensure as osteopathic (D.O.) physicians may be somewhat different.

accommodations by and through the University's Office of Disability Services ("ODS"), including additional time to complete examinations (1 1/2 time), taking examinations in a distraction-reduced space (typically a separate room), use of visual aids such as colored pencils and markers and access to scrap paper, along with access to an ODS counselor throughout the balance of her college career. These and additional accommodations were also granted to Plaintiff by her medical school such that she had up to twice (2X) the time to complete examinations, access to text-to-speech software and calculator during exams, was permitted to have a granola bar or other snack and water with her during testing in her separate exam room, an additional free print allowance, and written examinations on paper (so she could mark them up). Among the examinations for which Plaintiff has received these accommodations during her medical school career are a number of subject matter examinations developed by NBME.

11. In or around late November/early December, 2016 while a third-year medical student and in anticipation of having to sit for the Step 1 USMLE, Plaintiff applied to NBME for test accommodations, seeking many of the same accommodations that she had been receiving from Western Michigan University Medical School and Ohio State University. Earlier that year, Plaintiff had also suffered a deep vein thrombosis in her leg causing her

to miss some three weeks from classes.  Plaintiff was
subsequently diagnosed with a clotting disorder and prescribed
Xarelto.  In support of her application for accommodations,
Plaintiff provided the supporting documents sought by NBME,
including medical and psychological evaluation reports and
records, school reports and a Personal Statement describing her
impairments and how they affect her current, everyday
functioning.  Specifically, in addition to her Personal
Statement, Plaintiff had provided copies of her school records
from St. Joseph's High School, Ohio State University and Western
Michigan University Medical School, and records/reports from the
following medical/psychological providers and/or evaluators: Dr.
Mary Alice Tanguay, Therapeutic Optometrist, Katherine Turner,
M.D., Alan N. Smiy, M.D., and Charles A. Livingston, M.A., a
Licensed Masters Social Worker and Limited Licensed
Psychologist.

12.  NBME did not provide a decision on Plaintiff's request
until more than three months later - on or about March 10, 2017.
At the time it denied Plaintiff's request for accommodations,
NBME stated: "Overall, the documents you provided do not
demonstrate a record of chronic and pervasive problems with
inattention, impulsivity, behavioral regulation, or
distractibility that has substantially impaired your functioning
during your development or currently." In reaching this

conclusion, NBME noted that "[d]espite your reported history of difficulties, your documentation shows that you progressed through primary and secondary school without grade retention, evaluation, or services and with an academic record and scores on timed standardized tests sufficient to gain admission to college, all without accommodations."

13.   Faced with an NBME requirement that she submit new information as a pre-requisite for reconsideration or an appeal of its denial, Plaintiff took the Step 1 examination in July 2017 without accommodations with the hope that she could pass and enter into her fourth year of medical school.  In so doing, Plaintiff was unable to read all of the questions in each testing "block" which required her to guess at the answers to those remaining questions that she did not have time to read. Plaintiff failed the examination by one point.

14.   As a consequence of her failure of the USMLE Step 1 exam and in order to afford Plaintiff the opportunity to take the exam with accommodations, Western Michigan Medical School permitted Plaintiff to take a leave of absence which effectively commenced in August 2017.  That leave of absence has been extended several times such that it continues to the present. However, Plaintiff has been advised by the school that no further extensions will be granted and she will be required to

withdraw from the medical school if she does not take and pass the Step 1 examination by March 2, 2020.

15.  On June 6, 2018, Plaintiff re-applied to NBME for accommodations on her re-take of the Step 1 USMLE, after having submitted to additional evaluations by Alan Lewandowski, Ph.D., a Neurologist/Clinical Psychologist and Bruce Reukberg, M.D. a psychiatrist, both of whom found that Plaintiff met the DSM-5 and the ICD-10[2] criteria for Attention Deficit and Hyperactivity Disorder - Combined Type, and the Specific Learning Disorders of Abnormal Scanning and Processing Speed with Impairments in Reading and Written Expression.  In addition to providing these records/reports and all of the other materials that she had previously submitted as well as an updated Personal Statement, Plaintiff also provided letters of support from Jennifer N. Houtman, M.D., her then-primary care physician and her medical school mentor and Clinical Skills course instructor, and David Overton, M.D., the Associate Dean and Chair of the Essential Abilities Committee at Western Michigan University Medical School attesting to Plaintiff's diagnoses of ADHD, Learning Disorders, Migraine Headaches and Clotting Disorder with recent

---

[2] The DSM-5 is the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition of the American Psychiatric Association and the ICD-10 is the 10th revision of the International Statistical Classification of Diseases and Related Health Problems from the World Health Organization.

Deep Vein Thrombosis and Post-Thrombotic Syndrome and to her need for accommodations on the Step 1 USMLE.

16.  On September 11, 2018, NBME again found that Plaintiff's "documentation does not demonstrate that 100% additional testing time is an appropriate modification of your USMLE Step 1 administration," reasoning that since Ms. Ramsay's performance on the Conners Continuous Performance Test was normal, she had attained a 3.8 Grade Point Average in high school, an ACT score between 27 and 30 and a 30 M on the MCAT all under standard conditions, the data did not "demonstrate a developmental history of impaired cognitive or academic functioning or that standard testing time is a barrier to your access to the USMLE."  Nevertheless, recognizing that Plaintiff's clotting disorder required some accommodation, NBME granted Plaintiff additional break time and testing over two days, a separate testing room to permit her to stand, walk or stretch during the exam and permission to read aloud in that room.

17.  On or about September 25, 2018, Plaintiff consulted Robert D. Smith, Ph.D., another Psychologist/Neuropsychologist and the Michigan Dyslexia Institute for yet another evaluation, this time targeted at her dyslexia in anticipation of an appeal of the NBME's September 11, 2018 denial.  Dr. Smith administered a battery of tests, some of which were the same as those which

had been previously administered by Dr. Lewandowski and Charles Livingston.  At the conclusion of testing, Dr. Smith determined that Plaintiff did indeed have the specific learning disorder of developmental dyslexia which impaired her reading, reading comprehension and severely impaired her reading rate and fluent word recognition.  Dr. Smith concluded that "Jessica's pattern of reading and writing scores is typical of the intelligent dyslexic reader who struggles with efficient decoding and processing of the printed words, but can use her intelligence to substantially compensate and extract seemingly adequate comprehension from passages."  In also diagnosing Plaintiff with Attention Deficit Hyperactivity Disorder - Combined Presentation and finding her level of reading impairment to be severe such that it could be "expected to significantly and substantially interfere with education efforts without accommodations such as extended time," Dr. Smith also recommended a series of testing accommodations including 100% additional time.

