**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NATIONAL BOARD OF MEDICAL
EXAMINERS,

                Defendant,

    v.

JESSICA RAMSAY,

              Plaintiff.

Civil Action No. 2:19-CV-02002-JCJ

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO STAY PENDING APPEAL AND REQUEST FOR EXPEDITED RULING**

      The National Board of Medical Examiners ("NBME") respectfully asks this Court to stay

the mandatory preliminary injunction that it recently entered pending appeal to the Third Circuit.

*See* ECF 29.  The Court's order should be stayed because (1) NBME is likely to succeed on the

merits of its appeal, (2) NBME will be irreparably harmed absent a stay, (3) Plaintiff will not be

substantially injured if a stay issues, and (4) the public interest favors a stay.  NBME requests an

expedited ruling by **January 30, 2020** so that, if this Court denies this motion, the Court of Appeals

may decide a stay request from NBME in an orderly manner.

## BACKGROUND

      The relevant facts are detailed in NBME's Opposition to Plaintiff's Motion for Preliminary

Injunction, ECF 17, at 3-18.  The summary below supplements that narrative with evidence

presented during the preliminary injunction hearing.  References to "DX" and "PX" are to exhibits

admitted in the hearing, and references to "Tr." are to the hearing transcript.[1]

---

[1] The three-day preliminary injunction hearing was held from December 3 to 5, 2019.  "Tr. 1" refers to the hearing transcript from December 3, 2019, "Tr. 2" refers to the transcript from December 4, and "Tr. 3" refers to the transcript from December 5.

### A.    National Board of Medical Examiners

NBME is a nonprofit testing organization located in Philadelphia.  DX-4, at 1.  Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE")—a standardized examination that assesses a candidate's ability to apply knowledge, concepts, and principles that constitute the basis of safe and effective patient care.  *Id.*  Medical licensing authorities across the country rely on the USMLE as part of their licensure process, and residency programs rely on USMLE scores in evaluating residency applications.  *Id.*; Tr. 1, at 43.

NBME provides reasonable accommodations to disabled examinees and conscientiously evaluates each request for accommodations.  DX-4, at 3.  NBME's procedures are "designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004) (affirming summary judgment for NBME).

### B.    Plaintiff Jessica Ramsay

Jessica Ramsay is a medical student at Western Michigan University Homer Stryker School of Medicine.  Tr. 1, at 42.  She claims to be disabled under the ADA based on diagnoses of a learning disability and Attention Deficit Hyperactivity Disorder ("ADHD"), and entitled to double (100 percent extra) testing time on all three steps of the USMLE.  *See* PX-2.

**Elementary and middle school.**  Plaintiff's early years in school are relevant to her claims because learning disorders and ADHD are both lifelong disabilities, and such disabilities "do not manifest themselves later on in a person's life" without earlier manifestations.  *See Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 219 (E.D. Pa. 2007).

Plaintiff participated in a gifted program throughout much of elementary school and received mostly A's.  Tr. 2, at 158; DX-8–16.  She also took numerous standardized tests during this time, on which she received all average and above-average scores with no accommodations.  DX-24–26.  Although Plaintiff testified that her struggles were "always occurring" and she was "receiving special assistance from [her] teachers on virtually a daily basis," Tr. 1, at 98, 102, she indicated on her accommodation request form to NBME that she received accommodations only during a single school year, and that her "teacher, not the school" provided the accommodations, which did not include extra testing time.  PX-1, at 7; *see also* PX-1 at 10.

Plaintiff's elementary school report cards also contradicted her testimony that she regularly received informal accommodations.  In kindergarten, Ms. Ramsay's teacher wrote that "Jessica is doing well in all areas."  DX-8.  Both that year and in first grade, Ms. Ramsay received top marks in reading, and on measures of attention and organization.  DX-9–10.  As a second grader, she received an above-average score in reading, and her ability to "listen[] carefully, follow[] directions and stay[] on task" was consistently "excellent."  DX-11–12.  In third and fourth grades, Plaintiff not only received A's in reading, but a notation of "mastery" in that subject.  DX-13–14.  In fifth grade, Plaintiff received all A's.  DX-16.  Other than noting that Ms. Ramsay had participated in a gifted program, her teachers never indicated that she had received any extra assistance—even in the "Additional Programs/Support" section of her report cards, which called upon teachers to specifically address that issue as part of the grade reporting process.  DX-13–15.

While in elementary school, Plaintiff was evaluated by Dr. Tanguay, an optometrist, because of concerns about letter reversals.  PX-1, at 32; DX-5, at 28.  Dr. Tanguay administered a single test, which was done incorrectly and incompletely scored.  DX-5, at 28.  After Plaintiff participated in four months of perceptual skills training, Dr. Tanguay reported that she "scored

above age level in all categories," and her comprehension and perceptual skills were "excellent." PX-1, at 33.   No evidence was presented at the preliminary injunction hearing that Plaintiff received any accommodations in elementary school based upon Dr. Tanguay's evaluations, and Plaintiff's preliminary injunction motion did not rely on Dr. Tanguay's evaluations to support her claimed entitlement to accommodations.  *See* ECF 7.

Plaintiff did not receive accommodations in middle school either.  Tr. 1, at 106.  She tested into an accelerated program and received all A's.  DX-16; Tr. 1, at 33-34.  Plaintiff reported that she "did very well, understood everything and was able to do the homework[.]"  PX-1, at 11.  On the standardized Iowa Tests of Basic Skills and Cognitive Abilities Test, which Plaintiff took in sixth grade with no accommodations, her test results (including scores in reading) were average or above average.  DX-27.

**High School.**  Ms. Ramsay also excelled in high school without any accommodations.  *See* PX-1, at 7; DX-18.  Despite claiming that "[t]imed tests" were her "downfall in all of [her] classes," PX-2, at 13, and that she "rarely got an exam grade that accurately reflected how much [she] knew," PX-1, at 10, Plaintiff earned mostly A's and occasional B's while taking numerous honors and AP classes: AP US History, Honors Biology, Honors Chemistry, Honors Algebra, Honors Trigonometry/Pre-Calculus, and AP Calculus.  DX-18; Tr. 1, at 106-08.  She was in National Honor Society and finished high school with a 3.75 GPA.  DX-18, at 28; Tr. 1, at 106-07, 110. Out of the 237 students in her class, Plaintiff ranked 28th.  DX-18; Tr. 1, at 107.

