1

33

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          -  -  -

 3   JESSICA RAMSAY,              :  CIVIL ACTION NO.
                Plaintiff,        :  2:19-cv-02002
 4                                :
        v.                        :
 5                                :
     NATIONAL BOARD OF MEDICAL    :  PRELIMINARY
 6   EXAMINERS,                   :  INJUNCTION HEARING
                Defendant.        :  DAY 3
 7   _____

 8
        FILED                    James A. Byrne U.S. Courthouse
 9                               601 Market Street
     FEB 0 4 2020                Philadelphia, PA 19106
10                               December 5, 2019
     KATE BARKMAN, Clerk         Commencing at 9:30 a.m.
11   By_____Dep. Clerk
     _____

12              BEFORE THE HONORABLE J. CURTIS JOYNER

13   _____

14
     APPEARANCES:
15
        REISMAN CAROLLA GRAN & ZUBA, LLP
16      BY:  LAWRENCE D. BERGER, ESQUIRE
        19 Chestnut Street
17      Haddonfield, New Jersey 08033
        (856) 354-5640
18      larry@rcglawoffices.com                ORIGINAL
        Representing the Plaintiff
19

20

21                          -  -  -

22           Ann Marie Mitchell, CRR, RDR, RMR
                  Official Court Reporter
23                     (267) 299-7250

24
     Proceedings taken stenographically and prepared utilizing
25   computer-aided transcription
```

```
 1   APPEARANCES CONTINUED:

 2

         STEIN & VARGAS LLP
 3       BY:  MICHAEL STEVEN STEIN, ESQUIRE
         BY:  MARY C. VARGAS, ESQUIRE
 4       10 G Street NE
         Suite 600
 5       Washington, DC 20002
         (202) 248-5092
 6       michael.stein@steinvargas.com
         mary.vargas@steinvargas.com
 7       Representing the Plaintiff

 8


 9

         PERKINS COIE LLP
10       BY:  ROBERT A. BURGOYNE, ESQUIRE
         BY:  CAROLINE M. MEW, ESQUIRE
11       700 - 13th Street, NW
         Suite 600
12       Washington, DC 20005
         (202) 654-6200
13       rburgoyne@perkinscoie.com
         cmew@perkinscoie.com
14       Representing the Defendant

15

16                              -  -  -

17

18

19

20

21

22

23

24

25
```

1          (Court called to order at 9:30 a.m.)

2          THE COURT:  Good morning.  You may be seated.

3          MR. BERGER:  Your Honor, just one brief thing before

4    Mr. Burgoyne proceeds.  And that is that when Dr. Smith

5    testified on direct yesterday, I don't believe that I formally

6    moved exhibit P-21, which is his declaration and which was

7    covered in the testimony, into evidence, so I would like to

8    offer it into evidence now.

9          THE COURT:  Very well.  Any objection?

10         MR. BURGOYNE:  No objection, Your Honor.

11         THE COURT:  It's admitted.

12         (Exhibit P-21 admitted.)

13         THE COURT:  Sir, will you come and take the stand.

14   Sir, I'll remind you you're still under oath from previously

15   being sworn in yesterday.

16         Do you understand that?

17         THE WITNESS:  Yes.

18         THE COURT:  Very well.  Let's proceed.

19         (A discussion off the record occurred.)

20         THE COURT:  Now, check your mic and make sure it's

21   operating.

22         THE WITNESS:  No.

23         THE COURT:  This is what happens when your staff is

24   not here to do all these things before you come out, talking

25   about my deputy clerk, who is out this week.

1      Let's proceed.

2           MR. BURGOYNE:  Thank you, Your Honor.

3                          CROSS-EXAMINATION

4  BY MR. BURGOYNE:

5  Q.   Again, good morning, Dr. Smith.

6  A.   Good morning.

7  Q.   Jessica Ramsey came to see you in the fall of 2008 because

8  she wanted to obtain an evaluation to support her request for

9  accommodations on the Step 1 exam.  Correct?

10  A.   Yes.

11  Q.   And you'd never seen or treated her prior to that time?

12  A.   No.

13  Q.   And you have a reputation in this area of providing

14  evaluation reports for students seeking accommodations on

15  standardized tests?

16  A.   Yes.

17  Q.   And I think Ms. Ramsay testified she came across your name

18  on the internet.

19      Would you look at Defense Exhibit 34, which should be the

20  page that is up.

21  A.   It is.

22  Q.   Is this the home page for your website?

23  A.   Yes.

24  Q.   So this is the first page someone will see when they go to

25  your website?

1  A.   Yes.

2  Q.   And on the top it says you specialize in the assessment

3  and treatment options for dyslexia, ADD, ADHD, learning

4  disorders.

5       And then what's the fourth area in which you specialize?

6  A.   Extended time and accommodations for standardized tests.

7  Q.   And then in the first bullet point it states that adults

8  and teens with learning disabilities may be able to get

9  additional time and other accommodations in high-stakes testing

10 situations, and you refer to the SAT, the ACT, the MCAT, the

11 LSAT, the GRE, the GMAT, et cetera.  And you state you offer

12 neuropsychological evaluations to individuals who are seeking

13 documentation as part of their application to request more time

14 and/or other accommodations.

15      Prior to Ms. Ramsay, had you evaluated anyone for

16 accommodations on the Step 1 exam?

17 A.   I'm not sure.  I think so.  I'm not sure.  I evaluated a

18 previous medical student.

19 Q.   Then would you read the last bullet point or the last

20 sentence in the second bullet point for us.

21 A.   An official DSM-5 Diagnostic and Statistical Manual of

22 Mental Disorders diagnosis is necessary when you are trying to

23 qualify for services at school or work.

24 Q.   I believe you testified about the DSM-5 yesterday?

25 A.   Yes.

1  Q.   Did you evaluate Ms. Ramsay in accordance with the

2  criteria in the DSM-5 manual?

3  A.   Yes.

4  Q.   Turn to -- actually, I'm sorry, stay on Exhibit 34.   And

5  confirm for me that the second page here is a page from your

6  website that discusses evaluation for developmental dyslexia

7  and ADHD?

8  A.   Yes, that's my website.

9  Q.   You see there's a discussion about problems with IQ

10  testing?

11  A.   Yes.

12  Q.   And it states:   Principally, the principal method of

13  diagnosing learning disabilities such as dyslexia has been to

14  compare measured intelligence and achievement levels such as

15  reading?

16  A.   Yes.

17  Q.   Is that a reference to the so-called discrepancy model

18  that we were discussing yesterday?

19  A.   It is.

20  Q.   And then you go on to say:   However, there are serious

21  problems with this approach that are frequently not considered

22  in a diagnostic evaluation?

23  A.   Yes.

24  Q.   And at the bottom you identify some problems with ADHD or

25  ADD testing?

1  A.   Yes.

2  Q.   And the first sentence says:  There's considerable

3  controversy at the present time over what are the core symptoms

4  of ADHD or ADD.

5       Is that an accurate statement?

6  A.   Yes.

7  Q.   And then the last sentence in that paragraph says:

8  Evaluations require -- and it says a care review, but that

9  means a careful review?

10  A.   Yep.

11  Q.   A careful review of all tests, histories, grade reports,

12  teacher reports and parent reports?

13  A.   Yes.

14  Q.   Is that a statement you concur in until today?

15  A.   Yes.

16  Q.   Exhibit 35, please.  I think you mentioned this document

17  yesterday but I don't think we looked at it.

18       Is this the intake interview form that you have clients

19  fill out before they come to see you?

20  A.   Yes.

21  Q.   And was this the form that Ms. Ramsay completed?

22  A.   Yes.

23  Q.   And on the front page it says she's coming to see you to

24  get appropriate diagnosis and testing accommodations?

25  A.   Yes.

SMITH - CROSS

1  Q.   On page 2 of this document, which is Smith-33, there's a
2  section that says at the top, thinking back to growing up to
3  your school days, do you remember having trouble, and then
4  there's several activities that you describe here?
5  A.   Yes.
6  Q.   Is this relating to possible ADHD or LD or both?
7  A.   Both.
8  Q.   And Ms. Ramsay indicated that she remembered having
9  problems in all of these areas?
10 A.   Yes.
11 Q.   You're being compensated for your work in this case.
12 Correct?
13 A.   Yes.
14 Q.   And I believe you told me your rate is $125 per hour for
15 travel and waiting time?
16 A.   Yes.
17 Q.   From the time you leave home till the time you get home?
18 A.   Well, not quite.  That's not quite how I interpret it.
19       When I get to a hotel room where I would normally be at
20 home, I'm not going to count that, that kind of thing.
21 Q.   And then you're receiving I believe either 350 or $375 per
22 hour for --
23 A.   It's 350.
24 Q.   350.
25 A.   I looked back at the document.

1    Q.    Okay.  And that's for your deposition time and your time

2    in court?

3    A.    Just the deposition time.

4          I'm sorry, I misunderstood.  My deposition time and the

5    time testifying here.

6    Q.    We looked briefly at your resume yesterday.

7          Have you done any research relating to requests for

8    accommodations on high-stakes standardized tests?

9    A.    When you say research you mean studies?

10   Q.    Yes.

11   A.    No.

12   Q.    And have you written any articles or other publications on

13   that subject?

14   A.    No.

15   Q.    You were the first professional to diagnose Ms. Ramsay

16   with dyslexia.  Correct?

17   A.    Yes.

18   Q.    You also diagnosed her with ADHD?

19   A.    Yes.

20   Q.    Both of those impairments are neurodevelopmental diseases.

21   Right?

22   A.    Yes.

23   Q.    And that means they're lifelong impairments?

24   A.    Yes.

25   Q.    When you evaluate someone for a possible learning

1  disorder, what do you rely upon in making your diagnosis?

2  A.    Any documents I can get from any previous evaluations,

3  any -- the history that I can get from the client and anybody

4  else, and then of course my test results.

5  Q.    Do you also want to see report cards and grades and

6  teacher comments if they're available?

7  A.    Yes.

8  Q.    And do you also want to see performance on standardized

9  tests that were taken in elementary school?

10 A.    Yes.

11 Q.    And that would include tests such as the Iowa Tests of

12 Basic Skills?

13 A.    Yes.

14 Q.    And do you also want to see results from performance on

15 standardized tests such as the ACT, the SAT and the MCAT?

16 A.    Yes.

17 Q.    Why do you want to see report cards if they're available?

18 A.    In case there's something there that's informative about

19 what was going on for them at that time.

20 Q.    I think you told me in your deposition, you want to see if

21 there's anything that would indicate the presence or absence of

22 unusual struggle.  Is that an accurate statement of reasons you

23 want to see --

24 A.    I don't remember what I said then, but from my experience,

25 as I said yesterday, it's more about is there something that

SMITH - CROSS                                              11

1    indicates the presence.

2    Q.   And why do you want to see teacher comments?

3    A.   For the same purpose, in case they mention something.

4    Q.   Why do you want to know about someone's standardized

5    testing history?

6    A.   To get some kind of idea how they perform in such a

7    situation.

8    Q.   In your deposition in response to that question you

9    indicated that you want to see how they performed on other

10   kinds of tasks that are related to what you're evaluating.

11        Do you think performance on standardized tests like the

12   ACT and the MCAT are related to what you're evaluating when

13   you're doing an ADHD or LD evaluation?

14   A.   Yes, but not closely related.

15   Q.   And you also indicated that you like to see something

16   objective when you're doing an evaluation; is that correct?

17   A.   Yes.

18   Q.   And would teacher reports and teacher comments and grades

19   and performance on standardized tests be the type of objective

20   information you're looking for?

21   A.   The performance on standardized tests is more objective.

22   I don't really regard some of the information on the report

23   cards as necessarily truly objective.

24   Q.   What is the biggest risk in relying upon a patient's

25   self-report with information that's provided to you during an

1  interview?

2  A.   The biggest risk is that they're not presenting it

3  accurately, either deliberately or they're just a poor

4  reporter.

5  Q.   What do you rely upon when evaluating whether someone

6  meets the diagnostic criteria for ADHD?

7  A.   Primarily -- well, if there is something in the history

8  and records that would indicate that kind of dysfunction, but

9  primarily with the client and anybody else that they know --

10  any questionnaires or reading skills have filled out, that

11  information primarily.

12  Q.   I believe you testified in both your deposition and

13  yesterday that the assessments that are sometimes used in

14  evaluating ADHD are not very reliable?

15  A.   No.

16     I'm sorry, yes.  They're not -- I don't consider them very

17  precise instruments.

18  Q.   Okay.  When Ms. Ramsay came to you, she knew she was

19  undergoing diagnostic testing, the results of which would

20  affect whether or not she got accommodations on the Step 1

21  exam?

22  A.   Yes.

23  Q.   Likewise, when she filled out ratings scales, she knew

24  that that information would influence whether she got

25  accommodations on the Step 1 exam?

1    A.   Yes.

2    Q.   You testified yesterday I think that the DSM-5 requires

3    that an individual diagnosed with ADHD has experienced multiple

4    symptoms in multiple settings and with early onset.   Is that --

5    A.   Yes.

6    Q.   All of those are part of the diagnostic criteria?

7    A.   Yes.

8    Q.   Other than the self-report by Ms. Ramsay and her mother,

9    what evidence did you see of early onset of ADH symptoms with

10   Ms. Ramsay?

11   A.   Primarily it was the report from Ms. Ramsay and her

12   mother.

13   Q.   And what evidence did you see other than self-report of

14   impairment in multiple settings?

15   A.   Primarily it was the report from Ms. Ramsay and her

16   mother.

17   Q.   And likewise regarding the presence of multiple ADH

18   symptoms, was that primarily the report of Ms. Ramsay and her

19   mother and her fiancé?

20   A.   Yes.

21   Q.   Before your deposition in this case, you reviewed some

22   articles relating to detecting performance validity problems.

23   Correct?

24   A.   Yes.

25   Q.   Why did you review those articles?

SMITH - CROSS

1  A.   I'm sorry, could you repeat your question for me?

2  Q.   Sure.  You testified in your deposition that before your

3  deposition, you reviewed some articles dealing with detecting

4  performance validity issues.

5       So my question is why you had done that?

6  A.   To see if I overlooked something.

7  Q.   What are performance validity problems?

8  A.   Problems?

9  Q.   Yeah.  Why does one perform a performance validity test?

10  What are you trying to evaluate?

11  A.   Well, we're trying to evaluate whether they make a good

12  effort or whether they're deliberately trying to exaggerate

13  their problems and their symptoms.

14  Q.   What does the term "malingering" mean in the diagnostic

15  context?

16  A.   Typically it means deliberately exaggerating your

17  symptoms.

18  Q.   Do individuals sometimes exaggerate or not perform to

19  their maximum in order to obtain certain external incentives?

20  A.   Yes.

21  Q.   An example might be, for example, getting Ritalin or other

22  medications which students often believe will help them?

23  A.   Yes.

24  Q.   And would another incentive be the opportunity to obtain

25  accommodations in school or on a standardized test?

SMITH - CROSS                                              15

1   A.    Yes.

2   Q.    How would a person malinger in order to be diagnosed with

3   a specific learning disorder?

4   A.    They use whatever knowledge they have about what the

5   condition is and try to mimic what the symptoms or performance

6   that would be expected based on what they know.

7   Q.    Is one possibility to try to do poorly on tests of

8   phonological processing?

9   A.    Yes.

10  Q.    And what are examples of tests that evaluate phonological

11  processing?

12  A.    The -- in the WIAT, the -- I get the names confused

13  sometimes between the two tests.   Pseudo word decoding I think

14  is how they title it there.

15  Q.    What other tests might you administer to try to evaluate

16  phonological process?

17  A.    If I -- well, I could use the Woodcock Johnson, the

18  Kaufman test -- test of educational achievement.   I didn't use

19  those particular tests in this instance.

20  Q.    Could a person also read very slowly when taking a

21  diagnostic assessment in order to produce a result that might

22  not reflect full effort?

23  A.    Yes.

24  Q.    And what are examples of diagnostic tests on which slow

25  reading would influence the outcome?

1   A.   Well, let me think of which ones.  On the WIAT, the oral

2   reading fluency subtest, the word reading subtest, there's a

3   supplemental measure of how fast you read those words.  Again,

4   it relates to how fast you read the words.  The Gray Oral.  The

5   Nelson-Denny, anything that has any kind of timed fact around

6   it.

7   Q.   You mentioned the Gray Oral.  That's the GORT that we were

8   referring to yesterday?

9   A.   The GORT-5, yes.

10  Q.   Nelson-Denny.  So the WIAT, the GORT and the Nelson-Denny,

11  those are all assessments that you administered to Ms. Ramsay?

12  A.   Yes.

13  Q.   How would one go about malingering in the context of an

14  ADHD diagnosis?

15  A.   I guess they would report -- based on what they know, they

16  would report the symptoms being frequently experienced.

17  Q.   What about in terms of reports that you obtained from

18  other individuals, would those individuals likewise need to

19  report significant symptoms?

20  A.   Yes.

21  Q.   Look at Exhibit 51, please.  And that's in the other

22  notebook, I apologize.  DX-51.

23  A.   Okay.

24  Q.   And this is an article entitled "An Investigation of

25  Methods to Detect Feigned Reading Disabilities."

SMITH - CROSS                                        17

1  A.   Yes.

2  Q.   Is this one of the articles you reviewed in advance of

3  your deposition?

4  A.   Yes.

5  Q.   Let's look at your evaluation report for Ms. Ramsay.   And

6  if you'll look at DX-3, it's attached to your declaration.   It

7  is Tab B.

8  A.   DX what.

9  Q.   3?

10  A.   It's back in the other notebook?

11  Q.   Yes.   I apologize.

12  A.   It's okay.

13  Q.   I'll try to avoid that.

14  A.   You said DX-3.   Correct?

15  Q.   It's DX-3, Tab B.

16  A.   I'm sorry, DX-3, what?

17  Q.   Tab B as in boy.

18  A.   Got it.   All right.

19  Q.   We covered some of this yesterday with Mr. Berger in terms

20  of the types of information that you considered.

21       In your listing of records reviewed, is this a complete

22  list of the records you reviewed as part of your evaluation?

23  A.   Yes.

24  Q.   On page 2 of this, this exhibit, there's a reference to

25  the personal statement regarding Ms. Ramsay's need for

1  accommodations?  It's the second item listed.

2  A.   Yes, I see it.

3  Q.   It's dated June 6, 2018.

4  A.   Yes.

5  Q.   And did she give you her personal statement from 2016?

6  A.   I don't recall.  It's not here.  I don't recall getting

7  it.

8  Q.   And did she give you a copy of her request for

9  accommodations that she submitted to the NBME in 2016?

10  A.   I don't recall doing it, if it's not here.  I either

11  overlooked it or...

12  Q.   On the next page, page 4, you discussed this a little bit

13  yesterday, but Ms. Ramsay's school history?

14  A.   Yes.

15  Q.   And there's a statement that said she had academic

16  struggles that began from the first days in school and

17  consistently required accommodations, such as extended time on

18  tests and assignments, altered grading schemes, frequent

19  breaks, private space for testing and completing class work in

20  order to compensate for distractibility, impaired attention and

21  concentration, impaired reading comprehension, impaired reading

22  speed and hyperactivity.

23       Is that information that you relied upon in making your

24  evaluation?

25  A.   Yes.

SMITH - CROSS                                     19

1  Q.  Look at DX-4, Tab A for me.

2  A.  Okay.

3  Q.  And if you would go, please, to page 6 of this document.

4  A.  All right.

5  Q.  And this is Ms. Ramsay's initial request for

6  accommodations.  And you see on the top there, there's a

7  section where she discusses her accommodations in primary and

8  secondary school?

9  A.  Yes.

10  Q.  And then if you look at elementary school, there's a

11  reference to accommodations she received in one school year,

12  1996-1997?

13  A.  Yes.

14  Q.  And there's a reference to her getting an alphabet chart,

15  distraction reduced space, extra time for writing and reading.

16  And then she says:  These were provided by the teacher, not the

17  school, so I do not have records confirming them.

18      Had you ever seen this document as part of your

19  evaluation?

20  A.  I don't recall it, no.

21  Q.  And you see she doesn't list any other informal or formal

22  accommodations here?

23  A.  Yes.

24  Q.  Look at Exhibit -- back to Exhibit 3.

25      Actually, keep that one open.  I apologize.  Let me get to

SMITH - CROSS                          20

1   your report here.  And take a look at DX-4, Tab B, the same

2   document you were just in.

3   A.    Just a minute.  DX-4, Tab B.  Right?

4         All right.

5   Q.    And this is Ms. Ramsay's personal statement from 2016.

6   And it's not listed in your documents you reviewed, so I take

7   it that means you had not seen this document previously?

8   A.    I don't -- well, I'm not sure.  There were so many, it's

9   possible that I have it and didn't realize there were two

10  different versions.

11  Q.    Okay.  And then on page 2 of this document in the first

12  full paragraph, there's a discussion of Ms. Ramsay experiencing

13  reversals and distinguishing between similar-appearing

14  characters when reading and writing?

15  A.    Yes.

16  Q.    First of all, are reversals something you commonly see

17  with dyslexia, or is that something people just assume happens?

18  Is that a common trait with dyslexia?

19  A.    It's common to dyslexia but not exclusive to dyslexia.

20  Q.    And then she goes on to discuss that she had been placed

21  in a time-out desk to avoid distractions and also received an

22  alphabet chart.  And then at the very last sentence, she says:

23  Unfortunately, these accommodations were unofficial, enacted by

24  my teacher rather than the school, so I do not have any record

25  that they were provided.

1        Sorry, that was the third from the last sentence?

2        Other than this visual testing, I was not evaluated for

3  learning disabilities until 2009 and so did not receive any

4  other aid or accommodation.

5        Is that language you had seen before today?

6  A.   Not that I recall.

7  Q.   In your report you also reference some prior evaluation

8  reports that you looked at, including reports from a Dr.

9  Lewandowski?

10 A.   Yes.

11 Q.   And Dr. Lewandowski is a board certified

12 neuropsychologist.   Correct?

13 A.   Yes.

14 Q.   And he personally evaluated Ms. Ramsay?

15 A.   Yes.

16 Q.   He didn't just do a paper review, in other words?

17 A.   No.

18 Q.   And I believe you concluded that the assessments he

19 administered were inappropriate?

20 A.   I wouldn't use the word "inappropriate."  If I did, I

21 shouldn't have used the word "inappropriate."

22 Q.   I will show you, you did, but --

23 A.   No, I imagine I did.  But that was a poor choice of words.

24 Not applicable, insufficient for the kind of thing he was

25 trying to evaluate.

1  Q.   I think yesterday you put it as inadequate testing?

2  A.   I wouldn't use that word again, because of the pejorative

3  nature of it.  But insufficient.

4  Q.   Okay.  I think you testified in your deposition that based

5  on the evaluation he did of Ms. Ramsay, you don't believe he

6  could have arrived at a proper diagnosis regarding a learning

7  disability?

8  A.   No.

9  Q.   No meaning you don't think he could have?

10  A.   That's correct.  Yes.

11  Q.   That was despite the fact that he met with her in person

12  and was a licensed neuropsychologist?

13  A.   Yes.

14  Q.   Look at DX-3, your same document, and Tab D, which I

15  believe is Dr. Lewandowski's evaluation --

16  A.   Yes.

17  Q.   -- report.

18       And on -- at the page -- it's page 3 of his report.

19  A.   Yes.

20  Q.   He indicates normal achievement study, reading, spelling

21  and arithmetic are normal to above normal and consistent with

22  past education.

23       What assessment did he administer to arrive at that

24  conclusion?

25  A.   The -- I believe he administered only the WRAT5, the Wide

1    Range Achievement Test, Fifth Edition.

2    Q.   Regarding the diagnosis of -- actually, let me back up and

3    ask you first about there's a reference here to Dr. Livingston

4    in your report.

5    A.   What page are you on?

6    Q.   In fact, not Dr. Livingston, just Charles Livingston, MA.

7    A.   Where page are we on?

8    Q.   That's page 2 of your report.

9    A.   Of my report.   Where is that?

10   Q.   Page 2 at the top where you've listed the records.

11           THE COURT:   What's the exhibit number?

12           THE WITNESS:   Exhibit number.

13           MR. BURGOYNE:   It's Tab B, I'm sorry, Your Honor.

14           THE COURT:   He's asking.

15           MR. BURGOYNE:   No, I apologize.

16           THE WITNESS:   I'm sorry, what's the Exhibit and what's

17   the Tab?

18   BY MR. BURGOYNE:

19   Q.   It's Exhibit 3 and Tab B.   So it's your report.

20   A.   So D?

21   Q.   B as in boy.

22   A.   D-2, Tab B?

23   Q.   D-3.

24   A.   D-3 and Tab B, thank you.

25           All right.   I'm there.

SMITH - CROSS                                                24

1  Q.   Okay.  And again, you're listing documents you reviewed.

2  And one of the documents you reviewed was some series of

3  reports from a Charles Livingston.

4       Do you see that reference?

5  A.   Yes.

6  Q.   And I think your opinion regarding his evaluation is that

7  it was incomplete and concluded -- and included the

8  administration of the out-of-date assessment version of the

9  WIAT?

10 A.   Yes.

11 Q.   And that based on that, you overall discounted his

12 evaluation?

13 A.   I discounted that -- those results of the WIAT that he --

14 the subtest that he administered.

15 Q.   And those results reflected what level of reading

16 comprehension, do you recall?

17 A.   You want me to look at the -- I recall in general, but --

18 Q.   Give us your general recollection of what he found.

19 A.   Well above average for a reading comprehension -- the

20 reading comprehension subtest of the old WIAT.

21 Q.   I believe you also mentioned briefly yesterday

22 Dr. Ruekberg in connection with ADHD?

23 A.   Yes.

24 Q.   And I think you said you thought his report seemed okay?

25 A.   Yes.

1   Q.   Let's streamline this a little for you.

2        I'm going to hand you two sets of documents.  I tried to

3   streamline things regarding her academic history and

4   standardized tests.

5              MR. BURGOYNE:  Your Honor.

6              THE COURT:  Thank you.

7   BY MR. BURGOYNE:

8   Q.   And so the first one is a listing of her standardized

9   testing history.  The second one is a listing of some of the

10  results you found.

11  A.   Yes.

12  Q.   And the third one is just a listing of her academic

13  history.  Let me ask you a few questions about these.

14  Hopefully this will avoid the need for you to go back and forth

15  through documents.

16       You referenced in your report Ms. Ramsay's performance on

17  the MCAT, and then also you indicated you reviewed her ACT

18  score reports and her high school transcript and her college

19  transcript and her report cards from elementary school, or at

20  least some of them?

21  A.   Yes.

22  Q.   And did her ACT and MCAT scores raise any questions in

23  your mind relative to her performance on the diagnostic

24  assessments you administered?

25  A.   How do you mean?

SMITH - CROSS                                          26

1  Q.  Well, did they cause you to say, there's something not

2  matching up here in terms of what I'm seeing on her MCAT scores

3  and ACT scores and what I'm seeing in her diagnostic results?

4  A.  Yes, it caused me to take a deeper look at that.

5       MR. BERGER:  Your Honor, as to this document that Mr.

6  Burgoyne is using, I have every reason to believe that he's

7  copied all the numbers accurately, and I am fine with trying to

8  expedite in this way.  I'm just going to say this has got to be

9  subject to our eventually having the opportunity -- and we can

10 do it when we break -- to check against the actual numbers.

11      THE COURT:  Sure.  If he's moving this as an exhibit,

12 before it's admitted I'll give you an opportunity to place any

13 objection you may have.

14      It appears to be a summary of the information as

15 contained in the record.  This is a common exhibit that's shown

16 to witnesses in criminal and civil cases.  So we'll proceed,

17 and we'll allow you to entertain an objection at a later point.

18 All right?

19      You may proceed.

20      MR. BURGOYNE:  Thank you, Your Honor.  And I certainly

21 attempted to capture everything accurately and happy to be

22 corrected if not.

23      THE COURT:  We shall see.

24 BY MR. BURGOYNE:

25 Q.  How did you go about addressing the questions that arose

1  in your mind regarding the MCAT and the ACT scores relative to

2  what you were seeing on your diagnostic assessments?

3  A.  Well, there are two steps.  One is when I first saw them,

4  it raised a question in my mind.  But there was enough from the

5  other -- the other evaluations that really didn't address

6  things adequately as I thought.  So I thought, okay, let's do

7  the evaluation and see what I get.  And then afterwards, trying

8  to think through, well, what's going on here, how would this

9  be, that these scores could be true and that these scores could

10 be true.

11 Q.  Okay.  And what did you do to answer that question in your

12 mind?

13 A.  Well, the first one was I was confident about the scores

14 that I got were accurate, an accurate representation of her

15 true functioning.  And in looking at the overall pattern of

16 scores in her history, the combination of her intelligence,

17 what I know about partially remediated dyslexic readers and how

18 they can perform on these kinds of standardized tests, the --

19 my conclusion was that -- and my judgment of her and her

20 effort, that my judgment was that this would be not unexpected

21 for that person of that intelligence and effort to be able to

22 perform usually compensatory strategies, to perform well on

23 these kinds of tests.

24 Q.  And by compensatory strategies, are those the test-taking

25 strategies that Ms. Ramsay testified to yesterday?

SMITH - CROSS

1  A.   All of the things she's described in terms of strategies
2  that she learned and that she's described.
3  Q.   Did you make any effort to go and retrieve either ACT
4  questions or Step 1 questions or MCAT questions before you
5  prepared your report?
6  A.   I did not.
7  Q.   And do you know whether the MCAT is a computer-based test
8  or a paper-based test?
9  A.   I think it's a computer-based test.
10 Q.   Do you know how long it lasts?
11 A.   That version?
12 Q.   Yes.  The version she took.
13 A.   I think it lasts about 200 minutes total, not including
14 the writing section.
15 Q.   I believe when I deposed you, you said you weren't very
16 familiar about the MCAT or the Step 1 but you were familiar
17 with the ACT test?
18 A.   Well, yes, I said that, but I'm not that familiar with it.
19 They are standard -- ACT in particular is a standardized test.
20 The formats are very common.
21 Q.   You would agree that there's a substantial amount of
22 reading involved on that exam?
23 A.   Yes.
24 Q.   And you didn't discuss with Ms. Ramsay her test-taking
25 strategy on the ACT exam, did you?

1  A.    Yeah, I did, but only in a cursory way to get some idea

2  that she'd applied the strategies that she had generally talked

3  about.

4  Q.    Look again, if you would, please, or look for the first

5  time at the list of standardized tests that I've given you.

6  A.    Yes.

7  Q.    All of which she took without accommodations?

8  A.    Yes.

9  Q.    Do you recall reviewing these score reports during your

10  deposition?

11  A.    I don't recall having these.

12        Oh, I'm sorry, deposition.  I was thinking report.

13  Q.    Let's back up.

14  A.    Yes, deposition.

15  Q.    You don't recall having all of these as part of your

16  evaluation?

17  A.    No.

18  Q.    Okay.  But you did review these during your deposition?

19  A.    Yes.

20  Q.    And for example, one of the exams that you had not seen as

21  part of your evaluation was the Iowa Tests?

22  A.    Yes.  I had not seen them.

23  Q.    And you were asked questions about that test yesterday.

24  Correct?

25  A.    Yes.

SMITH - CROSS

1  Q.   And I think you testified that there were instances in

2  which her -- certain of her scores, she did not perform at the

3  level that one would have anticipated?

4  A.   Yes.

5  Q.   Even as to those scores, however, were the scores that she

6  obtained average or above average on the Iowa Tests?

7  A.   Yes.

8  Q.   And her composite score in fact was at the 86th

9  percentile?

10 A.   Yes.

11 Q.   And that's an above average score?

12 A.   That one is, yes.

13 Q.   And then her reading score was at the 74th percentile?

14 A.   Yes.

15 Q.   Meaning she was in the top 26 percent.  That's an average

16 score?

17 A.   That -- the way you're wording it doesn't sound right.

18      When you say top 26, her score was higher than 74 percent,

19 which would mean lower than 26 percent.  It means she's not in

20 the top 26, she's just below the top 26.

21 Q.   If she's in the 74th percentile, she did better than

22 76 percent of the people --

23 A.   74.

24 Q.   74.

25 A.   Yeah.  She did better than 74 percent of the people that

1   took the test.

2   Q.   If I was misphrasing that, I apologize.

3   A.   That's okay.

4   Q.   In any event, she achieved an average score?

5   A.   Yes.

6   Q.   And you'd agree that on all of these assessments from

7   kindergarten through the MCAT exam, she performed in the

8   average or above average range?

9   A.   Yes.

10          MR. BERGER:   I'm going to object here because the

11   document does omit one part of the MCAT exam, the writing

12   sample.   And if I remember --

13          THE COURT:   You'll have an opportunity to

14   cross-examine on that point -- redirect on that point, Counsel.

15          You may proceed, Counsel.

16   BY MR. BURGOYNE:

17   Q.   You were asked if the MCAT and the ACT test were

18   diagnostic tests for dyslexia, and I think you said no?

19   A.   Correct.

20   Q.   Would you agree they nevertheless provide relevant

21   information regarding someone's ability to think, read and

22   concentrate when taking a standardized test?

23   A.   Yes.

24   Q.   Putting aside the diagnostic assessments that she took in

25   your office in order to get a report for testing accommodations

1   that included extra time, are you aware of any testing results

2   from Ms. Ramsay that reflect the reading deficits that you

3   identified in your report?

4   A.   Could you restate that for me, please.

5   Q.   Sure.   Putting aside the diagnostic assessment results

6   that you obtained, are you aware of any documents reflecting

7   Ms. Ramsay's performance on standardized assessments that

8   reflect that -- reading deficits that you found in your

9   evaluation?

10  A.   Yes.

11  Q.   And what are those?

12  A.   Any of the standardized tests where she was in the average

13  range or the -- because that's substantially below where I

14  would have expected a person who is at the 98th percentile

15  intellectually.

16  Q.   So your testimony is she was average everywhere but that

17  was still below what you would have expected her to achieve?

18  A.   Yes.   And it seems to be below areas that are not reading

19  related.

20  Q.   Let me ask you to look at your deposition when I asked you

21  a similar question.

22  A.   Okay.

23  Q.   It's page 92 of your deposition, Dr. Smith.

24  A.   Is that coming up here?

25        MS. MEW:   It's coming up.

SMITH - CROSS                                        33

1            THE WITNESS:  Page what?

2    BY MR. BURGOYNE:

3    Q.   It's page 92, line 7.

4    A.   Okay.

5            MR. BERGER:  Okay.

6    BY MR. BURGOYNE:

7    Q.   And in line 7, my question to you was:  Putting aside the

8    diagnostic assessments that she's taken in order to get

9    accommodations, are you aware of any testing that reflects

10   reading deficits comparable to what you identified in your

11   diagnostic assessments?

12           Do you see that question?

13   A.   Yes.

14   Q.   Do you see there's a series of objections by Mr. Berger?

15   A.   Yes.

16   Q.   And then what was your answer in line 16?

17   A.   No.

18   Q.   You define dyslexia, I believe, as a neurological disorder

19   that interferes with acquiring basic reading skills?

20   A.   Yes.

21   Q.   Do you need basic reading skills to take the ACT exams?

22   A.   To take it or to --

23   Q.   To perform well.

24   A.   Yes.

25   Q.   And do you need basic reading skills to perform well on

1   the MCAT?

2   A.   Yes.  Let me revise that, the term "performing well."

3   Clearly you can have impaired basic reading skills and perform

4   well.  The question is, what does it mean.

5   Q.   What does what mean?

6   A.   What does the score mean, you know, is it an accurate

7   representation of what they were trying to measure.

8   Q.   And the other document I gave you includes a summary of

9   her report cards and teacher comments from kindergarten up

10  through I think Ohio State before she start --

11  A.   Yes.

12  Q.   This is in the handout I gave you, the little document

13  there.

14  A.   Yes.

15  Q.   And I think you testified both yesterday and in your

16  deposition that you didn't see anything in those documents that

17  reflected an impairment in learning or an impairment in

18  attention?

19  A.   Correct.

20  Q.   You indicated that in your experience it's not uncommon

21  for teachers not to make a notation about someone who is

22  struggling if their grades are good?

23  A.   Yes.

24  Q.   And did you have any factual basis for whether that

25  happened in this case regarding Ms. Ramsay's teachers?  Do you

SMITH - CROSS

1   have any knowledge one way or the other regarding why they did

2   or didn't put anything on these reports?

3   A.   No.

4   Q.   And one of the -- do you recall that Ms. Ramsay reported

5   struggling when she was in the third, fourth and fifth grades?

6   A.   Yes.

7   Q.   And do you recall her saying she required almost daily

8   attention from her teachers?

9   A.   Yes.

10   Q.   Look at DX-13, 14 and 15 for me.

11   A.   Again, which ones, DX what?

12   Q.   13, 14 and 15.  These are her report cards from the third,

13   fourth and fifth grades.

14   A.   Okay.

15   Q.   And I believe these were among the records that you had

16   when you prepared your report?

17   A.   Yes.

18   Q.   So you are familiar with these report cards?

19   A.   Yes.

20   Q.   And then on page 2 of each of these report cards, let's

21   start with 13.

22        And these are a little unusual relative to the other

23   report cards because they have a specific category that asks

24   for information regarding any additional support the student

25   was receiving.

SMITH - CROSS

1       Do you see that on the right side?

2  A.   Yes.

3  Q.   And you would agree, I take it, that there's no indication

4  on any of these forms in this category that Ms. Ramsay was

5  receiving specialized reading support or that her grades were

6  based on intensive teacher assistance?

7  A.   Yes.

8  Q.   Did you discuss that with Ms. Ramsay?

9  A.   Not that particular -- only the general absence of things

10  showing up in there, I asked her about that.

11  Q.   You circulated drafts of your evaluation report to Ms.

12  Ramsay and her attorney.  Correct?

13  A.   Yes.

14  Q.   And you set up a system they could use to provide comments

15  and feedback on that report?

16  A.   Yes.

17  Q.   And Ms. Ramsay and her attorney did in fact provide input

18  on the report?

19       MR. BERGER:  Objection to the extent that this is

20  calling for work product.

21  BY MR. BURGOYNE:

22  Q.   I don't want to know what the input was, just yes or no

23  questions.

24  A.   Yes.

25       THE COURT:  Overruled.

1   BY MR. BURGOYNE:

2   Q.   Let's look at the handout I gave you.

3        On page 2 of the stapled document, these are some of the

4   results that you obtained and which you testified to yesterday.

5   A.   Yes.

6   Q.   And what I want to do is try to make sure we and the Court

7   have an understanding what assessments produced those results.

8   Okay?

9        It starts with the Nelson-Denny.  We can start with that

10  one.

11  A.   This right here?

12  Q.   Yes.

13           THE COURT:  You didn't just put that on my --

14           MR. BURGOYNE:  I'm sorry, Your Honor.  I was trying to

15  make sure I didn't put it somewhere it wasn't going to fall.

16           THE COURT:  Here.  We'll put it here.

17           MR. BURGOYNE:  That's fine.  That's good.

18           THE COURT:  You'll be moving me out of here in a

19  moment, won't you?

20           MR. BURGOYNE:  Your Honor, I have to get rid of some

21  of these notebooks.

22  BY MR. BURGOYNE:

23  Q.   Looking at this document, please.

24           MR. BERGER:  Before we look at this document, this

25  document is a compilation of things which we have not seen

1  before.  I think some of them do correspond with exhibits that

2  counsel identified.

3       THE COURT:  Do you need a moment to review this

4  counsel?

5       MR. BERGER:  Yes, yes.  Thank you.

6       THE COURT:  Sure.

7       MR. BURGOYNE:  While he's doing that, Your Honor, I'll

8  just help speed things along a little -- the only document in

9  here --

10      THE COURT:  Hold on.  He has to listen to the

11  questions that you're posing to the witness.

12      MR. BURGOYNE:  No, no.  I was telling him what was in

13  here so he could know exactly what he wasn't seen before.

14      THE COURT:  Okay.  Go ahead.

15      MR. BURGOYNE:  The only one in here that wasn't an

16  exhibit, Larry, is the Nelson-Denny sample questions.

17      MR. BERGER:  Okay.  Just give me an minute.

18      THE WITNESS:  Is this an exact copy of the test?

19      MR. BERGER:  No, no.  This is one that someone uses to

20  help people prepare for an employment context.

21      MR. BURGOYNE:  All set?

22      MR. BERGER:  I think we may need to check some of this

23  at another time, but I'm okay with letting Mr. Burgoyne go

24  ahead.

25      THE COURT:  Proceed with his questions.  Very well.

1            MR. BERGER:  Thank you, Your Honor.

2   BY MR. BURGOYNE:

3   Q.   Let's look first at the summary of some of your diagnostic

4   assessments that we prepared.

5        And you see one of the things you have on here is the

6   Nelson-Denny reading rate, page --

7   A.   Yes.

8   Q.   Last one?

9   A.   Yeah.

10  Q.   And that was 1 percent.  I think you testified yesterday

11  that you agreed with Dr. Lovett that that reading rate test

12  isn't a very reliable instrument?

13  A.   Correct.

14  Q.   I think you also said you place greater reliance on the

15  Nelson-Denny comprehension test?

16  A.   Yes.

17  Q.   Reading comprehension.

18       And that's a test that consists of 38 multiple choice

19  questions?

20  A.   Yes.

21  Q.   And if you just look at the tab that's Nelson-Denny sample

22  questions.

23       And as it's indicated at the top, these are not actual

24  Nelson-Denny questions.  These were questions that the Texas

25  government provided to prospective police officers who were

SMITH - CROSS

1  going to take the Nelson-Denny.

2      And all I want you to do is just confirm for me whether

3  these two questions are roughly representative of the type of

4  questions that appear on the Nelson-Denny in terms of length

5  and format?

6  A.  Very roughly.  They don't look quite right.  They don't

7  look quite long enough.

8  Q.  Okay.

9  A.  And I certainly don't know about the content.

10 Q.  I think you testified yesterday regarding the Nelson-Denny

11 that you had seen research showing that -- I think it was most

12 high school graduates --

13 A.  Yes.

14 Q.  -- were able to answer all 38 questions.

15 A.  Yes.  I said most.  More like 75 percent of high school

16 graduates.  That was an imprecision on -- can complete most of

17 the questions.

18 Q.  If I told you the technical manual for the Nelson-Denny

19 reflected that 62 percent of grade 16 level students were able

20 to complete all 38 questions, would that be consistent with

21 your --

22 A.  Yeah.

23 Q.  So some number, not quite 40 percent, do not answer all

24 the questions?

25 A.  Yeah.

1  Q.   The next document in here is the TOMM score sheet.

2       And is this Ms. Ramsay's score sheet?

3  A.   Yes.

4  Q.   And this is the test you administered to evaluate whether

5  or not she was providing maximum effort?

6  A.   Yes.

7  Q.   And as the TOMM score sheet reflects, there is a column A

8  and a column B and then a check mark, and there's the word

9  "spinning wheel" and then "cookie"?

10 A.   Yes.

11 Q.   Just going down, "pennant," "boat."

12      Does this exam consist just of a series of pictures that

13 you show to the --

14 A.   Yes.

15 Q.   -- patient?

16      So there's no words on the TOMM exam?

17 A.   Correct.

18 Q.   And then the individual just has to remember which picture

19 they've seen previously?

20 A.   Yes.

21 Q.   And does the speed with which someone takes the TOMM have

22 any impact on the result?

23 A.   No.

24 Q.   And I apologize, Your Honor, Defendant's Exhibit 36 is

25 what we're looking at here.

1    And you in fact administered the TOMM to Ms. Ramsay three

2    times.  Correct?

3    A.   There are three subtests for it, yes.

4    Q.   So it was one administration, but you administered it

5    three times on that occasion?

6    A.   Well, the test is structured with three different

7    administrations that you can administer.

8    Q.   And you discussed yesterday the latter two scores on which

9    she achieved perfect scores, 50?

10   A.   Yes.

11   Q.   And then on the initial test, she achieved a 42?

12   A.   Yes.

13   Q.   Would that be an unusually low score for someone?

14   A.   No.

15   Q.   If you got that score on the latter two performances,

16   would that raise any concerns in your mind regarding whether or

17   not someone might not be exercising maximum effort?

18   A.   Yes.

19   Q.   And the Test of Memory Malingering, that was developed to

20   indicate malingering in the memory area?

21   A.   Yes.

22   Q.   Let's look at the next one.  Let's look at the GORT

23   results.  This is DX-40.

24       And this doesn't have Ms. Ramsay's name on it, but would

25   you confirm that this is her GORT-5 booklet?

SMITH - CROSS                                    43

1   A.   Yes.

2   Q.   And at the bottom here, there's a reference to oral

3   reading percentile rank?

4   A.   Yes.

5   Q.   1 percent?

6        And is that the result that you testified to yesterday?

7   A.   Yes.

8   Q.   And that's reflected in this chart that I've handed you --

9   actually, let me ask you.   There's two results that you had at

10  1 percent, the GORT-5 reading rate and the GORT-5

11  comprehension, and then GORT-5 fluency you had at the second

12  percentile?

13  A.   The GORT -- okay.   Let me compare this.

14       The reading rate, that's at the first percentile.

15  Comprehension is at the first percentile.   Fluency is at the

16  second.   Yes.

17  Q.   And what are the assessments that she answered in order to

18  produce the reading rate score?

19  A.   I'm confused.   Could you --

20  Q.   Actually, let me just ask you this:   It looks like there

21  are 11 stories in this assessment, so-called stories at the

22  top, which consist of text?

23  A.   There are 16 stories.   And when a person gets a certain

24  score that's below on two of the passages, it's assumed they've

25  signed out that they won't be able to complete the others

1  adequately.

2  Q.  So the fact that this document ends at 11 means that Ms.

3  Ramsay maxed out at story 11?

4  A.  That's right.

5  Q.  And when you administer this test, do you read the

6  questions to her or does she read the questions out loud?

7  A.  I read them to her.

8  Q.  And then what happens after you read the questions to her?

9  A.  Then she gives me an answer, and I mark whether it's

10  correct.  I try to -- in particularly, if they give me an

11  incorrect answer, I try to make a quick note on what it was.

12  Sometimes I don't get them all down, but I try to make a note

13  on what the incorrect answers were.

14  Q.  Let's look at story 2 to we make sure we understand how

15  this works.

16      Then the first line says:  Our cat Mimi likes to sit on

17  the roof.

18  A.  Yes.

19  Q.  And then Mimi goes up the tall tree by the house.

20  A.  Yep.

21  Q.  Then she jumps on the roof.  She sits and looks at birds,

22  but she always comes down when it is time to eat.

23      So those sentences you read to Ms. Ramsay?

24  A.  No.  She reads those out loud.

25  Q.  She reads those out loud.  And then what happens?

1  A.   Then I take the book away from her.  The instructions are

2  for her to read as quickly as she can but as accurately as she

3  can.

4       Then I time the time it takes her to finish that, to get

5  to the end, take the book away from her and then I ask her the

6  questions and she orally responds.

7  Q.   And then the time below there, it looks like it's 23

8  seconds?

9  A.   Yes.

10 Q.   And that reflects how long it took her to --

11 A.   To complete that.

12 Q.   Let's look at the sample WIAT-III questions.  I apologize,

13 these are tough to read.

14      But would you confirm that the document, which is

15 Defendant's Exhibit 38?

16 A.   Yes.

17 Q.   And then starting at the second page, the third page, and

18 then the fourth page, are these the three reading passages

19 which made up the WIAT-III?

20 A.   Yes.

21 Q.   And are these the passages that resulted in the oral

22 reading fluency score that's reflected in your sheet?

23 A.   Yes.

24 Q.   Would she read these questions out loud?

25 A.   Yes.

SMITH - CROSS

1  Q.   The next one is the Woodcock-Johnson IV.   And although

2  there is no name on this booklet, is this Ms. Ramsay's response

3  booklet?

4  A.   Yes.

5  Q.   And the handwriting on this document, I take it, is yours?

6  A.   Yes.

7  Q.   And then it looks like there are two sections here.   One

8  is sentence reading fluency and one is word reading fluency?

9  A.   Correct.

10  Q.   Do those two assessments in combination produce the

11  reading rate cluster?

12  A.   Yes.

13  Q.   And that's one of the clusters you report in your document

14  as her performing at the first percentile?

15  A.   Yes.

16  Q.   And if we look at sentence reading fluency, let's look at

17  the second page, it looks like first there's a page where there

18  are some samples provided to the individual?

19  A.   Correct.   They have to do it so I can make sure they

20  understand the directions.

21  Q.   The next page is her actual performance on this test?

22  A.   Yes.

23  Q.   And the sentences she's reading are:   Ants are small?

24  A.   Yes.

25  Q.   Children are all different ages?

1  A.   Yes.

2  Q.   And what is -- and it says, yes or no?

3  A.   Yes.

4  Q.   Is that just basically true or false?

5  A.   Correct.

6  Q.   It looks like there are 88 of those questions?

7  A.   Yes.  Oh, wait a minute.  Yes.

8  Q.   And then for word reading fluency, again there's a page

9  with sample items?

10  A.   Yes.

11  Q.   And I think you testified about this one yesterday.  It

12  looks like there are four words in each line.  If we look at

13  the first one on the actual assessment page, which is page 25,

14  the first line is cat, read, dog, boy?

15  A.   Yes.

16  Q.   And the individual is told to mark the two that are

17  similar?

18  A.   Yes.

19       MR. BERGER:  I apologize.  Which --

20       MR. BURGOYNE:  It's Smith 107.

21       MR. BERGER:  Okay.  Thank you.

22  BY MR. BURGOYNE:

23  Q.   And again, that's your handwriting at the top, it looks

24  like?

25  A.   Yes.

1   Q.   What does that say there?

2   A.   31 correct, zero wrong.

3   Q.   And is --

4   A.   If you get any wrong, you get deducted.   That lowers the

5   score.

6   Q.   This was Defendant's Exhibit 39.

7        It looks like there were 64 questions of which she

8   answered -- got through 31?

9   A.   Correct.

10  Q.   And this is a timed assessment?   She was told to stop at

11  some point?

12  A.   3 minutes.

13  Q.   You also testified regarding the IVA+Plus Continuous

14  Performance Report?

15  A.   Yes.

16  Q.   And I think you testified you administered it twice

17  because her scores were so low?

18  A.   Yes.

19  Q.   What did you mean by that?   Were you concerned about the

20  score being so low for some reason on the first administration?

21  A.   They were unusually low.

22  Q.   If the scores were low because of lack of effort, would

23  you anticipate any different result the second time it's

24  administered?

25  A.   It might not be different if somebody -- due to lack of

1  effort or they had a profound disorder.

2  Q.   Had Ms. Ramsay taken a similar continuous performance test

3  before for Dr. Lewandowski?

4  A.   Yes.

5  Q.   And how did she perform on that assessment?

6  A.   She performed in the average range in all but one score.

7  Q.   And again, in all events, these are the type of

8  assessments that you don't believe are very reliable?

9  A.   Yes, in general.  Let me qualify that if I could.

10  Q.   Sure.

11  A.   Their reliability is -- what wording do I want?  They're

12  not awful, but they're not as great as like the WIAT, which is

13  a more rigorous -- not rigorous.  Rigorous isn't the right

14  word.

15      Those -- the statistics for those have a much higher

16  reliability rating, where almost certainly when you -- if you

17  could repeat them again, you'd get almost the same score.

18      With scores like -- in neuropsych testing, in general

19  neuropsych testing, the scores are less reliable, so it tends

20  to be more of difference if you could repeat them again.

21  Q.   Okay.  I think you also testified that in general, you

22  place greater reliance on symptom checklists and your

23  interview?

24  A.   That's what the research says is the most applicable.

25  Q.   And so when you do that, do you get information from the

1  patient?

2  A.   Yes.

3  Q.   And then you also try to obtain information from

4  individuals who know the patient well?

5  A.   Yes.

6  Q.   That could be a family member?

7  A.   It almost always has to be a family member to know them

8  well enough to make a comment.

9  Q.   Is it sometimes a teacher?

10  A.   Sometimes.  Not generally for adults, because they just

11  don't seem to have the familiarity -- they don't know the adult

12  well enough.

13  Q.   Do you ever get information from primary care physicians?

14  A.   Generally not.

15  Q.   When you were looking at the symptom checklist that you

16  received from Ms. Ramsay, I think we saw yesterday she

17  identified 17 of 18 symptoms with maximum severity?

18  A.   Yes.

19  Q.   And did you compare that information with the information

20  that Dr. Smiy had provided when he evaluated her in 2009?

21  A.   Not closely, no.

22  Q.   Let's look at DX-42 if you would, please.

23  A.   DX-42.  I guess I'm in the wrong book.

24  Q.   It's in the other book.  I should have told you that, I'm

25  sorry.

1   A.   42.  Right?

2   Q.   Yes.  Thank you.

3   A.   Okay.

4   Q.   And this Exhibit 42 is the ADD/ADHD verification form that

5   Dr. Smiy submitted to Ohio State on behalf of Ms. Ramsay?

6   A.   Yes.

7   Q.   And just to help you a little bit, this is included as one

8   of the documents that you identified in your report as

9   something you reviewed?

10  A.   Yes.

11  Q.   If you look at page 2 of this document, that's where he

12  provides his DSM diagnosis?

13  A.   Yes.

14  Q.   And he diagnosed her as having ADHD, predominantly

15  inattentive.

16       Is that different from what you diagnosed her with?

17  A.   Yes.

18  Q.   I think you diagnosed her as having the combined type?

19  A.   Yes.

20  Q.   And that means she had both inattentive and hyperactive

21  impairment?

22  A.   Yes.

23  Q.   He indicates below that he arrived at his diagnosis

24  through developmental history.

25       What does that mean?

SMITH - CROSS                                              52

1   A.   I'm sorry, he arrived at his diagnosis?

2   Q.   Yes.  He says he arrived at it, on this document, through

3   first developmental history?

4   A.   I presume he asked her the same types of questions I was

5   asking her about developmental history.

6   Q.   And then what's the difference between that and medical

7   history, which he also indicated he had relied upon?

8   A.   I think medical history would be more related to a

9   diagnosis that she previously had and physical complaints, that

10  kind of thing.

11  Q.   And then he said, structured or unstructured clinical

12  interview with the student?

13  A.   Yes.

14  Q.   Is that similar to what you would have done as well?

15  A.   Yes.

16  Q.   The next page, he indicates how long he has had contact

17  with the student, and it looks like he began treating Ms.

18  Ramsay in 2003, and his last contact was 2010.

19       Did you understand that he was her primary care physician?

20  A.   Yes.

21  Q.   And then if you go to page 4, he walks through all of the

22  symptoms that were part of the ADHD diagnostic criteria under

23  the DSM-IV?

24  A.   Yes.

25  Q.   And so we're clear here, the DSM-IV is the version of the

1    Diagnostic and Statistical Manual that preceded the current

2    manual?

3    A.    Correct.

4    Q.    And how many symptoms did you need to have under that

5    version of the DSM in order to meet the diagnostic criteria for

6    ADHD?

7    A.    The criteria, there is not a strict number that you have

8    to have.  The recommended is 6.  You're allowed to deviate, but

9    then you're deviating.

10   Q.    And he identified five symptoms in this report?

11   A.    Yes.

12   Q.    And then he identified no issues with hyperactivity or

13   impulsivity?

14   A.    Yes.

15   Q.    And again, did you consider this information or discuss

16   this information with Ms. Ramsay to the extent that it was

17   inconsistent with what you were seeing on her --

18   A.    I did not discuss it with her.  I did consider it.

19          MR. BURGOYNE:  Your Honor, we have no further

20   questions.

21          THE COURT:  Very well.

22          Do you want to start with redirect now, or do you want

23   to take a break now?  Mr. Berger, it's your call.

24          MR. BERGER:  I think it would be a good time to take a

25   break.

1          THE COURT:  Very well.  We'll be in recess for 15

2    minutes then.

3          (Recess at 10:47 a.m. until 11:03 a.m.)

4          THE COURT:  You may be seated.

5          And you may proceed.

6                    REDIRECT EXAMINATION

7    BY MR. BERGER:

8    Q.   Dr. Smith, in Mr. Burgoyne's questioning, he referred you

9    to something on your web page about problems with the

10   discrepancy model?

11   A.   Yes.

12   Q.   What as you see it are the problems with the discrepancy

13   model?

14   A.   Well, actually, I don't think that page was saying there

15   was a problem with the discrepancy model.  I was referring to

16   the issues -- there's a long history of issues about IQ testing

17   and the accuracy of it and what scores should be used and that

18   kind of thing.

19        Oftentimes people get a score that doesn't really truly

20   reflect their abilities and then that is reported as if it's

21   accurate.  And then a person makes future decisions based on

22   that.

23   Q.   So if I understand correctly, there could be a case in

24   which someone had a relatively low intelligence score and there

25   would not be a discrepancy between that score and --

1  A.   That's correct.  That page, unfortunately, I have not

2  updated my website in quite a while.  That's referring to

3  DSM-IV issues and the importance of having -- the DSM-IV

4  required that you have a discrepancy and you be below average.

5  And if you don't have a discrepancy, you're out of luck.  And

6  the lack of a discrepancy is frequently because the IQ score is

7  depressed for these other reasons because it's not a really

8  true measure of your intelligence.

9  Q.   As applied to this case, however, there was in fact some

10  discrepancy in Ms. Ramsay's case.  Correct?

11  A.   Yes.

12  Q.   There is also a discussion about the fact in -- both in

13  your report and in your web page at the fact that you look for

14  early -- information about childhood problems?

15  A.   Please repeat that for me.

16  Q.   Just generally, you indicated in your report that you

17  consult records from Ms. Ramsay's childhood --

18  A.   Yes.

19  Q.   -- to look for information there?

20       And is one of the pieces of information that you looked at

21  the information from Dr. Tanguay, the optometrist who --

22  A.   Oh, yes.

23  Q.   Did that information from Dr. Tanguay, was that

24  information that you considered in evaluating and arriving at

25  your diagnoses?

1  A.   Yes.

2  Q.   And we know of course that Dr. Tanguay was an optometrist

3  and not a psychologist, but -- and so she couldn't evaluate a

4  reading -- a learning disorder, but is the fact that there was

5  something someone thought was a vision problem early on, is

6  that something that could be considered as part of your review

7  of the early records?

8  A.   Yes.

9  Q.   Is it easy to fake dyslexia?

10  A.   No.

11  Q.   You performed and there is some discussion about the TOMM,

12  the Test of Memory Malingering?

13  A.   Yes.

14  Q.   When you administered the TOMM to Ms. Ramsay, what did you

15  tell her that the purpose of that test was?

16  A.   That it was to measure a component of cognitive

17  functioning that was important for reading.  Just a general

18  statement to try to link the two together.

19  Q.   Just one moment.  Let me -- just so we also have the

20  reference to your report, if you would look at Exhibit DX-3.  I

21  can help you find it if --

22  A.   I'm sure I can find it.

23  Q.   And it's Tab B, which is your report.

24  A.   Hold on.  DX-3.  Tab B you said?

25  Q.   Tab B, which is your report.

1   A.   All right.

2   Q.   And it's page 23 of the report, although the page number

3   at the top will be different.   But it's under the discussion

4   and summary section, page 23 of 31.

5   A.   I am there.

6   Q.   All right.   So am I -- you've explained the purpose of

7   doing the TOMM, which is to check to see if Ms. Ramsay was

8   making genuine effort?

9   A.   Yes.

10  Q.   Did you tell her that?

11  A.   No.   In terms of administering the TOMM?   No.

12  Q.   Yeah.   And what did you tell her?

13  A.   About what?

14  Q.   About what the purpose was for that test.

15  A.   That it was going -- measuring a component of cognitive

16  memory function, I think I put memory in there, that's

17  important for adequate reading, something like that.

18  Q.   So if she was trying to fake a reading problem, would that

19  have affected her performance on the TOMM?

20  A.   I would have expected it to, yes.

21  Q.   Okay.   But you found that in fact that she was making

22  genuine effort?

23  A.   Yes.

24  Q.   I asked you a moment ago whether it was hard to fake

25  dyslexia or easy to fake dyslexia, something like that, and you

1   said no, that it was difficult, but would you explain that a

2   little further.  Why is it difficult?

3   A.   Well, people have misconceptions about what dyslexia is.

4   The most common misconception that persists with most people

5   is, number one, it's a visual disorder when it's not and it's

6   about flipping of letters.  And it's -- like I said earlier in

7   previous testimony that that's not exclusive to dyslexia.  So

8   they make those kinds -- so basically if people try to fake --

9   they're going to make those kind of errors and misread things

10  that are easy, because it's expected.

11  Q.   Mr. Burgoyne showed you a list of standardized exams that

12  Ms. Ramsay had taken.  One of them was the MCAT.  And I just

13  want to make part of the record at this point the other part of

14  the MCAT, the part that wasn't discussed, and that is the

15  writing sample.

16       Do you remember looking at the score for the writing

17  sample?

18  A.   Do I remember the score?

19  Q.   Yeah.

20  A.   Not for sure.  I think it was around the 31st percentile.

21  Q.   I believe that's correct.  There was also some discussion

22  this morning about DX-27.  And I think that's in the same

23  binder.  And that is a report of a test that was administered

24  to Ms. Ramsay in the sixth grade.  And we discussed it a little

25  bit yesterday.  Tell me when you've found it.

1  A.   All right.  I do.

2  Q.   We discussed it a little bit yesterday, and this morning

3  Mr. Burgoyne pointed out that the overall scores were above

4  average.  And that's correct.

5       And this isn't -- I think I'm right that you may not have

6  seen this test when you were doing your report; is that

7  correct?

8  A.   That is correct.

9  Q.   Okay.  But what is the thing that was of interest to you

10 when you did review this?

11 A.   Well, that a number of her scores, most of them related to

12 reading, were significantly below expectation or -- based on

13 the intelligence measure that they also administered, which

14 they point out in the score report here.

15 Q.   When Ms. Ramsay originally came to you and you discussed

16 the testing that Dr. Lewandowski had done, what did you say

17 about the testing that he had done and the question of dyslexia

18 which Ms. Ramsay was asking you about?

19 A.   I would have said something in general about the kind of

20 tests that needed to be done to examine that weren't done.

21 Q.   And when you gave Ms. Ramsay those tests -- and I think

22 they're generally the ones we discussed this morning, like the

23 WIAT and the Woodcock-Johnson and the GORT.  And when you

24 administered those tests to Ms. Ramsay, as far as you know, was

25 that the first time that anyone had ever administered those

1 tests to Ms. Ramsay?

2 A.   Yes.

3 Q.   And Dr. Smiy didn't do any of those tests either, did he?

4 A.   No.

5 Q.   And Dr. Smiy was a general physician, so those aren't

6 tests that he could have done.  Am I right?

7 A.   No.  Yes, you're correct.

8 Q.   Mr. Burgoyne discussed a little with you the Conners'

9 Continuous Performance Test --

10 A.   Yes.

11 Q.   -- that Dr. Lewandowski had done?

12 A.   Yes.

13 Q.   And is a test like the Conners' or a test like the

14 IVA+Plus that you did, are those tests that can provide helpful

15 information on a diagnosis of ADHD?

16 A.   Yes.

17 Q.   And what is the right way to use those tests, and what is

18 the problem with using those tests?

19 A.   Well, they are -- they supplement what you gather from

20 history and symptom counts from questionnaires and what the

21 people report.  They provide some -- sometimes provide some

22 kind of an objective support for whether there's a problem

23 related -- an attention problem.

24      The drawback from my reading of the literature is that

25 they -- of these types of tests in general is that they too

1   often fail to detect a problem when it's actually there.  And

2   that when they indicate that there's an impaired problem, that

3   doesn't automatically means it's attention deficit.  It means

4   there's an impaired problem with attention.

5        But the most problem is they're not sensitive enough to

6   pick up a problem frequently when in fact it's there.  That's

7   one of the reasons why they haven't been accepted as a core

8   diagnostic evaluation procedure.

9   Q.   Is there some literature that suggests that those tests

10  can lead to false negatives?

11  A.   Yes.

12  Q.   But that is not what happened in Ms. Ramsay's case.

13  Correct?

14  A.   Correct.

15  Q.   When you tested Ms. Ramsay, we covered this yesterday, but

16  just again to put this morning's testimony in context, was she

17  on her ADHD medication that day?

18  A.   No, she was not.

19          MR. BERGER:  I have no further questions.

20          THE COURT:  Any recross?

21          MR. BURGOYNE:  Just two, three, Your Honor.  Real

22  quick.

23                    RECROSS-EXAMINATION

24  BY MR. BURGOYNE:

25  Q.   Dr. Smith, would you look real quick at Defendant's

1   Exhibit 51.  It's in the second notebook of the two notebooks.

2   A.   Yes.

3   Q.   And you'll recall this is the article regarding detecting

4   feigned reading disabilities?

5   A.   Yes.

6   Q.   Would you read for us -- you were asked during your

7   questioning by Mr. Berger whether or not, you put it, it's

8   difficult to fake or feign dyslexia?

9   A.   Yes.

10  Q.   And you answered no, it was not, in your opinion?

11  A.   No.  I asked yes, that it was difficult.

12  Q.   It was difficult.  Right.  Sorry.  Double negative.

13       In your opinion it is difficult to feign dyslexia?

14  A.   Yes.

15  Q.   Would you read to us the last sentence in this research

16  article on page 1.

17  A.   On page 1?

18       Until recently, most clinicians assumed that students

19  could not feign a specific LD such as a reading disability.

20  And they quote an article.  And that the base rate for such

21  malingering in psychoeducational assessments was very low.

22       Do you want me to continue on to the next page?

23  Q.   Yes.

24  A.   However, this has proven not to be the case.

25       Continue?

1   Q.   No, that's good.

2        Again, have you done any research in this area?

3   A.   No.  I've not studied -- well, I mean, I've not done any

4   research articles or anything like that.

5   Q.   Quickly on the TOMM, just to confirm, there's no reading

6   on that assessment?

7   A.   Correct.

8   Q.   And it doesn't matter how long she takes to answer those

9   questions regarding the pictures she sees?

10  A.   Correct.

11  Q.   Then finally you were asked about her performance on the

12  MCAT, and I think -- on the writing sample.  And you said

13  performed at the 31st percentile?

14  A.   That's what I said, yes.

15  Q.   Is that an average score?

16  A.   It's in a lower part of the average range.

17           MR. BURGOYNE:  No further questions, Your Honor.

18           THE COURT:  Very well.  You may step down, sir, and

19  watch your step.

20           MR. BERGER:  And I promised Dr. Smith that I would ask

21  Your Honor whether he is also excused.

22           THE COURT:  Sure.  I see no reason why you can't be

23  excused.  You're excused, sir.

24           THE WITNESS:  Thank you.

25           THE COURT:  Thank you.  Have a good day.

1        Any witnesses on behalf of plaintiff?

2        MR. BERGER:  Your Honor, plaintiff rests.

3        THE COURT:  Very well.  I'll give you leave to admit

4   whatever exhibits have not been entered in at the conclusion of

5   the testimony.  All right?

6        So saying, defense.

7        MR. BURGOYNE:  We call Dr. Cathy Farmer.

8        THE COURT:  Very well.

9        And watch your step coming around, ma'am, and also

10  around the witness box.

11       DR. CATHERINE FARMER, after having been duly sworn,

12  was examined and testified as follows:

13       COURT REPORTER:  State your name for the record.

14       THE WITNESS:  Catherine Farmer, F-A-R-M-E-R.

15                    DIRECT EXAMINATION

16  BY MR. BURGOYNE:

17  Q.   Good morning, Ms. Farmer.

18  A.   Good morning.

19  Q.   Could you state your job title, please.

20  A.   I'm the director of disability services and the ADA

21  compliance services at the National Board.

22  Q.   And the National Board, that's the National Board of

23  Medical Examiners?

24  A.   It is.

25  Q.   And are your offices located here in Philadelphia?

FARMER - DIRECT                                      65

1   A.   Yes.

2   Q.   How long have you had that job position?

3   A.   Since 2006.

4   Q.   Would you give us a brief summary of your educational

5   background.

6   A.   Originally I was a licensed practical nurse.  I earned a

7   bachelor's degree in biology, a master's in health education

8   and a doctorate in clinical psychology.

9   Q.   Are you a licensed psychologist?

10  A.   No.

11  Q.   And you're not -- you don't have a practice where you see

12  patients?

13  A.   I don't.

14  Q.   Do your responsibilities include reviewing requests for

15  accommodations on the Step 1 examination?

16  A.   Yes.

17  Q.   Did you receive a request from Jessica Ramsay?

18  A.   Yes.

19  Q.   How many requests for disability-related accommodations

20  does NBME receive in a given year, just order of magnitude?

21  A.   Last year 1,700 requests.

22  Q.   And are some of those duplicate requests from the same

23  individual?

24  A.   They could be, yes.

25  Q.   And do you have any rough approximation of how many

1   individuals receive at least one of the accommodations they

2   request?

3   A.   In a given year, roughly 60, 65 percent.

4   Q.   Briefly describe the process by which someone requests

5   accommodations and then you go about evaluating that request in

6   making your decision.

7   A.   The process actually begins with our website where we post

8   information for students and applicants on how to make a

9   request, guidelines for documentation that would be helpful to

10  support their requests, forms for them to fill out or have

11  their school fill out.

12       When they send those documents to us, we ask that they be

13  registered for the examination at that time.

14       In-house, we have staff that go over the submission just

15  to make sure all the forms are there, signed, legible.

16       Then I have a group of professional staff who are

17  psychologists, and we do an audit.  They'll do an audit of the

18  file to make sure that the information that's provided that's

19  clinically based has enough information for us to make an

20  informed decision about the request.

21       We may or may not send it out to external consultants,

22  subject matter experts, to review.  If we're able to, based on

23  the submission, grant the request, we'll do so without sending

24  it out for review.  If we're not clear that we see a

25  substantial limitation in a major life activity, we'll send the

FARMER - DIRECT

1  submission out for consultant review.

2  Q.  Let me ask you there, do you ever deny a request without

3  sending it out to an external expert?

4  A.  Not typically, no.

5  Q.  And examinees request accommodations based on both

6  physical and mental impairments?

7  A.  Yes.

8  Q.  Do the mental impairments include impairments such as

9  learning disabilities and attention deficit disorder?

10  A.  They do.

11  Q.  Do those type of requests tend to take longer to review

12  than a request for accommodations based on a physical

13  impairment?

14  A.  They typically include a lot more documentation for us to

15  look through, yes.

16  Q.  What is the impairment that constitutes the largest

17  percentage of requests that you get?

18  A.  Probably attention-deficit/hyperactivity disorder and/or a

19  learning disability in reading or dyslexia.

20  Q.  Is it fairly common to see both of those diagnoses in a

21  request?

22  A.  It is.

23  Q.  How long do you tell examinees that it will take you to

24  process their accommodation request?

25  A.  On the request form we ask them to allow at least 60 days

1  for us to review.  And that's from the point where we've

2  received complete information from them.

3  Q.   And are you able in some instances to do it more quickly

4  than 60 days?

5  A.   Yes.

6  Q.   And likewise, are there instances in which you don't meet

7  your 60-day target?

8  A.   Yes.

9  Q.   Look at Exhibit DX-4, which is your declaration.

10  A.   I have it.

11  Q.   And would you confirm for us that's your signature on the

12  last page of this document.

13  A.   Yes.

14  Q.   And this is a declaration you submitted in connection with

15  this case?

16  A.   It is.

17  Q.   Let's walk through your attachments here and make sure we

18  understand what these are.

19       Attachment A, Tab A?

20  A.   Have it.

21  Q.   This is Ms. Ramsay's initial request for accommodations?

22  A.   Yes.

23  Q.   And it looks like she signed this November 28, 2016.

24       Is that when you received this?

25  A.   No.  I believe this was received in January, around

1    January 6th.

2    Q.    Look at Tab B for me.  It will suggests to me maybe you

3    received it a little earlier.

4          Is that stamp on Tab B, is this Ms. Ramsay's personal

5    statement, is that an NBME stamp that says received there?

6    A.    Yes.

7    Q.    And that indicates that that document at least was

8    received December 12th?

9    A.    Yes.

10   Q.    Does that refresh your recollection that perhaps you

11   received this request sooner than January?

12   A.    I apologize, you're right.  There is a stamp on the

13   request form I see.

14   Q.    The one on the request form was hard to read.

15   A.    Yes.

16   Q.    You received this it looks like December 12th?

17   A.    Yes.

18   Q.    And then Tab B, as indicated, that's a personal statement

19   that Ms. Ramsay submitted?

20   A.    It is.

21   Q.    You routinely ask candidates to submit a personal

22   statement?

23   A.    Yes.

24   Q.    And then Tab C, this is some high school grades that Ms.

25   Ramsay submitted to you?

FARMER - DIRECT

1   A.   Yes.

2   Q.   Tab D is at least a partial transcript from Ohio State

3   University that she submitted to you?

4   A.   I see that, yes.

5   Q.   Tab E is her MCAT score report?

6   A.   Yes.

7   Q.   Do you recall whether you received that later than her

8   initial submission?

9   A.   I don't recall.  There is a date stamped here, but I'm not

10  sure I can read.

11  Q.   And then Exhibit F, this is the report that Dr. Smiy -- or

12  at least a record of Dr. Smiy's visit in which he diagnosed Ms.

13  Ramsay with ADHD?

14  A.   Yes.

15  Q.   And then Exhibit G is the Ohio State verification form of

16  ADHD?

17  A.   That's correct.

18  Q.   And then H is a document from Mr. Livingston?

19  A.   Yes.

20  Q.   And then finally we get to your decision letter, which is

21  March 2017.

22  A.   I see it.

23  Q.   And I'll represent to you that the Livingston documents

24  included a supplement indicating that he provided documents to

25  you on January 5, 2017.

1      Do you recall asking for supplemental documents from Mr.

2  Livingston?

3  A.   Dr. Goldberg did, yes.

4  Q.   Dr. Goldberg was someone on your stuff?

5  A.   Who did the initial audit, requested the supplemental

6  information to clarify Mr. Livingston's initial report.

7  Q.   So that documentation, it looks like, came to you January

8  5, 2017.

9      Would that be when the 60 days would ordinarily begin to

10  run?

11  A.   Yes, if that was the final document that she submitted and

12  we determined or she determined that that submission was now

13  complete.

14  Q.   And then I'll represent to you that Dr. Zecker submitted a

15  report to you that was dated January 13th.

16      He's one of your external reviewers?

17  A.   Correct.

18  Q.   And you asked him to perform the initial review of Ms.

19  Ramsay's request?

20  A.   Yes.

21  Q.   Then we just looked at your decision letter March 10th.

22      So it looks like in this instance it took you just over 60

23  days to respond to her first request?

24  A.   That's correct.  60 calendar days, yes.

25  Q.   Is that what you do, 60 calendar days?  Is that what you

FARMER - DIRECT

1  tell people?  Or is it 60 --

2  A.   Actually, at this point in time we didn't -- we didn't say

3  either or.  So we tried to make that a little bit more clear

4  now.

5  Q.   Exhibit J, is this Ms. Ramsay's second request for

6  accommodations?

7  A.   It is.

8  Q.   And this is dated above her signature it looks like June

9  6, 2018?

10  A.   It is.

11  Q.   And K is the personal statement she submitted, also dated

12  June 6, 2018, in support of this request?

13  A.   That's correct.

14  Q.   And then Exhibit L reflects some documentation provided by

15  Dr. Lewandowski?

16  A.   That's correct.

17  Q.   And if you look in that tab at the page number at the top

18  it says page 89 of 106.

19  A.   Yes.

20  Q.   And you see there's a document in here from Dr.

21  Lewandowski that's dated June 20, 2018, which was subsequent to

22  Ms. Ramsay's initial submission?

23  A.   That's correct.

24  Q.   Do you recall receiving supplemental documentation from

25  Dr. Lewandowski?

FARMER - DIRECT

1  A.   I do.  After my initial audit of the documentation,

2  including Dr. Lewandowski's evaluation, I asked for

3  clarification of his score sheet and this is -- this submission

4  that he made to supplement.

5  Q.   And you referenced Dr. Goldberg a minute ago.

6       She performed the review and sent the decision letter out

7  on the initial request?

8  A.   That's correct.

9  Q.   And you did so on the second request?

10 A.   Yes.

11 Q.   Again, you sent this request out to Dr. Zecker; is that

12 correct?

13 A.   Yes.

14 Q.   And I'll represent to you that you got a letter from Dr.

15 Zecker that was dated July 19, 2018.

16 A.   That sounds about right.

17 Q.   And then if you'll look at Exhibit M, please.

18 A.   Yes.

19 Q.   Is this the decision letter that you prepared?

20 A.   Yes, it is.

21 Q.   Okay.  At this time it looks like something just over 80

22 days have gone by since you received the last piece of

23 supporting documentation and almost two months after you

24 received Dr. Zecker's letter recommending that extended testing

25 time be denied?

FARMER - DIRECT

1  A.   I believe we received Dr. Lewandowski's -- notwithstanding

2  his date on the document, I think we received it around the

3  27th of the month.  So I believe it was around 77, a little

4  less than 80 days, for us to get a decision letter.  Yes.

5  Q.   So 77 or 80 days after you got the last piece of

6  documentation but almost two months after Dr. Zecker said he

7  recommended denying extra testing time?

8  A.   Yes.

9  Q.   Why did it take you so long to tell Ms. Ramsay what your

10  decision was?

11  A.   The way that requests are coming in, it's in a rolling

12  schedule.  So individuals are submitting requests every day.

13  They are in various stages of the process.  They all go through

14  the same process but at their own pace.  So we're reviewing

15  initial submissions for clarity and completeness.  Then we're

16  doing an audit.  We may ask for more information.  So there's

17  fits and stops in the process.  But this is going on

18  concurrently for dozens if not hundreds of requests for

19  information.

20       We have made a promise to students that we'll take them in

21  the order which they are received.  And so we are attempting to

22  respond to folks as quickly as possible but not have people

23  sort of jumping the queue.  And in this case we had -- my best

24  recollection is a number of requests that had come in before

25  Ms. Ramsay's.

FARMER - DIRECT                                    75

1   Q.   And when you tell students your decision, do you simply

2   tell them yes or no, or do you attempt to provide an

3   explanation?

4   A.   If we're not granting everything that they've requested,

5   we make an effort to provide very specific detailed information

6   about why we can't grant what they requested.

7   Q.   Does that sometimes require you to pick up a file you

8   haven't looked at in a while in order to refresh your

9   recollection on the facts of that case?

10  A.   Almost always requires that, yes.

11  Q.   In this particular instance, you granted some

12  accommodations the second time but again denied extra testing

13  time?

14  A.   That's correct.

15  Q.   Let's look exactly at what you did grant.  And that's on

16  the third page of your letter.

17  A.   I see it.

18  Q.   Do you see that?

19       And it looks like you granted additional break time and

20  testing over two days.

21       Explain for the Court, if you would, exactly how that

22  would work compared to standard administration.

23  A.   So the standard Step 1 examination is an eight-hour day,

24  seven one-hour test blocks.  It's about 40 questions per hour.

25  For additional break time, we actually break the exam into two

FARMER - DIRECT

1   days, break the exam blocks into two.  So it's shorter blocks.

2   It's just 30 minutes, half the number of items, 20 items per

3   half hour, and again, spread out over two days.  And then in

4   addition to the standard 45 minutes of break time, we give

5   additional break time.  So you have more opportunities for

6   breaks, additional break time in between -- in between test

7   blocks.

8   Q.   And how long is each test day when it's broken out over

9   two days?

10  A.   In this case, for the Step 1 exam, the first day would

11  be -- would have been five hours and 15 -- five hours in

12  length.  And the second day would have been four hours and 45

13  minutes, a little less than five.

14  Q.   And with 20 questions per block, at that point once Ms.

15  Ramsay completed that block, she had the opportunity to take a

16  break?

17  A.   Correct.

18  Q.   And there's also a reference here to separate testing

19  room.

20       Does that mean she would be testing by herself?

21  A.   Yes.

22  Q.   And would she be able to stand, walk around?

23  A.   It's a fairly small room, but yes, she could get up,

24  stand, stretch, change her position.

25  Q.   Do those testing rooms ordinarily have standing desks or

FARMER - DIRECT

1  are they seated?

2  A.   Only the separate testing room has a desk that is usually

3  adjustable, so one can stand and take the test or sit and take

4  the test.

5  Q.   And then the final accommodation you granted was

6  permission to read aloud.

7       Back up a little.  Extra time or extra breaks and separate

8  room, were those based on her physical impairments that she had

9  relied upon in seeking accommodations the second time?

10  A.   Yes.

11  Q.   And those were I think deep vein thrombosis and then she

12  had also referenced migraines?

13  A.   That's correct.

14  Q.   And then your last accommodation you approved was

15  permission to read aloud.

16       Did that have anything to do with the physical

17  impairments?

18  A.   No, it didn't.  She had I think written in her personal

19  statements that reading aloud helps her, that she likes to do

20  that.

21       In the standard testing room, it's a room with 10 or 12

22  testing carrels, people sitting on either side and behind you.

23  One would not be able to read out loud or even subvocalize

24  without interfering with other examinees.  In a separate room

25  there is nobody to interrupt, and so she could potentially read

FARMER - DIRECT

1  aloud if she wanted to.  However, the test proctors are alert
2  to any activities.  And we wouldn't -- I would not want them to
3  think that was suspicious behavior, so this provides an
4  official accommodation that she has our permission to do that
5  so that the proctors would be informed.
6  Q.   Okay.  Now you're referencing proctors.
7       Individuals take your exams in testing centers that are
8  operated by another company?
9  A.   Correct.  The Prometric Test Centers.
10 Q.   So when you're referencing proctors, those are the
11 Prometric employees?
12 A.   That's correct.
13 Q.   And you say for security, you wouldn't want the Prometric
14 employees to think Ms. Ramsay was doing something inappropriate
15 if she was reading out loud?
16 A.   Correct.  Or interrupt her to tell her to stop doing that.
17 Q.   Is it fair to say that NBME devotes significant resources
18 to evaluating accommodation requests?
19 A.   I think so, yes.
20 Q.   Why don't you simply approve whatever accommodations that
21 an examinee requests if it's supported by documentation from a
22 professional who seems to be qualified?
23 A.   Well, it's a -- the USMLE is a national standardized
24 licensure exam for medical licensure in this country.  And so
25 we're -- we have folks tell us what accommodations they need

1    and then provide supporting documentation.  So we're going to

2    look through every piece of information that they provide,

3    whether they had accommodations previously.  And so just one

4    evaluation or more evaluations that recommend accommodations

5    wouldn't be sufficient for us to grant.

6    Q.   Do you believe most examinees might like extended testing

7    time on an exam like this?

8    A.   I believe so, yes.

9    Q.   And do you attempt to administer your program in a

10   rigorous but fair manner for all examinees?

11   A.   Absolutely, yes.

12            MR. BURGOYNE:  No further questions.

13            THE COURT:  Cross-examination.

14                         CROSS-EXAMINATION

15   BY MS. VARGAS:

16   Q.   Good morning, Dr. Farmer.

17   A.   Good morning.

18   Q.   Did I hear you correctly that you testified you are the

19   ADA compliance officer?

20   A.   For test requirement, yes.

21   Q.   Who is Brendan Berger?

22   A.   He is a USMLE candidate.

23   Q.   And did you testify against him receiving extended time

24   during 2019?

25   A.   Did I testify against him?  In a hearing, yes.

FARMER - CROSS

1  Q.    What disabilities was he alleging he had?

2  A.    I believe ADHD and reading disorder.

3  Q.    What was the reason the NBME denied him the accommodations

4  that he requested?

5  A.    Because his documentation did not demonstrate a

6  substantial limitation in a major life activity.

7  Q.    Specifically what documentation from Brendan Berger did

8  the NBME rely on to make that conclusion?

9  A.    I believe we reviewed all of the documentation he provided

10  over the course of his applications, looked at every piece of

11  data that he supplied and made the conclusion based on that.

12  Q.    I guess I'm asking something different.

13       Of all the data that he provided, what data did you agree

14  with?  What data did you credit?

15            MR. BURGOYNE:  I'm going to object to this.

16            That was a different case with a different candidate

17  with different documentation.  I don't see its relevance to the

18  manner in which --

19            THE COURT:  Yeah.  Where are we going with this,

20  Counsel?

21            MS. VARGAS:  Dr. Farmer is the person who is -- I

22  believe she will testify, and she did in deposition, that she

23  was responsible for making the determination to deny

24  accommodations to Ms. Ramsay.  And we were going to get to the

25  point that she testified against Mr. Berger, and the Court

1    ordered a preliminary injunction in that case against the NBME

2    for the very same reasons that it's now trying to put forward

3    in this Court.

4              MR. BURGOYNE:  Your Honor, they've cited that in their

5    briefs.  You can read it.

6              THE COURT:  Yes.  We can take judicial notice of that.

7              MS. VARGAS:  Thank you.  Will you take judicial notice

8    of that?

9              THE COURT:  Any objection?

10             MR. BURGOYNE:  Your Honor, it's a published decision.

11             THE COURT:  It's a published decision by a court.

12             MS. VARGAS:  Thank you, Your Honor.

13             THE COURT:  Very well.

14   BY MS. VARGAS:

15   Q.   You testified a moment ago that in granting Ms. Ramsay

16   permission to read aloud that you were doing that because you

17   were concerned the proctors might think it was suspicious

18   behavior if she read aloud or mouthed as she read.

19        Why would that be suspicious?

20   A.   Well, during the examination the proctors are observing

21   all of the examinees to make sure that they are not

22   surreptitiously either taking information out or bringing

23   information in to the exam.

24   Q.   That's not something that medical students ordinarily do

25   when they're taking the USMLE; is that correct?

FARMER - CROSS

1   A.   Take information out or bring information in?  We
2   certainly hope not.
3   Q.   Is it typical for medical students when they take the
4   USMLE to read out loud the questions?
5   A.   They're not able to, no.
6   Q.   So it would be unusual behavior for a medical student to
7   be reading the questions on the USMLE out loud during the test
8   administration?
9   A.   It would be, yes.
10  Q.   The NBME grants more than double time.  Correct?
11  A.   Occasionally, yes.
12  Q.   For example, students have requested and the NBME has
13  granted triple time.  Right?
14  A.   Yes.
15  Q.   Jessie Ramsay didn't ask for that triple time, did she?
16  A.   No.
17  Q.   She only requested the time that she received in medical
18  school.  Right?
19  A.   She requested double time.
20  Q.   Was that the time that she received in medical school?
21  A.   I believe she does receive double time, yes.
22  Q.   You're not licensed to perform psychoeducational
23  evaluations in Michigan.  Correct?
24  A.   In Michigan, no.
25  Q.   In fact, you're not licensed to perform psychoeducational

FARMER - CROSS

1  evaluations anywhere, are you?

2  A.   No.

3  Q.   You've admitted in deposition that you're not an expert in

4  dyslexia.  Correct?

5  A.   Correct.

6  Q.   And you also admitted in deposition that you're not an

7  expert in ADHD.  Correct?

8  A.   That's correct.

9  Q.   You were the one who made the decision to deny Ms. Ramsay

10 the accommodations she's received?

11 A.   Yes.

12 Q.   At what point was her file transferred to you?

13 A.   I'm not sure.  Which file, which time?

14 Q.   You testified that Dr. Goldberg initially had her file,

15 and at some point you took charge of it.

16     Why did you take charge of it?

17 A.   So Dr. Goldberg was the one who made the audit and the

18 review of her first request in 2016, I believe.  When the next

19 one came in, it was assigned to me.

20 Q.   Why was that?

21 A.   They're really just assigned based on the volume.

22 Q.   Do you recall testifying in deposition that whenever a

23 candidate is represented by a lawyer, that that file is

24 automatically transferred to you?

25 A.   Oh, I don't recall that that was -- that she was

1    represented by an attorney at that time.

2    Q.   You don't recall if she was represented by an attorney in

3    June of 2018?

4    A.   Yes.  Forgive me, I didn't recall that she had been.  Yes.

5    Q.   So is that why the file was transferred to you, because

6    she was now represented by an attorney?

7    A.   I would normally respond to folks represented by

8    attorneys, yes.

9    Q.   Even though you have no expertise in ADHD or dyslexia?

10   A.   That's correct.

11   Q.   So your decision to rely on Ms. Ramsay's MCAT scores as a

12   basis for denying her request for extended time, that wasn't

13   based on any research, was it?

14   A.   The decision was to deny her request based on all of the

15   documentation that she provided and our consultant, expert

16   consultant reviews.

17   Q.   I'm asking a little bit of a different question.  I'm

18   asking about your mental process in making the decision to deny

19   her extended time.

20        Your decision to deny her extended time, it wasn't based

21   on any research, was it?

22   A.   No.

23   Q.   And in your deposition in fact you testified it was based

24   on common sense.  Correct?

25   A.   I don't recall stating that, no.

1          MS. VARGAS:  I'm sorry, Your Honor.  One moment.

2          THE COURT:  That's all right.

3          MS. VARGAS:  We'll come back to that in the interest

4    of time.

5    BY MS. VARGAS:

6    Q.   So in addition not having a license to conduct

7    comprehensive psychoeducational evaluation, you testified -- I

8    asked you some questions at deposition about your knowledge of

9    the MCAT.  Correct?

10   A.   I believe so, yes.

11   Q.   And your knowledge of the MCAT was, is it fair to say,

12   fairly limited?

13   A.   Yes.

14   Q.   And in deposition -- would it be fair to say that based on

15   the testimony you gave in deposition that your knowledge of

16   Step 1 and Step 2 are also fairly limited?

17   A.   I wouldn't say that it's limited.  I work for the National

18   Board.  I don't work for the AAMC who publishes the MCAT.

19   Q.   Now I'm talking about Step 1 and Step 2 of the USMLE.

20        Is that administered by the NBME?

21   A.   Yes.

22   Q.   And do you work for them?

23   A.   I do.

24   Q.   Your knowledge of Step 1 and Step 2 is actually fairly

25   limited, isn't it?

1   A.   I don't believe it's limited.

2   Q.   So in your deposition do you recall how you testified when

3   I asked you about the number of multiple choice options, for

4   example, that there were on Step 1, that's a fairly basic

5   question about an exam.   Correct?

6   A.   Sure, uh-huh.   It's basic.

7   Q.   And do you recall what you answered?

8   A.   No.

9   Q.   Well, I believe you testified -- would it surprise you if

10  you testified that you thought there were maybe four multiple

11  choice answers or five multiple choice answers?

12  A.   No, it doesn't surprise me.

13  Q.   Is that correct?

14  A.   I don't know.

15  Q.   Is it possible that there are as many as, say, 10 or 12

16  multiple choice answers?

17  A.   On some items, sure.

18          THE COURT:   Now you may ask your next question.

19  BY MS. VARGAS:

20  Q.   So if there were 10 or 12 answers on a multiple choice

21  question, how would that compare, if you know, to an MCAT with

22  only four multiple choice answers in difficulty for somebody

23  with reading challenges?

24  A.   Well, I'm not sure the number of answer options has any

25  bearing on that, the difficulty of the item, the difficulty of

FARMER - CROSS

1   the reading.

2   Q.   Would you have to read all of the answers to answer a

3   question on an exam?

4   A.   Yes.

5   Q.   And so if there were four multiple choice options on the

6   MCAT versus as many as 10 or 12 on a Step 1 or Step 2 question

7   on the USMLE, that would be a big difference between the two

8   tests, wouldn't it?

9   A.   It would.

10  Q.   Do you agree that the MCAT is not designed for diagnosing

11  dyslexia?

12  A.   Yes.

13  Q.   Do you agree it's inappropriate to diagnose an individual

14  with dyslexia solely on the basis of diagnostic tests?

15  A.   Yes.

16  Q.   The NBME doesn't have any direct knowledge of Ms. Ramsay's

17  diagnosis, does it?

18  A.   We have only knowledge of the documentation that she

19  provided, yeah.

20  Q.   Is Dr. Zecker licensed to perform comprehensive

21  psychoeducational evaluations in Michigan?

22  A.   Not in Michigan, no.

23  Q.   Is Dr. Lovett licensed to perform psychoeducational

24  evaluations in Michigan?

25  A.   No.

1  Q.   Has Dr. Lovett testified for the NBME before in cases

2  involving denial of extended time?

3  A.   Yes.

4  Q.   In response to Ms. Ramsay's second request for

5  accommodation, you granted her permission to read the question

6  aloud.  We were discussing this a moment ago.

7       And that isn't an accommodation that's granted for DVT, is

8  it?

9  A.   No.

10  Q.   And that's not an accommodation that's granted for

11  migraines, is it?

12  A.   No.

13  Q.   In your experience, does it take longer to read something

14  out loud than it does to read it silently?

15  A.   I don't have experience, no.

16  Q.   How quickly after registering for Step 1 can nondisabled

17  students take Step 1?

18  A.   It depends on the eligibility period that they chose.

19  Q.   Well, let's say that a medical student registered for the

20  USMLE and chose the first available exam period.

21       What's the longest they would have to wait to take the

22  exam if they chose the first available?

23  A.   As soon as their eligibility -- their -- they get a

24  scheduling permit.  As long as that is within six months of the

25  test date, their permit is released and they can call Prometric

1  to schedule an exam at their discretion.

2  Q.   So how many days after submitting their registration for

3  Step 1 of the USMLE can a nondisabled student schedule that

4  test?

5  A.   I don't know.  It could be a matter of days or weeks.

6  Q.   So could it be a day or two?

7  A.   I don't know if it would be a day or two, but it could

8  probably be a few days.

9  Q.   Could it be under a week?

10  A.   Potentially.

11  Q.   How long does it take the USMLE, if you know, to provide

12  test results to medical students without disabilities who

13  take -- or any student who takes the USMLE?

14  A.   I believe it's somewhere around six weeks after their

15  exam.

16  Q.   Would it surprise you if your website says it was three to

17  four weeks?

18  A.   No.

19  Q.   Would you have any reason to think that your website was

20  incorrect?

21  A.   No.

22  Q.   Do you know how many students take the USMLE in the United

23  States in a year?

24  A.   No, not offhand.

25  Q.   Would it surprise you, taking just one year, say 2017,

FARMER - CROSS

1   would it surprise you to learn that there were 145,003 students

2   that took some part of the USMLE in 2017?

3   A.   No.

4   Q.   And the NBME is able to turn around all of those scores in

5   three to four weeks?

6   A.   I don't know that it's all of the scores, no.

7   Q.   With respect to Ms. Ramsay's first request for

8   accommodation, how long did it take you to decide her first

9   request?

10  A.   Again, I believe we had the decision letter sent to her in

11  about 65, 64 days.

12  Q.   I guess it depends on what you count as the first date.

13       How many days from the time she submitted her application

14  did it take for the NBME to make a final decision in her case?

15  A.   I don't recall.  I think it was more than the 65 days.

16  Q.   It was a couple months?

17  A.   Possibly, yes.

18  Q.   And with respect to her second request for accommodations,

19  do you recall how long it took from the time she submitted her

20  paperwork to the time that you wrote her a letter denying

21  testing accommodations?

22  A.   It was over 77 days.

23  Q.   A lot over 70 days?

24  A.   I don't recall.

25  Q.   Is it correct that you issued your decision letter

FARMER - CROSS

1   September 11, 2018?

2   A.   Yes.

3   Q.   And she submitted her documentation the beginning of June

4   2018?

5   A.   That's correct.

6   Q.   And you submitted her information to one of your paid

7   outside consultants in July of 2018.   Correct?

8   A.   Correct.

9   Q.   And did that consultant have a time limit for how long

10  they had to review her file?

11  A.   Yes.

12  Q.   Approximately what is that time limit?

13  A.   It's generally a week or two.

14  Q.   Did that consultant turn around that documentation in

15  time?

16  A.   As best as I recall, yes.

17  Q.   So then in July 2018, you had already decided to deny Ms.

18  Ramsay the testing accommodations that she had requested.

19  Correct?

20  A.   Possibly, yes.   Uh-huh.

21  Q.   I believe you testified in deposition that you typically

22  decide within two to three days of receiving an outside

23  consultant's report whether you're going to accept or deny --

24  whether you're going to provide the accommodations or not; is

25  that right?

FARMER - CROSS

1  A.   Yes.

2  Q.   And so in July 2018 you had already made a decision to

3  deny Ms. Ramsay testing accommodations.   Correct?

4  A.   Correct.

5  Q.   And the clock was running on her ability to be a doctor.

6  Correct?

7  A.   Correct.

8  Q.   And so what happened between July of 2018 and September of

9  2018?

10 A.   So because we are processing requests from hundreds of

11 examinees, we are taking those requests in the order in which

12 they are received.   And so what happened was, we were

13 processing and making decisions and writing letters to respond

14 to all the examinees who made the request prior to Ms. Ramsay's

15 request.

16 Q.   I believe you testified a few minutes ago that any request

17 where a candidate is represented by counsel goes to you.

18 Correct?

19 A.   It does.

20 Q.   It goes to you only?

21 A.   That's correct.

22 Q.   Is it possible if there were more individuals who could

23 review the requests for accommodation, that the requests for

24 accommodation could be turned around more quickly?

25 A.   Well, I guess I could qualify that, requests that are from

FARMER - CROSS

1  individuals represented are not the only requests that I get.

2  So the requests are distributed across all of the available

3  staff as equally as possible.

4  Q.   So you have responsibility for your share of all of the

5  requests for accommodation that come into the NBME.   Those are

6  divided among the staff that works on this issue.   Right?

7  A.   Correct.

8  Q.   And in addition to that, you also handle all of the

9  requests where the person is represented by counsel.   Correct?

10  A.   That is correct.

11  Q.   So if there were more than one of you, is it possible that

12  the students might get an answer more quickly about whether

13  they can take the test with the accommodations that they need?

14  A.   That's true, yes.

15  Q.   Do you have a sense of why the NBME hasn't dedicated more

16  resources in order to allow students with disabilities to have

17  an equitable opportunity to take the test as quickly as

18  students without disabilities receive?

19  A.   We actually have hired additional staff and are currently

20  recruiting for additional staff to do just that.

21  Q.   Do you do hiring?

22  A.   I'm sorry?

23  Q.   Do you do hiring for that position?

24  A.   I would be, yes.

25  Q.   And how many people are you looking to hire?

FARMER - CROSS

1  A.   Currently we have one position open.

2  Q.   Just one?

3  A.   Yes.

4  Q.   Are you familiar with the NBME's revenue for -- let's pick

5  a year, 2017?

6  A.   Not generally, no.

7  Q.   Would it surprise you to learn that their revenue was just

8  shy of $143 million in 2017?

9  A.   Again, I have no frame of reference for that, so --

10  Q.   If I provide you a copy of the 990, would that --

11  A.   I don't doubt your representation.

12  Q.   So the NBME has more resources.  It could hire more than

13  just you to handle the requests from attorneys and more than

14  one more person to process these requests that are taking, in

15  Ms. Ramsay's case, many months to process, to her detriment.

16  Correct?

17  A.   Yes.

18  Q.   How would you compare the resources of the NBME that I've

19  just described to the resources of somebody who is working as a

20  babysitter?

21  A.   I'm not sure I understand the question.

22  Q.   Would you think that $143 million --

23  A.   Oh.

24  Q.   -- resources was more than somebody who is working as a

25  babysitter?

1   A.   Of course, yes.

2   Q.   You agreed in your deposition that Dr. Smith was qualified

3   to perform a comprehensive psychoeducational evaluation.

4   Correct?

5   A.   Yes.

6   Q.   And you don't disagree with the battery of tests that he

7   administered?

8   A.   No.

9   Q.   And I believe you testified at deposition that there was

10  no test that he should have done that he didn't do.   Right?

11  A.   No.

12  Q.   You agree with what I said?

13  A.   We don't actually prescribe a battery of tests.

14  Q.   Right, but in your deposition do you recall testifying

15  that there was no test that Dr. Smith should have given that he

16  didn't give?

17  A.   Correct.

18  Q.   So your decision, which you testified in deposition -- and

19  I can show you the page if it's helpful -- was based on common

20  sense, your interpretation that her performance on the MCAT

21  common sense meant she didn't have dyslexia.   That wasn't

22  consistent with the decision that was made by Ms. Ramsay's

23  medical school about accommodations, was it?

24       MR. BURGOYNE:   Your Honor, I don't think there was

25  foundation for that characterization of her testimony either or

1   in deposition.  I'm happy to have her show the deposition,

2   but --

3           THE COURT:  Very well.

4           MS. VARGAS:  I'm happy to do that.

5   BY MS. VARGAS:

6   Q.   If you could turn, please, to page 139 of your deposition.

7        And once you're on page 139...

8   A.   I'm there.

9   Q.   If you could begin reading at line 1, just so we have the

10  full context of what you testified.

11  A.   Question:  Is it your testimony that the MCAT scores are a

12  more reliable indicator than the comprehensive educational

13  evaluation in determining whether Ms. Ramsay has a disability?

14      Answer:  They're a good indicator of her ability to read

15  under time constraints content that most people -- or I'm

16  sorry, that the reference group, whether it's high school

17  students or medical applicants, have to read.

18      Question:  How do you know that?

19      Answer:  By the scores that they -- by the scores that

20  they obtain.

21      Question:  How do you know that the MCAT is testing

22  reading?

23      Answer:  They had to read it.  They had to read the exam

24  to answer that question.

25      Question:  Is there any research to support what you're

1  saying?

2       Answer:  It's common sense.

3  Q.  Thank you.  So your decision to deny Ms. Ramsay extended

4  time, that decision was not consistent with the decision made

5  by her medical school about the need for extended time, was it?

6  A.  Correct.

7  Q.  Your decision was also not consistent with the decision

8  that was made by Ohio State University about her need for

9  extended testing time.  Correct?

10  A.  Correct.

11  Q.  And your decision was also not consistent with any of the

12  doctors or specialists who actually examined Ms. Ramsay, was

13  it?

14  A.  If they recommended accommodations, no, it was not.

15  Q.  Did they recommend accommodations?

16  A.  I believe all of them -- I'm not sure if all of them did.

17  Q.  Let's talk about how you weighted the documentation that

18  Ms. Ramsay submitted in support of her request for

19  accommodations.

20       Did you defer to the comprehensive in-person evaluation by

21  Dr. Smith in reaching your decision?

22  A.  No.  We carefully considered it, but we don't

23  automatically defer to it, no.

24  Q.  I'm not asking if you do it automatically.  I'm talking

25  about your end result.

FARMER - CROSS

1   A.   No.

2   Q.   Did you defer to his, Dr. Smith's, conclusions?

3   A.   No.

4   Q.   Did you defer to the conclusions of any of the other

5   individuals who provided -- who tested Ms. Ramsay?

6   A.   No.

7   Q.   Did you refer to the report of Dr. Lewandowski?

8   A.   I'm sorry?

9   Q.   Did you defer to the report of Dr. Lewandowski?

10  A.   No.

11  Q.   And he had examined Ms. Ramsay.  Correct?

12  A.   Correct.

13  Q.   Did you defer to the documentation provided by Mr.

14  Livingston?

15  A.   No.

16  Q.   Did you defer to the documentation provided by Dr. Smiy?

17  A.   No.

18  Q.   Did you defer to the documentation provided by

19  Dr. Ruekberg?

20  A.   No.

21  Q.   Did you defer to the documentation provided by Dr. Tanguay

22  referencing evaluations that were done of Ms. Ramsay when she

23  was in early elementary school?

24  A.   I believe that was the optometrist who diagnosed vision

25  impairments?  I don't recall that she made any --

FARMER - CROSS

1  Q.   Do you recall that Dr. Tanguay, when she was a child in

2  early elementary school, did testing as an optometrist and

3  concluded that her reading time was slow?   Do you recall that?

4  A.   Initially, yes.

5  Q.   Did you defer to that?

6  A.   No.

7  Q.   If you could turn, please, to plaintiff's exhibit binder.

8  And I'm going to be asking you about Exhibit 34.

9         THE COURT:   It's all right.

10        THE WITNESS:   I'm sorry, Your Honor.

11        THE COURT:   You're looking for plaintiff's exhibit --

12        THE WITNESS:   I am, Your Honor.

13        THE COURT:   Here.

14        THE WITNESS:   Thank you.

15        THE COURT:   Sure.   There's one down there.

16  BY MS. VARGAS:

17  Q.   Let me know when you're ready.   It's Exhibit 34, please.

18  A.   34.   I have it.

19  Q.   Have you seen this before?

20  A.   This is the PowerPoint presentation, is that what you're

21  referring to?

22  Q.   Yes.

23  A.   I have.

24  Q.   And what was the title of this PowerPoint?

25  A.   ADA Legal Update for NBME and Its Outside Consultants by

1  Robert Burgoyne.

2  Q.   And do you see at the top right of the first PowerPoint

3  slide Norton Rose Fulbright.

4       Is that who prepared this PowerPoint presentation?

5  A.   That is the law firm that Mr. Burgoyne worked --

6  Q.   That Mr. Burgoyne works for?

7  A.   At the time, yes.

8  Q.   And how is this PowerPoint used?

9  A.   This was a presentation to a meeting of our consultants,

10 our disability consultants, in December 2016.

11 Q.   And why was this PowerPoint presentation shown to your

12 outside consultants?

13 A.   This is information that we asked Mr. Burgoyne to present

14 on the ADA for their information.

15 Q.   Why was it important for the outside consultants to have

16 information about the ADA?

17 A.   They're making reviews of requests for accommodations

18 on -- for the USMLE examination.  This is information they are

19 very interested in.

20 Q.   If you can turn, please, in that same exhibit to page 4.

21 And if you could read that page for me, please.

22 A.   "DOJ's implementing regulations," that one?

23 Q.   Yes.

24 A.   Any private entity offering an examination covered by this

25 section must assure that the examination is selected and

1   administered so as to best ensure that when the examination is

2   administered to an individual with a disability that impairs

3   sensory, manual or speaking skills, the examination results

4   accurately reflect the individual's aptitude or achievement

5   level or whatever other factor the examination purports to

6   measure, rather than reflecting the individual's impaired

7   sensory, manual or speaking skills, except where those skills

8   are the factors that the examination purports to measure.

9   Q.   Do you believe that's an accurate statement of the

10  regulations as the NBME applies it to its review of requests

11  for accommodations?

12  A.   Yes.

13  Q.   What did the NBME do to best ensure that Ms. Ramsay's test

14  results showed her ability rather than her disability?

15          MR. BURGOYNE:   Your Honor, I'm going to object.   She's

16  skipping a step in the process here.   This regulation

17  applies -- of course she's asking her about a regulation.   This

18  regulation applies only if you first determined that the

19  individual has a disability.   And it's at that point that

20  you're obligated to best ensure that the exam measures what

21  you're attempting to measure and not the disability.

22          So until NBME decides --

23          THE COURT:   Can this witness answer that?

24          MR. BURGOYNE:   Pardon me?

25          THE COURT:   Can't the witness testify?

FARMER - CROSS

1          MR. BURGOYNE:  She's not an attorney, Your Honor.  I

2   just don't want there to be this line of questions regarding

3   what the ADA requires.  And I don't believe that's within her

4   central purview.

5          THE COURT:  Then she can tell us that.  She's a

6   professional.

7          MR. BURGOYNE:  Thank you, Your Honor.

8          THE COURT:  Your objection is noted as overruled.

9          THE WITNESS:  I'm sorry, would you restate the

10  question?

11         MS. VARGAS:  Could we read the question back, please.

12         (The court reporter read the requested portion of the

13  record.)

14         THE WITNESS:  We did not make a finding that Ms.

15  Ramsay had a disability within the meaning of the ADA.

16  BY MS. VARGAS:

17  Q.   So do I understand your answer to mean that you never

18  applied the regulation that would require you to best ensure

19  that her test results reflected ability rather than disability?

20  A.   Not any more or less than we expect the exam for all

21  examinees will reflect their ability.  In other words, she had

22  a standard examination.

23  Q.   Turning to page 7 of that document, 7 of 35.

24         Could you read me, starting at section 1 of the DOJ

25  implementing regulation.

1   A.   Any private entity offering an examination covered by this

2   section must assure that when considering requests for

3   accommodations, the entity gives considerable weight to

4   documentation of past modifications, accommodations or

5   auxiliary aids or services received in similar testing

6   situations, as well as such modifications, accommodations or

7   related aids and services provided in response to an

8   individualized education program or IEP or a plan describing

9   the services provided pursuant to a Section 504 plan.

10  Q.   So do you see where in the middle of what you just read

11  the words "similar testing situations" is bold?

12  A.   Yes.

13  Q.   Why was that put into bold, do you know?

14  A.   I did not prepare these slides, no.

15  Q.   So would the fact that Ms. Ramsay had extended time on

16  NBME shelf exams, would that be a similar testing situation?

17  A.   Perhaps, yes.

18  Q.   Did you give considerable weight to that?

19  A.   Yes.

20  Q.   How did you give considerable weight to that?

21  A.   We noted it.  That was documentation she provided.

22  Q.   Beyond noting that she provided that documentation, how

23  did you give considerable weight to the fact that she had

24  received double time on the NBME shelf exams?

25  A.   We gave considerable weight to all of the documentation

FARMER - CROSS

1   that she provided, including the scores on measures that she

2   did not receive accommodations, such as the MCAT and the ACT.

3   Q.   Turning to the next page, page 8 of 35.

4        It says that the entity responds -- any private entity

5   offering an examination covered by this section must assure

6   that the entity responds in a timely manner to requests for

7   modifications, accommodations, et cetera.

8        Did you respond in a timely manner to Ms. Ramsay's request

9   for accommodation?

10  A.   I believe so, yes.

11  Q.   Turning to page 10 and 11 of this exhibit, what's the

12  import of these pages in the presentation for the consultants?

13  A.   Again, I did not prepare these slides, so I don't know why

14  they were included other than for our information and

15  discussion.

16  Q.   Are you responsible for the consultants at the NBME

17  dealing with requests for accommodation?

18  A.   Yes.

19  Q.   Do you think it was important for them to know about the

20  US Department of Justice's ADA rulemaking?

21  A.   Again, we asked Mr. Burgoyne to make a presentation on

22  what was happening in the legal environment at the time.

23  Q.   And I believe page 11 is talking about what was happening

24  in the legal environment at the time.

25       What was that?  What was happening that you're

FARMER - CROSS

1   referencing?

2   A.   I'm sorry, I'm missing your question, what was happening

3   at the time.

4   Q.   I can ask it differently.

5        What was the import of the ADA Amendments Acts on the

6   definition of disability in your role, if you can answer as the

7   ADA compliance officer for the defendant?

8   A.   I'm sorry, I'm still not understanding the question that

9   you're asking.  What was the import of it?

10  Q.   Right.  What changed in terms of the definition of

11  disability with the passage of the ADA Amendments Act?

12  A.   So the definition didn't change much.  It was still a

13  substantial limitation in a major life activity compared to

14  most people in the general population.  The amendments added

15  things like enumerating major life activities that weren't in

16  the previous versions, talked about mitigating measures.  So

17  there were a number of things that were updated in the

18  regulations to comport with the Amendments Act.

19  Q.   What was the purpose, the Congressional purpose, behind

20  passage of the ADA Amendments Act?

21       What was the Congressional purpose?

22  A.   I'm going to fix this first.

23       The Congressional purpose of the Amendments Act?

24  Q.   Yes.

25  A.   It was to ensure that there was broad coverage of the ADA,

FARMER - CROSS

1  the Americans with Disabilities Act.

2  Q.   I believe you testified in deposition that the purpose of

3  the ADA Amendments Act was to -- in response to Supreme Court

4  decisions.  Correct?

5  A.   That was true as well, yes.

6  Q.   And that the Congressional intent in amending the ADA was

7  so that the determination of whether somebody has or doesn't

8  have a disability should not be demanding extensive analysis;

9  is that correct?

10 A.   That's true.  Right.  It did not require a demanding

11 standard.  Yes.

12 Q.   And did the NBME oppose that change to the law?

13 A.   Not that I'm aware of.

14 Q.   Looking at the very top of this document that I've showed

15 you, do you see where it says the National Board of Medical

16 Examiners?

17 A.   I do.

18 Q.   And what is the date on this document?

19 A.   July 14, 2008.

20 Q.   And who is this letter addressed to?

21 A.   This is to Senators Kennedy, Harkins, Specter, Stevens and

22 Enzi.

23 Q.   And what was the subject line?  It says regarding.  What

24 was that?  What was it regarding?

25 A.   The ADA Restoration Act of 2007.

1  Q.   Have you seen this document before?

2  A.   It looks familiar.

3  Q.   So you wouldn't be surprised to learn that prior to

4  passage of the ADA Amendments Act, the NBME objected to exactly

5  the definition of disability that is being used against Ms.

6  Ramsay.   Correct?

7            MR. BURGOYNE:   I'm not sure that's an accurate

8  characterization, Your Honor, but obviously the letter says

9  whatever it says.

10           THE COURT:   Very well.   And I'll interpret it pursuant

11  to what it says.   All right.

12           And this letter has not -- this exhibit has not been

13  marked as an exhibit.   You've just shown her a document.

14           MS. VARGAS:   Thank you, Your Honor.   I would like to

15  mark it as an exhibit.

16           THE COURT:   Would you like to give it a number or a

17  letter.

18           MS. VARGAS:   Number 40.

19           THE COURT:   What is it?

20           MS. VARGAS:   Number 40.

21           THE COURT:   And write it on there or put a sticker on

22  it.

23           MS. VARGAS:   May I just write it on hers?

24           THE COURT:   Sure.

25  BY MS. VARGAS:

FARMER - CROSS

1  Q.   So after the NBME submitted this letter, the ADA Amendment

2  Act were passed, correct, and broadened the definition of

3  disability?

4  A.   Again, I'm not sure that it broadened the definition of a

5  disability.  Many things were included or changed, but the

6  definition remained a physical or mental impairment that

7  substantially limits a major life activity.

8  Q.   But you agree that the Congressional purpose in amending

9  the ADA was so that the determination of whether an individual

10 had a disability would not, quote, demand extensive analysis?

11 A.   So that it did not include a demanding standard, that's

12 correct.

13 Q.   So Congress rejected the NBME's position in passing the

14 ADA Amendments Act.  Correct?

15       THE COURT:  If you know.

16       THE WITNESS:  I don't know.  I could not answer that

17 question.

18 BY MS. VARGAS:

19 Q.   So then after passage of the ADA Amendments Act, are you

20 aware that the Department of Justice held notice and comment,

21 rulemaking?

22 A.   Yes.

23 Q.   And did the NBME submit comments to the notice and

24 comment, rulemaking on the ADA Amendments Act?

25 A.   I don't know.  Not that I'm aware.

1          THE COURT:  Why don't we put an exhibit number on it

2    prior to showing it to the witness.

3          MS. VARGAS:  41?

4          MR. BERGER:  Yes.

5          THE COURT:  This is normally done before court.

6          MS. VARGAS:  Apologies.

7          THE COURT:  That's all right.

8    BY MS. VARGAS:

9    Q.   Have you seen this letter before?

10   A.   One moment.  I just need to make space.

11        May I take a moment?

12   Q.   Absolutely.

13   A.   I can't say for sure whether I've seen it before.  It's

14   dated 2014.

15   Q.   And what letterhead is this letter on?

16   A.   Norton Rose Fulbright.

17   Q.   And is that Mr. Burgoyne's letterhead?

18   A.   It is the former law firm, yes.

19   Q.   And turning to the last page of this document, can you

20   tell me who signed it as having written it?

21   A.   Robert A. Burgoyne.

22   Q.   If you could please turn -- you agree that the subject of

23   the letter dated March 31, 2014 says:  ADA notice of proposed

24   rulemaking.  Correct?

25   A.   It does.

1   Q.   So would you agree that this is the NBME's comments as

2   part of the notice of proposed rulemaking for the ADA

3   Amendments Act?

4   A.   It looks like it lists a number of testing organizations,

5   yes.

6   Q.   But the NBME was one of them?

7   A.   It is.

8   Q.   And it was written by your lawyer.  Correct?

9   A.   That's correct.

10  Q.   And you see on the second page, the National Board of

11  Medical Examiners is described and listed as a signatory to the

12  letter.  Correct?

13  A.   I see that, yes.

14  Q.   Turning to page 5 of this document, could you read the

15  last paragraph, please.

16  A.   DOJ's first rule of construction states that substantially

17  limits is not meant to be a demanding standard.  This language

18  goes too far in implementing Congress's intent to broaden

19  coverage under the ADA.  It suggests incorrectly that

20  substantially limits is a negligible requirement and conflicts

21  with the more common sense, ordinary meaning of substantial.

22  Q.   Thank you.  And if you could please turn to page 7.

23       About in the middle of the page do you see the paragraph

24  that begins "the testing entities"?

25  A.   Yes.

1  Q.   Could you read that, please.

2  A.   The testing entities.   The testing entities have no

3  suggested changes to either of these proposed rules.   They are

4  concerned, however, about the following statements made by DOJ

5  in discussing the proposed rules.

6       Learned behavioral or adaptive neurological modifications

7  include those strategies developed by an individual to lessen

8  the impact of an impairment.   Reasonable modifications include

9  informal or undocumented accommodations and modifications as

10  well as those provided through a formal process.

11  Self-mitigating measures or undocumented modifications or

12  accommodations or students with impairments that affect

13  learning, reading or concentrating may include measures such as

14  devoting a far larger portion of the day, weekends and/or

15  holidays to study than students without disabilities.   Teaching

16  one's self strategies to facilitate reading connected texts or

17  mnemonics to remember facts, receiving extra time to complete

18  tests, receiving modified homework assignments or being

19  permitted to take exams in a different format or in a less

20  stressful or anxiety-provoking setting, each of these

21  mitigating measures, whether formal or informal, documented or

22  undocumented, can lessen the impact of or improve the academic

23  function of a student having to deal with a substantial

24  limitation in a major life activity such as concentrating,

25  reading, speaking, learning or writing.   Nevertheless, these

1   are only temporary supports.  The individual still has a

2   substantial limitation in a major life activity and would be a

3   person with a disability under the ADA.

4   Q.   Okay.  I'll just stop you there.

5   A.   Thank you.

6   Q.   Is it fair to say that the NBME's comment, which begins

7   right after that extensive quote, is that these comments are

8   problematic?  That was the NBME's position, the consideration

9   of self-mitigation?

10         MR. BURGOYNE:  Your Honor, again, she's already said

11   she doesn't know -- she doesn't have familiarity with this

12   letter.  The letter again says whatever it says.

13         THE COURT:  And the document will speak for itself as

14   best evidence.

15         THE WITNESS:  Excuse me.  I'm parched now, Your Honor.

16         THE COURT:  That's all right.

17         MR. BURGOYNE:  Again, I guess our objection is to

18   having her walk through a letter that she has not testified

19   she's seen previously and asking her to read text that Your

20   Honor is going to have the time and opportunity to read.

21         THE COURT:  Fine.  But there's another aspect of that,

22   Counsel, also.  It's the defendant's stated position in that

23   letter that counsel is bringing out.

24         MR. BURGOYNE:  No objection to that, Your Honor.  If

25   she wants to ask a question about it, that's fine, just to the

FARMER - CROSS

1    extent she has knowledge of it.

2         THE COURT:  Very well.  Moving on.

3    BY MS. VARGAS:

4    Q.   Turning to page 8, do you see the fifth paragraph down

5    that begins with "DOJ should"?

6    A.   Yes.

7    Q.   Do you agree that in this paragraph, the NBME was asking

8    the DOJ to consider disability with the mitigating measures

9    rather than whether somebody had a substantial limitation

10   without mitigating measures?

11   A.   I'm going to read it real quick first before I answer.

12        So I believe this is saying, if I'm reading this

13   correctly, DOJ should also add a regulation that notes that --

14   is that the sentence you're talking about?

15   Q.   Yes.

16   A.   Although mitigating measures are not to be considered in

17   assessing whether a person has a disability, it is appropriate

18   to consider such measures in determining whether accommodations

19   are needed.  The purpose of accommodation --

20   Q.   If I could just interrupt you, you're reading the NBME's

21   position, not the DOJ's position.  Correct?

22   A.   Again, I haven't read the entire document, so I'm kind of

23   out of context here.

24   Q.   Fair enough.

25   A.   I'm guessing it was all of the organizations represented

FARMER - CROSS

1   in this letter.

2   Q.   Turning to page 10, do you see where it says Section 5?

3   A.   So I know, page 10, Section --

4   Q.   It's about halfway down the page, it says Section 5 and

5   then it has the regulation cite on page 10?

6   A.   I'm sorry, you may have to indulge me here where that is.

7   Section 5?

8   Q.   The paragraph starts with "DOJ's discussion."

9   A.   I see that.

10   Q.   If you could please read that section out loud.

11   A.   -- DOJ's discussion --

12   Q.   Yes.

13   A.   -- of the condition, manner and duration, in quotes,

14   concept of Section 36.105D3, Subsection 3, includes the

15   following language:  In determining whether an individual has a

16   disability under the, quote, actual disability or, quote,

17   record of prongs of the definition of disability, the focus is

18   on how a major life activity is substantially limited and not

19   on what outcomes an individual can achieve.  For example,

20   someone with a learning disability may achieve a high level of

21   academic success but may nevertheless be substantially limited

22   in one or more major life activities, including, but not

23   limited to, reading, writing, speaking or learning because of

24   the additional time or effort he or she must spend to read,

25   write, speak or learn compared to most people in the general

FARMER - CROSS

1   population.

2   Q.   And if you could just read the first sentence, what the

3   NBME had to say about that regulation.

4   A.   This language discounts the relevance of an individual's,

5   quote, high level of academic success.

6   Q.   So would you agree that the NBME is asking DOJ to make a

7   student's high level of academic success a consideration in

8   determining whether they have a disability?

9   A.   Again, this letter speaks for itself.  I can't comment one

10  way or the other on it.

11  Q.   Turning to page 11, if you could read that to yourself.

12  You don't need to read it out loud.

13  A.   Read what?

14  Q.   Page 11, Section D.

15  A.   Okay.  It's about DOJ providing technical assistance, that

16  paragraph?

17  Q.   Would you agree that in this section, Mr. Burgoyne on

18  behalf of the NBME and other testing entities is asking the DOJ

19  to issue technical assistance on testing accommodations?

20  A.   Again, I wouldn't interpret this to mean anything other

21  than what it says.

22  Q.   Just using common sense, if you look at the first sentence

23  of the last paragraph, the testing entities believe that DOJ

24  should issue a supplemental NPRM that proposes clear and

25  balanced regulations on referenced topics.

FARMER - CROSS

1      First paragraph, faults DOJ for not issuing new technical

2   assistance on testing accommodations.  And the paragraph below

3   that, to the best of our knowledge, no additional technical

4   assistance on any of the reference subjects has been posted by

5   DOJ.  The testing entities had hoped that DOJ would address at

6   least some of these subjects.

7           THE COURT:  Is that what it states?

8           THE WITNESS:  That is what it says.

9           THE COURT:  Okay.  Moving on.

10          MR. BURGOYNE:  Just to point out, Your Honor, it was

11  the Government Ability Office that criticized DOJ for not

12  issuing technical guidance.  It wasn't the testing agency.  And

13  that's what I was following up on.

14          THE COURT:  You'll have the opportunity to put that on

15  the record.

16          Anything else?

17          MS. VARGAS:  Yes.

18  BY MS. VARGAS:

19  Q.  Turning back to Exhibit 34, page 11.

20          MR. BURGOYNE:  Your Honor, I'll just note that we're

21  getting a series of exhibits that weren't designated in advance

22  of this hearing and which are not in fact impeachment exhibits.

23          THE COURT:  Is that an objection?

24          MR. BURGOYNE:  That is the objection, Your Honor.  We

25  went through the exercise of exchanging exhibits in advance of

1   this hearing, and obviously it would have been appreciated to

2   get some of these.

3            THE COURT:  Most definitely.

4            MR. BURGOYNE:  They say whatever they say.

5            MS. VARGAS:  Can I respond?

6            THE COURT:  Yes.  For sure.  I will give you an

7   opportunity.

8            MS. VARGAS:  This is the Federal Register, and I'm

9   asking about it because it goes directly to the information

10  that is provided in Exhibit 34 to train the consultants who

11  evaluated Ms. Ramsay.

12           THE COURT:  But it's still considered an exhibit.

13  Isn't that correct, Counsel?

14           MS. VARGAS:  Yes.

15           THE COURT:  That you want to show this witness.

16  Right?

17           MS. VARGAS:  Yes, please.

18           THE COURT:  Shouldn't they have had an opportunity to

19  be given that exhibit before this hearing?

20           MS. VARGAS:  This is impeachment material, so I'm not

21  sure that we needed to provide this in advance in the same way

22  they didn't need to provide the summaries they created.

23           THE COURT:  This is impeachment material?

24           MS. VARGAS:  Yes, it is.

25           THE COURT:  Or is it defining what is already in

1   another document?

2           MS. VARGAS:  I believe that it's impeachment.

3           THE COURT:  We'll see.

4           THE WITNESS:  I'm sorry, which exhibit are we?

5           MS. VARGAS:  I'll bring it to you.

6           THE COURT:  As a matter of fact, why don't we take our

7   break now before we get started.  It's lunchtime.  We'll be in

8   recess until 1:30.

9           And ma'am, I'll remind you, Ms. Farmer, that you're

10  under cross-examination and as such you cannot discuss your

11  testimony with counsel for defendant.  You can talk about

12  anything else, but not your testimony and your responses

13  thereto.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  We're in recess.

16          (Luncheon recess at 12:43 p.m. until 1:32 p.m.)

17          THE COURT:  Good afternoon.

18          RESPONSE:  Good afternoon, Your Honor.

19          THE COURT:  Let's proceed.

20          And I'll remind you you're still under oath after

21  previously being sworn in.  Let us proceed.

22          THE WITNESS:  Yes, Your Honor.

23  BY MS. VARGAS:

24  Q.  Good afternoon, Dr. Farmer.

25  A.  Good afternoon.

FARMER - CROSS

1  Q.   Did you communicate with counsel during lunch break?

2  A.   No.

3  Q.   Not at all?

4  A.   We had some words, yes.

5  Q.   So you did communicate with counsel during lunch break?

6  A.   Yes.

7  Q.   Exhibit 34, in plaintiff's exhibit binder, could you

8  please turn to the first page of that exhibit.

9  A.   The first page?

10  Q.   The first page.  If you could, what is the date on --

11  we're looking at the PowerPoint that was used, you testified,

12  to train outside consultants.  What's the date on this

13  PowerPoint?

14  A.   December 5, 2016.

15  Q.   So this PowerPoint was training consultants after passage

16  after the ADA Amendments Act.  Correct?

17  A.   It was presented at a meeting after that, yes.

18  Q.   And it was also after the Department of Justice issued its

19  final regulations for the ADA Amendments Act, wasn't it?

20  A.   Yes.

21  Q.   So turning to page 11, my understanding is that page 11,

22  page 12, a few pages after that, beginning on page 11, this is

23  training the consultants about the results of the new

24  regulations that had just come out.  Correct?

25  A.   It's informing them about that, yes.

FARMER - CROSS

1   Q.   And again, you testified earlier that the Congressional

2   intent behind passage of the ADA Amendments Act was so that

3   determination of disability wouldn't take substantial analysis.

4   Correct?

5   A.   Right.   That it didn't require a demanding standard.

6   Q.   So looking at the fifth bullet down, could you read that

7   to me, please?

8   A.   On which page?

9   Q.   I'm sorry, on page 11.

10  A.   Notice stated that many ADHD diagnoses may not meet the

11  clinical definition and thus would not qualify for an

12  accommodation under the revised definition of disability

13  (prompting DOJ to reduce its estimate of the number of

14  individuals with ADHD by 30 percent.)

15  Q.   So I understand the part in parentheses there at the end

16  to be -- correct me if I'm wrong -- that DOJ in its final rule

17  corrected some calculations on what they anticipated the number

18  of individuals with ADHD to be.   Correct?

19  A.   Perhaps.   I'm not exactly sure what this refers to.

20  Q.   But in terms of training your consultants about what the

21  import was of the new law and the new regulations that had just

22  gone into effect, do you think the most important thing to

23  teach them was that many ADHD diagnoses may not meet the

24  clinical definition and thus would not qualify for an

25  accommodation?

FARMER - CROSS

1  A.   No, it's not the most important thing.

2  Q.   In fact, that's really directly contrary to the entire

3  point of the law and regulations, wasn't it?

4  A.   Again, I didn't prepare these, so I didn't put any import

5  on one bullet or another.   This was a presentation.

6  Q.   So this was prepared by Mr. Burgoyne, your counsel?

7  A.   Uh-huh.

8  Q.   Or NBME's counsel?

9  A.   Correct.

10  Q.   Correct?

11  A.   (Witness nods head.)

12  Q.   Do you train consultants not to send emails to the NBME?

13  A.   No, not necessarily.

14  Q.   Could you turn to page 33 of this exhibit and read me the

15  last two lines.

16  A.   I'm sorry?

17  Q.   Page 33.   The heading is Usual Advice, Usual Advice for

18  External Reviewers.

19      And the fourth bullet, what was your usual advice for your

20  consultants?

21  A.   It reads:   Emails are particularly challenging because of

22  their informality.

23  Q.   What did you mean by that?

24  A.   I did not author this, so I don't know.

25  Q.   What did it mean to you?

FARMER - CROSS

1  A.   We ask for -- at least for the National Board our

2  reviewers submit something through their full review with all

3  of the information in it.

4       For me this means don't send it as an email, send it

5  through our official system that's a secure portal, it's not

6  informal.  Secure.

7  Q.   So I believe you've testified that the NBME has a system

8  of any time a person is represented by counsel, their file is

9  transferred to you.  Correct?

10  A.   Correct.

11  Q.   And the NBME has a system of saying, emails are

12  particularly challenging because of informality.  So you have

13  reviewers --

14       MR. BURGOYNE:  Your Honor, we've established multiple

15  times, I wrote this document.  NBME didn't write this document.

16       THE COURT:  She's asking a general question now.

17       MR. BURGOYNE:  Okay.

18       THE COURT:  Your objection is overruled.

19       You can complete your question, if there was a

20  question.

21  BY MS. VARGAS:

22  Q.   So instead of having your consultants email to communicate

23  with you, you testified in deposition that you have them call

24  you or you call them; is that correct?

25  A.   No.  They submit their review, their written review --

1    they upload it to a secure portal so we get the written review.

2    Q.   Do you recall testifying in deposition that you

3    communicate with your consultants sometimes by telephone?

4    A.   Oh, yes, uh-huh.

5    Q.   Turning back to page 11 of the PowerPoint, and it goes

6    through a few pages after that, up to page -- up to and

7    including page 15 where this PowerPoint is training consultants

8    on the DOJ's new rulemaking, do you see anywhere in that

9    training about the ADA rulemaking, do you see anywhere where it

10   says anything about disability not demanding extensive

11   analysis?

12   A.   Again, Ms. Vargas, it says what it says, so I -- if it's

13   not --

14   Q.   It's not there.  Correct?

15   A.   If it's not on the page, it's not on the page.

16   Q.   So the new regulations to the ADA Amendments Act, they

17   didn't go into effect until October of 2016.  Correct?

18   A.   I believe so.  I don't recall exactly.

19   Q.   So is it possible that students who were taking

20   standardized tests prior to the new law and then the new

21   regulations going into effect might have had a different result

22   had they requested accommodation than students submitting after

23   the change in the law and regulations?

24   A.   Because of what?  Because of --

25   Q.   Because the law changed?

FARMER - CROSS

1  A.   I don't know if it's possible -- you're asking would they

2  have had a different outcome if it was in a different -- you

3  know, the old or the new regulations?   Is that what you're

4  asking?

5  Q.   Yes.

6  A.   I don't know.

7  Q.   Would disability have been determined for a student

8  requesting testing accommodations differently prior to the new

9  regulations going into effect on the ADA Amendments Act?

10 A.   It would have in terms of, again, what the changes were in

11 the revisions to the regulations and the ADA amendments had to

12 do with delineating additional information about what major

13 life activities were, what mitigating measures were, when they

14 could be used.   So yes, things could have been different before

15 than after.

16 Q.   In this section on the ADA rulemaking, does it anywhere

17 say that the DOJ rejected the NBME's request to focus on or add

18 language about the importance of outcomes, tests and

19 standardized tests and grades and that kind of thing?   Do you

20 tell the consultants any of that here?

21 A.   I don't know.   I'm not familiar with all of the

22 information that's in the pages.

23      If you'd like me to review it or --

24 Q.   Sure.   It would be I believe pages 11 through 15.

25 A.   And again your question was, does it say what?

FARMER - CROSS

1   Q.   Does it inform the consultants, does it train the

2   consultants that the NBME's request to focus on grades and

3   performance on standardized tests, on outcomes, was explicitly

4   rejected by the Department of Justice in adopting the

5   regulations?

6   A.   I don't see anything to that effect.

7   Q.   Is it true that the Department of Justice explicitly

8   rejected Mr. Burgoyne's and the NBME's request to focus on and

9   add language about outcomes and grades and standardized test

10  performance in assessing a student's request for

11  accommodations?

12  A.   Again, I'm not sure if that's what the National Board

13  requested and I'm not sure what the Department of Justice

14  rejected or accepted.

15          MS. VARGAS:   Your Honor, I only have one question

16  about this document that we were just discussing prior to

17  lunch.

18          THE COURT:   What document is that?

19          MS. VARGAS:   It was the Federal Register cite that

20  goes directly to what this witness is testifying about right

21  now.

22          THE COURT:   And you said that goes to -- what's the

23  purpose of it?

24          MS. VARGAS:   May I read it?

25          THE COURT:   This is a document that you failed to give

1    opposing counsel because you say it's impeachment evidence?

2         MS. VARGAS:  This Federal Register cite is.  However,

3    the other documents that were part of this we did not receive

4    in discovery from defendants, and we literally found them at

5    1:00 in the morning last night, so that's why they weren't

6    disclosed earlier.  And we would have been happy to disclose

7    and we certainly would have had they produced them, but they

8    didn't.

9         MR. BURGOYNE:  They were never the subject of a

10   request that we did not respond to either by saying here's what

11   we're going to produce or these are relevant.  They don't have

12   anything to do with Jessica Ramsay's accommodation process.

13   And those were the documents we produced on an expedited basis

14   in connection with this hearing.

15        THE COURT:  Well, I'm going to overrule your objection

16   at this time.  I'll allow you to ask the question.  I'll

17   determine during the course of my deliberations and

18   determination in this case whether to accept or reject it in

19   whole or in part.

20        MS. VARGAS:  Thank you.

21   BY MS. VARGAS:

22   Q.   I'm showing you what's been marked as Exhibit 42, Dr.

23   Farmer.

24        Have you seen this document before?

25   A.   Yes.

FARMER - CROSS

1  Q.   What is it?

2  A.   It is the Federal Register Volume 81, Number 155,

3  Thursday, August 11, 2016, Rules and Regulations.

4  Q.   Is this the final rule adopting the regulations

5  implementing the ADA Amendments Act?

6  A.   Final as of August 11, 2016, yes.

7  Q.   If you could please turn to page 53237.

8  A.   53237?

9  Q.   Correct.

10  A.   I have it.

11  Q.   And if you look at the second paragraph beginning with

12  "organizations," could you read that, please, the first few

13  sentences?

14  A.   Organizations representing testing and educational

15  entities asked the department to add regulatory language

16  including that tested related --

17  Q.   I'm sorry, I think that was misread.

18       Would you mind taking a look at that again?

19  A.   I'm sorry, it's a little -- small print.

20       Organizations representing testing and educational

21  entities asked the department to add regulatory language

22  indicating that testing-related outcomes such as grades and

23  test scores are relevant to disability determination under the

24  ADA.  The department has considered this proposal and declines

25  to adopt it because it is inconsistent with Congressional

FARMER - CROSS

1    intent.

2    Q.   Okay.   Thank you.   You don't need to read any more.

3         So my question is, did you train your consultants, the

4    ones who evaluated Ms. Ramsay's request for accommodation, that

5    the Department of Justice had specifically rejected a reliance

6    on standardized test scores and grades in determining

7    disability?

8    A.   No.

9    Q.   Why not?

10   A.   You know, again, what we're training them to do, we're

11   asking the consultants to do as professionals in medicine,

12   psychology, is to review the documentation and to make a

13   determination of whether the individual has a substantial

14   limitation in a major life activity.

15        So their area of expertise is -- we're asking for their

16   clinical expertise, not to make a legal decision or even a

17   decision about accommodations, just to answer the questions

18   about whether the documentation supported the diagnoses that

19   were assigned, demonstrated impairment that substantially

20   limited a person in a major life activity compared to most

21   people, and if the accommodations that were requested seemed to

22   be supported.

23   Q.   And turning to page 21 of this document --

24   A.   I'm sorry, 21 of which document now?

25   Q.   Exhibit 34, I'm sorry.

FARMER - CROSS

1  A.   I have it.

2  Q.   Does the NBME comply with the DOJ's technical assistance

3  on testing accommodations?

4  A.   My understanding is that the technical assistance does not

5  supersede the ADA Amendments Act itself or the regulations.

6  It's technical assistance.  It's not law or regulation.

7  Q.   But that's not what I asked.  What I asked was:  Does the

8  NBME comply with the Department of Justice's technical

9  assistance on testing accommodations when it evaluates requests

10  like Ms. Ramsay's?

11  A.   So again, we review it, we understand that it is to

12  make -- to have assistance, but we comply with the law and the

13  regulations.

14  Q.   Let me ask you a yes or no question.

15  A.   Uh-huh.

16  Q.   Does the NBME follow the DOJ technical assistance on

17  testing accommodations when it evaluates student requests for

18  accommodations?

19  A.   In what regard?  Because nothing everything in there --

20  I'm sorry.  No.  Not everything in there is something that we

21  can do.

22  Q.   So I believe you testified earlier that you were familiar

23  with Mr. Burgoyne's letter of March 2014 as part of the

24  rulemaking on behalf of the NBME?

25  A.   The 2008 letter?

FARMER - CROSS

1  Q.   No.   The 2014 letter by Mr. Burgoyne on behalf of the NBMF

2  about disability and testing accommodations.   And you are the

3  ADA compliance officer and in charge of disability

4  accommodation requests at the NBME.   Correct?

5  A.   I am.

6  Q.   And you're familiar with the 2014 letter from Mr. Burgoyne

7  on behalf of the NBME that we discussed earlier.   Correct?

8  A.   Again, I believe I may have seen it at the time.   I don't

9  recall.

10  Q.   And we talked earlier about the fact that on behalf of the

11  NBME, Mr. Burgoyne -- and he noted the GAO had talked about

12  need for technical assistance on testing accommodations.   But

13  then he went a step further and said that it was needed, that

14  the NBME wanted technical assistance on testing accommodations.

15  Correct?

16  A.   I don't recall what he said, I'm sorry.

17  Q.   It says:   The testing entities believe the DOJ should

18  issue supplemental NPRM.   Prior to that, to the best of our

19  knowledge, no additional technical assistance on any of the

20  reference subjects has been posted by DOJ on its website and

21  otherwise released, even though two-and-a-half years have

22  passed.   Since the letter was sent, the testing entities had

23  hoped that DOJ would address at least some of these subjects,

24  but it hasn't done so.

25       So you understood that Mr. Burgoyne was asking the

FARMER - CROSS

1  Department of Justice to issue technical assistance on testing

2  accommodations?

3  A.   Again, I'm not sure what he was asking for, whether -- I

4  haven't read the letter in detail.  It's out of context.  I'm

5  not sure I can answer your question.

6  Q.   Are you aware that at some time after March 31, 2014, the

7  Department of Justice issued technical assistance on testing

8  accommodations?

9  A.   Yes.

10  Q.   And what is your view on whether that technical assistance

11  matters?

12  A.   Well, again, it's not that it doesn't -- on whether it

13  matters.  The technical assistance I believe is addressed to

14  individuals making requests for accommodations.  So it's

15  actually addressed to the individual who is making the request.

16  Q.   So it was something that the NBME wanted until it came

17  out, and then the NBME all of a sudden didn't have to follow it

18  anymore?

19  A.   Again, I'm not sure that the NBME wanted it or asked for

20  it.  I don't...

21  Q.   Turning to page 21 of Exhibit 34 that we're on.

22  A.   21?

23  Q.   21.

24  A.   Uh-huh.

25  Q.   Could you read the heading and first bullet, please.

FARMER - CROSS

1  A.   DOJ's, quote, technical assistance regarding testing

2  accommodations.   First bullet, what is the legal significance

3  of such, quote, technical assistance.

4  Q.   Could you continue reading the rest of the first bullet,

5  please.

6  A.   Sure.   It's not the law in the sense a statute or

7  regulation is law.   It is not entitled to the type of deference

8  that courts generally give to agency interpretations of a

9  statute of their own regulations.   Courts might afford a degree

10  of deference to the agency guidance, or they might disregard

11  the guidance altogether.

12  Q.   And so when I asked you a moment ago about whether the

13  NBME follows that technical assistance on testing

14  accommodations in evaluating, let's say, as Ms. Ramsay's

15  request, you testified no.   And here you're training your

16  examiners that it's not a law in the sense a statute or

17  regulation is.   It's not entitled to deference.   This seems

18  inconsistent, doesn't it, with it Mr. Burgoyne's letter asking

19  the Department of Justice to issue that exact document?

20  A.   I'm not sure if that's what his letter was asking.

21  Q.   Turning to page 22, is there some part of that page that's

22  bolded?

23  A.   Yes.

24  Q.   Do you know if that was something that -- this is not a

25  quotation.   Correct?

FARMER - CROSS

1  A.   I don't know.  I didn't -- I did not prepare this slide.
2  It's not in quotes.
3  Q.   So would you agree that the parts of a presentation that
4  are bolded are the parts that are supposed to be emphasized to
5  the people who are being trained?
6  A.   I imagine some would interpret it that way, sure.
7  Q.   So there's only one thing bolded on this page that's
8  headed DOJ's Technical Assistance.
9       And what part's bolded?
10 A.   In determining whether --
11 Q.   No, that's not bolded.  What part is bolded?
12 A.   I'm getting there.  In determining whether an individual
13 is substantially limited in a major life activity, it may be
14 useful to consider, and then in bold, when compared to most
15 people in the general population the conditions under which the
16 individual performs the activity or the manner in which the
17 activity is performed.
18 Q.   So you're familiar with the DOJ technical assistance on
19 testing accommodations?
20 A.   I am.
21 Q.   Is it your sense that the most important thing in that
22 document that needed to be bolded for your trainers is when
23 compared to most people in the general population?  There
24 wasn't anything else that was more important to tell your
25 trainers?

FARMER - CROSS

1  A.   Again, I didn't prepare this.  I don't know what the

2  intent was of bolding that.

3  Q.   Turning to page 24.

4        MS. VARGAS:  And I'm almost done, Your Honor.

5        THE WITNESS:  24?

6  BY MS. VARGAS:

7  Q.   Page 24, yes.  Do you agree that this is about the

8  examples of types of documentation that a person could submit?

9  A.   That's what it says, yes.

10 Q.   So let's go through each of them.  It says:

11 Recommendations of qualified professionals.

12       Did Ms. Ramsay submit that?

13 A.   Yes.

14 Q.   It says:  Proof of past testing accommodations.

15       Did Ms. Ramsay submit proof of past testing accommodations

16 on the NBME shelf exams?

17 A.   She did.

18 Q.   And on her medical school exams?

19 A.   Yes.

20 Q.   And in her college training?

21 A.   That's correct.

22 Q.   Then it says:  Observations by educators.

23       Did she submit that?

24 A.   That I don't recall.

25 Q.   You don't recall if she submitted her report cards?

FARMER - CROSS

1   A.   Well, that's not an observation, but she did submit her

2   college transcript and her high school report card, yes.

3   Q.   What about the letter of support from Dr. Houtman, wasn't

4   that an observation by an educator?

5   A.   I believe she was also reporting her -- that she was her

6   physician.

7   Q.   So Dr. Houtman was both a treating source and on the

8   faculty teaching her as a medical student as well.  She had

9   both of those roles?

10  A.   I believe she did.

11  Q.   So they saw this young woman in multiple settings when she

12  was motivated to do her best.  Correct?

13  A.   I would assume so.

14  Q.   And what did Dr. Houtman tell the NBME about her need for

15  accommodations?

16  A.   That she did recommend extra time and breaks.

17  Q.   Did she say that she saw her struggling and she needed the

18  accommodations?

19  A.   I believe so.

20  Q.   What about the letter from Dr. Overton, one of the deans

21  at Western Michigan at the medical school, did Ms. Ramsay

22  submit that to the NBME?

23  A.   I don't recall whether that was submitted or not.

24  Q.   Would it surprise you that a dean at her medical school

25  reported to the NBME that they strongly supported that she

FARMER - CROSS

1   receive the accommodations she needed, including extended time,

2   double time?

3   A.   That wouldn't surprise me, no.

4   Q.   Did Ms. Ramsay submit results of psychoeducational or

5   other professional evaluations?

6   A.   Yes.

7   Q.   Did she submit an applicant's history of diagnosis?

8   A.   Yes.

9   Q.   Did she submit a statement about her history regarding

10  testing accommodations?

11  A.   She did.

12  Q.   So she submitted not one or two but every single bullet of

13  the type of accommodations that the NBME should have

14  considered.   Correct?

15  A.   She did submit documentation that we considered.   That's

16  correct.

17  Q.   And in your deposition you actually admitted that there

18  was nothing Jessie could provide the NBME to prove to you that

19  she needed the accommodations she requested.   Isn't that true?

20  A.   I believe the question was what else could she have

21  provided, and I said I don't know what else that she had that

22  she didn't provide for us that would have demonstrated that she

23  was substantially limited.

24  Q.   I believe I asked you a follow-up question after that.

25       Do you remember that?

FARMER - REDIRECT

1  A.   Not offhand, no.

2  Q.   Do you remember saying that there was nothing?

3  A.   Again, in the context of my original answer, sure, yes.

4       MS. VARGAS:  No further questions.

5       THE COURT:  Any redirect?

6                   REDIRECT EXAMINATION

7  BY MR. BURGOYNE:

8  Q.   Just one very short question.

9       You were asked about the accommodation that you approved

10 for reading out loud.

11      Is that an accommodation that had anything to do with the

12 learning disability diagnosis or the attention deficit

13 diagnosis?

14 A.   No.  It was really just to give official permission so we

15 could tell Prometric that she was allowed to do it.

16      MR. BURGOYNE:  Nothing else, Your Honor.

17      THE COURT:  Very well.  Any redirect -- I mean, any

18 recross in reference to that limited area?

19      MS. VARGAS:  No, Your Honor.

20      THE COURT:  Very good.

21      You may step down now, ma'am, and watch your step.

22      Next witness.

23      MR. BURGOYNE:  I would call, Your Honor, Mike Jodoin

24 to the stand.

25      MICHAEL GLENN JODOIN, after having been duly sworn,

JODOIN - DIRECT

1  was examined and testified as follows:

2          THE COURT:  You may be seated.

3          COURT REPORTER:  For the record, would you state your

4  name.

5          THE WITNESS:  Sure.  Michael Glenn Jodoin.

6          THE COURT:  Will you bring that microphone --

7          THE WITNESS:  Sure.

8          THE COURT:  Perfect.  You may proceed.

9                        DIRECT EXAMINATION

10  BY MR. BURGOYNE:

11  Q.   Mr. Jodoin, would you state your job title, please.

12  A.   I'm vice president for psychometrics and data analysis.

13  Q.   Would you give us a brief summary of your educational

14  background.

15  A.   Sure.  I have bachelor's degrees in mathematics and

16  mathematics education from the University of Alberta; a

17  master's degree in psychometrics and measurement, also from the

18  University of Alberta; a PhD from the University of

19  Massachusetts in psychology but it again focuses on

20  psychometrics.

21  Q.   And what is a short summary of your job responsibilities

22  at the National Board of Medical Examiners?

23  A.   My primary responsibilities are to oversee the processes

24  leading to scoring and score reporting at the NBME.

25  Q.   And does that include scoring and score reporting for the

JODOIN - DIRECT

1   USMLE exams?

2   A.   USMLE and all other exams that the NBME administers.

3   Q.   How many questions are on the Step 1 exam?

4   A.   280.

5   Q.   And are those questions broken into blocks?

6   A.   They are.   Seven blocks.

7   Q.   And how many questions in each block?

8   A.   40.

9   Q.   And how long do examinees have to answer each question?

10  A.   On average 90 seconds.

11  Q.   And are you aware that Jessica Ramsay, the plaintiff in

12  this case, took the Step 1 exam in 2017?

13  A.   I am.

14  Q.   You have two notebooks up there.   Would you find the one

15  that is volume 2 for me?

16         THE COURT:   There's a folder up here.   I don't know if

17  that's it.

18         MR. BURGOYNE:   It's one of the big ones.

19         THE WITNESS:   I've got it.

20  BY MR. BURGOYNE:

21  Q.   You've got it.

22       Have you found Exhibit 71?

23  A.   I have.

24  Q.   What is this document?

25  A.   Pardon me?

JODOIN - DIRECT

1  Q.   What is this document?

2  A.   This is a printout of an Excel document that contains data

3  captured during Jessica's administration.

4  Q.   And that's Jessica's name on the left column?

5  A.   Yep.

6  Q.   And starting -- and then the third column, it says Step 1.

7       So this is outcome data from when she took the Step 1 exam

8  in 2017?

9  A.   Correct.

10 Q.   And then what are the next two columns?

11 A.   The column labeled Examinee Response is the answer that

12 Ms. Ramsay selected during the administration.  The correct

13 answer is the response that's keyed for that item.

14 Q.   And then explain the next column.

15 A.   The item duration column is a record of the number of

16 seconds that that item was up on Ms. Ramsay's computer screen

17 during the administration.

18 Q.   And explain so we have a careful understanding.  If an

19 examinee gets to a question, looks at it on their screen, do

20 they have the ability to mark it and then come back to it

21 afterwards?

22 A.   So the interface --

23       MR. BERGER:  Objection, lack of foundation.

24       THE COURT:  Do you want to establish some foundation

25 as to how he knows that?

1          MR. BURGOYNE:  Sure.  I'd be happy to, Your Honor.

2          THE COURT:  Sure.

3    BY MR. BURGOYNE:

4    Q.   Mr. Jodoin, you're familiar with the NBME's relationship

5    with Prometric?

6    A.   I am.

7    Q.   And is Prometric your test vendor?

8    A.   They are.

9    Q.   As your test vendor, does Prometric, as part of the

10   computer-based test administration, capture electronic data

11   relating to the examinee's performance?

12   A.   The software that delivers the -- the software that

13   delivers the test is actually NBME software that is operated

14   within the Prometric Test Center.

15   Q.   So it's your software that captures that data?

16   A.   It is.

17   Q.   And then does Prometric send that data to you for every

18   examinee after an exam is administered?

19   A.   They do.

20   Q.   And does that information include the answers that the

21   candidate provided?

22   A.   It does.

23   Q.   And does it also include information regarding how long a

24   given question was on a candidate's screen?

25   A.   It does.

JODOIN - DIRECT

1    Q.   And are you familiar with the manner in which candidates
2    take the examination at a Prometric Test Center?
3    A.   I am.
4    Q.   And are you familiar with whether or not candidates have
5    the ability to mark a question and come back to it
6    subsequently?
7    A.   I am.
8            MR. BURGOYNE:  Your Honor, may I proceed?
9            THE COURT:  I think there's a sufficient foundation to
10   ask the next question.
11           MR. BURGOYNE:  Thank you, Your Honor.
12           THE COURT:  Sure.
13   BY MR. BURGOYNE:
14   Q.   Okay.  So again, when a question is on the screen when a
15   candidate is testing and they mark that question, they can come
16   back to it later?
17   A.   Uh-huh.
18           THE COURT:  That's a yes?
19           THE WITNESS:  Yes, sorry.
20           THE COURT:  That's all right.
21   BY MR. BURGOYNE:
22   Q.   And if the candidate does come back to it later during
23   that period when it hasn't been on the screen, is that time
24   included in the Item Duration time here?
25   A.   It's not.

1   Q.   So the Item Duration column strictly reflects time when

2   the information is on the screen?

3   A.   Uh-huh.

4   Q.   And you don't know -- NBME doesn't know what the candidate

5   is doing during that time, you just know that question is on

6   the screen?

7   A.   We do.

8   Q.   And then what's the next column tell us?

9   A.   Block.  So that represents the block -- the block in which

10  this item was administered to Ms. Ramsay.

11  Q.   And then Item Duration, that's stated in seconds?

12  A.   It is.

13  Q.   And what was the amount of time you said that was the

14  average amount of time for a question?

15  A.   The allotted time is 90 seconds.

16  Q.   90 seconds.  Did Ms. Ramsay answer all of the questions on

17  her exam?

18  A.   She did.

19  Q.   And do you know how many questions she answered correctly?

20  A.   169.

21  Q.   And how many did she answer incorrectly?

22  A.   111 I think that leaves.

23  Q.   For the questions she answered correctly, do you know how

24  much time she spent on each question?

25  A.   Just over 76 seconds.

JODOIN - DIRECT

1   Q.   And how much time --

2              MR. BERGER:   Your Honor, he's testifying to

3   information that I don't believe is in this document, and he

4   hasn't -- I guess this is a foundation objection again, but I

5   haven't heard how he knows that information.

6   BY MR. BURGOYNE:

7   Q.   Are those calculations that either you performed --

8              THE COURT:   You're withdrawing the previous question?

9              MR. BURGOYNE:   Yes, Your Honor.

10             THE COURT:   Very well.

11             MR. BURGOYNE:   I'll lay a foundation, I apologize.

12  BY MR. BURGOYNE:

13  Q.   Did you prepare this document?

14  A.   I did not.

15  Q.   Was it prepared by someone that you supervise?

16  A.   It was.

17  Q.   And have you subsequently independently reviewed the data

18  in this table?

19  A.   I have.

20  Q.   And have you subsequently performed calculations or

21  performed evaluations to determine either how many questions

22  were answered correctly or incorrectly or the amount of time

23  that was spent on the questions?

24  A.   I have.

25  Q.   And going back to my last question, for the questions she

JODOIN - DIRECT

1    answered incorrectly, do you know how much time she spent on

2    each question on average?

3    A.   For the incorrect questions, just over 107 seconds per

4    question.

5         MR. BERGER:   I'm sorry, could I hear that again?

6         THE WITNESS:   For the incorrect questions, the average

7    time was just over 107 seconds.

8    BY MR. BURGOYNE:

9    Q.   If someone is randomly answering a large number of

10   questions on Step 1, what would you expect to see in their

11   outcome data?

12        MR. BERGER:   Objection, speculative, lack of

13   foundation.

14        THE COURT:   I'm going to sustain the objection.  You

15   have to put a little bit more out there for me.

16   BY MR. BURGOYNE:

17   Q.   Are you familiar with the concept of examinees randomly

18   answering questions?

19   A.   I am.

20   Q.   And does that reflect the fact that for whatever reason,

21   they're answering a question without reading the entire

22   question?

23   A.   There are a number of reasons why candidates might answer

24   a question randomly.

25   Q.   What are those reasons?

1   A.   So --

2               MR. BERGER:  Objection, lack of foundation.

3               THE COURT:  And he's trying to establish a foundation.

4   Overruled.  And you'll have an opportunity to cross, and you'll

5   have a continuing objection in that regard.  Let's move on,

6   Counsel.

7               MR. BERGER:  Thank you.

8   BY MR. BURGOYNE:

9   Q.   So again, if someone -- what are the reasons why someone

10  might randomly guess at a question?

11  A.   At least a couple.  One is that people are running out of

12  time and want to randomly select answers relatively quickly in

13  the hopes of getting correct responses.  Another option is

14  people want to complete the exam at the end, sometimes without

15  demonstrating their best behavior or their true performance.

16  Q.   Is there a guessing penalty on the Step 1 exam?

17  A.   There is no guessing penalty.

18  Q.   And if someone randomly answers questions because they're

19  running out of time, is there a certain amount of time that you

20  would anticipate seeing in their outcome data?

21              MR. BERGER:  Objection, lack of foundation.

22              THE COURT:  Overruled.

23              THE WITNESS:  That means I can answer?

24              THE COURT:  Yes, you can answer that.

25              THE WITNESS:  Thank you.

1        So traditionally people will look at rapid responses

2   looking at something less than 10 seconds or more recently some

3   work has looked at less than 20 seconds.

4   BY MR. BURGOYNE:

5   Q.   And how many questions from Ms. Ramsay's 2017 Step 1 exam

6   reflect that she spent less than 20 seconds with the item on

7   her screen?

8   A.   Four.

9   Q.   And did she get those answers right or wrong?

10  A.   All four were correct.

11  Q.   And how many questions from her exam reflected that a

12  question was open less than 40 seconds?

13  A.   25.

14  Q.   And how did she perform on those 25?

15  A.   20 of those 25 questions were correct.

16  Q.   Occasionally when you see possible indications of random

17  guessing because someone runs out of time, does that

18  necessarily occur at the end of an item block?

19  A.   That's the most frequent way it is represented.  People

20  will work through the first part of the exam, run out of time,

21  and towards the end will rapidly guess on the questions towards

22  the end of a block.  That's the most common manifestation.

23  Q.   Okay.  It doesn't happen all the time?

24  A.   It doesn't happen all the time.

25  Q.   And on Ms. Ramsay's seven blocks, if you look at the last

JODOIN - DIRECT

1    five questions on each of those blocks, how many of the
2    questions did she spend less than 40 seconds on in the last
3    four questions -- five questions in each of the blocks?
4    A.   So across those 35 questions there was one that had a
5    duration of less than 40 seconds.
6    Q.   And did she get that question right or wrong?
7    A.   She did, got it correct.
8    Q.   She got it correct.
9         Look at Defendant's Exhibit 1, please.  It's going to be
10   in the other notebook.
11   A.   I got it.
12   Q.   Defendant's Exhibit 1 is the Complaint that Ms. Ramsay
13   filed in this case.
14        And if you look at paragraph 40 for me.
15   A.   On page 9 or further back?
16   Q.   It's numbered paragraph 40.  I'll have to check the page.
17        It is page 9, yes.
18   A.   Okay.
19   Q.   Do you see the third sentence in this paragraph, it reads:
20   Because of her dyslexia and ADHD, Ramsey was only able to read
21   about 60 to 70 percent of the questions in each block and had
22   to enter guesses for the remaining questions without reading
23   them.
24        Is the outcome data that you've reviewed consistent with
25   that statement?

JODOIN - DIRECT                                                    149

1  A.   It is not.

2  Q.   Why is that?

3  A.   As I testified earlier about the amount of time that the

4  screen was up, it seems likely that the candidate was able to

5  look at, presumably read and consider all of the questions, the

6  vast majority of them for more than 40 seconds.

7  Q.   Did you see any indication that 30 to 40 percent of the

8  questions had not been read by Ms. Ramsay?

9  A.   No.

10  Q.   Look at Exhibit 2, please.

11       And this is going to be paragraph 28.

12  A.   Found it.

13  Q.   And this is a declaration Ms. Ramsay provided in this

14  case.  And in paragraph 28, she makes the following statement.

15  It's towards the end of the second line.  I did not have enough

16  time to read all of the questions and in the last minute of

17  each block was forced to blindly select answer choices for

18  about 30 to 35 percent of the questions.

19       Was Ms. Ramsay's outcome data consistent with that

20  statement?

21  A.   It was not.

22       MR. BERGER:  Objection, lack of foundation.  I'll

23  cover this in cross, but --

24       THE COURT:  Your objection is noted.  It's overruled.

25  BY MR. BURGOYNE:

1  Q.   So again, was the outcome data that you reviewed

2  consistent with the assertion in Ms. Ramsay's declaration that

3  in the last minute of each block she blindly selected answer

4  choices for about 30 to 35 percent of the questions?

5  A.   No, it was not.

6  Q.   And why is that?

7  A.   As we talked about before, the questions at the end of the

8  block, but overall across all the questions, there was a

9  reasonable amount of time where that item was open and

10 available for consideration, presumably for reading by the --

11 by Ms. Ramsay.

12          MR. BURGOYNE:  No further questions, Your Honor.

13                     CROSS-EXAMINATION

14 BY MR. BERGER:

15 Q.   Would you turn back to Exhibit 71, the outcome data.

16 A.   I have it right here.

17 Q.   You testified that this was a spreadsheet --

18 A.   Uh-huh.

19 Q.   -- of data relating to Ms. Ramsay's performance?

20 A.   I believe I said this was a printout of a spreadsheet.

21 Q.   Does this present all of the data that NBME has in its

22 possession concerning Ms. Ramsay's performance on the Step 1

23 examination?

24 A.   It does not.  It does not.

25 Q.   It does not.  Does NBME have data about the order in which

JODOIN - CROSS

1   Ms. Ramsay accessed the questions on the examination?

2   A.   It does.

3   Q.   It does?

4   A.   Uh-huh.

5   Q.   And that is not presented in this exhibit.   Correct?

6   A.   It is not.

7   Q.   You said that you have some familiarity with the Step 1

8   examination.

9        Are there questions on the Step 1 examination which are

10  paired in the sense that you cannot look at the second question

11  in the pair until you have answered the first question?

12  A.   I don't believe there are any of those questions on Step 1

13  currently.

14  Q.   I'm sorry?

15  A.   I don't believe there are any of those questions on the

16  Step 1 exam currently.

17  Q.   Were you present when Ms. Ramsay testified about her

18  experience in taking the Step 1 examination?

19  A.   I was not.

20  Q.   And has anyone related to you what she testified about the

21  way in which she attempted to answer the questions of the Step

22  1 examination?

23  A.   No.   The limited information I had heard about was a few

24  of the paragraphs that have already been referenced.

25  Q.   In addition -- I'm sorry, did I ask whether NBME has -- I

1  think I did ask and you said that NBME does have data about the

2  order in which she accessed the questions?

3  A.   Uh-huh.

4  Q.   So Mr. Burgoyne asked you, for example, about questions at

5  the end of the block, and you gave an answer indicating that

6  she had answered those accurately?

7  A.   I believe what I said was that in the last 35 questions,

8  there was only one which she didn't have 40 seconds in total to

9  consider, and that that question was answered correctly.

10 Q.   Do you know --

11       THE COURT:  You have to allow the witness to complete

12 his answer before you cut him off, Counsel.

13       Were you finished with your response?

14       THE WITNESS:  I was.

15       THE COURT:  Let's proceed.

16 BY MR. BERGER:

17 Q.   Do you know in which order Ms. Ramsay read the questions

18 that were at the end of the block?

19 A.   When you say at the end of the block, which questions

20 she -- are you referring to the questions she navigated to last

21 in the time limit allowed for each block?

22 Q.   I thought you testified that she had been -- that she

23 had -- let's look in the exhibit at page 2 of the exhibit.

24 A.   Okay.

25 Q.   And by the way, there is a column on this exhibit, Item

JODOIN - CROSS

1   Presentation Sequence.  What does that represent?

2   A.   That represents the order in which the items were

3   presented to Ms. Ramsay.

4   Q.   It doesn't represent the order in which Ms. Ramsay or any

5   other student for that matter actually read the questions?

6   A.   It does not necessarily.

7   Q.   You could read question 1 and then skip to question 30.

8   There's nothing to stop you from doing that?

9   A.   You can start at question 40 and work backwards if you

10  wanted to.

11  Q.   And perhaps I didn't hear your testimony correctly.

12       I thought you were making some statement about the

13  questions at the end of each block?

14  A.   I was -- I believe I was asked whether people who run out

15  of time, the most traditional way run out of time towards the

16  questions at the end of the exam, and I said that that was

17  true.

18  Q.   But you don't know whether that happened in Ms. Ramsay's

19  case?  At least you don't know it from this exhibit?

20  A.   Correct.

21  Q.   But you do have data -- NBME does have data that would

22  shows which were the questions she answered last.

23  A.   We do.

24  Q.   But that data is not presented in this exhibit?

25  A.   It's not.

JODOIN - CROSS

1  Q.   Is the data relating to Ms. Ramsay's performance, both

2  what is presented in this exhibit and what is not presented in

3  this exhibit, is that maintained in a database of some kind?

4  A.   Repeat the question?  Are you saying whether this data and

5  other data about her?

6  Q.   About her individual performance.

7  A.   It is stored in a database.

8  Q.   It is in a database.  And so what we have here is selected

9  data from that database?

10  A.   Yes.

11  Q.   Ms. Ramsay took the examination in July 2017.  Correct?

12  A.   I assume that that's true.  I don't have the date on this

13  data.  I didn't -- I didn't look at that data.

14  Q.   I think we'll all agree that that is correct.

15      Given that she took the examination in July '17, 2017, I

16  can look up the exact date, but that doesn't really matter for

17  this question.  Let's say July 15th.

18      How soon after that would NBME have had access to the

19  database that contains this data and the other data that you

20  have not presented?

21  A.   It probably would be loaded to that database within a week

22  or less.  It depends a little bit on transmission time.

23      MR. BERGER:  Your Honor, I am going to object to this

24  exhibit on a number of grounds.  First of all, I believe that

25  this could best be described as being a summary of voluminous

1   data, an extract of a summary of voluminous data.  And as Your

2   Honor knows, the rules allow for such a summary to be

3   presented, but only when the proponent makes the originals or

4   duplicates available for examination or copying or both by

5   other parties at a reasonable time and place.  An that's

6   Rule 1006.

7          THE COURT:  And did you request that before you came

8   into this courtroom with this matter?

9          MR. BERGER:  Your Honor, this exhibit was provided to

10  us by defendants last Tuesday, and that was the first time it

11  was ever provided.  We had made a discovery request for

12  information about Ms. Ramsay's examination.  It wasn't

13  specifically for data like this, but we had made a general

14  request for information about her taking of the examination.

15  That was objected to as irrelevant and it was objected to also

16  because we were asking for the text of the questions, and that

17  was said to be confidential and proprietary.

18         THE COURT:  Let's get back to this issue, though.  All

19  right?

20         MR. BERGER:  All right.

21         THE COURT:  You're going to skew it.

22         MR. BERGER:  But we only got this exhibit last

23  Tuesday, and we immediately objected to it.

24         THE COURT:  So you've had it at least a week?

25         MR. BERGER:  We've had it for a week.

JODOIN - CROSS

1          THE COURT:  And you made no indication to the Court

2   that there was this issue out there and that I could at least

3   order you -- order that disclosure before this witness took the

4   witness stand?  Potentially.  Right?

5          MR. BERGER:  Well, not to the Court.  That's correct.

6          THE COURT:  So --

7          MR. BERGER:  We did notify counsel of our objection.

8          THE COURT:  Okay.  So I've been sitting here, and you

9   haven't said at any point in this proceeding that you feel

10  prejudiced by not having this.

11         So you have an option.  All right?  You can get this

12  order produced.

13         How long will it take approximately?

14         THE WITNESS:  A few days.

15         THE COURT:  A few days.  And then you can also present

16  that -- after you get it and receive it, then you can put on

17  any additional testimony or evidence on the record relating

18  thereto.

19         And if need be -- you're local.  Right?

20         THE WITNESS:  Sure.

21         THE COURT:  When I say you're local, I mean you're in

22  the Continental United States?

23         THE WITNESS:  I am.

24         THE COURT:  All right.  You can have a video

25  deposition of him to further supplement the record or you can

JODOIN - CROSS

1    bring him back here whenever we have time for the rest of this

2    hearing and put that testimony on.

3          MR. BERGER:  Your Honor, as you know, this is a

4    preliminary injunction proceeding.  And for Ms. Ramsay, it's a

5    very urgent one.  We received this exhibit on -- was it the

6    Tuesday evening before Thanksgiving.  We did notify counsel of

7    our objection.  I don't want to delay proceeding in any way.  I

8    think I've adequately stated our objection.  And if Your Honor

9    is allowing the exhibit, then I accept that.

10          I note my exception, but I accept your ruling.

11          THE COURT:  I will note your exceptions, and we will

12    continue on.

13          Just out of some sense of curiosity, have you had an

14    opportunity to examine the results that counsel has asked you

15    about that was not produced?

16          THE WITNESS:  No, I have not.

17          THE COURT:  So you don't know whether or not they

18    support the testimony that you just gave in reference to the

19    other aspect of the test?

20          THE WITNESS:  I don't know that conclusively.  I'm not

21    sure -- given the amount of time that each item was presented

22    to the candidate, it is not consistent with rapid guessing

23    behavior, regardless of the order in which they were actually

24    answered by the candidate.

25          THE COURT:  Viewed?  Okay.  Very well.

JODOIN - CROSS

1  BY MR. BERGER:

2  Q.   Okay.   I think we've covered the fact that although you

3  have data about the order in which Ms. Ramsay accessed the

4  questions, that data is not included in this exhibit.   Correct?

5  A.   Correct.

6  Q.   How was the exhibit prepared?   Who gave the direction as

7  to what should be included?

8  A.   One of my staff asked one -- one of the psychometricians

9  in my group asked the data analyst whose primary responsibility

10  is Step 1 to pull this data from the database and to format it

11  in a way that was readily accessible to people outside of our

12  proprietary systems.

13  Q.   Looking at this document and looking at what Ms. Ramsay

14  said in this declaration that Mr. Burgoyne asked you about, can

15  you determine whether in the last minute of each block -- this

16  is what she says in paragraph 28 of her declaration, that she

17  blindly selected answer choices?   Can you determine that?

18  A.   It seems unlikely that someone could navigate to

19  30 percent of the questions and select a response in a minute.

20  Q.   All right.   Well, suppose that she -- suppose it was --

21  suppose it was two minutes, suppose it was three minutes.

22       I mean, my point is, can you determine from the data that

23  you've looked at, which may be more than the data that I have,

24  can you determine from the data that you looked at whether she

25  spent the last minute -- or whether it was a minute or two

JODOIN - CROSS

1   minutes or three minutes making random guesses, blindly
2   choosing answers?
3   A.   So just to be clear, I have not looked at other data
4   outside of what you have here with you.  I think I stated -- I
5   testified to that before.  I want to be clear, I've only looked
6   at the data in this Excel spreadsheet.
7        Was there a follow-on question?
8   Q.   No, no.  That's fine.  That's fine.
9        Do you have any training and experience in the area of
10  learning disabilities?
11  A.   That's not an area of expertise, no.
12  Q.   Do you have any training or experience in the area of
13  attention-deficit/hyperactivity disorder?
14  A.   No.
15  Q.   Do you have any training or experience as to how people
16  with those conditions would answer questions on an examination
17  like Step 1?
18  A.   No.
19            MR. BERGER:  No further questions.
20            THE COURT:  Any redirect?
21            MR. BURGOYNE:  No, Your Honor.
22            THE COURT:  Then you may step down now, sir.
23            Any reason why this witness can't be excused?
24            MR. BERGER:  No.
25            THE COURT:  Very well.

1        Next.

2              MR. BURGOYNE:  Your Honor, that's the conclusion of

3    our case.  We just need to offer into evidence our exhibits --

4              THE COURT:  Very well.

5              MR. BURGOYNE:  -- and we're done with our case.

6              THE COURT:  Okay.  I'll entertain your admissions,

7    starting out -- plaintiff wants to go first or...

8              MR. BURGOYNE:  Do you have any others?

9              THE COURT:  Do you want me to give you some time so

10   that you can use it wisely instead of me sitting here and

11   watching you?

12             MR. BERGER:  Ten minutes, Your Honor.

13             MR. BURGOYNE:  Ten minutes.

14             THE COURT:  Sure.  We'll reconvene at a quarter of

15   3:00.

16             And then tell me, Counsel, what is your pleasure after

17   you've moved these exhibits in?

18             Do you want to argue before the Court, or do you want

19   to submit a memorandum supporting your respective positions?

20   You tell me.

21             MS. VARGAS:  We've already submitted briefing, Your

22   Honor.  And this is obviously from our perspective time

23   sensitive, so our preference would be argument rather than

24   briefing.

25             THE COURT:  Okay.  And I take it --

 1          MR. BURGOYNE:  Your Honor, I actually thought it would

 2    be helpful to get the record and have briefing.  The other

 3    briefing was done some time ago.  I thought it would be helpful

 4    if we relatively promptly got you briefs that brought the

 5    evidence that came in at this hearing into the briefing.

 6          THE COURT:  I'll hear arguments.  I think that's

 7    probably a quicker process, because this has taken a little

 8    while to get to this point.

 9          And I'll hear arguments after we move the admissions.

10    All right?  Of the evidence.

11          We'll be in recess for at least ten minutes.

12          And you can get all of these exhibits and everything

13    in order around here.

14          (Recess at 2:36 p.m. until 2:49 p.m.)

15          THE COURT:  Now, Counsel, are we ready for the

16    exhibits to be moved that have not been moved?

17          MR. BERGER:  Yes, Your Honor.

18          I would like just to -- most of what we want to offer,

19    I believe, has been offered and admitted, and I am just going

20    to note what those are in case there's any difference.  But I

21    don't think there will be.

22          We believe that P-1 through P-4 have been admitted.

23          I'm not sure about the next ones, so we would like to

24    offer P-5, which is the NBME decision letter from March 2017.

25          P-6 --

1          THE COURT:  And hearing no objection -- unless I hear

2    an objection to an exhibit that you're moving at this point in

3    time --

4          MR. BERGER:  All right.

5          THE COURT:  -- it's admitted.  All right?

6          If he has an objection --

7          MR. BERGER:  P-5, the decision letter.  P-6, the

8    decision letter.  P-7, also a decision letter, February 2019.

9    And P-8, a decision on the second appeal.  So we want to offer

10   those.

11         (Exhibits P-5, P-6, P-7 and P-8 admitted into

12   evidence.)

13         MR. BERGER:  I believe the next two exhibits I'm going

14   to mention have been admitted.  They are P-13, which are

15   excerpts from the medical school student policy manual, and

16   P-14, which are documents relating to Ms. Ramsay's leave of

17   absence.

18         I believe that P-19, the MCAT form, has been admitted,

19   and also P-19A, which are the verbal reasoning section

20   questions that Ms. Ramsay annotated and testified about.

21         I also believe that P-20, the sample one -- Step 1

22   sample questions has been admitted.  And P-21, which is Dr.

23   Smith's declaration, has been admitted.

24         (Exhibit P-20 admitted into evidence.)

25         I would like to offer P-22, which is the decision

1  letter on the February 2019 -- that may be a duplicate, but

2  just to be sure.

3           (Exhibit P-22 admitted into evidence.)

4           MR. BERGER:  I would like to offer -- there was

5  testimony about it, but I don't think it was offered, P-33,

6  which is Professor Zecker's article.

7           (Exhibit P-33 admitted into evidence.)

8           MR. BERGER:  I believe that P-34, which is the

9  PowerPoint from the NBME consultants meeting, has been

10  admitted.

11          And finally, I would like to offer P-40, P-41 and

12  P-42, which are the documents that Ms. Vargas examined Dr.

13  Farmer about, the letter from the examination organizations,

14  the letter from Mr. Burgoyne to the Department of Justice and

15  the excerpt from the Federal Register.

16          (Exhibits P-40, P-41 and P-42 admitted into evidence.)

17          THE COURT:  Very well.

18          MR. BURGOYNE:  No objection.

19          THE COURT:  And they're all admitted.

20          Moving to defense.

21          MS. MEW:  Thank you, Your Honor.  We had quite a few

22  that were discussed but not admitted, so please bear with me.

23          We would like to admit Defendant's Exhibit 1, which

24  was the Complaint with exhibits.

25          (Exhibit DX-1 admitted into evidence.)

1            MS. MEW:   Defendant's Exhibit 2, which is the

2   declaration of Jessica Ramsay and exhibits.

3            (Exhibit DX-2 admitted into evidence.)

4            MS. MEW:   Defendant's Exhibit 3, which is the

5   declaration of Robert Smith and exhibits.

6            (Exhibit DX-3 admitted into evidence.)

7            MS. MEW:   Defendant's Exhibit 4, which is the

8   declaration of Catherine Farmer and exhibits.

9            (Exhibit DX-4 admitted into evidence.)

10           MS. MEW:   I believe 5 and 6 have already been

11  admitted.

12           Defendant's Exhibit 7, plaintiff's answers and

13  objections to defendant's first set of interrogatories.

14           (Exhibit DX-7 admitted into evidence.)

15           MS. MEW:   And to make this go faster, can I just go by

16  number or would you like to --

17           MR. BERGER:   I prefer -- I prefer to have a brief

18  description.

19           MS. MEW:   That's fine.   We'll keep going.

20           Defendant's Exhibit 8, kindergarten behavior report.

21           Defendant's Exhibit 9, kindergarten progress report.

22           Defendant's Exhibit 10, first grade progress report.

23           Defendant's Exhibit 11, second grade progress report.

24           Defendant's Exhibit 12, the physical education report

25  card.

1          Defendant's Exhibit 13, report card for third grade.

2          Defendant's Exhibit 14, report card for fourth grade.

3          Defendant Exhibit's 15, report card for Texas.

4          (Exhibits DX-8, DX-9, DX-10, DX-11, DX-12, DX-13,

5     DX-14 and DX-15 admitted into evidence.)

6          THE COURT:  Are you going through each one of the

7     numbered ones there?  Have you taken any out so far?

8          MS. MEW:  Eventually.  It's going to be most of them.

9     That's why I was wondering if I could go through large chunks.

10         THE COURT:  That would be faster.

11         MR. BERGER:  Sure, sure.

12         MS. MEW:  You know what, if you want to come look over

13    my shoulder, if it makes it easier for you.

14         MR. BERGER:  No.  If you just tell --

15         THE COURT:  The numbers.  Indicate the exhibits that

16    you're moving in a block.

17         MS. MEW:  Yes.

18         THE COURT:  From exhibit number what?

19         MS. MEW:  So now we're on to 16 through 20.

20         THE COURT:  Give him an opportunity to review those.

21         Hearing no objections.

22         (Exhibits DX-16, DX-17, DX-18, DX-19 and DX-20

23    admitted into evidence.)

24         MS. MEW:  Then 22, and then 24 through 36.

25         THE COURT:  Give him an opportunity.

1          MR. BERGER:  Your Honor, if -- so you're offering 24

2     through 26 but not 27?

3          MS. MEW:  24 through 36.  We didn't discuss 37.  I

4     don't know if we feel strongly --

5          MR. BERGER:  I'm sorry, you're offering 24 through --

6          MS. MEW:  36.

7          MR. BERGER:  Through 36, okay.

8          No objection.

9          (Exhibits DX-22, DX-24, DX-25, DX-26, DX-27, DX-28,

10    DX-29, DX-30, DX-31, DX-32, DX-33, DX-34, DX-35 and DX-36

11    admitted into evidence.)

12         MS. MEW:  38 through 42.

13         MR. BERGER:  Okay.

14         (Exhibits DX-38, DX-39, DX-40, DX-41 and DX-42

15    admitted into evidence.)

16         MS. MEW:  46.

17         MR. BERGER:  All right.

18         (Exhibit DX-46 admitted into evidence.)

19         MS. MEW:  48 through 54.

20         MR. BERGER:  Some of these, without reviewing them

21    individually, it's possible that some of these -- obviously

22    they contain references to Ms. Ramsay's attorney, and Your

23    Honor did generally sustain our objections as to work product.

24    I think that generally those exhibits are redacted, but if

25    there are any which are not redacted, then we would object to

1    that extent.

2              THE COURT:  Very well.

3              MS. MEW:  And just to clarify, I do think, Mr. Berger,

4    that you had objected to 49 on work product grounds, but it was

5    a document that you had produced, I believe.

6              THE COURT:  And I think they indicated it was by

7    accident or something?

8              MR. BERGER:  That's okay.

9              THE COURT:  No objections?  Okay.  Very well.

10             (Exhibits DX-48, DX-49, DX-50, DX-51, DX-52, DX-53 and

11   DX-54 admitted into evidence.)

12             MR. BERGER:  So we're up to --

13             MS. MEW:  So that took us from 48 to 54.

14             Now 56 through 61.

15             MR. BERGER:  All right.

16             (Exhibits DX-56, DX-57, DX-58, DX-59, DX-60 and DX-61

17   admitted into evidence.)

18             MS. MEW:  And then 63 through 68.

19             MR. BERGER:  I'm sorry, 6 --

20             MS. MEW:  63 through 68.

21             MR. BERGER:  Okay.  Again, there is potentially some

22   work product matter in there that was not -- I think without

23   reviewing individually, I can't say, but I think those are

24   things that were produced by Dr. Ruekberg or whoever produced

25   on behalf of Dr. Ruekberg.

1          MS. MEW:  If you'll look at this, Mr. Berger, for 63

2    through 67.  I guess 63, 64, 65, those all have Bates numbers

3    showing plaintiffs produced those documents.

4          MR. BERGER:  But -- okay.  Yes.  All right.  But these

5    are all --

6          Subject to the specific objections we made during the

7    hearing which Your Honor ruled upon, we have no other

8    objections.

9          THE COURT:  Very well.  They're admitted.

10          (Exhibits DX-63, DX-64, DX-65, DX-66, DX-67 and DX-68

11    admitted into evidence.)

12          MS. MEW:  Then Exhibits 70 and 71.

13          MR. BERGER:  We object to Exhibit 71.

14          THE COURT:  What's 71?

15          MR. BERGER:  That's the outcome data exhibit we were

16    just reviewing with the witness.

17          THE COURT:  And your objection is noted.  It's

18    overruled.

19          (Exhibits DX-70 and DX-71 admitted into evidence.)

20          MS. MEW:  Then Exhibit 73 through 80.

21          MR. BERGER:  Your Honor, I think that this material

22    generally speaking is things that were produced by Dr. Ruekberg

23    of communications between him and Ms. Ramsay.  And to that

24    extent, we would not object to its admission.

25          I don't think in here that there are any work product

1   areas, but I can't be sure without reviewing every page.   And

2   to the extent there are, Your Honor has ruled already.

3           THE COURT:  Very well.

4           MR. BERGER:  So subject to that, we have no objection.

5           THE COURT:  With that notation, the exhibits are

6   admitted.

7           (Exhibits DX-73, DX-74, DX-75, DX-76, DX-77, DX-78,

8   DX-79 and DX-80 admitted into evidence.)

9           THE COURT:  Next?

10          MS. MEW:  85.

11          MR. BERGER:  Same as for the prior emails with

12   Dr. Ruekberg.

13          THE COURT:  Very well.

14          (Exhibit DX-85 admitted into evidence.)

15          MS. MEW:  And then, Your Honor, we would like to go

16   ahead and introduce -- they're in my hands -- as Defendant's

17   Exhibits 86 and 87 the charts that Mr. Burgoyne was using in I

18   believe in his questioning of Dr. Smith this morning, the --

19          THE COURT:  Summaries?

20          MS. MEW:  The summaries.

21          MR. BERGER:  Your Honor, I don't see why that is

22   evidence.  It's just a chart of evidence.

23          THE COURT:  Yeah.  It helps or aids the viewer, the

24   finder of fact, to look at this rather than the totality of all

25   the documents to sort through and get to the final issue.

1          Is there something in the charts or summaries that you

2    disagreed with in total or in part, Counsel?

3          MR. BERGER:  Well, if I have to review it right now,

4    if I have to review it right now.  If I can have -- you know, I

5    will.

6          Which one specifically are you --

7          MS. MEW:  This one.

8          MR. BERGER:  Your Honor, I think for the record I have

9    to object because we haven't had a chance to review them.

10         THE COURT:  You can object.  Your objection is

11   overruled.  If there is something in these summaries that you

12   find are incorrect, you can contact counsel, make them aware,

13   send me a notification and I'll consider it.  All right?

14         MR. BERGER:  Thank you.

15         (Exhibits DX-86 and DX-87 admitted into evidence.)

16         THE COURT:  Let's move on.

17         Anything else from the defense?

18         MS. MEW:  No, Your Honor.

19         THE COURT:  All right.  I'll hear the plaintiff.

20         MS. VARGAS:  Thank you, Your Honor.

21         So what happened to Jessie Ramsay over the last three

22   years and what played out in this courtroom this week was

23   exactly what the ADA was amended to prevent, passed to prevent,

24   the ADA Amendments Act.

25         And in passing that law, as we heard testimony,

1   Congress specifically instructed that the question of

2   whether -- and I'm quoting, the question of whether an

3   individual's impairment is a disability under the ADA should

4   not demand extensive analysis.  Instead, the ADA, and in turn

5   its regulations, directed that the definition of disability --

6   and again quoting -- shall be construed in favor of broad

7   coverage and also to the maximum extent permitted.

8          Here defense argues that it need not defer to the

9   report of a qualified professional who actually examined Ms.

10  Ramsay, that it must only provide access to a test rather than

11  best ensuring that the test shows the student's ability and

12  potential and not their disability.  And that it should be able

13  to look at Ms. Ramsay's test scores on certain standardized

14  tests and grades while not looking at the accommodations that

15  Ms. Ramsay actually had on the NBME's own shelf exams at

16  medical school.  That it wants to disregard.

17         And as we made clear in the deposition I hope of Dr.

18  Farmer, this is not the first time that the NBME has made these

19  arguments.  These arguments were made prior to the passage of

20  the ADA Amendments Act, and they were rejected with the passage

21  of the law.  They were made prior to the adoption of

22  regulations by the Department of Justice, by Mr. Burgoyne on

23  the behalf of the NBME, and they were explicitly rejected in

24  the executive summary of the final rule as being inconsistent

25  with the Congressional history of the ADAA.

1          And then of course they requested and the NBME

2    requested that the DOJ should go ahead and issue technical

3    assistance on testing accommodations in order to provide

4    guidance to everybody on how these accommodations requests

5    would be -- should be processed and evaluated.

6          And that entire document is fully supportive of Ms.

7    Ramsay.  And it is only after that document was issued and did

8    not adopt the arguments that the NBME has continually tried to

9    push forward before Congress and before the agency, only then

10   was it something that they weren't interested in actually

11   applying.  And I do have copies of the technical assistance if

12   the Court would like me to provide those.

13         So the Department has considered -- the Department of

14   Justice has considered the arguments that were made here and

15   rejected them, and here we are.

16         Jessie Ramsay has to take and pass Step 1 of the USMLE

17   by March 2, 2020.  She can't simply withdraw from medical

18   school, because once she withdraws from medical school, she is

19   no longer eligible to take the USMLE.  And she has no guarantee

20   that if she applies to medical school again, especially after

21   what's transpired in the last three years, that she'll be

22   admitted.  So she asks only for the accommodations that she's

23   needed and has been granted in the past in medical school,

24   accommodations that she received at OSU.

25         THE COURT:  What other accommodations has -- the only

1   one is the time, as I understand it now, because the other

2   accommodations have been granted by defendants?

3          MS. VARGAS:  Yes, yes.  It's only the issue --

4          THE COURT:  So we're talking about now additional time

5   to complete the reading process?

6          MS. VARGAS:  Right.  Your Honor, it's only the issue

7   of double time, the extended time that she needs.

8          THE COURT:  Right.

9          MS. VARGAS:  And she didn't ask for the maximum amount

10  of extended time that NBME offers.  They offer triple time.

11  She didn't ask for that.  She asked for double time.  And the

12  reason is because -- and I hope you saw that when she

13  testified -- is that she wants to pass or fail on her own

14  merit, not because of her disability but because she knows the

15  material or because she doesn't.

16          So the law is clear.  It says that licensing

17  examinations -- and I'm going to quote the regulations -- must

18  be administered so as to best ensure that when the examination

19  is administered to an individual with a disability, the

20  examination results accurately reflect the individual's

21  aptitude or achievement level or whatever other factor the

22  examination purports to measure rather than reflecting the

23  individual's impaired sensory, manual or speaking skills.

24          THE COURT:  And her disability is her reading?

25          MS. VARGAS:  Yes.

1          THE COURT:  As you relate to it.

2          MS. VARGAS:  Reading and attention as well.

3          And as we heard from Dr. Smith, those disabilities

4    interact.  It takes her much more concentration than it would

5    your average person to read and focus.  At the same time she

6    has ADHD, so she lacks the ability to read and focus that she

7    requires.

8          THE COURT:  And as I recall the testimony, he was the

9    first and only one that diagnosed her with the -- with that

10   condition?

11         MS. VARGAS:  Well, there were diagnoses before, a

12   prior diagnosis of learning disability.

13         THE COURT:  Learning disability.

14         MS. VARGAS:  But as Dr. Smith said -- and we

15   acknowledge that that examination, they didn't do the tests

16   that were needed to show learning disability, so it was Dr.

17   Smith who did the comprehensive battery and got those results.

18         THE COURT:  And those tests that were taken of your

19   client, they were more -- I guess they were her actual conduct

20   of the reading and understanding?  There was no test that she

21   performed in a -- by any type of machine or any type of test,

22   written test, that demonstrated these conditions other than his

23   observing her and the conduct that she exhibited in reading and

24   understanding and responding?

25         MS. VARGAS:  There had been documentation all the way

1  back into early or mid elementary school that her reading was

2  slow and that there was an issue for her, both from

3  Dr. Tanguay, which is in I believe Plaintiff's Exhibit 1, which

4  is the first application for --

5          THE COURT:  And that's the optometrist?

6          MS. VARGAS:  She was an optometrist, but she

7  recognized that there was something wrong with the way Jessie

8  was reading.

9          And then obviously there's Ms. Ramsay's own testimony

10  and Dr. Smith's interview of her and the input that he got from

11  her mother historically about how she was as a child and also

12  from her fiancé.  But it was Dr. Smith who was the first one to

13  do the testing that was necessary to show dyslexia.

14          What's really important about that is that the law

15  requires that disability be determined without mitigation.  So

16  when somebody is using learned behavioral conduct, when

17  somebody is taking medication for ADHD, that's mitigation.

18  You're supposed to take that out of the equation and consider

19  sort of -- I don't know if naked is the right word, but the

20  person without any of that, do they have a disability without

21  any of that.

22          None of the tests that had been done up until Dr.

23  Smith did that.  That's the import of all of this battery of

24  comprehensive psychological testing.

25          Two things:  One, that it took out the mitigation and

1    it looked at what she's actually able to do without regard for

2    what kind of tricks she's doing in order to skip the reading on

3    tests or how she had informal accommodations so she was at a

4    table alone or only parts of her test were graded in elementary

5    school.  It screens all of that out, so it's important for that

6    reason.

7            It's also important because she was administered a

8    number of different tests by Dr. Smith.  And across those

9    tests, not just within those tests, they were remarkably

10   consistent.  She was tested without her ADHD medication.  She

11   was tested actually on what would show up for dyslexia.  And it

12   wasn't that she had one test that showed something and one test

13   that didn't, consistently across the board in each test, there

14   were very strikingly similar results where she had to rely on

15   reading, particularly in a timed setting, where that showed her

16   weakness.  And that weakness unmitigated isn't going to show up

17   on other kinds of tests that either aren't timed or where she's

18   allowed to use those, you know, medications and self-mitigation

19   that we aren't supposed to consider, according to the

20   regulations and according to the technical assistance from the

21   Department of Justice.

22           So I keep referencing the technical assistance.  There

23   are just a few parts of it I'd like to highlight.

24           THE COURT:  Sure.

25           MS. VARGAS:  But I think they're all critically

1 important because they're the rules we're all supposed to play

2 by.

3        So one of the things that the technical assistance on

4 testing accommodations says is a person with a history of

5 academic success may still be a person with a disability who is

6 entitled to testing accommodations under the ADA.

7        A history of academic success does not mean that a

8 person does not have a disability that requires testing

9 accommodations.  For example, someone with a learning

10 disability may achieve a high level of academic success but may

11 nevertheless be substantially limited in one or more of the

12 major life activities of reading, writing, speaking or learning

13 because of the additional time or effort he or she must spend

14 to read, write, speak or learn compared to most people in the

15 general population.

16        Second, the testing -- I mentioned this before.

17 Testing entity, and this is a quote, must administer its exams

18 so it accurately reflects an individual's aptitude, achievement

19 level or the skill that the exam purports to measure rather

20 than the individual's impairment.

21        Three, again a quote.  Proof of past testing

22 accommodations in similar test settings is generally sufficient

23 to support a request for the same testing accommodation for

24 current standardized exams or other high-stakes tests.

25        We heard a lot from the defendants about the ACT and

1  the MCAT.  And Your Honor heard from Ms. Ramsay, her

2  explanation of how it was that she was able to circumvent some

3  of the reading on those tests and self-mitigate.

4        What we don't hear from the defendants is any talk

5  about the fact that Ms. Ramsay --

6        THE COURT:  Ohio State and the medical school gave her

7  accommodations in reference to her testing.  Yes.

8        MS. VARGAS:  Right.  Yes, sir.  Including on their

9  tests.

10        THE COURT:  On their tests.

11        MS. VARGAS:  And then furthermore that -- again a

12  quote, an absence of previous formal testing accommodations

13  does not preclude a candidate from receiving testing

14  accommodations.  In the absence of documentation of prior

15  testing accommodations, testing entities should consider the

16  entirety of a candidate's history, including informal testing

17  accommodations, to determine whether that history indicates a

18  current need.

19        And lastly -- and this is really critically

20  important -- is that -- and this is a quote, testing entities

21  should defer to the documentation from a qualified professional

22  who has made an individualized assessment of the candidate that

23  supports the need for the requested testing accommodation.

24  Candidates who submit documentation such as reports,

25  evaluations or letters that is based on careful consideration

1  of the candidate by a qualified professional should not be

2  required by testing entities to submit additional

3  documentation.   A testing entity should generally accept such

4  documentation and provide the recommended testing

5  accommodation.

6          THE COURT:  And who would that qualified expert be?

7          MS. VARGAS:  Dr. Smith.

8          THE COURT:  So you would say Dr. Smith?

9          MS. VARGAS:  Dr. Smith.

10         THE COURT:  Even though those tests might be based on

11 conduct that is manipulated, let's say?

12         I'm looking at the position that the defense is

13 clearly considering by the questions that they proposed to the

14 expert testifying.  Clearly we have an individual that's highly

15 intelligent, without any question or exceptions about that.  I

16 observed her testify for almost -- a whole day almost.  And I

17 saw how she was directed to go to different pages, to look at

18 the questions that were being posed to her.  She was able to

19 read them and respond to the questions.

20         This is a person, plaintiff, who is studying medicine,

21 who has the wherewithal to understand the test that she was

22 going to be taking and perform on those tests that she was

23 going to be requested to take.

24         So there is the possibility that those tests could be

25 manipulated, but I'm not saying she did.  I'm not saying she

1    did.  But I have to rely on the expert's representation that

2    was given to support her position.

3              MS. VARGAS:  Yes, Your Honor.  And that is exactly why

4    the technical assistance directs -- it is particularly

5    important in the context of learning disabilities, which are

6    difficult to diagnose, particularly in gifted students where

7    they can be masked through early education.  That's why the

8    Department of Justice says that it's really important to

9    actually put eyes on the person and talk to them and understand

10   how they approach the test and how that they did it, because

11   from a distance where all you have is paperwork, those kind of

12   scores by definition in a bright person with learning

13   disability, they're going to look just like Ms. Ramsay's.  You

14   have to have somebody who is trained, who is actually

15   communicating with her, who is actually looking at the validity

16   of what she's saying and the sincerity of her effort in drawing

17   a conclusion.  And that's not something that can be done in

18   learning disabilities on paper.  And that's certainly what the

19   technical assistance says.

20             THE COURT:  Very well.

21             MS. VARGAS:  So defendant has I think admitted pretty

22   clearly that it did none of the things in the technical

23   assistance despite the fact that that technical assistance is

24   entitled to deference.  The US Supreme Court in Bragdon v.

25   Abbott said that there should be deference given.  And courts

1  of appeals have held that unless the technical assistance is

2  directly contrary to the regulation itself, which they aren't

3  in this case, that they should be afforded deference.

4       And certainly it was something that Mr. Burgoyne

5  thought was worth asking for, because he did ask for it on

6  behalf of his client until he didn't like the result, and then

7  he trained the consultants, the ones who evaluated Ms. Ramsay,

8  in a version of the law that they would have preferred to have.

9       So we talked briefly about the fact that the NBME has

10  extraordinary resources.  And after Your Honor rules, whenever

11  that is, they will go about their business.  Their business

12  will go on.

13       It is a very different story for Ms. Ramsay.  If Ms.

14  Ramsay doesn't get the double time, her future as a doctor is

15  quite literally over.  It doesn't matter how much determination

16  she put in to succeed in medical school.  It doesn't matter how

17  smart she is.  It doesn't matter how hard she worked if she

18  doesn't have a fair opportunity to show what she knows.  And

19  the only way she can do that is if she has the extended time

20  that somebody with extraordinary respected credentials who

21  defendant's own people have acknowledged did everything he was

22  supposed to do, and they have no question with how he did it

23  and what he tested, unless his report is given more

24  credibility, than how this young woman did.  Did she get a

25  sticker on her kindergarten report card for good behavior?  We

1   don't have the benefit of bringing in her kindergarten teacher.

2   So certainly the few words they might have chosen to put in

3   kindergarten on her report card, certainly those words can't

4   damn her future as a doctor.

5         And so we've already briefed the standards for what's

6   required for a preliminary injunction.  I don't think we need

7   to belabor that.  But I would just submit to the Court that we

8   leave it to you to determine what's in the public interest

9   here.

10        THE COURT:  Thank you, Counsel.

11        Defense?

12        MR. BURGOYNE:  Yes, Your Honor.  And with apologies, I

13   don't have a copy of the technical assistance guidance with me,

14   so with your indulgence, I hate to use a cell phone, but I have

15   the guidance pulled up.

16        THE COURT:  That's fine.

17        MR. BURGOYNE:  One of the things that wasn't read to

18   you with all the reading on technical assistance was the last

19   page of that document.

20        And the last page of that document states as follows:

21   This guidance document is not intended to be a final agency

22   action, has no legally binding effect and may be rescinded or

23   modified in the department's complete discretion in accordance

24   with applicable laws.  The department's guidance documents,

25   including this document, do not establish legally enforceable

1  responsibilities beyond what is required by the terms of the

2  applicable statutes, the regulations or judicial precedent.

3       And as a consequence, it is not surprising that much

4  of what you're hearing is based on the technical guidance.  In

5  fact, what the ADA requires that the testing entities like the

6  National Board of Medical Examiners administer their exams in a

7  place and manner that is accessible to individuals with

8  disabilities.  In order to be entitled to those accommodations,

9  an individual has to be disabled within the meaning of the ADA.

10  And to be disabled within the meaning of the ADA, you have to

11  be substantially limited in one or more major life activities

12  as compared to most people in the general population.

13       And the evidence in this case did not show that Ms.

14  Ramsay is in fact substantially limited in any major life

15  activities that are relevant to taking the test like the Step 1

16  exam as compared to most people in the general population.

17       The evidence that Ms. Ramsay offered was primarily Dr.

18  Smith's testimony.  And Dr. Smith in turn had reviewed

19  information from other professionals, but as you pointed out,

20  acknowledged he that was the first one to diagnose her with

21  dyslexia, a lifelong impairment, and that he had done that in

22  2018 in connection with her desire to get accommodations on the

23  Step 1 exam.

24       The first diagnosis of ADHD was in 2009.  ADHD, also a

25  lifelong impairment, but she was diagnosed with that in her

1   second year at Ohio State after she had already achieved a

2   3.56 grade point average with no accommodations.

3           Dr. Smith's testimony was that in his opinion, Dr.

4   Smiy's ADHD diagnosis was not thorough enough to have resulted

5   in an ADHD diagnosis in accordance with the DSM criteria.

6           Dr. Smith also addressed the documentation from Dr.

7   Lewandowski, which, as was acknowledged here, was not

8   sufficient to produce a reliable diagnosis regarding a learning

9   disability.

10          And then finally he said he discounted Mr.

11  Livingston's documentation because he had administered an

12  outdated test and had otherwise performed insufficient

13  evaluation of Ms. Ramsay.

14          Dr. Smith acknowledged that he saw nothing in the

15  educational records or the standardized testing history that

16  indicated that Ms. Ramsay experienced any issues in learning or

17  attention kindergarten to high school.  He acknowledged that

18  all of Ms. Ramsay's standardized test results reflected average

19  or above average results in reading.  He acknowledged that to

20  do well on the ACT and the MCAT one would have to have basic

21  reading skills.  And he defined dyslexia as the absence of

22  basic reading skills.

23          Regarding ADHD, he acknowledged that the evidence of

24  Ms. Ramsay experiencing multiple symptoms in multiple settings

25  and -- beginning in childhood, as would be required to make a

1   diagnosis under the DSM, came from Ms. Ramsay, her mother and

2   her fiancé.

3        The severe symptoms that Ms. Ramsay reported to Dr.

4   Smith were inconsistent with the symptoms that had been

5   referenced in the documentation from Dr. Smiy in 2009.

6        On the other side of the ledger, as I said, is the

7   history and -- on both standardized testing and academic

8   performance, real world objective evidence that NBME and the

9   external experts that it relied upon reviewed in making a

10  determination regarding her entitlement to accommodations.

11       At some point along the way, reading deficiencies and

12  attention deficiencies at the level Ms. Ramsay described would

13  have shown up in some form or fashion in records from

14  kindergarten to the 12th grade.  It isn't just a question of

15  stickers on her kindergarten report.  It's a question of

16  whether or not if someone is receiving daily attention from

17  teachers and a parent because of severe problems, whether one

18  would logically and reasonably anticipate that would show up

19  somewhere, either in someone's academic performance, someone's

20  performance on standardized tests, some of which include

21  lengthier content than the Step exam, and in the comments the

22  teachers provide.

23       Dr. Smith said in his experience you'll often see

24  teachers simply not make a comment there because so long as the

25  student is getting by, they don't want to communicate negative

1   information.  On the other hand, we know that at least three

2   years she had report cards that specifically captured

3   information and asked teachers to provide information on

4   whether or not the grades the student was receiving reflected

5   any intensive instruction from a teacher, any extra

6   instruction, any special guidance, and none of that showed up

7   in those records.  It is not unreasonable to rely on real world

8   evidence, nor is it unlawful to do so.

9        Ms. Vargas referenced the "best ensured" language and

10  said testing entities like NBME are required to administer

11  their exams to best ensure they're evaluating knowledge and

12  skills, not the disability.  That is certainly what the

13  regulation says, but that regulation kicks in after you've made

14  a determination whether someone is disabled within the meaning

15  of the ADA.  If someone is disabled within the meaning of the

16  ADA, it's at that point you have to identify appropriate

17  accommodations in order to best ensure that you measure their

18  abilities and knowledge and not the disability.

19        THE COURT:  Counsel, what do you say in reference

20  to -- here we have at least two higher institutions of learning

21  that when confronted with the plaintiff, they acknowledge,

22  without reservation or hesitation or pause, that she in fact

23  needs accommodations to matriculate in these environments.  And

24  that's the educational foundation that she proceeds with to

25  take the ultimate exam that you present to her.  And I think

1   she has accommodations in medical school in reference to a part

2   of the exam that she took.

3        What do you say in reference to why they meet -- why

4   she meets these criteria in these levels and fails to meet it

5   in your client's?

6        MR. BURGOYNE:  Well, two periods that you're referring

7   to, Your Honor.

8        The first instance was the Ohio State University

9   context where as a sophomore in college, she got accommodations

10  from the university.  As you heard, she got those

11  accommodations on the strength of an ADHD diagnosis that was a

12  made in a half an hour evaluation in which Dr. Smith said was

13  not sufficient to support a diagnosis.

14       Colleges vary in their liberalness with which they

15  will provide accommodations in an academic context.  In this

16  particular instance, Ohio State was willing to accept an ADHD

17  diagnosis, which we have now heard in this Court would not

18  support a diagnosis under the DSM-5 criteria.  And that's fine.

19  That's their prerogative.

20       When she gets into medical school, at that point of

21  course she's relying in part on the fact that she got

22  accommodations from Ohio State.  So there's a history of

23  accommodations, so the medical school says we know you've got

24  that.

25       She also says, well, I've got this additional

1  documentation here from Mr. Livingston, and this supports my

2  need for accommodations.

3          Well, then we have this trial and we hear, well, Mr.

4  Livingston's documentation is insufficient as well.  And again,

5  that's the medical school's prerogative.  They've admitted Ms.

6  Ramsay to medical school, and they have every reason to want to

7  see her succeed.  And that's great.  But that's very different

8  from a standardized testing context where exams are

9  purposefully standardized and where NBME, as the Second Circuit

10  has said, is obligated on the one hand to administer

11  accommodations when people show they're entitled to them.  At

12  the same time, it also has an obligation to ensure that it does

13  not provide accommodations if an individual has not

14  demonstrated a need for accommodations, and more importantly,

15  entitlement to accommodations under the ADA, because that's not

16  fair to other examinees.  Every examinee who takes this

17  challenging exam under time constraints would love to have the

18  exam taken over two days with half hour blocks instead of an

19  hour block and with the benefit of a less stressful testing

20  environment.

21          Your Honor, there was a question about the ADA

22  Amendments Act.  We don't dispute for a minute that that

23  statute broadened the coverage provided by the ADA.  On the

24  other hand, it didn't get rid of the requirement that someone

25  still has to establish substantial limitation in a major life

 1    activity as compared to a person in the general population.

 2         You never heard Dr. Smith once testify that she is

 3    substantially limited in a major life activity as compared to

 4    most people in the general population.  He testified that based

 5    on her dyslexia, he believes she needs extended testing time.

 6    That's a different issue than meeting the standard under the

 7    ADA for disability.

 8         Multiple courts subsequent to the ADA Amendments Act

 9    have held that it is reasonable and appropriate in a case

10    directly like this for you to consider performance on

11    standardized tests like the MCAT, the GRE, the ACT, precisely

12    because they do tell you something.

13         The Bibber case I referenced earlier by Judge Dalzell

14    where again, a very similar case, I think the plaintiff was

15    deaf, had been diagnosed early with dyslexia, came to court

16    with two qualified professionals who testified on her behalf.

17    The testing organization had experts.  And at the end of the

18    day, Judge Dalzell said, you know, there is much that is very

19    compelling in this case and difficult, but at the end of the

20    day, I have to provide and apply the law as it is stated, which

21    is there has to be substantial limitation compared to most

22    people, and he didn't find it in that case, again, looking in

23    large part at performance on external measures of real life

24    examinations.

25         There is the Black v. The National Board of Medical

1    Examiners case out of Florida, which again where the court
2    looked to performance on real life measures, performance in
3    college, performance in high school, in middle school and
4    performance on other standardized tests.
5            And then there's the Healy case we cited in our briefs
6    out of -- I believe it's Indiana, where again the court looked
7    at those externals.
8            There's also an earlier case, Love v. Law School
9    Admission Council, decided by the Eastern District of
10   Pennsylvania, where again the court looked to performance on
11   other standardized tests in evaluating whether or not there was
12   substantial limitation.
13           There was the suggestion that because Dr. Smith
14   personally evaluated her, more weight should be given to that.
15   There was also testimony that Dr. Lewandowski personally
16   evaluated her, yet there was an acknowledgment that the fact
17   that you personally evaluate somebody doesn't necessarily mean
18   that your opinion is correct or sound or at the end of the day
19   should carry controlling weight.
20           Briefly, Your Honor, on the question of irreparable
21   harm, in order to meet that requirement of the preliminary
22   injunction standard, it has to be immediate and certain.
23   Certainly at this point it has not been shown that she is
24   certain to fail the exam if she tests next week with testing
25   over two days and the other accommodations that were provided.

1  Likewise, the harm, which I don't mean to minimize, but the

2  harm is a delay in her graduate education.  And this court and

3  other courts have held that's not sufficient for irreparable

4  harm.

5         We think the case ultimately, Your Honor, should be

6  decided on the basis that Ms. Ramsay has not shown a clear

7  likelihood of succeeding on the merits under a burden where

8  she's seeking a mandatory preliminary injunction which is

9  perhaps the highest requirement in terms of the evidentiary

10  burden when someone is seeking that type of relief.

11        Thank you, Your Honor.

12        THE COURT:  Very well.  Yes, counsel.  I know you're

13  jumping up.  Rebuttal argument.

14        MS. VARGAS:  I'll keep it brief.  I promise.

15        THE COURT:  Sure.

16        MS. VARGAS:  I would draw the Court's attention

17  obviously to the court cases cited in our brief, in particular

18  Featherstone v. Pacific Northwest University of Health

19  Sciences.  That was a case in which a deaf student was admitted

20  to medical school and then requested interpreters and

21  captioning in order to understand the content.  After that

22  request was made, the medical school withdrew his admission and

23  considered -- well, first it considered for a year whether it

24  should do that, and then it ultimately withdrew his admission.

25        We represented Mr. Featherstone, and Mr. Featherstone

1  filed for a preliminary injunction.  And that injunction was

2  granted on the day of hearing.  And in the decision, the judge

3  referenced that the delay in being able to practice to one's

4  chosen profession was in and of itself discrimination, that it

5  was irreparable harm.

6         We have more than that here.  March 2nd is not

7  distant.  It is not uncertain.  It is an absolute deadline by

8  which she has to take this test.  And the ADA does not require

9  that you take it and fail it and you take it and you fail it

10 again and you try this and you fail it again.  The ADA requires

11 that having provided documentation from a qualified

12 professional, as well as a wealth of other documentation that

13 we haven't spoken about in the last few minutes but there was

14 testimony provided about it at length over the past few days,

15 that the accommodations should be provided so that you can show

16 what you know, not whether you're limited by disability.

17        And I would cite specifically to Dr. Farmer's

18 testimony that was at deposition that she -- we discussed when

19 she was in cross-examination that there was no documentation

20 that Ms. Ramsay could provide that would change their minds.

21 There was nothing she could do.

22        And it's not just about passing.  It's about the

23 ability to even get a residency.  If you pass by a point or

24 two, your ability to get a residency is irrevocably harmed.

25 You can't claw that back.  You can't somehow get a different

1  score later and substitute that.  That doesn't happen with

2  medical school residency programs and the match.  She only has

3  one chance.  And that chance is over in this courtroom with the

4  relief that the Court either grants or doesn't grant.

5          I would also say that yes, we did talk about the

6  technical assistance and manual a lot.  That's because they

7  testified that they didn't apply it and we think it's so

8  clearly applicable.  But the law and the regulations, they also

9  support what we testified and what's in the technical

10  assistance manual.

11          Finally we heard a lot about their theme of the real

12  world, the real world being MCAT and the ACT.  And it's

13  tempting for us as well to look at Ms. Ramsay and make our own

14  determinations about was she able to read that, was she not

15  able to read that.

16          Dyslexia is not that simple.  If it were, it would be

17  diagnosed every time somebody had it when they were in second

18  grade.  And the research shows that it actually is very

19  frequently, particularly in gifted students, diagnosed very

20  late when there is this sort of perfect collision between the

21  inability of their mitigation to overcome the complexity of the

22  reading and the time requirements that are necessary to read

23  that kind of complex meaning and process it and actually show

24  what you know.

25          So whether Ms. Ramsay can understand an exhibit that

1    she wrote herself and has seen before in the courtroom, I would

2    ask the Court -- I would submit that that's not the appropriate

3    determination.  We are not neuropsychologists.  Dr. Smith is.

4    And I think he was credible in acknowledging -- you know, I

5    often see experts who say all of her testing is good, all of

6    the prior diagnosis is good.  I've rarely seen an expert in the

7    courtroom say very even-handedly, this testing, I don't think

8    this was the right test.  Or this testing, I don't think it was

9    enough.  And he did that.  And then he explained why his

10   testing was valid and what he did to ensure it was valid and

11   what he did to ensure that there wasn't some kind of

12   malingering going on.  And he concluded that there wasn't.

13        And we weren't in a position any more than the

14   external evaluators who are only looking at the documentation

15   based on Mr. Burgoyne's training of what the law requires

16   making a determination.  What matters is somebody who has the

17   expertise, what that person has concluded based on a very

18   comprehensive, extensive evaluation, using multiple testing

19   modalities that all consistently, without mitigation,

20   considered support what Ms. Ramsay at great length testified.

21        And let me say that it is incredibly difficult to

22   testify about your weaknesses.  And what we often see is that

23   very often students with disabilities, they hide them.  They

24   don't ask for what they need for a long time until they have no

25   other choice.

1          And in this case it wasn't until her professors told

2     her there is something wrong, you need to go see disability

3     services, you need testing, contrary to Mr. Burgoyne's

4     representation of colleges and medical schools passing out

5     accommodations like candy.  I assure you that is not how that

6     works.  I would be out of a job.  That's not what medical

7     schools do.  Medical schools are putting forward a student at

8     the end of four years that they believe can safely practice

9     medicine.  And they would not put forward and provide

10    accommodations if they believed that the person was not doing

11    the work and showing what they know.  They would not put a

12    finger on the scale unless it was necessary.

13         And so I would urge you to find that Ms. Ramsay has

14    shown that she is an individual with a disability, which is the

15    only question that Mr. Burgoyne when we met back in your

16    chambers two months ago, three months ago, to schedule this

17    hearing, that was the only issue he raised was whether she was

18    an individual with a disability.  I would ask you to find that

19    she is and to allow her to take the accommodations so that her

20    career doesn't end today.

21         THE COURT:  Very good.  Thank you.

22         MR. BURGOYNE:  Nothing further, Your Honor.

23         THE COURT:  I'll tell you, I'll take it under

24    advisement.  And I hope to have something for you shortly.

25         In any case, thank you for your presentation of the

1    evidence in this case.

2           And good luck to you.

3           MS. RAMSAY:   Thank you.

4           MR. BURGOYNE:   Thank you, Your Honor.

5           THE COURT:   We are adjourned.

6           Oh, make sure we have -- okay.  I have the plaintiff's

7    exhibits, the defense exhibits.  And additional exhibits that

8    you included from the witnesses today.

9           MR. BURGOYNE:   I think that's right, Your Honor.

10   We'll double check.

11          THE COURT:   And I have the summaries here from the

12   defense.

13          MS. MEW:   Do we leave in everything or should we take

14   out the ones --

15          THE COURT:   Just leave it right there.

16          Leave just the documents that are admitted into

17   evidence.

18          MS. MEW:   Okay.  All right.

19          THE COURT:   So go through your exhibit book and reduce

20   them.  And don't forget to take everything else out of the

21   courtroom.  All right.

22          MS. VARGAS:   Your Honor.

23          THE COURT:   Yes, ma'am.

24          MS. VARGAS:   Would you like me to provide a copy of

25   the technical assistance manual?

1          THE COURT:  Sure.  You can leave that here.

2          MR. BURGOYNE:  I don't mind a copy if it has the last

3  page.

4          MS. VARGAS:  It's a complete copy.

5          THE COURT:  As long as counsel has seen it and has the

6  totality of it, that's fine.

7          (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13          I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  _____

17  Ann Marie Mitchell, CRR, RDR, RMR
    Official Court Reporter

18

19

20

21

22

23

24

25

1                              -   -   -

2                          I N D E X

3                              -   -   -

4

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| DR. ROBERT SMITH | | 4 | 54 | 61 |
| DR. CATHERINE FARMER | 64 | 79 | 137 | |
| MICHAEL GLENN JODOIN | 138 | 150 | | |

5

6

7

8

9

10

11
                               -   -   -

12
                          E X H I B I T S

13
                               -   -   -

14

15          NO.                        ADMITTED PAGE

16          P-21                    . . . . . . . .   3

17          P-5                            162

18          P-6                            162

19          P-7                            162

20          P-8                            162

21          P-20                           162

22          P-22                           163

23          P-33                           163

24          P-40                           163

25          P-41                           163

| 1 | P-42 | 163 |
| 2 | DX-1 | 163 |
| 3 | DX-2 | 164 |
| 4 | DX-3 | 164 |
| 5 | DX-4 | 164 |
| 6 | DX-7 | 164 |
| 7 | DX-8 | 165 |
| 8 | DX-9 | 165 |
| 9 | DX-10 | 165 |
| 10 | DX-11 | 165 |
| 11 | DX-12 | 165 |
| 12 | DX-13 | 165 |
| 13 | DX-14 | 165 |
| 14 | DX-15 | 165 |
| 15 | DX-16 | 165 |
| 16 | DX-17 | 165 |
| 17 | DX-18 | 165 |
| 18 | DX-19 | 165 |
| 19 | DX-20 | 165 |
| 20 | DX-22 | 166 |
| 21 | DX-24 | 166 |
| 22 | DX-25 | 166 |
| 23 | DX-26 | 166 |
| 24 | DX-27 | 166 |
| 25 | DX-28 | 166 |

| | | |
|---|---|---|
| 1 | DX-29 | 166 |
| 2 | DX-30 | 166 |
| 3 | DX-31 | 166 |
| 4 | DX-32 | 166 |
| 5 | DX-33 | 166 |
| 6 | DX-34 | 166 |
| 7 | DX-35 | 166 |
| 8 | DX-36 | 166 |
| 9 | DX-38 | 166 |
| 10 | DX-39 | 166 |
| 11 | DX-40 | 166 |
| 12 | DX-41 | 166 |
| 13 | DX-42 | 166 |
| 14 | DX-46 | 166 |
| 15 | DX-48 | 167 |
| 16 | DX-49 | 167 |
| 17 | DX-50 | 167 |
| 18 | DX-51 | 167 |
| 19 | DX-52 | 167 |
| 20 | DX-53 | 167 |
| 21 | DX-54 | 167 |
| 22 | DX-56 | 167 |
| 23 | DX-57 | 167 |
| 24 | DX-58 | 167 |
| 25 | DX-59 | 167 |

| 1  | DX-60 | 167 |
| 2  | DX-61 | 167 |
| 3  | DX-63 | 168 |
| 4  | DX-64 | 168 |
| 5  | DX-65 | 168 |
| 6  | DX-66 | 168 |
| 7  | DX-67 | 168 |
| 8  | DX-68 | 168 |
| 9  | DX-70 | 168 |
| 10 | DX-71 | 168 |
| 11 | DX-73 | 169 |
| 12 | DX-74 | 169 |
| 13 | DX-75 | 169 |
| 14 | DX-76 | 169 |
| 15 | DX-77 | 169 |
| 16 | DX-78 | 169 |
| 17 | DX-79 | 169 |
| 18 | DX-80 | 169 |
| 19 | DX-85 | 169 |
| 20 | DX-86 | 170 |
| 21 | DX-87 | 170 |
| 22 |  |  |
| 23 |  |  |
| 24 |  |  |
| 25 |  |  |

**$125** [1] - 8:14
**$143** [2] - 94:8, 94:22
**$375** [1] - 8:21
**'17** [1] - 154:16
**08033** [1] - 1:17
**1** [49] - 4:9, 5:16, 12:20,
12:25, 28:4, 28:16, 39:10,
43:5, 43:10, 62:16, 62:17,
65:15, 75:23, 76:10, 85:16,
85:19, 85:24, 86:4, 87:6,
88:16, 88:17, 89:3, 96:9,
102:24, 139:3, 139:12,
140:6, 140:7, 145:10,
146:16, 147:5, 148:9,
148:12, 150:23, 151:8,
151:10, 151:13, 151:17,
151:19, 151:23, 153:8,
158:11, 159:18, 162:22,
163:24, 172:17, 175:4,
183:16, 183:24
**1,700** [1] - 65:21
**10** [11] - 2:4, 77:21, 86:15,
86:20, 87:6, 104:11, 114:2,
114:3, 114:5, 147:2, 164:23
**1006** [1] - 155:7
**106** [1] - 72:18
**107** [3] - 47:20, 145:3, 145:7
**10:47** [1] - 54:3
**10th** [1] - 71:21
**11** [18] - 43:21, 44:2, 44:3,
91:1, 104:11, 104:23,
115:11, 115:14, 116:19,
119:21, 119:22, 120:9,
123:5, 124:24, 127:3, 127:6,
164:24
**111** [1] - 143:22
**11:03** [1] - 54:3
**12** [6] - 77:21, 86:15, 86:20,
87:6, 119:22, 164:25
**12:43** [1] - 118:16
**12th** [3] - 69:8, 69:16, 185:15
**13** [3] - 35:12, 35:21, 165:2
**137** [1] - 198:7
**138** [1] - 198:8
**139** [1] - 96:6
**139..** [1] - 96:7
**13th** [2] - 2:11, 71:15
**14** [4] - 35:10, 35:12, 106:19,
165:3
**145,003** [1] - 90:1
**15** [7] - 35:10, 35:12, 54:1,
76:11, 123:7, 124:24, 165:4
**150** [1] - 198:8
**155** [1] - 127:2
**15th** [1] - 154:18
**16** [4] - 33:16, 40:19, 43:23,
165:20
**162** [5] - 198:17, 198:18,
198:19, 198:20, 198:21
**163** [5] - 198:22, 198:23,

198:24, 198:25, 199:1
**164** [5] - 199:2, 199:3, 199:4,
199:5, 199:6
**165** [13] - 199:7, 199:8,
199:9, 199:10, 199:11,
199:12, 199:13, 199:14,
199:15, 199:16, 199:17,
199:18, 199:19
**166** [20] - 199:20, 199:21,
199:22, 199:23, 199:24,
199:25, 200:1, 200:2, 200:3,
200:4, 200:5, 200:6, 200:7,
200:8, 200:9, 200:10,
200:11, 200:12, 200:13,
200:14
**167** [13] - 200:15, 200:16,
200:17, 200:18, 200:19,
200:20, 200:21, 200:22,
200:23, 200:24, 200:25,
201:1, 201:2
**168** [8] - 201:3, 201:4, 201:5,
201:6, 201:7, 201:8, 201:9,
201:10
**169** [10] - 143:20, 201:11,
201:12, 201:13, 201:14,
201:15, 201:16, 201:17,
201:18, 201:19
**17** [1] - 50:17
**170** [2] - 201:20, 201:21
**18** [1] - 50:17
**19** [2] - 1:16, 73:15
**19106** [1] - 1:9
**1996-1997** [1] - 19:12
**1:00** [1] - 126:5
**1:30** [1] - 118:8
**1:32** [1] - 118:16
**2** [18] - 8:1, 17:24, 20:11,
23:8, 23:10, 35:20, 37:3,
44:14, 51:11, 85:16, 85:19,
85:24, 87:6, 139:15, 149:10,
152:24, 164:2, 172:18
**20** [7] - 72:21, 76:2, 76:14,
147:3, 147:6, 147:15, 165:20
**200** [1] - 28:13
**20002** [1] - 2:5
**20005** [1] - 2:12
**2003** [1] - 52:18
**2006** [1] - 65:3
**2007** [1] - 106:25
**2008** [3] - 4:7, 106:19, 129:25
**2009** [4] - 21:3, 50:20,
183:25, 185:6
**2010** [1] - 52:18
**2014** [6] - 109:14, 109:23,
129:23, 130:1, 130:6, 131:6
**2016** [10] - 18:5, 18:9, 20:5,
68:23, 83:18, 100:10,
119:14, 123:17, 127:3, 127:6
**2017** [13] - 70:21, 70:25,
71:8, 89:25, 90:2, 94:5, 94:8,

139:12, 140:8, 147:5,
154:12, 154:16, 161:25
**2018** [14] - 18:3, 72:9, 72:12,
72:21, 73:15, 84:3, 91:1,
91:4, 91:7, 91:17, 92:2, 92:8,
92:9, 183:23
**2019** [4] - 1:10, 79:24, 162:9,
163:2
**202** [2] - 2:5, 2:12
**2020** [1] - 172:18
**21** [5] - 128:23, 128:24,
131:21, 131:22, 131:23
**22** [2] - 132:21, 165:25
**23** [3] - 45:7, 57:2, 57:4
**24** [7] - 134:3, 134:5, 134:7,
165:25, 166:2, 166:4, 166:6
**248-5092** [1] - 2:5
**25** [4] - 47:13, 147:13,
147:14, 147:15
**26** [6] - 30:15, 30:18, 30:19,
30:20, 166:3
**267** [1] - 1:23
**27** [1] - 166:3
**27th** [1] - 74:3
**28** [4] - 68:23, 149:11,
149:14, 158:17
**280** [1] - 139:4
**299-7250** [1] - 1:23
**2:19-cv-02002** [1] - 1:3
**2:36** [1] - 161:15
**2:49** [1] - 161:15
**2nd** [1] - 192:7
**3** [9] - 1:6, 17:9, 19:24, 22:18,
23:19, 48:12, 114:14, 164:5,
198:16
**3.56** [1] - 184:3
**30** [7] - 76:2, 120:14, 149:7,
149:18, 150:4, 153:8, 158:20
**31** [5] - 48:2, 48:8, 57:4,
109:23, 131:6
**31st** [2] - 58:20, 63:13
**33** [2] - 121:14, 121:17
**34** [10] - 4:19, 6:4, 99:8,
99:17, 99:18, 116:19,
117:10, 119:7, 128:25,
131:21
**35** [7] - 7:16, 102:23, 104:3,
148:4, 149:18, 150:4, 152:8
**350** [3] - 8:21, 8:23, 8:24
**354-5640** [1] - 1:17
**36** [5] - 41:24, 165:25, 166:4,
166:7, 166:8
**36.105D3** [1] - 114:14
**37** [1] - 166:4
**38** [5] - 39:18, 40:14, 40:20,
45:15, 166:13
**39** [1] - 48:6
**3:00** [1] - 160:16
**3:47** [1] - 197:8
**4** [5] - 18:12, 52:21, 100:20,

164:8, 198:5
**40** [14] - 40:23, 75:24,
107:18, 107:20, 139:8,
147:12, 148:2, 148:5,
148:14, 148:16, 149:6,
149:7, 152:9, 153:10
**41** [1] - 109:3
**42** [5] - 42:11, 51:1, 51:4,
126:22, 166:13
**45** [2] - 76:4, 76:12
**46** [1] - 166:17
**48** [2] - 166:20, 167:14
**49** [1] - 167:5
**5** [9] - 1:10, 70:25, 71:8,
110:14, 114:2, 114:4, 114:7,
119:14, 164:11
**50** [1] - 42:9
**504** [1] - 103:9
**51** [2] - 16:21, 62:1
**53237** [2] - 127:7, 127:8
**54** [3] - 166:20, 167:14, 198:5
**56** [1] - 167:15
**6** [7] - 18:3, 19:3, 53:8, 72:9,
72:12, 164:11, 167:20
**60** [9] - 66:3, 67:25, 68:4,
71:9, 71:22, 71:24, 71:25,
72:1, 148:21
**60-day** [1] - 68:7
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**61** [2] - 167:15, 198:5
**62** [1] - 40:19
**63** [4] - 167:19, 167:21,
168:2, 168:3
**64** [4] - 48:7, 90:11, 168:3,
198:7
**65** [4] - 66:3, 90:11, 90:15,
168:3
**654-6200** [1] - 2:12
**67** [1] - 168:3
**68** [2] - 167:19, 167:21
**6th** [1] - 69:1
**7** [6] - 33:3, 33:7, 102:23,
110:22, 164:13
**70** [3] - 90:23, 148:21, 168:13
**700** [1] - 2:11
**71** [5] - 139:22, 150:16,
168:13, 168:14, 168:15
**73** [1] - 168:21
**74** [4] - 30:18, 30:23, 30:24,
30:25
**74th** [2] - 30:13, 30:21
**75** [1] - 40:15
**76** [2] - 30:22, 143:25
**77** [3] - 74:3, 74:5, 90:22
**79** [1] - 198:7
**8** [3] - 104:3, 113:4, 164:21
**80** [4] - 73:21, 74:4, 74:5,
168:21

**81** [1] - 127:2
**85** [1] - 169:11
**856** [1] - 1:17
**86** [1] - 169:18
**86th** [1] - 30:8
**87** [1] - 169:18
**88** [1] - 47:6
**89** [1] - 72:18
**9** [3] - 148:15, 148:17, 164:22
**90** [3] - 139:10, 143:15, 143:16
**92** [2] - 32:23, 33:3
**98th** [1] - 32:14
**990** [1] - 94:10
**9:30** [2] - 1:10, 3:1
**a.m** [4] - 1:10, 3:1, 54:3
**AAMC** [1] - 85:18
**Abbott** [1] - 181:1
**abilities** [2] - 54:20, 186:19
**ability** [12] - 31:21, 92:5, 96:14, 101:14, 102:19, 102:21, 140:20, 142:5, 171:12, 174:7, 192:24, 192:25
**Ability** [1] - 116:11
**able** [20] - 5:8, 27:21, 40:14, 40:19, 43:25, 66:22, 68:3, 76:22, 77:23, 82:5, 90:4, 148:20, 149:4, 171:13, 176:2, 178:3, 179:19, 192:4, 193:15, 193:16
**above-entitled** [1] - 197:15
**absence** [6] - 10:21, 36:9, 162:18, 178:13, 178:15, 184:22
**absolute** [1] - 192:8
**absolutely** [2] - 79:11, 109:12
**academic** [13] - 18:15, 25:3, 25:12, 111:22, 114:21, 115:5, 115:7, 177:6, 177:8, 177:11, 185:8, 185:20, 187:16
**accept** [6] - 91:23, 126:18, 157:10, 157:11, 179:4, 187:17
**accepted** [2] - 61:7, 125:14
**access** [2] - 154:19, 171:11
**accessed** [3] - 151:2, 152:3, 158:4
**accessible** [2] - 158:12, 183:8
**accident** [1] - 167:8
**accommodation** [27] - 21:4, 67:24, 77:5, 77:14, 78:4, 78:18, 88:5, 88:7, 88:10, 90:8, 92:23, 92:24, 93:5, 104:9, 104:17, 113:19, 120:12, 120:25, 123:22, 126:12, 128:4, 130:4, 137:9,

137:11, 177:24, 178:24, 179:6
**accommodations** [125] - 4:9, 4:14, 5:6, 5:9, 5:14, 5:16, 7:24, 9:8, 12:20, 12:25, 14:25, 18:1, 18:9, 18:17, 19:6, 19:7, 19:11, 19:22, 20:23, 29:7, 31:25, 33:9, 65:15, 65:19, 66:1, 66:5, 67:5, 67:12, 68:21, 72:6, 75:12, 77:9, 78:20, 78:25, 79:3, 79:4, 80:3, 80:24, 83:10, 90:18, 90:21, 91:18, 91:24, 92:3, 93:13, 95:23, 97:14, 97:15, 97:19, 100:17, 101:11, 103:3, 103:4, 103:6, 104:2, 104:7, 111:9, 111:12, 113:18, 115:19, 116:2, 124:8, 125:11, 128:17, 128:21, 129:3, 129:9, 129:17, 129:18, 130:2, 130:12, 130:14, 131:2, 131:8, 131:14, 132:2, 132:14, 133:19, 134:14, 134:15, 135:15, 135:18, 136:1, 136:10, 136:13, 136:19, 171:15, 172:4, 172:5, 172:23, 172:25, 173:1, 173:3, 176:4, 177:5, 177:7, 177:10, 177:23, 178:8, 178:13, 178:15, 178:16, 178:18, 183:9, 183:23, 184:3, 185:11, 186:18, 186:24, 187:2, 187:10, 187:12, 187:16, 187:23, 187:24, 188:3, 188:12, 188:14, 188:15, 188:16, 191:1, 192:16, 195:6, 195:11, 195:20
**accordance** [3] - 6:1, 182:24, 184:6
**according** [2] - 176:20, 176:21
**accuracy** [1] - 54:17
**accurate** [8] - 7:5, 10:22, 27:14, 34:6, 54:21, 101:9, 107:7
**accurately** [8] - 12:3, 26:7, 26:21, 45:2, 101:4, 152:7, 173:21, 177:19
**achieve** [4] - 32:17, 114:19, 114:20, 177:11
**achieved** [4] - 31:4, 42:9, 42:11, 184:2
**achievement** [6] - 6:14, 15:18, 22:20, 101:4, 173:22, 177:19
**Achievement** [1] - 23:1
**acknowledge** [2] - 174:16, 186:22

**acknowledged** [7] - 181:22, 183:21, 184:8, 184:15, 184:18, 184:20, 184:24
**acknowledging** [1] - 194:5
**acknowledgment** [1] - 190:17
**acquiring** [1] - 33:19
**Act** [24] - 105:11, 105:18, 105:20, 105:23, 106:1, 106:3, 106:25, 107:4, 108:2, 108:14, 108:19, 108:24, 110:3, 119:16, 119:19, 120:2, 123:16, 124:9, 127:5, 129:5, 170:25, 171:21, 188:23, 189:9
**ACT** [18] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:3, 27:1, 28:3, 28:17, 28:19, 28:25, 31:17, 33:21, 104:2, 178:1, 184:21, 189:12, 193:13
**action** [1] - 182:23
**ACTION** [1] - 1:3
**activities** [8] - 8:4, 78:2, 105:15, 114:22, 124:13, 177:13, 183:12, 183:16
**activity** [14] - 66:25, 80:6, 105:13, 108:7, 111:24, 112:2, 114:18, 128:14, 128:20, 133:13, 133:16, 133:17, 189:2, 189:4
**Acts** [1] - 105:5
**actual** [6] - 26:10, 39:23, 46:21, 47:13, 114:16, 174:20
**ADA** [56] - 64:20, 79:19, 99:25, 100:14, 100:16, 102:3, 102:15, 104:20, 105:5, 105:7, 105:11, 105:20, 105:25, 106:3, 106:6, 106:25, 107:4, 108:1, 108:9, 108:14, 108:19, 108:24, 109:23, 110:2, 110:19, 112:3, 119:16, 119:19, 120:2, 123:9, 123:16, 124:9, 124:11, 124:16, 127:5, 127:24, 129:5, 130:3, 170:24, 170:25, 171:4, 171:5, 171:21, 177:7, 183:6, 183:10, 183:11, 186:16, 186:17, 188:16, 188:22, 188:24, 189:8, 189:9, 192:9, 192:11
**ADAA** [1] - 172:1
**adaptive** [1] - 111:6
**add** [5] - 113:13, 124:17, 125:9, 127:15, 127:21
**ADD** [3] - 5:3, 6:25, 7:4
**ADD/ADHD** [1] - 51:4
**added** [1] - 105:14
**addition** [4] - 76:4, 85:6,

93:8, 152:1
**additional** [18] - 5:9, 35:24, 75:19, 75:25, 76:5, 76:6, 93:19, 93:20, 114:24, 116:3, 124:12, 130:19, 156:18, 173:5, 177:14, 179:3, 188:1, 196:8
**address** [3] - 27:5, 116:5, 130:23
**addressed** [4] - 106:20, 131:13, 131:15, 184:7
**addressing** [1] - 26:25
**adequate** [1] - 57:17
**adequately** [3] - 27:6, 44:1, 157:9
**ADH** [2] - 13:9, 13:17
**ADHD** [37] - 5:3, 6:7, 6:24, 7:4, 8:6, 9:18, 11:13, 12:6, 12:14, 13:3, 16:14, 24:22, 51:14, 52:22, 53:6, 60:15, 61:17, 70:13, 70:16, 80:2, 83:7, 84:9, 120:10, 120:14, 120:18, 120:23, 148:20, 174:7, 175:18, 176:11, 183:25, 184:5, 184:6, 184:24, 187:12, 187:17
**adjourned** [1] - 196:6
**adjustable** [1] - 77:3
**administer** [9] - 15:15, 22:23, 42:7, 44:5, 79:9, 177:18, 183:7, 186:11, 188:11
**administered** [25] - 16:11, 21:19, 22:25, 24:14, 25:24, 41:4, 42:1, 42:4, 48:16, 48:24, 56:14, 58:23, 59:13, 59:24, 59:25, 85:20, 95:7, 101:1, 101:2, 141:18, 143:10, 173:19, 173:20, 176:8, 184:12
**administering** [1] - 57:11
**administers** [1] - 139:2
**administration** [9] - 24:8, 42:4, 48:20, 75:22, 82:8, 140:3, 140:12, 140:17, 141:10
**administrations** [1] - 42:7
**admission** [3] - 168:25, 191:23, 191:25
**Admission** [1] - 190:10
**admissions** [2] - 160:7, 161:10
**admit** [2] - 64:3, 163:24
**ADMITTED** [1] - 198:15
**admitted** [46] - 3:11, 3:12, 26:12, 83:3, 83:6, 136:17, 161:20, 161:23, 162:6, 162:12, 162:15, 162:19, 162:23, 162:24, 162:25, 163:4, 163:8, 163:11,

163:17, 163:20, 163:23,
164:1, 164:4, 164:7, 164:10,
164:12, 164:15, 165:6,
165:24, 166:12, 166:16,
166:19, 167:12, 167:18,
168:10, 168:12, 168:20,
169:7, 169:9, 169:15,
170:16, 172:23, 180:22,
188:6, 191:20, 196:17
**adopt** [2] - 127:25, 172:9
**adopting** [2] - 125:4, 127:4
**adoption** [1] - 171:22
**adult** [1] - 50:11
**adults** [2] - 5:7, 50:10
**advance** [4] - 17:2, 116:21,
116:25, 117:21
**Advice** [2] - 121:17
**advice** [1] - 121:19
**advisement** [1] - 195:25
**affect** [2] - 12:20, 111:12
**affected** [1] - 57:19
**afford** [1] - 132:9
**afforded** [1] - 181:4
**afternoon** [4] - 118:17,
118:18, 118:24, 118:25
**afterwards** [2] - 27:7, 140:21
**agency** [5] - 116:12, 132:8,
132:10, 172:10, 182:22
**ages** [1] - 46:25
**ago** [9] - 57:24, 73:5, 81:15,
88:6, 92:16, 132:12, 161:4,
195:17
**agree** [17] - 28:21, 31:6,
31:20, 36:3, 80:13, 87:10,
87:13, 95:12, 108:8, 109:22,
110:1, 113:7, 115:6, 115:17,
133:3, 134:7, 154:15
**agreed** [2] - 39:11, 95:2
**ahead** [4] - 38:14, 38:24,
169:17, 172:3
**aid** [1] - 21:4
**aided** [1] - 1:25
**aids** [3] - 103:5, 103:7,
169:24
**Alberta** [2] - 138:16, 138:18
**alert** [1] - 78:1
**alleging** [1] - 80:1
**allotted** [1] - 143:15
**allow** [7] - 26:17, 67:25,
93:16, 126:16, 152:12,
155:3, 195:20
**allowed** [4] - 53:8, 137:15,
152:22, 176:19
**allowing** [1] - 157:10
**almost** [10] - 34:7, 49:16,
49:17, 50:7, 73:23, 74:6,
75:10, 134:4, 179:17
**alone** [1] - 176:5
**aloud** [7] - 77:6, 77:15,
77:19, 78:1, 81:16, 81:18,

88:6
**alphabet** [2] - 19:14, 20:22
**altered** [1] - 18:18
**altogether** [1] - 132:11
**amended** [1] - 170:24
**amending** [2] - 106:6, 108:8
**Amendment** [1] - 108:1
**Amendments** [22] - 105:5,
105:11, 105:18, 105:20,
105:23, 106:3, 107:4,
108:14, 108:19, 108:24,
110:3, 119:16, 119:19,
120:2, 123:16, 124:9, 127:5,
129:5, 170:25, 171:21,
188:23, 189:9
**amendments** [2] - 105:14,
124:11
**Americans** [1] - 106:1
**amount** [9] - 28:21, 143:13,
143:14, 144:22, 146:19,
149:3, 150:9, 157:22, 173:10
**analysis** [6] - 106:8, 108:10,
120:3, 123:11, 138:12, 171:5
**analyst** [1] - 158:10
**Ann** [2] - 1:22, 197:18
**annotated** [1] - 162:21
**answer** [38] - 27:11, 33:16,
40:14, 40:23, 44:9, 44:11,
63:8, 86:24, 87:2, 93:12,
96:14, 96:19, 96:23, 96:24,
97:2, 101:23, 102:17, 105:6,
108:16, 113:11, 128:17,
131:5, 137:3, 139:9, 140:11,
140:13, 143:16, 143:21,
145:23, 146:23, 146:24,
149:17, 150:3, 151:22,
152:6, 152:13, 158:18,
159:17
**answered** [13] - 43:17, 48:8,
62:10, 86:7, 143:19, 143:23,
144:22, 145:1, 151:12,
152:7, 152:10, 153:23,
157:25
**answering** [3] - 145:9,
145:18, 145:21
**answers** [13] - 44:13, 86:11,
86:16, 86:20, 86:22, 87:2,
141:20, 146:12, 146:18,
147:9, 159:3, 164:13
**anticipate** [3] - 48:23,
146:20, 185:19
**anticipated** [2] - 30:3, 120:17
**ants** [1] - 46:23
**anxiety** [1] - 111:20
**anxiety-provoking** [1] -
111:20
**apologies** [2] - 109:6, 182:13
**apologize** [10] - 16:22,
17:11, 19:25, 23:15, 31:2,
41:24, 45:12, 47:19, 69:12,

144:11
**appeal** [1] - 162:10
**appeals** [1] - 181:2
**appear** [1] - 40:4
**APPEARANCES** [2] - 1:14,
2:1
**appearing** [1] - 20:13
**applicable** [5] - 21:24, 49:24,
182:25, 183:3, 193:9
**applicant's** [1] - 136:7
**applicants** [2] - 66:8, 96:17
**application** [3] - 5:13, 90:13,
175:5
**applications** [1] - 80:10
**applied** [3] - 29:2, 55:9,
102:18
**applies** [4] - 101:10, 101:17,
101:18, 172:21
**apply** [2] - 189:21, 193:8
**applying** [1] - 172:12
**appreciated** [1] - 117:1
**approach** [2] - 6:21, 180:11
**appropriate** [5] - 7:24,
113:17, 186:17, 189:10,
194:3
**approve** [1] - 78:20
**approved** [2] - 77:14, 137:9
**approximation** [1] - 65:25
**aptitude** [3] - 101:4, 173:22,
177:19
**area** [9] - 4:13, 5:5, 42:20,
63:2, 128:15, 137:18,
159:10, 159:12, 159:13
**areas** [3] - 8:9, 32:18, 169:2
**argue** [1] - 160:19
**argues** [1] - 171:9
**argument** [2] - 160:24,
191:14
**arguments** [6] - 161:7,
161:10, 171:20, 172:9,
172:15
**arithmetic** [1] - 22:21
**arose** [1] - 26:25
**arrive** [1] - 22:23
**arrived** [4] - 22:6, 51:23,
52:1, 52:2
**arriving** [1] - 55:24
**article** [5] - 16:24, 62:3,
62:16, 62:20, 163:7
**articles** [6] - 9:12, 13:22,
13:25, 14:3, 17:2, 63:4
**aside** [3] - 31:24, 32:5, 33:7
**aspect** [2] - 112:21, 157:20
**assertion** [1] - 150:2
**assessing** [2] - 113:17,
125:10
**assessment** [11] - 5:2, 15:21,
22:23, 24:8, 32:5, 43:21,
47:13, 48:10, 49:5, 63:6,
178:23

**assessments** [16] - 12:13,
16:11, 21:18, 25:24, 27:2,
31:6, 31:24, 32:7, 33:8,
33:11, 37:7, 39:4, 43:17,
46:10, 49:8, 62:21
**assigned** [3] - 83:19, 83:21,
128:19
**assignments** [2] - 18:18,
111:18
**assistance** [37] - 36:6,
115:15, 115:19, 116:2,
116:4, 129:2, 129:4, 129:6,
129:9, 129:12, 129:16,
130:12, 130:14, 130:19,
131:1, 131:7, 131:10,
131:13, 132:1, 132:3,
132:13, 133:18, 172:4,
172:12, 176:21, 176:23,
177:4, 180:5, 180:20,
180:24, 181:2, 182:14,
182:19, 193:7, 193:11, 197:1
**Assistance** [1] - 133:8
**assume** [3] - 20:17, 135:13,
154:13
**assumed** [2] - 43:24, 62:18
**assure** [4] - 100:25, 103:2,
104:5, 195:6
**attached** [1] - 17:6
**attachment** [1] - 68:19
**attachments** [1] - 68:17
**attempt** [2] - 75:2, 79:9
**attempted** [2] - 26:21,
151:22
**attempting** [2] - 74:21,
101:21
**attention** [15] - 18:20, 34:18,
35:8, 60:23, 61:3, 61:4, 67:9,
67:18, 137:12, 159:14,
174:3, 184:18, 185:13,
185:17, 191:17
**attention-deficit/
hyperactivity** [2] - 67:18,
159:14
**attorney** [7] - 36:12, 36:17,
84:1, 84:2, 84:6, 102:1,
166:23
**attorneys** [2] - 84:8, 94:13
**audit** [6] - 66:17, 71:5, 73:1,
74:16, 83:17
**August** [2] - 127:3, 127:6
**author** [1] - 121:24
**automatically** [4] - 61:3,
83:24, 97:23, 97:24
**auxiliary** [1] - 103:5
**available** [7] - 10:6, 10:17,
88:20, 88:22, 93:2, 150:10,
155:5
**average** [23] - 24:19, 30:6,
30:11, 30:15, 31:4, 31:8,
32:12, 32:16, 49:6, 55:4,

59:4, 63:15, 63:16, 139:10, 143:14, 145:2, 145:6, 174:6, 184:3, 184:19, 184:20
**avoid** [3] - 17:13, 20:21, 25:14
**aware** [9] - 32:1, 32:6, 33:9, 106:13, 108:20, 108:25, 131:6, 139:11, 170:13
**awful** [1] - 49:12
**babysitter** [2] - 94:20, 94:25
**bachelor's** [2] - 65:7, 138:15
**background** [2] - 65:5, 138:14
**backwards** [1] - 153:10
**balanced** [1] - 115:25
**base** [1] - 62:20
**based** [30] - 15:6, 16:15, 22:4, 24:11, 28:7, 28:8, 28:9, 36:6, 54:21, 59:12, 66:19, 66:22, 67:5, 67:12, 77:8, 80:11, 83:21, 84:13, 84:14, 84:20, 84:23, 85:14, 95:19, 141:10, 179:1, 179:11, 183:5, 189:5, 194:16, 194:18
**basic** [8] - 33:19, 33:21, 33:25, 34:3, 86:4, 86:6, 184:21, 184:23
**Basic** [1] - 10:12
**basis** [5] - 34:24, 84:12, 87:14, 126:13, 191:7
**Bates** [1] - 168:3
**battery** [4] - 95:6, 95:13, 174:18, 175:24
**bear** [1] - 163:23
**bearing** [1] - 86:25
**BEFORE** [1] - 1:12
**began** [2] - 18:16, 52:17
**begin** [2] - 71:9, 96:9
**beginning** [4] - 91:3, 119:22, 127:11, 185:1
**begins** [4] - 66:7, 110:24, 112:6, 113:5
**behalf** [11] - 51:5, 64:1, 115:18, 129:24, 130:1, 130:7, 130:10, 168:1, 171:24, 181:7, 189:17
**behavior** [7] - 78:3, 81:18, 82:6, 146:15, 157:24, 164:21, 182:1
**behavioral** [2] - 111:6, 175:17
**behind** [3] - 77:22, 105:19, 120:2
**belabor** [1] - 182:8
**believes** [1] - 189:6
**below** [10] - 30:20, 32:13, 32:17, 32:18, 43:24, 45:7, 51:23, 55:4, 59:12, 116:2
**benefit** [2] - 182:2, 188:20
**Berger** [9] - 17:19, 33:14,

53:23, 62:7, 79:21, 80:7, 80:25, 167:4, 168:2
**BERGER** [72] - 1:16, 3:3, 26:5, 31:10, 33:5, 36:19, 37:24, 38:5, 38:17, 38:19, 38:22, 39:1, 47:19, 47:21, 53:24, 54:7, 61:19, 63:20, 64:2, 109:4, 140:23, 144:2, 145:5, 145:12, 146:2, 146:7, 146:21, 149:22, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:25, 160:13, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15
**best** [17] - 74:23, 91:16, 101:1, 101:13, 101:20, 102:18, 112:14, 116:3, 130:18, 135:12, 146:15, 155:1, 171:12, 173:19, 186:10, 186:12, 186:18
**better** [2] - 30:21, 30:25
**between** [10] - 15:13, 20:13, 52:6, 54:25, 76:6, 87:7, 92:8, 168:24, 193:21
**beyond** [2] - 103:22, 183:2
**Bibber** [1] - 189:14
**big** [2] - 87:7, 139:18
**biggest** [2] - 11:24, 12:2
**binder** [3] - 58:23, 99:7, 119:7
**binding** [1] - 182:23
**biology** [1] - 65:7
**birds** [1] - 44:21
**bit** [8] - 18:12, 51:7, 58:25, 59:2, 72:3, 84:17, 145:15, 154:23
**Black** [1] - 190:1
**blindly** [4] - 149:17, 150:3, 158:18, 159:2
**block** [20] - 76:14, 76:15, 139:7, 143:9, 147:18, 147:22, 148:21, 149:17, 150:3, 150:8, 152:6, 152:19, 152:20, 152:22, 153:14, 158:16, 165:17, 188:20
**blocks** [10] - 75:24, 76:1, 76:7, 139:5, 139:6, 147:25, 148:1, 148:3, 188:19
**BOARD** [1] - 1:5
**board** [2] - 21:11, 176:14

**Board** [11] - 64:21, 64:22, 85:18, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1
**boat** [1] - 41:11
**bold** [3] - 103:11, 103:13, 133:14
**bolded** [7] - 132:22, 133:4, 133:7, 133:9, 133:11, 133:22
**bolding** [1] - 134:2
**book** [5] - 45:1, 45:5, 50:23, 50:24, 196:20
**booklet** [3] - 42:25, 46:2, 46:3
**bottom** [2] - 6:24, 43:2
**box** [1] - 64:10
**boy** [3] - 17:17, 23:21, 47:14
**Bragdon** [1] - 180:25
**break** [14] - 26:10, 53:23, 53:25, 75:19, 75:25, 76:1, 76:4, 76:5, 76:6, 76:16, 118:7, 119:1, 119:5
**breaks** [4] - 18:19, 76:6, 77:7, 135:16
**Brendan** [2] - 79:21, 80:7
**brief** [6] - 3:3, 65:4, 138:13, 164:18, 191:15, 191:18
**briefed** [1] - 182:6
**briefing** [5] - 160:22, 160:25, 161:3, 161:4, 161:6
**briefly** [6] - 9:6, 24:21, 66:4, 181:10, 190:21
**briefs** [3] - 81:5, 161:5, 190:6
**bright** [1] - 180:13
**bring** [4] - 82:1, 118:5, 138:6, 157:2
**bringing** [3] - 81:22, 112:23, 182:2
**broad** [2] - 105:25, 171:7
**broaden** [1] - 110:18
**broadened** [3] - 108:2, 108:4, 188:24
**broken** [2] - 76:8, 139:5
**brought** [1] - 161:5
**bullet** [10] - 5:7, 5:19, 5:20, 120:6, 121:5, 121:19, 131:25, 132:2, 132:4, 136:12
**burden** [2] - 191:8, 191:11
**BURGOYNE** [89] - 2:10, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:20, 26:24, 31:16, 33:2, 33:6, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 38:7, 38:12, 38:15, 38:21, 39:2, 47:20, 47:22, 53:19, 61:21, 61:24, 63:17, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 112:10,

112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14, 122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:6, 144:9, 144:11, 144:12, 145:8, 145:16, 146:8, 147:4, 149:25, 150:12, 159:22, 160:3, 160:6, 160:9, 160:14, 161:2, 163:19, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3
**Burgoyne** [25] - 3:4, 26:6, 38:23, 58:11, 59:3, 60:8, 100:1, 100:5, 100:6, 100:13, 104:21, 109:21, 115:17, 121:6, 130:1, 130:6, 130:11, 130:25, 152:5, 158:15, 163:15, 169:18, 171:23, 181:5, 195:16
**Burgoyne's** [7] - 54:8, 109:17, 125:8, 129:23, 132:18, 194:16, 195:4
**business** [2] - 181:12
**Byrne** [1] - 1:8
**calculations** [3] - 120:17, 144:7, 144:20
**calendar** [2] - 71:24, 71:25
**candidate** [14] - 79:22, 80:16, 83:23, 92:17, 141:21, 142:15, 142:22, 143:4, 149:4, 157:23, 157:25, 178:14, 178:23, 179:2
**candidate's** [2] - 141:24, 178:17
**Candidates** [1] - 178:25
**candidates** [4] - 69:21, 142:1, 142:4, 145:23
**candy** [1] - 195:6
**cannot** [2] - 118:10, 151:11
**captioning** [1] - 191:22
**capture** [2] - 26:21, 141:10
**captured** [2] - 140:3, 186:3
**captures** [1] - 141:15
**card** [7] - 135:2, 165:1, 165:2, 165:3, 165:4, 182:1, 182:4
**cards** [11] - 10:5, 10:17, 11:23, 25:19, 34:9, 35:12, 35:18, 35:20, 35:23, 134:25, 186:3
**care** [3] - 7:8, 50:13, 52:19
**career** [1] - 195:21
**careful** [4] - 7:9, 7:11, 140:18, 179:1
**carefully** [1] - 97:22
**CAROLINE** [1] - 2:10
**CAROLLA** [1] - 1:15

**carrels** [1] - 77:22
**carry** [1] - 190:20
**case** [41] - 8:11, 10:18, 11:3, 13:21, 34:25, 54:23, 55:9, 55:10, 61:12, 62:24, 68:15, 74:23, 75:9, 76:10, 80:16, 81:1, 90:14, 94:15, 126:18, 139:12, 148:13, 149:14, 153:20, 160:4, 160:6, 161:21, 181:4, 183:14, 189:10, 189:14, 189:15, 189:20, 189:23, 190:2, 190:6, 190:9, 191:6, 191:20, 195:2, 196:1, 196:2
**cases** [3] - 26:16, 88:1, 191:18
**cat** [2] - 44:16, 47:14
**category** [2] - 35:23, 36:4
**CATHERINE** [2] - 64:11, 198:7
**Catherine** [2] - 64:14, 164:9
**Cathy** [1] - 64:7
**caused** [1] - 26:4
**cell** [1] - 182:15
**Center** [2] - 141:14, 142:2
**centers** [1] - 78:7
**Centers** [1] - 78:9
**central** [1] - 102:4
**certain** [7] - 14:19, 30:2, 43:23, 146:19, 171:14, 190:23, 190:25
**certainly** [11] - 26:20, 40:9, 49:16, 82:2, 126:7, 180:19, 181:5, 182:3, 182:4, 186:13, 190:24
**certified** [1] - 21:11
**certify** [1] - 197:14
**cetera** [2] - 5:11, 104:7
**challenges** [1] - 86:23
**challenging** [3] - 121:21, 122:12, 188:18
**chambers** [1] - 195:17
**chance** [3] - 170:10, 193:4
**change** [5] - 76:24, 105:12, 106:12, 123:23, 192:21
**changed** [3] - 105:10, 108:5, 123:25
**changes** [2] - 111:3, 124:10
**characterization** [2] - 95:25, 107:8
**characters** [1] - 20:14
**charge** [3] - 83:15, 83:16, 130:3
**Charles** [2] - 23:6, 24:3
**chart** [4] - 19:14, 20:22, 43:8, 169:23
**charts** [2] - 169:18, 170:2
**check** [7] - 3:20, 26:10, 38:22, 41:8, 57:7, 148:16, 196:11

**checklist** [1] - 50:15
**checklists** [1] - 49:22
**Chestnut** [1] - 1:16
**child** [2] - 99:1, 175:12
**childhood** [3] - 55:14, 55:17, 185:1
**children** [1] - 46:25
**choice** [10] - 21:23, 39:18, 86:3, 86:11, 86:16, 86:20, 86:22, 87:5, 195:1
**choices** [3] - 149:17, 150:4, 158:18
**choosing** [1] - 159:3
**chose** [3] - 88:18, 88:20, 88:22
**chosen** [2] - 182:3, 192:5
**chunks** [1] - 165:10
**Circuit** [1] - 188:10
**circulated** [1] - 36:11
**circumvent** [1] - 178:3
**cite** [4] - 114:5, 125:19, 126:2, 192:18
**cited** [3] - 81:4, 190:6, 191:18
**CIVIL** [1] - 1:3
**civil** [1] - 26:16
**clarification** [1] - 73:3
**clarify** [2] - 71:6, 167:4
**clarity** [1] - 74:15
**class** [1] - 18:19
**claw** [1] - 193:1
**clear** [6] - 52:25, 66:24, 72:3, 115:24, 159:4, 159:6, 171:18, 173:17, 191:7
**clearly** [5] - 34:3, 179:14, 179:15, 180:23, 193:9
**client** [4] - 10:3, 12:9, 174:20, 181:7
**client's** [1] - 187:6
**clients** [1] - 7:18
**clinical** [5] - 52:11, 65:8, 120:11, 120:24, 128:16
**clinically** [1] - 66:19
**clinicians** [1] - 62:18
**clock** [1] - 92:5
**closely** [2] - 11:14, 50:21
**cluster** [1] - 46:11
**clusters** [1] - 46:13
**cmew@perkinscoie.com** [1] - 2:13
**cognitive** [2] - 56:16, 57:15
**COIE** [1] - 2:9
**college** [5] - 25:18, 134:20, 135:2, 187:10, 190:4
**colleges** [2] - 187:15, 195:5
**collision** [1] - 193:21
**column** [10] - 41:7, 41:8, 140:4, 140:6, 140:11, 140:14, 140:15, 143:1,

143:8, 153:1
**columns** [1] - 140:10
**combination** [2] - 27:16, 46:10
**combined** [1] - 51:18
**coming** [5] - 7:23, 32:24, 32:25, 64:9, 74:11
**Commencing** [1] - 1:10
**comment** [6] - 50:8, 108:20, 108:24, 112:6, 115:9, 185:25
**comments** [9] - 10:6, 11:2, 11:18, 34:9, 36:14, 108:23, 110:1, 112:7, 185:22
**common** [13] - 20:18, 20:19, 26:15, 28:20, 58:4, 67:20, 84:24, 95:19, 95:21, 97:2, 110:21, 115:22, 147:22
**commonly** [1] - 20:16
**communicate** [5] - 119:1, 119:5, 122:22, 123:3, 186:1
**communicating** [1] - 180:16
**communications** [1] - 168:24
**company** [1] - 78:8
**comparable** [1] - 33:10
**compare** [5] - 6:14, 43:13, 50:19, 86:21, 94:18
**compared** [12] - 75:22, 105:13, 114:25, 128:20, 133:14, 133:23, 177:15, 183:13, 183:17, 189:2, 189:4, 189:22
**compelling** [1] - 189:20
**compensate** [1] - 18:20
**compensated** [1] - 8:11
**compensatory** [2] - 27:22, 27:24
**compilation** [1] - 37:25
**Complaint** [2] - 148:12, 163:25
**complaints** [1] - 52:9
**complete** [14] - 17:21, 40:16, 40:20, 43:25, 45:11, 68:2, 71:13, 111:17, 122:19, 146:14, 152:12, 173:6, 182:24, 197:5
**completed** [2] - 7:21, 76:15
**completeness** [1] - 74:15
**completing** [1] - 18:19
**complex** [1] - 193:24
**complexity** [1] - 193:22
**compliance** [4] - 64:21, 79:19, 105:7, 130:3
**comply** [3] - 129:2, 129:8, 129:12
**component** [2] - 56:16, 57:15
**comport** [1] - 105:18
**composite** [1] - 30:8
**comprehension** [8] - 18:21,

24:16, 24:19, 24:20, 39:15, 39:17, 43:11, 43:15
**comprehensive** [8] - 85:7, 87:20, 95:3, 96:12, 97:20, 174:18, 175:25, 194:19
**computer** [5] - 1:25, 28:7, 28:9, 140:16, 141:10
**computer-aided** [1] - 1:25
**computer-based** [3] - 28:7, 28:9, 141:10
**concentrate** [1] - 31:22
**concentrating** [2] - 111:13, 111:24
**concentration** [2] - 18:21, 174:5
**concept** [2] - 114:14, 145:17
**concerned** [3] - 48:19, 81:17, 111:4
**concerning** [1] - 150:23
**concerns** [1] - 42:16
**concluded** [6] - 21:18, 24:7, 99:3, 194:13, 194:18, 197:8
**conclusion** [7] - 22:24, 27:19, 64:4, 80:8, 80:11, 160:3, 180:18
**conclusions** [2] - 98:2, 98:4
**conclusively** [1] - 157:21
**concur** [1] - 7:14
**concurrently** [1] - 74:18
**condition** [3] - 15:5, 114:13, 174:11
**conditions** [3] - 133:15, 159:17, 174:23
**conduct** [5] - 85:6, 174:20, 174:24, 175:17, 179:12
**confident** [1] - 27:13
**confidential** [1] - 155:18
**confirm** [6] - 6:5, 40:2, 42:25, 45:14, 45:14, 63:5, 68:11
**confirming** [1] - 19:17
**conflicts** [1] - 110:20
**confronted** [1] - 186:22
**confused** [2] - 15:12, 43:19
**Congress** [3] - 108:13, 171:2, 172:10
**Congress's** [1] - 110:18
**Congressional** [6] - 105:19, 105:21, 105:23, 106:6, 108:8, 120:1, 127:25, 172:1
**connected** [1] - 111:16
**connection** [4] - 24:22, 68:14, 126:14, 183:23
**Conners'** [2] - 60:8, 60:13
**consequence** [1] - 183:4
**consider** [13] - 12:16, 53:15, 53:18, 113:8, 113:18, 133:14, 149:5, 152:10, 170:14, 175:19, 176:20, 178:16, 189:11
**considerable** [8] - 7:2,

103:3, 103:18, 103:20, 103:23, 103:25
consideration [4] - 112:8, 115:7, 150:10, 179:1
considered [15] - 6:21, 17:20, 55:24, 56:6, 97:22, 113:16, 117:12, 127:24, 136:14, 136:15, 172:14, 172:15, 191:24, 194:21
considering [2] - 103:2, 179:14
consist [2] - 41:12, 43:22
consistent [11] - 22:21, 40:20, 95:22, 97:4, 97:7, 97:11, 148:24, 149:19, 150:2, 157:23, 176:11
consistently [3] - 18:17, 176:14, 194:20
consists [1] - 39:18
constitutes [1] - 67:16
constraints [2] - 96:15, 188:18
construction [1] - 110:16
construed [1] - 171:7
consult [1] - 55:17
consultant [5] - 67:1, 84:15, 84:16, 91:9, 91:14
consultant's [1] - 91:23
consultants [25] - 66:21, 91:7, 100:9, 100:10, 100:12, 100:15, 104:12, 104:16, 117:10, 119:12, 119:15, 119:23, 120:20, 121:12, 121:20, 122:22, 123:3, 123:7, 124:20, 125:1, 125:2, 128:3, 128:11, 163:10, 181:8
Consultants [1] - 99:25
contact [3] - 52:16, 52:18, 170:13
contain [1] - 166:23
contained [1] - 26:15
contains [2] - 140:2, 154:20
content [4] - 40:9, 96:15, 185:22, 191:22
context [12] - 14:15, 16:13, 38:20, 61:16, 96:10, 113:23, 131:4, 137:3, 180:6, 187:10, 187:16, 188:9
Continental [1] - 156:23
continually [1] - 172:9
continue [4] - 62:22, 62:25, 132:4, 157:13
CONTINUED [1] - 2:1
continuing [1] - 146:5
Continuous [2] - 48:13, 60:9
continuous [1] - 49:2
contrary [3] - 121:2, 181:3, 195:4
controlling [1] - 190:20
controversy [1] - 7:3

cookie [1] - 41:9
copied [1] - 26:7
copies [1] - 172:12
copy [7] - 18:8, 38:18, 94:10, 182:14, 196:25, 197:3, 197:5
copying [1] - 155:5
core [2] - 7:3, 61:7
correct [130] - 4:9, 8:12, 9:16, 11:16, 13:23, 17:14, 21:12, 22:10, 29:24, 31:19, 34:19, 36:12, 39:13, 41:17, 42:2, 44:10, 46:9, 46:19, 47:5, 48:2, 48:9, 53:3, 55:1, 55:10, 58:21, 59:4, 59:7, 59:8, 60:7, 61:13, 61:14, 63:7, 63:10, 70:17, 71:17, 71:24, 72:13, 72:16, 72:23, 73:8, 73:12, 75:14, 76:17, 77:13, 78:9, 78:12, 78:16, 81:25, 82:10, 82:23, 83:4, 83:5, 83:7, 83:8, 84:10, 84:24, 85:9, 86:5, 86:13, 90:25, 91:5, 91:7, 91:8, 91:19, 92:3, 92:4, 92:6, 92:7, 92:18, 92:21, 93:7, 93:9, 93:10, 94:16, 95:4, 95:17, 97:6, 97:9, 97:10, 98:11, 98:12, 106:4, 106:9, 107:6, 108:2, 108:12, 108:14, 109:24, 110:8, 110:9, 110:12, 113:21, 117:13, 119:16, 119:24, 120:4, 120:16, 120:18, 121:9, 121:10, 122:9, 122:10, 122:24, 123:14, 123:17, 127:9, 130:4, 130:7, 130:15, 132:25, 134:21, 135:12, 136:14, 136:16, 140:9, 140:12, 146:13, 147:10, 147:15, 148:7, 148:8, 151:6, 153:21, 154:12, 154:15, 156:6, 158:5, 158:6, 190:19, 197:14
corrected [2] - 26:22, 120:17
correctly [8] - 54:23, 79:18, 113:13, 143:19, 143:23, 144:22, 152:10, 153:12
correspond [1] - 38:1
Council [1] - 190:10
Counsel [11] - 31:14, 31:15, 80:20, 112:22, 117:13, 146:6, 152:13, 160:17, 161:16, 170:3, 182:11
counsel [19] - 38:2, 38:4, 92:17, 93:9, 112:23, 118:11, 119:1, 119:5, 121:6, 121:8, 122:8, 126:1, 156:8, 157:7, 157:15, 170:13, 186:20, 191:13, 197:6
count [2] - 8:20, 90:12

country [1] - 78:24
counts [1] - 60:20
couple [2] - 90:16, 146:11
course [6] - 10:4, 56:2, 80:10, 95:1, 101:17, 126:17, 172:2, 187:22
COURT [3] - 1:1, 64:13, 138:3
Court [7] - 1:22, 3:1, 81:3, 106:3, 180:25, 187:18, 197:18
court [5] - 9:2, 81:11, 109:5, 189:16, 191:3
Court's [1] - 191:17
Courthouse [1] - 1:8
courtroom [6] - 155:9, 170:23, 193:4, 194:2, 194:8, 196:22
courts [5] - 132:8, 132:9, 181:1, 189:9, 191:4
cover [1] - 149:23
coverage [4] - 105:25, 110:19, 171:8, 188:24
covered [7] - 3:7, 17:19, 61:15, 100:24, 103:1, 104:5, 158:3
created [1] - 117:22
credentials [1] - 181:21
credibility [1] - 181:25
credible [1] - 194:5
credit [1] - 80:14
criminal [1] - 26:16
criteria [9] - 6:2, 12:6, 13:6, 52:22, 53:5, 53:7, 184:6, 187:5, 187:19
critically [2] - 177:1, 178:20
criticized [1] - 116:11
Cross - 198:4
cross [6] - 31:14, 79:13, 118:10, 146:4, 149:23, 192:20
CROSS [3] - 4:3, 79:14, 150:13
cross-examination [3] - 79:13, 118:10, 192:20
CROSS-EXAMINATION [3] - 4:3, 79:14, 150:13
cross-examine [1] - 31:14
CRR [2] - 1:22, 197:18
curiosity [1] - 157:14
current [1] - 53:1, 177:25, 178:19
cursory [1] - 29:1
CURTIS [1] - 1:12
cut [1] - 152:13
D-2 [1] - 23:22
D-3 [2] - 23:23, 23:24
daily [1] - 35:7, 185:17
Dalzell [2] - 189:14, 189:19
damn [1] - 182:5

data [45] - 80:11, 80:13, 80:14, 138:12, 140:2, 140:7, 141:10, 141:15, 141:17, 144:17, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 150:20, 150:22, 151:1, 152:2, 153:22, 153:25, 154:2, 154:5, 154:6, 154:10, 154:14, 154:20, 155:2, 155:14, 158:4, 158:5, 158:10, 158:11, 158:23, 158:24, 158:25, 159:4, 159:7, 168:16
database [7] - 154:4, 154:8, 154:9, 154:10, 154:20, 154:22, 158:11
date [10] - 24:8, 70:9, 74:2, 88:25, 90:12, 106:18, 119:10, 119:12, 154:13, 154:17
dated [8] - 18:3, 71:15, 72:8, 72:11, 72:21, 73:15, 109:14, 109:23
DAY [1] - 1:6
days [29] - 8:3, 18:16, 67:25, 68:4, 71:9, 71:23, 71:24, 71:25, 73:22, 74:4, 74:5, 75:20, 76:1, 76:3, 76:9, 89:2, 89:5, 89:8, 90:11, 90:13, 90:15, 90:22, 90:23, 91:22, 156:15, 156:16, 188:19, 191:1, 192:15
DC [2] - 2:5, 2:12
deadline [1] - 192:8
deaf [2] - 189:16, 191:20
deal [1] - 111:23
dealing [2] - 14:3, 104:17
dean [1] - 135:24
deans [1] - 135:20
December [5] - 1:10, 69:8, 69:16, 100:10, 119:14
decide [2] - 90:8, 91:22
decided [3] - 91:17, 190:10, 191:7
decides [1] - 101:22
decision [38] - 66:6, 66:20, 70:20, 71:21, 73:6, 73:19, 74:4, 74:10, 75:1, 81:10, 81:11, 83:9, 84:11, 84:14, 84:18, 84:20, 90:10, 90:14, 90:25, 92:2, 95:18, 95:22, 97:3, 97:4, 97:7, 97:11, 97:21, 128:16, 128:17, 161:25, 162:8, 162:9, 162:10, 163:1, 192:3
decisions [3] - 54:21, 92:13, 106:4
declaration [12] - 3:6, 17:6, 68:9, 68:14, 149:13, 150:2, 158:15, 158:17, 162:24,

164:3, 164:6, 164:9
**declines** [1] - 127:24
**decoding** [1] - 15:13
**dedicated** [1] - 93:15
**deducted** [1] - 48:4
**deep** [1] - 77:11
**deeper** [1] - 26:4
**Defendant** [2] - 1:6, 2:14
**defendant** [4] - 105:7, 118:11, 165:4, 180:22
**Defendant's** [19] - 41:24, 45:15, 48:6, 61:25, 148:9, 148:12, 163:24, 164:2, 164:5, 164:8, 164:13, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 169:17
**defendant's** [3] - 112:22, 164:14, 181:22
**defendants** [5] - 126:4, 155:11, 173:3, 178:1, 178:5
**Defense** [1] - 4:19
**defense** [8] - 64:6, 163:21, 170:18, 171:9, 179:13, 182:12, 196:8, 196:13
**defer** [12] - 97:20, 97:23, 98:2, 98:4, 98:9, 98:13, 98:16, 98:18, 98:21, 99:5, 171:9, 178:22
**deference** [6] - 132:7, 132:10, 132:17, 180:25, 181:1, 181:4
**deficiencies** [2] - 185:12, 185:13
**deficit** [3] - 61:3, 67:9, 137:12
**deficit/hyperactivity** [2] - 67:18, 159:14
**deficits** [3] - 32:2, 32:8, 33:10
**define** [1] - 33:18
**defined** [1] - 184:22
**defining** [1] - 117:25
**definitely** [1] - 117:3
**definition** [13] - 105:6, 105:10, 105:12, 107:5, 108:2, 108:4, 108:6, 114:17, 120:11, 120:12, 120:24, 171:6, 180:13
**degree** [3] - 65:7, 132:9, 138:17
**degrees** [1] - 138:15
**delay** [3] - 157:8, 191:3, 192:4
**deliberately** [3] - 12:3, 14:12, 14:16
**deliberations** [1] - 126:17
**delineating** [1] - 124:12
**delivers** [2] - 141:12, 141:13
**demand** [2] - 108:10, 171:5

**demanding** [6] - 106:8, 106:10, 108:11, 110:17, 120:5, 123:10
**demonstrate** [1] - 80:5
**demonstrated** [4] - 128:19, 136:22, 174:23, 188:15
**demonstrating** [1] - 146:15
**denial** [1] - 88:2
**denied** [3] - 73:25, 75:12, 80:3
**Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18
**deny** [10] - 67:2, 80:23, 83:9, 84:14, 84:18, 84:20, 91:17, 91:23, 92:3, 97:3
**denying** [3] - 74:7, 84:12, 90:20
**Department** [17] - 104:20, 108:20, 119:18, 125:4, 125:7, 125:13, 128:5, 129:8, 131:1, 131:7, 132:19, 163:15, 171:23, 172:14, 176:22, 180:9
**department** [3] - 127:15, 127:21, 127:24
**department's** [2] - 182:24, 182:25
**deposed** [1] - 28:15
**deposition** [42] - 9:1, 9:3, 9:4, 10:20, 11:8, 12:12, 13:21, 14:2, 14:3, 17:3, 22:4, 29:10, 29:12, 29:14, 29:18, 32:20, 32:23, 34:16, 80:22, 83:3, 83:6, 83:22, 84:23, 85:8, 85:14, 85:15, 86:2, 91:21, 95:2, 95:9, 95:14, 95:18, 96:1, 96:6, 106:2, 122:23, 123:2, 136:17, 157:1, 171:18, 192:19
**depressed** [1] - 55:7
**deputy clerk** [1] - 3:25
**describe** [2] - 8:4, 66:4
**described** [6] - 28:1, 28:2, 94:19, 110:11, 155:1, 185:13
**describing** [1] - 103:8
**description** [1] - 164:19
**designated** [1] - 116:21
**designed** [1] - 87:10
**desire** [1] - 183:23
**desk** [2] - 20:21, 77:2
**desks** [1] - 76:25
**despite** [2] - 22:11, 180:24
**detail** [1] - 131:4
**detailed** [1] - 75:5
**detect** [1] - 61:1
**Detect** [1] - 16:25
**detecting** [3] - 13:22, 14:3, 62:3

**determination** [12] - 80:23, 106:7, 108:9, 120:3, 126:18, 127:23, 128:13, 181:16, 185:11, 186:15, 194:4, 194:17
**determinations** [1] - 193:15
**determine** [8] - 126:17, 144:21, 158:16, 158:18, 158:23, 158:25, 178:18, 182:9
**determined** [5] - 71:12, 101:18, 124:7, 175:16
**determining** [7] - 96:13, 113:18, 114:15, 115:8, 128:6, 133:10, 133:12
**detriment** [1] - 94:15
**developed** [2] - 42:19, 111:7
**developmental** [4] - 6:6, 51:24, 52:3, 52:5
**deviate** [1] - 53:8
**deviating** [1] - 53:9
**devotes** [1] - 78:17
**devoting** [1] - 111:14
**diagnose** [4] - 9:15, 87:13, 180:7, 183:21
**diagnosed** [13] - 9:18, 13:3, 15:2, 51:14, 51:16, 51:18, 70:12, 98:24, 174:10, 184:1, 189:16, 193:18, 193:20
**diagnoses** [6] - 55:25, 67:20, 120:10, 120:23, 128:18, 174:12
**diagnosing** [2] - 6:13, 87:10
**diagnosis** [26] - 5:22, 7:24, 10:1, 16:14, 22:6, 23:2, 51:12, 51:23, 52:1, 52:9, 60:15, 87:17, 136:7, 137:12, 137:13, 174:13, 183:25, 184:5, 184:6, 184:9, 185:2, 187:12, 187:14, 187:18, 187:19, 194:7
**diagnostic** [20] - 6:22, 12:6, 12:19, 13:6, 14:14, 15:21, 15:24, 25:23, 26:3, 27:2, 31:18, 31:24, 32:5, 33:8, 33:11, 39:3, 52:22, 53:5, 61:8, 87:14
**Diagnostic** [2] - 5:21, 53:1
**difference** [4] - 49:20, 52:6, 87:7, 161:21
**different** [23] - 20:10, 42:6, 46:25, 48:23, 48:25, 51:16, 57:3, 80:12, 80:16, 80:17, 84:17, 111:19, 123:21, 124:2, 124:14, 176:9, 179:18, 181:14, 188:8, 189:7, 193:1
**differently** [2] - 105:4, 124:8
**difficult** [9] - 58:1, 58:2, 62:8, 62:11, 62:12, 62:13, 180:7,

189:20, 194:22
**difficulty** [3] - 86:22, 86:25
**DIRECT** [2] - 64:15, 138:9
**direct** [2] - 3:5, 87:16
**Direct** [1] - 198:4
**directed** [2] - 171:6, 179:18
**direction** [1] - 158:7
**directions** [1] - 46:20
**directly** [5] - 117:9, 121:2, 125:20, 181:3, 189:11
**director** [1] - 64:20
**directs** [1] - 180:5
**disabilities** [16] - 5:8, 6:13, 21:3, 62:4, 67:9, 80:1, 89:12, 93:16, 93:18, 111:15, 159:11, 174:4, 180:6, 180:19, 183:9, 194:24
**Disabilities** [2] - 16:25, 106:1
**disability** [60] - 22:7, 62:19, 64:20, 65:19, 67:19, 96:13, 100:10, 101:2, 101:14, 101:19, 101:21, 102:15, 102:19, 105:6, 105:11, 106:8, 107:5, 108:3, 108:5, 108:10, 112:3, 113:8, 113:17, 114:16, 114:17, 114:20, 115:8, 120:3, 120:12, 123:10, 124:7, 127:23, 128:7, 130:2, 130:3, 137:12, 171:4, 171:6, 171:13, 173:15, 173:20, 173:25, 174:13, 174:14, 174:17, 175:16, 175:21, 177:6, 177:9, 177:11, 180:14, 184:10, 186:13, 186:19, 189:8, 192:17, 195:3, 195:15, 195:19
**disability-related** [1] - 65:19
**disabled** [4] - 183:10, 183:11, 186:15, 186:16
**disagree** [1] - 95:6
**disagreed** [1] - 170:3
**disclose** [1] - 126:6
**disclosed** [1] - 126:6
**disclosure** [1] - 156:4
**discounted** [3] - 24:11, 24:13, 184:11
**discounts** [1] - 115:4
**discovery** [2] - 126:4, 155:12
**discrepancy** [9] - 6:17, 54:10, 54:12, 54:15, 54:25, 55:4, 55:5, 55:6, 55:10
**discretion** [2] - 89:1, 182:24
**discrimination** [1] - 192:5
**discuss** [7] - 20:20, 28:24, 36:8, 53:15, 53:18, 118:10, 166:4
**discussed** [11] - 18:12, 42:8, 58:14, 58:24, 59:2, 59:15, 59:22, 60:8, 130:7, 163:23,

192:19

**discusses** [2] - 6:6, 19:7
**discussing** [4] - 6:18, 88:6, 111:5, 125:16
**discussion** [10] - 3:19, 6:9, 20:12, 55:12, 56:11, 57:3, 58:21, 104:15, 114:8, 114:11
**diseases** [1] - 9:20
**disorder** [10] - 10:1, 15:3, 33:18, 49:1, 56:4, 58:5, 67:9, 67:18, 80:2, 159:14
**disorders** [1] - 5:4
**Disorders** [1] - 5:22
**dispute** [1] - 188:23
**disregard** [2] - 132:10, 171:17
**distance** [1] - 180:12
**distant** [1] - 192:8
**distinguishing** [1] - 20:13
**distractibility** [1] - 18:20
**distraction** [1] - 19:15
**distractions** [1] - 20:21
**distributed** [1] - 93:2
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 190:10
**divided** [1] - 93:6
**doctor** [3] - 92:5, 181:15, 182:5
**doctorate** [1] - 65:8
**doctors** [1] - 97:12
**document** [64] - 7:16, 8:1, 8:25, 19:3, 19:18, 20:2, 20:7, 20:11, 22:14, 26:5, 31:11, 34:8, 34:12, 37:3, 37:23, 37:24, 37:25, 38:8, 41:1, 44:2, 45:14, 46:5, 46:13, 51:11, 52:2, 68:12, 69:7, 70:18, 71:11, 72:20, 74:2, 102:23, 106:14, 106:18, 107:1, 107:13, 109:19, 110:14, 112:13, 113:22, 118:1, 122:15, 125:16, 125:18, 125:25, 126:24, 128:23, 128:24, 132:19, 133:22, 139:24, 140:1, 140:2, 144:3, 144:13, 158:14, 167:6, 172:7, 172:8, 182:20, 182:21, 182:22, 183:1
**documentation** [47] - 5:13, 66:9, 67:14, 71:7, 72:14, 72:24, 73:1, 73:23, 74:6, 78:21, 79:1, 80:5, 80:7, 80:9, 80:17, 84:15, 87:18, 91:3, 91:14, 97:17, 98:13, 98:16, 98:18, 98:21, 103:4, 103:21, 103:22, 103:25, 128:12, 128:18, 134:8, 136:15, 175:1, 178:15, 178:22, 178:25, 179:4, 179:5, 184:7,

184:12, 185:6, 188:2, 188:5, 192:12, 192:13, 192:20, 194:15
**documented** [1] - 111:21
**documents** [21] - 10:2, 20:6, 24:1, 24:2, 25:2, 25:15, 32:6, 34:16, 51:8, 66:12, 70:23, 70:24, 71:1, 126:3, 126:13, 162:17, 163:13, 168:4, 170:1, 182:25, 196:17
**dog** [1] - 47:14
**DOJ** [22] - 102:24, 111:4, 113:5, 113:8, 113:13, 115:6, 115:15, 115:18, 115:23, 116:1, 116:5, 116:11, 120:13, 120:16, 124:17, 129:16, 130:17, 130:20, 130:23, 133:18, 172:3
**DOJ's** [9] - 100:22, 110:16, 113:21, 114:8, 114:11, 123:8, 129:2, 132:1, 133:8
**don't..** [1] - 131:20
**done** [21] - 9:7, 14:5, 52:14, 59:16, 59:17, 59:20, 60:6, 60:11, 63:2, 63:3, 95:10, 98:22, 109:5, 130:24, 134:4, 160:6, 161:4, 175:23, 180:18, 183:22
**double** [10] - 62:12, 82:10, 82:19, 82:21, 103:24, 136:2, 173:8, 173:12, 181:15, 196:11
**doubt** [1] - 94:11
**down** [10] - 41:11, 44:12, 44:22, 63:18, 99:15, 113:4, 114:4, 120:6, 137:21, 159:23
**dozens** [1] - 74:18
**DR** [3] - 64:11, 198:5, 198:7
**Dr** [97] - 3:4, 4:5, 21:8, 21:11, 22:15, 23:3, 23:6, 24:22, 32:23, 39:11, 49:3, 50:20, 51:5, 54:8, 55:21, 55:23, 56:2, 59:16, 60:3, 60:5, 60:11, 61:25, 63:20, 64:7, 70:11, 70:12, 71:3, 71:4, 71:14, 72:15, 72:20, 72:25, 73:2, 73:5, 73:11, 73:14, 73:24, 74:1, 74:6, 79:16, 80:21, 83:14, 83:17, 87:20, 87:23, 88:1, 95:2, 95:15, 97:21, 98:2, 98:7, 98:9, 98:16, 98:19, 98:21, 99:1, 118:24, 126:22, 135:3, 135:7, 135:14, 135:20, 162:23, 163:13, 167:25, 168:1, 168:23, 169:13, 169:19, 171:18, 174:4, 174:15, 174:17, 175:4, 175:11, 175:13, 175:23, 176:9, 179:8, 179:9, 179:10,

183:18, 183:19, 184:4, 184:7, 184:15, 185:4, 185:6, 185:24, 187:13, 189:3, 190:14, 190:16, 192:18, 194:4
**drafts** [1] - 36:11
**draw** [1] - 191:17
**drawback** [1] - 60:24
**drawing** [1] - 180:17
**DSM** [8] - 51:12, 52:23, 52:25, 53:5, 55:3, 184:6, 185:2
**DSM-5** [5] - 5:21, 5:24, 6:2, 13:2, 187:19
**DSM-IV** [4] - 52:23, 52:25, 55:3
**due** [1] - 48:25
**duly** [2] - 64:11, 137:25
**duplicate** [2] - 65:22, 163:2
**duplicates** [1] - 155:5
**Duration** [3] - 142:24, 143:1, 143:11
**duration** [3] - 114:13, 140:15, 148:5
**during** [16] - 11:25, 29:9, 29:18, 62:6, 79:24, 81:20, 82:7, 119:1, 119:5, 126:17, 140:3, 140:12, 140:17, 142:22, 143:5, 168:7
**DVT** [1] - 88:7
**DX** [2] - 17:8, 35:11
**DX-1** [2] - 164:1, 199:2
**DX-10** [2] - 165:5, 199:9
**DX-11** [2] - 165:5, 199:10
**DX-12** [2] - 165:5, 199:11
**DX-13** [3] - 35:10, 165:5, 199:12
**DX-14** [2] - 165:6, 199:13
**DX-15** [2] - 165:6, 199:14
**DX-16** [2] - 165:23, 199:15
**DX-17** [2] - 165:23, 199:16
**DX-18** [2] - 165:23, 199:17
**DX-19** [2] - 165:23, 199:18
**DX-2** [2] - 164:4, 199:3
**DX-20** [2] - 165:23, 199:19
**DX-22** [2] - 166:10, 199:20
**DX-24** [2] - 166:10, 199:21
**DX-25** [2] - 166:10, 199:22
**DX-26** [2] - 166:10, 199:23
**DX-27** [3] - 58:22, 166:10, 199:24
**DX-28** [2] - 166:10, 199:25
**DX-29** [2] - 166:11, 200:1
**DX-3** [9] - 17:6, 17:14, 17:15, 17:16, 22:14, 56:20, 56:24, 164:7, 199:4
**DX-30** [2] - 166:11, 200:2
**DX-31** [2] - 166:11, 200:3
**DX-32** [2] - 166:11, 200:4

**DX-33** [2] - 166:11, 200:5
**DX-34** [2] - 166:11, 200:6
**DX-35** [2] - 166:11, 200:7
**DX-36** [2] - 166:11, 200:8
**DX-38** [2] - 166:15, 200:9
**DX-39** [2] - 166:15, 200:10
**DX-4** [6] - 19:1, 20:1, 20:3, 68:9, 164:10, 199:5
**DX-40** [3] - 42:23, 166:15, 200:11
**DX-41** [2] - 166:15, 200:12
**DX-42** [4] - 50:22, 50:23, 166:15, 200:13
**DX-46** [2] - 166:19, 200:14
**DX-48** [2] - 167:11, 200:15
**DX-49** [2] - 167:11, 200:16
**DX-50** [2] - 167:11, 200:17
**DX-51** [3] - 16:22, 167:11, 200:18
**DX-52** [2] - 167:11, 200:19
**DX-53** [2] - 167:11, 200:20
**DX-54** [2] - 167:12, 200:21
**DX-56** [2] - 167:17, 200:22
**DX-57** [2] - 167:17, 200:23
**DX-58** [2] - 167:17, 200:24
**DX-59** [2] - 167:17, 200:25
**DX-60** [2] - 167:17, 201:1
**DX-61** [2] - 167:17, 201:2
**DX-63** [2] - 168:11, 201:3
**DX-64** [2] - 168:11, 201:4
**DX-65** [2] - 168:11, 201:5
**DX-66** [2] - 168:11, 201:6
**DX-67** [2] - 168:11, 201:7
**DX-68** [2] - 168:11, 201:8
**DX-7** [2] - 164:15, 199:6
**DX-70** [2] - 168:20, 201:9
**DX-71** [2] - 168:20, 201:10
**DX-73** [2] - 169:8, 201:11
**DX-74** [2] - 169:8, 201:12
**DX-75** [2] - 169:8, 201:13
**DX-76** [2] - 169:8, 201:14
**DX-77** [2] - 169:8, 201:15
**DX-78** [2] - 169:8, 201:16
**DX-79** [2] - 169:9, 201:17
**DX-8** [2] - 165:5, 199:7
**DX-80** [2] - 169:9, 201:18
**DX-85** [2] - 169:15, 201:19
**DX-86** [2] - 170:16, 201:20
**DX-87** [2] - 170:16, 201:21
**DX-9** [2] - 165:5, 199:8
**dysfunction** [1] - 12:8
**dyslexia** [32] - 5:3, 6:6, 6:13, 9:16, 20:17, 20:18, 20:19, 31:18, 33:18, 56:9, 57:25, 58:3, 58:7, 59:17, 62:8, 62:13, 67:19, 83:4, 84:9, 87:11, 87:14, 95:21, 148:20, 175:14, 176:12, 183:22, 184:22, 189:6, 189:16,

193:17
**dyslexic** [1] - 27:17
**early** [10] - 13:4, 13:9, 55:14, 56:5, 56:7, 98:23, 99:2, 175:2, 180:8, 189:16
**earned** [1] - 65:6
**easier** [1] - 165:14
**Eastern** [1] - 190:10
**EASTERN** [1] - 1:1
**easy** [3] - 56:9, 57:25, 58:10
**eat** [1] - 44:22
**Edition** [1] - 23:1
**education** [7] - 22:22, 65:7, 103:8, 138:16, 164:25, 180:8, 191:3
**educational** [8] - 15:18, 65:4, 96:12, 127:14, 127:20, 138:13, 184:16, 186:25
**educator** [1] - 135:4
**educators** [1] - 134:22
**effect** [6] - 120:22, 123:17, 123:21, 124:9, 125:6, 182:23
**effort** [15] - 14:12, 15:22, 27:20, 27:21, 28:3, 41:5, 42:17, 48:22, 49:1, 57:8, 57:22, 75:5, 114:24, 177:14, 180:17
**eight** [1] - 75:23
**eight-hour** [1] - 75:23
**either** [16] - 8:21, 12:3, 18:10, 28:3, 60:3, 72:3, 77:22, 81:22, 95:25, 111:3, 126:10, 144:7, 144:21, 176:18, 185:20, 193:5
**electronic** [1] - 141:10
**elementary** [7] - 10:9, 19:10, 25:19, 98:23, 99:2, 175:2, 176:5
**eligibility** [2] - 88:18, 88:23
**eligible** [1] - 172:20
**email** [2] - 122:4, 122:22
**emails** [4] - 121:12, 121:21, 122:11, 169:12
**emphasized** [1] - 133:4
**employees** [2] - 78:11, 78:14
**employment** [1] - 38:20
**enacted** [1] - 20:23
**end** [19] - 45:5, 97:25, 120:15, 146:14, 147:18, 147:21, 147:22, 149:15, 150:7, 152:6, 152:19, 152:20, 153:14, 153:17, 189:18, 189:20, 190:19, 195:9, 195:21
**ends** [1] - 44:2
**enforceable** [1] - 183:1
**ensure** [11] - 101:1, 101:13, 101:20, 102:18, 105:25, 173:19, 186:12, 186:18, 188:13, 194:11, 194:12

**ensured** [1] - 186:10
**ensuring** [1] - 171:12
**enter** [1] - 148:22
**entered** [1] - 64:4
**entertain** [2] - 26:17, 160:7
**entire** [4] - 113:22, 121:2, 145:21, 172:7
**entirety** [1] - 178:17
**entities** [15] - 110:24, 111:2, 115:18, 115:23, 116:5, 127:15, 127:21, 130:17, 130:22, 178:16, 178:21, 179:3, 183:6, 186:11
**entitled** [8] - 16:24, 132:7, 132:17, 177:7, 180:25, 183:9, 188:12, 197:15
**entitlement** [2] - 185:11, 188:16
**entity** [8] - 100:24, 103:1, 103:3, 104:4, 104:6, 177:18, 179:4
**enumerating** [1] - 105:15
**environment** [2] - 104:22, 104:24, 188:21
**environments** [1] - 186:24
**Enzi** [1] - 106:22
**equally** [1] - 93:3
**equation** [1] - 175:19
**equitable** [1] - 93:17
**errors** [1] - 58:9
**especially** [1] - 172:21
**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10
**establish** [4] - 140:24, 146:3, 183:1, 189:1
**established** [1] - 122:14
**estimate** [1] - 120:13
**et** [2] - 5:11, 104:7
**evaluate** [10] - 6:1, 9:25, 14:10, 14:11, 15:10, 15:15, 21:25, 41:4, 56:3, 190:18
**evaluated** [11] - 5:15, 5:17, 21:2, 21:14, 50:20, 117:11, 128:4, 172:6, 181:8, 190:15, 190:17
**evaluates** [2] - 129:9, 129:17
**evaluating** [10] - 11:10, 11:12, 12:5, 12:14, 55:24, 66:5, 78:18, 132:14, 186:12, 190:12
**evaluation** [30] - 4:8, 4:14, 6:6, 6:22, 11:13, 11:16, 17:5, 17:22, 18:24, 19:19, 21:7, 22:5, 22:15, 24:6, 24:12, 27:7, 29:16, 29:21, 32:9, 36:11, 61:8, 73:2, 79:4, 85:7, 95:3, 96:13, 97:20, 184:14, 187:13, 194:19
**evaluations** [13] - 5:12, 7:8, 10:2, 27:5, 79:4, 82:23, 83:1,

87:21, 87:24, 98:22, 136:5, 144:21, 179:1
**evaluators** [1] - 194:15
**even-handedly** [1] - 194:8
**evening** [1] - 157:7
**event** [1] - 31:4
**events** [1] - 49:7
**eventually** [2] - 26:9, 165:9
**everywhere** [1] - 32:16
**evidence** [41] - 3:7, 3:8, 13:9, 13:13, 112:14, 126:1, 156:18, 160:4, 161:6, 161:11, 162:13, 162:25, 163:4, 163:8, 163:17, 164:1, 164:4, 164:7, 164:10, 164:15, 165:6, 165:24, 166:12, 166:16, 166:19, 167:12, 167:18, 168:12, 168:20, 169:9, 169:15, 169:23, 170:16, 183:14, 183:18, 184:24, 185:9, 186:9, 196:2, 196:18
**evidentiary** [1] - 191:10
**exact** [3] - 38:18, 132:19, 154:17
**exactly** [8] - 38:13, 75:15, 75:21, 107:4, 120:19, 123:18, 170:24, 180:4
**exaggerate** [2] - 14:12, 14:18
**exaggerating** [1] - 14:16
**exam** [46] - 4:9, 5:16, 12:21, 12:25, 28:22, 28:25, 31:7, 31:11, 41:12, 41:16, 75:25, 76:1, 76:10, 78:24, 79:7, 81:23, 86:5, 87:3, 88:20, 88:22, 89:1, 89:15, 96:23, 101:20, 102:20, 139:3, 139:12, 140:7, 141:18, 143:17, 146:14, 146:16, 147:5, 147:11, 147:20, 151:17, 153:17, 177:20, 183:17, 183:24, 185:22, 187:1, 187:3, 188:18, 188:19, 190:25
**examination** [35] - 65:15, 66:13, 75:23, 79:13, 81:20, 100:18, 100:24, 100:25, 101:1, 101:3, 101:5, 101:8, 102:22, 103:1, 104:5, 118:10, 142:2, 150:24, 151:2, 151:9, 151:10, 151:19, 151:23, 154:12, 154:16, 155:5, 155:13, 155:15, 159:17, 163:14, 173:19, 173:21, 173:23, 174:16, 192:20
**EXAMINATION** [8] - 4:3, 54:6, 61:23, 64:15, 79:14, 137:6, 138:9, 150:13
**examinations** [2] - 173:18,

189:25
**examine** [3] - 31:14, 59:20, 157:15
**examined** [6] - 64:12, 97:12, 98:11, 138:1, 163:13, 171:10
**Examinee** [1] - 140:11
**examinee** [4] - 78:21, 140:19, 141:18, 188:17
**examinee's** [1] - 141:11
**examinees** [12] - 67:5, 67:23, 77:24, 79:6, 79:10, 81:21, 92:11, 92:14, 102:21, 139:9, 145:17, 188:17
**EXAMINERS** [1] - 1:6
**examiners** [1] - 132:16
**Examiners** [6] - 64:23, 106:16, 110:11, 138:22, 183:7, 190:2
**example** [8] - 14:21, 29:20, 82:12, 86:4, 114:19, 152:5, 177:10
**examples** [3] - 15:10, 15:24, 134:8
**exams** [17] - 29:20, 33:21, 58:11, 78:7, 103:16, 103:24, 111:19, 134:16, 134:18, 139:1, 139:2, 171:16, 177:18, 177:25, 183:7, 186:12, 188:9
**Excel** [2] - 140:2, 159:7
**except** [1] - 101:7
**exception** [1] - 157:11
**exceptions** [2] - 157:12, 179:16
**excerpt** [1] - 163:16
**excerpts** [1] - 162:16
**exchanging** [1] - 116:25
**exclusive** [2] - 20:19, 58:7
**excuse** [1] - 112:15
**excused** [4] - 63:21, 63:23, 159:24
**executive** [1] - 171:25
**exercise** [1] - 116:25
**exercising** [1] - 42:17
**exhibit** [41] - 3:6, 17:24, 23:11, 23:12, 26:11, 26:15, 38:16, 99:7, 99:11, 100:20, 104:11, 107:12, 107:13, 107:15, 109:1, 117:12, 117:19, 118:4, 119:7, 119:8, 121:14, 151:6, 152:24, 153:1, 153:20, 153:25, 154:3, 154:4, 154:25, 155:10, 155:23, 157:6, 157:10, 158:5, 158:7, 162:3, 165:19, 168:16, 194:1, 196:20
**Exhibit** [59] - 3:12, 4:19, 6:4, 7:16, 16:21, 19:24, 23:16, 23:19, 41:24, 45:15, 48:6,

51:4, 56:20, 62:1, 68:9, 70:11, 70:15, 72:5, 72:14, 73:17, 99:8, 99:17, 116:19, 117:10, 119:7, 126:22, 128:25, 131:21, 139:22, 148:9, 148:12, 149:10, 150:16, 162:25, 163:4, 163:8, 163:24, 164:1, 164:2, 164:4, 164:5, 164:7, 164:8, 164:10, 164:13, 164:15, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 166:19, 168:14, 168:21, 169:15, 175:4

**Exhibit's** [1] - 165:4

**exhibited** [1] - 174:24

**exhibits** [20] - 38:1, 64:4, 116:21, 116:22, 116:25, 160:4, 160:18, 161:13, 161:17, 162:14, 163:25, 164:3, 164:6, 164:9, 165:16, 166:25, 169:6, 196:8

**Exhibits** [14] - 162:12, 163:17, 165:5, 165:23, 166:10, 166:15, 167:11, 167:17, 168:11, 168:13, 168:20, 169:8, 169:18, 170:16

**expect** [2] - 102:20, 145:10

**expectation** [1] - 59:12

**expected** [5] - 15:6, 32:14, 32:17, 57:20, 58:10

**expedite** [1] - 26:8

**expedited** [1] - 126:13

**experience** [9] - 10:24, 34:20, 88:13, 88:15, 151:19, 159:10, 159:13, 159:16, 185:24

**experienced** [3] - 13:3, 16:16, 184:17

**experiencing** [2] - 20:12, 184:25

**expert** [7] - 67:3, 83:3, 83:7, 84:15, 179:7, 179:15, 194:7

**expert's** [1] - 180:2

**expertise** [5] - 84:9, 128:15, 128:16, 159:12, 194:18

**experts** [4] - 66:22, 185:10, 189:18, 194:6

**explain** [4] - 58:1, 75:21, 140:14, 140:18

**explained** [2] - 57:6, 194:10

**explanation** [2] - 75:3, 178:3

**explicitly** [3] - 125:3, 125:7, 171:24

**extended** [18] - 5:6, 18:17, 73:24, 79:6, 79:23, 84:12, 84:19, 84:20, 88:2, 97:3, 97:5, 97:9, 103:15, 136:1, 173:8, 173:11, 181:20, 189:6

**extensive** [6] - 106:8, 108:10, 112:7, 123:10, 171:5, 194:19

**extent** [7] - 36:19, 53:16, 113:1, 167:2, 168:25, 169:3, 171:8

**external** [7] - 14:19, 66:21, 67:3, 71:16, 185:10, 189:24, 194:15

**External** [1] - 121:18

**externals** [1] - 190:8

**extra** [9] - 19:15, 32:1, 74:7, 75:12, 77:7, 111:17, 135:16, 186:6

**extract** [1] - 155:2

**extraordinary** [2] - 181:11, 181:21

**eyes** [1] - 180:10

**F-A-R-M-E-R** [1] - 64:14

**facilitate** [1] - 111:16

**fact** [32] - 16:5, 22:11, 23:6, 30:8, 36:17, 42:1, 44:2, 55:9, 55:12, 55:13, 56:4, 57:21, 61:6, 82:25, 84:23, 103:15, 103:23, 116:22, 118:6, 121:2, 130:10, 145:20, 158:3, 169:25, 178:6, 180:24, 181:10, 183:6, 183:15, 186:23, 187:22, 190:17

**factor** [2] - 101:5, 173:22

**factors** [1] - 101:8

**facts** [2] - 75:9, 111:17

**factual** [1] - 34:24

**faculty** [1] - 135:8

**fail** [6] - 61:1, 173:14, 190:25, 192:10, 192:11

**failed** [1] - 125:25

**fails** [1] - 187:5

**fair** [8] - 78:17, 79:10, 85:11, 85:14, 112:6, 113:24, 181:19, 188:17

**fairly** [6] - 67:20, 76:23, 85:12, 85:16, 85:24, 86:4

**fake** [6] - 56:9, 57:18, 57:24, 57:25, 58:8, 62:8

**fall** [2] - 4:7, 37:15

**false** [2] - 47:4, 61:10

**familiar** [14] - 28:16, 28:18, 35:18, 94:4, 107:2, 124:21, 129:22, 130:6, 133:18, 141:4, 142:1, 142:4, 145:17

**familiarity** [3] - 50:11, 112:11, 151:8

**family** [2] - 50:6, 50:7

**far** [4] - 59:24, 110:18, 111:14, 165:8

**Farmer** [11] - 64:7, 64:14, 64:17, 79:16, 80:21, 118:9, 118:24, 126:23, 163:14,

164:9, 171:19

**FARMER** [2] - 64:11, 198:7

**Farmer's** [1] - 192:18

**fashion** [1] - 185:14

**fast** [2] - 16:3, 16:4

**faster** [2] - 164:16, 165:11

**faults** [1] - 116:1

**favor** [1] - 171:7

**Featherstone** [3] - 191:19, 192:1

**February** [2] - 162:9, 163:2

**Federal** [5] - 117:8, 125:19, 126:2, 127:2, 163:16

**feedback** [1] - 36:15

**feign** [3] - 62:8, 62:13, 62:19

**Feigned** [1] - 16:25

**feigned** [1] - 62:4

**few** [16] - 25:13, 89:8, 92:16, 119:22, 123:6, 127:12, 151:24, 156:15, 156:16, 163:22, 176:24, 182:3, 192:14, 192:15

**fiancé** [3] - 13:19, 175:13, 185:3

**fifth** [4] - 35:5, 35:13, 113:4, 120:6

**Fifth** [1] - 23:1

**file** [9] - 66:18, 75:7, 83:12, 83:13, 83:14, 83:23, 84:5, 91:10, 122:8

**filed** [2] - 148:13, 192:2

**fill** [3] - 7:19, 66:10, 66:11

**filled** [2] - 12:10, 12:23

**final** [10] - 71:11, 77:5, 90:14, 119:19, 120:16, 127:4, 127:6, 170:1, 171:25, 182:22

**finally** [5] - 63:11, 70:20, 163:12, 184:11, 193:12

**finder** [1] - 169:25

**fine** [10] - 26:7, 37:17, 112:21, 112:25, 159:9, 164:20, 182:17, 187:19, 197:7

**finger** [1] - 195:13

**finish** [1] - 45:4

**finished** [1] - 152:14

**firm** [2] - 100:5, 109:18

**first** [61] - 4:24, 5:7, 7:2, 9:15, 18:16, 20:11, 20:16, 23:3, 25:8, 27:3, 27:13, 29:4, 39:3, 43:14, 43:15, 44:16, 46:14, 46:17, 47:13, 47:14, 48:20, 52:3, 59:25, 71:23, 76:10, 83:18, 88:20, 88:22, 90:7, 90:8, 90:12, 100:2, 101:18, 105:22, 110:16, 113:11, 115:2, 115:22, 116:1, 119:8, 119:9, 119:10, 127:12, 131:25, 132:2, 132:4, 147:20, 151:12,

154:25, 155:11, 160:8, 164:14, 164:23, 171:19, 174:10, 175:5, 175:13, 183:21, 183:25, 187:9, 191:24

**fits** [2] - 74:17

**five** [7] - 53:10, 76:11, 76:13, 86:11, 148:1, 148:3

**fix** [1] - 105:22

**flipping** [1] - 58:6

**Florida** [1] - 190:2

**fluency** [8] - 16:2, 43:11, 43:15, 45:22, 46:8, 46:16, 47:8

**focus** [6] - 114:17, 124:17, 125:2, 125:8, 174:6, 174:7

**focuses** [1] - 138:19

**folder** [1] - 139:16

**folks** [3] - 74:22, 78:25, 84:7

**follow** [4] - 129:16, 131:17, 136:24, 159:8

**follow-on** [1] - 159:8

**follow-up** [1] - 136:24

**following** [4] - 111:4, 114:15, 116:13, 149:14

**follows** [4] - 64:12, 132:13, 138:1, 182:21

**forced** [1] - 149:17

**foregoing** [1] - 197:14

**forget** [1] - 196:21

**forgive** [1] - 84:4

**form** [9] - 7:18, 7:21, 51:4, 67:25, 69:13, 69:14, 70:15, 162:19, 185:14

**formal** [4] - 19:21, 111:10, 111:21, 178:13

**formally** [1] - 3:5

**format** [3] - 40:5, 111:19, 158:11

**formats** [1] - 28:20

**former** [1] - 109:18

**forms** [3] - 36:4, 66:10, 66:15

**forth** [1] - 25:14

**forward** [4] - 81:2, 172:10, 195:8, 195:10

**foundation** [12] - 95:25, 140:23, 140:24, 142:9, 144:4, 144:11, 145:13, 146:2, 146:3, 146:21, 149:22, 186:25

**four** [11] - 47:12, 76:12, 86:10, 86:22, 87:5, 89:17, 90:5, 147:8, 147:10, 148:3, 195:9

**fourth** [6] - 5:5, 35:5, 35:13, 45:18, 121:19, 165:3

**frame** [1] - 94:9

**frequent** [2] - 18:18, 147:19

**frequently** [5] - 6:21, 16:16, 55:6, 61:6, 193:20

front [1] - 7:23
Fulbright [2] - 100:3, 109:16
full [4] - 15:22, 20:12, 96:10, 122:2
fully [1] - 172:7
function [2] - 57:16, 111:23
functioning [2] - 27:15, 56:17
furthermore [1] - 178:12
future [3] - 54:21, 181:15, 182:5
GAO [1] - 130:11
gather [1] - 60:19
general [21] - 24:17, 24:18, 36:9, 49:9, 49:18, 49:21, 56:17, 59:19, 60:5, 60:25, 105:14, 114:25, 122:16, 133:15, 133:23, 155:14, 177:16, 183:13, 183:17, 189:2, 189:5
generally [13] - 29:2, 50:10, 50:14, 55:16, 59:22, 91:13, 94:6, 132:8, 166:24, 166:25, 168:23, 177:23, 179:4
genuine [2] - 57:8, 57:22
gifted [2] - 180:7, 193:20
given [12] - 29:5, 65:20, 66:3, 95:15, 117:19, 141:24, 154:16, 157:22, 180:3, 181:1, 181:24, 190:15
GLENN [2] - 137:25, 198:8
Glenn [1] - 138:5
GMAT [1] - 5:11
Goldberg [5] - 71:3, 71:4, 73:5, 83:14, 83:17
GORT [5] - 16:7, 16:10, 42:22, 43:13, 59:23
GORT-5 [5] - 16:9, 42:25, 43:10, 43:11
Government [1] - 116:11
government [1] - 39:25
grade [10] - 7:11, 40:19, 58:24, 164:23, 164:24, 165:2, 165:3, 184:3, 185:15, 193:19
graded [1] - 176:5
grades [14] - 10:5, 11:18, 34:22, 35:5, 35:13, 36:5, 69:24, 124:19, 125:2, 125:9, 127:22, 128:6, 171:15, 186:5
grading [1] - 18:18
graduate [1] - 191:3
graduates [2] - 40:12, 40:16
GRAN [1] - 1:15
grant [5] - 66:23, 75:6, 75:15, 79:5, 193:5
granted [10] - 75:11, 75:19, 77:5, 82:13, 88:5, 88:7, 88:10, 172:24, 173:3, 192:3
granting [2] - 75:4, 81:15

grants [2] - 82:10, 193:5
Gray [2] - 16:4, 16:7
GRE [2] - 5:11, 189:12
great [3] - 49:12, 188:8, 194:21
greater [2] - 39:14, 49:22
grounds [2] - 154:25, 167:5
group [3] - 66:16, 96:16, 158:10
growing [1] - 8:2
guarantee [1] - 172:20
guess [11] - 16:15, 50:23, 80:12, 90:12, 92:25, 112:17, 144:4, 146:10, 147:21, 168:3, 174:20
guesses [2] - 148:22, 159:2
guessing [5] - 113:25, 146:16, 146:17, 147:17, 157:23
guidance [10] - 116:12, 132:10, 132:11, 172:5, 182:14, 182:16, 182:22, 182:25, 183:5, 186:7
guidelines [1] - 66:9
Haddonfield [1] - 1:17
half [5] - 76:2, 76:3, 130:21, 187:13, 188:19
halfway [1] - 114:4
hand [4] - 25:2, 186:2, 188:11, 188:25
handed [1] - 43:8
handedly [1] - 194:8
handle [2] - 93:8, 94:13
handout [2] - 34:12, 37:2
hands [1] - 169:17
handwriting [2] - 46:5, 47:23
happy [5] - 26:21, 96:1, 96:4, 126:6, 141:1
hard [3] - 57:24, 69:14, 181:18
Harkins [1] - 106:21
harm [5] - 190:22, 191:2, 191:3, 191:5, 192:6
harmed [1] - 192:25
hate [1] - 182:15
head [1] - 121:11
headed [1] - 133:8
heading [2] - 121:17, 131:25
health [1] - 65:7
Health [1] - 191:19
Healy [1] - 190:6
hear [9] - 79:18, 145:5, 153:12, 161:7, 161:10, 162:2, 170:20, 178:5, 188:4
heard [10] - 144:5, 151:24, 171:1, 174:4, 178:1, 178:2, 187:11, 187:18, 189:3, 193:12
HEARING [1] - 1:6
hearing [13] - 79:25, 116:22,

117:1, 117:19, 126:14, 157:3, 161:6, 162:2, 165:22, 168:8, 183:5, 192:3, 195:18
held [4] - 108:20, 181:2, 189:10, 191:4
help [14] - 14:22, 38:8, 38:20, 51:7, 56:21
helpful [5] - 60:14, 66:9, 95:19, 161:3, 161:4
helps [2] - 77:19, 169:24
herself [2] - 76:20, 194:2
hesitation [1] - 186:23
hide [1] - 194:24
high [15] - 5:9, 9:8, 25:18, 40:12, 40:15, 69:24, 96:16, 114:20, 115:5, 115:7, 135:2, 177:11, 177:25, 184:18, 190:4
high-stakes [3] - 5:9, 9:8, 177:25
higher [3] - 30:18, 49:15, 186:21
highest [1] - 191:10
highlight [1] - 176:24
highly [1] - 179:15
hire [2] - 93:25, 94:12
hired [1] - 93:19
hiring [2] - 93:21, 93:23
historically [1] - 175:12
histories [1] - 7:11
history [25] - 10:3, 11:5, 12:7, 18:13, 25:3, 25:9, 25:13, 27:16, 51:24, 52:3, 52:5, 52:7, 52:8, 54:16, 60:20, 136:7, 136:9, 172:1, 177:5, 177:8, 178:17, 178:18, 184:16, 185:8, 187:23
hold [2] - 38:10, 56:24
holidays [1] - 111:15
home [4] - 4:22, 8:17, 8:20
homework [1] - 111:18
Honor [87] - 3:3, 3:10, 4:2, 23:13, 25:5, 26:5, 26:20, 37:14, 37:20, 38:7, 39:1, 41:24, 53:19, 61:21, 63:17, 63:21, 64:2, 81:4, 81:10, 81:12, 85:1, 95:24, 99:10, 99:12, 101:15, 102:1, 102:7, 107:8, 107:14, 112:10, 112:15, 112:20, 112:24, 116:10, 116:20, 116:24, 118:14, 118:18, 118:22, 122:14, 125:15, 134:4, 137:16, 137:19, 137:23, 141:1, 142:8, 142:11, 144:2, 144:9, 150:12, 154:24, 155:3, 155:10, 157:4, 157:9, 159:22, 160:3, 160:13, 160:23, 161:2, 161:18,

163:22, 166:2, 166:24, 168:8, 168:22, 169:3, 169:16, 169:22, 170:9, 170:19, 170:21, 173:7, 178:2, 180:4, 181:11, 182:13, 187:8, 188:22, 190:21, 191:6, 191:12, 195:23, 196:5, 196:10, 196:23
HONORABLE [1] - 1:12
hope [4] - 82:2, 171:18, 173:13, 195:25
hoped [2] - 116:5, 130:23
hopefully [1] - 25:14
hopes [1] - 146:13
hotel [1] - 8:19
hour [9] - 8:14, 8:22, 75:23, 75:24, 76:3, 187:13, 188:19, 188:20
hours [3] - 76:11, 76:12
house [2] - 44:19, 66:14
Houtman [3] - 135:3, 135:7, 135:14
hundreds [2] - 74:18, 92:10
hyperactive [1] - 51:20
hyperactivity [2] - 18:22, 53:12
idea [2] - 11:6, 29:1
identified [7] - 32:3, 33:10, 38:2, 50:17, 51:8, 53:10, 53:12
identify [2] - 6:24, 186:17
IEP [1] - 103:8
III [2] - 45:12, 45:19
imagine [2] - 21:23, 133:6
immediate [1] - 190:23
immediately [1] - 155:24
impact [3] - 41:22, 111:8, 111:22
impaired [8] - 18:20, 18:21, 34:3, 61:2, 61:4, 101:6, 173:24
impairment [13] - 13:14, 34:17, 51:21, 67:13, 67:16, 108:6, 111:8, 128:19, 171:4, 177:21, 183:22, 184:1
impairments [9] - 9:20, 9:23, 67:6, 67:8, 77:8, 77:17, 98:25, 111:12
impairs [1] - 101:2
impeachment [5] - 116:22, 117:20, 117:23, 118:2, 126:1
implementing [4] - 100:22, 102:25, 110:18, 127:5
import [6] - 104:12, 105:5, 105:9, 120:21, 121:4, 175:24
importance [2] - 55:3, 124:18
important [1] - 56:17, 57:17, 100:15, 104:19, 120:22,

213

121:1, 133:21, 133:24, 175:15, 176:6, 176:8, 177:2, 178:21, 180:6, 180:9
**importantly** [1] - 188:15
**imprecision** [1] - 40:16
**improve** [1] - 111:22
**impulsivity** [1] - 53:13
**in-house** [1] - 66:14
**in-person** [1] - 97:20
**inability** [1] - 193:22
**inadequate** [1] - 22:1
**inappropriate** [5] - 21:19, 21:20, 21:21, 78:14, 87:13
**inattentive** [2] - 51:15, 51:20
**incentive** [1] - 14:24
**incentives** [1] - 14:19
**include** [12] - 10:11, 65:14, 67:8, 67:14, 108:11, 111:7, 111:8, 111:13, 138:25, 141:20, 141:23, 185:21
**included** [10] - 24:7, 32:1, 51:7, 70:24, 104:14, 108:5, 142:24, 158:5, 158:8, 196:9
**includes** [2] - 34:8, 114:14
**including** [11] - 21:8, 28:13, 73:2, 104:1, 114:22, 123:7, 127:16, 136:1, 178:9, 178:17, 183:1
**incomplete** [1] - 24:7
**inconsistent** [5] - 53:17, 127:25, 132:18, 171:25, 185:5
**incorrect** [6] - 44:11, 44:13, 89:20, 145:3, 145:6, 170:13
**incorrectly** [4] - 110:19, 143:21, 144:22, 145:1
**incredibly** [1] - 194:22
**independently** [1] - 144:17
**Indiana** [1] - 190:7
**indicate** [5] - 10:21, 12:8, 42:20, 61:2, 165:16
**indicated** [11] - 8:8, 11:9, 11:15, 25:17, 34:20, 39:23, 52:7, 55:16, 69:18, 167:7, 184:17
**indicates** [6] - 11:1, 22:20, 51:23, 52:16, 69:7, 178:18
**indicating** [3] - 70:24, 127:22, 152:6
**indication** [3] - 36:3, 149:7, 156:2
**indications** [1] - 147:16
**indicator** [2] - 96:12, 96:14
**individual** [24] - 13:3, 41:18, 46:18, 47:16, 65:23, 87:13, 101:2, 101:19, 108:9, 111:7, 112:1, 114:15, 114:19, 128:13, 131:15, 133:12, 133:16, 154:7, 173:20, 179:15, 183:10, 188:14,

195:15, 195:19
**individual's** [8] - 101:4, 101:6, 115:4, 171:4, 173:21, 173:24, 177:19, 177:21
**individualized** [1] - 103:8, 178:23
**individually** [2] - 166:22, 167:24
**individuals** [15] - 5:12, 14:18, 16:18, 50:4, 66:1, 74:12, 78:7, 92:22, 93:1, 98:5, 120:14, 120:18, 131:14, 183:8
**indulge** [1] - 114:6
**indulgence** [1] - 182:15
**influence** [2] - 12:24, 15:25
**inform** [1] - 125:1
**informal** [6] - 19:21, 111:9, 111:21, 122:6, 176:4, 178:17
**informality** [2] - 121:22, 122:12
**information** [59] - 11:20, 11:22, 11:25, 12:11, 12:24, 17:20, 18:23, 26:14, 31:21, 35:24, 49:25, 50:3, 50:13, 50:19, 53:15, 53:16, 55:14, 55:19, 55:20, 55:21, 55:23, 55:24, 60:15, 66:8, 66:18, 66:19, 68:2, 71:6, 74:16, 74:19, 75:5, 79:2, 81:22, 81:23, 82:1, 91:6, 100:13, 100:14, 100:16, 100:18, 104:14, 117:9, 122:3, 124:12, 124:22, 141:20, 141:23, 143:2, 144:3, 144:5, 151:24, 155:13, 155:15, 183:20, 186:2, 186:4
**informative** [1] - 10:18
**informed** [2] - 66:20, 78:5
**informing** [1] - 119:25
**initial** [11] - 19:5, 42:11, 68:21, 70:8, 71:5, 71:6, 71:18, 72:22, 73:1, 73:7, 74:15
**INJUNCTION** [1] - 1:6
**injunction** [7] - 81:1, 157:5, 182:7, 190:23, 191:9, 192:2
**input** [3] - 36:17, 36:22, 175:11
**instance** [5] - 15:19, 71:22, 75:11, 187:9, 187:17
**instances** [3] - 30:1, 68:3, 68:6
**instead** [4] - 122:22, 160:11, 171:5, 188:19
**institutions** [1] - 186:21
**instructed** [1] - 171:2
**instruction** [2] - 186:6, 186:7
**instructions** [1] - 45:1
**instrument** [1] - 39:12

**instruments** [1] - 12:17
**insufficient** [4] - 21:24, 22:3, 184:13, 188:5
**intake** [1] - 7:18
**intellectually** [1] - 32:15
**intelligence** [6] - 6:14, 27:16, 27:21, 54:24, 55:8, 59:13
**intelligent** [1] - 179:16
**intended** [1] - 182:22
**intensive** [2] - 36:6, 186:6
**intent** [5] - 106:6, 110:18, 120:2, 128:1, 134:2
**interact** [1] - 174:5
**interest** [3] - 59:9, 85:3, 182:9
**interested** [2] - 100:19, 172:11
**interface** [1] - 140:22
**interferes** [1] - 33:19
**interfering** [1] - 77:24
**internet** [1] - 4:18
**interpret** [4] - 8:18, 107:10, 115:20, 133:6
**interpretation** [1] - 95:20
**interpretations** [1] - 132:8
**interpreters** [1] - 191:21
**interrogatories** [1] - 164:14
**interrupt** [3] - 77:25, 78:16, 113:20
**interview** [5] - 7:18, 12:1, 49:23, 52:12, 175:11
**introduce** [1] - 169:17
**investigation** [1] - 16:24
**involved** [1] - 28:22
**involving** [1] - 88:2
**Iowa** [3] - 10:11, 29:21, 30:6
**IQ** [3] - 6:9, 54:16, 55:6
**irrelevant** [1] - 155:16
**irreparable** [3] - 190:21, 191:4, 192:6
**irrevocably** [1] - 192:25
**issue** [16] - 93:6, 115:19, 115:24, 130:18, 131:1, 132:19, 155:19, 156:3, 170:1, 172:3, 173:4, 173:7, 175:3, 189:7, 196:18
**issued** [4] - 90:25, 119:18, 131:7, 172:8
**issues** [6] - 14:4, 53:12, 54:16, 55:3, 184:17
**issuing** [2] - 116:1, 116:12
**item** [10] - 18:1, 86:25, 140:13, 140:15, 140:16, 143:10, 147:6, 147:18, 150:9, 157:22
**Item** [4] - 142:24, 143:1, 143:11, 153:1
**items** [5] - 47:9, 76:2, 86:17, 153:3
**itself** [5] - 112:13, 115:9,

129:5, 181:3, 192:5
**IV** [5] - 46:1, 52:23, 52:25, 55:3
**IVA+Plus** [2] - 48:13, 60:14
**James** [1] - 1:8
**January** [4] - 68:25, 69:1, 69:11, 70:25, 71:7, 71:15
**Jersey** [1] - 1:17
**Jessica** [5] - 4:7, 65:17, 126:12, 139:11, 164:3
**JESSICA** [1] - 1:3
**Jessica's** [2] - 140:3, 140:4
**Jessie** [5] - 82:15, 136:18, 170:22, 172:17, 175:8
**job** [5] - 64:19, 65:2, 138:11, 138:21, 195:7
**Jodoin** [4] - 137:23, 138:5, 138:11, 141:4
**JODOIN** [2] - 137:25, 198:9
**Johnson** [3] - 15:17, 46:1, 59:23
**JOYNER** [1] - 1:12
**judge** [1] - 192:3
**Judge** [2] - 189:14, 189:19
**judgment** [2] - 27:19, 27:20
**judicial** [3] - 81:6, 81:7, 183:3
**July** [9] - 73:15, 91:7, 91:17, 92:2, 92:8, 106:19, 154:12, 154:16, 154:18
**jumping** [2] - 74:23, 191:14
**jumps** [1] - 44:21
**June** [6] - 18:3, 72:8, 72:12, 72:21, 84:3, 91:3
**Justice** [14] - 108:20, 119:18, 125:4, 125:7, 125:13, 128:5, 131:1, 131:7, 132:19, 163:15, 171:23, 172:15, 176:22, 180:9
**Justice's** [2] - 104:20, 129:8
**Kaufman** [1] - 15:18
**keep** [4] - 19:25, 164:20, 176:23, 191:15
**Kennedy** [1] - 106:21
**keyed** [1] - 140:13
**kicks** [1] - 186:14
**kind** [17] - 8:20, 11:6, 12:8, 16:5, 21:24, 52:10, 54:18, 58:9, 59:19, 60:22, 113:22, 124:19, 154:4, 176:3, 180:12, 193:24, 194:12
**kindergarten** [10] - 31:7, 34:9, 164:21, 164:22, 182:1, 182:2, 182:4, 184:18, 185:15, 185:16
**kinds** [5] - 11:10, 27:18, 27:23, 58:8, 176:18
**knowledge** [13] - 15:4, 35:1, 85:8, 85:11, 85:15, 85:24, 87:16, 87:18, 113:1, 116:3,

130:19, 186:12, 186:19
**knows** [5] - 140:25, 144:5, 155:3, 173:15, 181:19
**labeled** [1] - 140:11
**lack** [8] - 48:22, 48:25, 55:6, 140:23, 145:12, 146:2, 146:21, 149:22
**lacks** [1] - 174:7
**language** [9] - 21:5, 110:17, 114:15, 115:4, 124:18, 125:9, 127:15, 127:21, 186:10
**large** [3] - 145:9, 165:10, 189:24
**larger** [1] - 111:14
**largest** [1] - 67:16
**Larry** [1] - 38:16
**larry@rcglawoffices.com** [1] - 1:18
**last** [36] - 5:19, 7:7, 20:22, 21:1, 39:8, 52:18, 62:15, 65:21, 68:12, 73:22, 74:5, 77:14, 109:19, 110:15, 115:23, 121:15, 126:5, 144:25, 147:25, 148:2, 149:16, 150:3, 152:8, 152:21, 153:23, 155:11, 155:23, 158:16, 159:1, 170:22, 172:22, 182:19, 182:21, 192:14, 197:3
**lastly** [1] - 178:20
**lasts** [2] - 28:10, 28:13
**late** [1] - 193:21
**latter** [2] - 42:8, 42:15
**law** [21] - 100:5, 106:12, 109:18, 120:21, 121:3, 123:20, 123:23, 123:25, 129:6, 129:12, 132:6, 132:7, 132:16, 171:1, 171:22, 173:17, 175:15, 181:9, 189:21, 193:9, 194:16
**Law** [1] - 190:9
**LAWRENCE** [1] - 1:16
**laws** [1] - 182:25
**lawyer** [2] - 83:23, 110:8
**lay** [1] - 144:11
**LD** [3] - 8:6, 11:13, 62:19
**lead** [1] - 61:10
**leading** [1] - 138:24
**learn** [5] - 90:1, 94:7, 107:3, 114:25, 177:15
**learned** [3] - 28:2, 111:6, 175:17
**learning** [28] - 5:3, 5:8, 6:13, 9:25, 15:3, 21:3, 22:6, 34:17, 56:4, 67:9, 67:19, 111:13, 111:25, 114:20, 114:23, 137:12, 159:11, 174:13, 174:14, 174:17, 177:10, 177:13, 180:6, 180:13,

180:19, 184:9, 184:17, 186:21
**least** [16] - 25:20, 66:1, 67:25, 69:7, 70:2, 70:12, 116:6, 122:1, 130:23, 146:11, 153:20, 155:25, 156:3, 161:12, 186:2, 186:21
**leave** [8] - 8:17, 64:3, 162:17, 182:9, 196:14, 196:16, 196:17, 197:2
**leaves** [1] - 143:22
**ledger** [1] - 185:7
**left** [1] - 140:4
**legal** [4] - 104:22, 104:24, 128:16, 132:2
**Legal** [1] - 99:25
**legally** [2] - 182:23, 183:1
**legible** [1] - 66:15
**length** [4] - 40:4, 76:12, 192:15, 194:21
**lengthier** [1] - 185:22
**less** [13] - 49:19, 74:4, 76:13, 102:20, 111:19, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 154:23, 188:20
**lessen** [2] - 111:7, 111:22
**letter** [43] - 70:20, 71:21, 73:6, 73:14, 73:19, 73:24, 74:4, 75:16, 90:10, 90:20, 90:25, 106:20, 107:8, 107:12, 107:17, 108:1, 109:9, 109:15, 109:23, 110:12, 112:12, 112:18, 112:23, 114:1, 115:9, 129:23, 129:25, 130:1, 130:6, 130:22, 131:4, 132:18, 132:20, 135:3, 135:20, 161:25, 162:8, 162:9, 163:2, 163:14, 163:15
**letterhead** [2] - 109:15, 109:17
**letters** [3] - 58:6, 92:13, 179:1
**letting** [1] - 38:23
**level** [14] - 24:15, 30:3, 40:19, 101:5, 114:20, 115:5, 115:7, 173:22, 177:11, 177:20, 185:13
**levels** [2] - 6:14, 187:5
**Lewandowski** [12] - 21:9, 21:11, 49:3, 59:16, 60:11, 72:15, 72:21, 72:25, 98:7, 98:9, 184:8, 190:16
**Lewandowski's** [3] - 22:15, 73:2, 74:1
**liberalness** [1] - 187:15
**license** [1] - 85:6
**licensed** [7] - 22:12, 65:6, 65:9, 82:22, 82:25, 87:20, 87:23

**licensing** [1] - 173:17
**licensure** [2] - 78:24
**life** [20] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:13, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4, 189:24, 190:3
**lifelong** [3] - 9:23, 183:22, 184:1
**likelihood** [1] - 191:8
**likely** [1] - 149:4
**likewise** [5] - 12:23, 13:17, 16:18, 68:6, 191:2
**limit** [3] - 91:9, 91:12, 152:22
**limitation** [10] - 66:25, 80:6, 105:13, 111:24, 112:2, 113:9, 128:14, 189:1, 189:22, 190:13
**limited** [18] - 85:12, 85:16, 85:17, 85:25, 86:1, 114:18, 114:21, 114:23, 128:20, 133:13, 136:23, 137:18, 151:24, 177:12, 183:12, 183:15, 189:4, 192:17
**limits** [3] - 108:7, 110:17, 110:20
**line** [10] - 33:3, 33:7, 33:16, 44:16, 47:12, 47:14, 96:9, 102:2, 106:23, 149:15
**lines** [1] - 121:15
**link** [1] - 56:18
**list** [4] - 17:22, 19:21, 29:5, 58:11
**listed** [4] - 18:1, 20:6, 23:10, 110:11
**listen** [1] - 38:10
**listing** [5] - 17:21, 24:1, 25:8, 25:9, 25:12
**lists** [1] - 110:4
**literally** [2] - 126:4, 181:16
**literature** [2] - 60:24, 61:9
**Livingston** [9] - 23:3, 23:6, 24:3, 70:18, 70:23, 71:2, 98:14, 188:2
**Livingston's** [3] - 71:6, 184:12, 188:5
**LLP** [3] - 1:15, 2:2, 2:9
**loaded** [1] - 154:22
**local** [2] - 156:20, 156:22
**located** [1] - 64:25
**logically** [1] - 185:19
**longest** [1] - 88:21
**look** [61] - 4:19, 16:21, 17:5, 17:6, 19:1, 19:10, 19:24, 20:1, 22:14, 24:17, 26:4, 29:4, 32:20, 35:10, 37:2, 37:24, 39:3, 39:21, 40:6, 40:7, 42:22, 44:14, 45:12,

46:16, 47:12, 50:22, 51:11, 55:13, 55:19, 56:20, 61:25, 67:15, 68:9, 69:2, 72:17, 73:17, 75:15, 79:2, 115:22, 127:11, 127:18, 147:1, 147:25, 148:9, 148:14, 149:5, 149:10, 151:11, 152:24, 154:14, 154:17, 165:13, 168:2, 169:25, 171:14, 179:18, 180:14, 193:14
**looked** [17] - 7:17, 8:25, 9:6, 21:8, 55:20, 71:21, 75:8, 80:10, 147:3, 158:24, 158:25, 159:4, 159:6, 176:2, 190:3, 190:7, 190:11
**looking** [19] - 11:20, 27:15, 37:23, 41:25, 50:15, 58:16, 93:25, 99:11, 106:14, 119:11, 120:6, 147:2, 158:14, 171:15, 179:13, 180:16, 189:23, 194:15
**looks** [20] - 43:20, 44:21, 45:7, 46:7, 46:17, 47:6, 47:12, 47:23, 48:7, 52:17, 68:23, 69:16, 71:7, 71:22, 72:8, 73:21, 75:19, 107:2, 110:4, 140:19
**loud** [12] - 44:6, 44:24, 44:25, 45:24, 77:23, 78:15, 82:4, 82:7, 88:14, 114:10, 115:12, 137:10
**love** [1] - 188:18
**Love** [1] - 190:9
**Lovett** [3] - 39:11, 87:23, 88:1
**low** [7] - 42:13, 48:17, 48:20, 48:21, 48:22, 54:24, 62:21
**lower** [2] - 30:19, 63:16
**lowers** [1] - 48:4
**LSAT** [1] - 5:11
**luck** [2] - 55:5, 196:3
**lunch** [3] - 119:1, 119:5, 125:17
**Luncheon** [1] - 118:16
**lunchtime** [1] - 118:7
**MA** [1] - 23:6
**ma'am** [4] - 64:9, 118:9, 137:21, 196:24
**machine** [1] - 174:22
**magnitude** [1] - 65:20
**maintained** [1] - 154:4
**major** [18] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:12, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4
**majority** [1] - 149:6
**malinger** [1] - 15:2

**Malingering** [2] - 42:19, 56:12

**malingering** [5] - 14:14, 16:13, 42:20, 62:21, 194:13

**mandatory** [1] - 191:9

**manifestation** [1] - 147:22

**manipulated** [2] - 179:12, 180:1

**manner** [8] - 79:10, 80:18, 104:6, 104:8, 114:13, 133:16, 142:1, 183:8

**Manual** [2] - 5:21, 53:1

**manual** [10] - 6:2, 40:18, 53:2, 101:3, 101:7, 162:16, 173:24, 193:7, 193:11, 197:1

**March** [8] - 70:21, 71:21, 109:23, 129:23, 131:6, 161:25, 172:18, 192:7

**Marie** [2] - 1:22, 197:18

**mark** [7] - 41:8, 44:9, 47:16, 107:15, 140:20, 142:5, 142:15

**marked** [2] - 107:13, 126:22

**Market** [1] - 1:9

**MARY** [1] - 2:3

**mary.vargas@steinvargas. com** - 2:6

**masked** [1] - 180:8

**Massachusetts** [1] - 138:19

**master's** [2] - 65:7, 138:17

**match** [1] - 193:3

**matching** [1] - 26:2

**material** [4] - 117:20, 117:23, 168:22, 173:16

**mathematics** [2] - 138:15, 138:16

**matriculate** [1] - 186:24

**matter** [12] - 63:8, 66:22, 89:5, 118:6, 153:6, 154:17, 155:9, 167:23, 181:16, 181:17, 181:18, 197:15

**matters** [3] - 131:11, 131:13, 194:17

**maxed** [1] - 44:3

**maximum** [6] - 14:19, 41:5, 42:17, 50:17, 171:8, 173:10

**MCAT** [34] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:2, 27:1, 28:4, 28:7, 28:16, 31:7, 31:11, 31:17, 34:1, 58:12, 58:14, 63:12, 70:5, 84:11, 85:9, 85:11, 85:18, 86:21, 87:6, 87:10, 95:20, 96:11, 96:21, 104:2, 162:19, 178:2, 184:21, 189:12, 193:13

**mean** [21] - 9:9, 14:14, 25:25, 30:19, 34:4, 34:5, 34:6, 48:19, 51:25, 63:3, 76:20, 102:17, 115:20, 121:23, 121:25, 137:17, 156:22,

158:23, 177:8, 190:18, 191:2

**meaning** [9] - 22:9, 30:15, 102:15, 110:21, 183:10, 183:11, 186:15, 186:16, 193:24

**means** [11] - 7:9, 9:23, 14:16, 20:7, 30:19, 44:2, 51:20, 61:3, 122:4, 146:23

**meant** [2] - 95:21, 110:17

**measure** [11] - 16:3, 34:7, 55:8, 56:16, 59:13, 101:6, 101:8, 101:21, 173:23, 177:20, 186:18

**measured** [1] - 6:14

**measurement** [1] - 138:17

**measures** [13] - 101:20, 104:1, 105:16, 111:11, 111:13, 111:21, 113:8, 113:10, 113:16, 113:18, 124:13, 189:24, 190:3

**measuring** [1] - 57:15

**MEDICAL** [1] - 1:5

**Medical** [6] - 64:23, 106:15, 110:11, 138:22, 183:7, 190:1

**medical** [37] - 5:18, 52:6, 52:8, 78:24, 81:24, 82:3, 82:6, 82:17, 82:20, 88:19, 89:12, 95:23, 96:17, 97:5, 134:18, 135:8, 135:21, 135:24, 162:16, 171:17, 172:18, 172:19, 172:21, 172:24, 178:7, 181:17, 187:2, 187:21, 187:24, 188:6, 188:7, 191:21, 191:23, 193:3, 195:5, 195:7, 195:8

**medication** [3] - 61:17, 175:18, 176:11

**medications** [2] - 14:22, 176:19

**medicine** [3] - 128:11, 179:21, 195:10

**meet** [7] - 53:5, 68:6, 120:10, 120:23, 187:4, 187:5, 190:22

**meeting** [4] - 100:9, 119:17, 163:10, 189:7

**meets** [2] - 12:6, 187:5

**member** [2] - 50:6, 50:7

**memorandum** [1] - 160:20

**Memory** [2] - 42:19, 56:12

**memory** [4] - 42:20, 57:16

**mental** [4] - 67:6, 67:8, 84:18, 108:6

**Mental** [1] - 5:22

**mention** [2] - 11:3, 162:15

**mentioned** [4] - 7:16, 16:7, 24:21, 177:17

**merit** [1] - 173:15

**merits** [1] - 191:8

**met** [2] - 22:11, 195:16

**method** [1] - 6:12

**Methods** [1] - 16:25

**MEW** [33] - 2:10, 32:25, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 196:14, 196:19

**mic** [1] - 3:20

**Michael** [1] - 138:5

**MICHAEL** [3] - 2:3, 137:25, 198:8

**michael.stein@ steinvargas.com** [1] - 2:6

**Michigan** [6] - 82:23, 82:24, 87:21, 87:22, 87:24, 135:21

**microphone** [1] - 138:6

**mid** [1] - 175:2

**middle** [3] - 103:10, 110:23, 190:4

**might** [15] - 14:21, 15:15, 15:21, 42:17, 48:25, 79:6, 81:17, 93:12, 123:21, 132:9, 132:10, 145:23, 146:10, 179:11, 182:3

**migraines** [2] - 77:12, 88:11

**Mike** [1] - 137:23

**million** [2] - 94:8, 94:22

**Mimi** [2] - 44:16, 44:19

**mimic** [1] - 15:5

**mind** [7] - 25:23, 27:1, 27:4, 27:12, 42:16, 127:18, 197:3

**minds** [1] - 192:21

**minimize** [1] - 191:2

**minute** [11] - 20:3, 38:17, 47:7, 73:5, 149:16, 150:3, 158:16, 158:20, 159:1, 188:23

**minutes** [15] - 28:13, 48:12, 54:2, 76:2, 76:4, 76:13, 92:16, 158:22, 159:2, 160:13, 160:14, 161:12, 192:14

**misconception** [1] - 58:4

**misconceptions** [1] - 58:3

**misphrasing** [1] - 31:2

**misread** [2] - 58:9, 127:17

**missing** [1] - 105:2

**misunderstood** [1] - 9:4

**Mitchell** [2] - 1:22, 197:18

**mitigate** [1] - 178:4

**mitigating** [7] - 105:16, 111:11, 111:21, 113:8, 113:10, 113:16, 124:13

**mitigation** [7] - 112:9,

175:16, 175:18, 176:1, 176:19, 193:22, 194:20

**mnemonics** [1] - 111:17

**modalities** [1] - 194:20

**model** [4] - 6:17, 54:10, 54:13, 54:15

**modifications** [7] - 103:4, 103:6, 104:7, 111:6, 111:8, 111:9, 111:11

**modified** [2] - 111:18, 182:24

**moment** [10] - 37:19, 38:3, 56:19, 57:24, 81:15, 85:1, 88:6, 109:10, 109:11, 132:12

**month** [1] - 74:3

**months** [7] - 73:23, 74:6, 88:24, 90:16, 94:15, 195:17

**morning** [12] - 3:2, 4:5, 4:6, 58:22, 59:2, 59:22, 64:17, 64:18, 79:16, 79:17, 126:5, 169:19

**morning's** [1] - 61:16

**most** [30] - 40:11, 40:15, 40:16, 49:24, 58:4, 59:11, 61:5, 62:18, 79:6, 96:15, 105:14, 114:25, 117:3, 120:22, 121:1, 128:20, 133:14, 133:21, 133:23, 147:19, 147:22, 153:16, 161:19, 165:9, 177:15, 183:13, 183:17, 189:5, 189:22

**mother** [6] - 13:8, 13:12, 13:16, 13:19, 175:12, 185:2

**motivated** [1] - 135:12

**mouthed** [1] - 81:18

**move** [3] - 146:5, 161:10, 170:17

**moved** [4] - 3:6, 160:18, 161:17

**moving** [7] - 26:11, 37:18, 113:2, 116:9, 162:3, 163:21, 165:17

**MR** [159] - 3:3, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:5, 26:20, 26:24, 31:10, 31:16, 33:2, 33:5, 33:6, 36:19, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 37:24, 38:5, 38:7, 38:12, 38:15, 38:17, 38:19, 38:21, 38:22, 39:1, 39:2, 47:19, 47:20, 47:21, 47:22, 53:19, 53:24, 54:7, 61:19, 61:21, 61:24, 63:17, 63:20, 64:2, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 109:4, 112:10, 112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14,

122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 140:23, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:2, 144:6, 144:9, 144:11, 144:12, 145:5, 145:8, 145:12, 145:16, 146:2, 146:7, 146:8, 146:21, 147:4, 149:22, 149:25, 150:12, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:22, 159:25, 160:3, 160:6, 160:9, 160:13, 160:14, 161:2, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 163:19, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3
**MS** [102] - 32:25, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:4, 196:14, 196:19, 196:23, 196:25, 197:5
**multiple** [18] - 13:3, 13:4,

13:14, 13:17, 39:18, 86:3, 86:10, 86:11, 86:16, 86:20, 86:22, 87:5, 122:14, 135:11, 184:25, 189:9, 194:19
**must** [8] - 100:25, 103:2, 104:5, 114:24, 171:11, 173:18, 177:14, 177:18
**naked** [1] - 175:20
**name** [6] - 4:17, 42:24, 46:2, 64:13, 138:4, 140:4
**names** [1] - 15:12
**national** [1] - 78:23
**NATIONAL** [1] - 1:5
**National** [11] - 64:21, 64:22, 85:17, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1
**nature** [1] - 22:3
**navigate** [1] - 158:19
**navigated** [1] - 152:21
**NBME** [78] - 18:9, 65:20, 69:5, 78:17, 80:3, 80:8, 81:1, 82:10, 82:12, 85:20, 87:16, 88:1, 90:4, 90:14, 93:5, 93:15, 94:12, 94:18, 99:25, 101:10, 101:13, 101:22, 103:16, 103:24, 104:16, 106:12, 107:4, 108:1, 108:23, 110:6, 113:7, 115:3, 115:6, 115:18, 121:12, 122:7, 122:11, 122:15, 129:2, 129:8, 129:16, 129:24, 130:1, 130:4, 130:7, 130:11, 130:14, 131:16, 131:17, 131:19, 132:13, 134:16, 135:14, 135:22, 135:25, 136:13, 136:18, 138:24, 139:2, 141:13, 143:4, 150:22, 151:1, 152:1, 152:2, 153:22, 154:19, 161:25, 163:10, 171:19, 171:24, 172:2, 172:9, 173:11, 181:10, 185:9, 186:11, 188:10
**NBME's** [12] - 94:4, 108:13, 110:1, 112:6, 112:8, 113:20, 121:8, 124:17, 125:2, 125:8, 141:4, 171:16
**NE** [1] - 2:4
**necessarily** [5] - 11:23, 121:13, 147:18, 153:7, 190:18
**necessary** [4] - 5:22, 175:14, 193:23, 195:13
**need** [29] - 16:18, 17:25, 25:14, 33:21, 33:25, 38:3, 38:22, 53:4, 78:25, 93:13, 97:5, 97:8, 109:10, 115:12, 117:22, 128:2, 130:12, 135:14, 156:20, 160:4,

171:9, 178:19, 178:24, 182:7, 188:3, 188:15, 194:25, 195:3, 195:4
**needed** [10] - 59:20, 113:19, 117:21, 130:13, 133:22, 135:17, 136:1, 136:19, 172:24, 174:17
**needs** [3] - 173:8, 186:24, 189:6
**negative** [2] - 62:12, 186:1
**negatives** [1] - 61:10
**negligible** [1] - 110:20
**Nelson** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18
**Nelson-Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18
**neurodevelopmental** [1] - 9:20
**neurological** [2] - 33:18, 111:6
**neuropsych** [2] - 49:18, 49:19
**neuropsychological** [1] - 5:12
**neuropsychologist** [2] - 21:12, 22:12
**neuropsychologists** [1] - 194:4
**never** [4] - 4:11, 102:17, 126:9, 189:3
**nevertheless** [4] - 31:20, 111:25, 114:21, 177:12
**new** [10] - 116:1, 119:23, 120:21, 123:8, 123:16, 123:20, 124:3, 124:8
**New** [1] - 1:17
**next** [20] - 18:12, 41:1, 42:22, 46:1, 46:21, 52:16, 62:22, 83:18, 86:18, 104:3, 137:22, 140:10, 140:14, 142:10, 143:8, 160:2, 161:24, 162:14, 169:10, 190:25
**night** [1] - 126:5
**NO** [2] - 1:3, 198:15
**nobody** [1] - 77:25
**nondisabled** [2] - 88:16, 89:3
**none** [3] - 175:23, 180:23, 186:7
**normal** [3] - 22:20, 22:21
**normally** [3] - 8:19, 84:7, 109:5
**Northwest** [1] - 191:19
**Norton** [2] - 100:3, 109:16
**notation** [2] - 34:21, 169:6
**note** [6] - 44:11, 44:12,

116:20, 157:11, 157:12, 161:21
**notebook** [4] - 16:22, 17:10, 62:1, 148:10
**notebooks** [3] - 37:21, 62:1, 139:14
**noted** [5] - 102:8, 103:21, 130:11, 149:24, 168:18
**notes** [1] - 113:13
**nothing** [8] - 129:19, 136:18, 137:2, 137:16, 153:9, 184:15, 192:22, 195:23
**notice** [7] - 81:6, 81:7, 108:20, 108:23, 109:23, 110:2, 120:10
**notification** [1] - 170:14
**notify** [2] - 156:8, 157:7
**noting** [1] - 103:22
**notwithstanding** [1] - 74:1
**November** [1] - 68:23
**NPRM** [2] - 115:24, 130:18
**number** [27] - 23:11, 23:12, 40:23, 53:7, 57:2, 58:5, 59:11, 72:17, 74:24, 76:2, 86:3, 86:24, 105:17, 107:16, 107:18, 107:20, 109:1, 110:4, 120:13, 120:17, 140:15, 145:9, 145:23, 154:25, 164:17, 165:19, 176:9
**Number** [1] - 127:2
**numbered** [2] - 148:16, 165:8
**numbers** [4] - 26:7, 26:10, 165:16, 168:3
**nurse** [1] - 65:6
**NW** [1] - 2:11
**oath** [2] - 3:14, 118:20
**object** [9] - 31:10, 80:15, 101:15, 154:24, 167:1, 168:14, 168:25, 170:10, 170:11
**objected** [5] - 107:4, 155:16, 155:24, 167:5
**objection** [33] - 3:9, 3:10, 26:13, 26:17, 36:19, 81:9, 102:8, 112:17, 112:24, 116:23, 116:24, 122:18, 126:15, 140:23, 144:4, 145:12, 145:14, 146:2, 146:5, 146:21, 149:22, 149:24, 156:8, 157:8, 157:9, 162:2, 162:3, 162:7, 163:19, 166:9, 168:18, 169:5, 170:11
**objections** [21] - 33:14, 164:14, 165:22, 166:24, 167:10, 168:7, 168:9
**objective** [6] - 11:16, 11:19, 11:21, 11:23, 60:22, 185:9
**obligated** [2] - 101:20,

188:11
obligation [1] - 188:13
observation [2] - 135:1, 135:4
observations [1] - 134:22
observed [1] - 179:17
observing [2] - 81:20, 174:24
obtain [5] - 4:8, 14:19, 14:24, 50:3, 96:20
obtained [4] - 16:17, 30:6, 32:6, 37:4
obviously [6] - 107:8, 117:1, 160:23, 166:22, 175:10, 191:18
occasion [1] - 42:5
occasionally [2] - 82:11, 147:16
occur [1] - 147:18
occurred [1] - 3:19
October [1] - 123:17
offer [10] - 3:8, 5:11, 160:4, 161:19, 161:25, 162:10, 163:1, 163:5, 163:12, 173:11
offered [3] - 161:20, 163:6, 183:18
offering [5] - 100:24, 103:1, 104:5, 166:2, 166:6
offers [1] - 173:11
offhand [2] - 89:24, 137:1
Office [1] - 116:11
office [1] - 31:25
officer [3] - 79:19, 105:7, 130:3
officers [1] - 39:25
offices [1] - 64:25
official [4] - 5:21, 78:4, 122:5, 137:14
Official [2] - 1:22, 197:18
often [6] - 14:22, 61:1, 185:24, 194:6, 194:23, 194:24
oftentimes [1] - 54:19
Ohio [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23
old [2] - 24:20, 124:3
omit [1] - 31:11
once [4] - 76:14, 96:7, 172:19, 189:3
one [96] - 3:3, 14:9, 15:7, 16:13, 17:2, 19:11, 19:25, 24:2, 25:8, 25:9, 25:12, 27:3, 27:13, 29:20, 30:3, 30:12, 31:11, 35:1, 35:4, 37:10, 38:15, 38:19, 39:5, 39:8, 42:4, 42:22, 46:1, 46:7, 46:8, 46:13, 47:11, 47:13, 49:6, 51:7, 55:20, 56:19, 58:5, 58:12, 61:7, 66:1, 69:14,

71:16, 75:24, 77:3, 77:23, 79:3, 83:9, 83:17, 83:19, 85:1, 89:25, 91:6, 93:11, 94:1, 94:2, 94:14, 99:15, 100:22, 109:10, 110:6, 114:22, 115:9, 121:5, 125:15, 133:7, 135:20, 136:12, 137:8, 139:14, 139:18, 146:11, 148:4, 152:9, 157:6, 158:9, 162:22, 165:7, 170:7, 170:8, 173:2, 174:10, 175:13, 176:1, 176:13, 177:4, 177:12, 182:18, 183:12, 183:21, 184:21, 185:18, 188:11, 193:4
one's [2] - 111:16, 192:4
one-hour [1] - 75:24
ones [9] - 16:1, 35:11, 59:22, 128:4, 139:18, 161:24, 165:8, 181:8, 196:15
onset [2] - 13:4, 13:9
open [4] - 19:25, 94:1, 147:12, 150:9
operated [2] - 78:8, 141:13
operating [1] - 3:21
opinion [5] - 24:6, 62:10, 62:13, 184:4, 190:19
opportunities [1] - 76:5
opportunity [15] - 14:24, 26:9, 26:12, 31:13, 76:15, 93:17, 112:20, 116:14, 117:7, 117:18, 146:4, 157:15, 165:21, 166:1, 181:19
oppose [1] - 106:12
opposing [1] - 126:1
option [2] - 146:13, 156:12
options [4] - 5:3, 86:3, 86:24, 87:5
optometrist [6] - 55:21, 56:2, 98:24, 99:2, 175:6, 175:7
or.. [2] - 18:11, 160:8
oral [3] - 16:1, 43:2, 45:21
Oral [2] - 16:4, 16:7
orally [1] - 45:6
order [31] - 3:1, 14:19, 15:2, 15:21, 18:20, 31:25, 33:8, 43:17, 53:5, 65:20, 74:21, 75:8, 92:11, 93:16, 151:1, 152:3, 152:18, 153:3, 153:5, 156:4, 156:13, 157:24, 158:4, 161:14, 172:4, 176:3, 183:9, 186:18, 190:22, 191:22
ordered [1] - 81:1
ordinarily [3] - 71:9, 76:25, 81:24
ordinary [1] - 110:21
organization [1] - 189:18

organizations [6] - 110:4, 113:25, 127:12, 127:14, 127:20, 163:14
original [1] - 137:3
originally [2] - 59:15, 65:6
originals [1] - 155:4
OSU [1] - 172:25
otherwise [2] - 130:21, 184:13
out-of-date [1] - 24:8
outcome [10] - 15:25, 124:2, 140:7, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 168:16
outcomes [5] - 114:19, 124:18, 125:3, 125:9, 127:22
outdated [1] - 184:13
Outside [1] - 99:25
outside [7] - 91:7, 91:22, 100:12, 100:15, 119:12, 158:12, 159:5
overall [4] - 24:11, 27:15, 59:3, 150:8
overcome [1] - 193:22
overlooked [2] - 14:6, 18:11
overrule [1] - 126:15
overruled [8] - 36:25, 102:8, 122:18, 146:4, 146:22, 149:24, 168:19, 170:12
oversee [1] - 138:23
overton [1] - 135:20
own [7] - 74:14, 132:9, 171:16, 173:14, 175:10, 181:22, 193:14

P-1 [1] - 161:23
P-13 [1] - 162:15
P-14 [1] - 162:17
P-19 [1] - 162:19
P-19A [1] - 162:20
P-20 [3] - 162:22, 162:25, 198:21
P-21 [4] - 3:6, 3:12, 162:23, 198:16
P-22 [3] - 163:1, 163:4, 198:22
P-33 [3] - 163:6, 163:8, 198:23
P-34 [1] - 163:9
P-4 [1] - 161:23
P-40 [3] - 163:12, 163:17, 198:24
P-41 [3] - 163:12, 163:17, 198:25
P-42 [3] - 163:13, 163:17, 199:1
P-5 [4] - 161:25, 162:8, 162:12, 198:17
P-6 [4] - 162:1, 162:8, 162:12, 198:18
P-7 [3] - 162:9, 162:12,

198:19
P-8 [3] - 162:10, 162:12, 198:20
p.m [2] - 118:16, 161:15, 197:8
PA [1] - 1:9
pace [1] - 74:14
Pacific [1] - 191:19
PAGE [1] - 198:15
page [105] - 4:20, 4:22, 4:24, 6:5, 7:23, 8:1, 17:24, 18:12, 19:3, 20:11, 22:18, 23:5, 23:7, 23:8, 23:10, 32:23, 33:1, 33:3, 35:20, 37:3, 39:6, 45:17, 45:18, 46:17, 46:21, 47:8, 47:13, 51:11, 52:16, 52:21, 54:9, 54:14, 55:1, 55:13, 57:2, 57:4, 62:16, 62:17, 62:22, 68:12, 72:17, 72:18, 75:16, 95:19, 96:6, 96:7, 100:20, 100:21, 102:23, 104:3, 104:11, 104:23, 109:19, 110:10, 110:14, 110:22, 110:23, 113:4, 114:2, 114:3, 114:4, 114:5, 115:11, 115:14, 116:19, 119:8, 119:9, 119:10, 119:21, 119:22, 120:8, 120:9, 121:14, 121:17, 123:5, 123:6, 123:7, 123:15, 127:7, 128:23, 131:21, 132:21, 133:7, 134:3, 134:7, 148:15, 148:16, 148:17, 152:24, 169:2, 182:20, 182:21, 197:4
pages [6] - 104:12, 119:22, 123:6, 124:22, 124:24, 179:18
paid [1] - 91:6
pair [1] - 151:12
paired [1] - 151:11
paper [3] - 21:16, 28:8, 180:19
paper-based [1] - 28:8
paperwork [2] - 90:20, 180:12
paragraph [18] - 7:7, 20:12, 110:15, 110:23, 113:4, 113:7, 114:8, 115:16, 115:23, 116:1, 116:2, 127:11, 148:14, 148:16, 148:19, 149:11, 149:14, 158:17
paragraphs [1] - 151:25
parched [1] - 112:15
pardon [2] - 101:24, 139:25
parent [2] - 7:12, 185:18
parentheses [1] - 120:15
part [27] - 5:13, 13:6, 17:22, 19:18, 29:15, 29:21, 31:11,

52:22, 56:6, 58:13, 58:14, 63:16, 90:2, 110:2, 120:15, 126:3, 126:19, 129:23, 132:21, 133:11, 141:9, 147:20, 170:3, 187:2, 187:22, 189:24
**part's** [1] - 133:9
**partial** [1] - 70:2
**partially** [1] - 27:17
**particular** [6] - 15:19, 28:19, 36:9, 75:11, 187:17, 191:18
**particularly** [7] - 44:10, 121:21, 122:12, 176:16, 180:5, 180:7, 193:20
**parties** [1] - 155:6
**parts** [4] - 133:3, 133:4, 176:5, 176:24
**pass** [3] - 172:17, 173:14, 192:24
**passage** [8] - 105:11, 105:20, 107:4, 108:19, 119:15, 120:2, 171:20, 171:21
**passages** [3] - 43:24, 45:18, 45:21
**passed** [3] - 108:2, 130:22, 170:24
**passing** [4] - 108:13, 171:1, 192:23, 195:5
**past** [7] - 22:22, 103:4, 134:14, 134:15, 172:24, 177:22, 192:15
**patient** [3] - 41:15, 50:1, 50:4
**patient's** [1] - 11:24
**patients** [1] - 65:12
**pattern** [1] - 27:15
**pause** [1] - 186:23
**pejorative** [1] - 22:2
**penalty** [2] - 146:16, 146:17
**pennant** [1] - 41:11
**Pennsylvania** [1] - 190:11
**PENNSYLVANIA** [1] - 1:1
**people** [34] - 20:17, 30:22, 30:25, 38:20, 54:19, 58:3, 58:4, 58:8, 60:21, 72:1, 74:22, 77:22, 93:25, 96:15, 105:14, 114:25, 128:21, 133:5, 133:15, 133:23, 146:11, 146:14, 147:1, 147:19, 153:15, 158:12, 159:16, 177:15, 181:22, 183:13, 183:17, 188:12, 189:5, 189:23
**per** [6] - 8:14, 8:21, 75:24, 76:2, 76:14, 145:3
**percent** [18] - 30:15, 30:18, 30:19, 30:22, 30:25, 39:10, 40:15, 40:19, 40:23, 43:5, 43:10, 66:3, 120:14, 148:21, 149:7, 149:18, 150:4, 158:20

**percentage** [1] - 67:17
**percentile** [11] - 30:9, 30:13, 30:21, 32:14, 43:3, 43:12, 43:14, 43:15, 46:14, 58:20, 63:13
**perfect** [3] - 42:9, 138:8, 193:21
**perform** [19] - 11:6, 14:9, 14:18, 27:18, 27:22, 30:2, 33:23, 33:25, 34:3, 49:5, 71:18, 82:22, 82:25, 87:20, 87:23, 95:3, 147:14, 179:23
**Performance** [2] - 48:14, 60:9
**performance** [36] - 10:8, 10:14, 11:11, 11:19, 11:21, 13:22, 14:4, 14:7, 14:9, 15:5, 25:16, 25:23, 32:7, 46:21, 49:2, 57:19, 63:11, 95:20, 125:3, 125:10, 141:11, 146:15, 150:20, 150:23, 154:2, 154:7, 185:9, 185:20, 185:21, 189:11, 189:24, 190:3, 190:4, 190:5, 190:11
**performances** [1] - 42:15
**performed** [12] - 11:9, 31:7, 49:6, 56:11, 63:13, 73:6, 133:17, 144:7, 144:20, 144:21, 174:22, 184:13
**performing** [2] - 34:2, 46:14
**performs** [1] - 133:16
**perhaps** [5] - 69:10, 103:17, 120:19, 153:12, 191:10
**period** [2] - 88:18, 88:20, 142:23
**periods** [1] - 187:7
**PERKINS** [1] - 2:9
**permission** [6] - 77:6, 77:15, 78:4, 81:16, 88:5, 137:14
**permit** [2] - 88:24, 88:25
**permitted** [2] - 111:19, 171:8
**persists** [1] - 58:4
**person** [27] - 15:2, 15:20, 22:11, 27:21, 32:14, 43:23, 54:21, 80:21, 93:9, 94:14, 97:20, 112:3, 113:17, 122:8, 128:20, 134:8, 174:6, 175:21, 177:5, 177:6, 177:9, 179:21, 180:10, 180:13, 189:2, 194:18, 195:11
**personal** [8] - 17:25, 18:5, 20:5, 69:4, 69:18, 69:21, 72:11, 77:18
**personally** [4] - 21:14, 190:15, 190:16, 190:18
**perspective** [1] - 160:23
**PhD** [1] - 138:18
**Philadelphia** [2] - 1:9, 64:25
**phone** [1] - 182:15
**phonological** [3] - 15:8,

15:10, 15:16
**physical** [7] - 52:9, 67:6, 67:12, 77:8, 77:16, 108:6, 164:25
**physician** [3] - 52:19, 60:5, 135:6
**physicians** [1] - 50:13
**pick** [3] - 61:6, 75:7, 94:4
**picture** [1] - 41:18
**pictures** [2] - 41:12, 63:9
**piece** [4] - 73:22, 74:5, 79:2, 80:10
**pieces** [1] - 55:20
**place** [5] - 26:12, 39:14, 49:22, 155:6, 183:8
**placed** [1] - 20:20
**Plaintiff** [3] - 1:3, 1:18, 2:7
**plaintiff** [8] - 64:1, 64:2, 139:11, 160:8, 170:20, 179:21, 186:22, 189:15
**plaintiff's** [5] - 99:7, 99:11, 119:7, 164:13, 196:7
**Plaintiff's** [1] - 175:4
**plaintiffs** [1] - 168:4
**plan** [2] - 103:8, 103:9
**play** [1] - 177:2
**played** [1] - 170:23
**pleasure** [1] - 103:6
**point** [28] - 5:7, 5:19, 5:20, 26:17, 31:14, 48:11, 58:13, 59:14, 68:1, 72:2, 76:14, 80:25, 83:12, 83:15, 101:19, 116:10, 121:3, 156:10, 158:23, 161:9, 162:3, 184:3, 185:12, 186:17, 187:21, 190:24, 192:24
**pointed** [2] - 59:3, 183:20
**police** [1] - 39:25
**policy** [1] - 162:16
**poor** [2] - 12:3, 21:23
**poorly** [1] - 15:7
**population** [6] - 105:14, 115:1, 133:15, 133:23, 177:16, 183:13, 183:17, 189:2, 189:5
**portal** [2] - 122:5, 123:1
**portion** [2] - 102:12, 111:14
**posed** [1] - 179:19
**posing** [1] - 38:11
**position** [12] - 65:2, 76:24, 93:23, 94:1, 108:13, 112:8, 112:22, 113:21, 179:13, 180:3, 194:14
**positions** [1] - 160:20
**possession** [1] - 150:23
**possibility** [2] - 15:7, 179:25
**possible** [12] - 8:6, 9:25, 20:9, 74:22, 86:15, 92:22, 93:3, 93:11, 123:19, 124:1, 147:16, 166:22

**possibly** [2] - 90:17, 91:20
**post** [1] - 66:7
**posted** [2] - 116:4, 130:20
**potential** [1] - 171:13
**potentially** [4] - 77:25, 89:10, 156:5, 167:22
**PowerPoint** [12] - 99:20, 99:24, 100:2, 100:4, 100:8, 100:11, 119:11, 119:13, 119:15, 123:5, 123:7, 163:10
**practical** [1] - 65:6
**practice** [3] - 65:11, 192:4, 195:9
**preceded** [1] - 53:1
**precedent** [1] - 183:3
**precise** [1] - 12:17
**precisely** [1] - 189:12
**preclude** [1] - 178:14
**predominantly** [1] - 51:14
**prefer** [2] - 164:18
**preference** [1] - 160:24
**preferred** [1] - 181:9
**prejudiced** [1] - 156:11
**preliminary** [6] - 81:1, 157:5, 182:7, 190:22, 191:9, 192:2
**PRELIMINARY** [1] - 1:5
**prepare** [7] - 38:20, 103:14, 104:13, 121:4, 133:1, 134:1, 144:13
**prepared** [9] - 1:24, 28:5, 35:16, 39:4, 73:19, 100:4, 121:6, 144:15, 158:7
**prerogative** [2] - 187:20, 188:6
**prescribe** [1] - 95:13
**presence** [3] - 10:21, 11:1, 13:17
**present** [6] - 7:3, 100:13, 150:22, 151:18, 156:16, 187:1
**Presentation** [1] - 153:2
**presentation** [9] - 99:20, 100:4, 100:9, 100:11, 104:12, 104:21, 121:5, 133:3, 196:1
**presented** [9] - 119:17, 151:6, 153:4, 153:25, 154:3, 154:21, 155:4, 157:22
**presenting** [1] - 12:2
**president** [1] - 138:12
**presumably** [2] - 149:5, 150:10
**presume** [1] - 52:4
**pretty** [1] - 180:22
**prevent** [2] - 170:24
**previous** [6] - 5:18, 10:2, 58:7, 105:16, 144:8, 178:13
**previously** [7] - 3:14, 20:7, 41:19, 52:9, 79:3, 112:19, 118:21

primarily [7] - 12:7, 12:9, 12:11, 13:11, 13:15, 13:18, 183:18
primary [5] - 19:7, 50:13, 52:19, 138:23, 158:10
principal [1] - 6:12
principally [1] - 6:12
print [1] - 127:19
printout [2] - 140:2, 150:21
private [4] - 18:19, 100:24, 103:1, 104:4
problem [11] - 54:15, 56:5, 57:18, 60:18, 60:22, 60:23, 61:1, 61:2, 61:4, 61:5, 61:6
problematic [1] - 112:8
problems [12] - 6:9, 6:21, 6:24, 8:9, 13:22, 14:7, 14:8, 14:13, 54:9, 54:12, 55:14, 185:18
procedure [1] - 61:8
proceed [12] - 3:18, 4:1, 26:16, 26:19, 31:15, 38:25, 54:5, 118:19, 118:21, 138:8, 142:8, 152:16
proceeding [3] - 156:10, 157:5, 157:8
proceedings [1] - 197:15
Proceedings [2] - 1:24, 197:8
proceeds [2] - 3:4, 186:25
process [16] - 15:16, 66:4, 66:7, 67:24, 74:13, 74:14, 74:17, 84:18, 94:14, 94:15, 101:16, 111:10, 126:12, 161:8, 173:6, 193:24
processed [1] - 172:6
processes [1] - 138:23
processing [4] - 15:8, 15:11, 92:10, 92:13
proctors [6] - 78:1, 78:5, 78:6, 78:10, 81:17, 81:20
produce [5] - 15:21, 43:18, 46:10, 126:11, 184:9
produced [10] - 37:7, 126:7, 126:13, 156:13, 157:16, 167:6, 167:25, 168:4, 168:23
product [5] - 36:20, 166:24, 167:5, 167:23, 169:1
profession [1] - 192:5
professional [9] - 9:15, 66:16, 78:22, 102:6, 136:5, 171:10, 178:22, 179:2, 192:13
professionals [4] - 128:11, 134:11, 183:20, 189:17
Professor [1] - 163:7
professors [1] - 195:2
profound [1] - 49:1
program [2] - 79:9, 103:8
programs [1] - 193:3

progress [3] - 164:22, 164:23, 164:24
Prometric [11] - 78:9, 78:11, 78:13, 88:25, 137:15, 141:5, 141:7, 141:9, 141:14, 141:17, 142:2
promise [2] - 74:20, 191:15
promised [1] - 63:20
prompting [1] - 120:13
promptly [1] - 161:5
prongs [1] - 114:17
proof [3] - 134:14, 134:15, 177:22
proper [1] - 22:6
proponent [1] - 155:4
proposal [1] - 127:24
proposed [5] - 109:23, 110:2, 111:3, 111:5, 179:14
proposes [1] - 115:24
proprietary [2] - 155:18, 158:13
prospective [1] - 39:25
prove [1] - 136:18
proven [1] - 62:24
provide [29] - 31:20, 36:14, 36:17, 60:14, 60:21, 75:2, 75:5, 79:1, 79:2, 89:11, 91:24, 94:10, 117:21, 117:22, 136:18, 136:22, 171:11, 172:4, 172:13, 179:5, 185:23, 186:4, 187:16, 188:14, 189:21, 192:21, 195:10, 196:25
provided [35] - 11:25, 19:16, 20:25, 39:25, 46:18, 50:20, 66:18, 70:24, 72:14, 80:9, 80:13, 84:15, 87:19, 98:5, 98:13, 98:16, 98:18, 98:21, 103:7, 103:9, 103:21, 103:22, 104:1, 111:10, 117:10, 136:21, 141:21, 149:13, 155:10, 155:12, 188:24, 191:1, 192:12, 192:15, 192:16
provides [2] - 51:12, 78:3
providing [4] - 4:13, 41:5, 115:15
provoking [1] - 111:20
pseudo [1] - 15:13
psychoeducational [8] - 62:21, 82:22, 82:25, 85:7, 87:21, 87:23, 95:3, 136:4
psychological [1] - 175:25
psychologist [2] - 56:3, 65:9
psychologists [1] - 66:17
psychology [2] - 65:8, 128:12, 138:19
psychometricians [1] - 158:9
psychometrics [3] - 138:12,

138:17, 138:20
public [1] - 182:9
publications [1] - 9:12
published [2] - 81:10, 81:11
publishes [1] - 85:18
pull [1] - 158:11
pulled [1] - 182:16
purports [4] - 101:5, 101:8, 173:23, 177:20
purpose [12] - 11:3, 56:15, 57:6, 57:14, 105:19, 105:21, 105:23, 106:2, 108:8, 113:19, 125:23
purposefully [1] - 188:10
pursuant [2] - 103:9, 107:10
purview [1] - 102:4
push [1] - 172:10
put [22] - 22:1, 35:2, 37:13, 37:15, 37:16, 57:16, 61:16, 62:7, 81:2, 103:13, 107:21, 109:1, 116:14, 121:4, 145:15, 156:17, 157:3, 180:10, 181:17, 182:3, 195:10, 195:12
putting [1] - 31:24, 32:5, 33:7, 195:8
qualified [9] - 78:22, 95:2, 134:11, 171:10, 178:22, 179:2, 179:7, 189:17, 192:12
qualify [5] - 5:23, 49:9, 92:25, 120:11, 120:24
quarter [1] - 160:15
questioning [3] - 54:8, 62:7, 169:19
questionnaires [2] - 12:10, 60:20
questions [101] - 25:13, 25:22, 26:25, 28:4, 29:23, 36:23, 38:11, 38:16, 38:25, 39:19, 39:22, 39:24, 40:3, 40:4, 40:14, 40:17, 40:20, 40:24, 44:6, 44:8, 45:6, 45:12, 45:24, 47:6, 48:7, 52:4, 53:20, 61:19, 63:9, 63:17, 75:24, 76:14, 79:12, 82:4, 82:7, 85:8, 102:2, 128:17, 137:4, 139:3, 139:5, 139:7, 143:16, 143:19, 143:23, 144:21, 144:23, 144:25, 145:3, 145:6, 145:10, 145:18, 146:18, 147:5, 147:11, 147:15, 147:21, 148:1, 148:2, 148:3, 148:4, 148:21, 148:22, 149:5, 149:8, 149:16, 149:18, 150:4, 150:7, 150:8, 150:12, 151:2, 151:10, 151:13, 151:16, 151:22, 152:3, 152:5, 152:8, 152:18, 152:20, 152:21, 153:6,

153:14, 153:17, 153:23, 155:17, 158:5, 158:20, 159:17, 159:20, 162:21, 162:23, 179:14, 179:19, 179:20
queue [1] - 74:23
quick [4] - 44:11, 61:22, 61:25, 113:11
quicker [1] - 161:8
quickly [9] - 45:2, 63:5, 68:3, 74:22, 88:16, 92:24, 93:12, 93:17, 146:12
quite [8] - 8:18, 40:6, 40:7, 40:23, 55:2, 163:22, 181:16
quotation [1] - 132:25
quote [13] - 62:20, 108:10, 112:7, 114:16, 115:5, 132:1, 132:3, 173:18, 177:18, 177:22, 178:13, 178:21
quotes [2] - 114:13, 133:2
quoting [2] - 171:3, 171:7
raise [2] - 25:22, 42:16
raised [2] - 27:4, 195:18
RAMSAY [2] - 1:3, 196:4
Ramsay [116] - 4:17, 5:15, 6:1, 7:21, 8:8, 9:15, 12:18, 13:8, 13:10, 13:11, 13:15, 13:18, 16:11, 17:5, 20:12, 21:14, 22:5, 27:25, 28:24, 32:2, 35:4, 36:4, 36:8, 36:12, 36:17, 42:1, 44:3, 44:23, 49:2, 50:16, 51:5, 52:18, 53:16, 56:14, 57:7, 58:12, 58:24, 59:15, 59:18, 59:21, 59:24, 60:1, 61:15, 65:17, 69:19, 69:25, 70:13, 74:9, 76:15, 78:14, 80:24, 81:15, 82:15, 83:9, 91:18, 92:3, 96:13, 97:3, 97:12, 97:18, 98:5, 98:11, 98:22, 102:15, 103:15, 107:6, 117:11, 134:12, 134:15, 135:21, 136:4, 139:11, 140:12, 143:10, 143:16, 148:12, 149:8, 149:13, 150:11, 151:2, 151:18, 152:18, 153:4, 153:5, 154:12, 157:5, 158:4, 158:14, 162:21, 164:3, 168:24, 170:22, 171:11, 171:16, 172:8, 172:17, 178:2, 178:6, 181:8, 181:14, 181:15, 183:15, 183:18, 184:14, 184:17, 184:25, 185:2, 185:4, 185:13, 188:7, 191:7, 192:21, 193:14, 194:1, 194:21, 195:14
Ramsay's [48] - 17:25, 18:13, 19:5, 20:5, 25:16, 32:7, 34:25, 41:2, 42:24, 46:2,

55:10, 55:17, 61:12, 68:21, 69:4, 71:19, 72:5, 72:22, 74:25, 84:11, 87:16, 88:4, 90:7, 92:14, 94:15, 95:22, 101:13, 104:8, 126:12, 128:4, 129:10, 132:14, 140:16, 147:5, 147:25, 149:19, 150:2, 150:20, 150:23, 153:19, 154:2, 155:13, 162:17, 166:23, 171:14, 175:10, 180:14, 184:19
**Ramsey** [2] - 4:7, 148:20
**random** [2] - 147:16, 159:2
**randomly** [6] - 145:9, 145:17, 145:24, 146:10, 146:12, 146:18
**range** [4] - 31:8, 32:13, 49:6, 63:16
**Range** [1] - 23:1
**rank** [1] - 43:3
**rapid** [2] - 147:1, 157:23
**rapidly** [1] - 147:21
**rarely** [1] - 194:7
**rate** [8] - 8:14, 39:6, 39:11, 43:10, 43:14, 43:18, 46:11, 62:20
**rather** [10] - 20:24, 101:6, 101:14, 102:19, 113:9, 160:24, 169:25, 171:11, 173:23, 177:20
**rating** [1] - 49:16
**ratings** [1] - 12:23
**rburgoyne@perkinscoie.com** [1] - 2:13
**RDR** [2] - 1:22, 197:18
**reaching** [1] - 97:21
**read** [74] - 5:19, 15:20, 16:3, 16:4, 31:21, 44:5, 44:6, 44:7, 44:8, 44:23, 45:2, 45:13, 45:24, 47:14, 62:6, 62:15, 69:14, 70:10, 77:6, 77:15, 77:23, 77:25, 81:5, 81:16, 81:18, 82:4, 87:2, 88:5, 88:13, 88:14, 96:14, 96:17, 96:23, 100:21, 102:11, 102:12, 102:24, 103:10, 110:14, 111:1, 112:19, 112:20, 113:11, 113:22, 114:10, 114:24, 115:2, 115:11, 115:12, 115:13, 120:6, 121:14, 125:24, 127:12, 128:2, 131:4, 131:25, 148:20, 149:5, 149:8, 149:16, 152:18, 153:6, 153:8, 174:6, 174:7, 177:15, 179:20, 182:18, 193:15, 193:16, 193:23
**readers** [1] - 27:17
**readily** [1] - 158:12

**reading** [86] - 6:15, 12:10, 15:25, 16:2, 18:21, 19:15, 20:14, 22:20, 24:15, 24:19, 24:20, 28:22, 30:13, 32:2, 32:8, 32:18, 33:10, 33:19, 33:21, 33:25, 34:3, 36:5, 39:6, 39:11, 39:17, 43:3, 43:10, 43:14, 43:18, 45:18, 45:22, 46:8, 46:11, 46:16, 46:23, 47:8, 56:4, 56:17, 57:17, 57:18, 59:12, 60:24, 62:4, 62:19, 63:5, 67:19, 77:19, 78:15, 80:2, 82:7, 86:23, 87:1, 96:9, 96:22, 99:3, 111:13, 111:16, 111:25, 113:12, 113:20, 114:23, 132:4, 137:10, 145:21, 148:22, 150:10, 173:6, 173:25, 174:3, 174:21, 174:24, 175:2, 175:9, 176:3, 176:16, 177:13, 178:4, 182:19, 184:20, 184:22, 184:23, 185:12, 193:23
**Reading** [1] - 16:25
**reads** [4] - 44:24, 44:25, 121:21, 148:19
**ready** [2] - 99:17, 161:16
**real** [9] - 61:21, 61:25, 113:11, 185:9, 186:8, 189:24, 190:3, 193:12, 193:13
**realize** [1] - 20:9
**really** [11] - 11:22, 27:5, 54:19, 55:7, 83:21, 121:2, 137:14, 154:17, 175:15, 178:20, 180:9
**reason** [10] - 26:6, 48:20, 63:22, 80:3, 89:19, 145:20, 159:24, 173:13, 176:7, 188:7
**reasonable** [4] - 111:8, 150:9, 155:6, 189:10
**reasonably** [1] - 185:19
**reasoning** [1] - 162:20
**reasons** [7] - 10:22, 55:7, 61:7, 81:2, 145:23, 145:25, 146:9
**rebuttal** [1] - 191:14
**receive** [10] - 21:3, 65:17, 65:20, 66:1, 82:21, 93:18, 104:2, 126:3, 136:1, 156:17
**received** [25] - 19:11, 20:21, 50:16, 68:2, 68:24, 68:25, 69:3, 69:5, 69:8, 69:11, 69:16, 70:7, 73:22, 73:24, 74:1, 74:2, 74:21, 82:17, 82:20, 83:10, 92:12, 103:5, 103:24, 157:6, 172:25
**receiving** [11] - 8:21, 35:25, 36:5, 72:24, 79:23, 91:22,

111:17, 111:18, 178:14, 185:17, 186:5
**recently** [2] - 62:18, 147:2
**recess** [5] - 54:1, 118:8, 118:15, 118:16, 161:12
**Recess** [2] - 54:3, 161:15
**recognized** [1] - 175:8
**recollection** [4] - 24:18, 69:10, 74:24, 75:9
**recommend** [3] - 79:4, 97:15, 135:16
**recommendations** [1] - 134:11
**recommended** [4] - 53:8, 74:7, 97:14, 179:5
**recommending** [1] - 73:24
**reconvene** [1] - 160:15
**record** [16] - 3:19, 20:24, 26:15, 58:13, 64:13, 70:12, 102:13, 114:17, 116:15, 138:3, 140:15, 156:18, 157:1, 161:3, 170:9, 197:15
**records** [7] - 12:8, 17:21, 17:22, 19:17, 23:10, 35:15, 55:17, 56:7, 184:16, 185:14, 186:8
**recross** [2] - 61:20, 137:18
**Recross** [1] - 198:4
**RECROSS** [1] - 61:23
**RECROSS-EXAMINATION** [1] - 61:23
**recruiting** [1] - 93:20
**redacted** [2] - 166:25, 167:1
**REDIRECT** [2] - 54:6, 137:6
**redirect** [5] - 31:14, 53:22, 137:5, 137:17, 159:21
**Redirect** [1] - 198:4
**reduce** [2] - 120:13, 196:20
**reduced** [1] - 19:15
**refer** [2] - 5:10, 98:7
**reference** [20] - 6:17, 17:24, 19:11, 19:14, 21:7, 23:3, 24:4, 43:2, 56:20, 76:18, 94:9, 96:16, 116:4, 130:20, 137:18, 157:19, 178:8, 186:20, 187:2, 187:4
**referenced** [9] - 25:16, 73:5, 77:12, 115:25, 151:25, 185:6, 186:10, 189:14, 192:4
**references** [1] - 166:23
**referencing** [5] - 78:6, 78:10, 98:22, 105:1, 176:23
**referred** [1] - 54:8
**referring** [6] - 16:8, 54:15, 55:2, 99:21, 152:21, 187:7
**refers** [1] - 120:19
**reflect** [9] - 15:22, 32:2, 32:8, 54:20, 101:4, 102:21, 145:20, 147:6, 173:21
**reflected** [9] - 24:15, 34:17,

40:19, 43:8, 45:22, 102:19, 147:11, 184:19, 186:5
**reflecting** [3] - 32:6, 101:6, 173:23
**reflects** [6] - 33:9, 41:7, 45:10, 72:14, 143:1, 177:19
**refresh** [2] - 69:10, 75:8
**regard** [4] - 11:22, 129:19, 146:5, 176:2
**regarding** [25] - 13:17, 17:25, 22:6, 23:2, 24:6, 25:3, 27:1, 31:21, 34:25, 35:1, 35:24, 40:10, 42:16, 48:13, 62:3, 63:9, 102:2, 106:23, 106:24, 132:1, 136:9, 141:23, 184:9, 184:24, 185:11
**regardless** [1] - 157:24
**Register** [5] - 117:8, 125:19, 126:2, 127:2, 163:16
**registered** [2] - 66:13, 88:19
**registering** [1] - 88:16
**registration** [1] - 89:2
**regulation** [14] - 101:16, 101:17, 101:18, 102:18, 102:25, 113:13, 114:5, 115:3, 129:6, 132:7, 132:17, 181:3, 186:14
**Regulations** [1] - 127:3
**regulations** [25] - 100:22, 101:10, 105:18, 115:25, 119:19, 119:24, 120:21, 121:3, 123:16, 123:21, 123:23, 124:3, 124:9, 124:11, 125:5, 127:4, 129:5, 129:13, 132:9, 171:6, 171:23, 173:18, 176:21, 183:3, 193:9
**regulatory** [2] - 127:15, 127:21
**REISMAN** [1] - 1:15
**reject** [1] - 126:18
**rejected** [9] - 108:13, 124:17, 125:4, 125:8, 125:14, 128:5, 171:21, 171:24, 172:16
**relate** [1] - 174:2
**related** [12] - 11:10, 11:12, 11:14, 32:19, 52:8, 59:11, 60:23, 65:19, 103:7, 127:16, 127:22, 151:21
**relates** [1] - 16:4
**relating** [8] - 8:6, 9:7, 13:22, 141:11, 150:20, 154:2, 156:18, 162:17
**relationship** [1] - 141:4
**relative** [3] - 25:23, 27:1, 35:22
**relatively** [3] - 54:24, 146:12, 161:5
**released** [2] - 88:25, 130:21
**relevance** [2] - 80:17, 115:4

**relevant** [4] - 31:20, 126:11, 127:23, 183:16
**reliability** [2] - 49:11, 49:16
**reliable** [6] - 12:14, 39:12, 49:8, 49:19, 96:12, 184:9
**reliance** [3] - 39:14, 49:22, 128:5
**relied** [4] - 18:23, 52:7, 77:9, 185:10
**relief** [2] - 191:11, 193:5
**rely** [7] - 10:1, 12:5, 80:8, 84:11, 176:15, 180:2, 186:8
**relying** [2] - 11:24, 187:22
**remained** [1] - 108:6
**remaining** [1] - 148:22
**remarkably** [1] - 176:10
**remediated** [1] - 27:17
**remember** [9] - 8:3, 10:24, 31:12, 41:18, 58:16, 58:18, 111:17, 136:25, 137:2
**remembered** [1] - 8:8
**remind** [3] - 3:14, 118:9, 118:20
**repeat** [5] - 14:1, 49:17, 49:20, 55:15, 154:5
**report** [73] - 10:5, 10:17, 11:22, 11:25, 13:8, 13:11, 13:13, 13:15, 13:18, 16:15, 16:16, 16:19, 17:5, 20:1, 21:7, 22:17, 22:18, 23:4, 23:8, 23:9, 23:19, 24:24, 25:16, 25:19, 28:5, 29:12, 31:25, 32:3, 34:9, 35:12, 35:16, 35:18, 35:20, 35:23, 36:11, 36:15, 36:18, 46:13, 51:8, 53:10, 55:13, 55:16, 56:20, 56:23, 56:25, 57:2, 58:23, 59:6, 59:14, 60:21, 70:5, 70:11, 71:6, 71:15, 91:23, 98:7, 98:9, 134:25, 135:2, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 165:4, 171:10, 181:24, 182:1, 182:4, 185:16, 186:3
**Report** [1] - 48:14
**reported** [4] - 35:4, 54:20, 135:25, 185:4
**REPORTER** [2] - 64:13, 138:3
**Reporter** [2] - 1:22, 197:18
**reporter** [2] - 12:4, 102:12
**reporting** [3] - 135:5, 138:24, 138:25
**reports** [13] - 4:14, 7:11, 7:12, 11:18, 16:17, 21:8, 24:3, 25:18, 29:9, 35:2, 178:25
**represent** [5] - 70:23, 71:14, 73:14, 153:2, 153:5

**representation** [5] - 27:14, 34:7, 94:11, 180:2, 195:5
**representative** [1] - 40:3
**represented** [12] - 83:23, 84:1, 84:2, 84:6, 84:7, 92:17, 93:1, 93:9, 113:25, 122:8, 147:19, 192:1
**representing** [2] - 127:14, 127:20
**Representing** [3] - 1:18, 2:7, 2:14
**represents** [2] - 143:9, 153:3
**reputation** [1] - 4:13
**request** [52] - 4:8, 5:13, 18:8, 19:5, 65:17, 66:2, 66:5, 66:9, 66:20, 66:23, 67:2, 67:5, 67:12, 67:21, 67:24, 67:25, 68:21, 69:11, 69:13, 69:14, 71:19, 71:23, 72:5, 72:12, 73:7, 73:9, 73:11, 83:18, 84:12, 84:14, 88:4, 90:7, 90:9, 90:18, 92:14, 92:15, 92:16, 97:18, 104:8, 124:17, 125:2, 125:8, 125:10, 126:10, 128:4, 131:15, 132:15, 155:8, 155:12, 155:15, 177:24, 191:23
**requested** [18] - 71:5, 75:4, 75:6, 80:4, 82:12, 82:17, 82:19, 91:18, 102:12, 123:22, 125:13, 128:21, 136:19, 172:2, 172:3, 178:24, 179:24, 191:21
**requesting** [1] - 124:8
**requests** [36] - 9:7, 65:14, 65:19, 65:21, 65:22, 66:4, 66:10, 67:11, 67:17, 74:11, 74:12, 74:18, 74:24, 78:18, 78:21, 92:10, 92:11, 92:23, 92:25, 93:1, 93:2, 93:5, 93:9, 94:13, 94:14, 100:17, 101:10, 103:2, 104:6, 104:17, 129:9, 129:17, 130:4, 131:14, 172:5
**require** [6] - 7:8, 75:7, 102:18, 106:10, 120:5, 192:9
**required** [8] - 18:17, 35:7, 55:4, 179:3, 182:7, 183:2, 185:1, 186:11
**requirement** [5] - 79:20, 110:20, 188:25, 190:22, 191:10
**requirements** [1] - 193:23
**requires** [9] - 13:2, 75:10, 102:3, 174:8, 175:16, 177:9, 183:6, 192:11, 194:16
**rescinded** [1] - 182:23
**research** [11] - 9:7, 9:9, 40:11, 49:24, 62:15, 63:2, 63:4, 84:13, 84:21, 96:25,

193:19
**reservation** [1] - 186:23
**residency** [3] - 192:24, 192:25, 193:3
**resources** [7] - 78:17, 93:16, 94:12, 94:18, 94:19, 94:24, 181:11
**respect** [2] - 90:7, 90:18
**respected** [1] - 181:21
**respective** [1] - 160:20
**respond** [8] - 71:23, 74:22, 84:7, 92:13, 104:8, 117:5, 126:10, 179:20
**responding** [1] - 174:25
**responds** [3] - 45:6, 104:4, 104:6
**response** [8] - 11:8, 46:2, 88:4, 103:7, 106:3, 140:13, 152:14, 158:20
**RESPONSE** [1] - 118:18
**Response** [1] - 140:11
**responses** [3] - 118:12, 146:13, 147:1
**responsibilities** [4] - 65:14, 138:21, 138:23, 183:2
**responsibility** [2] - 93:4, 158:10
**responsible** [2] - 80:23, 104:16
**rest** [2] - 132:4, 157:2
**restate** [2] - 32:4, 102:9
**Restoration** [1] - 106:25
**rests** [1] - 64:2
**result** [7] - 15:21, 41:22, 43:6, 48:23, 97:25, 123:21, 181:7
**resulted** [2] - 45:21, 184:5
**results** [25] - 10:4, 10:14, 12:19, 24:13, 24:15, 25:10, 26:3, 32:1, 32:5, 37:4, 37:7, 42:23, 43:9, 89:12, 101:3, 101:14, 102:19, 119:23, 136:4, 157:15, 173:21, 174:18, 176:15, 184:19, 184:20
**resume** [1] - 9:6
**retrieve** [1] - 28:3
**revenue** [2] - 94:4, 94:7
**reversals** [2] - 20:13, 20:16
**review** [31] - 7:8, 7:9, 7:11, 13:25, 21:16, 29:18, 38:3, 56:6, 59:10, 66:22, 66:24, 67:1, 67:11, 68:1, 71:18, 73:6, 83:18, 91:10, 92:23, 101:10, 122:2, 122:25, 123:1, 124:23, 128:12, 129:11, 165:21, 170:4, 170:5, 170:10
**reviewed** [16] - 13:21, 14:3, 17:2, 17:21, 17:22, 20:6,

24:1, 24:2, 25:17, 51:9, 80:9, 144:17, 148:24, 150:1, 183:19, 185:10
**Reviewers** [1] - 121:18
**reviewers** [3] - 71:16, 122:2, 122:13
**reviewing** [7] - 29:9, 65:14, 74:14, 166:21, 167:24, 168:17, 169:2
**reviews** [2] - 84:16, 100:17
**revise** [1] - 34:2
**revised** [1] - 120:12
**revisions** [1] - 124:11
**rid** [2] - 37:20, 188:25
**rigorous** [4] - 49:13, 79:10
**risk** [2] - 11:24, 12:2
**Ritalin** [1] - 14:21
**RMR** [2] - 1:22, 197:18
**Robert** [3] - 100:1, 109:21, 164:6
**ROBERT** [2] - 2:10, 198:5
**role** [1] - 105:6
**roles** [1] - 135:9
**rolling** [1] - 74:11
**roof** [2] - 44:17, 44:21
**room** [8] - 8:19, 76:19, 76:23, 77:2, 77:8, 77:21, 77:24
**rooms** [1] - 76:25
**Rose** [2] - 100:3, 109:16
**rough** [1] - 65:25
**roughly** [3] - 40:3, 40:6, 66:3
**routinely** [1] - 69:21
**Ruekberg** [6] - 24:22, 98:19, 167:25, 168:1, 168:23, 169:13
**Rule** [1] - 155:7
**rule** [4] - 110:16, 120:16, 127:4, 171:25
**ruled** [2] - 168:8, 169:3
**rulemaking** [9] - 104:20, 108:21, 108:24, 109:24, 110:2, 123:8, 123:9, 124:16, 129:24
**rules** [5] - 111:3, 111:5, 155:3, 177:2, 181:11
**Rules** [1] - 127:3
**ruling** [1] - 157:11
**run** [4] - 71:10, 147:20, 153:15, 153:16
**running** [3] - 92:5, 146:11, 146:19
**runs** [1] - 147:17
**safely** [1] - 195:9
**sample** [10] - 31:12, 38:16, 39:21, 45:12, 47:9, 58:15, 58:17, 63:12, 162:22, 162:23
**samples** [1] - 46:18
**SAT** [2] - 5:10, 10:15
**saw** [7] - 27:3, 50:16, 135:11, 135:17, 173:13, 179:18,

184:15
**scale** [1] - 195:13
**scales** [1] - 12:23
**schedule** [4] - 74:12, 89:1, 89:3, 195:17
**scheduling** [1] - 88:24
**schemes** [1] - 18:18
**School** [1] - 190:9
**school** [48] - 5:23, 8:3, 10:9, 14:25, 18:13, 18:16, 19:8, 19:10, 19:11, 19:17, 20:24, 25:18, 25:19, 40:12, 40:15, 66:11, 69:24, 82:18, 82:20, 95:23, 96:16, 97:5, 98:23, 99:2, 134:18, 135:2, 135:21, 135:24, 162:16, 171:17, 172:19, 172:21, 172:24, 175:2, 176:6, 178:7, 181:17, 184:18, 187:2, 187:21, 187:24, 188:7, 190:4, 191:21, 191:23, 193:3
**school's** [1] - 188:6
**schools** [3] - 195:5, 195:8
**Sciences** [1] - 191:20
**score** [34] - 25:18, 29:9, 30:8, 30:11, 30:13, 30:16, 30:18, 31:4, 34:6, 41:1, 41:2, 41:7, 42:13, 42:15, 43:18, 43:24, 45:22, 48:5, 48:20, 49:6, 49:17, 54:19, 54:24, 54:25, 55:6, 58:16, 58:18, 59:14, 63:15, 70:5, 73:3, 138:24, 138:25, 193:2
**scores** [31] - 25:22, 26:2, 26:3, 27:1, 27:9, 27:13, 27:16, 30:2, 30:5, 42:8, 42:9, 48:17, 48:22, 49:18, 49:19, 54:17, 59:3, 59:11, 84:11, 90:4, 90:6, 96:11, 96:19, 104:1, 127:23, 128:6, 171:14, 180:13
**scoring** [2] - 138:24, 138:25
**screen** [9] - 140:16, 140:19, 141:24, 142:14, 142:23, 143:2, 143:6, 147:7, 149:4
**screens** [1] - 176:6
**seated** [4] - 3:2, 54:4, 77:1, 138:2
**second** [26] - 5:20, 6:5, 18:1, 25:9, 43:11, 43:16, 45:17, 46:17, 48:23, 62:1, 72:5, 73:9, 75:12, 76:12, 77:9, 88:4, 90:18, 110:10, 127:11, 149:15, 151:11, 162:10, 164:24, 177:17, 184:2, 193:18
**Second** [1] - 188:10
**secondary** [1] - 19:8
**seconds** [17] - 45:8, 139:10, 140:16, 143:11, 143:15,

143:16, 143:25, 145:3, 145:7, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 149:6, 152:9
**Section** [6] - 103:9, 114:2, 114:3, 114:4, 114:14, 115:14
**section** [13] - 8:2, 19:7, 28:14, 57:4, 100:25, 102:24, 103:2, 104:5, 114:7, 114:10, 115:17, 124:16, 162:20
**sections** [1] - 46:7
**secure** [3] - 122:5, 122:6, 123:1
**security** [1] - 78:13
**see** [65] - 4:7, 4:24, 6:9, 7:19, 7:23, 10:5, 10:8, 10:14, 10:17, 10:20, 10:23, 11:2, 11:9, 11:15, 13:9, 13:13, 14:6, 18:2, 19:6, 19:21, 20:16, 24:4, 26:23, 27:7, 33:12, 33:14, 34:16, 36:1, 39:5, 54:12, 57:7, 63:22, 65:11, 66:24, 67:20, 69:13, 70:4, 70:22, 72:20, 75:17, 75:18, 80:17, 100:2, 103:10, 106:15, 110:10, 110:13, 110:23, 113:4, 114:2, 114:9, 118:3, 123:8, 123:9, 125:6, 145:10, 147:16, 148:19, 149:7, 169:22, 185:24, 188:8, 194:6, 194:23, 195:3
**seeing** [5] - 26:2, 26:3, 27:2, 53:17, 146:20
**seeking** [5] - 4:14, 5:12, 77:9, 191:9, 191:11
**seem** [1] - 50:11
**sees** [1] - 63:9
**select** [3] - 146:12, 149:17, 158:20
**selected** [5] - 100:25, 140:12, 150:3, 154:9, 158:18
**self** [8] - 11:25, 13:8, 13:13, 111:11, 111:16, 112:9, 176:19, 178:4
**self-mitigate** [1] - 178:4
**self-mitigating** [1] - 111:11
**self-mitigation** [2] - 112:9, 176:19
**self-report** [3] - 11:25, 13:8, 13:13
**Senators** [1] - 106:21
**send** [8] - 66:12, 66:21, 66:25, 121:12, 122:4, 141:17, 170:14
**sending** [2] - 66:23, 67:3
**sense** [12] - 84:24, 93:15, 95:20, 95:21, 97:2, 110:21, 115:22, 132:6, 132:16, 133:21, 151:11, 157:14
**sensitive** [2] - 61:5, 160:24

**sensory** [3] - 101:3, 101:7, 173:24
**sent** [4] - 73:6, 73:11, 90:10, 130:22
**sentence** [12] - 5:20, 7:2, 7:7, 20:22, 21:1, 46:8, 46:16, 62:15, 113:14, 115:2, 115:22, 148:19
**sentences** [3] - 44:23, 46:23, 127:13
**separate** [4] - 76:18, 77:2, 77:7, 77:24
**September** [2] - 91:1, 92:8
**Sequence** [1] - 153:2
**series** [4] - 24:2, 33:14, 41:12, 116:21
**serious** [1] - 6:20
**services** [7] - 5:23, 64:20, 64:21, 103:5, 103:7, 103:9, 195:4
**set** [3] - 36:14, 38:21, 164:14
**sets** [1] - 25:2
**setting** [2] - 111:20, 176:16
**settings** [5] - 13:4, 13:14, 135:11, 177:23, 184:25
**seven** [3] - 75:24, 139:6, 147:25
**several** [1] - 8:4
**severe** [2] - 185:4, 185:18
**severity** [1] - 50:17
**shall** [2] - 26:23, 171:7
**share** [1] - 93:4
**sheet** [5] - 41:1, 41:2, 41:7, 45:22, 73:3
**shelf** [4] - 103:16, 103:24, 134:16, 171:16
**short** [2] - 137:8, 138:21
**shorter** [1] - 76:1
**shortly** [1] - 195:25
**shoulder** [1] - 165:14
**show** [15] - 21:22, 41:13, 95:19, 96:1, 117:15, 174:17, 175:14, 176:12, 176:17, 181:19, 183:14, 185:19, 188:12, 192:16, 193:24
**showed** [6] - 58:11, 101:14, 106:14, 176:13, 176:16, 186:7
**showing** [6] - 36:10, 40:11, 109:2, 126:22, 168:4, 195:12
**shown** [7] - 26:15, 100:11, 107:13, 185:14, 190:24, 191:7, 195:15
**shows** [3] - 153:23, 171:12, 193:19
**shy** [1] - 94:8
**side** [3] - 36:1, 77:22, 185:7
**signatory** [1] - 110:11
**signature** [2] - 68:11, 72:8
**signed** [4] - 43:25, 66:15,

68:23, 109:20
**significance** [1] - 132:2
**significant** [2] - 16:19, 78:17
**significantly** [1] - 59:12
**silently** [1] - 88:14
**similar** [11] - 20:13, 32:21, 47:17, 49:2, 52:14, 103:5, 103:11, 103:16, 176:15, 177:23, 189:15
**similar-appearing** [1] - 20:13
**simple** [1] - 193:17
**simply** [4] - 75:1, 78:20, 172:18, 185:25
**sincerity** [1] - 180:17
**single** [1] - 136:12
**sit** [2] - 44:16, 77:3
**sits** [1] - 44:21
**sitting** [3] - 77:22, 156:9, 160:11
**situation** [2] - 11:7, 103:16
**situations** [3] - 5:10, 103:6, 103:11
**six** [2] - 88:24, 89:14
**sixth** [1] - 58:24
**skew** [1] - 155:22
**skill** [1] - 177:20
**Skills** [1] - 10:12
**skills** [12] - 12:10, 33:19, 33:21, 33:25, 34:3, 101:3, 101:7, 173:24, 184:22, 184:23, 186:13
**skip** [2] - 153:8, 176:3
**skipping** [1] - 101:16
**slide** [2] - 100:3, 133:1
**slides** [2] - 103:14, 104:13
**slow** [3] - 15:24, 99:3, 175:3
**slowly** [1] - 15:20
**small** [3] - 46:23, 76:23, 127:19
**smart** [1] - 181:18
**Smith** [30] - 3:4, 4:5, 32:23, 47:20, 54:8, 61:25, 63:20, 95:2, 95:15, 97:21, 164:6, 169:19, 174:4, 174:15, 174:18, 175:13, 175:24, 176:9, 179:8, 179:9, 179:10, 183:19, 184:7, 184:15, 185:5, 185:24, 187:13, 189:3, 190:14, 194:4
**SMITH** [1] - 198:6
**Smith's** [5] - 98:2, 162:24, 175:11, 183:19, 184:4
**Smith-33** [1] - 8:1
**Smiy** [7] - 50:20, 51:5, 60:3, 60:5, 70:11, 98:16, 185:6
**Smiy's** [2] - 70:12, 184:5
**so-called** [2] - 6:17, 43:21
**software** [4] - 141:12, 141:13, 141:15
**solely** [1] - 87:14

**someone** [26] - 4:24, 9:25, 12:5, 34:21, 38:19, 41:21, 42:13, 42:17, 54:24, 56:5, 66:4, 71:4, 114:20, 144:15, 145:9, 146:9, 146:18, 147:17, 158:19, 177:10, 185:17, 186:15, 186:16, 188:25, 191:11

**sometimes** [10] - 12:13, 14:18, 15:13, 44:12, 50:9, 50:10, 60:21, 75:7, 123:3, 146:14

**somewhere** [3] - 37:15, 89:14, 185:20

**soon** [2] - 88:23, 154:19

**sooner** [1] - 69:11

**sophomore** [1] - 187:10

**sorry** [37] - 6:4, 9:4, 12:16, 14:1, 17:16, 21:1, 23:13, 23:16, 29:12, 37:14, 50:25, 52:1, 62:12, 85:1, 93:22, 96:16, 98:8, 99:10, 102:9, 105:2, 105:8, 114:6, 118:4, 120:9, 121:16, 127:17, 127:19, 128:24, 128:25, 129:20, 130:16, 142:19, 145:5, 151:15, 152:1, 166:6, 167:20

**sort** [4] - 74:23, 170:1, 175:20, 193:21

**sound** [2] - 30:17, 190:19

**sounds** [1] - 73:16

**source** [1] - 135:7

**space** [3] - 18:19, 19:15, 109:10

**speaking** [7] - 101:3, 101:7, 111:25, 114:23, 168:23, 173:24, 177:13

**speaks** [1] - 115:9

**special** [1] - 186:7

**specialists** [1] - 97:12

**specialize** [2] - 5:2, 5:5

**specialized** [1] - 36:5

**specific** [5] - 15:3, 35:23, 62:19, 75:5, 168:7

**specifically** [7] - 80:7, 128:5, 155:14, 170:7, 171:2, 186:3, 192:18

**Specter** [1] - 106:21

**speculative** [1] - 145:12

**speed** [3] - 18:22, 38:8, 41:21

**spelling** [1] - 22:20

**spend** [3] - 114:24, 148:2, 177:14

**spent** [5] - 143:24, 144:23, 145:1, 147:6, 159:1

**spinning** [1] - 41:9

**spoken** [1] - 192:14

**spread** [1] - 76:3

**spreadsheet** [3] - 150:18, 150:21, 159:7

**staff** [8] - 3:23, 66:14, 66:16, 93:3, 93:6, 93:19, 93:20, 158:9

**stages** [1] - 74:13

**stakes** [3] - 5:9, 9:8, 177:25

**stamp** [3] - 69:4, 69:5, 69:12

**stamped** [1] - 70:9

**stand** [6] - 3:13, 76:22, 76:24, 77:3, 137:24, 156:5

**standard** [12] - 28:19, 75:22, 75:23, 76:4, 77:21, 102:22, 106:11, 108:11, 110:17, 120:5, 189:7, 190:23

**standardized** [36] - 4:15, 5:6, 9:8, 10:8, 10:15, 11:4, 11:11, 11:19, 11:21, 14:25, 25:4, 25:8, 27:18, 28:19, 29:5, 31:22, 32:7, 32:12, 58:11, 78:23, 123:20, 124:19, 125:3, 125:9, 128:6, 171:14, 177:25, 184:16, 184:19, 185:8, 185:21, 188:9, 188:10, 189:12, 190:5, 190:12

**standards** [1] - 182:6

**standing** [1] - 76:25

**stapled** [1] - 37:3

**start** [5] - 34:10, 35:21, 37:9, 53:22, 153:10

**started** [1] - 118:7

**starting** [4] - 45:17, 102:24, 140:6, 160:8

**starts** [2] - 37:9, 114:8

**state** [5] - 5:11, 64:13, 64:19, 138:3, 138:11

**State** [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23

**statement** [18] - 7:5, 7:14, 10:22, 17:25, 18:5, 18:15, 20:5, 56:18, 69:5, 69:18, 69:22, 72:11, 101:9, 136:9, 148:25, 149:14, 149:20, 153:13

**statements** [2] - 77:19, 111:4

**States** [2] - 89:23, 156:23

**states** [5] - 5:7, 6:12, 110:16, 116:7, 182:21

**STATES** [1] - 1:1

**stating** [1] - 84:25

**Statistical** [2] - 5:21, 53:1

**statistics** [1] - 49:15

**statute** [4] - 132:6, 132:9, 132:16, 188:24

**statutes** [1] - 183:3

**stay** [1] - 6:4

**STEIN** [2] - 2:2, 2:3

**stenographically** [1] - 1:24

**step** [8] - 63:18, 63:19, 64:9, 101:16, 130:13, 137:21, 159:23

**Step** [42] - 4:9, 5:16, 12:20, 12:25, 28:4, 28:16, 65:15, 75:23, 76:10, 85:16, 85:19, 85:24, 86:4, 87:6, 88:16, 88:17, 89:3, 139:3, 139:12, 140:6, 140:7, 145:10, 146:16, 147:5, 150:23, 151:8, 151:10, 151:13, 151:17, 151:19, 151:22, 158:11, 159:18, 162:22, 172:17, 183:16, 183:24, 185:22

**steps** [1] - 27:3

**STEVEN** [1] - 2:3

**Stevens** [1] - 106:21

**sticker** [2] - 107:21, 182:1

**stickers** [1] - 185:16

**still** [9] - 3:14, 32:17, 105:8, 105:12, 112:1, 117:12, 118:20, 177:6, 189:1

**stop** [4] - 48:10, 78:16, 112:4, 153:9

**stops** [1] - 74:17

**stored** [1] - 154:8

**stories** [3] - 43:21, 43:23

**story** [3] - 44:3, 44:14, 181:14

**strategies** [7] - 27:22, 27:24, 27:25, 28:1, 29:2, 111:7, 111:16

**strategy** [1] - 28:25

**streamline** [2] - 25:1, 25:3

**Street** [4] - 1:9, 1:16, 2:4, 2:11

**strength** [1] - 187:12

**stressful** [2] - 111:20, 188:20

**stretch** [1] - 76:24

**strict** [1] - 53:7

**strictly** [1] - 143:1

**strikingly** [1] - 176:15

**strongly** [2] - 135:25, 166:5

**structured** [2] - 42:6, 52:11

**struggle** [1] - 10:22

**struggles** [1] - 18:16

**struggling** [3] - 34:22, 35:5, 135:17

**student** [18] - 5:18, 35:24, 52:12, 52:17, 82:6, 88:19, 89:3, 89:13, 111:23, 124:7, 129:17, 135:8, 153:6, 162:16, 186:1, 186:5, 191:20, 195:8

**student's** [3] - 115:7, 125:10, 171:12

**students** [25] - 4:14, 14:22, 40:19, 62:18, 66:8, 74:20, 75:1, 81:24, 82:3, 82:12,

88:17, 89:12, 89:22, 90:1, 93:12, 93:16, 93:18, 96:17, 111:12, 111:15, 123:19, 123:22, 180:7, 193:20, 194:24

**studied** [1] - 63:3

**studies** [1] - 9:9

**study** [2] - 22:20, 111:15

**studying** [1] - 179:21

**stuff** [1] - 71:4

**subject** [8] - 9:13, 26:9, 66:22, 106:23, 109:22, 126:9, 168:7, 169:5

**subjects** [4] - 116:4, 116:6, 130:20, 130:23

**submission** [7] - 66:14, 66:23, 67:1, 70:8, 71:12, 72:22, 73:3

**submissions** [1] - 74:15

**submit** [19] - 69:21, 108:23, 122:2, 122:25, 134:8, 134:12, 134:15, 134:23, 135:1, 135:22, 136:4, 136:7, 136:9, 136:15, 160:20, 178:25, 179:3, 182:8, 194:3

**submitted** [19] - 18:9, 51:5, 68:14, 69:19, 69:25, 70:3, 71:11, 71:14, 72:11, 90:13, 90:19, 91:3, 91:6, 97:18, 108:1, 134:25, 135:23, 136:12, 160:22

**submitting** [3] - 74:12, 89:2, 123:22

**Subsection** [1] - 114:14

**subsequent** [2] - 72:21, 189:9

**subsequently** [3] - 142:6, 144:17, 144:20

**substantial** [13] - 28:21, 66:25, 80:6, 105:13, 110:21, 111:23, 112:2, 113:9, 120:3, 128:13, 189:1, 189:22, 190:13

**substantially** [13] - 32:13, 108:7, 110:16, 110:20, 114:18, 114:21, 128:19, 133:13, 136:23, 177:12, 183:12, 183:15, 189:4

**substitute** [1] - 193:2

**subtest** [4] - 16:2, 24:14, 24:20

**subtests** [1] - 42:3

**subvocalize** [1] - 77:23

**succeed** [2] - 181:17, 188:8

**succeeding** [1] - 191:8

**success** [6] - 114:21, 115:5, 115:7, 177:6, 177:8, 177:11

**sudden** [1] - 131:17

**sufficient** [6] - 79:5, 142:9, 177:23, 184:9, 187:14, 191:4

**suggested** [1] - 111:3
**suggestion** [1] - 190:14
**suggests** [3] - 61:9, 69:2, 110:19
**Suite** [2] - 2:4, 2:11
**summaries** [6] - 117:22, 169:20, 169:21, 170:2, 170:12, 196:12
**summary** [11] - 26:14, 34:8, 39:3, 57:4, 65:4, 138:13, 138:21, 155:1, 155:2, 155:3, 171:25
**supersede** [1] - 129:5
**supervise** [1] - 144:15
**supplement** [4] - 60:19, 70:24, 73:4, 157:1
**supplemental** [6] - 16:3, 71:1, 71:5, 72:24, 115:24, 130:18
**supplied** [1] - 80:11
**support** [16] - 4:8, 35:24, 36:5, 60:22, 66:10, 72:12, 96:25, 97:18, 135:3, 157:19, 177:24, 180:3, 187:14, 187:19, 193:10, 194:21
**supported** [4] - 78:21, 128:18, 128:22, 135:25
**supporting** [3] - 73:23, 79:1, 160:20
**supportive** [1] - 172:7
**supports** [3] - 112:1, 178:24, 188:2
**suppose** [4] - 158:21, 158:22
**supposed** [5] - 133:4, 175:19, 176:20, 177:2, 181:23
**Supreme** [2] - 106:3, 180:25
**surprise** [8] - 86:9, 86:12, 89:16, 89:25, 90:1, 94:7, 135:24, 136:3
**surprised** [1] - 107:3
**surprising** [1] - 183:4
**surreptitiously** [1] - 81:22
**suspicious** [3] - 78:3, 81:17, 81:19
**sustain** [2] - 145:14, 166:24
**sworn** [4] - 3:15, 64:11, 118:21, 137:25
**symptom** [3] - 49:22, 50:15, 60:20
**symptoms** [16] - 7:3, 13:4, 13:9, 13:18, 14:13, 14:17, 15:5, 16:16, 16:19, 50:17, 52:22, 53:4, 53:10, 184:25, 185:4, 185:5
**system** [4] - 36:14, 122:5, 122:7, 122:11
**systems** [1] - 158:13
**Tab** [21] - 17:7, 17:15, 17:17, 19:1, 20:1, 20:3, 22:14,

23:13, 23:17, 23:19, 23:22, 23:24, 56:23, 56:24, 56:25, 68:19, 69:2, 69:4, 69:18, 69:24, 70:2
**tab** [3] - 39:21, 70:5, 72:17
**table** [2] - 144:18, 176:5
**tall** [1] - 44:19
**Tanguay** [6] - 55:21, 55:23, 56:2, 98:21, 99:1, 175:4
**target** [1] - 68:7
**tasks** [1] - 11:10
**teach** [1] - 120:23
**teacher** [12] - 7:12, 10:6, 11:2, 11:18, 19:16, 20:24, 34:9, 36:6, 50:9, 182:2, 186:6
**teachers** [7] - 34:21, 34:25, 35:8, 185:18, 185:23, 185:25, 186:4
**teaching** [2] - 111:15, 135:8
**technical** [38] - 40:18, 115:15, 115:19, 116:1, 116:3, 116:12, 129:2, 129:4, 129:6, 129:8, 129:16, 130:12, 130:14, 130:19, 131:1, 131:7, 131:10, 131:13, 132:1, 132:3, 132:13, 133:18, 172:3, 172:12, 176:21, 176:23, 177:4, 180:5, 180:20, 180:23, 180:24, 181:2, 182:14, 182:19, 183:5, 193:7, 193:10, 197:1
**Technical** [1] - 133:8
**teens** [1] - 5:8
**telephone** [1] - 123:3
**temporary** [1] - 112:1
**tempting** [1] - 193:14
**ten** [3] - 160:13, 160:14, 161:12
**tend** [1] - 67:11
**tends** [1] - 49:19
**term** [2] - 14:14, 34:2
**terms** [11] - 16:17, 17:19, 26:2, 28:1, 40:4, 57:11, 105:10, 120:20, 124:10, 183:2, 191:10
**test** [75] - 10:4, 14:9, 14:25, 15:18, 27:24, 28:7, 28:8, 28:9, 28:17, 28:19, 28:24, 29:23, 31:1, 31:17, 31:22, 38:18, 39:11, 39:15, 39:18, 41:4, 42:6, 42:11, 44:5, 46:21, 49:2, 56:15, 57:14, 58:23, 59:6, 60:13, 75:24, 76:6, 76:8, 77:3, 77:4, 78:1, 79:20, 82:7, 88:25, 89:4, 89:12, 93:13, 93:17, 95:10, 95:15, 101:13, 102:19, 125:9, 127:23, 128:6, 141:7,

141:9, 141:10, 141:13, 157:20, 171:11, 171:12, 171:14, 174:21, 174:22, 174:23, 176:5, 176:13, 176:14, 177:23, 179:22, 180:11, 183:16, 184:13, 184:19, 192:9, 194:9
**Test** [7] - 23:1, 42:19, 56:12, 60:9, 78:9, 141:14, 142:2
**test-taking** [2] - 27:24, 28:24
**tested** [6] - 61:15, 98:5, 127:16, 176:11, 176:12, 181:24
**testified** [56] - 3:5, 4:17, 5:24, 12:12, 13:2, 14:2, 22:4, 27:25, 30:1, 34:15, 37:4, 39:10, 40:10, 43:6, 47:11, 48:13, 48:16, 49:21, 64:12, 79:18, 80:25, 81:15, 83:14, 84:23, 85:7, 86:2, 86:9, 86:10, 88:1, 91:21, 92:16, 95:9, 95:18, 96:10, 106:2, 112:18, 119:11, 120:1, 122:7, 122:23, 129:22, 132:15, 138:1, 149:3, 150:18, 151:18, 151:21, 152:23, 159:6, 162:21, 173:14, 189:5, 189:17, 193:8, 193:10, 194:21
**testify** [7] - 79:23, 79:25, 80:22, 101:25, 179:17, 189:3, 194:23
**testifying** [7] - 9:5, 83:22, 95:14, 123:2, 125:20, 144:2, 179:15
**testimony** [23] - 3:7, 32:16, 58:7, 61:16, 64:5, 85:15, 95:25, 96:11, 118:11, 118:12, 153:12, 156:18, 157:3, 157:19, 163:19, 171:1, 174:9, 175:10, 183:19, 184:4, 190:16, 192:15, 192:19
**testing** [106] - 5:9, 6:10, 6:25, 7:24, 11:5, 12:19, 18:19, 21:2, 22:1, 25:9, 31:25, 32:1, 33:9, 49:18, 49:19, 54:16, 59:16, 59:17, 73:24, 74:7, 75:12, 75:20, 76:18, 76:20, 76:25, 77:2, 77:21, 77:22, 78:7, 79:6, 90:21, 91:18, 92:3, 96:21, 97:9, 99:2, 103:5, 103:11, 103:16, 110:4, 110:24, 111:2, 115:18, 115:19, 115:23, 116:2, 116:5, 116:12, 124:8, 127:14, 127:20, 127:22, 129:3, 129:9, 129:17, 130:2, 130:12, 130:14, 130:17, 130:22, 131:1, 131:7, 132:1,

132:13, 133:19, 134:14, 134:15, 136:10, 142:15, 172:4, 175:14, 175:25, 177:5, 177:7, 177:9, 177:17, 177:18, 177:22, 177:24, 178:8, 178:13, 178:14, 178:16, 178:17, 178:21, 178:24, 179:3, 179:4, 179:5, 183:6, 184:16, 185:8, 186:11, 188:9, 188:20, 189:6, 189:18, 190:25, 194:6, 194:8, 194:9, 194:11, 194:19, 195:4
**testing-related** [1] - 127:22
**tests** [64] - 4:15, 5:6, 7:11, 9:8, 10:9, 10:11, 10:15, 11:11, 11:19, 11:21, 15:7, 15:10, 15:13, 15:15, 15:19, 15:24, 18:18, 25:4, 27:18, 27:23, 29:5, 31:18, 32:12, 59:20, 59:21, 59:24, 60:1, 60:3, 60:6, 60:14, 60:17, 60:18, 60:25, 61:9, 87:8, 87:14, 95:6, 95:13, 111:18, 123:20, 124:18, 124:19, 125:3, 171:15, 174:16, 174:19, 175:23, 176:4, 176:9, 176:10, 176:18, 177:25, 178:4, 178:10, 178:11, 179:11, 179:23, 179:25, 185:21, 189:12, 190:5, 190:12, 190:25
**Tests** [3] - 10:11, 29:21, 30:6
**Texas** [2] - 39:24, 165:4
**text** [3] - 43:22, 112:19, 155:17
**texts** [1] - 111:16
**Thanksgiving** [1] - 157:7
**The court** [198] - 3:2, 3:9, 3:11, 3:13, 3:18, 3:20, 3:23, 23:11, 23:14, 25:6, 26:11, 26:23, 31:13, 36:25, 37:6, 37:13, 37:16, 37:18, 38:3, 38:6, 38:10, 38:14, 38:25, 53:21, 54:1, 54:4, 61:20, 63:18, 63:22, 63:25, 64:3, 64:8, 75:21, 79:13, 80:19, 80:25, 81:6, 81:9, 81:11, 81:13, 85:2, 86:18, 96:3, 99:9, 99:11, 99:13, 99:15, 101:23, 101:25, 102:5, 102:8, 102:12, 107:10, 107:16, 107:19, 107:21, 107:24, 108:15, 109:1, 109:5, 109:7, 112:13, 112:16, 112:21, 113:2, 116:7, 116:9, 116:14, 116:23, 117:3, 117:6, 117:12, 117:15, 117:18, 117:23, 117:25, 118:3,

118:6, 118:15, 118:17,
118:19, 122:16, 122:18,
125:18, 125:22, 125:25,
126:15, 137:5, 137:17,
137:20, 138:2, 138:6, 138:8,
139:16, 140:24, 141:2,
142:9, 142:12, 142:18,
142:20, 144:8, 144:10,
145:14, 146:3, 146:22,
146:24, 149:24, 152:12,
152:16, 155:8, 155:19,
155:22, 155:25, 156:2,
156:6, 156:7, 156:9, 156:16,
156:22, 156:25, 157:12,
157:18, 158:1, 159:21,
159:23, 160:1, 160:5, 160:7,
160:10, 160:15, 160:19,
161:1, 161:7, 161:16, 162:2,
162:6, 163:18, 163:20,
165:7, 165:11, 165:16,
165:19, 165:21, 166:1,
167:3, 167:7, 167:10,
168:10, 168:15, 168:18,
169:4, 169:6, 169:10,
169:14, 169:20, 169:24,
170:11, 170:17, 170:20,
172:13, 173:1, 173:5, 173:9,
173:25, 174:2, 174:9,
174:14, 174:19, 175:6,
176:25, 178:7, 178:11,
179:7, 179:9, 179:11,
180:21, 182:8, 182:11,
182:17, 186:20, 190:2,
190:7, 190:11, 191:13,
191:16, 191:18, 193:5,
194:3, 195:22, 195:24,
196:6, 196:12, 196:16,
196:20, 196:24, 197:2, 197:6
**The witness** [40] - 3:17, 3:22,
23:12, 23:16, 33:1, 38:11,
38:18, 63:24, 64:10, 64:14,
99:10, 99:12, 99:14, 101:25,
102:9, 102:14, 108:16,
109:2, 112:15, 116:8, 118:4,
118:14, 118:22, 134:5,
138:5, 138:7, 139:19,
142:19, 145:6, 146:23,
146:25, 152:12, 152:15,
156:4, 156:15, 156:21,
156:24, 157:17, 157:21,
168:17
**theme** [1] - 193:12
**thereto** [2] - 118:13, 156:19
**they've** [5] - 41:19, 43:24,
75:4, 81:4, 188:6
**thinking** [2] - 8:2, 29:12
**third** [9] - 21:1, 25:12, 35:5,
35:12, 45:17, 75:16, 140:6,
148:19, 165:2
**thorough** [1] - 184:5

**three** [16] - 42:1, 42:3, 42:5,
42:6, 45:18, 61:21, 89:16,
90:5, 91:22, 158:22, 159:2,
170:22, 172:22, 177:22,
186:2, 195:17
**thrombosis** [1] - 77:11
**Thursday** [1] - 127:3
**time-out** [1] - 20:21
**timed** [4] - 16:5, 48:10,
176:16, 176:18
**timely** [2] - 104:6, 104:8
**title** [4] - 15:14, 64:19, 99:24,
138:11
**today** [4] - 7:14, 21:5,
195:21, 196:9
**together** [1] - 56:18
**TOMM** [11] - 41:1, 41:7,
41:16, 41:21, 42:1, 56:11,
56:14, 57:7, 57:11, 57:19,
63:5
**took** [17] - 28:12, 29:7, 31:1,
31:24, 45:10, 71:22, 83:15,
90:2, 90:19, 139:12, 140:7,
154:12, 154:16, 156:4,
167:14, 176:1, 187:3
**top** [15] - 5:2, 8:2, 19:6,
23:10, 30:15, 30:18, 30:20,
39:23, 43:22, 47:23, 57:3,
72:17, 100:2, 106:14
**topics** [1] - 115:25
**total** [3] - 28:13, 152:9, 170:3
**totality** [2] - 169:25, 197:7
**tough** [1] - 45:13
**towards** [4] - 147:21, 149:15,
153:16
**traditional** [1] - 153:16
**traditionally** [1] - 147:1
**train** [5] - 117:10, 119:12,
121:12, 125:1, 128:3
**trained** [3] - 133:5, 180:15,
181:8
**trainers** [2] - 133:22, 133:25
**training** [12] - 119:15,
119:23, 120:20, 123:7,
123:9, 128:10, 132:15,
134:20, 159:10, 159:13,
159:16, 194:16
**trait** [1] - 20:18
**transcript** [5] - 25:18, 25:19,
70:2, 135:2, 197:14
**transcription** [1] - 1:25
**transferred** [4] - 83:12,
83:24, 84:5, 122:9
**transmission** [1] - 154:23
**transpired** [1] - 172:22
**travel** [1] - 8:15
**treated** [1] - 4:11
**treating** [2] - 52:17, 135:7
**treatment** [1] - 5:3
**tree** [1] - 44:19

**trial** [1] - 188:4
**tricks** [1] - 176:3
**tried** [3] - 25:2, 72:3, 172:9
**triple** [3] - 82:13, 82:15,
173:11
**trouble** [1] - 8:3
**true** [13] - 27:9, 27:10, 27:15,
47:4, 55:8, 93:14, 106:5,
106:10, 125:7, 136:19,
146:15, 153:18, 154:13
**truly** [2] - 11:23, 54:19
**try** [12] - 15:5, 15:7, 15:15,
17:13, 37:6, 44:10, 44:11,
44:12, 50:3, 56:18, 58:8,
192:11
**trying** [12] - 5:22, 14:10,
14:11, 14:12, 21:25, 26:7,
27:7, 34:7, 37:14, 57:18,
81:2, 146:3
**Tuesday** [3] - 155:11,
155:24, 157:7
**turn** [14] - 6:4, 90:4, 91:14,
96:6, 99:7, 100:20, 109:22,
110:22, 119:8, 121:14,
127:7, 150:16, 171:5, 183:19
**turned** [1] - 92:24
**turning** [15] - 102:23, 104:3,
104:11, 109:19, 110:14,
113:4, 114:2, 115:11,
116:19, 119:21, 123:5,
128:23, 131:21, 132:21,
134:3
**twice** [1] - 48:16
**two** [43] - 15:13, 20:9, 25:2,
27:3, 40:3, 42:8, 42:15, 43:9,
43:24, 46:7, 46:10, 47:16,
56:18, 61:21, 62:1, 73:23,
74:6, 75:20, 75:25, 76:1,
76:3, 76:9, 87:7, 89:6, 89:7,
91:13, 91:22, 121:15,
130:21, 136:12, 139:14,
140:10, 158:22, 159:1,
162:14, 176:1, 186:21,
187:7, 188:19, 189:17,
191:1, 192:25, 195:17
**two-and-a-half** [1] - 130:21
**type** [10] - 11:19, 40:3, 49:7,
51:18, 67:11, 132:7, 136:13,
174:22, 191:11
**types** [4] - 17:20, 52:4,
60:25, 134:8
**typical** [1] - 82:3
**typically** [4] - 14:16, 67:4,
67:14, 91:21
**U.S** [1] - 1:8
**ultimate** [1] - 187:1
**ultimately** [2] - 191:6, 191:25
**uncertain** [1] - 192:8
**uncommon** [1] - 34:20
**under** [23] - 3:14, 52:22,

53:4, 57:3, 89:9, 96:15,
110:19, 112:3, 114:16,
118:10, 118:20, 120:12,
127:23, 133:15, 171:4,
177:7, 185:2, 187:19,
188:16, 188:18, 189:7,
191:8, 195:24
**undergoing** [1] - 12:19
**understood** [1] - 130:25
**undocumented** [3] - 111:9,
111:11, 111:22
**unexpected** [1] - 27:20
**unfortunately** [2] - 20:23,
55:1
**United** [2] - 89:22, 156:23
**UNITED** [1] - 1:1
**university** [1] - 187:11
**University** [7] - 70:3, 97:8,
138:16, 138:18, 187:9,
191:19
**unlawful** [1] - 186:9
**unless** [4] - 162:2, 181:2,
181:24, 195:13
**unlikely** [1] - 158:19
**unmitigated** [1] - 176:17
**unofficial** [1] - 20:23
**unreasonable** [1] - 186:8
**unstructured** [1] - 52:11
**unusual** [3] - 10:22, 35:22,
82:6
**unusually** [2] - 42:13, 48:21
**up** [34] - 4:20, 8:2, 23:2, 26:2,
29:13, 32:24, 32:25, 34:9,
36:10, 36:14, 44:19, 45:19,
61:6, 75:7, 76:23, 77:7,
116:13, 123:6, 136:24,
139:14, 139:16, 140:16,
149:4, 154:17, 167:13,
175:23, 176:12, 176:17,
182:16, 185:14, 185:19,
186:7, 191:14
**Update** [1] - 99:25
**updated** [2] - 55:2, 105:17
**upload** [1] - 123:1
**urge** [1] - 195:14
**urgent** [1] - 157:6
**US** [2] - 104:20, 180:25
**useful** [1] - 133:14
**uses** [1] - 38:19
**USMLE** [18] - 78:23, 79:22,
81:25, 82:4, 82:7, 85:19,
87:7, 88:20, 89:3, 89:11,
89:13, 89:22, 90:2, 100:18,
139:1, 139:2, 172:17, 172:20
**Usual** [2] - 121:17
**usual** [1] - 121:19
**utilizing** [1] - 1:24
**valid** [2] - 194:11
**validity** [5] - 13:22, 14:4,
14:7, 14:9, 180:16

**Vargas** [3] - 123:12, 163:13, 186:10
**VARGAS** [71] - 2:2, 2:3, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:23, 196:25, 197:5
**various** [1] - 74:13
**vary** [1] - 187:15
**vast** [1] - 149:6
**vein** [1] - 77:11
**vendor** [2] - 141:7, 141:9
**verbal** [1] - 162:20
**verification** [2] - 51:4, 70:15
**version** [6] - 24:8, 28:11, 28:12, 52:25, 53:5, 181:9
**versions** [2] - 20:10, 105:16
**versus** [1] - 87:6
**vice** [1] - 138:12
**video** [1] - 156:25
**view** [1] - 131:10
**viewed** [1] - 158:1
**viewer** [1] - 169:24
**vision** [2] - 56:5, 98:24
**visit** [1] - 70:12
**visual** [2] - 21:2, 58:5
**volume** [2] - 83:21, 139:15
**Volume** [1] - 127:2
**voluminous** [2] - 155:1, 155:2
**wait** [2] - 47:7, 88:21
**waiting** [1] - 8:15
**walk** [3] - 68:17, 76:22, 112:18
**walks** [1] - 52:21
**wants** [4] - 112:25, 160:8, 171:17, 173:14
**Washington** [2] - 2:5, 2:12
**watch** [3] - 63:19, 64:9, 137:21
**watching** [1] - 160:12
**weakness** [2] - 176:17
**weaknesses** [1] - 194:23

**wealth** [1] - 192:13
**web** [2] - 54:9, 55:13
**website** [9] - 4:22, 4:25, 6:6, 6:8, 55:2, 66:7, 89:16, 89:19, 130:20
**week** [8] - 3:25, 89:9, 91:13, 154:22, 155:25, 156:1, 170:23, 190:25
**weekends** [1] - 111:14
**weeks** [4] - 89:5, 89:14, 89:17, 90:5
**weight** [7] - 103:3, 103:18, 103:20, 103:23, 103:25, 190:15, 190:20
**weighted** [1] - 97:17
**Western** [1] - 135:21
**wheel** [1] - 41:9
**wherewithal** [1] - 179:22
**whole** [2] - 126:19, 179:17
**WIAT** [10] - 15:12, 16:1, 16:10, 24:9, 24:13, 24:20, 45:12, 45:19, 49:12, 59:23
**WIAT-III** [2] - 45:12, 45:19
**Wide** [1] - 22:25
**willing** [1] - 187:17
**wisely** [1] - 160:11
**withdraw** [1] - 172:18
**withdrawing** [1] - 144:8
**withdraws** [1] - 172:19
**withdrew** [2] - 191:23, 191:25
**Witness** [2] - 121:11, 198:4
**witness** [6] - 101:23, 117:15, 125:20, 137:22, 156:4, 159:24
**witnesses** [3] - 26:16, 64:1, 196:9
**woman** [2] - 135:11, 181:25
**wondering** [1] - 165:10
**Woodcock** [3] - 15:17, 46:1, 59:23
**Woodcock-Johnson** [2] - 46:1, 59:23
**word** [10] - 15:13, 16:2, 21:20, 21:21, 22:2, 41:8, 46:8, 47:8, 49:14, 175:20
**wording** [2] - 30:17, 49:11
**words** [11] - 16:3, 16:4, 21:16, 21:23, 41:16, 47:12, 102:21, 103:11, 119:4, 182:3, 182:4
**works** [4] - 44:15, 93:6, 100:6, 195:7
**world** [4] - 185:9, 186:8, 193:13
**worth** [1] - 181:6
**WRAT5** [1] - 22:25
**write** [5] - 107:21, 107:23, 114:25, 122:15, 177:15
**writing** [11] - 19:15, 20:14,

28:14, 31:11, 58:15, 58:16, 63:12, 92:13, 111:25, 114:23, 177:13
**written** [7] - 9:12, 77:18, 109:20, 110:8, 122:25, 123:1, 174:23
**wrote** [3] - 90:20, 122:15, 194:2
**year** [9] - 19:11, 65:20, 65:21, 66:3, 89:23, 89:25, 94:5, 184:2, 191:24
**years** [5] - 130:21, 170:23, 172:22, 186:3, 195:9
**yesterday** [27] - 3:5, 3:15, 5:24, 6:18, 7:17, 9:6, 10:25, 12:13, 13:2, 16:8, 17:19, 18:13, 22:1, 24:21, 27:25, 29:23, 34:15, 37:4, 39:10, 40:10, 42:8, 43:6, 47:11, 50:16, 58:25, 59:2, 61:15
**young** [2] - 135:11, 181:25
**yourself** [1] - 115:11
**Zecker** [5] - 71:14, 73:11, 73:15, 74:6, 87:20
**Zecker's** [2] - 73:24, 163:7
**zero** [1] - 48:2
**ZUBA** [1] - 1:15