1



```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                            -  -  -

 3    JESSICA RAMSAY,              :   CIVIL ACTION NO.
              Plaintiff,          :   2:19-cv-02002
 4                                :
                                  :
 5        v.                      :
                                  :
 6    NATIONAL BOARD OF MEDICAL    :   PRELIMINARY
      EXAMINERS,                   :   INJUNCTION HEARING
 7           Defendant.           :   DAY 2
      _____

 8
                                   James A. Byrne U.S. Courthouse
 9                                 601 Market Street
                                   Philadelphia, PA 19106
10                                 December 4, 2019
                                   Commencing at 9:29 a.m.
11    _____

12            BEFORE THE HONORABLE J. CURTIS JOYNER

13    _____

14
      APPEARANCES:
15
            REISMAN CAROLLA GRAN & ZUBA, LLP
16          BY:  LAWRENCE D. BERGER, ESQUIRE
            19 Chestnut Street
17          Haddonfield, New Jersey 08033
            (856) 354-5640
18          larry@rcglawoffices.com
            Representing the Plaintiff
19

20

21                            -  -  -

22            Ann Marie Mitchell, CRR, RDR, RMR
                   Official Court Reporter
23                    (267) 299-7250

24
      Proceedings taken stenographically and prepared utilizing
25    computer-aided transcription
```

FILED

FEB 0 5 2020

KATE BARKMAN, Clerk
By_____ Dep. Clerk

ORIGINAL

36



```
 1   APPEARANCES CONTINUED:

 2

 3           STEIN & VARGAS LLP
             BY:  MICHAEL STEVEN STEIN, ESQUIRE
             BY:  MARY C. VARGAS, ESQUIRE
 4           10 G Street NE
             Suite 600
 5           Washington, DC 20002
             (202) 248-5092
 6           michael.stein@steinvargas.com
             mary.vargas@steinvargas.com
 7           Representing the Plaintiff

 8

 9
             PERKINS COIE LLP
10           BY:  ROBERT A. BURGOYNE, ESQUIRE
             BY:  CAROLINE M. MEW, ESQUIRE
11           700 - 13th Street, NW
             Suite 600
12           Washington, DC 20005
             (202) 654-6200
13           rburgoyne@perkinscoie.com
             cmew@perkinscoie.com
14           Representing the Defendant

15

16                                    -   -   -

17

18

19

20

21

22

23

24

25
```

```
 1              (Court called to order at 9:29 a.m.)
 2              THE COURT:  Good morning.
 3              Are we ready to proceed?
 4              MS. VARGAS:  Yes, Your Honor.
 5              THE COURT:  Very well.  You may resume the stand, Ms.
 6    Ramsay.
 7              Oh, you're calling somebody out of order?
 8              MR. BURGOYNE:  Your Honor, he was going to defend a
 9    thesis today and his student notified him last night that she
10    is not coming, so we don't have to go out of order.
11              THE COURT:  I'm sorry to hear that from the student.
12              MR. BURGOYNE:  Yeah, it was a little -- not a good way
13    to start on your getting your thesis reviewed.
14              THE COURT:  No.  All right, Ms. Ramsay, then we can
15    proceed with the continuation of your testimony.
16              MS. VARGAS:  Your Honor, if I could just ask briefly
17    about scheduling.
18              There was some discussion at the end of the day
19    yesterday that we might not finish today and what that --
20              THE COURT:  If you don't finish today, then we'll
21    finish tomorrow.
22              MS. VARGAS:  Okay.  Thank you, Your Honor.
23              THE COURT:  I hope.
24              And, Ms. Ramsay, I'll remind you you're still under
25    oath from previously being sworn in yesterday.
```

1      Do you understand that, ma'am?

2      THE WITNESS:  Yes, Your Honor.

3      THE COURT:  Very well.  We have the same situation

4   with the mics today.  I'm working without my clerk.  She has a

5   family matter this week, so I'm lonely.

6      MR. BURGOYNE:  Jessica, I'm going to start with

7   Exhibit 73, if you want to turn to that.

8      THE WITNESS:  Thank you.  I think it's on.

9      THE COURT:  Great.  There it is.  All right.  Let's

10   proceed.

11                    CROSS-EXAMINATION

12   BY MR. BURGOYNE:

13   Q.  All right.  Good morning, Jessica.  I just mentioned,

14   let's start with Exhibit 73, please.

15   A.  Okay.

16   Q.  And as you can see, this is an email from you to Dr.

17   Ruekberg, who we were -- an individual we were discussing

18   yesterday.  And he is your psychologist?

19   A.  Psychiatrist.

20   Q.  Treating psychiatrist?

21   A.  Yes.

22   Q.  Okay.  And he provided a letter in support of your second

23   request for accommodations on Step 1.  Correct?

24   A.  Yes.

25   Q.  Okay.  In this letter dated January 26, 2018, you tell

1  him:  Sorry for not getting this to you sooner, I was trying to

2  get at least a little bit in each section and get rid of a lot

3  of extra details to make the information clearer.

4      And then you attach a table --

5  A.  Yes.

6  Q.  -- to this document.  And we're going to look at several

7  exhibits today in which you have such tables.  And I'll note to

8  you these weren't produced to us by you in discovery, these

9  were produced to us by Dr. Ruekberg.

10  A.  Okay.

11  Q.  Okay?

12      What is the table that you were preparing and working on

13  in these various communications to Dr. Ruekberg, starting on

14  the second page?

15  A.  This table was something I used to help me write my

16  personal statement.  And he asked to see it, because I had a

17  hard time communicating everything he was asking about or

18  everything that the guidelines asked about.  And so he asked me

19  to put it -- or to send him the table that I had used.  But I

20  wasn't quite done with it, so it took me longer than expected

21  to get it to him.

22  Q.  Okay.  And this is seven or eight pages, but there's sort

23  of pictures included in the table?

24  A.  Yeah.

25  Q.  Where did you get this document that you were working

RAMSAY - CROSS

1  from?  I assume you didn't go in and paste these pictures of

2  clocks and things like that in here.

3  A.   Yeah, I did.

4  Q.   Okay.  So this is a document you created entirely?

5  A.   Yes.

6  Q.   And on the last page -- I'm sorry, these pages aren't

7  numbered, but it's the next to the last page in this document.

8  A.   Okay.

9  Q.   And you see on the first column, it just has, how will

10  each accommodation alleviate functional limitations.  And then

11  on the right, you've provided a statement regarding how much

12  extra time you thought you needed.

13       And what amount of extra time did you include in the chart

14  at that time?

15  A.   50 percent.

16       MR. BURGOYNE:  And the Bates number, Your Honor, for

17  that page is 2248.

18  BY MR. BURGOYNE:

19  Q.   And if you turn, Jessica, if you would, please, to

20  Exhibit 74, is this an email message that you sent Dr. Ruekberg

21  in February of 2018?

22  A.   Yes.

23  Q.   And you're forwarding another copy of the table that you

24  had prepared?

25  A.   It appears so.

RAMSAY - CROSS

1  Q.   And then in addition to the table, it looks like you've

2  gone in and now prepared comments in the right-hand margins for

3  him to review?

4  A.   Yes.

5  Q.   And then on the page that's the second page of this

6  document, I'm sorry, it's the page that says 231 at the bottom.

7  A.   Okay.

8  Q.   Your first comment, the last comment in that block, you

9  state:  To help with Step 2 CS requests later, it may also be

10  beneficial to mention at least how -- and I can't read it

11  because it's blue -- is even more of a struggle because I not

12  only have to translate my thoughts into words but I have to

13  read and reread what I've written using the process I've

14  described.

15  A.   Okay.

16  Q.   And that's -- were you attempting at this point to have

17  him include language that might help you get accommodations on

18  Step 2 CS?

19  A.   I don't think language was the issue, it was whether or

20  not to include the writing as part of the explanation with --

21  for what I struggle with, because I didn't know if reapplying

22  for Step 2 CS, if I would have the opportunity to include that

23  then, because I haven't been through this process that far

24  before.

25  Q.   And then if you look at the page that says 239 at the

RAMSAY - CROSS

1   bottom, Bates number.

2   A.   Okay.

3   Q.   All right.  And the last sentence in this page states:  I

4   think a separate testing room, 50 percent additional testing

5   time with additional break time over two days would best

6   equalize my access to the exam.

7   A.   Okay.

8   Q.   All right.  And those were words you wrote?

9   A.   At the time, yes.

10   Q.   And those were words you wrote in, what, 2018, February

11   2018?

12   A.   Yes.

13   Q.   And that was after you'd taken Step 1 the first time?

14   A.   Yes.

15   Q.   And out of those, at this point, you have a separate

16   testing room?

17   A.   Yes.

18   Q.   You have additional break time?

19   A.   Yes.

20   Q.   And you have testing over two days?

21   A.   Yes.

22   Q.   So the one thing you don't have is any additional time,

23   50 percent?

24   A.   Correct.

25   Q.   Look at the next page.  It's Exhibit 75, rather.

RAMSAY - CROSS

1  A.   Okay.

2  Q.   And do you recall that in connection with working with

3  Dr. Ruekberg in his preparation of a supporting letter, you and

4  your mother and your fiancé completed ADHD symptom checklists?

5  A.   Yes.

6  Q.   And would you confirm for me that Exhibit 75 contains the

7  symptom checklist that you provided and your mother provided

8  and your fiancé provided to Dr. Ruekberg?

9  A.   Yes.

10  Q.   And the first one, page -- Bates page 223, it says at the

11  top, Jerri mom.

12       Is that your handwriting?

13  A.   I can't really tell, but I think so.

14  Q.   Okay.  And it reappears on the next page.  I don't know if

15  that makes it easier to confirm that's your handwriting?

16  A.   I believe so.

17  Q.   Okay.  And so the first two pages reflect what your mom

18  was reporting regarding your ADHD symptoms?

19  A.   Yes.  I had to do this over the phone with her, so I had

20  to ask her -- I sent her the list.

21  Q.   Okay.  And it looks like there's a total of 18 symptoms

22  described in this chart?

23  A.   Yes.

24  Q.   And it looks like she indicated on here that you had all

25  18 symptoms and that the degree of severity for all of them was

RAMSAY - CROSS

1  severe; is that correct?

2  A.   It appears so, yes.

3  Q.   And then you also filled out a prompt or a symptom report

4  for Dr. Ruekberg.  Is that on the third page at 225?

5  A.   Yes.

6  Q.   And it looks like you likewise indicated that you have all

7  18 symptoms, and again indicated that they were -- assigned to

8  each of them the most severe rating possible?

9  A.   In the major categories, yes, but I also ranked each

10  individual prompt separately.

11  Q.   But relative to the 18 categories, you assigned maximum

12  severity to each one?

13  A.   Yes.

14  Q.   The last two pages starting on 227, are these the ratings

15  provided by your fiancé?

16  A.   Yes.

17  Q.   And his name is Neil?

18  A.   Correct.

19  Q.   And it looks like he's assigned sort of varying degrees of

20  symptoms.  Some he indicates, for example, can't organize, he

21  indicates you have no symptoms in that regard.  Others he

22  indicates you have moderate symptoms.  And then some he

23  indicates you have severe symptoms; is that correct?

24  A.   Yes.

25  Q.   Look at Exhibit 76 for me.

1  A.   Okay.

2  Q.   And would you just confirm this is another chart that you

3  prepared, an updated chart that you sent Dr. Ruekberg in March

4  2018?

5  A.   It appears so.

6  Q.   And it looks like on the page 219, as of March 2018,

7  you're still indicating that you need 50 percent additional

8  time?

9  A.   Where is that?

10  Q.   Requested accommodations on page 219.

11  A.   Can you point or tell me where again, please?

12  Q.   Sure.

13  A.   On the table that you're referring to?

14  Q.   Do you see on the left-hand side, the first column, it

15  says requested accommodations, middle of the page?

16  A.   Okay.  Yeah.  It says 50 percent.

17  Q.   Okay.  So at that time, as of March, you still thought

18  50 percent --

19  A.   I don't know if I thought that.  I think I was asking for

20  advice on whether -- if I decreased the amount of time I was

21  requesting, if it would be more likely to be approved.  And so

22  I had been talking to people to see if they had any experience

23  with that.  So at that time, I was considering it.

24  Q.   The last page of this document, you say the same thing:  I

25  think the separate testing room, 50 percent additional testing

RAMSAY - CROSS

1  time, additional break time over two days would equalize my

2  access to the exam.

3  A.   It appears unchanged from the one in February, so yes.

4  Q.   Exhibit 77.  Is this an email from you to Dr. Ruekberg in

5  March of 2018?

6  A.   Yes.

7  Q.   In the second line you say:  To make it easier for you and

8  the school to support my request for accommodations, I worked

9  really hard to condense my reasoning down to the bare minimum.

10  I've attached the document to this email and also sent one to

11  the school so they would be working from the same information.

12       And then is the document that follows that, you've now got

13  a two-page document.  Is that a document you prepared and sent

14  to Dr. Ruekberg?

15  A.   I believe so.

16  Q.   And again, you've indicated 50 percent additional testing

17  time over two days.  Page 207.

18  A.   Where in the...

19  Q.   The paragraph begins, "Simplified versions of the main

20  things I want to say to support each accommodation I am

21  requesting."

22  A.   Oh, okay.  Yes.

23  Q.   And the working diagnoses you identified to him at this

24  time in support of the accommodations you wanted were ADHD,

25  combined presentation, and then learning disability nonverbal

RAMSAY - CROSS

1   with impairment in reading with impairment in written
2   expression.  And you say over on the right:  I'm still not sure
3   which to use for now.  I've included the one Dr. Lewandowski
4   gave as well as the ones we've talked about.
5   A.   Where was that?
6   Q.   Your comment on the right.
7   A.   On the same page?
8   Q.   Same page.  You didn't mention migraines at this time?
9   A.   Not apparently in this document, but I haven't read the
10  whole thing.
11       What was your first question about that, about the
12  comment?
13  Q.   Yeah.  That's a comment you wrote in there saying you were
14  still not sure which learning disability to identify in support
15  of your accommodation?
16  A.   Yes.  I wasn't sure if the learning disability that Dr.
17  Lewandowski had diagnosed was encompassed by the one that -- or
18  the couple that Dr. Ruekberg had diagnosed clinically.
19  Q.   And again, we established yesterday, Dr. Ruekberg didn't
20  perform any diagnostic evaluation of you, he didn't administer
21  the type of assessments Dr. Smith did?
22  A.   No.  But I didn't know that that made a difference at that
23  point.
24  Q.   The next exhibit is Exhibit 78.  We're now into April
25  2018.

RAMSAY - CROSS

```
 1          Is this another email from you to Dr. Ruekberg?
 2    A.   Yes.
 3    Q.   All right.  And you say in this email:  Sending the
 4    document to you so you have it to make changes if needed during
 5    the appointment.  Sorry I'm not completely done with it.  I
 6    tried.
 7    A.   Okay.
 8    Q.   All right.  And then the document that follows goes from
 9    page 194 to 202 -- or 1, basically.
10          And is this your revised version of Dr. Ruekberg's initial
11    letter?
12    A.   I don't know if it's technically my revised version.  I
13    think I had help with that from other people.
14    Q.   Which other people did you have help with on that?
15          MS. VARGAS:  Objection, attorney-client privilege and
16    work product.
17    BY MR. BURGOYNE:
18    Q.   Putting aside your lawyers, who else helped you?
19          THE COURT:  He's withdrawn the question.
20    BY MR. BURGOYNE:
21    Q.   Putting aside your lawyers --
22          THE COURT:  He's rephrased question.  All right?
23          MS. VARGAS:  Thank you.
24          THE COURT:  All right.
25          THE WITNESS:  Maybe my mom helped me with editing and
```

1    stuff.

2    BY MR. BURGOYNE:

3    Q.   And then the document that follows, there's comments over

4    in the right and highlighting.

5         Are those comments and highlighting that you provided?

6    A.   I don't know if all of them are all from me.

7    Q.   Well, they said Comment JR.

8    A.   I may have been communicating some.

9    Q.   You typed them in, in all events; is that correct?   Is

10   this a document you prepared and then sent to Dr. Ruekberg,

11   since it has your initials in the comments?

12   A.   He wrote the letter.   I had typed the comments.

13   Q.   Okay.   And the comments go -- like you have 38 comment

14   boxes that you provided to him.   I take it, in order to provide

15   those comments, you were closely reading this letter?

16   A.   I had the Kurzweil to help with that.

17   Q.   And it looks like some of your comments on page 198?

18   A.   Okay.

19   Q.   You'll recall at the top there was a paragraph I asked you

20   about yesterday that was in his initial draft, stating:   Even

21   if the board does not find Jessica meets criteria for

22   accommodations for ADHD, in my professional opinion, the board

23   should approve Jessica for accommodations for reading and

24   writing learning disabilities.

25   A.   Okay.

RAMSAY – CROSS

1  Q.   Do you remember our discussion in that paragraph

2  yesterday?

3  A.   Yes.

4  Q.   And then I asked whether you had suggested that that be

5  deleted or changed.

6  A.   Okay.

7  Q.   Okay.  And you see on one of your comments here you tell

8  him that you would rephrase that paragraph; is that correct?

9  A.   Yes.

10  Q.   And then your next comment is:  May be smart to say

11  something along the lines of, quote, In all future exams of a

12  similar nature to help the process moving forward.