18.  Plaintiff thereafter sought reconsideration of the NBME's September 11, 2018 decision by way of an appeal letter sent on her behalf by her attorney, Lawrence Berger, on December 12, 2018.  Once again, in reliance on Plaintiff's overall strong academic performance throughout her educational career and on the earlier standardized ACT and MCAT test scores, NBME denied

Plaintiff's appeal and her renewed request for the extended testing time accommodation on February 14, 2019.

19. On March 19, 2019, Plaintiff's counsel sent another letter to the NBME requesting reconsideration of its September 11, 2018 and February 14, 2019 denials. In an email addressed to Plaintiff by NBME's Director of Disability Services and ADA Compliance Officer for Testing Programs, Catherine Farmer, dated March 27, 2019, NBME denied the request for further reconsideration. In the email, Dr. Farmer reiterated that, in view of Plaintiff's "average and above average performances on timed standardized tests taken for the purpose of gaining admission to college and medical school," NBME had concluded that Plaintiff's "skills are better than most people in the general population." NBME made this determination notwithstanding that its evaluator had accepted that Plaintiff's "exceptionally low scores on timed reading tests administered for the purpose requesting test accommodations [was] valid and credible."

20. In making its decision to deny Plaintiff's requests for accommodations, NBME referred Ms. Ramsay's applications and supporting documentation to two of its outside, independent contractor-evaluators, Steven G. Zecker, Ph.D. and Benjamin J. Lovett, Ph.D. for their opinions. Dr. Zecker is presently an Associate Professor in the Department of Communication Sciences

and Disorders at Northwestern University and has been employed by NBME as an outside consultant/evaluator for the past 16 years. Dr. Lovett is now currently an Associate Professor of Psychology and Education at Teachers College, Columbia University[3] and has been employed as an outside consultant/evaluator since 2010.  Both Drs. Zecker and Lovett are paid at the rate of $200 per hour for their reviewing services.  Drs. Zecker and Lovett reviewed only the written materials submitted by Plaintiff; neither ever interviewed or met her prior to giving their opinions to NBME and to testifying as expert witnesses before this Court.

21.  Prior to the enactment of the ADA Amendments Act of 2008, NBME, along with seven other standardized testing organizations[4], sent a letter dated July 14, 2008 to various U.S. Senators opposing the passage of the Act as it was written. Among the "significant concerns" expressed by these organizations were the "significant costs in complying with the ADA," and "the important implications beyond just the substantial costs incurred by testing organizations to provide

---

[3] At the time of his review of Plaintiff's accommodations request, Dr. Lovett was an Associate Professor of Psychology at the State University of New York (SUNY) Cortland and an Adjunct Professor of Psychology at Syracuse University.  Dr. Zecker has held his position at Northwestern University since 1991.
[4] These organizations were ACT, Inc., the Association of American Medical Colleges, the Federation of State Medical Boards of the United States, Inc., the Graduate Management Admission Council, the Law School Admission Council, the National Conference of Bar Examiners and the National Council of Examiners for Engineering and Surveying.

such accommodations." It was the expressed opinion of the testing organizations that "[t]hese requests [for accommodations] involve, in some way, the very cognitive skills (such as thinking and concentrating) that a standardized exam is attempting to measure," and that "[t]he provision of such accommodations - especially extra testing time - can affect the comparability of the resulting scores and scores achieved under standard testing conditions…. Accommodations can thus undermine the very purpose of a 'standardized' examination" such that they could "also affect the interests of the general public if the exams in question are licensing exams or exams that are taken to gain access to professional schools such as medical school or law school."

22. Some six years later, in response to the ADA Notice of Proposed Rulemaking concerning the drafting of the implementing Regulations by DOJ for the ADA Amendments Act, Defense counsel Robert Burgoyne wrote a lengthy letter on behalf of four standardized testing organizations which he represented, including NBME.[5] In that letter, the four organizations took exception to and opposed, *inter alia*: (1) the inclusion of the directive that "the primary object of attention in cases brought

---

[5] Mr. Burgoyne represents NBME in this case and the organizations which he represented in the drafting of this letter, in addition to NBME were the Association of American Medical Colleges ("AAMC"), the Graduate Management Admission Council ("GMAC") and the National Conference of Bar Examiners ("NCBE").

under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability" in 28 C.F.R. §36.101(b); (2) the notation that "[t]he question of whether an individual meets the definition of disability under this part should not demand extensive analysis" in 28 C.F.R. §36.101(b) and 28 C.F.R. §36.105(d)(1)(iii); (3) the language that "[s]ubstantially limits is not meant to be a demanding standard" proposed for inclusion in 28 C.F.R. §105(d)(1)(i); (4) the inclusion in the discussion of the proposed rules of examples of "self-mitigating measures or undocumented modifications or accommodations for students with impairments that affect learning, reading, or concentrating" as possibly including "measures such as devoting a far larger portion of the day, weekends and holidays to study than students without disabilities; teaching oneself strategies to facilitate reading connected text or mnemonics to remember facts, receiving extra time to complete tests, receiving modified homework assignments, or being permitted to take exams in a different format or in a less stressful or anxiety-provoking setting. Each of these mitigating measures, whether formal or informal, documented or undocumented, can lessen the impact of, and improve the academic function of a student having to deal with a substantial limitation in a major life activity such as

concentrating, reading, speaking, learning, or writing. Nevertheless, these are only temporary supports; the individual still has a substantial limitation in a major life activity and would be a person with a disability under the ADA." In that same letter Mr. Burgoyne, on behalf of the testing organizations asked that DOJ "add a regulation which notes that, although mitigating measures are not to be considered in assessing whether a person has a disability, it is appropriate to consider such measures in determining whether accommodations are needed." He suggested: "The purpose of accommodations is to address an individual's functional limitations. If mitigating measures already address an individual's functional limitations, there is no need for accommodations."