On top of her demanding course load, Ms. Ramsay found time for a host of time-consuming extracurricular activities.  Tr. 1, at 108.  She participated in three sports in high school (swimming and soccer all four years, and volleyball for two), and was a swim team captain her senior year. *Id.* at 108-09; DX-19.  She was a Southwestern Michigan Athletic Conference Academic All-

Conference Member and received a senior athletic plaque award. Tr. 1, at 109; DX-20. Plaintiff also participated in other activities (Miracle League Baseball volunteer, Key Club, Spanish Club, Men's Swim Team manager), and worked (babysitting and tutoring). Tr. 1, at 110-11, 113-14; DX-56. Plaintiff took no ADHD-related medications during this time. Tr. 1, at 118; PX-2, at 4.

Plaintiff's college application essay walked through a day in her life: 6 a.m. swim practice; a day packed with AP and honors classes; back-to-back after-school swim and soccer practices; and homework ("a research paper, Spanish translations and exercises, a pre-lab and chemistry problem . . . a 35-page history chapter and 15 extremely hard calculus problems"). DX-56, at 10. She wrote: "EXHAUSTION. REPEAT. College? Hit me with everything you've got." *Id.* Unsurprisingly, Plaintiff reports working very hard during this period. PX-1, at 10.

**ACT College Admission Test.** Consistent with her excellent grades, Ms. Ramsay received a stellar score without accommodations on the ACT, a standardized test requiring reading under time pressure. *See* DX-31; PX-2, at 3; Tr. 1, at 133 -34; *Love v. LSAC*, 513 F. Supp. at 227 (noting that the ACT is "strictly timed and . . . involve[s] reading and processing information"). Many, and perhaps most, of the reading passages on the ACT exam are longer than those on the USMLE Step 1 exam. *Compare* DX-60, at 34-41 (sample ACT Reading section), *with* DX-61 (sample Step 1 questions). Although Plaintiff indicated in her 2018 application to NBME for accommodations that she "was not able to read all the questions and could not accurately demonstrate [her] knowledge [on the ACT]," PX-2, at 9; *see also* Tr. 1, at 138, she in fact scored in the 97th percentile—***the top three percent***—of all examinees nationwide who took the ACT in 2007, DX-31. Ms. Ramsay's overall reading score was in the 91st percentile (*top 9 percent*), and her reading subscore in "Arts/Literature" was in the 99% percentile (*top 1 percent*). Tr. 2, at 59; DX-31. Plaintiff characterized her score on this exam as "acceptable." PX-2, at 9.

**Ohio State University.**  Plaintiff also did very well at Ohio State University, where she graduated *cum laude* with a Bachelor of Science degree, majoring in genetics with minors in business and dance.  DX-22.  For the first five terms of college—during which Ms. Ramsay did not receive any accommodations—she earned all A's and B's and made the Dean's List four times. *Id*.  On top of her course work, Plaintiff taught a chemistry lab and tutored students in general and organic chemistry.  Tr. 2, at 32; DX-57, at 5.

In March 2009, Plaintiff visited Dr. Alan Smiy, her primary care physician, who gave her a prescription for Ritalin to help her be more focused in her classes.  Tr. 1, at 115; *see* DX-4, at 34-38.  According to Dr. Smiy—who met with Plaintiff for only 30 minutes—Plaintiff's "Chief Complaint" was "ADD/ADHD."  DX-4, at 35, 37.  Although the Court's decision states that the "record does not evince what tests, if any, Dr. Smiy administered to plaintiff," ECF 28, at 35, Plaintiff testified at the hearing that Dr. Smiy did not administer any tests.  *See* Tr. 1, at 116-17; DX-4, at 34-38.  In his brief history of the visit, Dr. Smiy noted that Plaintiff had "no problems" in high school but "college stress" was causing her to "switch letters around a bit."  DX-4, at 35-36.  He found that Ms. Ramsay "has more focus issues than dyslexic tendencies."  *Id.* at 37.

Although Dr. Smiy's "office visit" summary does not indicate a formal ADHD diagnosis, DX-5, at 4-5, Dr. Smiy completed a form in August 2010 in support of Ms. Ramsay's request to Ohio State for accommodations stating that he had diagnosed Ms. Ramsay in March 2009 with ADHD.  DX-4, at 40-45.  Ohio State apparently began providing accommodations to Ms. Ramsay in the late spring of her sophomore year on a provisional basis, including 50 percent additional testing time, before receiving the form submitted by Dr. Smiy.  *See id.*; PX-2, at 4.

The Court's decision states that Dr. Smiy also diagnosed Ms. Ramsay with "probable dyslexia."  ECF 28, at 3.  That is not correct.  Neither Dr. Smiy's evaluation summary nor the form

he completed for Ohio State diagnosed Ms. Ramsay with "probable dyslexia;" at best, they suggest

that Ms. Ramsay might have "*moderate* dys[lexic] tendencies."  DX-42, at 3 (emphasis added).

**The Medical College Admission Test ("MCAT").**  Plaintiff scored very well on the
MCAT without any accommodations.  DX-32; PX-2, at 3.  Like the USMLE Step 1 exam, the
MCAT is a challenging multiple-choice exam administered over several hours on a computer, with
questions that require extensive reading and concentration under fixed time limits.  DX-6, at 4.
Many of the questions involve complex subjects that one encounters in medical school, and most
are longer than questions found on the USMLE Step 1 exam.  *Compare* DX-61 (sample Step 1
questions), *with* DX-59, at 27-42 (sample MCAT Verbal Reasoning questions).  On her first try,
Plaintiff scored in the top 21 percent of all contemporaneous MCAT test-takers—a select, high-
performing sample of over 70,000 college-educated individuals. DX-32; DX-58, at 13.  On the
most reading-intensive section of the MCAT (Verbal Reasoning), Plaintiff outperformed 67
percent (top 33 percent) of other medical school aspirants.  DX-32.

**Western Michigan University Homer Stryker School of Medicine.**  Plaintiff began
medical school in 2014.  PX-2, at 4.  That same year, she visited Charles Livingston, a licensed
social worker and limited license psychologist, to help her secure accommodations in medical
school and thereby "meet the increased curricular demands."  DX-4, at 6, 47.  In his one-page
report, Mr. Livingston incorrectly noted that Plaintiff had been "diagnosed with ADHD and
Dyslexia by her primary care physician" and had received "various testing in elementary and
middle school."  *Id.* at 47.  According to Mr. Livingston, Plaintiff reported that she was "tired"
and "stressed" and worried that her grades did not reflect her knowledge.  *Id.*  He found that Ms.
Ramsay's "reading comprehension was above average" on measures of academic achievement.
*Id.*  Although Mr. Livingston did not perform comprehensive testing and Plaintiff scored above

average on the test most dependent on attentional functioning, Mr. Livingston diagnosed Plaintiff

with ADHD, grounded largely on unspecified "biographical information."  *Id.*; DX-5, at 6.  After

receiving this evaluation, Plaintiff's medical school granted her accommodations, including

double (100 percent extra) testing time.  *See* PX-2, at 4; DX-2, at 7.