13  A.   Yes.

14  Q.   And then there's -- a sentence has been inserted

15  addressing informal accommodations, stating:  She has

16  received -- she received informal accommodations starting in

17  the second grade, including a secluded testing area and extra

18  time to work on assignments.  Throughout elementary, middle and

19  high school, there were multiple instances where working with

20  her teachers and sometimes needing to involve her mother,

21  Jessica received informal accommodations.

22       And do you see over on the right you say:  I added this

23  sentence, but you can change it?

24  A.   Which comment?

25  Q.   21.

RAMSAY - CROSS

1   A.   Okay.

2   Q.   And do you recall making that suggestion to Dr. Ruekberg

3   for an addition?

4   A.   I don't recall doing it specifically, but it says here.

5   Q.   Then on page 2200 at the top, it looks like you were

6   correcting spelling and grammar errors, one of your comments?

7   A.   Again, my mom helped me with editing.

8   Q.   Exhibit 79.

9   A.   Okay.

10  Q.   And you said, this is April 20:  Dear Dr. Ruekberg, Here

11  is the final draft of the letter.  Sorry it is so long.  I had

12  to add a lot to support each of the points in the NBME

13  guidelines.

14       And then what follows is a nine-page, small-font document.

15       Is that the document you sent him in April 2018?

16  A.   I'm sorry, because it's not dated, but I would assume so

17  if it was attached.

18  Q.   And if we go to Exhibit 64, page 42 -- I'm sorry, page 27,

19  Jessica.

20       THE COURT:  Three strikes, you're out, Counsel.

21       MR. BURGOYNE:  Pardon me?

22       THE COURT:  Is that your phone ringing?

23       MR. BURGOYNE:  Well, I actually was wondering that,

24  Your Honor.

25       I apologize, Your Honor.

RAMSAY - CROSS

1   BY MR. BURGOYNE:

2   Q.   Page 27.

3   A.   Okay.

4   Q.   Okay.  And I think we established yesterday, this was an

5   early draft from Dr. Ruekberg of his letter; is that correct?

6   A.   Yes.  I believe this is the one that I said was his early

7   thoughts in the draft, yeah.

8   Q.   And now if we go to 79, that two-and-a-half page letter

9   has become the nine-page letter that was eventually sent to

10   NBME?

11   A.   I'm sorry, Exhibit 79?

12   Q.   Yes.

13   A.   Okay.

14   Q.   Is that correct?

15   A.   Your question was, the attachment is nine pages?

16   Q.   Yeah.  That's what, at least at that time, was the final

17   version of the letter?

18   A.   At that time, yes.

19   Q.   Okay.  Then if you go to Exhibit 80, we're now into May

20   2018.  And you're forwarding suggestions for Dr. Ruekberg's

21   letter?

22         MS. VARGAS:  Your Honor, this exhibit includes

23   attorney-client privilege and attorney work product.  It's

24   actually documented that way on the exhibit and was disclosed

25   inappropriately.  And so to the extent you would be seeking to

RAMSAY - CROSS

1  put before the Court privileged material, we would object.

2          MR. BURGOYNE:  Your Honor, this is the letter that was

3  produced to us in discovery by Dr. Ruekberg.  They were aware

4  of it.  It's been in our exhibit book.

5          THE COURT:  Your objection at this time is overruled.

6          I'm going to allow questions on it.  This is not a

7  proceeding where a jury is sitting.  I can remove the

8  considerations that are attorney-client from any considerations

9  that I may have in reference to the preliminary injunction or

10  the permanent injunction.

11         MS. VARGAS:  Thank you, Your Honor.

12         THE COURT:  So it's overruled at this time.  All

13  right?

14         MR. BURGOYNE:  Thank you.

15         THE WITNESS:  What was your question again?

16  BY MR. BURGOYNE:

17  Q.  The question was, at this point in this email from May

18  2018, are you forwarding suggested changes to Dr. Ruekberg's

19  letter from your attorney?

20  A.  I think so.

21  Q.  It looks like at the bottom there were also comments

22  provided on your draft letter from a Dr. Sorrentino.

23         Who is Dr. Sorrentino?

24         MS. VARGAS:  Your Honor, he's asking work product and

25  attorney-client privilege.  I recognize what you've said, but

1  he's now asking directly about communication from the attorney

2  in the court record.

3        THE COURT:  I'm going to sustain the objection to this

4  question.

5        MR. BURGOYNE:  And I'll just note, Your Honor, this

6  isn't -- presumably it's not attorney-client privilege because

7  it was sent to Dr. Ruekberg and any privilege would have been

8  waived.  It might be work product, but it was prepared in

9  connection with a request for reconsideration, not in

10  connection with this lawsuit, so I'm not sure there's a valid

11  work product.  Notwithstanding that, I'll accept your ruling

12  and move on.

13        THE COURT:  I find it to be a work product.  And I

14  sustain the objection, so move on.

15  BY MR. BURGOYNE:

16  Q.  Exhibit 81.  Actually, you don't even have to worry about

17  Exhibit 81.

18        MR. BURGOYNE:  I apologize, Judge.

19        THE WITNESS:  Okay.

20  BY MR. BURGOYNE:

21  Q.  We're now up to Exhibit 82.  And this looks like what is

22  in fact the final draft of the letter.

23        THE COURT:  And again, this is work product?

24        MS. VARGAS:  Yes, it is, Your Honor.  It's directly

25  discussing communication with the attorney.

RAMSAY - CROSS

1          THE COURT:  Very well.  It's sustained.

2          Next.

3     BY MR. BURGOYNE:

4     Q.   Exhibit 85.  We've now gotten to the point, it's September

5     22, 2018.  You submitted your second request for accommodations

6     in June, and that request was denied.  And you're now working

7     with your attorney on a request for reconsideration at this

8     time.  Is that accurate?

9     A.   Okay.

10    Q.   Is that timing accurate?

11    A.   In June we're working on it, is that what you said?

12    Q.   No.  In June you had submitted your second request.

13    A.   Yes.

14    Q.   It was subsequently granted in part and denied in part.

15         And at this point, September, you're working with your

16    attorney on a request for reconsideration; is that correct?

17    A.   Yes.

18    Q.   Okay.  And is this a letter -- an email from you to

19    Dr. Ruekberg?

20    A.   Yes.

21    Q.   And it looks like in the third bullet point you're

22    reporting that you had had a preliminary telephone conversation

23    with Dr. Smith and that he is someone you identified --

24    A.   For the third -- like left side bullet?

25    Q.   They're dark bullet points, yes.

RAMSAY - CROSS                                    22

1  A.   Sorry, what was your question again?

2  Q.   First of all, did you identify Dr. Smith by doing an

3  internet search?

4  A.   I did originally, yes.

5  Q.   Okay.  And then the bottom of this, you say:  Separately,

6  my lawyer also received a recommendation for Dr. Smith for a

7  colleague who has worked with medical students applying for

8  accommodations from the NBME.

9          MS. VARGAS:  Your Honor, work product.

10         THE COURT:  Overruled.

11  BY MR. BURGOYNE:

12  Q.   And then first indented bullet point, it looks like you're

13  saying:  Here are some highlights from our conversation that

14  might interest you.

15         And that's referring to your telephone -- was that a

16  telephone conversation you had with Dr. Smith initially?

17  A.   I believe it was.

18  Q.   And then that first bullet point, you say:  He stated that

19  the testing Dr. Lewandowski performed is used to show deficits

20  incurred from trauma, CVA or brain tumors and is generally not

21  helpful in showing ADHD and not at all appropriate for

22  evaluating possible learning disorders and that he should have

23  done appropriate testing.

24         Is that information that you received from Dr. Smith?

25  A.   It may not be a direct quote, but it's the impression that

RAMSAY - CROSS

1   I received.

2   Q.   And you met in person with Dr. Lewandowski on two

3   occasions?

4   A.   I believe so, yes.

5   Q.   All right.   And the first time was I think maybe a one- to

6   two-hour evaluation, just discussion and interview?

7   A.   I don't know if it was two hours, but I know that it was

8   longer than like -- I know it was longer than half an hour.   I

9   don't know exactly how long it was.

10  Q.   Longer than you spent with Dr. Smiy?

11  A.   Yes.

12  Q.   And then you came back a second time to see him, and he

13  performed a series of assessments?

14  A.   His technician did.

15  Q.   Okay.   And he's a licensed neuropsychologist?

16  A.   I believe so.

17  Q.   And at this point you had already sent -- Dr. Ruekberg's

18  letter had already been sent to the NBME.   For the record, the

19  final version of that letter was included in PX-2 at page 37.

20  But you attached to this document another edited document with

21  redlines and comments.

22       What were you contemplating that Dr. Ruekberg was going to

23  do in September 2018?   Why did you send him this information?

24  A.   To the best of my recollection, I think this was when we

25  were considering having him write a follow-up letter to address

RAMSAY - CROSS

1  the points that the denial letter had said -- had said, but

2  since they didn't really acknowledge anything from

3  Dr. Ruekberg, we decided against it.

4  Q.   On page 152, comment 9, looks like you're discussing the

5  severity of certain symptoms you experienced there on the

6  bottom where the draft letter was?

7  A.   Okay.

8  Q.   And you state:  We can support moderate with the fact that

9  I have to have Neil, other people, read for me at home, outside

10 of school, and I require accommodations for reading and writing

11 at school.  We could even support severe because I can neither

12 read nor write efficiently at home, school or work.

13 A.   Okay.

14 Q.   What were you communicating -- why were you making those

15 comments to Dr. Ruekberg at that time?

16 A.   I don't remember at this time.  I'm assuming it had to do

17 with whatever conversations we were having at the time.

18 Q.   You also submitted a letter from a Dr. Houtman?

19 A.   Yes.

20 Q.   And that letter is included in the record at PX-2, page

21 45.

22      Did you and your lawyer also work with Dr. Houtman in

23 crafting her letter?

24 A.   Not crafting it, no.

25 Q.   Preparing it, drafting it?

1   A.   She sent us the letter almost written, and we asked her

2   to -- or, well, actually, she had forgotten a section, and we

3   asked her to put that back in.  And she had already, like, said

4   she had forgotten, so she added that section too.  And then I

5   think we may have helped with editing at the end.

6   Q.   Okay.  Look at Exhibit 65, please.  And confirm for me, if

7   you will, that these are a series of emails and attachments

8   that were on your computer and you forwarded to or you provided

9   to us in discovery?

10  A.   You said 65?

11  Q.   65, yeah.  Starting with Ramsay 0003.

12  A.   Okay.

13       Okay.

14  Q.   And is this a document you sent to Dr. Houtman in May 2018

15  with a description of the symptoms that you -- and impairments

16  that you thought supported accommodation?

17  A.   I believe it was the same list we looked at earlier.

18  Q.   Reminds me, you said a moment -- in one of your emails,

19  you said, I have simplified everything that I've put together,

20  Dr. Ruekberg, and I'm getting this to you and to the school so

21  that everybody has the same information, words to that effect.

22       Who was it you were sending that simplified version of

23  your background to when you referred to the school?

24  A.   My best guess would have been that it was to Erin Dafoe.

25  Q.   Erin Dafoe is the individual who drafted the letter that

RAMSAY - CROSS

1    eventually went out over Mr. Overton's or Dean Overton's

2    signature?

3    A.    I believe so.

4    Q.    Look at page -- the page that says 8 at the bottom.

5    A.    Okay.

6    Q.    All right.  And I'll explain to you that, as I understand

7    the manner in which these documents were produced to us, the

8    attachments came first and then the email that was forwarding

9    the attachments.

10        So if you look at page 8, this is an email from Dr.

11   Houtman to you saying:  Here is my first attempt.  Let me know

12   what needs changing and I'll get it on letterhead.

13        Is that an email you received from Dr. Houtman?

14   A.    It appears so.

15   Q.    And then if you go back to pages 6 and 7, is this her

16   initial draft that you referenced a minute ago?

17   A.    If that was the one attached to the email, then yes.

18   Q.    It looks like she sent this to you on June 3, 2018 at

19   almost 6:00; is that right?

20   A.    It looks like it.

21   Q.    If you then go to page 17, which is the same date, her

22   letter came to you about 6:00, and it looks at 9:17 p.m. you've

23   sent back the redlined document that is found at pages 14

24   through 16.

25   A.    I'm sorry, can you say that again?

1  Q.   Sure.   On page 17, is this an email, in the middle of the

2  page, that you sent to Dr. Houtman?

3  A.   Yes.

4  Q.   All right.   It's dated June 3rd, 9:17 p.m.?

5  A.   Okay.

6  Q.   And it's got a paragraph here where you say:   Thanks so

7  much for writing the letter!   There's then a redacted sentence,

8  presumably on work product grounds.   And then you explain to

9  her the changes you've made to the letter.

10      And then if you look at the three pages preceding that

11  email, are those changes that you forwarded to her on that

12  date?

13  A.   I don't know if they're all changes or just areas that I

14  highlighted with changes, but...

15  Q.   In all events, they're comments you made after reviewing

16  her letter and reading that letter?

17  A.   I don't know if they were my comments.   I typed them, like

18  you stated before.

19  Q.   Okay.   And if they weren't your comments, whose comments

20  would they be?

21  A.   My lawyer's.

22  Q.   And the final letter we mentioned was the letter from Dean

23  Overton.

24          MR. BURGOYNE:   Which is PX-2, Your Honor, at page 50.

25  BY MR. BURGOYNE:

RAMSAY - CROSS

1  Q.   And if you look at Exhibit 63.

2  A.   Okay.

3  Q.   And at the bottom of the page, is this an email from you

4  to Erin Dafoe on April 11, 2018?

5  A.   Yes.

6  Q.   And you say:  I lied.  I read it and I am so impressed you

7  were able to organize the mess of thoughts and words I gave you

8  into something so well put together.  I only have a few

9  corrections/editing requests.

10  A.   Okay.

11  Q.   So did you prepare the initial draft of the letter for Ms.

12  Dafoe, or did she prepare an initial draft using information

13  you gave her?

14  A.   She prepared the letter, the initial draft.

15  Q.   When that request was denied in June, as you said, you

16  went to see Dr. Smith.  Correct?

17  A.   Denied in June?

18  Q.   You submitted it in June, and it was subsequently denied.

19  A.   In September, I think, yes.

20  Q.   To make sure we have that in the record, would you look at

21  DX-4, Tab M, and just confirm that this is the letter you

22  received from NBME granting certain accommodations but denying

23  extended time.  And specifically the accommodations you were

24  approved for are on page 3 of the letter.

25  A.   This is the letter, yeah.

RAMSAY - CROSS

1   Q.   So just in terms of time, it's September 11, 2018 was when

2   you learned the decision from NBME?

3   A.   That one, yes.

4   Q.   And then very soon thereafter, you went to see Dr. Smith.

5   Correct?  I believe you saw him on September 25th for an

6   evaluation?

7   A.   That sounds right.

8   Q.   And you went to see him specifically to get an evaluation

9   report that would support your request for extended testing

10  time?

11  A.   No.  I went there specifically for testing that measured

12  reading speed, because the letter had said something about not

13  having objective measurements of my reading speed.  And since I

14  went to Lewandowski for the same thing but he didn't do those

15  tests, I looked for someone who could do those tests.

16  Q.   Okay.  But you wanted that testing in order to support

17  your request for extended testing time on Step 1?

18  A.   Since I hadn't -- since I was told basically I didn't have

19  enough documentation to support it, yes.

20  Q.   And then you and your attorney worked with Dr. Smith on

21  his letter; is that correct?

22  A.   I don't know necessarily if I did, but I know that we

23  communicated about making sure all the facts were correct.

24  Q.   And Dr. Smith in fact sent drafts of his report to both

25  you and your counsel for review?

RAMSAY - CROSS

1          MS. VARGAS:  Objection, Your Honor, work product.

2          THE COURT:  Yes.

3          MS. VARGAS:  Dr. Smith is an expert witness we'll be

4    calling to the stand next.

5          THE COURT:  And you'll be able to cross-examine.  Very

6    well.

7    BY MR. BURGOYNE:

8    Q.  Exhibit 48, 49 and 50, would you just confirm for us that

9    these are all emails either to or from you and Dr. Smith?

10   A.  I'm sorry, was that -- what numbers?

11   Q.  I'm sorry, Jessica.  48, 49 and 50.

12   A.  Thank you.

13   Q.  So we can start with 48.

14        And then pages 40 -- the first two pages, it says 45 and

15   46 in the Bates numbers.

16   A.  Okay.

17   Q.  Is that information you sent to Dr. Smith for his

18   consideration to be included in his report?

19   A.  I believe so.

20   Q.  And then 49, Exhibit 49, is this an email from Dr. Smith

21   to you and Lawrence Berger forwarding a draft of the report?

22   A.  Yes.

23        MS. VARGAS:  Objection, work product.

24        THE COURT:  Again, it's work product, Counsel.

25   BY MR. BURGOYNE:

RAMSAY - CROSS

1  Q.   Exhibit 50.  Can you just confirm these are email

2  exchanges between you and Dr. Smith?

3  A.   Yes.

4  Q.   Turn to Exhibit 57, if you would.

5       Would you confirm that this is a secondary application

6  that you prepared for the University of Wisconsin's medical

7  school?