23. On or about December 5, 2016, Defense counsel Burgoyne gave a power point presentation in the course of a training seminar to NBME's outside consulting reviewers such as Drs. Zecker and Lovett, among others, which was entitled *"ADA Legal Update for NBME and its Outside Consultants."* In addition to reviewing the relevant provisions of the ADA applicable to entities offering examinations related to licensing and credentialing for secondary or post-secondary education, professional or trade purposes, the presentation included a discussion of the process underlying the Department of Justice's ("DOJ") Title II and Title III Rulemaking. In the course of

that discussion, the power point presentation included the
following observations on the DOJ's Notice of Proposed
Rulemaking (dated 1/30/14 and found at 79 Fed. Reg. 483):

- … **many ADHD diagnoses may not "meet the clinical
  definition** … and thus **would not qualify for an
  accommodation** under the revised definition of
  disability" (prompting DOJ to reduce its estimate of
  the # of individuals with ADHD by 30%)

- In response to comments on the proposed rule, DOJ
  added ADHD as an example of a physical or mental
  impairment that can constitute a covered disability

- … that, in estimating the cost impact of the new
  regulations on testing entities and colleges when it
  published its Notice of Proposed Rulemaking, DOJ "had
  assumed based on some available research that 30
  percent of those who self-identify as having ADHD as
  their primary disability would not need additional
  testing time because they would not meet the clinical
  definition of the disability."

- DOJ retreated from that approach in the final rule,
  because of concerns raised by some commenters

- "One commenter raised concern about presenting a
  specific percentage of students with ADHD who would
  not meet that clinical definition, because that number
  might inadvertently become a benchmark for
  postsecondary institutions and national testing
  entities to deny accommodations to a similar
  percentage of applicants requesting additional exam
  time because of their ADHD."

- "The Department did not intend for this percentage to
  establish a benchmark. Covered entities should
  continue to evaluate requests for additional exam time
  by all individuals with disabilities on an
  individualized basis. In direct response to these
  concerns, the Department has decided not to reduce the
  number of individuals with ADHD who could now receive
  testing accommodations as a direct result of the ADA

Amendments Act in estimating the financial impact of
the new regulations." (emphasis in original)

**DISCUSSION**

On May 8, 2019, Plaintiff filed her Complaint commencing
this action alleging violations and seeking relief under the
Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.*
("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C.
§794 ("Section 504").  Following the filing of Defendant's
Answer to the Complaint, Plaintiff filed the Motion for
Preliminary Injunction which is now before us. By this motion,
Plaintiff asks this Court to enter an injunction in her favor
preliminarily enjoining and restraining NBME and all others
acting in concert with it from refusing to grant her the
accommodation of 100% extended testing (double) time for the
USMLE Step 1 and all subsequent Step USMLE examinations.

A.  *Standards for Ruling on Preliminary Injunction Motions*

Fed. R. Civ. P. 65(d) outlines the "Contents and Scope of
Every Injunction and Restraining Order" by way of the following
language:

(1) *Contents.*

Every order granting an injunction and every
restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required.

(2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Of course, under Rule 65(a)(1), a preliminary injunction may only issue on notice to the adverse party. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867, 138 L. Ed.2d 162 (1997)(emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed.2d 249 (2008). "The grant or denial of a preliminary injunction is almost always based on an

abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequence of immediate irreparable injury." GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp., No. 05-4566, 2006 U.S. App. LEXIS 16377, 197 Fed. Appx. 120, 123 (3d Cir. 2006)(quoting U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970)).  Indeed, "[i]n each case courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Winter, 555 U.S. at 24, 129 S. Ct. at 377 (quoting Amoco Production Co. v. Gambell, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed.2d 542 (1987)).

It should also be noted that in order to make the required showing of irreparable harm, it is incumbent upon the plaintiff to demonstrate that he is threatened by a harm "which cannot be redressed by a legal or equitable remedy..." "The preliminary injunction must be the *only* way of protecting the plaintiff from [the] harm." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992)(quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).  Moreover, "a party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity."  Ferring Pharmaceuticals, Inc. v. Watson

_Pharmaceuticals, Inc._, 765 F.3d 205, 219, n. 13 (3d Cir. 2014)((quoting _Acierno v. New Castle_ County, 40 F.3d 645, 653 (3d Cir. 1994); _See_ _also_, _Doe v. Law School Admission Council, Inc._, Nos. 17-3230, 17-3357, 2019 U.S. App. LEXIS 32784 at * 10 (3d Cir. Nov. 1, 2019)(same).

> _B. Plaintiff's Entitlement to Accommodations under the Americans with Disabilities Act and/or the Rehabilitation Act_

As stated, Plaintiff here is alleging that NBME violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12182 and Section 504 of the Rehabilitation Act ("§504" and/or "RHA"), 29 U.S.C. §794 by failing to grant her repeated requests for accommodations in the taking of Step 1 of the USMLE.[6] In general, these Acts provide the following in pertinent part:

---

[6] It should be noted that Defendant long ago conceded that its services constitute a public accommodation covered by title III of the ADA. _See_, _e.g._, _Powell v. National Board of Medical Examiners_, 364 F.3d 79, 85 (2d Cir. 2004). Defendant also does not dispute that it is subject to this portion of the ADA here, though it denies that it is the recipient of Federal financial assistance such as is required to be subject to §504 of the RHA. (Def's Ans. to Pl's Compl., Doc. No. 3, ¶s 3-4). Insofar as it appears that no discovery has been taken and no record evidence on the matter of NBME's receipt of federal funds has been presented, however, we cannot and do not address that issue at this time. Indeed, it is not necessary that we do so now given that the standards adopted by titles II and III of the ADA are generally the same as those required under the RHA and that for this reason, Courts typically consider the merits of claims under both statutes together. _Powell_, _supra_, (citing _Henrietta D. v. Bloomberg_, 331 F.3d 261, 272 (2d Cir. 2003)); _K.N. v. Gloucester City Board of Education_, 379 F. Supp. 3d 334, 354-355 (D.N.J. 2019). _See also_, _Bragdon v. Abbott_, 524 U.S. 624, 631-632, 118 S. Ct. 2196, 2202, 141 L. Ed.2d 540, 553 (1998)("The ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973, … and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988." (internal citations omitted).

### §12182. Prohibition of discrimination by public accommodations.

**(a) General rule.** No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

…..

### §794. Nondiscrimination under Federal grants and programs

**(a) Promulgation of rules and regulations.** No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. §725(20)], shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. …

Under the ADA, "[t]he term 'disability means, with respect

to an individual –

(A)  a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)  a record of such an impairment; or

(C)  being regarded as having such an impairment…

42 U.S.C. §12102(1).  "Major life activities," in turn, "include

but are not limited to, caring for oneself, performing manual

tasks, seeing, hearing, eating, sleeping, walking, standing,

lifting, bending, speaking, breathing, learning, reading,

concentrating, thinking, communicating, and working."  42 U.S.C.