**Seeking Accommodations for the USMLE.**  In December 2016, Plaintiff sought various

accommodations—including 100 percent additional time—on Step 1 and Step 2 CK of the

USMLE, based on diagnoses of dyslexia and ADHD.  PX-1, at 4-5.  In her application, she

represented, inaccurately (*see* Tr. 1, at 157), that she had received double testing time at Ohio

State.  *Id.* at 6.  The *only* accommodations she referenced as having received prior to college were

the informal accommodations that she said she received in a single school year (1996-1997) from

one of her elementary school teachers.  *Id.* at 7.

After reviewing Plaintiff's documentation and consulting an outside expert, Steven Zecker,

Ph.D., NBME denied her request.  NBME determined she had not shown a substantial limitation

in a major life activity compared to most people in the general population.  PX-4, at 3-6, 54-55.

Plaintiff took Step 1 in July 2017 without accommodations.  DX-2 at 10-11.  She missed

passing by one point.  DX-33.  Although Plaintiff represented in her complaint that she was only

able to read 60 to 70 percent of the questions, her test records show—contrary to her testimony

(Tr. 1 at 160) and the Court's finding (ECF 28 at 6)—that she spent time reviewing *all* questions

on the exam.  DX-1, at 9.  Students taking Step 1 under standard conditions have 7 hours to answer

approximately 280 questions, or roughly 90 seconds per question. *See* usmle.org/step-1/.  Plaintiff

spent an average of 76 seconds on the Step 1 questions she answered correctly, and an average of

107 seconds on the ones she answered incorrectly.  Tr. 3, at 143-45.  She spent less than 20 seconds

on only four questions, all of which she answered correctly.  Tr. 3, at 147.

Plaintiff subsequently took a leave of absence from medical school.  Instead of re-taking Step 1, she submitted a new request for accommodations in June 2018.  In addition to learning disabilities and ADHD, her new request relied on diagnoses of migraines and a clotting disorder with recent deep vein thrombosis ("DVT").  PX-2, at 3.  She sought 100 percent extra testing time over two days, a private room, and additional break time.  *Id.* at 7.  Plaintiff's supporting documentation included the documentation from Dr. Smiy and Mr. Livingston, as well as a new 2017 evaluation from Alan Lewandowski, Ph.D., who she went to see "to obtain accommodations similar to that which she was allowed throughout medical school."  PX-4, 6-7, 75.

Dr. Lewandowski's evaluation indicated moderate depression, inefficient thinking, and health concerns. *Id.* at 83. "Academic" testing resulted in a "high average" reading score, and a finding that "[r]eading . . . [was] above normal and consistent with past education."  *Id.* at 82-83. "Attention" testing resulted in largely normal scores.  *Id.*; *see also id.* at 91 (eight of nine subscores were "normal").  Dr. Lewandowski nevertheless diagnosed Plaintiff with ADHD and a learning disability and recommended 50 percent extra testing time.  *Id.* at 84-85.  Six months later, he changed his recommendation to 100 percent extra time given Plaintiff's "additional description of the requirements of the examination."  *Id.* at 87.

Plaintiff also submitted letters of support from Dr. Reukberg,[2] Dean Overton, and Dr. Houtman.  None of these documents, however, were independently prepared by the signatories.

---

[2] The Court's decision incorrectly states that Dr. Reukberg performed an "additional evaluation[]" of Ms. Ramsay.  ECF 28, at 7.  As Ms. Ramsay acknowledged at the hearing, Dr. Reukberg is her treating psychiatrist, and he did not conduct an evaluation of her for either ADHD or learning disorders (apart from having her, her mother, and her fiancé complete ADHD symptom checklists).  *See* Tr. 1, at 165; Tr. 2, at 9-10.  His "letter in support" of Ms. Ramsay's request for accommodations relied upon the evaluations of Drs. Smiy, Livingston, and Lewandowski, *see* PX-2 at 40, 41-42—all of which were characterized as being insufficient in some respect by Dr. Smith, her testifying expert, *see* Tr. 3, at 20-24, 50-53.

They were substantively revised by Plaintiff and also reviewed by her lawyer, whose input was not disclosed based upon privilege claims. Tr. 1 at 164-72; Tr. 2 at 4-19, 24-28; PX-2 at 37, 45.

Although NBME concluded—after carefully reviewing the documentation and again consulting Dr. Zecker—that Ms. Ramsay was not entitled to extra testing time, it approved additional break time, testing over two days, and a separate room in which Ms. Ramsay could stand or stretch, to address her stated needs associated with migraines and DVT.  DX-4, at 7-8.

Ms. Ramsay nevertheless chose not to retake Step 1. Instead, she obtained another diagnostic evaluation, this time from Robert Smith, Ph.D., who was recommended to her lawyer as someone who had helped other medical students obtain accommodations on the USMLE.  DX-3, at 3; DX-85; Tr. 2, at 22; *see also* Tr. 3, at 4 (acknowledgment by Dr. Smith that he has "a reputation in this area of providing evaluation reports for students seeking accommodations on standardized tests"); DX-34 (Dr. Smith's website homepage, stating that he specializes in "**EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED TESTS**").

In his report, Dr. Smith stated incorrectly—and despite access to substantial contrary evidence in Plaintiff's prior evaluations, standardized testing score reports, and grades—that Plaintiff "has a history of academic struggles that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments[.]"  DX-3, at 15-16, 18; *see also* Tr. 2, at 99.  This assertion was apparently based on oral reports by Plaintiff and her mother.  Dr. Smith acknowledged Plaintiff's "good grades" and "good" ACT and MCAT scores but speculated that "she may have scored significantly higher" with extra time.  DX-3, at 20, 42.  He also found it "noteworthy" that a medical school applicant with Plaintiff's MCAT score (79th percentile) and GPA (3.562) "only had an acceptance rate of 38%," *id*. at 42—a fact with no relevance to whether Plaintiff has a learning disorder or ADHD.