8  A.   I don't know if it was the final one, but possibly.  But

9  it was for the University of Wisconsin.

10 Q.   And did you end up applying to medical school in

11 Wisconsin?

12 A.   Which year?

13 Q.   Any year.

14 A.   I think so.

15 Q.   And then if you look at page -- the page it says at the

16 bottom, Ramsay 47.

17      And is this a discussion of your employers and activities?

18 A.   That's the title of the table, yes.

19 Q.   It looks like you have a description of your lifeguarding

20 job.  As a guard, I have to react quickly and intelligently in

21 emergency situations, provide necessary care.  And you were

22 also providing swim instructions over a four-year period, it

23 looks like.

24      And this is after high school, 2008 to 2012?

25 A.   Yes, yes.

RAMSAY - CROSS

1  Q.   And then it looks -- if you turn the page, it looks like

2  when you were at Ohio State, for the first description here,

3  you were teaching a chemistry lab at school?

4  A.   Yes.

5  Q.   And you were tutoring students in both general and organic

6  chemistry?

7  A.   Yes.

8  Q.   And you were guiding students in proper lab procedures?

9  A.   Yes.

10  Q.   And grading lab reports, assignments and quizzes and

11  exams?

12  A.   Yes.

13  Q.   And the next one, it looks like you have a different

14  title, you're now an instructor's assistant and head teaching

15  assistant?

16  A.   It was the same job, it just had different names.

17  Q.   Okay.  And this is post-graduation, it looks like?

18  A.   Yes.

19  Q.   And you were working full time in this position?

20  A.   They included the grading hours I believe in that, so yes.

21  Q.   On the left side you indicate 40 hours per week?

22  A.   Yeah.  That was within the job description.

23  Q.   Okay.  And it looks like you had this job not quite a

24  year?

25  A.   Yeah, yes.

1   Q.   And you were, in this position, it says you were teaching

2   three lab sections.

3        How many students were in each lab section?

4   A.   No more than 20.

5   Q.   So you were teaching three sections.  You were also head

6   TA for one section each week and that you managed six sections.

7        Did that mean you supervised sections that were under the

8   responsibility of other teaching assistants?

9   A.   Yes.  But mostly I was supposed to be in the chemistry

10  supply window so that if anything went wrong for those labs,

11  then I could be there to help out or answer questions for

12  students who came by.

13  Q.   Look at DX-4, Tab L.  We discussed a little bit your time

14  with Dr. Lewandowski.

15  A.   Okay.

16  Q.   And in this document, it's probably easiest to look at --

17  there's no page in numbers or Bates numbers.  So look at the

18  top of the page and go to the page that says page 79 of 106.

19  A.   Okay.

20  Q.   And this is page 5 of the document.

21       And this is a letter from Dr. Lewandowski on a

22  consultation dated October 25, 2017.

23  A.   Okay.

24  Q.   And you see in the last paragraph there, he says:  I spent

25  approximately 120 minutes with a patient today in individual

RAMSAY - CROSS

1   examination consulting with her mother, providing a detailed

2   neurobehavioral cognitive status examination and preparing this

3   consultation.

4   A.   Okay.

5   Q.   Does that refresh your recollection regarding the amount

6   of time you spent with him?  Easier way to say it, you don't

7   have any reason to disagree with his summary of how long he

8   spent with you?

9   A.   I don't know if that's the time he spent with me, but it

10  could have been between me and his note.

11  Q.   Okay.  On page 2 of this document, there is a discussion

12  of some of the background information he obtained from you at

13  the time.

14  A.   Okay.

15  Q.   Do you see that, social history?

16  A.   Sorry.

17  Q.   And in your social history, there's a section called

18  avocational.  And this is on page 76 of 106.

19       Do you see that?

20  A.   Can you say where on the page?

21  Q.   It's right above medical.

22  A.   Okay.

23  Q.   All right.  And do you recall discussing with Dr.

24  Lewandowski your interests?

25  A.   Somewhat.  He kind of didn't really let me talk a lot, but

1   he would say, do you like this, do you like this.  And then if

2   he hit something that I said yes to, then he would ask more

3   details about that, but quickly.  So I do remember somewhat

4   those things.

5   Q.   And he lists -- you reported to him that your interests

6   include sports, art, painting acrylics, drawing, ceramics,

7   camping, reading, paper making.

8        Are those all interests that you communicated to him

9   during your evaluation?

10  A.   No.  I would have never said reading.  I think in fact I

11  said that I hated reading.  But I like being read to is

12  probably something I would have said.

13  Q.   Let me ask you to flip to your deposition.

14            THE COURT:  Page and line?

15            MR. BURGOYNE:  Page 232.

16            MR. BERGER:  Give us a moment, please.

17            THE COURT:  One moment.  Let him get to that before

18  you ask your question.  That's the proper procedure before you

19  ask the question, Counsel.

20            MR. BURGOYNE:  Okay.  And, Larry, it's line 2, page

21  232.

22            THE WITNESS:  Okay.

23  BY MR. BURGOYNE:

24  Q.   In looking at line 2 from your deposition, my question

25  was:  On page 2, there's a list of your avocational interests.

1        You said:  Where you highlighted.  Okay.

2        And I go on and say:  And then avocational.  Sports, art,

3   painting, acrylics, drawing, ceramics, camping, reading, paper

4   making.

5        And I then asked you:  Is that all information you

6   provided to him?

7        And what was your answer at that point?

8   A.   Can you tell me what line the --

9   Q.   Line 12.  It's the answer immediately after the question I

10  put to you.

11  A.   Okay.  It says:  He asked me what my interests were, so I

12  would assume so because that's all stuff I like to do.

13  Q.   I'll take that back from you.

14       Exhibit 52.  This is a copy of your CV; is that correct?

15  A.   It's a working copy.

16  Q.   And then on page 2, there's a list of publications and

17  presentations.  Correct?

18  A.   Okay.  Yes.

19  Q.   And it looks like you've been a co-author on four

20  publications?

21  A.   That's correct.

22  Q.   And are those all peer-reviewed, do you know?

23  A.   I'm not sure.

24  Q.   And then let's just look at a couple of them.

25       Exhibit 53.

1  A.   Okay.

2  Q.   And it's a research article from 2015 entitled "Genetic

3  Influences on Nicotinic A5 Receptor," and the title continues

4  on.

5       And on this particular article, you are the lead author in

6  terms of which author is listed first.

7       What is the significance of being the lead author on a

8  publication?

9  A.   Generally -- it can vary, but generally it's the person

10 who put in the most work or had the idea for the research,

11 whether the most work was the paper itself or the research,

12 like the experiments that went into it.

13 Q.   And then Exhibit 54, is this a second article that you

14 were the lead author on, it's titled "Organic Acid Disorders"?

15 A.   Yes.

16 Q.   And it looks like this was from 2018?

17 A.   Yes.

18 Q.   You scored on the Step 1 exam a 191.   Correct?

19 A.   Yes.

20 Q.   And then your attorney asked you, if you had gotten a

21 passing score of 192, would that have been representative of

22 your knowledge and abilities.   And I believe you answered no?

23 A.   When was this?

24 Q.   Yesterday.

25 A.   I believe that's correct.

RAMSAY - CROSS

1  Q.   Okay.  Would a 195 have been representative of your

2  knowledge and abilities?

3  A.   It's impossible to tell, because I wasn't able to read all

4  of the -- each question.

5  Q.   Well, if you received a 195, would you think that was a

6  reasonable representation of your abilities?

7  A.   It's impossible to know.  I would have to read all of the

8  questions and answer them to know what my score would be.  That

9  would be representative.

10  Q.   Okay.  Because you were able to answer at 192, because you

11  can't answer at 195?

12  A.   The score isn't -- my ability to read isn't based on the

13  score.  The score is based on my ability to read.

14  Q.   Look at Exhibit 66 for me.

15        Yesterday you testified a few times during your direct

16  about exams that you took in medical school and you referred to

17  them as NBME exams.

18  A.   Okay.

19  Q.   Those are subject matter exams or shelf exams that NBME

20  prepares but that schools can use; is that correct?

21  A.   Some of them are.

22  Q.   And any decision regarding accommodations on those exams,

23  those are made by your school, not NBME.  Correct?

24  A.   I'm not sure about that.

25  Q.   Do you have any reason to think that NBME was involved in

1   deciding whether you got accommodations on your subject matter

2   exams?

3   A.   Yes.

4   Q.   What's your basis for that?

5   A.   Because my school told me that when they contacted NBME

6   to like request and provide the accommodations, that when I

7   initially requested that they be on paper, the test be provided

8   on paper like I was receiving at school, the NBME had told my

9   school that they can't do that and -- because they only provide

10  the test on the computer.  And so that is what happened.  I

11  still had to take the test on a computer.

12  Q.   Okay.  So other than whether or not there was a paper

13  version of these tests, was NBME involved at all in deciding

14  whether or not you could get accommodations when you took those

15  exams at your medical school?

16  A.   I don't know.  That's just what my school told me.  So as

17  far as I knew, they had been asking NBME.

18  Q.   Okay.  And you weren't involved in any of those

19  discussions?  Those were discussions that your school said they

20  had with NBME?

21  A.   I believe so, yes.

22  Q.   Okay.  Let's look at Exhibit 66.

23  A.   Okay.

24  Q.   And this is a document captioned Customized Examination

25  Performance Profile.  Examination name:  NBME CAS 1.

RAMSAY - CROSS

1  A.   Okay.

2  Q.   What is this document?  What subjects were you being

3  evaluated for under this exam, do you recall?

4  A.   I know this was one of the first exams that we had in -- I

5  believe it was after our first term in our first year.  And we

6  would have only had our first few classes, so I believe that

7  the topics selected were to be representative -- or not

8  representative, to be only from those subjects that we had --

9  courses we had taken.

10  Q.   Okay.  Let's look at the next page then, which is 27,

11  Ramsay 27.

12  A.   Okay.

13  Q.   And this is a customized examination performance profile

14  for an exam that you took, it looks like it says organic,

15  maybe, I'm not sure, but you took this exam in 2015, June.

16  That was your second year of medical school?

17  A.   Nope.

18  Q.   When was that?

19  A.   That would have been the end of my first year.

20  Q.   End of your first year.  And did you take this examination

21  with accommodations?

22  A.   I believe so.

23  Q.   And that would have included double testing time?

24  A.   I believe so, yeah.

25  Q.   The second page, does this reflect your performance on the

RAMSAY - CROSS

1  exam?

2  A.   At that time, I believe it would.

3  Q.   Okay.  And so with accommodations, you got 66 percent of

4  the questions correct it looks like.

5      And does this indicate that you were below average

6  performance in several areas, for example, cardiovascular?

7  A.   In a couple of them, yes.

8  Q.   Physiology, yes, it looks like you didn't do as well?

9  A.   Yes.

10 Q.   Look, please, at NBME -- or Defendant's Exhibit 67, which

11 is a document captioned NBME Comprehensive Basic Science

12 Self-Assessment.

13 A.   Okay.

14 Q.   And it looks like this was a test you took in 2016.

15     This was also your first year?

16 A.   2016 would have been my second year.

17 Q.   Your second year.  Okay.

18     All right.  And is this an assessment you took with

19 extended testing time?

20 A.   I believe so.

21 Q.   Okay.  And likewise, with whatever other accommodations

22 your school provided, including a private testing room?

23 A.   Yes.

24 Q.   And this was an exam you took on computer?

25 A.   Yes.

1   Q.   And do you see it's broken down, performance profile,

2   lower performance, borderline performance and then higher

3   performance?

4   A.   Yes.

5   Q.   And would you agree that in several areas your performance

6   was below borderline?

7   A.   Yes.

8   Q.   And whatever reason that was, it didn't have to do with

9   how much testing time you were provided on that testing?

10  A.   No.  At that time, I don't believe so.  That was right

11  after I had my DVT and had to make up my neuro course.

12  Q.   If you look over on the page that says Ramsay 33 --

13  A.   I'm sorry, you said Ramsay 33?

14  Q.   Yeah.

15  A.   Okay.

16  Q.   And on this particular test, you achieved a score of 310

17  with accommodations.

18       And do you see on this page there's a sort of rough

19  forecasting of, if you achieve a particular score on this exam,

20  here's the approximate Step 1 exam?

21  A.   Okay.

22  Q.   And what was the approximate Step 1 exam you would have

23  achieved with a 310 on this?

24  A.   It says 188 as approximate.

25  Q.   That's slightly below what you actually achieved with no

1    accommodations when you took Step 1?

2    A.    At this time, yes.

3    Q.    How many times did you take that test?  Once or more than

4    once?

5    A.    Which test?

6    Q.    The one we just looked at, the comprehensive.

7    A.    I don't know because I don't know what version that was.

8    And the one we just looked at was a self-assessment.

9    Q.    Okay.  In this same assessment, it looks like you took it

10   again, if you look at page 57.  And it looks like the test date

11   of this document is captioned NBME Comprehensive Basic Science

12   Self-Assessment Performance Profile.  And the test date is June

13   2017.

14   A.    Okay.

15   Q.    And you took it a second time and you got the identical

16   score, it looks like, 310?

17   A.    It looks like it.  And this is a CB -- okay.  Okay.  Yes.

18   Q.    And again, an exam you took with all the accommodations

19   that the school provided?

20   A.    No.

21   Q.    This one you did not have accommodations on?

22   A.    I didn't -- not use the time because I had already been

23   denied accommodations, and so I was trying to simulate what

24   would happen if I had standard time, but I still used the room

25   and -- I think just the room.

1  Q.   So you had a private testing room with no extended time?

2  A.   Yes.

3  Q.   Did the test with no extended time?

4  A.   I didn't test with extended time.

5  Q.   And your score at this point was the same, but you had

6  slightly different testing in that situation?

7  A.   Right.  And it was also after third year and it was the

8  day after my surgery rotation ended, so didn't have time to

9  study for it.

10  Q.   Look at Exhibit 68.  Is this a subject matter exam that

11  you took as part of your surgery course at school or rotation?

12  A.   Yes.

13  Q.   And this is dated April of 2017 on the second page where

14  it says 174?

15  A.   Okay.

16  Q.   It looks like you got a 67 percent score.

17       And again, would you agree with me that most of your

18  performance was below average on the score report?

19  A.   For surgery, yes, which is Step 2 content.

20  Q.   And then did I understand you to say that you thought you

21  did better in psychiatry than you did in surgery?

22  A.   I believe so, at least in the overall grade.

23  Q.   Turn to the next page, if you would, 175.

24  A.   Okay.

25  Q.   And is this the results of your psychiatry examination

1    that you took after your subject matter or for your course?

2    A.   Yes.

3    Q.   And if you look at page 2, is this your score report for

4    how you did on that exam?

5    A.   Yes.

6    Q.   Are subject matter exams taken on a computer?

7    A.   Yes.

8    Q.   And this is an exam you took with double testing time?

9    A.   Yes.

10   Q.   And whatever other accommodations the school provided?

11   A.   Yes.

12   Q.   And would you look at your performance there.  Would you

13   agree that in many, if not most, of the categories here, mental

14   disorders, mechanisms of disease, management, emergency

15   department, patient groups for females, your performance was

16   below average?

17   A.   Some of those you listed were on the average performance,

18   but yes, some of those were below.

19   Q.   Look if you would, please, at the page that says 262.

20        And now it looks like a subject matter exam from August

21   2016 for family medicine?

22   A.   Yes.

23   Q.   Again, this is a standardized exam you took with extended

24   testing time?

25   A.   Yes.

RAMSAY - CROSS

1  Q.   And other accommodations.  And it looks like your score

2  was a 60.

3       And would you agree that most of your performance

4  categories on this exam, you performed below average?

5  A.   Yes.

6  Q.   So whatever the reason for that performance was, it didn't

7  have anything to do with how much testing time you were allowed

8  on that day to take the exam?

9  A.   No.  It had to do with the difficulty of the questions,

10 because they were pretty ambiguous.

11 Q.   And then finally, looking at your medicine exam on page

12 264.

13 A.   Okay.

14 Q.   Is this an exam you took to evaluate your knowledge and

15 abilities after taking your medicine course at school?

16 A.   Sorry, it was -- you were asking about the medicine

17 course, yes.

18 Q.   Yeah.  What is this exam evaluating?  What had you just

19 completed before taking this exam?

20 A.   The internal medicine rotation, which was my first

21 clinical.

22 Q.   And again, would you agree that your performance was below

23 average on most of the subject areas?

24 A.   It's below on five of them.  The rest are below average or

25 average.

RAMSAY - CROSS

1  Q.   And that was an exam you took with the school's

2  accommodations?

3  A.   Yes.

4  Q.   Look at Exhibit 70 for me.

5  A.   Exhibit or page?

6  Q.   I'm sorry.  It's Exhibit 70.

7  A.   Okay.  Thank you.

8       Okay.

9  Q.   All right.  And what is this document?

10 A.   This is what is called a student dashboard at my school.

11 Q.   And tell the Court what a student dashboard is.

12 A.   It shows a box and whisker, I think it's called, graph of

13 performance on exams relative to other students.

14 Q.   Is that other students at your medical school?

15 A.   Within my class.

16 Q.   Within your class.

17      What did you have, approximately 50 students in your

18 class?

19 A.   It varied at the time of year, but approximately.

20 Q.   Okay.  All right.  And what does the red dot signify on

21 the first page, page 87?