§12102(2).  Under Section 504 of the RHA, an "[i]ndividual with

a disability" is defined to mean in general "any individual who-

> (i) has a physical or mental impairment which for such
> individual constitutes or results in a substantial
> impediment to employment; and

> (ii) can benefit in terms of an employment outcome from
> vocational rehabilitation services provided pursuant to
> title I, III, or VI [29 U.S.C. §§720, *et. seq.* 771, *et.
> seq.* or 795 *et. seq.*]

29 U.S.C. §705(20)(A).

Title III of the ADA renders testing entities such as

Defendant here subject to its anti-discrimination mandates.  In

this regard, 42 U.S.C. §12189 provides:

**§12189.  Examinations and courses**

> Any person that offers examinations or courses related to
> applications, licensing, certification or credentialing for
> secondary or post-secondary education, professional, or
> trade purposes shall offer such examinations or courses in
> a place and manner accessible to persons with disabilities
> or offer alternative accessible arrangements for such
> individuals.

To show a violation of the ADA based on a failure to

accommodate, a Plaintiff must prove: (1) that she is disabled;

(2) that her requests for accommodation are reasonable; and (3)

that those requests have been denied.  Rawdin v. American Board

of Pediatrics, 985 F. Supp. 2d 636, 647 (E.D. Pa. 2013); Mahmood

v. National Board of Medical Examiners, No. 12-1544, 2012 U.S.

Dist. LEXIS 86837, 2012 WL 2368462 at * 4 (E.D. Pa. June 21,

2012)).  In this case, there is no dispute as to the

reasonableness of Plaintiff's requested accommodations nor is there any question but that her request has been denied.[7] Consequently, the threshold issues before us for adjudication are whether or not the Plaintiff truly is disabled and, of course, whether the pre-requisites for issuance of a preliminary injunction have been satisfied.

In determining the question of Plaintiff's disability, we must examine the evidence presented at the hearing under the lens of the ADA Amendments Act of 2008 which took effect on January 1, 2009. As clearly reflected in Section 2, the Findings and Purpose Notes to the text of the Amendments Act, the Statute was a direct response to what Congress believed was the improper narrowing of the "broad scope of protection intended to be afforded by the ADA" by the Supreme Court decisions in <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999) and <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184 (2002) which had the effect of "eliminating protection for many individuals whom Congress intended to protect." <u>See</u>, <u>e.g.</u>, 122 Stat. 3553; 110 P.L. 325;

---

[7]  As set forth above in our factual findings, Plaintiff initially sought 100% additional exam time (double time), a separate, distraction-reduced room for testing, colored dry-erase markers to use on the laminated paper, an alarm or timer (either in the room, visible on the computer screen or a visual signal or reminder from a proctor), water and a snack in the room to facilitate taking needed medications at the appropriate times. Following Plaintiff's second application, NMBE granted Plaintiff all of her requested modifications with the exception of additional time, although they did permit added break time and testing over 2 days. Accordingly, the only accommodation still being sought is that of additional (double) testing time.

Enacted S. 3406; 110 Enacted S. 3406 (Sept. 25, 2008).

Specifically, Congress took exception with what it characterized as lower courts' incorrect findings "in individual cases that people with a range of substantially limiting impairments are not people with disabilities," and with the then-current EEOC ADA regulations defining the term "'substantially limits' as 'significantly restricted'" for the reason that that definition was "inconsistent with congressional intent, by expressing too high a standard." Id. In so doing, Congress meant to convey that its intent was "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," … and "that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."

Id. The Amendments Act further clarified that:

> "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; (II) use of assistive technology; (III) reasonable accommodations or auxiliary aids or services; or (IV) learned behavioral or adaptive neurological modifications."

42 U.S.C. §12102(4)(E)(1).

The implementing regulations promulgated by the Department of Justice[8] are similar[9].  Indeed, 29 C.F.R. §1630.1(c)(4) and 28 C.F.R. §36.101(b) both provide:

> Broad coverage.  The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA.  Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA.  The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability.  The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 C.F.R. §1630.2(j) is particularly instructive with regard to the meaning to be ascribed to the term "substantially limits" and provides as follows in relevant part:

> **(1)**  Rules of construction.  The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:
>
>> **(i)**  The term "substantially limits" shall be construed broadly in favor of expansive coverage, to

---

[8] "Congress directed the DOJ to promulgate regulations implementing Title III, 42 U.S.C. §12186(b), and, as a result, such regulations are 'entitled to substantial deference,' and 'given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Rawdin v. American Board of Pediatrics, No. 13-4544, 582 Fed. Appx. 114, 118, n.9, 2014 U.S. App. LEXIS 17002, 2014 WL 4345834 (3d Cir. Sept. 3, 2014)(quoting Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) and Helen L. v. DiDario, 46 F.3d 325, 331-32 (3d Cir. 1995)).

[9] In fact, the language of 29 C.F.R. §1630.2 and 28 C.F.R. §§ 36.105 and 36.301 outlining the purpose and broad coverage goal and setting forth key definitions nearly mirrors that contained in the statute itself at §§12101, 12102, 12103 and 12111.

the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

**(ii)** An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

**(iii)** The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

**(iv)** The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

**(v)** The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

**(vi)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall

be considered in determining whether an impairment substantially limits a major life activity.

**(vii)**  An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(viii)**  An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

**(ix)**  The six month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in §1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section.  The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

…

**(4)**  Condition, manner, or duration --

**(i)** At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

**(ii)** Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of

a major bodily function.  In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

**(iii)**  In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.  For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read,  write, or learn compared to most people in the general population.

**(iv)**  Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts.  This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

**(5)**  Examples of mitigating measures -- Mitigating measures include, but are not limited to:

**(i)**  Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

**(ii)**  Use of assistive technology;

**(iii)** Reasonable accommodations or "auxiliary aids or services" (as defined by 42 U.S.C. §12103(1);

**(iv)** Learned behavioral or adaptive neurological modifications; or

**(v)** Psychotherapy, behavioral therapy, or physical therapy.

**(6)** Ordinary eyeglasses or contact lenses -- defined. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

It is particularly noteworthy for purposes of this case that specific learning disabilities such as dyslexia and Attention Deficit Hyperactivity Disorder are included within the definition of "physical or mental impairment" for purposes of the Act(s). 28 C.F.R. §36.105(b)(1)(ii); (b)(2). Furthermore, 28 C.F.R. §36.309, the regulation which specifically governs the giving of "Examinations and Courses" states the following in relevant part:

**(a)** General. Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

**(b)** Examinations. (1) Any private entity offering an examination covered by this section must assure that --

**(i)** The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual or speaking skills, the

examination accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure);

**(ii)** An examination that is designed for individuals with impaired sensory, manual, or speaking skills is offered at equally locations, as often, and in as timely a manner as are other examinations; and

**(iii)** The examination is administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements are made.

**(iv)** Any request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

**(v)** When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan).

**(vi)** The entity responds in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

**(2)** Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given.

**(3)** A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the

measurement of the skills or knowledge the examination is intended to test or would result in an undue burden. Auxiliary aids and services required by this section may include taped examinations, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments or learning disabilities, transcribers for individuals with manual impairments, and other similar services and actions.