Dr. Smith diagnosed Plaintiff with a learning disorder (dyslexia) based on her 1st or 2nd percentile scores on certain diagnostic reading tests (*i.e.*, scores one would expect from an elementary or middle school student). *Id.* at 32-34, 37-43; DX-6, at 35. Dr. Smith also diagnosed Plaintiff with ADHD, based primarily on the self-reports of Plaintiff and her mother, Tr. 3, at 13, as well as Plaintiff's poor performance on a computerized test that evaluates ADHD symptoms. DX-3, 42-43; DX-6, at 9-11. Dr. Smith credited the computerized test score despite Plaintiff's strong academic record, the absence of any documented attentional issue in any setting (much less in multiple settings, as required for an ADHD diagnosis under the DSM-5), and Plaintiff's non-impaired performance on a similar test administered by Dr. Lewandowski one year prior. DX-6, at 10-11; *see* Tr. 2, at 98 (testimony from NBME's expert that "if [Plaintiff's] scores were taken at face value, her attention skills and her self-control skills would be very, very poor, in the bottom 1 percent of the population.").

In December 2018, Plaintiff submitted Dr. Smith's evaluation—on which she and her lawyer had provided input—with a request that NBME reconsider its denial of 100 percent extended testing time. DX-4, at 8; Tr. 3, at 36. NBME reviewed Ms. Ramsay's request and sought the recommendation of Benjamin Lovett, Ph.D., another external expert. DX-4, at 8. After receiving Dr. Lovett's report, NBME determined that the scores from the Smith evaluation were not credible and concluded, once again, that Plaintiff had not shown a substantial limitation as compared to most people.[3] *Id.* at 9, 102-03.

---

[3] The Court states in its decision that NBME denied extra testing time to Plaintiff "notwithstanding that its evaluator had accepted that Plaintiff's 'exceptionally low scores on timed reading tests administered for the purpose of requesting test accommodations [was] valid and credible.'" ECF 28, at 10. That is not correct. To the contrary, and as noted above, NBME's evaluator found Dr. Smith's exceptionally low scores ***not*** to be credible. The Court did not provide a citation for its contrary finding, but the language that it partially quoted in its opinion comes from NBME's February 14, 2019 decision letter to Plaintiff, which stated, in relevant part, as follows: "Although *your* evaluator appears to accept your exceptionally low scores on time reading tests administered for the purpose of requesting test accommodations as valid and credible, your

Ms. Ramsay remained on leave from medical school after failing to pass Step 1 on her first attempt.  *See* Tr. 1, at 14.  After she apparently requested an indefinite leave of absence, her medical school informed her that she could, as an alternative, extend her leave of absence until March 2, 2020, if she takes Step 1 by that date.  DX-2, at 27.  If she does not pass or she voluntarily withdraws from school, Ms. Ramsay is eligible to apply for readmission.  *Id.*

### C.    Procedural History

Plaintiff sued NBME on May 8, 2019 under the Americans with Disabilities Act ("ADA")[4] and Rehabilitation Act.[5]  DX-1, at 1.  The complaint alleges that she is entitled to double testing time because she has been diagnosed with dyslexia and ADHD and "has a history of significant reading difficulties and distractibility throughout her educational career."  *Id.* at 2.

---

average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college and medical school demonstrates that your skills are better than most people in the general population."  PX-7, at 2 (emphasis added).  NBME's two external professionals likewise testified that Plaintiff's "exceptionally low scores" on certain diagnostic assessments administered by Dr. Smith were not credible.  *See* Tr. 2, at 108-09, 150.

[4] The relevant provision of the ADA is Section 12189, which requires private testing entities to administer their tests to disabled individuals in an accessible place and manner.  *See* 42 U.S.C. § 12189; Compl. ¶¶ 4, 78.  The Court, however, mistakenly stated that Plaintiff's ADA claim arises under ADA Section 12182, which prohibits discrimination by "public accommodations." ECF 28, at 19, 20.  Although referenced in Plaintiff's Complaint (at ¶ 79), Section 12182 does not apply to NBME because NBME is not a public accommodation.  Rather, NBME is a "private entity" covered by Section 12189, which was added to the ADA specifically because entities like NBME were *not* covered by the ADA's other provisions.  *See* H.R. Rep. No. 101-485(III), at 68-69 (1990).  If Section 12182 governed testing entities like NBME, Section 12189 (also found in Title III) would have been "superfluous."  *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d at 146, 155 (3d Cir. 1999) (holding that Section 12189 governs NBME, not Section 12182).  The statement in *Powell* that NBME had conceded it was a public accommodation (referenced by the Court in its decision, ECF 28, at 19 n.6) appears to have been erroneously included, but regardless, that court did not analyze the issue or find that NBME is a public accommodation.  *See* 346 F.3d at 85.  NBME concedes that it must provide reasonable accommodations to individuals who are disabled within the meaning of the ADA, but this obligation traces to Section 12189, not Section 12182.

[5] Although the Rehabilitation Act is referenced and quoted in the Court's decision (ECF 28, at 19, 20), Plaintiff did not rely on her Rehabilitation Act claim to support her motion for a preliminary injunction. ECF 7-2, at 7.  NBME denies that it is subject to that statute, which in any event does not alter the analysis regarding whether Plaintiff is entitled to accommodations on the USMLE.

Nearly three months later, Plaintiff sought a mandatory preliminary injunction that would provide the very relief that is otherwise warranted only if she prevails on the merits. ECF 7 (July 25, 2019). She sought double testing time on all of the USMLE exams—Step 1, Step 2 CK, Step 2 CS, and Step 3—the last of which she will not take for at least two years. *Id.* at 4-5. A preliminary injunction hearing was held in early December. ECF 25-27. The Court granted her motion on December 31, 2019, ordering NBME to provide double testing time on all three steps of the USMLE. ECF 28-29. NBME filed its Notice of Appeal on January 7, 2020. ECF 30.

Ms. Ramsay is currently scheduled to take the Step 1 exam with the extra time ordered by the Court on February 20 and February 21, 2020.

## ARGUMENT

Plaintiff is not "disabled" under the ADA and therefore is not entitled to extra testing time on the USMLE. NBME respectfully requests a stay pending appeal to the Third Circuit. Fed. R. Civ. P. 62(d) (permitting district courts to "suspend . . . an injunction" while an appeal is pending).

The Court must consider four factors when deciding whether to grant a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Anastasio v. Saul*, No. 18-CV-05074-GEKP, 2019 WL 3503387, at *1 n.1 (E.D. Pa. Aug. 1, 2019) (quoting *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991)). As set forth below, all four factors weigh in favor of granting a stay pending appeal.

## I.     There is a strong likelihood that NBME will succeed on the merits.

Because Plaintiff is not substantially limited in a major life activity compared to most people in the general population, NBME respectfully submits that it likely to succeed on appeal.