22 A.   The red dot is my score.

23 Q.   And what does the sort of dark shaded gray area indicate

24 on each?

25 A.   Those would be the middle quartiles.

1   Q.   So on many of these, it looks like two of them you're in

2   the bottom, but in more of those you were below the bottom

3   quartile in each of these subject areas as of this date?

4   A.   Yes.

5          MR. BURGOYNE:  Your Honor, I have no other questions.

6          THE COURT:  Very well.  Why don't we take --

7          MR. BURGOYNE:  Oh, I'm sorry, we have just mechanics

8   of getting our exhibits in.

9          THE COURT:  Okay.  I'll give you a chance to do that

10   in your case.

11          MR. BURGOYNE:  Okay.

12          THE COURT:  All right.  Why don't we take our morning

13   break now.  We'll be in recess till 11:00.

14          (Recess at 10:47 a.m. until 11:01 a.m.)

15          THE COURT:  Let's proceed.

16          Ms. Ramsay, please resume the witness stand.

17                         REDIRECT EXAMINATION

18   BY MS. VARGAS:

19   Q.   Good morning, Ms. Ramsay.

20          You had testified a few moments ago before our break about

21   your performance on the shelf exams.

22          Can you tell us a little bit about your experience in the

23   rotations that ended with those shelf exams?

24   A.   Sure.  So first of all, our school is a new medical

25   school, and I was in the first class originally.  And so this

 1    was kind of a test run for everybody.  And because of that, we

 2    didn't have a class ahead of us to kind of show us the ropes or

 3    give us pointers on how to manage everything.  So we were kind

 4    of on our own.  And so like I said, my first couple rotations,

 5    clinical rotations, were quite a new experience for me, and

 6    there was a huge learning curve with that.  And because of

 7    that, not only because of that, but also just the sheer amount

 8    of time we were expected to be in either the clinic or the

 9    hospital, didn't leave a lot of time for reading or studying.

10        And because I am a slow reader and not everything was

11    available in a format that could be -- the Kurzweil could be

12    used on.  Or if I was at the hospital, some of their computers

13    didn't have software to read to me.  And that's the only place

14    I would get -- be able to have access to whatever that

15    information was, I didn't necessarily get to see all of the

16    information that was being tested on.

17        In some of the lighter rotations where there was either

18    less reading or there was more time to read for me, I got to

19    more of the material and did -- was able to show that I had

20    gotten to that material because I knew it.

21        And there -- so it varied based on the rotation.

22        There was also a rotation at the end which was the

23    psychiatry one, which they didn't tell us that neurology would

24    be included on that and we had our neurology as part of our

25    internal medicine rotation.  At least our clinical part was

1  during our internal medicine, and so I didn't study that part

2  of it before taking that exam.

3       It's just stuff like that.  Because it's their first year,

4  it's our first year, and so there was a lot of like

5  miscommunication.  But in general, if I had access to the

6  material and had time to access the material, I would do what I

7  could to learn it.  And I generally did a decent job.

8       But on the -- the testing week, the final week of our

9  block, we had not only the shelf exams, which are the written

10 exams on the computer, we also had OSCEs.  And those are

11 clinical tests for like -- with standardized patients where I

12 talked about yesterday, the setup of the note that we had to

13 write.  And a lot of times those were based off of reading too.

14 And if I hadn't gotten to the reading for those, then it made

15 it harder for me to state the diagnosis or support that they

16 were looking for in the words that they were looking for.  Even

17 if I was close or had the right reasoning or the right

18 question -- I had asked the right questions and done the right

19 exam in the encounter, and that was some of the feedback that I

20 got from my clerkship directors, when I hadn't passed either in

21 the writing portion or the -- coming up with the right

22 diagnosis or the expected diagnosis for that encounter.

23      And then so that particularly was the neuro OSCE.  And I

24 failed it twice.  And then the clerkship director pointed me to

25 the reading that the case was from, and I passed it.

1          In my OB rotation, I also failed that note because I

2    didn't have time to write everything.  And so I made sure -- I

3    had the diagnosis and support, but I didn't put that support

4    also in the other paragraphs because I didn't have time.  And

5    so I didn't even get credit for that.  And she told me that I

6    had a great exam, physical exam, and great questioning of the

7    patient and she could follow my logic there, but -- and those

8    are videotaped for them to view, to grade us.  She said I did

9    really well through that, but it just wasn't in my note

10   because -- and she could only grade the note.  She couldn't

11   grade what I had asked for the note writing portion.

12         So I had to redo that one, but...

13   Q.   So you also testified that you had a DVT?

14   A.   I did.

15   Q.   Can you explain what happened?

16   A.   I was at the beginning of my neurology rotation in my --

17   at the end of my second year, and I -- and during the -- one of

18   the lectures, my leg was bothering me or had been bothering me.

19   And I sort of had this feeling that like, watch, this is

20   probably a DVT.  And it was like a kind of a joke in the back

21   of my head.  But then it still kept bothering me.  So I told

22   Neil about it.  And then after -- that was like a Tuesday.  And

23   by Friday, my leg -- it had changed.  My leg had hurt a lot

24   more and had traveled up my leg.

25         And then so by Friday evening, my leg was extremely

RAMSAY - REDIRECT

1    swollen and very visibly swollen compared to my other leg.  And
2    so we went to the emergency department Saturday.  And they did
3    an ultrasound and said that I had a clot from my foot up to my
4    hip, basically, all the way up.  And they didn't even check the
5    other leg.  And they didn't check my IVC, which is the vein
6    that goes back to your heart.  And so it could have gone all
7    the way up.  And if it had gone all the way up to my heart, I
8    would have died.
9         So we caught it before that, but they had to put me on
10   blood thinners, Xarelto, which I was on for two years after
11   that.  But I was in a lot of pain from that for quite a while,
12   and I missed school for like three weeks.
13        And in this process, I was trying -- I had to go to a
14   bunch of doctor appointments to try to figure out what was
15   going on, why the clot happened, and dealing with the pain.
16   And I had initially tried to study while I was off to try to
17   keep up with the course, but I realized that with the pain and
18   the meds that I was on, I couldn't do that.
19        So then I worked it out with my school that during the
20   summer break, which is more intended -- it's a study break that
21   the students -- the rest of my class had before they took
22   the -- that exam, I don't know if it was a CBSSA or the CBSE,
23   but the one that we took in the following June, I believe --
24   Q.   I'm sorry to interrupt.
25        What is the purpose of that test?

1  A.   That was to see whether -- if we pass that, we could start

2  our clinical exams -- or, sorry, clinical rotations for third

3  year.  And if we didn't, then we had to spend one rotation of

4  that doing independent study to study for it and pass it before

5  beginning our clinical rotations.  And it would have been a

6  study program with the school.

7        And so I -- instead of getting that time to study for that

8  exam, that month, which my -- the rest of my class got, I spent

9  that time having to make up my neurology rotation, both the

10 class work and the anatomy part.

11       And so I -- and then in the very last week of that, I

12 was -- like right before we started school, was the exam.

13 Q.   So yesterday defense counsel reviewed your report cards

14 all the way back to kindergarten.

15       Did you obtain those grades with or without accommodation?

16 A.   I have -- I attained those with the informal

17 accommodations and all of the help and support I was getting

18 from friends and family and my teachers.

19 Q.   And whose idea was it to provide you with those informal

20 accommodations?

21 A.   My teachers.

22 Q.   Do you know why the teachers decided to provide you those

23 informal accommodations?

24 A.   I don't know for a fact, but I assume it's because they

25 realize I was struggling or needed some extra help,

RAMSAY - REDIRECT

1  specifically that help that they could provide to allow me to

2  do the best work that I could.

3  Q.   Defense counsel also asked you about receiving

4  accommodations at OSU in college.

5       Whose idea was it for you to get those accommodations?

6  A.   Initially it was recommended by my Spanish professor and

7  then again by my organic chemistry professor.

8  Q.   Do you know why they made those recommendations?

9  A.   Both had said that when I had asked them about what I

10  could do to do better in the class or achieve, like just show

11  better what I knew or even learn more to do better, they looked

12  at my coursework and my -- and in the case of my Spanish

13  teacher, my oral tests with her.  And both said in a way that,

14  you know, there wasn't much else I could do because I knew the

15  material and it was clear that I knew it by the other things

16  that I had shown, which weren't necessarily timed, and that

17  they thought that just having the extra time would give me the

18  opportunity I needed to show what I knew.

19  Q.   Turning for a moment to the ACT.

20       On the ACT, did you read everything that was on the test?

21  A.   No.

22  Q.   What did you do when you encountered questions that

23  required you to read the entire question or passage?

24  A.   Moved on to the next question that maybe didn't require

25  that.

1  Q.   And what types of questions based on the reading were you

2  able to answer without reading the passage?

3  A.   A lot of the ones that had formulas or math that I could

4  do, or if it was just factual knowledge, so if I knew the

5  answer based on something I had learned without having to read

6  the passage, which maybe the passage restated what I already

7  knew, but I didn't read it if I didn't have to, so I wouldn't

8  be able to say specifically.

9       But then for like the verbal or -- I don't know what the

10 section titles are for the ACT.  But for the ones that were

11 reading based, a lot of the times it would say a line or a

12 paragraph to go to or a specific word even to think about, so I

13 would focus on those and just read those.

14 Q.   How would you compare your experience taking the ACT with

15 your experience taking the MCAT?

16 A.   Well, for one, the MCAT was like a lot longer time wise.

17 There were more sections with more questions that I remember.

18 And the content was more difficult because it was something for

19 college students.  And it included more like sciences, like

20 biology and physics and chemistry, but it also had a writing

21 section and a verbal section.

22      And from my recollection, the ACT had a guess penalty,

23 guessing penalty.  And I'm pretty sure both of them had

24 passages with multiple questions associated with them, and that

25 both of them had multiple questions within the passage, related

RAMSAY - REDIRECT

1  questions, not just the ones labeled as passage independent,

2  that you could answer without any or very little reading of the

3  passages.

4  Q.   Do you recall how you scored on the writing sample on the

5  MCAT?

6  A.   I got a score of M, which is kind of a weird scoring

7  system.

8  Q.   Do you remember your percentile rank?

9  A.   I believe it was 31 -- 31st percentile.

10  Q.   Defense counsel asked you yesterday about Step 1.

11  A.   Yes.

12  Q.   How would you compare Step 1 with the MCAT?

13  A.   Well, even though the MCAT had like some topics of science

14  and health, the Step 1 is mostly like health-related.  And

15  sometimes there's statistics or social -- social health

16  questions, but that's a very small portion of the questions.

17  It's mostly all health related.  And it's -- the questions

18  themselves are not related to a passage.  They are the

19  question.  And in order to evaluate the information in the

20  passage -- or sorry, evaluate the information in the question

21  for Step 1, in order to answer the question, you have to read

22  the whole question for each question.  And you can't skip

23  information.  There's no like line it directs you to.  It's all

24  information related to that patient or that disease or whatever

25  it's trying to have you analyze in order to answer the

RAMSAY - REDIRECT

1   question.  And so you can't skip reading like you could with

2   the MCAT or the ACT that had a long passage and then several

3   questions associated with it.

4   Q.   You testified earlier this morning that you enjoy being

5   read to?

6   A.   Yes.

7   Q.   Who reads to you?

8   A.   Neil, sometimes my parents, my friends will.  I had a

9   friend in -- when I was between undergrad and middle --

10  undergrad and medical school who was reading the Game of

11  Thrones book series, and so every now and then she would invite

12  me over and she would read the Game of Thrones series to me.

13  And she would do like the little voices for each character,

14  which was cool.  And a lot of my friends read -- like if I'm

15  watching a movie, they know that if there's captions at the

16  bottom, that I can't read fast enough.  My parents do this too.

17  But they'll read it for me.  That's less enjoyable and more

18  necessity, but it's a lot more enjoyable to watch the movie if

19  they're doing it and I don't have to pause it to do it.

20      Yeah.  I've pretty much always enjoyed -- like I enjoy the

21  story, pretty much like I feel anybody would, except for that.

22  It's -- I don't know.  There's that personal connection, too,

23  with somebody reading to you.

24  Q.   Do you ever read for pleasure on your own?

25  A.   No.

1  Q.   Why is that?

2  A.   It's work for me.  It's hard work.  And even if I want the

3  story, that act of reading it is not enjoyable and it takes

4  forever.  And so it's not -- it's not an activity that I would

5  choose to do for fun or leisure or however people describe it.

6  It's work for me.

7  Q.   If you withdraw from medical school, can you be readmitted

8  if you have not passed Step 1?

9  A.   No.

10  Q.   And can you take Step 1 if you're not enrolled in medical

11  school?

12  A.   No.

13          MS. VARGAS:  No further questions.

14          THE COURT:  Any recross?

15          MR. BURGOYNE:  Just a couple of quick questions, Your

16  Honor.

17                    RECROSS-EXAMINATION

18  BY MR. BURGOYNE:

19  Q.   Ms. Ramsay, you testified about your performance on the

20  writing section of the MCAT exam?

21  A.   Yes.

22  Q.   And you performed I think at the 31st percentile.

23       There's no writing component to the Step 1 exam, is there?

24  A.   Not Step 1.

25  Q.   And then I think you indicated on the ACT exam, if you got

1  to a question that you couldn't answer, you just moved on to

2  the next question if it required reading?

3  A.   Yes.

4  Q.   And do you recall you scored in the 97th percentile on the

5  ACT exam?

6  A.   Yes.

7  Q.   And your reading scores in arts and literature were in the

8  99th percentile?

9  A.   Yes.

10 Q.   You said the MCAT is a longer exam than the ACT, and it

11 also includes some science and biology?

12 A.   With longer, I think I was referring to the time that it

13 was scheduled.

14 Q.   Okay.  The amount of time the test takes?

15 A.   Yeah.  I don't know about word count because I don't have

16 access to those exams.

17 Q.   And again, you refer to a guessing penalty, but do you

18 recall yesterday we saw in the ACT booklet that ACT says there

19 is no guessing penalty on the exam?

20 A.   That's what it says, but, again, my recollection is that

21 there was.

22       MR. BURGOYNE:  Okay.  No further questions.

23       THE COURT:  Very well.  You may step down now, ma'am.

24 Watch your step.

25       Next witness.

1          MR. BURGOYNE:  Your Honor, we have I guess a
2    scheduling question.
3          Our preference is to sort of continue on with
4    plaintiffs putting on their case and us putting ours on.  Our
5    experts aren't available tomorrow but are available a week from
6    Friday, or Friday.  We can have at least one of them available
7    Friday, I think.
8          THE COURT:  Surely you jest.
9          Why wouldn't they be available pursuant to us
10   scheduling this hearing for this week?
11         MR. BURGOYNE:  Well, again, Your Honor, it was our
12   understanding initially it was a one-day and then it was a
13   two-day hearing, so it wasn't our understanding it could
14   continue for a third, so I apologize.
15         THE COURT:  Well, this is a second day, and so where
16   are they?
17         MR. BURGOYNE:  They're here, Your Honor.
18         THE COURT:  All right.  We can get to them.
19         MR. BURGOYNE:  All right.  We'll take them out of
20   order and we'll put ours on next?
21         THE COURT:  If necessary, but you can't --
22         MR. BURGOYNE:  Okay.
23         THE COURT:  You're looking at my scheduling and you're
24   attempting on a Friday and that's not conceivable.
25         MR. BURGOYNE:  Okay.  That's fine, Your Honor.  We

1  thought we would check with you and see if that was a

2  possibility.

3            THE COURT:  Very well.  Yes.

4            MR. BERGER:  Yes.  And we will accommodate that.  But

5  I then need a moment to consult with Dr. Smith, who would

6  otherwise be the next expert, because he has to rearrange his

7  schedule.

8            THE COURT:  Fine.

9            MR. BERGER:  So if I could just have two minutes --

10            THE COURT:  You've got two minutes right now.

11            MR. BERGER:  Thank you very much.

12            MR. BURGOYNE:  And we'll get our witness.

13            THE COURT:  You said they're not going to be long in

14  any case?

15            MR. BURGOYNE:  One is very short.  The other one is a

16  little longer.

17            (A discussion off the record occurred.)

18            THE COURT:  Let's proceed.  We'll have you call your

19  witness out of order.

20            How long is your expert witness, just out of

21  curiosity?

22            MR. BERGER:  I estimate that his direct will be

23  between an hour and an hour-and-a-half, but I think closer to

24  an hour.  And I don't know about their cross, obviously.

25            THE COURT:  Cross-examination.

1          Very well.  Why don't you call your witness.

2          MS. MEW:  Thank you, Your Honor.  The defense calls

3    Dr. Benjamin Lovett.

4          THE COURT:  All right.  Watch your step coming around

5    there and around this.

6          THE WITNESS:  Thank you.

7          DR. BENJAMIN LOVETT, after having been duly sworn, was

8    examined and testified as follows:

9          COURT REPORTER:  State your name for the record.

10          THE WITNESS:  Benjamin Lovett.

11                    DIRECT EXAMINATION

12    BY MS. MEW:

13    Q.  Good morning, Dr. Lovett.

14    A.  Good morning.

15    Q.  Are you an external consultant for NBME?

16    A.  Yes.

17    Q.  And how long have you been serving in that role?

18    A.  I believe it's been nine years.  I think I started in

19    2010.