**(4)** Alternative accessible arrangements may include, for example, provision of an examination at an individual's home with a proctor if accessible facilities or equipment are unavailable. Alternative arrangements must provide comparable conditions to those provided for nondisabled individuals.

     ….

In applying the foregoing to the case at hand, we note that insofar as the above-quoted regulations are "the equivalent[s] of a 'legislative rule' … issued by an agency pursuant to statutory authority," they thus have the 'force and effect' of law." PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)). At the very minimum, the regulations are "entitled to substantial deference" and "given controlling weight" unless "it can be shown that they are arbitrary, capricious, or manifestly contrary to the statute." See, n. 8, supra. See also, Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144

L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, … its views warrant respect") and _Bragdon v. Abbott_, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'"(quoting _Skidmore v. Swift & Co._, 323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)).

Defendant NBME does not disagree that the regulatory language addressing the type of accommodations sought by Plaintiff is appropriately applied here _if_ Plaintiff is found to be disabled within the meaning of the statutes.  See e.g., _Defendant NBME's Opposition to Plaintiff's Motion for Preliminary Injunction_  at p. 22.  Thus, the threshold question in this matter for purposes of assessing the correctness of NBME's decisions to deny accommodations to Plaintiff and determining Plaintiff's likelihood of success on the merits, is whether or not Ms. Ramsay truly is disabled within the meaning of the ADA and/or the RHA.

In resolving this question, we note at the outset that Defendant is right that the documentary evidence of Plaintiff's ADHD and dyslexia in her early years is indeed sparse and that for the most part, Plaintiff performed exceedingly well overall

academically during this time with little help.  Likewise, Ms.
Ramsay scored quite well on several standardized tests without
accommodations, including the ACT and the MCAT examinations.
Certainly, in comparison to the average individual in the
general population, Plaintiff appears to have been and continues
to be quite successful in her endeavors.

Nevertheless, while performance is unquestionably an
important factor to consider, the Regulations make clear that it
is not the *only* consideration.  And, the record here does
reflect that Plaintiff has a history of having struggled with
reading, visual perception, focus and attention beginning at
least in the first or second grade[10].  While there is no evidence
that her elementary school itself ever formally provided
accommodations, Plaintiff's classroom teachers did.  These
informal accommodations/interventions included providing an
alphabet board to assist in reading and writing letters, a
distraction-reduced space (*i.e.* plaintiff was often seated at

---

[10] Some examples of the evidence of such struggles from the record include
Plaintiff's second and third grade school reports from Sunset Oaks Academy
wherein her teachers noted "I will help her with the switching of letters"
and "Jessica needs to focus on getting her work done on time;" her Stanford
Achievement Test Record from first grade reflecting that Plaintiff scored in
the 13th percentile in Word Reading, a score that was in stark contrast to her
next lowest score in the 69th percentile for mathematics computation; and the
notation on the report of Plaintiff's scores on the Iowa Tests of Basic
Skills and Cognitive Abilities Test from the sixth grade that despite
"seem[ing] to be high in overall cognitive ability" "Jessica's actual
achievement is lower than expected in seven test areas. These are Vocabulary,
Reading Comprehension, Spelling, Capitalization, punctuation, Social Studies
and Math Computation.  These represent areas in which Jessica is not doing as
well as she might be expected.  Jessica might do better in these areas with
additional effort and with continued encouragement."

the "time-out" desk), being kept in the classroom during recess so she could finish the classwork that she couldn't finish during regular class time, being given extra time to complete assignments and tests and spending extra time with her teachers, provided a quiet environment, and altered grading such that many of her elementary, middle and high school teachers agreed to grade her on the portions of examinations completed in lieu of the tests in their entirety and affording her opportunities to re-do work that were not afforded to all other students.  In addition, at or about age 7 and at the recommendation of her classroom teacher because of "reversals in her school work," Plaintiff was evaluated by a therapeutic optometrist, Dr. Mary Alice Tanguay, who performed testing of Plaintiff's visual perceptual and spatial skills.  Dr. Tanguay found "substantial deficits in the areas of visual-spatial relationships, visual discrimination and was also lacking in visual memory."  Dr. Tanguay prescribed eyeglasses and perceptual skills training which took place over a three-month period from February - May, 1998.  When Dr. Tanguay saw Plaintiff again in January 2000, she found her comprehension and perceptual skills to be excellent but that "[s]he still has the original vision problem, which may slightly reduce her reading speed."

Plaintiff testified that fourth and fifth grades became far more difficult for her because she had to do a lot more writing.

Her homeroom teacher was also her language arts teacher, was very strict and became angry with her because she would often forget things, had trouble handing in her homework and had a lot of difficulty with writing and spelling. Only after her mother went to see her teacher did Plaintiff's teacher begin spending more time with her to help her get her work done. Throughout Plaintiff's middle and high school years, she spent far more time completing her homework assignments and studying for tests than her peers, usually receiving late-night help from her mother to finish her work and proof-read her papers. Her friends thought she was exaggerating because she was always working on her homework and could only hang out with them in the summer and occasionally on the weekends. Plaintiff's hard work evidently paid off as she graduated from high school with a 3.747 grade point average, a class ranking of 28 out of a class of 225 and an acceptance to Ohio State University. Throughout her high school years, Plaintiff was also a multi-sport athlete in swimming and soccer, and played junior varsity volleyball her freshman and sophomore years. She took the ACT in her sophomore and junior years in high school without accommodations and scored well (27 and 30) overall.