A.        The Americans with Disabilities Act

Title III of the ADA requires NBME to offer the USMLE "in a place and manner accessible *to persons with disabilities*."  42 U.S.C. § 12189 (emphasis added).  To prove an ADA violation based on failure to accommodate in the testing context, the plaintiff must demonstrate that: "(1) she is disabled; (2) her requests for accommodation are reasonable; and (3) those requests have been denied."  *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV-15-4987, 2016 WL 1404157, at *5 (E.D. Pa. Apr. 11, 2016).  The threshold issue—and key question in this case—is whether Ms. Ramsay is "disabled" under the ADA.  *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 626 (6th Cir. 2000) ("[T]he only question in this case is whether Gonzales is disabled within the meaning of the ADA.") (affirming denial of preliminary injunction).

"Disability" is a legal term of art, tied to substantial impairment relative to most people.  Insofar as relevant here, "disability" requires "a physical or mental impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(1)(A).  Critically, an impairment is only a disability "if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*."  28 C.F.R. § 36.105(d)(1)(v) (emphasis added); *see also* § 36.105(e)(2).  Relative to "most people" means to a greater degree than the majority of people.  *See Mancini v. City of Providence*, 909 F.3d 32, 42 (1st Cir. 2018) ("[A] determination as to whether this 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's limitations and those of the majority of people in the general population." (citation omitted)).

In assessing substantial limitation, the point of comparison is not high-performing groups—future doctors or college graduates—but rather most members of the general population.  *See, e.g.*, *Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1103 (D.C. Cir. 2007); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).

- 14 -

**B.      This Court did not apply the correct legal standard under the ADA in assessing whether Plaintiff is disabled.**

The key legal issue on appeal will be whether this Court erred in ruling that Plaintiff is "disabled"—that is, substantially impaired in a major life activity (reading, thinking, or concentrating) as compared to most people in the general population. *See* 28 C.F.R. § 36.105(d)(1)(v). The Court properly found, based on significant and largely uncontradicted evidence, that Plaintiff performs at a level *above* that of the average person. ECF 28, at 32. In nonetheless concluding that Plaintiff is disabled under the ADA, the Court did not apply the correct legal standard. Rather, the Court's disability determination relied on (1) facts that were insufficient to establish a disability, and (2) a misinterpretation of the 2008 amendments to the ADA. The Court's conclusion on the merits of Plaintiff's case was therefore incorrect.

**1.      The evidence relied upon was insufficient to demonstrate a disability.**

The Court made a single factual finding that compared Ms. Ramsay to most people in the general population:

> [W]e note at the outset that Defendant is right that the documentary evidence of Plaintiff's ADHD and dyslexia in her early years is indeed sparse and that for the most part, Plaintiff performed exceedingly well overall academically during this time with little help. Likewise, Ms. Ramsay scored quite well on several standardized tests without accommodations, including the ACT and the MCAT examinations. ***Certainly, in comparison to the average individual in the general population, Plaintiff appears to have been and continues to be quite successful in her endeavors.***

ECF 28, at 32 (emphasis added). The finding that Ms. Ramsay *outperforms the average person* is consistent with—and was compelled by—overwhelming evidence of largely above-average grades in school and scores on standardized tests, earned without accommodations, since she was in kindergarten. And "[o]f course, average (or above-average) performance presumptively establishes the absence of a substantial limitation." *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249 (M.D. Fla. 2017); *see Marshall v. Sisters of Holy Family of Nazareth*, 399 F.

Supp. 2d 597, 603 (E.D. Pa. 2005) ("[A] student who learns as well as the average student does not have an impairment that substantially affects the major life activity of learning."); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012) ("By definition, 'average' is not 'substantially limited.'").

In concluding that Plaintiff is disabled under the ADA, despite finding consistently above-average performance, the Court emphasized Ms. Ramsay's: (1) diagnosed impairments, (2) past accommodations for part of her time at Ohio State and in medical school, and (3) strong work ethic. As set forth below, none of this evidence, even accepted as true, is sufficient to establish a disability under the ADA.

First, the Court improperly conflated a diagnosis of an impairment with a disability. Plaintiff's mere diagnoses do not establish a disability. 28 C.F.R. § 36.105(d)(1)(v); *see Matthews v. Penn. Dept. of Corrections*, 613 F. App'x 163, 167 (3rd Cir. 2015) ("[N]ot every impairment will constitute a disability[.]"). Rather, an impairment "does not make one disabled for purposes of the ADA" *unless* the alleged impairment substantially limits the individual compared to most people. *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009); *see Healy*, 870 F. Supp. 2d at 620 (distinguishing between a clinical diagnosis "based on an internal referent"—*i.e.*, the plaintiff's intellectual ability or IQ versus his achievement, as reflected on diagnostic assessments—and the ADA's definition of disability, which calls for a comparison with the general population).

This district's recent decision in *Bibber* highlights the critical distinction between a mere diagnosed impairment and a disability under the ADA. In that case, it was undisputed that the plaintiff had dyslexia and that her impairment affected her ability to read and process information. 2016 WL 1404157, at *5. Bernadette Bibber, who was born deaf, repeated kindergarten after

- 16 -

failing to master the alphabet, was sent to separate reading classes when she had trouble reading in first grade, and began working with a reading specialist in fourth grade to improve her reading. *Id.* at *2. She received accommodations in high school, college and medical school, and she was diagnosed with dyslexia by two qualified professionals who personally evaluated here. Nevertheless, the court concluded that Bibber's dyslexia did not rise to the level of a disability because it did not *substantially limit* her ability to read and process information as compared to most people in the general population. *Id.* at *11; *see also Healy*, 870 F. Supp. 2d at 617, 620-21 (holding that Plaintiff suffered from a reading disorder but was not substantially limited in reading compared to most people in the general population).

Here, too, Plaintiff's purported impairments (which, even as alleged, are less severe than Ms. Bibber's) cannot support a disability finding unless she is substantially limited compared to most people in the general population. The record does not support such a finding, and the Court never reached this conclusion; if anything, it found the opposite. By conflating diagnosed impairments with a "disability" under the ADA—which requires a substantial limitation compared to most people—the Court did not apply the correct statutory standard.

Second, the Court erred by embracing Plaintiff's legal argument that her "past record of having received accommodations" effectively precluded NBME from denying accommodations because of the regulatory requirement that "considerable weight" be afforded to a person's prior receipt of accommodations. ECF 28, at 47 (citing 28 C.F.R. § 36.309(b)(1)(v)).