20    Q.  And briefly, what do you do in that role?

21    A.  For NBME, I review cases that are sent to them,

22    applications for accommodations.  So typically I'll get an

23    email that asks me to go to a secure website.  I download a

24    file that has the documents that the applicant has submitted,

25    review those and write a review with some sort of

1    recommendation.  Or if I can't provide one, I give it still a

2    summary of the documents.

3    Q.   And what questions does NBME ask you to answer as you're

4    reviewing accommodation requests on the USMLE?

5    A.   One thing I consider is whether or not the applicant meets

6    criteria for the diagnoses that they have requested

7    accommodations under.  If they have, then I also ask a question

8    of whether or not they're substantially limited in any major

9    life activities that are relevant to taking whatever tests

10   they've asked for accommodations on.  And then, if appropriate,

11   I recommend or summarize evidence with regard to what

12   accommodations, if any, are indicated based on the evidence

13   that's been submitted.

14   Q.   And did you review Jessica Ramsay's request for

15   accommodations in the US MLE?

16   A.   I did.  I wasn't an initial reviewer, so I saw I believe

17   it was her request for reconsideration.

18   Q.   And is it your understanding in reviewing that request for

19   reconsideration that you saw her entire file, all of the

20   documentation she had submitted to the NBME up to that point in

21   support of her requests?

22   A.   It is, yes, that I saw all the evidence that she had

23   submitted up to that point.

24   Q.   And did you provide a written analysis and recommendation

25   to NBME with respect to her request?

LOVETT - VOIR DIRE - DIRECT

1  A.   I did.

2  Q.   And then did you also provide a declaration in this

3  litigation relating to Ms. Ramsay's testing accommodation

4  request?

5  A.   Yes.

6  Q.   Dr. Lovett, I'm going to ask you to turn to Exhibit 6 in

7  the defense exhibit book, which should be a black binder, the

8  first volume.

9  A.   Okay.  Let's see.  Okay.

10      Okay.  I'm there.

11  Q.   You're going to be quicker than I am.

12  A.   That's okay.

13  Q.   Do you recognize this exhibit with the beginning document,

14  the declaration that you submitted in this litigation?

15  A.   Yes.

16  Q.   And then Tab A to Exhibit 6, do you recognize this as your

17  CV?

18  A.   Yes.  As of the time the declaration was submitted.

19  Q.   Understood.  And then Exhibit B, is this the letter that

20  you submitted to NBME containing your analysis and

21  recommendation on initially reviewing Ms. Ramsay's request for

22  reconsideration?

23  A.   Yes.  That's my review of the documentation.

24          MS. MEW:  Your Honor, this is in the record in terms

25  of being filed in support of our preliminary injunction

1    opposition, but we'd also ask to admit Exhibit 6 to the record

2    today.

3              THE COURT:  Very well.  Hearing no objection.

4              MR. BURGOYNE:  No objection.

5              THE COURT:  It's admitted.

6              (DX-6 admitted.)

7    BY MS. MEW:

8    Q.  Dr. Lovett, we are going to get into more details very

9    shortly, but could you briefly state the opinion that you

10   reached regarding Ms. Ramsay's request for testing

11   accommodations based on the materials that she submitted to

12   NBME in support of her request?

13   A.  Sure.  Ms. Ramsay had requested accommodations under

14   several different conditions or diagnoses.  And my expertise is

15   in learning disabilities and ADHD, so I reviewed with regard to

16   those.  And that really applies to pretty much all of the

17   testimony that I'm giving.

18        And my conclusion is that there was insufficient evidence

19   supporting learning disabilities or ADHD.  And there was

20   actually some pretty significant evidence undermining those

21   diagnoses, arguing against the learning disabilities in

22   particular.

23   Q.  And then since the time that you even prepared your

24   declaration in this case, have you reviewed additional material

25   that's been produced during the discovery?  And I'm speaking

LOVETT - VOIR DIRE - DIRECT

1  specifically with regard to Ms. Ramsay's school records, the

2  report cards and additional standardized test scores that we've

3  been discussing in the hearing.

4  A.   Yes.  Those have been provided to me, and I have reviewed

5  them.

6  Q.   Have the opinions that you expressed in your declaration

7  and in your written report for NBME changed in any respect with

8  regard to this additional information?

9  A.   No.  The school records and especially the standardized

10  test scores actually really strengthen the argument against the

11  learning disabilities.  And things like the excellent scores

12  for attention or excellent ratings by teachers for attention in

13  the report cards further weaken the argument for ADHD and more

14  undermine that diagnosis as well.

15  Q.   And we're going to get again into a little more detail of

16  that, but before we do so, I'd like to talk just a bit about

17  your background and credentials.

18      We can reference your CV, which is Exhibit 6A, Defense

19  Exhibit 6A.

20      If you'll just briefly state your educational background.

21  A.   I have a bachelor's degree in psychology from Penn State

22  University, a master's degree in psychology from Syracuse and a

23  doctoral degree, a PhD in school psychology, from Syracuse as

24  well.

25  Q.   And where do you currently work?

1   A.   Teachers College, Columbia University in New York City.

2   Q.   And how long have you been in that position?

3   A.   Just for a few months.  I've -- since September 1, 2019

4   officially, as it says on the CV.

5   Q.   Okay.  And where were you before then?

6   A.   Before then, for five years, I was a professor achieving

7   tenure at the State University of New York at Cortland.  Before

8   that, I taught for seven years at a small liberal arts college,

9   Elmira College.

10   Q.   Do you have any particular specialties in your work?

11   A.   Learning disabilities and ADHD, specifically their

12   diagnostic assessment.  And also the provision of testing

13   accommodations to students with disabilities.  Most of my work,

14   pretty much all of my current work, is on one of those two

15   things or both.

16   Q.   And what are your primary job responsibilities as a

17   professor?

18   A.   As a professor, teaching, research and service.  They're

19   sort of the three things professors do.  So I teach classes at

20   Teachers College, I train graduate students who are becoming

21   certified school psychologists, and some of them will become

22   researchers as well.  So I teach courses on law and ethics for

23   school psychologists, for instance.

24        I was brought there, really, to take over the assessment

25   courses, and so I'll start those in the spring semester.  So

LOVETT - VOIR DIRE - DIRECT                                    68

1    that's teaching.

2         In terms of research, I present at conferences, giving --

3    I do talks.  I publish in peer-reviewed journals.  I published

4    a book on testing accommodations.

5         And then with regard to service, that involves things like

6    sitting on committees, advising students, other sorts of

7    informal mentoring and that sort of thing.

8    Q.   Focusing particularly on your research work, if we could

9    look at Exhibit 6A, which is your CV, pages 2 through 9.

10        Is this a listing of your publications and works in

11   progress, including publications in peer-reviewed journals?

12   A.   Yes.

13   Q.   And focusing specifically on your peer-reviewed journal

14   articles, does any of this research pertain to learning

15   disabilities or ADHD?

16   A.   Yes.  Many of the articles are about learning disabilities

17   and/or ADHD.

18   Q.   And what types of journals are you publishing in?

19   A.   Journals in the fields of psychology and education,

20   specifically journals on assessment issues, journal on school

21   psychology, things like that.

22   Q.   And you mentioned that you have been invited to give -- to

23   speak to different groups.

24        Now, can you give examples of some of the groups that

25   you've been invited to present to?

LOVETT - VOIR DIRE - DIRECT

1   A.   Sure.   Currently a lot of the talks that I give are

2   actually to schools.   So I speak to teachers.   I speak to

3   school administrators, groups of school psychologists.   In

4   addition, I've done continuing education workshops for

5   psychologists, those who do evaluations, things like that.

6   I've also given invited talks beyond that to reviewers, for

7   instance, of documentation.   I've given invited talks at

8   conferences, things like that.

9   Q.   And just briefly, focusing on your teaching, if we look at

10   page 16 of your CV, is this an accurate listing of the courses

11   you have taught?

12   A.   As of that date, yes.

13   Q.   So you might have some additional courses you're now

14   teaching at Columbia?

15   A.   Right.   There's one this semester.

16   Q.   And do you teach classes that address learning

17   disabilities and ADHD?

18   A.   Yes.   And I have for many years now.

19   Q.   Dr. Lovett, are you a licensed psychologist?

20   A.   I am.

21   Q.   What does it mean to be a licensed psychologist?

22   A.   In New York state, at least, the requirements for

23   licensure are education, experience and examination passing.

24        So you have to have a doctoral degree from an appropriate

25   institution.   You have to have thousands of hours of experience

1 supervised doing various sorts of psychological practice,

2 assessment consultation and intervention.  And then you also

3 have to pass a licensure exam.

4 Q.  Do you see patients or clients as part of your work?

5 A.  I don't.  I don't have a clinical practice.  I

6 occasionally do clinical consultation, but I don't have a

7 clinical practice.

8 Q.  And do you currently perform diagnostic evaluations as

9 part of your work?

10 A.  No.

11 Q.  Have you ever performed diagnostic evaluations?

12 A.  I've been part of teams certainly in school and clinical

13 settings doing them, but not presently.  And that was during my

14 training as part of that supervised experience.

15 Q.  Are you familiar, nevertheless, with the diagnostic tests

16 that were administered to Ms. Ramsay by Dr. Smith and her other

17 evaluators?

18 A.  Yes.  I've given many of them myself for research

19 purposes, for training purposes.  And even those that I haven't

20 given myself, I'm familiar with their content and format in

21 general.

22        MS. MEW:  Your Honor, the defense offers Dr. Lovett as

23 an expert witness in the evaluation and diagnosis of

24 individuals with learning disabilities, ADHD, as well as the

25 provision of accommodations and testing and academic

1    environments and research related to this.

2              THE COURT:  Very well.

3              MR. BERGER:  Your Honor, I think my comments have more

4    to do with weight than overall expertise.  So certainly we

5    acknowledge that by education and training, Dr. Lovett has

6    expertise in these areas Counsel has brought out.  And he does

7    acknowledge that he does not have a clinical practice.  And

8    that will, of course, be something that I will examine about

9    and will give -- there will be some arguments, therefore, about

10   the weight.

11             So with all that, we don't object to allowing this to

12   proceed, but I may have particular points to make later on

13   about his expertise in particular areas.

14             THE COURT:  Very well.  We find the witness to be an

15   expert in the area that has been stated by counsel.

16             You may proceed.

17             MS. MEW:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19   BY MS. MEW:

20   Q.   Dr. Lovett, when you are reviewing a request for

21   accommodations on the USMLE like Ms. Ramsay's, do you meet with

22   that individual in person as part of your review?

23   A.   No.

24   Q.   So how are you able to assess whether that individual has

25   an impairment or should be receiving testing accommodations on

LOVETT - DIRECT

1   the test?

2   A.   Based on the documentation that they've provided.  And

3   that documentation virtually always involves records and

4   reports from individuals who have met with them personally.

5        So I can't think of a case of a diagnosis of learning

6   disabilities or ADHD where an applicant has not submitted

7   letters or reports, records, from someone who performed an

8   evaluation personally.

9   Q.   And so you are looking to the information that they

10  themselves have put forth in support of their request?

11  A.   Exactly.  For NBME in particular, I believe that I see all

12  of the documents that are submitted even if there's email

13  correspondence between the applicant and NBME.

14  Q.   And are you familiar with other -- in other contexts where

15  there are other reviews of individuals' impairments or levels

16  of disability for purposes of receiving services in other

17  contexts where the review might be solely based on paper, as

18  opposed to an in-person meeting?

19  A.   Generally, yes.  I have colleagues who review for

20  disability, not so much under ADA but workmen's compensation

21  and other sorts of things.  And my understanding is that at

22  times there's no personal evaluation.

23  Q.   And let's focus now on your review of Ms. Ramsay's file.

24       And just starting first with logistics, how did NBME reach

25  out to you to review her file?

LOVETT - DIRECT

1   A.   In her case, I believe, just like in virtually all cases

2   with NBME, I got an email one day asking me to log in to a

3   secure website because there was a review that had been

4   deposited for me to look at.  And so I went to that website,

5   logged in and downloaded a file of documentation, a PDF file of

6   all the papers that had been submitted.

7   Q.   And did you have any communication with NBME about the

8   substance of this file before you began your review?

9   A.   I don't believe so.  I don't recall any communication in

10  this case.  And the years that I've been working with NBME, I

11  can only remember a handful of times when I've communicated

12  with them about a file before writing a report.  In those

13  cases, it's because there's a piece of paper that's illegible

14  or there's a piece a paper that seems to be like missing a page

15  or something like that, maybe when it was photocopied.  And in

16  this case, I certainly don't recall anything like that.

17  Q.   And then between the time you reviewed the file and you

18  wrote the report that was attached as Exhibit B to your

19  declaration, did you have any communications with NBME?

20  A.   Again, I don't recall any, and it would have been

21  extremely unusual.

22  Q.   And then after you submitted your report to NBME, did they

23  suggest any revisions or changes to the report that you wrote?

24  A.   Just the same thing, I don't recall any.  I don't believe

25  there were any communications at that point.  And it would be

LOVETT - DIRECT

1   extremely unusual to hear anything.  In the vast, vast majority

2   of cases after I turn in a review, I don't hear anything at

3   all.

4   Q.   When Ms. Ramsay requested accommodations on the USMLE,

5   which diagnoses or impairments were the basis for her request?

6   A.   She requested accommodations under learning disabilities

7   and reading and writing, ADHD, headaches and a clotting

8   disorder.

9   Q.   And as you previously stated, your testimony today is

10  focusing on the learning disabilities and ADHD.  Correct?

11  A.   Exactly.

12  Q.   Okay.  Can you very briefly explain the diagnostic

13  features of ADHD?

14  A.   Sure.  To have ADHD, someone not only needs to have

15  episodes or instances where they have trouble paying attention

16  or impulsive or overactive/hyperactive, but they have to be

17  often and they have to be frequent.  They have to be to a level

18  that's atypical and very unusual for their age.  And so that's

19  just one of the criteria.  You have to have very high levels of

20  symptoms.

21      The second criterion is that they have to start early in

22  life.  So they have to be present -- you have to have some

23  symptoms by age 12.

24      The third criterion is that they have to be present in

25  multiple settings.  If someone is only showing symptoms at

LOVETT - DIRECT

1    school, for instance, that's not ADHD.

2        A fourth criterion is that they have to interfere with

3    someone's performance.  If someone has those symptoms but

4    they're doing fine, that's not ADHD.  It may be a personality

5    profile or a personality trait or set of traits, but it's not a

6    disorder.  Disorders involve impairment.

7        And then finally, it can't be due to something else.  So

8    if someone is having high levels of those symptoms because

9    of -- just because of drug use or something like that, we

10   wouldn't call that ADHD.  So those are the five criterion for

11   ADHD.

12       For learning disabilities, the core sort of --

13   Q.  Let me stop you.  Let's stay on ADHD for just a minute.

14   A.  Okay.

15   Q.  What are some of the traits or characteristics that are

16   represented in the sort of symptom criteria for ADHD?

17   A.  Sure, yeah.  So there are 18 symptoms that are listed in

18   the DSM for ADHD.  Nine of them have to do with inattention.

19   Those are things like making careless mistakes, being easily

20   distracted.  The other nine have to do with hyperactivity and

21   impulsiveness.  Those are things like talking excessively, you

22   know, being impulsive, reacting before you should, things like

23   that.

24   Q.  How do you differentiate individuals who have these types

25   of traits, maybe not to a clinical level, in individuals who

1   experience these traits to something that would constitute

2   ADHD?

3   A.   Yeah, these are things that I had sort of mentioned

4   earlier.  So one is certainly the frequency.  Again, everyone

5   has experiences where they have trouble paying attention in

6   certain settings, where they have to work harder than others to

7   pay attention or focus.  We all have experiences where we feel

8   jittery.  We all have experiences where we act impulsively and

9   then regret it later and things like that.  But the frequency

10  is one thing.  So frequency and severity, we can sort of put

11  those together.

12       And then another feature would be the impairment, the fact

13  that it's actually causing problems for someone, if they are

14  experiencing significant negative consequences and then the

15  symptoms continue.

16       So for most of us, when we experience significant enough

17  negative consequences, we learn, we adapt, we change sort of

18  the way that we're behaving.  For individuals with ADHD, those

19  negative consequences bother them.  They really cause them some

20  distress, but they continue to engage in those behaviors.  And

21  so it's something that really causes a substantial level of

22  impairment typically.

23  Q.   And what would be an example of a substantial level of

24  impairment?

25  A.   So depending on the symptoms, it would differ, but for

LOVETT - DIRECT

1    someone who, for instance, a schoolchild with ADHD, we would

2    expect them to be doing poorly in school.  So if someone has

3    ADHD to a significant degree such that they meet the criteria

4    for clinical diagnosis, we would expect that they have trouble

5    remembering to turn in work, to the point where their grades

6    are affected, but they continue to not turn in work despite

7    those negative consequence.  We would expect that they're not

8    paying attention to the teacher and so they're actually not

9    getting instruction in the sense.  So we would expect that to

10   be reflected in terms of their school performance as well.

11   Those are the sorts of things for a schoolchild, for instance,

12   with inattention.

13   Q.   And we were speaking about school, but is ADHD a learning

14   disability?

15   A.   No, no.  Technically ADHD would not be considered a

16   learning disability.  Those are separate categories in the

17   classification system.