In college, Plaintiff testified that she had a very hard time keeping up with the workload because of all of the required reading. Since she had lived in Texas when she was young where

Spanish is a much-spoken language, Plaintiff had always done well in Spanish class in high school. In her college Spanish class oral examinations, she always had high scores. However, her overall grades would suffer because she had difficulty on the written portions of the tests. She asked her instructor if it was possible to disregard the written parts of the exams and consider only the oral portions, but her instructor told her that she could not do that unless plaintiff had a diagnosed disability. Plaintiff had a similar experience in organic chemistry and her professor in that class suggested that she go to the University's Office of Disability Services ("ODS"). ODS referred her to an advisor who in turn recommended that she be formally evaluated.

Plaintiff then went to see her primary care doctor, Dr. Alan Smiy who, after listening to her describe her life-long struggles, evaluated and subsequently diagnosed her with ADHD and told her that she probably also had dyslexia. The record does not evince what tests, if any, Dr. Smiy administered to Plaintiff in making his ADHD diagnosis, though Plaintiff testified that he told her that the testing for dyslexia was long and costly and he wasn't qualified to administer those tests or diagnose that. In any event, Dr. Smiy said that the accommodations for dyslexia were probably the same as for ADHD. He prescribed and Plaintiff then began a trial course of Ritalin

for ADHD and the record demonstrates that she has taken medication for ADHD since that time, although the actual medications have varied over the years and have included Adderall and Vyvanse. She did not pursue testing for dyslexia at that time.

Subsequent to her formal diagnosis of ADHD from Dr. Smiy and his completion of the necessary forms, Plaintiff received testing accommodations from Ohio State midway through her sophomore year. Those accommodations included receiving additional time (1 1/2 time) on tests, being able to take exams on paper instead of on the computer, being permitted to use colored pens, markers or pencils, having access to scrap paper, taking examinations in a distraction-reduced space (typically a separate room), and having access to an ODS counselor throughout the balance of her college career. Plaintiff took the MCAT examination while still in college but, as she did not know that she could receive accommodations for the test, she did not ask for them and thus took the exam without any. Plaintiff scored reasonably well nonetheless, receiving a score of 30M.

At the end of her senior year in college, Plaintiff applied to medical schools, but did not get in. After graduating in June 2012 *cum laude* with a 3.562 grade point average with a degree in Molecular Genetics from Ohio State, Plaintiff took some time off, worked doing autism research, bartending and

dancing with a modern dance company and re-applied to medical schools for admission in 2014.  She was accepted to Western Michigan University Medical School and matriculated in the Fall of 2014.

Upon entry to medical school, Plaintiff sought to continue receiving the accommodations that she had received in college. In support of the Request for Reasonable Accommodation that Plaintiff made to Western Michigan in 2014, Plaintiff was evaluated by Charles Livingston, M.A., a licensed social worker and psychologist in the fall of that year.  Mr. Livingston administered several assessment batteries, notably the Wechsler Adult Intelligence Scale (WAIS-IV) and the Wechsler Individual Achievement Test (WIAT) which resulted in a "broad range in the results, compared to other people of a similar age. Composite scores for verbal comprehension and perceptual (non-verbal) reasoning were both at the 96th percentile.  Strengths included abstract verbal reasoning, practical comprehension, visual spatial reasoning, and long-term memory.  The composite score for working memory attention, and concentration was at the 63rd percentile.  The composite score for processing speed was at the 10th percentile."  Mr. Livingston went on to observe:

> Individuals with similar scores spend so much time and
> energy in basic data entry tasks, so to speak, that there
> is little left for higher order fluid reasoning and
> synthesizing.  Jessie's exceptionally bright reasoning
> abilities and long-term memory stand in contrast to

relatively low attention and concentration and very low
processing speed.  Her native intelligence has been some
compensation for low abilities in the identified areas.

And he further concluded:

> The diagnosis of ADHD, predominantly inattentive, severe,
> 314.00 is supported by the written records, self-report, [11]
> and objective test results.  There has been a persistent
> pattern of careless mistakes in daily activities and
> schoolwork, difficulty sustaining attention in tasks and
> academics, lapses in focus when spoken to directly,
> incomplete follow-through on instructions and tasks of
> daily living, being easily sidetracked, struggling to meet
> deadlines, trouble keeping materials and belongings in
> order, avoiding reading and writing tasks requiring
> sustained mental effort, losing things, and being easily
> distracted by extraneous stimuli.  The symptoms are not
> better described or indicated by a neurotic or psychotic
> disorder or substance abuse.  There is historical
> information that suggests a likelihood of dyslexia.

Plaintiff was subsequently granted accommodations by her

medical school which included having up to twice the time to

take examinations, taking examinations in a distraction-reduced

space (typically a separate room), use of visual aids such as

colored pencils and markers and access to scrap paper[12], access

to text-to-speech software and calculator during exams, having a

---

12   At the hearing before the undersigned, Plaintiff testified  that she
uses different colored pencils in her notetaking, among other endeavors,
giving different types of diseases, conditions, etc. different colors so that
they stand out in her notes and make them easier to locate while studying.
She prefers to use pencils because she often makes mistakes.  She explained
that it is difficult and time-consuming for her to decode each word
separately and read through text so she uses her finger or another object to
keep her place as she goes through the decoding/reading process.  Plaintiff
also testified that she usually needs to read through sentences and
paragraphs several times usually aloud, in order to comprehend the meaning of
the text.

granola bar or other snack and water with her during testing, an additional free print allowance, and written examinations on paper (so she could mark them up).  Again, included among the examinations for which Plaintiff has received these accommodations during her medical school career are a number of the subject matter examinations developed by NBME.

In addition to providing reports and records from Dr. Tanguay, Dr. Smiy and Mr. Livingston, following NBME's initial denial of her accommodations request, Plaintiff also underwent evaluations and/or produced the results of her examinations by several other providers, all of whom agreed with the diagnoses that she had been previously given of, *inter alia*, Attention Deficit Hyperactivity Disorder and Dyslexia.  Specifically, Plaintiff produced a report of her neurocognitive examination by Alan Lewandowski, Ph.D, a board certified neuropsychologist, who administered a broad series of assessments to Plaintiff including the WAIS-IV, the Wide Range Achievement Test (4th ed.), Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number Writing Test, Tactile Form Recognition Test, the California Verbal Learning Test (2d ed.), the Rey Osterrieth Complex Figure Test, a Grip Strength Test, Finger Oscillation Tactile Performance Test, Trail Making Tests A and B, Category Test, the Seashore Rhythm Test, the Speech Sounds Perception Test, a Personality Assessment Inventory and an Aphasia

Screening Test.  In reviewing the results of the tests administered, Dr. Lewandowski found that while Plaintiff's achievement studies were normal, her intellectual, neurocognitive and psychological studies were abnormal/ borderline abnormal and it was his clinical impression that Plaintiff indeed had attention deficit hyperactivity disorder and a nonverbal learning disability characterized by abnormal scanning and processing speed.