The Fifth Circuit recently rejected that exact argument in a decision vacating a preliminary injunction awarded to a prospective USMLE examinee who, the court concluded, had not shown that she was disabled within the meaning of the ADA despite having been diagnosed by a qualified professional as having a learning disorder, ADHD and anxiety disorder. Section 36.309(b)(1)(v),

the court explained, "applies only *after* a person establishes that they are disabled under the ADA." *Doherty v. Nat'l Bd. of Med. Exam'rs*, No. 19-30661, 2019 WL 5855779, at *3 (5th Cir. Nov. 7, 2019) (citing § 36.309(a)) (emphasis added).   The court also noted that her medical school might have provided accommodations even if they were not warranted under the ADA, and its decision in that regard did not bind other entities from which accommodations were later sought.   *Id.* ("Tulane may grant accommodations to individuals who do not meet the ADA's definition of disability."); *see also Ware v. Wyo. Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997), *aff'd*, 161 F.3d 19 (10th Cir. 1998).

Here, Plaintiff's receipt of extra time in college and in medical school—while relevant— was not entitled to controlling or even significant weight on the issue of whether she is disabled. *See* ECF 28, at 47.   Indeed, not only was there *no evidence* that these schools applied the ADA's definition of a disability, but the evidence at the hearing demonstrated that the decisions were made based on faulty diagnoses.   Tr. 3, at 20-24, 50-53 (testimony from Plaintiff's own expert that the diagnoses relied upon by Ohio State and Western Michigan in granting her accommodations were "insufficient").[6]

Third, this Court appears to have concluded that Ms. Ramsay is disabled because her academic success reflected "remarkably hard work habits," ECF 28, at 48, which, according to Ms. Ramsay, enabled her to overcome her alleged disabilities, *see, e.g.*, DX-2, at 3-4.   But working hard does not show that Plaintiff is substantially impaired compared to most people.   *See Healy*, 870 F. Supp. 2d at 617, 620-21 (acknowledging that the plaintiff was a driven, hard-working

---

[6] *See also* Robert Weiss et al., *When Average Is Not Good Enough: Students With Learning Disabilities at Selective, Private Colleges*, J. of Learning Disabilities 1-17 (2016) (study finding that most students receiving accommodations at a selective, private colleges were not disabled within the meaning of the ADA, and noting that "[a]lthough these students may believe their academic abilities and test-taking skills are impaired compared to their intellectually talented and high-achieving classmates, there is often little evidence that they experience substantial limitations in academic skills compared to most people in the general population, as characteristic of a disability").

individual with a reading impairment, but concluding that he was not disabled under the ADA). That Plaintiff purportedly spent more time studying "simply describes good study habits" and is consistent with her ability to excel despite an extremely demanding schedule of academic and extracurricular activities. *See, e.g.*, DX-56. It does not evidence a substantial limitation in reading, thinking, or any other major life activity.

In sum, Ms. Ramsay is not substantially limited compared to most people, as confirmed by years of objective evidence in the form of educational and standardized testing records. This Court did not find otherwise, and her expert, Dr. Smith, did not testify otherwise. In nevertheless concluding that Plaintiff is disabled under the ADA, the Court failed to apply the correct legal standard.

### 2.      The Court misapplied the ADAAA.

The Court interpreted the Americans with Disabilities Act Amendments Act ("ADAAA") as effectively eliminating an ADA plaintiff's burden of proving a disability. Noting that the term "disability" should "be construed broadly in favor of expansive coverage," and "should not demand extensive analysis," the Court reasoned:

> In many ways, the outcome of this case is best achieved by resolving a "battle of experts[.]" . . .  In undertaking this resolution, however, we are constrained to follow the provisions of the ADA and the guidance and directives set forth in the implementing regulations[.]
>
> [N]either Dr. Lovett nor Dr. Zecker evaluated or even met with Plaintiff before testifying before this Court at the hearing. In rejecting the findings of all of the aforesaid doctors and psychologists who interviewed and administered educational and neuropsychological testing to Plaintiff in the process of diagnosing her, Dr. Lovett and Dr. Zecker focused primarily on Plaintiff's record of academic performance throughout her school years and her performance on standardized tests and on the paucity of documentation of disability in her primary and secondary school years[.]
>
> In their rejection of the conclusions of those providers who actually *did* evaluate Plaintiff, Drs. Lovett and Zecker instead undertook to analyze the results of the various tests themselves, substituting their own opinions regarding how those test

results should be interpreted. . . .  This was blatant error in light of the language of both the statute and relevant provisions of the Code of Federal Regulations.

ECF 28, at 44-45.  The Court further noted—despite extensive case law to the contrary—that NBME's "focus on Plaintiff's prior academic successes and her performance on the ACT and MCAT standardized examinations was . . . improper[.]" *Id.* at 47.

But the ADAAA did not compel the Court or NBME to uncritically accept the Plaintiff's theory of the case, as put forth through her expert, who—unsurprisingly—largely ignored her excellent grades and stellar standardized test scores and the absence of *any* indication of learning or attention issues in her K-12 academic records.  Nothing in that statute or its implementing regulations,[7] including its broad introductory language, requires NBME or this Court to blindly accept, be "constrained" by, or defer to the findings of Plaintiff's evaluating professionals.

This Court has observed on multiple occasions that the ADAAA was enacted to "address certain impairments that were not receiving the protection that Congress intended," such as "cancer, HIV–AIDS, epilepsy, [and] diabetes[.]"  *See Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012); *Bibber*, 2016 WL 1404157, at *6.  Such physical impairments, unlike a learning disability or ADHD, tend to be relatively straightforward both in terms of their existence and any resulting functional limitations.  *See, e.g.*, *Matthews*, 613 F. App'x at 167 (reasoning a person who cannot lift more than 20 pounds for several months is substantially limited).  The ADAAA's broad introductory language, on which the Court's preliminary injunction order so heavily relied, should be understood in that context.

---

[7] The Court referenced "the implementing regulations promulgated by the Department of Justice" in its opinion and found 29 C.F.R. § 1630.2(j) to be "particularly instructive"—devoting roughly four pages to a verbatim quotation of the regulation.  ECF 28 at 24-28.  This regulation, however, was promulgated by the EEOC, not DOJ, and it implements Title I of the ADA (dealing with employment).  Strictly speaking, the regulation does not apply in this Title III case.