18   Q.   So could someone have ADHD and have no functional

19   impairment, say, in reading or writing?

20   A.   Yes.  I certainly have seen cases where folks who I think

21   have a valid diagnosis of ADHD nonetheless do well in reading

22   and writing for various reasons.

23   Q.   And then you were starting on this and I stopped you.  But

24   now if you could just briefly discuss the diagnostic criteria

25   for specific learning disorders?

LOVETT - DIRECT

1   A.   Yeah, absolutely.  So learning disabilities involve

2   trouble acquiring academic skills initially, reading, math or

3   writing skills or some grouping of those.  And in addition,

4   that's reflected in terms of poor performance on standardized

5   tests.  That's actually something that's in the diagnostic

6   criteria as well as poor performance in real world settings,

7   educational or occupational performance.  Those things are

8   noted in the criteria.

9        And then also those deficits can't be due to another

10  disorder or another problem.  Like, for instance, if someone

11  has a general low ability, then that could explain academic

12  problems, but we wouldn't call that a learning disability.

13  Q.   And so what kind of objective evidence are you looking for

14  in determining whether someone meets a diagnostic criteria for

15  a learning disability?

16  A.   There are really two types of evidence that I look for as

17  a reviewer.  One is evidence from diagnostic tests that are

18  administered by, you know, an evaluator, and then the second

19  sort of evidence is from real world settings, because we really

20  need both.  So the real world evidence would include things

21  like grades on real world standardized tests that are taken for

22  admission purposes or for, you know, group tests that are given

23  in schools but under a standardized set of conditions, as well

24  as grades and other records of school performance.  Those are

25  in that second grouping of real world evidence.

1  Q.  If an individual has sort of uneven strengths and

2  weaknesses, let's say, really superior math skills or above

3  average math skills but perhaps just average reading skills, is

4  that sufficient to show a learning disability?

5  A.  No, absolutely not.  It is typical to have a profile of

6  strengths and weaknesses in the sense of having some things

7  that you're better at than other things.  We all have some

8  personal strengths, we all have some personal weaknesses in

9  that sense of the term.  And so if your math skills are better

10 that your reading skills, that by itself doesn't mean anything.

11      I should also mention individuals with higher levels of

12 ability tend to have more variability across areas.

13 Q.  Are you familiar with the concept of individuals who are

14 both gifted and learning disabled?

15 A.  Absolutely.

16 Q.  What does it mean to be gifted?

17 A.  Traditionally giftedness was defined rather narrowly based

18 on a high IQ score, an IQ score above 120 or 130 in some cases.

19 There's no official definition of giftedness in a diagnostic

20 manual.  And these days, different school districts have

21 different criteria for entry into giftedness programs.  Many

22 still use IQ tests, but they also may use tests of academic

23 skills, creativity tests as well, parent and teacher ratings,

24 things like that.

25 Q.  Is it possible to be both gifted and learning disabled?

1  A.   Absolutely.  There's no reason why someone, you know,

2  cannot have significant deficits in academic skills even if

3  they meet those various criteria to be called gifted.

4  Q.   And how would you expect that to present itself?

5  A.   We would see evidence of both meeting the gifted criteria

6  and also separately distinctly meeting the criteria for a

7  learning disability.

8       So whatever your preferred definition or whatever a school

9  district is using as a gifted criteria set, they would be

10 meeting those, and in addition, they would meet the

11 requirements for a learning disability separately.

12 Q.   And does a learning disability require some level of

13 impaired performance?

14 A.   It's the core definition of it.  Academic skills are

15 substantially and quantifiably impaired.  Substantially and

16 quantifiably is the term in the diagnostic criteria.

17 Q.   What is the discrepancy theory?

18 A.   For a long time, starting back when the concept of

19 learning disabilities was first developed, it was thought

20 initially that learning disabilities should be diagnosed by

21 looking at a discrepancy between someone's IQ and someone's

22 level of achievement.

23      And so for a long period of time, the diagnostic criteria,

24 the clinical diagnostic criteria for learning disabilities

25 involved some sort of calculation of that discrepancy.  So you

LOVETT - DIRECT

1   would administer an IQ test, you would administer a test of

2   academic skills.  And if there was an area where there was a

3   significant gap between IQ and achievement, then that was part

4   of the criteria for a learning disability.

5       Research accumulated over the course of a decade showing

6   that those discrepancies are not reliable and also that they're

7   not a valid indicator for many reasons.  And so when the

8   diagnostic manual that's most commonly used, the DSM, was

9   revised, it was actually revised specifically to address that

10  problem.  And so the discrepancy criteria are gone.  And that's

11  been since 2013 at the latest, at least.  But the discrepancy

12  approach has been under attack by researchers whose data

13  continue not to support it for decades.

14  Q.   And just for the record, when you're referring to the DSM,

15  what are you referring to?

16  A.   That's the Diagnostic and Statistical Manual of Mental

17  Disorders, currently in its fifth edition, so that would be the

18  DSM-5.

19  Q.   And so if I understand it correctly, under the discrepancy

20  theory, someone could potentially be diagnosed with a learning

21  disability if they had an IQ in the 95th percentile but

22  academic scores in the average range?

23  A.   In theory, yes.  When the discrepancy formulas and the

24  discrepancy criteria were originally developed, it was never

25  anticipated, I think, but it would be applied to folks like

LOVETT - DIRECT

1   that.  The thought was that to be referred for an evaluation to

2   see if someone has a learning disability in the first place,

3   they would actually be doing poorly academically, they would

4   actually have low academic skills.  And I think it was a later

5   application or misapplication to individuals who were not

6   impaired academically.

7        But it is true that under the discrepancy approach to

8   diagnosis, in theory, someone certainly could have average

9   range achievement and still qualify as having a learning

10  disability because they were not performing up to their

11  ability.  The idea was that IQ was the sort of measure of your

12  potential and you were entitled to perform in every area up to

13  your IQ.  We know for a lot of reasons that's wrong.

14  Q.  So within your profession, that is no longer an accepted

15  method for diagnosis?

16       MR. BERGER:  Objection.  I think at this point, on a

17  question like that, that counsel is leading her own witness

18  more than is appropriate.

19       THE COURT:  You can rephrase your question.

20  BY MS. MEW:

21  Q.  Is the discrepancy model currently accepted in your

22  profession?

23  A.  I don't know any researchers who would endorse it, folks

24  who specialize in looking at evidence and conducting scientific

25  studies of learning disabilities.  Are there practitioners, are

1   there evaluators who use it, at times, yes.

2   Q.   Are ADHD and specific learning disabilities

3   neurodevelopmental disorders?

4   A.   Yes.   That's the category in the DSM that they're called,

5   neurodevelopmental disorders, because they are understood to be

6   brain based and to start early in childhood.

7   Q.   Okay.   You anticipated my second question.   Thanks.

8        So now focusing back on your review of accommodation

9   requests, what type of information are you looking for when you

10   review a file for a candidate who requests accommodations on

11   the USMLE?

12   A.   Well, it depends on the disorder.   So, again, for learning

13   disabilities, it's the two types of evidence that I just -- I

14   discussed earlier.   So one thing that I look for is evidence

15   from standardized diagnostic tests that are given by an

16   evaluator showing scores that are below the average range in

17   terms of academic skills, and then the second type of evidence

18   that I look for is real world evidence.   So evidence of poor

19   grades, evidence of poor performance on real world tests that

20   are taken without accommodations.

21   Q.   Ms. Ramsay submitted a report from Dr. Robert Smith in

22   support of her request for reconsideration.

23        Are you familiar with that report?

24   A.   Yes.

25   Q.   If you'll turn to Defendant's Exhibit 3 and Tab B behind

LOVETT - DIRECT

1   that.

2   A.   Okay.  I'm there.

3   Q.   Is this the report from Dr. Smith that you reviewed as

4   part of your review of her file?

5   A.   Yes.

6   Q.   Looking at the first page of this report, Dr. Smith lists

7   a number of sources of information.  And focusing here on the

8   items in caps, I'm going to take them a bit out of order.  I'm

9   just going to ask you to just very briefly explain what some of

10  these tests are.

11        One of them is the Nelson-Denny Reading Test.

12  A.   Uh-huh.

13  Q.   Is this a diagnostic test?

14  A.   The Nelson-Denny, that one is a little bit complicated

15  because it was -- it's generally interpreted to be a screening

16  test, but it can provide useful evidence relating to a

17  diagnosis of reading problems.

18  Q.   And what does it measure?

19  A.   It measures reading skills.  It has a component that looks

20  at someone's ability to take a vocabulary test through reading.

21  It has another component that looks at reading comprehension,

22  where someone reads passages and then answers multiple choice

23  questions about the passages.  And it generates sort of a

24  supplemental score, called reading rate, that is really not

25  reliable even according to the Nelson-Denny manual, but that's

LOVETT - DIRECT

1 part of the comprehension portion.

2 Q.   Did Ms. Ramsay obtain any below average scores on this

3 test?

4 A.   Yes.

5 Q.   And if it helps, you can refer to pages 22 to 23.  And

6 it's of the report, not -- the page in the actual report, not

7 the page numbers on the top that show the court filing.

8 A.   Okay.  Yes, I'm there.

9 Q.   What were Ms. Ramsay's below average scores on this test?

10 A.   So according to this report, her vocabulary score was

11 below average at the 11th percentile.  The 11th percentile

12 would generally be considered, in many tests, the low average

13 range, I should say.  And that 11th percentile score did

14 compare her to graduating college seniors.  But compared to

15 that group, her scores were below average.

16    I should mention, in the DSM -- the performance doesn't

17 just have to be below average, it has to be below average

18 compared to age expectations.

19    And so the Nelson-Denny doesn't directly show any sort of

20 age comparison.  Dr. Smith also compared Ms. Ramsay's

21 performance to those of graduating high school seniors.  And

22 that's often done for the purposes of getting something that

23 roughly approximates a general population sort of comparison.

24    That showed that her comprehension score was low average

25 at the 18th percentile.  And her reading rate score, the

LOVETT - DIRECT

1  unreliable score, as I mentioned, even the manual shows to be

2  so, was at the 1st percentile, at the very bottom.

3  Q.   Why does the manual state that that reading rate score is

4  unreliable?

5  A.   Well, there are ways of calculating a test's reliability.

6  And here it was done, I believe, by correlating the two forms

7  of the Nelson-Denny test.  And the correlation between those

8  two forms was below what's generally considered to be a

9  minimally accepted level of reliability.

10      So .7 is often described as minimally acceptable.  And if

11  I recall correctly from the manual, I think the reliability of

12  the reading rate score is .68.

13  Q.   And how is the reading rate score measured?

14  A.   So during the comprehension portion of the Nelson-Denny,

15  someone starts reading the first passage on the test.  And one

16  minute in, you stop them and ask them basically to indicate

17  where they are.

18      So it's a -- it's -- you're essentially asking someone how

19  far they've gotten, but there's no check on their comprehension

20  for that reading rate score.  And it's just based on one minute

21  of their silent reading with no comprehension check.

22  Q.   And so if these scores, the ones that you mentioned, the

23  reading rate score in particular, if the 1 percent score is

24  accepted at face value, what would it reflect?

25  A.   If we put aside the issues with reliability, it would

LOVETT - DIRECT

1  suggest that her reading speed is in the bottom 1 percent, even

2  compared to high school students, high school seniors in this

3  case.

4  Q.   And did Dr. Smith also administer the Wechsler Individual

5  Achievement Test, Third Edition?

6  A.   Yes.

7  Q.   And is that commonly referred to by acronyms, like WIAT,

8  WIAT?

9  A.   Yes, I've always heard the WIAT, or that's how I was

10 trained, but WIAT is another pronunciation.

11 Q.   W-I-A-T.  What does this test measure?

12 A.   The WIAT is a general achievement battery, so it measures

13 academic skills in a bunch of areas, reading, math, writing, as

14 well as oral language.

15 Q.   Did Ms. Ramsay obtain any below average scores on this

16 test?  And if it helps, I think this is page 18.

17 A.   Okay.  Yes, she did.  On the WIAT, the main score that I

18 would say was below average, in this case described as far

19 below average, was her oral reading fluency score.

20 Q.   And what was that score?

21 A.   That was based on her reading passages aloud and looking

22 at the speed that she took to read those passages.

23 Q.   And then what actual score did she receive?

24 A.   She received a 67, where 100 is average.  And so that was

25 at the 1st percentile.

LOVETT - DIRECT

1          MR. BERGER:  Can I just ask for a page reference?

2          MS. MEW:  Oh, I'm sorry, yes.  Page 18 of 31.  I'm

3     using the report page numbers, not the court filing numbers.

4          THE WITNESS:  There's a table of scores there.

5     BY MS. MEW:

6     Q.   And so if we took that score at face value, what would it

7     indicate?

8     A.   That would, again, suggest that her reading speed or

9     fluency, which includes, actually, a bit of comprehension, was

10    in the bottom 1 percent.  And the WIAT compared her to age

11    peers.  So that would have been compared to other folks her age

12    at the time, her reading fluency was in the bottom 1 percent of

13    the population approximately.

14    Q.   Did Ms. Ramsay also take the Woodcock-Johnson IV Tests of

15    Achievement?

16    A.   Portions of those tests, yes.

17    Q.   Which portions did she take?  Which portions did Dr. Smith

18    administer?

19    A.   Let me look for them.

20    Q.   And this is page 21.

21    A.   Okay.  So she took, at the very least, the

22    sentence reading fluency test and -- the sentence reading

23    fluency test and the word fluency reading test.  And together

24    the scores on those two tests are used to make an overall

25    composite score called reading rate.

1  Q.   And did Ms. Ramsay obtain any below average scores on

2  these tests?

3  A.   All of her scores, the overall reading rate and the two

4  subscores that it's made of, are below the average range

5  certainly, even below the low average range.

6       Her overall score for reading rate is at the 1st

7  percentile.  So again, that would be the -- approximately the

8  bottom 1 percent of the population.

9  Q.   And when you say the population, is that age based or --

10 A.   In this case she was, again, compared to age peers.

11 Q.   So this is saying that she's performing at the 1 percent

12 level, 99 percent of her same age peers perform better?

13 A.   Taken at value, that's approximately -- taken at face

14 value, that's approximately the interpretation here.

15 Q.   That's what it would be.

16      And then did Dr. Smith also administer the Gray Oral

17 Reading Test, or the GORT?

18 A.   Yes.

19 Q.   Okay.  This is pages 21 and 22.

20      And what does this test measure?

21 A.   This test measures oral reading skills, both with regard

22 to accuracy and fluency, as well as comprehension.

23 Q.   And how does it measure that?

24 A.   So the individual reads a series of passages that get

25 progressively longer and more difficult.  And after each

LOVETT - DIRECT

1  passage, after reading it aloud, the passage is removed and the

2  individual answers comprehension questions about it.  While the

3  client is reading the passages, the examiner notes whether or

4  not errors are made, as well as the time that's taken, things

5  like that.

6  Q.   And did Ms. Ramsay obtain any below average scores on

7  these GORT tests?

8  A.   Yes.  So her rate score was 3, which is at the first

9  percentile.  Her accuracy score, in terms of errors being made,

10  was also below average.  Her fluency score is made up of the

11  rate and accuracy scores, so it, too, unsurprisingly then is

12  below average.  And her comprehension score was also very low,

13  a 3, where 10 is average in this case.  And her score was 3

14  and, that was at the 1st percentile as well.

15  Q.   And so again, taken at face value, what would these scores

16  reflect?

17  A.   Extremely poor reading skills with regard to a variety of

18  different areas of reading.  Not just the speed, but also

19  things like accuracy and comprehension.

20  Q.   And falling at the 1 percentile, who is that compared to?

21  A.   That was compared, not exactly to age peers, because the

22  GORT doesn't quite go up to Ms. Ramsay's age range, but to a

23  sample of the general population, I believe, of 19 to 23 year

24  olds.

25  Q.   So with respect to the below average scores on these

1   various tests we just discussed, in your opinion, are those

2   scores credible?

3   A.   No.

4   Q.   And what do you mean first when we're talking about --

5   credible, what do you mean when you're discussing a credible

6   score?

7   A.   Yeah.  Non-credible is a term that's used in the

8   scientific research literature with regard to assessment.  So

9   when someone takes diagnostic tests and they get scores that,

10  for whatever reason, are not accurate representations of their

11  true skill levels, that could be called a set of non-credible

12  scores.

13  Q.   And so why is it your opinion that these scores are not

14  credible?

15  A.   Because of the overwhelming real world evidence to the

16  contrary.

17  Q.   And what real world evidence are you speaking of?

18  A.   Things like performance on admissions tests, like the ACT

19  and MCAT that were taken without accommodations.  Performance

20  on group administered standardized achievement tests in school,

21  in Ms. Ramsay's K to 12 education, grades, things like that.

22  Q.   So what should an evaluator do when faced with

23  inconsistencies between real world performance and results of

24  diagnostic testing?

25  A.   Well, there are a number of reasons that can cause

1  non-credible data, and so you want to think about what

2  mechanism might explain them in a particular case.

3      So, for instance, if you're evaluating someone who is just

4  recovering from the flu, then you're probably not getting an

5  accurate representation of their skills, if you see that they

6  perform much worse on a diagnostic test that day than they do

7  in the real world during most of their life.  And so that would

8  be one thing to consider.  It doesn't seem to be operating in

9  this case.