Additionally, Plaintiff also produced an 8-page report from her treating psychiatrist, Dr. Bruce Ruekberg, M.D., a 5-page report from Jennifer N. Houtman, M.D., Plaintiff's then-primary care physician and medical school mentor, a letter of support from David Overton, M.D., the Associate Dean of WMed, and a 30-page report from Robert D. Smith, Ph.D. a licensed psychologist and neuropsychologist with the Michigan Dyslexia Institute.  For his part, Dr. Ruekberg  gave his professional opinion that Plaintiff had functional limitations due to ADHD, Combined type and the Specific Learning Disorder of abnormal scanning and processing speed with impairments in reading and written expression and that she thus was "without question, … a qualified person with disabilities under the ADA…"

Dr. Houtman confirmed "from … personal observation of [plaintiff] as a patient, and as a student, that she has the following diagnoses that require accommodations:  attention

deficit/hyperactivity disorder, Combined presentation…, Learning disability, nonverbal (abnormal scanning and processing speed… [w]ith impairment in reading…, [w]ith impairment in written expression…, Migraines with aura, without status migranosis…, [c]lotting disorder with recent Deep Venous Thrombosis…/Post-thrombotic syndrome." (diagnostic codes from DSM-5 and ICD-10 omitted).

Dr. Smith, who also testified at the hearing in this matter, reported that he diagnosed Ms. Ramsay with Specific Learning Disorder with impairment in reading (developmental dyslexia), reading comprehension, severely impaired reading rate and fluent word recognition and with ADHD Combined after interviewing her and her mother and administering the following battery of tests: the Test of Memory Malingering (TOMM), Adult ADHD Rating Scale-IV with Adult Prompts, Nelson-Denny Reading Test, Wechsler Individual Achievement Test (3d ed.) (WIAT-III), Woodcock-Johnson IV Test of Achievement, Gray Oral Reading Tests (5th ed.)(GORT), the Integrated Visual & Auditory Continuous Performance Test (IVA + Plus) and reviewing the Symptom Checklist-90 Revised (SCL-90-R).

Despite this evidence and primarily in reliance on the opinions of its two outside-contracted reviewing experts, NBME concluded that Plaintiff is *not* disabled and it has therefore denied her requests for accommodations.  NBME's first outside

reviewing expert, Steven G. Zecker, Ph.D. is an Associate Professor of Communication Sciences and Disorders at Northwestern University and is licensed in Illinois as a Registered Clinical Psychologist. He testified that he specializes in Learning Disorders and ADHD and that he supervises the clinic run by Northwestern University graduate students. As a clinician, Dr. Zecker primarily sees young, school-age children aged around 6-7 years of age through young adults. He rarely sees adults. Dr. Zecker has been employed as an external consultant for NBME and other testing providers for the past 16 years and he reviewed both Plaintiff's first and second requests for accommodations on the Step 1 USMLE. Although he did not doubt that the tests administered by her providers had been appropriately given or that the scores were as reported, in reviewing the documentation submitted by Plaintiff including her personal statement, and the reports and records outlined above, Dr. Zecker took exception with the conclusions reached in that he did not believe that the tests results supported the other providers' findings of ADHD and LD. In any event, Dr. Zecker stated:

> Ms. Ramsay's academic history prior to medical school and her exceptional unaccommodated standardized test performance, in my professional opinion, provide strong evidence that Ms. Ramsay is not substantially impaired in a major life function in a manner that warrants accommodations on the USMLE under the ADA.

In addition to Dr. Zecker, NBME also referred Plaintiff's file to Benjamin Lovett, Ph.D, who is an Associate Professor at Teacher's College of Columbia University and who has also been employed as an external consultant/reviewer by NBME and other testing providers since 2010. Dr. Lovett attested that his professional expertise is in the diagnosis and management of neurodevelopmental disorders, including Learning Disabilities and ADHD and he has published numerous articles and book chapters on these subjects. As part of his work, he often meets with young adults who have learning and attention problems and assesses their self-reported symptoms and their objective performances on various tests of cognitive, academic and behavioral functioning. Dr. Lovett testified that ADHD and Learning Disorders are considered under the DSM-V to be neurodevelopmental disorders because they begin early in childhood and thus, in the absence of symptoms during childhood, the criteria for diagnosing those conditions is not satisfied. Since he did not see any evidence that Ms. Ramsay's symptoms had presented during childhood, he did not believe that she had a disorder.

In reviewing the documentation submitted by Plaintiff, Dr. Lovett also did not find the scores or the conclusions of those providers who had evaluated and diagnosed Plaintiff to be

credible. Rather, he testified that he looks primarily at what he characterized as "real-world" test scores, *i.e.* those standardized tests actually taken and under what conditions, in assessing the strength of a diagnosis. According to Dr. Lovett,

> Here, there is insufficient evidence that Ms. Ramsay is substantially limited in her ability to read or engage in any other activity that is relevant to taking the USMLE, when she is compared to most people in the general population, at least with regard to LD/ADHD issues. There are no historical school or work records reflecting such limitations. Although at times Ms. Ramsay has obtained scores during diagnostic evaluations that would superficially suggest possible substantial limitations, those scores (and other evidence from the diagnostic evaluations) are not supported by - and are often inconsistent with - other important evidence, including her performance on real-world timed tests that required significant amounts of reading.

In many ways, the outcome of this case is best achieved by resolving a "battle of experts" and we note our finding that all of the experts who examined Plaintiff and/or reviewed the documents on behalf of the Defendant and who testified at the preliminary injunction hearing appear eminently qualified. In undertaking this resolution, however, we are constrained to follow the provisions of the ADA and the guidance and directives set forth in the implementing regulations. In conjunction with those directives, we first note that unlike Mr. Livingston and Drs. Tanguay, Smiy, Ruekberg, Lewandowski, Houtman, and Smith, neither Dr. Lovett nor Dr. Zecker evaluated or even met Plaintiff before testifying before this Court at the hearing.

In rejecting the findings of all of the aforesaid doctors and psychologists who interviewed and administered educational and neuropsychological testing to Plaintiff in the process of diagnosing her, Drs. Lovett and Zecker focused primarily on Plaintiff's record of academic performance throughout her school years and her performance on standardized tests and on the paucity of documentation of disability in her primary and secondary school years. To be sure, it is certainly possible that they did not have the benefit of seeing all of the early school records which were produced to this Court. However, in their rejection of the conclusions of those providers who actually *did* evaluate Plaintiff, Drs. Lovett and Zecker instead undertook to analyze the results of the various tests themselves, substituting their own opinions regarding how those test results should be interpreted. In thus adopting the findings of Drs. Zecker and Lovett, NBME did likewise.