Moreover, the ADA's "expansive" coverage extends only as far as its concrete legal standards. *See, e.g.*, 28 C.F.R. § 36.101 ("[T]his part shall be construed broadly in favor of expansive coverage to the maximum extent *permitted by the terms of the ADA*" (emphasis added)). Although the ADA "provides for expansive coverage," courts "must still analyze [the ADA's definition of disability] logically" and with due regard for the statute's express requirements. *Doherty*, 2019 WL 5855779, at *2; *Morriss v. BNSF Railway Co.*, 817 F.3d 1104, 1111-12 (8th Cir. 2016) (holding that ADAAA's "general policy statement" regarding "broad coverage" "cannot trump [the statute's] plain language" regarding who is impaired within the meaning of the ADA). Post-ADAAA plaintiffs must still demonstrate substantial limitation, as "Congress expressly chose to retain the 'substantially limits' modifier for 'one or more major life activities.'" *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 434-35 (6th Cir. 2016) (citation omitted)); *see Mann v. La. High Sch. Athletic Assoc.*, 535 F. App'x. 405, 410 (5th Cir. 2013) ("Although the [ADAAA] lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation[.]"); 28 C.F.R. § 36.105(d)(1)(iv) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment."). The ADAAA "in no way eliminated the term ['disability'] from the ADA or the need to prove a disability[.]" *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 & n.4 (5th Cir. 2013).

A disability remains distinct from an impairment and must be proven by reference to most people. As a prior decision from this district explained, "the amendments themselves made clear that 'not every impairment will constitute a disability within the meaning of [the ADA].'" *Bibber*, 2016 WL 1404157, at *5 (quoting 28 C.F.R. § 36.105(d)(1)(v)); *see also* Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008,

- 21 -

154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) ("By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA.").

Despite the "broad expansion of what constitutes a disability," an ADA plaintiff must still establish that an alleged "impairment 'substantially limits [his or her] ability . . . to perform a major life activity as compared to most people in the general population.'" *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013) (noting that the ADAAA was not intended to make "every impairment . . . a disability"), *aff'd*, 582 F. App'x 114 (3d Cir. 2014). The ADAAA did not eliminate a plaintiff's burden of proving a disability or the need to show a substantial limitation compared to most people.

Applying that framework, numerous post-ADAAA cases have held that a defendant testing agency permissibly rejected the conclusions and recommendations of a plaintiff's supporting professional, oftentimes because, as here, the plaintiff's supporting medical evidence did not align with the plaintiff's "real-world" evidence (*e.g.*, grades and standardized test scores). Another court in this district, for example—despite recognizing the DOJ's informal guidance regarding the utility of individualized, face-to-face assessment—adopted the expert opinion of the outside testing agency's consultants, even though they had never met with the plaintiff.[8]  *Bibber*, 2016 WL 1404157, at *5. In holding that the plaintiff was not disabled, the *Bibber* court explained that the plaintiff's academic and testing success without accommodations was "inconsistent with the

---

[8] While acknowledging that NBME's external evaluators are "eminently qualified," the Court discounted their findings because they did not evaluate Plaintiff in person. ECF 28 at 44-46. That was unwarranted. DOJ has expressly stated—post-enactment of the ADAAA—that NBME "is not required to defer to the conclusions or recommendations of an applicant's supporting professional" and may instead seek input from and rely upon its own qualified professionals, so long as it states why it has done so. *See* Settlement Agreement ¶ 17 (Feb. 23, 2011), *available at* https://www.ada.gov/nbme.htm;

notion that her dyslexia *substantially limits* her ability to read and process information compared to the general population," and "evidenced someone who is a slow reader [but] able to read effectively in both academic situations and daily activities." *Id.* at *9-10.  A similar analysis was applied by another court in this district in rejecting a prospective examinee's claim that he was entitled to accommodations on the LSAT.  *Love v. LSAC*, 513 F. Supp. 2d at 214 (holding that plaintiff with learning disability and ADHD diagnoses from a qualified professional was not disabled within the meaning of the ADA and noting, among other things, that plaintiff's ACT and SAT scores were "within the average range" with no accommodations).

Similarly, the *Healy* court scrutinized both side's expert opinions and ultimately agreed with the defendant testing agency's expert, who relied heavily on the plaintiff's academic success without accommodations.  The court discredited the plaintiff's experts' diagnosis of ADHD and, while it did agree that the plaintiff had a reading disorder, concluded that he was not disabled given his "stellar academic record, the majority of it achieved in the absence of accommodation."  870 F. Supp. 2d at 619, 620-21 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, still stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *see also Black*, 281 F. Supp. 3d at 1252-53 ("[C]onsidered in contrast to more than two decades of above-average performance, the superficial, equivocal, or unqualified opinions [of the plaintiff's psychologists] create no genuine dispute of fact.").[9]

---

[9] *See also Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her [ADHD] substantially limits her abilities to think, learn, remember and concentrate."); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 630 (6th Cir. 2000) (noting that non-disabled plaintiff achieved "an average [SAT] score" and "high enough" score on the MCAT without accommodations to gain medical school admission); *Marshall*, 399 F. Supp. 2d at 604 (rejecting argument that student's ADHD constitutes a disability where "he earned grades consistently at or near the top of his class, and he exhibited no difficulty with learning during the 2002-2003 school year"); *Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL

In short, there is no support in the ADA, its implementing regulations, or case law that supports the propositions that this Court or NBME must defer to Plaintiff's professionals, that grades or standardized test scores cannot be relied upon or determinative, or that the ADAAA somehow eliminated Ms. Ramsay's—or any ADA plaintiff's—burden of satisfying the legal standard for a disability. To the contrary, such a boundless reading of the ADA conflicts with the statute, as amended, which retains the substantial limitation requirement. The Court's reading of the statute would effectively guarantee that any ADA plaintiff who can secure a diagnosis and afford to litigate will receive extra testing time, to the detriment of other examinees and the public. *Powell*, 364 F.3d at 88-89; *Healy*, 870 F. Supp. 2d at 616 (citation omitted) (reasoning that the ADA is not meant to maximize performance on high-stakes tests or "allow individuals to advance to professional positions through a back door"); *see infra* Parts II & IV (discussing harm to other test-takers and the public).