10     Another mechanism that would have to be considered is

11 motivation.  So in real world contexts, especially in

12 admissions tests, the individual is motivated usually to

13 perform as well as they possibly can.  The goal is to do

14 something like get into college, get into a good medical

15 school, things like that.

16     In contrast, that motivation, that incentive, is not there

17 in diagnostic testing.  And sometimes in diagnostic testing

18 it's the opposite.  So if someone is already contemplating

19 getting accommodations, if someone already believes that they

20 need accommodations, then if they perform well during the

21 diagnostic testing, then they're not going to get a

22 recommendation for accommodations.

23 Q.  Are there ways that the clinician can test for this

24 motivation?

25 A.  There are specialized assessment measures that have been

1   developed to try to look at someone's motivation or effort

2   level during an assessment, but the discrepancy between the

3   real world evidence and the diagnostic testing would actually

4   be to me the most clear evidence that there's something wrong

5   with the diagnostic test scores.  But there are specialized

6   assessment measures that have been developed.

7   Q.   What are performance validity tests?

8   A.   Performance validity tests are a type of those measures

9   that look at someone's motivation or effort during diagnostic

10  testing.  And they were generally developed to look at feigned

11  memory problems or exaggerated memory problems or otherwise

12  non-credible memory problems.  A lot of them were developed for

13  use or have been used in civil litigation where someone is

14  alleging an injury that may have occurred, say, during a car

15  accident, someone says that they have memory problems

16  afterwards.  And that test is given to detect if their memory

17  problems are genuine or exaggerated or feigned.

18  Q.   And so did Dr. Smith administer one of these types of

19  tests?

20  A.   He did.  He gave the Test of Memory Malingering, which, as

21  its title suggests, was developed to look at feigned memory

22  problems or exaggerated or non-credible memory problems.

23  Q.   And how -- very briefly, how does this -- what does this

24  test measure?  How are you --

25  A.   In the Test of Memory Malingering, you show someone -- to

LOVETT - DIRECT

1  make it very simple line -- drawings of different common

2  objects, like a door or a saw or something like that.  And you

3  show them sets of these and then ask which they've seen before

4  and which they haven't, things like that.

5  Q.   Is there any reading involved on this test?

6  A.   No.

7  Q.   How did Ms. Ramsay perform on this test of memory

8  malingering?

9  A.   In Dr. Smith's report, he describes the two parts of the

10  Test of Memory Malingering that are typically used to score at,

11  Trial 2 and the Retention trial.  And I believe she got perfect

12  scores on both of those, suggesting that she -- if those are

13  taken to mean what the Test of Memory Malingering normally

14  means, it suggests that she was not exaggerating or feigning

15  any memory problems.

16  Q.   So in this case, does that explain away the discrepancy

17  between the diagnostic tests and the real world performance

18  that you referred to?

19  A.   No, it would have nothing to do with that.  In this case,

20  especially by the time that Ms. Ramsay saw Dr. Smith, as she

21  testified to earlier today, she needed evidence of slow

22  reading.  She obtained evidence of slow reading.  The Test of

23  Memory Malingering never would have picked up on slow reading,

24  whether it was genuine, exaggerating, feigned, credible,

25  non-credible.

1   Q.   Focusing now, or switching to ADHD, Dr. Smith administered

2   or utilized assessments relating to attention; is that correct?

3   A.   Yes.

4   Q.   What are the adult ADHD rating scales?  And you know what?

5   Let's look at Defendant's Exhibit -- let's look at Defendant's

6   Exhibit 76.

7   A.   Okay.  76.  I'm there.

8   Q.   Oh, 46, 46.  My apologies, all.

9   A.   Okay.  I'm at 46.

10  Q.   You still beat me there.

11       So are these the adult ADHD rating scales with adult

12  prompts?

13  A.   Yes.

14  Q.   And so just briefly explain, what are these rating scales

15  used for?

16  A.   So these are used as part of a diagnostic assessment for

17  ADHD.  So I had mentioned earlier that there are 18 official

18  symptoms of ADHD in the DSM.  And you see those listed here.

19       And in addition, you see more specific prompts, questions

20  that can be asked that are more adult specific.  So the ADHD

21  criteria were originally developed long ago for children.  It

22  was thought of as a childhood disorder.  We know that certainly

23  there are cases where it continues to adulthood.  It still has

24  to have childhood onset, but it has to -- but it can continue

25  to adulthood.  And so there have been criteria for -- or I

LOVETT - DIRECT

1   should say there have been assessment measures developed that

2   have more adult-specific examples of DSM symptoms.

3   Q.   If you look at pages 60 and 61 of Exhibit 46, it looks

4   like these are Ms. Ramsay's scores that she applied on this

5   rating scale.

6        What do these ratings convey in terms of her symptoms and

7   the level of severity?

8   A.   It appears that when Ms. Ramsay rated each of her 18

9   symptoms in a sort of overall way, she reported that 17 of them

10  were experienced to a severe degree and one of them was

11  reported as being present to a mild degree.

12  Q.   What type of day-to-day behavior would you expect to see

13  from someone who is endorsing this number and level of severity

14  of symptoms of ADHD?

15  A.   Well, some of that is contained in the individual prompt,

16  so there are times when Ms. Ramsay reports having severe

17  problems with, for instance, forgetting things.  There are

18  other times when we would just expect to see general pretty

19  significant life impairment.  To have a diagnosis of ADHD, you

20  only actually have to have five symptoms under the current

21  criteria if you're 17 or older.  And so reporting 17 out of the

22  18 symptoms as being present to a severe degree, we would

23  expect someone to be grossly impaired.  We would expect someone

24  to not be able to function in school or work settings.  We

25  would expect someone to have deficits that I would expect to be

LOVETT - DIRECT

1    visible in terms of everyday behavior in life, to have that

2    many more symptoms than are needed for a diagnosis.

3    Q.   In your opinion, are Ms. Ramsay's reports as to the level

4    and degree of her symptoms credible based on the other records

5    that you see?

6    A.   At the very least, I would say they're not adequately

7    supported by objective evidence.

8    Q.   What is the Integrated Visual and Auditory Continuous

9    Performance Test?

10   A.   That's a computerized test that's often given as part of

11   ADHD evaluations, where someone has to press keys at certain

12   times during the task and then withhold pressing during other

13   times.  So it's supposed to look at both attention as well as

14   self-control.

15   Q.   And is this another test that Dr. Smith administered?

16   A.   He did.

17   Q.   How did Ms. Ramsay perform on this test?

18   A.   Just to be precise, I'd have to go back to --

19   Q.   Please do.  I'm sorry.

20   A.   Let's see.  So I'm back in Dr. Smith's report.

21        Okay.  Dr. Smith actually administered the test that you

22   mentioned twice, it's listed.  And there were a number of very

23   low scores both times.

24   Q.   And if you wait just a minute, Dr. Lovett.

25        THE COURT:  What page?

LOVETT - DIRECT

1           MS. MEW:  Page 12, page 11, beginning on page 11.

2           THE WITNESS:  This is page 11 to 14 of the report

3    where it says page X of 31.

4           MS. MEW:  Just hold on for one minute.

5           THE WITNESS:  Sure.

6           MS. MEW:  So this is Exhibit 3B.

7           MR. BERGER:  Okay.  Thank you.

8    BY MS. MEW:

9    Q.   So if you could continue.

10          How did Ms. Ramsay perform on this?

11   A.   Well, the tests that we're describing, it's known as the

12   IVA, or I-V-A, for short.  It generates many scores.  Dozens of

13   scores, actually.  But the overall scores are the ones that I

14   think -- total scores or composites are the ones that are, in

15   some sense, most important, or easily interpretable.  Ms.

16   Ramsay's performance was far below the average range at the 1st

17   percentile.  It appears that, again, if these scores were taken

18   at face value, her attention skills and her self-control skills

19   would be very, very poor, in the bottom 1 percent of the

20   population.

21   Q.   Do you consider these scores to be credible?

22   A.   I don't consider them to be adequately supported.

23   Q.   Dr. Lovett, is it appropriate to diagnose a learning

24   disability or ADHD based solely on scores of diagnostic,

25   in-office assessments, diagnostic assessments?

LOVETT - DIRECT

1  A.   No.  It's in the criteria for both types of disorders.  If

2  you look at the DSM criteria for both learning disabilities and

3  ADHD, you see reference to things in real world settings,

4  educational and occupational functioning, in the case of

5  learning disabilities, academic, social and occupational

6  situations for ADHD.  So you see reference to things outside of

7  the diagnostic context.

8  Q.   Do you remember, from your review of Dr. Smith's report,

9  whether he had any, what you've discussed as real world

10  evidence that he considered as part of his report?

11  A.   Yes.  I remember at the very least there were report

12  cards, selected report cards that at least he had listed as

13  reviewing.  And there may be more.  I can go to the listing of

14  things.

15  Q.   Okay.  So we're back to Exhibit 3B on the first page,

16  first and second page.

17  A.   So the records that he describes as having reviewed

18  include an MCAT score report, the ACT score report.  So those

19  two, obviously, very important, real world standardized tests,

20  taken without accommodations.  He reports the report cards that

21  I had mentioned earlier, a high school transcript, an

22  undergraduate college transcript, as well as the Step 1 score

23  report.

24  Q.   And how did Dr. Smith treat this real world evidence in

25  his analysis?

LOVETT - DIRECT

1   A.   At one point in the report, I believe he described the

2   report cards and the real world records, something like that,

3   as not clearly showing impairment or not clearly showing

4   problems academically.  Let me see.  It may have been in the

5   summary.

6        Perhaps it's in the background history.

7   Q.   And that's fine.  I don't think you need to look for a

8   direct quote if that's your...

9   A.   Yeah.  I remember at one point there was an admission that

10  there wasn't clear evidence from the report cards of problems.

11  And with regard to some of the other evidence that I mentioned,

12  the MCAT as well as -- well, for the MCAT at the very least,

13  there's a description on page 7 of the report about reading

14  strategy involving not reading any of the passages until you

15  first answer the questions that you could without reading the

16  passage, something we've heard about a number of times already.

17       So the evidence from the real world was discussed.  I

18  don't believe it was interpreted correctly, but it was

19  reviewed.

20  Q.   If you look on page 29 of the report, the first full

21  paragraph, is that what you were looking for?

22  A.   Yes, that's actually the exact passage I was thinking of.

23  In the first full paragraph, the only full paragraph on that

24  page, the available school records do not clearly reflect

25  academic struggles in elementary, middle or high school.  And

LOVETT - DIRECT

1    then Dr. Smith provides what he feels is a sort of explaining

2    away of that.  This is the result of the family obtaining help,

3    et cetera, which we've heard already in the hearing.

4    Q.   In the records that you reviewed relating for Ms. Ramsay's

5    school records that we've discussed in this hearing, did you

6    see any indication in those records that she had received

7    informal accommodations?

8    A.   I did not.  Even when there were places on the report

9    cards where there were spots for the teacher to indicate that

10   specifically, any sort of unusual or additional or atypical

11   support or help.  So no, absolutely not.

12   Q.   Dr. Lovett, are you familiar with the ACT exam?

13   A.   Generally, yes.

14   Q.   Can you generally describe its content?

15   A.   It's a test that's used for college admission.  It has

16   different sections that yield scores in a variety of areas.

17   And the overall scores include English, math, science and

18   reading.

19   Q.   Is the ACT a test used for diagnosing learning

20   disabilities?

21   A.   It's not a test that was designed to diagnose learning

22   disabilities through a clinical evaluation, but it can provide

23   very helpful evidence, because, remember, the learning

24   disability criteria involve real world functioning.  So it can

25   provide evidence that's certainly relevant to making a

LOVETT - DIRECT

1   diagnosis.  And if someone has a learning disability, we would

2   expect it to be reflected on that test, so long as it's taken

3   without accommodations.

4       I should also mention the ACT has a writing portion, I

5   don't think I mentioned that earlier, as part of the scores.

6   Q.   Well, we can turn to -- why don't you turn to Defendant's

7   Exhibits 30 and 31, so you have the scores.

8   A.   Okay.  I'm there.

9   Q.   Do you know how many individuals take the ACT exam each

10  year?

11  A.   I understand that it's been somewhere between a million

12  and 2 million and may have surpassed 2 million recently.

13  Q.   And how does the cohort of individuals who take the ACT

14  compare to the general population?

15  A.   In a rough way, I would describe it as reflecting the

16  general population at that age and grade level.

17  Q.   How did Ms. Ramsay perform on the ACT?

18  A.   So the -- when she took it in March of 2007, her overall

19  score was at the 90th percentile, so in the top 10 percent of

20  that cohort that we described.  And her reading score, in

21  particular, the overall reading score was at the 87th

22  percentile, so in the top 13 percent of that --

23  Q.   And you're looking at Exhibit 30?

24  A.   I am.  So that was the March 2007 administration of the

25  ACT.

1    And then she took it again in October of 2007.  Her

2    overall score was at the 97th percentile, so in the top

3    3 percent of individuals in that cohort.  And then the reading

4    score in particular was at the 91st percentile, so in the top

5    9 percent of the individuals in the population there.

6    Q.   And you're looking now at Defendant's Exhibit 31?

7    A.   Yes.

8    Q.   Would Ms. Ramsay's performance to perform at this level on

9    the ACT exam, would Ms. Ramsay need to read with fluency?

10   A.   I believe so, yes.

11   Q.   Would she need to read with automaticity?

12   A.   Some degree of it, yes, absolutely.

13   Q.   What does Ms. Ramsay's performance on the ACT tell us with

14   respect to her alleged learning disabilities, ADHD?

15   A.   It's among many pieces of evidence that really undermine

16   those diagnoses.  To have a learning disability and to be

17   performing in the top 3 percent on a college admissions test

18   that is a reading-based test, with some writing, to --

19        MR. BERGER:  Your Honor, I'm going to object at this

20   point because of lack of foundation, because all that Dr.

21   Lovett has said is that he's generally familiar with the ACT.

22   We don't know if he's familiar with the ACT as it was

23   administered when Ms. Ramsay was taking it.  We don't know the

24   extent of his familiarity.  We don't know --

25        THE COURT:  If that's a form of an objection,

LOVETT - DIRECT

1   overruled.

2         MR. BERGER:  Yes, sir.

3         THE COURT:  You'll have an opportunity to

4   cross-examine the witness.

5         You may continue, sir.

6   BY MS. MEW:

7   Q.   What does Ms. Ramsay's performance on the ACT tell us with

8   respect to whether she's substantially limited in any major

9   life activity relevant to taking standardized tests?

10  A.   Well, with regard to the tests that she -- it suggests

11  that she is generally not substantially limited in that regard.

12        Considering the Step 1 exam, which she's applied for

13  accommodations on, one skill that's needed when you're taking

14  that test is reading comprehension skills under timed

15  conditions.  And those were measured in the ACT and found to be

16  not only adequate but well above average.

17  Q.   Let's turn now to Defendant's Exhibit 32, which is Ms.

18  Ramsay's MCAT score report.

19        Are you familiar with the Medical College Admission Test?

20  A.   Again, generally.  I have seen sample items that have been

21  disclosed by the Association for American Medical Colleges, the

22  group that administers the test.  I'm familiar with the

23  different sections and what the formats of the items are like.

24  Q.   Can you very briefly describe its consent?

25  A.   Yeah.  So the MCAT has changed over time.  The version

LOVETT - DIRECT

1   that Ms. Ramsay took yielded scores in four areas, physical

2   sciences, verbal reasoning, biological sciences and then a

3   writing sample.  So the physical sciences, verbal reasoning and

4   biological sciences involve multiple choice questions.  And of

5   those three sections that are multiple choice based, the

6   physical sciences and biological sciences are what I would call

7   content intensive, content heavy, in the sense that they are

8   relying on specific premedical knowledge that you're supposed

9   to have.  You're applying to get into medical school.

10       The verbal reasoning portion I would not describe as

11  content heavy in that sense.  You're not expected to be

12  familiar with a lot of specific background content for the

13  different passages.  Instead, you're supposed to be able to

14  read, comprehend and analyze them under the timed conditions

15  under the standard administration conditions of the test.

16  Q.  Is the MCAT a test that can be used to -- as a diagnostic

17  test for learning disabilities?

18  A.  Again, I wouldn't call it a diagnostic test.  It wasn't

19  designed for the purpose of diagnosis of learning disabilities,

20  but it's absolutely a test where we would expect learning

21  disabilities to be reflected.  It certainly is a part of the

22  information that should be considered during a diagnostic

23  assessment of learning disabilities.

24  Q.  How does the cohort who takes the MCAT compare to the

25  general population?

LOVETT - DIRECT

1  A.   Well, if you're taking the MCAT, you're typically applying

2  to medical school.  And so if you're a medical school

3  applicant, you may be a junior or senior in college.  You may

4  have graduated from college.  We would expect individuals who

5  are taking the MCAT to be above average compared to the general

6  population in terms of their academic skills.

7  Q.   And how did Ms. Ramsay's performance compare to this above

8  average cohort?

9  A.   Her overall score on the MCAT was at the 79th percentile.

10  So better than 79 percent of that select group to begin with.

11       Her verbal reasoning score, which, again, is the one that

12  really represents that timed reading comprehension, that was at

13  the 67th percentile.  So her performance was better than

14  two-thirds of that select group when it comes to timed reading

15  comprehension.