This was a blatant error in light of the language of both the statute and the relevant provisions of the Code of Federal Regulations. Indeed, it was the stated goal of Congress in enacting the ADA Amendments Act to make it easier for individuals with disabilities to obtain protection under the Act and to mandate that the definition of "disability" "be construed broadly in favor of expansive coverage." See, 29 C.F.R. §1630.1(c)(4), 1630.2(j), and 28 C.F.R. §36.101(b). The

Regulations clearly state that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, **not** whether the individual meets the definition of disability."  And, "[t]he question of whether an individual meets the definition of disability under this part should **not** demand **extensive analysis.**" Id.(emphasis added).  In re-analyzing the results of the numerous diagnostic tests that were administered, Drs. Zecker and Lovett did just that.  They thus focused on whether Plaintiff met the definition of disability, rather than whether the covered entity had complied with their obligations under the Act(s).  Indeed, although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed in assessing accommodations requests under the ADA.  It decidedly did not do so in this case.

It further appears that NBME either discounted or disregarded entirely the admonition to focus on "how a major life activity is substantially limited, and not on what outcomes an individual can achieve" and apparently ignored the example that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the

additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. §1630.2(j)(4)(iii). NBME's exclusive focus on Plaintiff's prior academic successes and her performance on the ACT and MCAT standardized examinations without accommodations was therefore improper, particularly given that we can discern that no consideration was given to the other evidence produced by Plaintiff, including her lengthy personal statement[13].

Finally, we also find that Defendant ran afoul of 28 C.F.R. §36.309(b)(v) which requires that "[w]hen considering requests for … accommodations …  the [testing]entity give[]considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations…"  Again, it does not appear from the record that NBME gave any consideration, much less the "considerable weight" required to Ms. Ramsay's past record of having received accommodations.

In view of all of the evidence provided by Plaintiff both in the form of the materials and supporting documentation submitted to NBME pursuant to her numerous requests for accommodations and requests for reconsideration of the denials thereof and at the three-day hearing before the undersigned, we

---

[13] It should be noted that the Personal Statement was required by NBME to be submitted along with all of the other required documentation in order for the request for accommodations to be considered.

find that Plaintiff has sufficiently established that she is indeed a qualified individual with a disability within the meaning of the ADA despite her prior academic successes and her performances on standardized tests. Indeed, we find that the evidence as outlined above supports the conclusion that, despite having Attention Deficit/Hyperactivity Disorder and Dyslexia/Learning Disorder of reading/scanning/processing speeds, Ms. Ramsay has been able through her high intelligence and remarkably hard work habits to achieve great academic success. Thus, Plaintiff has shown the requisite likelihood of success on the merits of her Complaint in this matter.

We also find that the evidence supports the finding that Plaintiff will suffer irreparable harm unless granted preliminary relief. Again, the record evidence reflects that unless Plaintiff takes and passes her Step 1 USMLE by March 2, 2020, she will be forced to withdraw from medical school and that it is highly unlikely that she would be able to transfer to another school, given what has transpired. That enrollment in a medical school is a pre-requisite to being allowed to sit for the Step 1 exam is further evidence of the "Catch 22" in which Plaintiff finds herself and further supports the conclusion that her medical career will effectively end if she cannot satisfy WMed's mandate by March 2, 2020. The element of irreparable harm is thus satisfied.

Finally, we also find the record evidence supportive of a finding that the balance of equities and the public interest both militate in favor of granting injunctive relief here. It is obviously in the public interest that the dictates of the ADA and the RHA be followed - Congress so decreed by passing both statutes. Further, one need only to read the myriad newspaper and magazine articles or watch television documentaries, among other news sources, to learn that there remains a great need for qualified and capable physicians throughout the United States, particularly in rural, economically-depressed areas of the Country. While we share NBME's concern for the fulfillment of its mission to provide such physicians, we feel certain that granting this plaintiff the relief which she seeks here does not run afoul of this goal. In granting preliminary relief, we are granting Plaintiff only the *opportunity* to move forward should she succeed in passing her examinations with appropriate accommodations. This Court is not a licensing or credentialing body and by this decision we do not assume that mantle.

In furtherance of all of the preceding findings, we now enter the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1343.

2.   Plaintiff is disabled within the meaning of the Americans with Disabilities and the Rehabilitation Acts by virtue of her diagnoses of Attention Deficit Hyperactivity Disorder, Specific Learning Disorder with impairments in reading (developmental dyslexia), and reading comprehension, Migraine Headaches and Deep Vein Thrombosis/Post-Thrombotic Syndrome.

3.   As a disabled individual under the foregoing federal statutes, Plaintiff is entitled to reasonable accommodations in sitting for examinations given by any person or entity relating to applications, licensing, credentialing, or certification for secondary or post-secondary education, professional or trade purposes.

4.   Defendant NBME, by virtue of its status as the testing organization responsible, along with the Federation of State Medical Boards, for the administration of, *inter alia*, the United States Medical Licensing Examination ("USMLE"), is obligated to offer its exams in such place and manner as would make those exams accessible to persons with disabilities or to offer alternative accessible arrangements for such individuals, *i.e.* to provide reasonable accommodations where necessary.

5.   Plaintiff's request for additional (2X or double) time to complete the USMLE was reasonable, as were her requests for a separate, distraction-reduced room for testing, colored dry-erase markers to use on the laminated paper, an alarm or timer

(either in the room, visible on the computer screen or a visual signal or reminder from a proctor), water and a snack in the room to facilitate taking needed medications at the appropriate times, given the nature of her disabilities.

6.    Defendant's continued denial/refusal to grant Plaintiff's request for double time to take the USMLE was unreasonable and constitutes a violation of her rights under the ADA.

7.    Plaintiff has demonstrated a strong likelihood that she will succeed on the merits of the claims raised in her Complaint were this case to proceed to trial.

8.    Plaintiff has demonstrated that, in the absence of the issuance of a preliminary injunction directing Defendant to refrain from refusing to provide her with the reasonable accommodation of 100% extended testing time on the USMLE Step 1 examination, she will suffer and will continue to suffer immediate irreparable harm for which there is no adequate remedy at law.

An Order follows.