By interpreting the ADA to require deference to Plaintiff's evaluators and disregard of her "real-world" performance, the Court improperly concluded that she is disabled. Plaintiff is not substantially limited as compared to most people. Therefore, she is not entitled to twice the testing time afforded other non-disabled students. In stark contrast to the holdings and analysis in both *Bibber* and *Love*, which were also from this district—the Court allowed Plaintiff's performance on a handful of diagnostic assessments taken for the specific purpose of obtaining accommodations on a licensing exam to trump a lifetime of objective evidence showing that she is not substantially limited compared to most people in the general population. A stay is warranted while the Court

---

3977891, at *6 (W.D. Tex. 2018) (stressing that non-disabled plaintiff "succeeded academically in primary and secondary school and college without requesting or receiving accommodations, took the SAT and ACT without requesting or receiving accommodations, and took the LSAT without accommodations and scored in the average range").

of Appeals reviews this important question regarding the proper application of the ADA in the factual context presented in this case. *See* Order Granting Stay, *Doherty v. Nat'l Bd. of Med. Exam'rs*, No. 19-30661 (5th Cir. Sept. 3, 2019).

## II.   NBME and other test takers will be irreparably harmed absent a stay.

As an initial matter, the Court did not consider harm to NBME. Although the preliminary injunction order recognized that "in each case courts must balance the competing claims of injury and *must consider the effect on each party* of granting or withholding the requested relief," the Court never addressed the effect the injunction would have on NBME, nor did it balance the relevant interests. ECF 28, at 18 (emphasis added).

NBME will be irreparably harmed if it must provide Ms. Ramsay with unwarranted accommodations on the USMLE exams. Releasing Plaintiff's score before the merits of the preliminary injunction can be reviewed on appeal threatens the integrity of the USMLE exams and impacts other Step 1 examinees. As Plaintiff acknowledged, Step 1 and Step 2 scores are relied upon for both licensure purposes and medical residency selection. Tr. 1, at 76. If Plaintiff receives higher USMLE scores because of extra testing time that she was not entitled to, she will receive an unfair advantage over other applicants also vying for competitive residency positions.

The mandatory preliminary injunction will harm NBME by undermining its "duty to ensure that its examination is fairly administered to all those taking it." *Powell*, 364 F.3d at 89; *see Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 125 (10th Cir. 2004) (overturning preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting that LSAC would be irreparably harmed if the accommodated score was released).

## III.   A stay will not substantially harm Plaintiff.

By contrast, Ms. Ramsay will not be irreparably harmed if she cannot take Step 1 next month without extra testing time because the alleged harm is neither irreparable nor likely to occur.

- 25 -

*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  First, a mere delay in testing or education does not constitute irreparable harm.  *B.P.C. v. Temple Univ.*, No. CIV-A-13-7595, 2014 WL 4632462, at *5 (E.D. Pa. Sept. 16, 2014).  If Plaintiff decides to withdraw from medical school or does not pass Step 1, she would be eligible to reapply for admission once she is prepared to take the exam.  DX-2, at 27.

Second, Plaintiff's "alleged harm is purely speculative and thus cannot constitute irreparable harm."  *B.P.C.*, 2014 WL 4632462, at *5; *see also Rothberg*, 102 F. App'x at 125 (finding that harm to plaintiff was speculative and therefore not irreparable).  Plaintiff acknowledges this on some level, as she has argued that "*there is no assurance* that the leave-of-absence will be extended again," she "*may* never be able to receive the academic degree of Doctor of Medicine," and "[f]urther delay *could* jeopardize even this very delayed schedule."  ECF 7, at 2, 4; ECF 7-2, at 21; DX-2, at 12 (emphasis added).

Consistent with Plaintiff's characterization, this Court made no finding that Ms. Ramsay will likely fail without accommodation, and there is no evidence that she is likely to do so.  Plaintiff missed passing by a single point, and her ability to review every question (despite her contrary testimony), suggests that she could pass if she were to adequately prepare.  Tr. 1, at 160; Tr. 3, at 143-45, 147; *see also Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that she will suffer the predicted harm; she may pass the test."); *Bach v. Law School Admission Council*,  2014 U.S. Dist. LEXIS 124632, at *5-6 (M.D.N.C. 2014) (emphasizing, in finding that any alleged harm was speculative, that plaintiff had had successfully taken other standardized tests without accommodations); *Kelly v. W. Va. Bd. of Law Exam'rs*, 2008 U.S. Dist. LEXIS 56840, at *6-7 (S.D.W. Va. 2008) (insufficient showing of harm where the plaintiff had done well on tests without accommodations).  The mere *possibility* of injury is

- 26 -

insufficient to establish irreparable harm and cannot outweigh the harm to NBME and other test-takers if Plaintiff receives unwarranted accommodations.

**IV.     The public interest favors a stay.**

The public interest also favors staying the injunction pending appeal.  Like NBME, the public "has an interest in the fair administration of standardized tests," *Bach v. Law School Admission Council*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *8 (M.D.N.C. Feb. 4, 2014), particularly when the test assesses the competency of potential doctors.  As relevant here, the public is concerned about (1) effective patient care, and (2) fairness.

First, there is a strong public interest in helping to ensure that doctors are competent to practice.  In furtherance of that aim, the USMLE exams assess whether examinees have the minimum competencies to deliver safe and effective patient care.  DX-4, at 1-2.  Medical licensing authorities rely on USMLE scores in deciding whether to license prospective doctors.  *Id.*  A court order compelling NBME to provide an examinee with extra testing time on a licensing exam, when doing so is unwarranted, undercuts the public interest if the extra testing time enables someone to achieve a passing score they might not otherwise have received.[10]

Second, if residency programs rely on a score Plaintiff received on Step 1 with an unwarranted accommodation, it will "alter[] the substance of the product because the resulting scores [will] not be guaranteed to reflect each examinee's abilities accurately."  *Powell*, 363 F.3d at 89.  That unfairly advantages Plaintiff to the detriment of other USMLE examinees, residency applicants, and residency programs.  Because this includes applicants who have disabilities within

---

[10] Although the Court noted that there is a great need for physicians in "rural, economically-depressed areas of the Country," it made no finding that Plaintiff intends to practice in such a region, nor is there any indication in the record that she does.  ECF 28, at 49.

the meaning of the ADA, the Court's preliminary injunction harms the very population the ADA is designed to protect.

## CONCLUSION

NBME respectfully requests that the Court stay the preliminary injunction pending appeal to the Third Circuit and issue an expedited ruling by **January 30, 2020**.

Dated:  January 23, 2020

By: /s/ Robert A. Burgoyne

Nancy L. Goldstein (Pa. Bar No. 40019)
Hamburg & Golden, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
Phone: 215-255-8590
goldsteinnl@hamburg-golden.com

Robert A. Burgoyne (*pro hac vice*)
Caroline M. Mew (*pro hac vice*)
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Phone: 202-654-6200
RBurgoyne@perkinscoie.com

Counsel for Defendant NBME

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document and proposed order were electronically filed on January 23, 2020, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Plaintiff.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

- 28 -

146895958.2