16  Q.   Does performance at this level on the MCAT require reading

17  with fluency?

18  A.   I believe it does.

19  Q.   And does performance at this level of the MCAT require

20  reading with automaticity?

21  A.   I do believe so, some degree of automaticity.

22  Q.   What does Ms. Ramsay's performance on the MCAT tell us

23  with respect to her diagnosis of learning disabilities and

24  ADHD?

25  A.   Certainly with regard to the learning disability diagnoses

1  that she's applied for accommodations under reading and

2  writing, it severely undermines those diagnoses.  She performed

3  in the average range on the writing sample and she performed

4  above -- well, she performed in the average range again on

5  verbal reasoning, compared to that highly select group.

6  Q.   What does Ms. Ramsay's performance on the MCAT tell us

7  with respect to whether she is substantially limited in any

8  major life activity relevant to taking a standardized test?

9       MR. BERGER:   Objection to legal conclusion.

10       THE COURT:   Overruled.

11       THE WITNESS:   It suggests that she does not have those

12  limitations with regard to tests that are similar in format in

13  terms of what you have to do on the MCAT, at least.  You know,

14  a reading-based test where you're responding to multiple choice

15  questions.

16  BY MS. MEW:

17  Q.   Just shifting gears a bit.

18       We've alluded to this before, but in the course of this

19  litigation, have you reviewed additional school and

20  standardized test records for Ms. Ramsay?

21  A.   Again, yes.

22  Q.   And you were here for the testimony yesterday, so you were

23  following along and I don't need to go through --

24  A.   I was.  Some of those I had seen and others I had not.

25  Q.   In Ms. Ramsay's case, did the results of the diagnostic

LOVETT - DIRECT

1  testing conducted by Dr. Smith, with respect to where the

2  scores were exceptionally low, match with what you've seen and

3  heard about in her school and other standardized test history?

4  A.  They directly and thoroughly contradict each other.

5  Q.  In your opinion, does Ms. Ramsay meet the diagnostic

6  criteria for any specific learning disability?

7  A.  No, I don't believe so.

8  Q.  In your opinion, does Ms. Ramsay meet the diagnostic

9  criteria for ADHD?

10  A.  I don't believe there is sufficient evidence to conclude

11  that ADHD is present.  And there also is some evidence that

12  suggests the opposite, that it is not.

13  Q.  In your opinion, again based on the materials you've

14  reviewed, is Ms. Ramsay substantially limited in any major life

15  activity relevant to taking the USMLE?

16  A.  At least with regard to the learning disabilities and

17  ADHD, again, I could not find sufficient evidence that she is.

18  Q.  Or that she requires extra time on the USMLE?

19  A.  Exactly, yes.  That I cannot find -- that I wasn't able to

20  find sufficient evidence, certainly, of a need for additional

21  time.

22  Q.  Dr. Lovett, I think you testified at the start of your

23  testimony that when you make recommendations to NBME, sometimes

24  you recommend denying, sometimes you recommend granting,

25  sometimes you make no recommendation at all.  Is this a close

LOVETT - DIRECT

1    case, is this a borderline case between yes or no?

2    A.   Even based on the initial documentation, I would say no,

3    it's not a close case.  So given that even when I first

4    reviewed the case, there were multiple pieces of clear real

5    world evidence of adequate or above average performance on

6    timed measures of reading comprehension, from the real world, I

7    would say no.  And since I have seen some additional documents

8    and even, honestly, having sat here for this hearing, I've

9    heard even more that really undermines both the diagnoses, as

10   well as the accommodation needs, relative to the standard that

11   we use.

12              MS. MEW:  Thank you, Dr. Lovett.

13              THE COURT:  Very well.  Cross-examination.

14              MR. BERGER:  Your Honor, it's 12:30 --

15              THE COURT:  I'm aware of the time.

16              Are you ready to proceed, Counsel?

17              MR. BERGER:  Do you want me to --

18              THE COURT:  Yes.  I said before we resumed that we

19   would be taking lunch at a quarter of 1:00.

20              MR. BERGER:  Okay.

21              THE COURT:  And we'll be in lunch until 1:30.

22              MR. BERGER:  Right.

23              THE COURT:  I want to use this time as much as I can.

24              MR. BERGER:  Yes.

25              THE COURT:  So I don't have to spend your time and my

LOVETT - CROSS

1  time any longer than necessary.

2          MR. BERGER:  Absolutely.

3          THE COURT:  All right?

4          MR. BERGER:  I apologize, I missed that.

5          THE COURT:  No problem.  I'm just trying to make sure

6  it's clear.

7                     CROSS-EXAMINATION

8  BY MR. BERGER:

9  Q.  Dr. Lovett, good afternoon.

10  A.  Good afternoon.

11  Q.  You recall that several weeks ago I took your deposition.

12  Correct?

13  A.  Yes.

14  Q.  And I asked you at that time several questions about the

15  tests that Dr. Smith administered to Ms. Ramsay and the results

16  that he got.

17      And I may want to refer to some of those, again,

18  specifically, but generally, I asked you, for example, with

19  respect to the WIAT-III, which you discussed in your testimony,

20  whether you had any doubt that Dr. Smith had actually

21  administered that test.  And let me ask you that question now.

22      Do you have any doubt that he administered the portions of

23  the WIAT-III that he described in his report?

24  A.  I have no reason to doubt that, no.

25  Q.  And do you have any doubt that he -- that the results of

LOVETT - CROSS

1  his administration of that test were as he reported?

2  A.   No.  I haven't rescored them, but I have no reason to

3  doubt that the scores, you know, were calculated correctly in

4  the sense that Ms. Ramsay obtained those scores on those tests.

5  Q.   And I asked you also I believe with respect to the

6  WIAT-III whether you would agree that that was an appropriate

7  test to administer in a case where there was consideration of a

8  dyslexia diagnosis.

9  A.   Yeah.

10  Q.   And what's your answer to that?

11  A.   I believe it was what I'm going to say it is now as well,

12  which is that it can certainly contribute useful information

13  towards that diagnosis.  Like any piece of evidence, it has to

14  be interpreted correctly, but to give that during a diagnostic

15  battery would not be inappropriate.

16  Q.   And that's generally consistent with your testimony so far

17  today.  Correct?

18  A.   I hope so.

19  Q.   And the same -- let me just quickly review the same set of

20  questions with respect to the Woodcock-Johnson IV.

21       Do you have any doubt that Dr. Smith administered those

22  portions of the Woodcock-Johnson IV that he described?

23  A.   No.

24  Q.   And do you have any doubt that the results from his

25  administration were what he reported?

LOVETT - CROSS

1  A.   I have no reason to doubt that the scores were

2  miscalculated.

3  Q.   And again, is that a test that is appropriate for a

4  situation where a diagnosis of dyslexia is being considered?

5  A.   As I had said in the deposition and as I had said with

6  regard to other tests that were described, it can certainly

7  contribute useful evidence when one is assessing the presence

8  of learning disabilities if it's properly interpreted.

9  Q.   All right.  And the same question then with respect -- or

10 series of questions with respect to the Gray Oral Reading Test,

11 or GORT.

12      Do you have any doubt that he administered the GORT as he

13 described?

14 A.   No.

15 Q.   And do you have any doubt that he -- that the results were

16 what he reported?

17 A.   Again, I have no reason to doubt it.  I haven't rescored

18 it, but I have no reason to doubt that those scores were

19 correctly calculated.

20 Q.   And is the GORT an appropriate test to administer in a

21 case where a diagnosis of dyslexia is being considered?

22 A.   As with the others, it can contribute useful information

23 if it's interpreted properly.

24 Q.   Now, I don't believe that in the deposition I asked the

25 same question with respect to the IVA or IVA+Plus.  That test,

1    as I understand it, is one that relates to the diagnosis of

2    ADHD; is that correct?

3    A.   Yes.

4    Q.   And do you have any reason to doubt that Dr. Smith

5    administered that test as he described in the report?

6    A.   No.

7    Q.   And do you have any reason to doubt that he achieved the

8    results that he reported?

9    A.   No.

10   Q.   And is that an appropriate test to consider when

11   considering a diagnosis in an adult like Ms. Ramsay of ADHD?

12   A.   Although it's not a primary source of evidence, I don't

13   think it's inappropriate to include that in a battery for ADHD.

14   Q.   Do you recall from Dr. Smith's report whether Ms. Ramsay

15   took her ADHD medication on the day that he tested her, that

16   Dr. Smith tested her?

17   A.   If I recall correctly, she did not take her ADHD

18   medication on that day.  I would have to check the report, but

19   I recall that --

20   Q.   Yes, I think you're recalling correctly.  I think that's

21   what the test said -- what the report says.

22        Is that an appropriate procedure when you are testing

23   someone for ADHD?

24   A.   There are debates about that.  There's no consensus among

25   clinicians in my experience, so there are reasons why you might

LOVETT - CROSS

1    want to have someone on medication, there are reasons why you

2    might want to have them off medication.  I don't think it was

3    inappropriate to ask Ms. Ramsay not to take medication or to

4    test her off medication.

5    Q.    Do you know, and this is kind of a legal question, so I

6    will apologize in advance, but I think certainly you have some

7    familiarity with the ADA.

8          Do you know what the ADA provides as to whether mitigating

9    measures like medication should be considered in determining

10   whether somebody has a disability?

11   A.    My understanding is that it differs with regard to the

12   issue of disability versus accommodation needs.  And for the

13   purposes of disability, I understand the current version of the

14   ADA as amended to indicate that determination of disability, as

15   opposed to accommodation needs, should be made without

16   reference to mitigating factors, with the exception of

17   eyeglasses, I believe.  Accommodation needs being another

18   matter.

19   Q.    So when Dr. Smith tested Ms. Ramsay based on what he has

20   reported, she was not, on that day, getting whatever benefit

21   she gets from the ADHD medication that's been prescribed for

22   her; is that correct?

23   A.    I'm sorry, could you repeat that question?

24   Q.    Let me try and restate it.

25         On the day when Dr. Smith tested her and based on what he

LOVETT - CROSS

 1  said in his report, on that day she did not have the ADHD

 2  medication, so that mitigating measure was not in play when he

 3  tested her?

 4  A.   Correct.

 5  Q.   All right.  You mentioned with respect to ADHD that one of

 6  the criteria is the presence of symptoms prior to the age of

 7  12.

 8       Is that generally correct?

 9  A.   Yes.

10  Q.   Is it also true that ADHD can be diagnosed for the first

11  time when somebody is an adult?

12  A.   It can certainly be diagnosed for the first time when

13  there's evidence of the symptom prior to age 12.

14  Q.   And the DSM-5 specifically says that it can be diagnosed

15  in an adult?

16  A.   I know that there are -- I mean, I would have to check the

17  DSM, but I certainly, you know, know that the DSM-5

18  acknowledges adult ADHD-related issues.  I don't think there's

19  any problem diagnosing it in an adult.  It can even be

20  diagnosed, as I say, for the first time in an adult, but,

21  again, it has to show symptoms much earlier on.

22  Q.   The group of people who apply for accommodations for USMLE

23  Step 1 are not a group of people that is the same as the

24  general population, would you agree with me?

25  A.   I would certainly -- I would not expect them to be.

LOVETT - CROSS

1   Q.   They are all people who have been accepted to a medical

2   school.  Correct?

3   A.   I believe so.

4   Q.   And they're all people -- and it varies from one school to

5   another, but they are all people who have completed either

6   generally two years or three years of medical school.  Correct?

7   A.   I would have to check the exact requirements for taking

8   the Step 1 exam, but as a general rule, they are, at the very

9   least I believe enrolled in medical school.  As you say, it

10  would vary from school to school, but as a whole, yes.

11  Q.   Okay.  And my -- last question before we break.

12       On your direct testimony, you discussed the fact that in

13  cases that NBME sends you for review, that in some cases you do

14  recommend that an accommodation be granted, and in some cases

15  you recommend against that.

16       What would you estimate is the percentage of cases in

17  which you recommend that an accommodation be granted?

18  A.   I don't keep track of that.  I couldn't estimate that.

19  And as I say, in some cases I don't even make a recommendation,

20  I might just summarize things.  I also review for other testing

21  agencies and so it's hard to think about what was NBME versus

22  other things.

23  Q.   Okay.  One other -- one other question.

24       What other testing agencies do you currently review for?

25  A.   I review regularly for the National Board of Osteopathic

LOVETT - CROSS

1   Medical Examiners, the New York State Board of Law Examiners,

2   for the New York Bar Exam and the Law School Admissions

3   Council, for the LSAT.  Those I would say are the regular

4   agencies.  Occasionally I also will review by special request

5   for an agency that has a particular issue and have reviewed for

6   others in the past.

7            MR. BERGER:  Your Honor, I think this is a good time.

8            THE COURT:  Very good.  We shall be in recess till

9   1:30.  And enjoy your lunch today.

10            And sir, I will advise you you're under

11   cross-examination now and you cannot consult with counsel in

12   reference to your testimony.  You can talk to them about

13   anything, lunch or the game last night or whatever or this

14   weekend, but not about your testimony because you're under

15   cross-examination.

16            THE WITNESS:  Thank you.

17            THE COURT:  We'll be in recess.

18            (Luncheon recess at 12:46 p.m. until 1:31 p.m.)

19            THE COURT:  You may be seated.

20            You can resume the witness stand, sir.

21            THE WITNESS:  Thank you.

22            THE COURT:  And I'll remind you, you are still under

23   oath from previously being sworn in this afternoon.

24            THE WITNESS:  I understand.

25            THE COURT:  You may proceed, Counsel.

LOVETT - CROSS

1  BY MR. BERGER:

2  Q.   In teaching students who are training to become

3  psychologists, who are studying to become psychologists, do you

4  teach courses about assessment or have you taught courses about

5  assessment?

6  A.   I will be starting the graduate courses for school

7  psychologists in the spring.  I've certainly taught courses for

8  undergraduates on assessment, and some of them are in education

9  or other fields where they are administering achievement

10  measures, things like that.

11  Q.   Would you teach your students that they should administer

12  a test like the ACT in order to help them in reaching a

13  diagnosis?

14  A.   I would definitely tell them they need to review someone's

15  ACT scores when making a diagnosis.  The ACT is not a test

16  that's given in a one-to-one format from a clinical evaluator,

17  so it's information that would need to be reviewed on making a

18  diagnosis, and I certainly have taught that.

19  Q.   And I assume that the same would be true for the MCAT?

20  A.   Exactly.

21  Q.   Do you believe based on your knowledge of ADHD that

22  someone with ADHD can be successful in school?

23  A.   With intervention and accommodation, I certainly think

24  that's possible, and I've seen it happen.

25  Q.   And do you believe, again, based on your knowledge and

LOVETT - CROSS

1  experience, that someone with dyslexia can be successful in

2  school?

3  A.  Dyslexia is a little tougher, because if the intervention

4  is effective, there's a question of whether or not the person

5  really still has dyslexia or a learning disability in reading

6  or anything like that.  But I would say that with

7  accommodations and interventions, I've seen students who at

8  least at some point have had a diagnosis of dyslexia, or a

9  profile of scores that may indicate a learning disability in

10  reading, be successful in school with appropriate measures.

11  That really depends on the exact data for that individual.

12  Q.  Well, in the case of a person with dyslexia, would a

13  possible accommodation be to allow that person additional time

14  to read whatever had to be read?

15  A.  It really would depend on the person's profile.  I can see

16  that being one of the things, but for a child who has dyslexia,

17  at least as it's generally understood as a learning disability

18  in reading, the term "dyslexia" is used somewhat more flexibly,

19  so it's a little harder to speak about dyslexia.  But if we're

20  talking about what qualifies as a learning disability in

21  reading, at least under the DSM, extended time would not be the

22  first thing that would come to mind.  If someone has trouble,

23  especially as a child with a learning disability in reading,

24  then I would expect that they would actually need a more

25  intensive accommodation, like a reader or something like that,

LOVETT - CROSS

1  on tests.  But extended time could be part of a package of

2  accommodations that are given to a student with dyslexia.

3  Q.  All right.  So Ms. Ramsay -- and you were present during

4  Ms. Ramsay's testimony.  Correct?  And she testified that she

5  has, in some situations, been able to use the Kurzweil program.

6      Are you familiar with that?

7  A.  Generally, yes, uh-huh.

8  Q.  All right.  So if someone who had dyslexia was permitted

9  to use a Kurzweil -- the Kurzweil program, would that person

10  still be a person with dyslexia?

11  A.  Well, first of all, since you're referring to Ms. Ramsay's

12  testimony, I don't recall a period of time during which she

13  reported having had access to Kurzweil or having used it.

14      Putting that aside, an individual who has a learning

15  disability in reading or some sort of reading problems, could

16  certainly be assisted by the Kurzweil technology.

17  Q.  Do you believe that people with ADHD can be successful in

18  work or in their careers?

19  A.  Again, if someone has appropriate intervention, then they

20  certainly may be able to.

21  Q.  And do you believe that somebody with dyslexia can be

22  successful in work or in a career?

23  A.  Well, again, there, if the intervention is successful, I

24  don't know if I would use the term "dyslexia" or a learning

25  disability in reading to describe them anymore.  Those sorts of